INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

# Exhibit 6

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM

NYSCEF DOC. NO. 7

Studio Legale Associato
www.slcg.it

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

SLCG

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
AMERICAN ARBITRATION ASSOCIATION
Case No. 01-18-0002-9174

**GE Oil & Gas, LLC**
**Pressure Control Systems Nigeria Limited**
**(As Successor to GE International Operations (Nigeria) Ltd.)**
**Baker Hughes, a GE Company**
**Baker Hughes, a GE Company, LLC**

Respondents

v.

**International Engineering & Construction S.A.**
**Greenville Oil & Gas Co. Ltd.**

Claimants

---

### STATEMENT OF DEFENSE TO CLAIM
### AND REPLY ON COUNTERCLAIMS

---

Before:
David Arias
Stefano Azzali
Paul F. Saba, Esq.

September 2, 2019

Counsel for Respondents
Michael McIlwrath
Teresa Garcia-Reyes
Baker Hughes, a GE company

SLCG – Studio Legale Associato
Piazza Indipendenza, 28
50129 Florence, Italy

**GE OIL & GAS, LLC**
**PRESSURE CONTROL SYSTEMS NIGERIA LIMITED**
**(AS SUCCESSOR TO GE INTERNATIONAL OPERATIONS (NIGERIA) LTD.)**
**BAKER HUGHES, A GE COMPANY**
**BAKER HUGHES, A GE COMPANY, LLC**

V.

**INTERNATIONAL ENGINEERING & CONSTRUCTION S.A.**
**GREENVILLE OIL & GAS CO. LTD.**

**STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS**

**TABLE OF CONTENTS**

I.    WHAT THIS STATEMENT IS ABOUT ................................................................1

II.   THE PLOT AGAINST IEC AND THE EPC "MANTRA" ...............................4

   A. THE LNG TRAINS ARE NOT STANDARD EQUIPMENT ...............................4

   B. FIRST EPISODE: THE "FRAUDULENT" CHANGE OF TEMPERATURE OF THE FIRST PASS OF THE COLD BOX ...............................................................................7

   C. SECOND EPISODE: THE NEVER CHANGING GAS COMPOSITION THAT CHANGED SEVERAL TIMES..10

   D. END OF THE SAGA: THE SMALL STEP FOR AN EPC THAT BECAME A GIANT LEAP FOR IEC ..........12

III.  THE END OF THE LITANY: STATUS OF COMPLETION OF THE PLANT .............................14

   A. GEOG'S ALLEGED DEFECTS .........................................................................14

   B. THE CURRENT STATUS OF THE RUMUJI PLANT ..........................................20

IV.   GREENVILLE IS NOT ENTITLED TO ASSERT CLAIMS IN THIS ARBITRATION.................24

   A. THE CORPORATE AND CONTRACTUAL RELATIONSHIP BETWEEN IEC AND GREENVILLE................27

   B. GREENVILLE IS NEITHER A PARTY NOR AN INTENDED THIRD-PARTY BENEFICIARY TO ANY OF THE CONTRACTS BETWEEN IEC AND THE GEOG ENTITIES.................................................30

   C. GREENVILLE PROVIDES NO OTHER BASIS ON WHICH TO ASSERT CLAIMS AGAINST THE GEOG ENTITIES IN THIS ARBITRATION ..........................................33

V.    LACK OF JURISDICTION ON THE BHGE ENTITIES ..........................................35

   A. BHGE LLC IS THE PARENT – NOT THE SUCCESSOR IN INTEREST – TO GEOG................37

   B. THE BHGE ENTITIES ARE NOT THE ALTER EGOS OF GEOG .............................39

   C. ON THE THEORY OF ESTOPPEL ...................................................................41

VI.   RESPONSE TO THE CLAIMS ...........................................................................42

   A. THE CONTRACTUAL REMEDIES ..................................................................43

   B. THE CLAIMANTS' POST-CONTRACT FRAUDULENT MISREPRESENTATION CLAIM FAILS AS A MATTER OF LAW ....................................................................46

   C. THE GEOG ENTITIES DID NOT ENGAGE IN WILLFUL MISCONDUCT OR GROSS NEGLIGENCE .........47

   D. THE CLAIMANTS FAIL TO DEMONSTRATE THAT GEOG FRAUDULENTLY INDUCED IEC TO ENTER INTO THE CONTRACTS....................................................................50

      i.   The GEOG Entities Did Not Misrepresent Their Ability or Intention to Deliver on the Contracts50

      ii.  IEC Fails to Demonstrate Justifiable Reliance Where the GEOG Entities Provided Full Transparency with Respect to their Technical Capabilities ...................................................53

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM

NYSCEF DOC. NO. 7

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

SLCG

ICDR/AAA Case No. 01-18-0002-9174 – Statement of Defense to Claim and Reply on Counterclaims
Page 2

iii.   IEC's Fraudulent Inducement is Duplicative of its Breach of Contract Claim ................................ 55

E.   The Claimants Cannot Claim Damages for Lost Profits That Are Merely Speculative 55

F.   The Claimants Have Not Proven Any Direct Damages ........................................................ 58

VII.  THE COUNTERCLAIMS .............................................................................................................. 59

A.   Payments Due under the Contracts ............................................................................... 61

i.   Mechanical Completion of the Trains ................................................................ 61

ii.   Taking Over of the Trains ................................................................................... 64

iii.   Spare Parts under the Equipment Contract ......................................................... 64

iv.   Payment for the Services Contract ....................................................................... 64

B.   Additional Work under the Contracts ........................................................................... 65

i.   Compliance with Clause 24 is not a condition precedent .................................. 67

ii.   Waiver / Estoppel ............................................................................................... 72

iii.   Unjust Enrichment / Quasi Contract .................................................................. 73

iv.   Alternative Damages Resulting from IEC'S Breach of the Contracts .............................. 74

v.   GEOG's Warranty Limitations ............................................................................ 75

C.   Costs Incurred in New York Action to Compel Arbitration .................................................. 76

VIII.   THE RESPONDENTS' REQUEST FOR RELIEF .................................................................. 77

List of Acronyms and Abbreviations .......................................................................................... 79

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM

NYSCEF DOC. NO. 7

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

SLCG

ICDR/AAA Case No. 01-18-0002-9174 – Statement of Defense to Claim and Reply on Counterclaims
Page 1

## I.    WHAT THIS STATEMENT IS ABOUT

1.   In short, the Claimants' Statement of Claim and Defense to Counterclaim of March 15, 2019 ("**Statement of Claim**")[1] is the story of a - badly organized - conspiracy.

2.   The narrative of the Statement of Claim is heavy, due to a massive and mostly unnecessary description of technical issues encountered during the execution of the Contracts, the majority of which were resolved years before this arbitration began.  We cannot deny, however, that certain portions of the reading are compelling, because some of the typical elements of a John Grisham drama are well developed and instinctively attractive.  Indeed, here we have:

   i.    On one side, the evil multinational company (GEOG), whose only desire is to make profits by inducing customers to buy equipment that it knows it cannot manufacture, and

   ii.   On the other side, the small family-owned enterprise, envisioned from an enlightened idea of a self-made man, who puts his lifetime savings at risk and naively relies on the promises of the deceitful manufacturer.

3.   Unfortunately, the writer soon became too emotional and, after the first few pages, the story loses credibility.  So, for example:

   i.    The multinational corporation GEOG becomes an empty box, such that only the involvement of (two) parent companies could actually satisfy the requests of the Claimants;

   ii.   GEOG, who "*knew*" it could not produce the equipment sold to IEC, is the same GEOG that manufactured the "*Shell Reference Plant that…was fully modularized and was assembled…in four months*";[2]

   iii.  The Claimants themselves, transform from the small unexperienced enterprise into two entities of a large group, providing finance, technical consultancy, procurement, marketing and trade services in the LNG field.[3]

---

[1]   All capitalized terms in this Statement of Defense to Claim and Reply on Counterclaims (the "**Statement of Defense**") shall have the meanings defined in the Statement of Counterclaim dated January 18, 2019 (the "**Statement of Counterclaim**").

[2]   Statement of Claim ¶¶ 8 and 322.

[3]   See Exhibits C-322, C-323 and C-324, the Credit, Procurement and Services Agreements between IEC and Greenville.

**FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM** INDEX NO. 650627/2021
NYSCEF DOC. NO. 7 RECEIVED NYSCEF: 01/27/2021

SLCG

ICDR/AAA CASE No. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 2

4. That happened for a good reason: the story the Claimants told us was pure imagination, a Philip K. Dick work of fiction, an alternative technical universe where consistency with facts is not required. If one questions the grounds of the serious allegations raised by IEC against the Respondents (unfortunately, when we deal with a dispute, no one can avoid that question, even if the consequence is to spoil a fascinating tale), the answer is: ***nothing***. The disappointing truth is that IEC raised accusations and claimed fraud, deceit and willful misconduct based on a devastating combination of no supporting documentation and a failure to understand the basic principles of the LNG technology.

5. In order to seek, *ex post*, support to their story, the Claimants requested the Respondents to produce ***170*** (yes, one hundred and seventy) categories of documents, ranging from internal communications on the selection of the cold boxes, the merger between GE and Baker Hughes, the pipe stress analysis, and the exchange of emails in preparation for meetings. The request speaks for itself - when a party believes its counterparty has 170 (one hundred and seventy) categories of documents that may support its case, that party cannot support its case on its own.

6. For the sake of clarity, this Statement of Defense is not intended to provide a detailed response to the story narrated in the Statement of Claim, most of which is irrelevant to the dispute at hand. The technical and factual allegations of the Claimants are dealt with in the expert reports attached to this Statement of Defense. We will provide the Arbitral Tribunal with an update on the status of the works at the site and the reasons that brought the GEOG Entities to the decision to demobilize from the Rumuji Plant (see Chapter III).

7. The main purpose of this Statement of Defense is to clarify the context of any future discussion on this dispute. The Parties are requested to confront themselves taking into account the Contracts and the law. This is exactly what is missing in the Statement of Claim: a reasonable legal background in asserting the claims (see Chapter VI).

8. Indeed, further to the Statement of Claim, we still have:

    i. ***two*** different parties on the side of the Claimants, IEC and Greenville;

    ii. each involved in ***two*** different stages of the project: IEC in the negotiation and signing of the Contracts, Greenville in their execution;

    iii. each claiming, with ***no*** distinction between one and the other, the ***same*** amount of damages, unrelated – and expressly ignoring - the remedies provided by the Contracts;

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM

NYSCEF DOC. NO. 7

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

SLCG

ICDR/AAA CASE NO. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS

Page 3

iv.     under *three* different legal grounds: fraudulent inducement to enter into the Contracts, post-contract fraudulent misrepresentations, and willful misconduct in executing the Contracts;

v.      for alleged breaches related to pre and post-contract events.

9.      In addition, one of the Claimants (Greenville) and two of the Respondents (the BHGE Entities) did not sign either of the two Contracts and, therefore, should not be involved in this arbitration (see Chapters IV and V).

10.     *All* claims raised by or against the non-signing parties, *all* claims that are duplicative of those for breach of the Contracts (i.e. those based on fraud allegations) and *all* claims that are not based on the Contracts fail as a matter of law, with no need to spend time on facts or technicalities.  The point is that, once all of these claims are dismissed, there is *nothing* left for the Claimants, as they are not seeking the enforcement of the Contracts and their remedies in this arbitration.

11.     Interestingly, the 27 pages (out of 148) that the Statement of Claim devotes to the GEOG Entities' counterclaims are mainly based on the Contracts and, in particular, to Clause 2 of the Equipment Contract and Clause 25 of the Services Contract governing change requests from GEOG and GE Nigeria, respectively.  In other words, the Claimants seem to believe that this dispute should be decided on the – indeed, interesting - principle that the Contracts can be ignored when dealing with the claims, but must be strictly followed when defending against the counterclaims.  We will reply in detail to the Claimants' arguments on the counterclaim in Chapter VII.  For the time being, suffice it to say that the amount currently sought by the GEOG Entities is around $42 million (plus interest) and that – opposite to the Claimants' claims - all of the counterclaims are based on the Contracts, with no exceptions.

12.     The Respondents have confined this Statement of Defense to the Parties' contractual relationship.  However, the Claimants' reference to Shell's Canadian Green Corridor facility in Alberta, Canada ("**CGC**") and Shell's contract with GEOG (the "**CGC Contract**") has been noted.  Suffice it to say that the factual witness engaged by the Claimants to testify on the alleged poor performance of GEOG in the CGC Contract, Mr. Ed Griffin, *does not* know how that project ended.  That is a pity, because it seems Mr. Griffin missed the most interesting part of the discussions between GEOG and Shell: soon after Mr. Griffin left Shell (coincidence?), the parties

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM

NYSCEF DOC. NO. 7

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

SLCG

ICDR/AAA CASE No. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 4

to the CGC project found an agreement and resolved all pending issues.[4]  We do not attach the CGC Contract because the content of all purchase orders and agreements between GEOG and Shell are strictly confidential, have nothing to do with this arbitration, and are irrelevant for the decision of this dispute.  However, upon request, the Respondents can make it available to the Arbitral Tribunal, subject to suitable confidentiality protection.

13.  The Claimants' reference to something that is *not* known by the Claimants is not surprising at all.  Staying on the topic of third parties and disputes that have nothing to do with this arbitration, the Respondents also noted that the Claimants' Consolidated Financial Statements demonstrate the Claimants' quite consolidated attitude towards disputes.  The financial statements for 2016 and 2017 refer to eight disputes, two of which were related to the Rumuji Plant, in which Greenville was claiming, against a supplier, "*termination for abandonment of work and bringing spurious variation orders not acceptable*".[5]  Again, no surprises: it is the Claimants' opinion that "*Nigeria is characterized by a highly litigious culture, in which lawsuit are commonly initiated for opportunistic reasons against big, successful groups, who are perceived as easy targets*".[6]

14.  In fact, that is exactly our case.

## II.    THE PLOT AGAINST IEC AND THE EPC "MANTRA"[7]

15.  Much was said in the previous submissions on technical issues.  As anticipated above, we will leave to the experts the discussion on items like the cable sizing, the pipe stress analysis, the vent flare, the proper design of the Trains, etc.

16.  However, it is worth highlighting from the start, without going into the details of any technicalities, that most of the misunderstandings from which this dispute originate can be explained with some basic technical principles that do not require sophisticated expertise.

### A.    THE LNG TRAINS ARE NOT STANDARD EQUIPMENT

17.  The story IEC is telling us is that in the summer of 2014 it was looking for liquefaction trains for LNG.  It had two main criteria - possibly the cheapest, certainly the quickest.  IEC asked for

---

[4]   Second Witness Statement of Marco Pagliaro ¶ 100.

[5]   Exhibit C-679, 2016 Consolidated Financial Statement, p. 37. See also Exhibit C-678, 2015 Consolidated Financial Statement, pp. 35-36 and Exhibit C-680, 2017 Consolidated Financial Statement, pp. 43-46.

[6]   Exhibit C-661, 2014 Consolidated Financial Statements, p. 50.

[7]   Credit for this definition is owed to the Claimants, see ¶ 7 of their Reply Memorandum in Support of Application for Interim Relief dated August 29, 2019.

**FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM**

NYSCEF DOC. NO. 7

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

**SLCG**

ICDR/AXA Case No. 01-18-0002-9174 – Statement of Defense to Claim and Reply on Counterclaims

Page 5

quotations from Chinese suppliers, including enCryo which was 50% controlled by GEOG, but it was ready to buy the train GEOG had already manufactured for Shell.

18. There is no indication from IEC of any other requirement for the Trains other than the time of delivery, leading us to believe that no other technical specifications were a real priority. The quotations produced by IEC from enCryo and SASPG[8] say nothing about the detailed design of the offered trains, while Train 3 was complete and designed on the basis of very specific technical requirements, tailor-made for the specific plant where it was supposed to be installed.

19. The impression is that IEC was looking for trains, but had no idea (i) how to build the balance of the plant and, consequently (ii) what kind of technical specification the potential seller was supposed to apply to develop the design of the trains. Referring to trains designed and manufactured for another project as the Reference Trains does not mean a lot, considering the detailed engineering required to accommodate the equipment to the specific needs of a plant.

20. The basis of design attached to the Equipment Contract was a preliminary design (*basis*) developed by GEOG on the few indications received by IEC, such as a tentative gas composition and a pressurized storage of the LNG. To develop a final design for the Trains, other crucial information was needed from IEC. At the time the Parties entered into the Contracts, there was no doubt that was the case.

21. At the kick-off meeting of September 22-23, 2014, the following urgent actions were on IEC to finalize by September 26:[9]

- Key LNG storage tank details;
- Quantity of BOG compressor;
- Load out flow rates for sizing the BOG compressor; and
- Feed gas maximum temperature.

22. In the section entitled Changes in Design, IEC informed GEOG that it was (emphasis added) *"coordinating with suppliers to provide a **consistent** composition gas"* and both Parties

---

8    Exhibits C-9 and C-10.

9    Exhibit R-19, Minutes of Meeting 22,23 September 2014, p. 1.

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM
INDEX NO. 650627/2021
NYSCEF DOC. NO. 7
RECEIVED NYSCEF: 01/27/2021

ICDR/AAA Case No. 01-18-0002-9174 – Statement of Defense to Claim and Reply on Counterclaims
Page 6

SLCG

acknowledged that (emphasis added) the *"basis design of the plant (Contract Appendix A, Annex A) is based on a **Pressurized** LNG tank"*.

23. The various gas compositions that IEC requested GEOG to analyze were addressed in the Statement of Counterclaim.[10]  We will consider the impact of the change on the LNG storage in the following section.  In the following table, we highlight the impact both in terms of process design and on the equipment that inevitably derive from the information that IEC was required to provide after the Contracts' signature:

**Table 1. Impact of IEC Changes on Process Design and Equipment**

| OPEN ITEM AT KOM | PROCESS CHANGES | MECHANICAL EFFECTS |
|---|---|---|
| 1. Atmospheric or pressurized storage | • Cooler temperature (-6.252°C or lower); <br> • Increase of unstable condensate; <br> • Volume of BOG from LNG tank | • Cold Box design <br> • HHR required <br> • BOG compressor specs |
| 2. Load-out Philosophy | • Volume of BOG from LNG tank and trucks <br> • Increase of power consumption | • Size of pumps <br> • BOG skid size <br> • Pipe size <br> • Size of BOG compressor |
| 3. Fuel for Power Island | • Integration of LNG condensate into power island <br> • LNG specifications | • Cold box design and integration |
| 4. Gas composition | • Confirmation of Btex and heavies <br> • Change in LNG production <br> • Change in power consumption | • Add HHR system <br> • Amine system design <br> • Cold Box design |

24. If IEC believed that it could buy any LNG train available on the market, regardless of the feed gas composition and the overall design of the LNG plant, it was simply wrong.  When the GEOG Entities were urging the involvement of an EPC contractor[11], it was exactly for this reason: to avoid the communication problems (and frustration) in dealing with a project team on the side of IEC that appeared incapable of understanding the complexity of the task.  What may seem to be simple changes to certain aspects of the Rumuji Plant can have huge implications and consequences on the specifications for the rest of the equipment, including in particular, the Trains.

---

[10]  Statement of Counterclaim ¶¶ 86, 178; Witness Statement of Jay Schleicher; Expert Report of Dr. Gareth Smith.

[11]  Statement of Counterclaim ¶ 64; Witness Statement of Alessandro Bresciani ¶¶ 17-19.

25.   It is clear that even now most of the claims from IEC derive from the failure to understand that many of the issues on which it places blame on the GEOG Entities, in fact arise from IEC's decisions over the course of the project.

26.   In the following paragraphs, we will only consider two of the major episodes of the IEC saga, as they were presented in the Statement of Claim, namely the storage pressure and the gas composition.  The expert reports produced with this Statement of Defense address all the others (and provide more details on the following two).

B.     First Episode: The "Fraudulent" Change of Temperature of the First Pass of the Cold Box

27.   The claim on the so-called defective process design is exemplary.  According to IEC, this is one of the main *"lies"* that induced them to enter into the Contracts with the GEOG Entities.  The allegation is that *"what is missing is the ability to liquify the natural gas"*, because GEOG *"adopted a liquefaction design that was incapable of producing the contractually specified volumes of LNG"*.[12]  Even worse, *"the original design of the trains was fatally defective because it failed to provide for proper separation of the HHCs"*, because the -6.252° C outlet temperature of the cold box, which liquefies and purifies the natural gas from non-condensable items (the **"Cold Box"**), was not sufficient, as highlighted by Technip in early 2015.[13]  If the heavy hydrocarbons are not sufficiently separated and removed from the gas vapor before it is chilled below the freezing temperature of the hydrocarbon, key components of the Trains would freeze in operation.

28.   IEC believes that *"GE knew"* the problem and fixed it by changing *"the design of the cold box without Claimants' knowledge and permission"*, so that in the final configuration at the exit of the first pass the Cold Box does not cool the vapor to -6.252° C, but instead to temperatures in the range of -60° to -70° C.[14]

29.   Going to the consequences, IEC claims that, because of the lower temperature at the first pass of the Cold Box and the production of more unstable condensate, they needed *"to purchase additional long-lead equipment – expensive fractionation columns – to separate the various hydrocarbons*

---

[12]   Statement of Claim ¶¶ 5 and 10(a).

[13]   Statement of Claim ¶¶ 167 and 172-173.

[14]   Statement of Claim ¶¶ 174, 175, 177, 180.

*by type*".[15]  The costs that IEC seek to recover from the Respondents for that is around $19.8 million.[16]

30.   The legal ground of the request is the following:[17]

> *Depending upon when GE knew its contractual design would not work, its misrepresentations about the performance capabilities of the Trains was (i) a fraudulent inducement to Claimants to secure the Contracts and/or (ii) a fraudulent deception to prevent Claimants from terminating the Contracts for material anticipatory breach and returning to China. GE's deception was also willful misconduct.*

31.   Far from being fraud or willful misconduct, the whole argument developed by IEC shows that, from a technical standpoint, the Claimants still do not know what they are talking about.  The lower temperature at the first pass of the Cold Box with respect to that indicated in Annex A to the Equipment Contract was **required by a change requested by IEC** to enable the Trains to operate both with a pressurized and an atmospheric storage.  In turn, lowering the first pass temperature produces increased levels of condensate containing C1, C2 and C3 components, with, potentially, the requirement for an HHR (heavy hydrocarbon removal system).

32.   The original design developed by GEOG as the basis of design would have worked – as confirmed by the IEC expert, Mr. Lumley[18] – but that is only a **theoretical** issue, because such design assumed the use of only pressurized storage at 1.72 barg.[19]

33.   GEOG's obligation under the Equipment Contract was to deliver the Trains in accordance with the contractual specifications.  IEC had the obligation to set those specifications, and to understand the consequences that any changes may have to the GEOG equipment as well as the rest of the BOP.

34.   While there is no way for IEC to deny that it knew about the pressurized storage[20] – which was out of GEOG's scope of work – the doubt is whether IEC had the basic technical capability to understand that, by deciding to change the pressure of the storage tanks, the temperature of the

---

[15]   Statement of Claim ¶¶ 178-179.

[16]   Helsen Witness Statement ¶ 53.

[17]   Statement of Claim ¶ 181.

[18]   Statement of Claim ¶ 172 and Lumley Expert Report § 16.1. For completeness, Mr. Lumley is of the opinion that the margin of 2°Cn of error granted by the original design "*does not allow for minor variation of gas composition or plant control perturbations*".

[19]   See Exhibit R-17, Appendix A attached to the Equipment Contract.

[20]   Exhibit R-19, Minutes of Meeting 22,23 September 2014, p. 6., Changes in Design, "*Noted that Basis of Design of the plant (Contract Appendix A, Annex A) is based on a Pressurized LNG tank*".

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM

NYSCEF DOC. NO. 7

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

SLCG

ICDR/AAA CASE No. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 9

Cold Box **needed** to be changed. There are only two alternatives on this point: either IEC knew it, and is now arguing in bad faith in this arbitration, or it did not, and IEC needed the support of an experienced EPC contractor, as the GEOG Entities have always suggested.

35. The way the Claimants are telling their story on the HHR is not only technical non-sense, it is also contradicted by the documents and their expert reports.

36. The Claimants' version, first. In the Statement of Claim, the Claimants say that "*the significance behind the difference in TM-0010 and TM-0128 was first recognized by one of the Claimants' advisers in November 2016*".[21] TM-0010 is a process simulation report based on the contractual basis of design, issued by GEOG on October 9, 2014[22], TM-00128[23] was released by GEOG in September 2015 in response to the Claimants' investigation on "*possible feed gas suppliers*" other than that listed in the contract, "*to analyze how the Trains would operate with feed gas from the Ogbele field*".

37. The Claimants maintain that it was only then, **14 months** after the release of TM-00128, that not them, but one of their advisors, realized that, although the "*Ogbele field's gas was leaner…than the feed gas specified in the Equipment Contract…it would generate 600 percent more unstabilized condensate*". For this reason – again, **14 months** after the release of TM-00128 – "*it became clear that the reason for the changed condensate volumes was that GE had changed the design of the cold box without Claimants' knowledge or permission*".[24]

38. Indeed, the truth is that GEOG "*knew*", shortly after the Equipment Contract was signed, that the Cold Box does not cool the vapor to -6.252° C.[25] The same information was shared with IEC on October 10, 2014, as an attachment to an email that GEOG sent to IEC "*for the four process scenarios you have requested (pressurized tank vs atmospheric tank and Frame 5 turbine vs LM2500 turbine)*".[26] In all of the drawings attached to that email, the temperature of the first pass of the Cold Box was indicated as -70° C. That is very clearly illustrated in the drawing at p. 32 of Mr. Lumley's expert report.

---

[21] Statement of Claim ¶ 177.

[22] Exhibit C-254, TM-0010, Process Simulation Report Case-1 Contract, dated October 9, 2014.

[23] Exhibit C-259, TM-0128, Process Simulation Reports Case 2 Atmospheric Storage and Case 100A Pressurized Storage, dated September 28, 2015.

[24] Statement of Claim ¶ 177.

[25] Statement of Claim ¶¶ 174-175.

[26] Exhibit C-626, Power Consumption HMBs dated October 10, 2014.

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM
NYSCEF DOC. NO. 7
INDEX NO. 650627/2021
RECEIVED NYSCEF: 01/27/2021
SLCG
ICDR/AAA Case No. 01-18-0002-9174 – Statement of Defense to Claim and Reply on Counterclaims
Page 10

39. At the subsequent meeting of October 27-28, 2014, IEC – which should have read and understood GEOG's email and attachment of October 10, 2014 – specifically requested to have "*flexibility to be able to use pressurized load out and atmospheric load out*".[27]  The change was highlighted and confirmed at the December 2014 meeting.  That is exactly what they got.

40. So, basically, what IEC is telling us is not only that it took **14 months** to properly read a document (TM-0128), but also that it did not read the email of October 10, 2014, or that it took **25 months** before it realized the change of the Cold Box temperature, after it took the decision for an atmospheric storage (supposedly) based also on the content of that email.

41. Looking at the volume of condensate, in the minutes of the meeting held in October 2014, the Parties agreed that the feed gas should be supplied by IEC from a "*parent plant*", providing for a pre-treatment removing all BTEX, with no condensate.[28]  That **never** happened.  The change of condensate volumes that IEC only realized in November 2016 was due to the need to bring the level of Hexane from the 1900ppm of TM-0010 to the 124 of TM-0128: for laymen, that was due to the change from pressurized to atmospheric storage.

42. Just to note: the CGC plant designed for Shell, including Train 3 supplied to IEC, featured pressurized LNG storage at 1.37 barg and first Cold Box pass at -75° C.

C.   <u>Second Episode: The Never Changing Gas Composition That Changed Several Times</u>

43. The Cold Box was changed compared with the basis of design due to the need to accommodate IEC's request for atmospheric storage, regardless of the gas composition.  GEOG proposed a design for a specific composition, but this was within the context of other design parameters such as the pressure of LNG storage, temperature of the feed gas, pressure of the feed gas and the composition of the product LNG.[29]

44. It is undisputed, however, that the freezing point, the boiling point and many other physical properties may vary dramatically depending on the feed gas, and that the gas composition plays a crucial role in the design of the train.

45. When, at the kick-off meeting, GEOG asked IEC to provide a "*consistent composition gas*", it was for a good reason.  IEC's case is very simple: the gas composition was provided in August 2014

---

[27]  Exhibit C-51, Minutes of Meeting of 27, 28 October, point 7, p. 6. The change was highlighted and confirmed at the December 9-10, 2014 meeting, Exhibit R-21, point. 3.5.

[28]  Exhibit C-51, Minutes of Meeting of 27, 28 October, points 2, 3, 4, 7.

[29]  HKA Expert Report of Dr. Gareth Smith § 4.5.3.29

and "*that composition has never changed and Claimants never authorized GE to alter the design of the Trains to accommodate any other gas composition*".[30]

46. Stated like that, it seems to be a simple story. It should be no surprise that documents tell us something different.[31]

47. **First**, the gas composition provided by IEC on August 27, 2014[32] was not clear at all. In that email, the heaviest hydrocarbon component was described as "*n-Hexane C6+*". That is simply technical non-sense: a component can be *either* n-Hexane *or* C6 *or* C6+. If it is:

    i.    n-Hexane (or normal Hexane), there is no need for any additional specification;

    ii.    C6, then some additional details are required, because C6 can refer to a mixture of hydrocarbons with six carbon atoms, but a variety of structures;

    iii.    -C6+, then there is certainly the need for additional information on the "+" factor.[33]

48. Accordingly, what IEC indicated to GEOG in August 2014 for the purposes of developing the basis of design was not at all a "*consistent gas composition*": in non-technical terms, it was like asking for a dry mineral water (or expecting that the atmospheric storage would have no impact on the Cold Box).

49. **Second**, and maybe more important, the sole and exclusive reference in the Equipment Contract to the gas composition is for a n-Hexane[34], not for C6, or for C6+ (whatever the plus may mean). The Trains as originally designed by GEOG were therefore supposed – and only required – to work and to perform with a n-Hexane gas composition.

50. **Third**, since the gas composition provided by IEC in August 2014 made no sense and the Equipment Contract only makes reference to n-Hexane, at the kick-off meeting of September 2014, GEOG requested IEC to provide the "*consistent composition gas*" that IEC agreed to

---

[30]  Statement of Claim ¶ 445.

[31]  The enCryo technical proposal (Exhibit C-10) mentions a very light composition of feed gas, see HKA Expert Report of Dr. Gareth Smith § 4.5.3.2.

[32]  Exhibit C-31, Email from Deepak Katraia to Mesgina Risat et al., dated August 27, 2014.

[33]  A much more detailed explanation of these principles and their impact on the design process is provided in Exhibit RER-10, HKA Expert Report of Dr. Gareth Smith.

[34]  See Exhibit R-17, Appendix A attached to the Equipment Contract, p. 26.

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM

NYSCEF DOC. NO. 7

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

ICDR/AAA CASE NO. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 12

SLCG

provide[35] and never delivered. IEC's argument that the August 2014 gas composition was never changed and that all the subsequent gas compositions that IEC requested GEOG to analyze were irrelevant (including that provided at the time of developing the design of the HHR[36]) will likely be reconsidered in the Claimants' Rejoinder.

D.    END OF THE SAGA: THE SMALL STEP FOR AN EPC THAT BECAME A GIANT LEAP FOR IEC

51.    The following diagram shows how a change of the n-Hexane content on gas composition and/or of the gas composition may impact the process design, including the storage temperature (and the temperature at the first and second pass of the Cold Box):[37]



Figure 1. Impact of Change in Gas Composition on Process Design

52.    The figure above shows that there is a direct correlation between any - even small – change in:

    i.    the gas composition (plus 10% of propane and ethane vs. pure methane): their solubility value is represented in the vertical line on the left entitled N-Hexane Solubility;

    ii.    the storage pressure (the horizontal line); and

---

[35]    Exhibit R-19, Minutes of Meeting 22,23 September 2014, p. 6., Changes in Design, "[*IEC] is coordinating with suppliers to provide a consistent composition gas*".

[36]    HKA Expert Report of Dr. Gareth Smith § 4.5.3.37. IEC requested the analysis of yet another alternate feed gas in February 2016, after the Trains had already been delivered, see GEOG Letter dated February 25, 2016 (**Exhibit R-146**), along with email correspondence between IEC and GEOG on February 18, 2016 (**Exhibit R-208**), March 1, 2016 (**Exhibit R-209**),and March 4, 2016 (**Exhibit R-238**).

[37]    HKA Expert Report of Dr. Gareth Smith § 4.5.4.21.

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM
INDEX NO. 650627/2021
NYSCEF DOC. NO. 7
ICDR/AAA CASE NO. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
RECEIVED NYSCEF: 01/27/2021
SLCG
Page 13

iii.     the storage temperature, which is affected by the temperature inside the Cold Box.

The dotted vertical red line, at the storage pressure provided by the Equipment Contract, meets the lines of the gas at certain bubble point temperatures (indicated on the right), that are lower than they would be at any lower level of pressure. Moving the red dotted line to the left, up to the atmospheric pressure, would inevitably lead to a change (lower) in the bubble point temperature.

53. Going back to the EPC mantra – which became a mantra, indeed, because the GEOG Entities continued asking for the involvement of an EPC contractor from the very beginning of the project, while IEC believed it could manage the job in-house itself - Figure 1 is certainly not an easy diagram to develop, but it is really a simplistic representation of some basic principles of LNG technology.

54. What IEC sees as a conspiracy is only the reverse side of their incapability to understand implications and consequences of their own choices: the admitted – and actually boasted – ignorance of IEC's management on LNG technology cannot serve as a justification; to the contrary, it is an aggravating factor. If IEC knew – as it did – that it did not have the skills and knowledge required to manage a project like the Rumuji Plant, it should have sought external support. IEC did only for a limited period of time (with Technip) at the beginning of the project and for a limited scope (with the Lisbon Group and Softec) at the end.[38] That was simply not enough.

55. What is surprising is the *fact* that IEC sold project management services to its subsidiary Greenville, while IEC knew that it was not capable of supplying those services. Even now, in the middle of an arbitration proceeding and the related support of technical experts, IEC seems to ignore the basic technical principles described above: that a change in the pressure of the storage has a direct impact on the process design, and that a change in the process has mechanical consequences on the equipment (with associated cost and time impacts).

56. A closing note, on Mr. Lumley's expert report filed with the Statement of Claim. The report is based on the double – mistaken - assumption that the GEOG basis of design at the time of the signature of the Equipment Contract was based on (i) an atmospheric storage and (ii) a C6+ gas

---

[38] Softec appears to have disappeared from the project since February 2019 and all of the GEOG Entities' efforts to engage with Softec regarding critical issues have gone unanswered, with no explanation. Second Witness Statement of Marco Pagliaro ¶¶ 83-84, GEOG Letter dated July 25, 2019 (**Exhibit R-147**).

composition. The conclusions reached by Mr. Lumley on those assumptions belong to the alternative technical universe mentioned in the introduction (¶ 4 above).[39]

## III.    THE END OF THE LITANY: STATUS OF COMPLETION OF THE PLANT

57.    In the Statement of Claim, the Claimants addressed the "*litany of defects*" resulting from the GEOG Entities' alleged non-performance of the Contracts.[40]

58.    The Claimants' list of 23 items that are supposedly open is – to say the least – outdated. In fact, from the beginning of the project, and notwithstanding the arbitration proceedings, the GEOG Entities have continued to cooperate with IEC towards the resolution of any pending issues as they occurred, and also committed to the resolution of items that were outside their scope. In addition to all of the legal reasons, which are addressed in Chapter VI below, that fact by itself is enough to reject any claim of fraud, willful misconduct or gross negligence.

### A.    GEOG'S ALLEGED DEFECTS

59.    Since October 2018, the GEOG Entities had been asking IEC to have a technical meeting to discuss any outstanding issues. However, IEC delayed making a decision on when/where to have the meeting, and it was ultimately held on February 12-13, 2019 in Rumuji. Despite the difficulties in arranging the required visas for travel to Nigeria, the GEOG Entities mobilized 12 technical experts and three project managers from the United States and Europe to sit down and address all open issues with IEC.[41]

60.    IEC, on the other hand, chose not to have its technical consultants (Softec) attend the meeting, effectively preventing a meaningful technical discussion.[42] The only technical counterparty attending the meeting on IEC's side was the Lisbon Group, and only for a limited part of the discussion: as can be seen in the minutes of the February 12-13 meeting, out of the 17 agenda topics discussed during the two-day meeting, the Lisbon Group was only involved in one (the flare network), for which it participated in a side meeting with GEOG.[43]

---

[39]  To be noted that, when referring to his source of information, Mr. Lumley often mentions Mr. Pirjins' witness statement, instead of the Equipment Contract.

[40]  Statement of Claim ¶¶ 157 and thereafter.

[41]  Second Witness Statement of Marco Pagliaro ¶ 5.

[42]  Second Witness Statement of Marco Pagliaro ¶ 5.

[43]  Exhibit C-243, Minutes of Meeting, dated February 12-13, 2019, item 1, p. 1.

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM
NYSCEF DOC. NO. 7                                                    INDEX NO. 650627/2021
                                                         RECEIVED NYSCEF: 01/27/2021

SLCG

ICDR/AAA Case No. 01-18-0002-9174 – Statement of Defense to Claim and Reply on Counterclaims
Page 15

61. The GEOG Entities never stopped cooperating with IEC:

    i.   GE Nigeria continued to provide additional support services at site (before the GEOG
         Entities were ultimately forced to demobilize on May 15, 2019[44] due to safety concerns
         that IEC failed to address, as we will further explain in the following section) even
         though the hours per the Services Contract were already accrued and despite IEC's
         position that "*IEC has never requested GE Nigeria to 'provide additional services'*"[45] and even
         that the Services Contract was never activated;[46]

    ii.  GEOG procured and shipped to site several materials in order to rectify defects in the
         Trains (namely the pipe supports and the back flow preventer kits), but IEC denied
         GEOG permission to complete these activities.[47]

62. While GEOG was actively attempting to assist IEC with completion of the Rumuji Plant and to
    find a common ground to move forward towards the resolution of the pending issues on Train
    1 and Train 2, IEC undermined the results that could have jointly been achieved by the Parties.
    Just to provide a few examples, IEC:[48]

    i.   withheld information on the result of the analysis carried out by its consultants Softec to
         allow a productive technical discussion;

    ii.  refused to share Softec's report on the piping stress analysis, which GEOG only received
         one year later (pursuant to the Respondents' request in the document production phase
         of this arbitration), which was in any case partial and incomplete as it relates to only one
         system out of hundreds;[49]

---

[44]  GEOG Letter dated June 14, 2019 (**Exhibit R-148**).

[45]  See Exhibit R-103.

[46]  See Exhibit R-83.

[47]  Second Witness Statement of Marco Pagliaro ¶ 5; IEC Letter dated May 22, 2019 related to IEC's approval
      to GEOG's site activities (**Exhibit R-149**), "*BHGE's "making good" design and technical description for the
      required interventions shall be approved by IEC/Greenville before any site activity is authorized*".

[48]  Second Witness Statement of Marco Pagliaro ¶ 5.

[49]  Softec Report on Air Coolers E-0502A/B, E-0503 Piping Stress Analysis dated July 31, 2018 (**Exhibit R-
      150**).

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM
NYSCEF DOC. NO. 7
INDEX NO. 650627/2021
RECEIVED NYSCEF: 01/27/2021
SLCG
ICDR/AAA CASE No. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 16

   iii.   withheld information on the additional load that IEC added to the already designed and existing flare network;[50]

   iv.   prohibited the GEOG Entities' personnel from taking pictures on site and refused GEOG's proposal to have a 3D laser scanning of the Trains at its own cost, without providing a meaningful reason;[51] and

   v.   focused on the startup of Train 3, rather than addressing the pending issues on site regarding Trains 1 and 2 (the only trains that are subject of GEOG's contract), together with GEOG's team and IEC's technical consultants.[52]

63.  Of the 23 items listed in the Statement of Claim as alleged pending issues[53], only four remain unresolved.[54] Notably, three of these are the items that the Respondents address in the expert reports attached to this submission, which find that:

   i.   the MR Compressor power cables: most of the power cables were correctly sized, but incorrectly installed by IEC, and those that were too small have already been replaced by GEOG;[55]

   ii.   the piping supports: GEOG's pipe support design changes were limited to 38 out of approximately 700 lines and "*a corrective design for the 37 defective pipe lines could have been implemented quickly*" had IEC agreed to a pipe support modification review meeting with GEOG;[56] and

[50] GEOG Letter dated December 19, 2018 (**Exhibit R-151**), where GEOG "*reminded again to IEC that the flare is only designated for GEOG's equipment loads and those small loads agreed with change order as at 3 July 2015, not IEC's Balance of Plant*"; GEOG Letter dated March 14, 2019 (**Exhibit R-152**).

[51] GEOG Letter dated June 28, 2019 (**Exhibit R-153**); Exhibit C-243, Minutes of Meeting, dated February 12-13, 2019, item 9, p. 11.

[52] GEOG Letter dated December 13, 2018 (**Exhibit R-154**); IEC Letter dated July 8, 2019 (**Exhibit R-155**); IEC Letter dated July 10, 2019 (**Exhibit R-156**).

[53] Statement of Claim ¶¶ 157 and thereafter.

[54] Second Witness Statement of Marco Pagliaro ¶ 54; IEC Letter dated May 22, 2019 (**Exhibit R-157**).

[55] RER-12, HKA Expert Report of John Middleton dated August 29, 2019 § 7.1.1.2.

[56] RER-14, HKA Expert Report of Stephen Linwood dated August 29, 2019 §§ 4.5-4.8.

iii.   the flare network design review: although it is true that the slope of some segments of the flare system do not comply with the design standard, this does "*not require remedial work*" and IEC could have accepted the solution proposed by GEOG.[57]

64.   The fourth open issue is the VFD, which is not a technical dispute.  On the contrary, this issue is a direct consequence of IEC's failure to properly address the importance of the complete integration of the scopes of supply of the subcontractors (of which GEOG is one of several) with IEC's BOP in order to achieve the successful completion of the project.

65.   The VFD is one of several possible systems that enable the MR Compressor start up, other options are the Soft Starter and the Autotransformer.  At the project kick-off meeting, IEC clarified that the Rumuji Plant would run in a power island mode, meaning that it would not be connected to any power network, but instead depend on an off-grid power generation system. Both GEOG and IEC agreed that this would require additional start-up equipment for the MR Compressor[58], but because the as-sold equipment assumed a grid connection, such start-up equipment had not been included in the Equipment List of Appendix A to the Equipment Contract, and thus was not part of GEOG's scope of supply.[59]

66.   While IEC was actively working to select a suitable source of power to feed the Rumuji Plant, evaluating different power generation systems and different potential vendors, GEOG provided IEC with quotes for three different options of start-up equipment (a VFD for approximately $3.9 million, a Soft Starter for around $1.1 million and an autotransformer for around $290,000).[60] IEC initially informed GEOG that it was not certain that it would buy the power solution from GEOG.[61]   Then, just a few days later, rather than accepting or engaging in a commercial discussion related to the change order, IEC tried push to the cost of the VFD on GEOG under the (wrong) assumption that IEC has bought "*a solution and not equipment*".[62]

---

[57]   RER-13, HKA Expert Report of Alan Borrowman dated August 29, 2019 § 5.3.

[58]   Exhibit R-19, Minutes of Meeting 22,23 September 2014, p. 13; Second Witness Statement of Marco Pagliaro ¶¶ 59-60.

[59]   Exhibit R-17, Appendix A attached to the Equipment Contract; Email from Michael Cohen dated February 13, 2015 (**Exhibit R-158**).

[60]   Email from M. Cohen dated October 25, 2014 (**Exhibit R-159**).

[61]   Email from Werner Pirjins dated December 5, 2014 (**Exhibit R-160**): "*it is correct [IEC] will install a VFD or soft starter, it is not correct that [IEC will] order this from GE*".

[62]   Email from Werner Pirjins dated December 31, 2014 (**Exhibit R-161**).

67. GEOG rejected IEC's position, but worked to identify a cheaper alternative solution (the Soft Starter), which was finally accepted by IEC through the change order COR-27 dated July 3, 2015. GEOG decided to "*absorb the cost of MR start-up system ("soft start") with J620-Power Gen*" in the interest of a strategic relationship and "*focus to installation and service activity*".[63] Notably, the change order was agreed for the total amount of $1 million and also included other items, while the cost of the Soft Starter alone was $1.1 million.[64]

68. Ultimately, in 2018 the Soft Starter solution was found ineffective and it was determined that instead a VFD was required. This could have been avoided: had IEC commissioned the Capsim study on the integration of the different systems[65] back in 2014 rather than in late 2018, the need for the VFD would have been revealed prior to the supply of the Soft Starter.[66] The consequence is that, due to its poor understanding of the overall requirements of the Rumuji Plant, IEC now needs to procure a VFD, which it claims should be paid for by GEOG.[67] In other words, according to IEC, GEOG must cover the costs of a piece of equipment that was not included in GEOG's original scope of work, for an issue for which it already provided another piece of equipment (the Soft Starter) at a significant discount. In order to – once again – support its customer, in May 2019 GEOG offered to provide the VFD for a cost pursuant to a change order under the Equipment Contract.[68]

69. The GEOG Entities' commitment to resolve the pending issues is by itself explanatory of their attitude, and voids any claim related to fraud, willful misconduct or gross negligence. The GEOG Entities are still committed to remedy any defects or issues that arise under the Equipment Contract. This is confirmed by the fact that out of the 23 pending issues, only four items remain still outstanding, while the vast majority of the issues have been closed and resolved by the GEOG Entities – despite IEC's lack of support.

70. The Parties are almost at the end of the project, the Rumuji Plant is nearly completed and yet, after almost five years, they are still speaking two different languages:

---

[63] Exhibit R-43, Change Order/Scope Change Resolution Contract for the supply of LNG plant 1 and 2, COR-27.

[64] Second Witness Statement of Marco Pagliaro ¶ 69.

[65] See Exhibit C-566.

[66] Second Witness Statement of Marco Pagliaro ¶¶ 70-71.

[67] Statement of Claim ¶ 400.

[68] GEOG Letter dated May 21, 2019 (**Exhibit R-162**).

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM
INDEX NO. 650627/2021
NYSCEF DOC. NO. 7
RECEIVED NYSCEF: 01/27/2021
ICDR/AAA CASE No. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 19
SLCG

i. The GEOG Entities' attempts to close the project have faced reluctancy from IEC's side (for instance, in refusing access to site, failing to provide answers to RFIs, failing to provide the relevant safety documentation, failing to allow GEOG to install the equipment shipped on site, failing to allow GEOG to perform a 3D scan of the Trains etc.);[69]

ii. IEC often skipped the appropriate channels to discuss and address routine day-to-day project issues, preferring instead to conduct the communication through formal letters with the consequent delay and reduced effectiveness;

iii. GE Nigeria provided additional support on site well beyond the limits set forth in the Services Contract, however IEC even failed to even acknowledge that GE Nigeria carried out any work pursuant to the Services Contract;

iv. As explained above in Chapter II(B), IEC accused GEOG of having unilaterally changed the process design because the contract design was allegedly not working, therefore failing to acknowledge that such change is actually due to the changes in the specifications that IEC communicated to GEOG from the very beginning of the project, pursuant to which GEOG had no other option but to change the applicable specification in order to guarantee the performance of the Trains.

71. For the reasons above, the litany of alleged defects resulting from "*GE's non-performance of the Contract*"[70] must be dismissed, along with the claims related to fraud, willful misconduct and gross negligence. As will be discussed in detail in Chapter VI, the claim for fraud cannot pass the evidence that the GEOG Entities constantly tried to tackle the issues that arose during the performance of the Contracts, including suggesting technical meetings, site audits, providing additional equipment outside the GEOG Entities' scope as requested by IEC and suggesting the performance of additional tests with no charges for IEC.

72. Similarly, the claims for willful misconduct and gross negligence shall fail in front of the evidence of the GEOG Entities' many attempts to complete the project. The fact itself that in February 2019, while the arbitration proceedings were already ongoing, the GEOG Entities organized (and stressed with IEC the importance to have) a technical meeting, and flew to Nigeria with 12 engineers committed to go through each end every open item raised by IEC,

[69] Second Witness Statement of Marco Pagliaro ¶ 5.

[70] Statement of Claim ¶¶ 157.

confirms the GEOG Entities' commitment to the project as well as their good faith in the execution of the project.[71]

<div align="center">

B.    THE CURRENT STATUS OF THE RUMUJI PLANT

</div>

73.    As already noted in the Statement of Counterclaim, during the execution of the project, the GEOG Entities issued many requests to IEC asking it to address serious safety concerns and violations. IEC repeatedly ignored its safety obligations under the Contracts, forcing the GEOG Entities to provide additional technical expertise in order to mitigate the safety concerns arising from IEC's incompetency.[72]

74.    Since the submission of the Statement of Counterclaim, several developments have occurred on site:[73]

    i.    IEC started up Train 3, although subsequently stopped production, possibly due to the lack of sufficient storage to keep the unsold LNG;

    ii.    GEOG completed the main portion of its outstanding activities, but could not perform all of them because IEC denied its authorization;

    iii.    More than one incident happened on site increasing the GEOG Entities' concerns about the safety of their personnel on site;

    iv.    The GEOG Entities requested IEC to provide safety procedures and documents in order to respond to their concerns about the safety of the GEOG Entities' personnel on site;

    v.    For the reasons detailed below, on May 15, 2019 the GEOG Entities ultimately determined that they had no other option but to temporarily demobilize their personnel from site, until IEC can provide evidence that the safety concerns have been properly addressed.

75.    From late 2018, the GEOG Entities had growing concerns related to safety issues on site. In January 2019, they sought technical external advice, which recommended that (i) the changes being introduced by IEC should be curtailed as they would impact the completion and robustness of operation of the Trains, (ii) IEC should not proceed with hydrocarbon

---

[71]    Second Witness Statement of Marco Pagliaro ¶ 3.

[72]    Statement of Counterclaim, Chapter VI.

[73]    Second Witness Statement of Marco Pagliaro ¶ 3.

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM
NYSCEF DOC. NO. 7
ICDR/AAA CASE NO. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 21

INDEX NO. 650627/2021
RECEIVED NYSCEF: 01/27/2021

SLCG

commissioning of Train 3 until it determined that process hazards are limited, (iii) IEC needed to carry out a pre-start up HAZOP and (iv) the additional flare loads added by IEC could cause "*severe safety consequences*" and GEOG should inform IEC that GEOG "*must take steps to protect their personnel by removing them from areas at risk as soon as the hydrocarbons are introduced to Train 3*".[74]

76. On March 6, 2019, GEOG requested IEC to have a Health, Safety & Environment ("**HSE**") audit performed by GEOG's HSE manager, at GEOG's expense.[75]  IEC's refusal to that request is self-explanatory: Mr. Pirjins stated that "*we don't need a tourist on our site*" and that "*it's a gas plant, not a tourist attraction, so the less people that visit the plant the better it is*".[76]

77. As stated in GEOG's letter dated March 29, 2019, "*a good industry practice is to embrace HSE site reviews, not reject them*".  In the same letter, GEOG also reminded IEC that (i) GEOG was still waiting to receive a list of the items that had been removed from Train 1 and 2 and used on Train 3, (ii) the additional loads that IEC planned to add to the GEOG flare header, and (iii) IEC was still preventing GEOG from taking photographs on site.[77]

78. GEOG again reiterated its safety concerns with a letter dated May 2, 2019 stressing the importance of providing the requested safety documentation "*before introducing hydrocarbons into the plant*".[78]  In the same letter, GEOG also communicated to IEC that it had started to "*appropriately reducing [its] presence on the Rumuji site to the bare minimum*" due to the increased hazard profile in the Rumuji Plant as hydrocarbons were introduced in the Trains without having received the requested safety reassurances and documents.

79. A week later, on May 8, 2019, GEOG repeated its request for documents related to the various HSE issues that arose at site, expressing its disappointment for the lack of response from IEC's

---

[74] RER-8, Briefing Notes of Alan Borrowman dated January 16, 2019 §§ 7.1.2-7.1.5; Second Witness Statement of Marco Pagliaro ¶¶ 36-37.

[75] Email from Ali Kassem dated March 6, 2019 (**Exhibit R-163**).

[76] Exhibit R-163, Emails from Werner Pirjins dated March 6 and March 8, 2019.

[77] GEOG Letter dated March 29, 2019 related to Safety of GEOG's Personnel. (**Exhibit R-164**), IEC Letter dated April 9, 2019 related to GEOG's access to site. (**Exhibit R-165**), IEC Letter dated April 9, 2019 related to removed items from Train 1 and 2 (**Exhibit R-166**), GEOG Letter dated March 29, 2019 related to removal of equipment from the Trains (**Exhibit R-191**).

[78] GEOG Letter dated May 2, 2019 (**Exhibit R-167**).

side.[79]  GEOG once again outlined the information the it would need in order to comply with the safety requirement standard requested by the GEOG Entities:

> *a. Names and CVs of IEC/Greenville's "internal and external HSE personnel dedicated to regular inspections".*
>
> *b. Copy of all "regular inspections" and related reports carried out by IEC/Greenville since 1 January 2019.*
>
> *c. Copy of IEC's HSE policy and procedure for the facility at Rumuji and a copy of all audits carried out against these policies and procedures, including action items.*

80. In the same letter GEOG also restated its proposal to conduct an HSE audit, at GEOG's cost, that the GEOG Entities "*have genuine concerns over the safety of [their] personnel at site and are not seeking to impose any cost on IEC*" and that, in any case, the GEOG Entities would continue the works from a remote location even in the case of complete demobilization.

81. In response, IEC provided incomplete and partial safety information that did not "*address GEOG's concerns and reasonable requests for information and documentation that should be readily available within IEC's project records*".[80]  This is unacceptable under standard industry practice and can potentially cause serious harm because a project that had been ongoing for more than four years must have this critical HSE document promptly available, at least in a previous unrevised format: such document – for its paramount importance – should be conspicuously displayed on a wall at site.[81]

82. In addition, between April and May 2019 two significant incidents occurred, confirming the GEOG Entities' concerns of the increased risks caused by IEC's rush to start up Train 3: (i) a temporary cable was heavily damaged and started sparking and (ii) a fire alarm was activated in the Train 3 flare area.[82]  With special disregard for the supplier of the LNG technology and its personnel, IEC did not promptly inform GEOG that these events occurred.  When the GEOG Entities asked for further information, IEC did not provide the details, the root cause, or the

---

[79]  GEOG Letter dated May 8, 2019 (**Exhibit R-168**).

[80]  Exhibit R-148, GEOG Letter dated June 14, 2019.

[81]  Second Witness Statement of Marco Pagliaro ¶ 46.

[82]  Second Witness Statement of Marco Pagliaro ¶ 42, IEC Letter dated April 29, 2019 (**Exhibit R-169**), IEC Letter dated May 5, 2019 (**Exhibit R-170**), IEC Letter dated May 5, 2019 related to Electric incident (**Exhibit R-171**).

corrective actions of such incidents, but only underplayed their significance rather than addressing the serious safety concerns for the personnel of the GEOG Entities at site.[83]

83. The GEOG Entities did not rely on their own views of whether IEC's operations at the Rumuji Plant were putting their personnel in harm's way. They commissioned additional technical experts to analyze the site safety and process safety plan, who confirmed the GEOG Entities' concerns related to safety were fully justified.[84]

84. Based on these findings, along with the failure to receive a satisfactory response from IEC over months of correspondence[85], the GEOG Entities determined that they had no other option but to demobilize their personnel from site. The last representative of the GEOG Entities left the Rumuji site on May 15, 2019.[86]

85. It was not until July 2019 that IEC even communicated about the safety issues. Rather than cooperating with the GEOG Entities to resolve the problems, however, IEC cynically used its lawyers to request the Arbitral Tribunal's urgent intervention "*[i]n order to address the safety issues that GE/BHGE has generated by its defective engineering and subsequent demobilization*".[87]

86. Despite the "urgency" of the request, the Claimants took the entire two week period granted by the Arbitral Tribunal to submit their application for interim relief, rather than filing it immediately.[88] On the other hand, the GEOG Entities promptly replied the day after stressing that "*given that the application relates to purported hazards to lives and properties, [the GEOG Entities] propose to meet at [IEC's] earliest convenience*" to address the identified issues.[89] IEC refused the meeting with its letter dated July 29, 2019.[90] The GEOG Entities provided all information requested by the Claimants (most of which was already in IEC's possession) with its response of August 23, 2019.

---

[83] Second Witness Statement of Marco Pagliaro ¶ 42.

[84] Second Witness Statement of Marco Pagliaro ¶¶ 44-46; RER-8, Briefing Notes of Alan Borrowman dated January 16, 2019; RER-9, Expert Report of Alan Borrowman dated June 3, 2019.

[85] See also GEOG Letter dated February 1, 2019 (**Exhibit R-172**); GEOG Letter dated February 5, 2019 (**Exhibit R-173**) and Exhibit R-152, GEOG Letter dated March 14, 2019.

[86] Exhibit R-148, GEOG Letter dated June 14, 2019.

[87] IEC's July 5, 2019 Response to the Respondents' Application and Counter-Application for Interim Relief.

[88] See email of Mr. Capiel dated July 9, 2019, informing the Parties of the Arbitral Tribunal's instructions to file its application by July 23, 2019.

[89] Exhibit R-147, GEOG Letter dated July 25, 2019.

[90] IEC Letter dated July 29, 2019 (**Exhibit R-174**).

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM

INDEX NO. 650627/2021

NYSCEF DOC. NO. 7

RECEIVED NYSCEF: 01/27/2021

SLCG

ICDR/AAA CASE NO. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 24

87. Although GEOG has the right to suspend its performance based on IEC's breach of its payment obligations under the Equipment Contract[91], the GEOG Entities did not *abandon* the site. The GEOG Entities are ready to re-mobilize as soon as IEC complies with its HSE obligations under the Contracts.[92] Once this is accomplished, they can quickly be back on site.[93]

## IV.   GREENVILLE IS NOT ENTITLED TO ASSERT CLAIMS IN THIS ARBITRATION

88. The Statement of Counterclaim emphasized the GEOG Entities' limited roles as equipment and services providers, and IEC's lack of a skilled EPC contractor to define, plan, design, develop, procure, manage, construct, and bring into operation the Rumuji Plant.[94]

89. What we have learned with the Statement of Claim is that IEC **is** the EPC contractor, and Greenville is the final customer. As explained in subchapter (A) below, the contract matrix for the Rumuji Plant is as follows:



90. In the Claimants' request on August 6, 2019 that the Arbitral Tribunal accelerate the deadline for the response to the Application for Interim Relief, they attached a directive issued by the

---

[91]   As explained in Chapter VII below, IEC violated the Equipment Contract due to the non-payment of the relevant invoices issued by GEOG. Because IEC is in breach of its payment obligations "*and has not remedied within a thirty (30) day written notice*", pursuant to Clause 28.1.1 of the Equipment Contract GEOG "*may suspend performance and delivery*".

[92]   Exhibit R-148, GEOG Letter dated June 14, 2019; Second Witness Statement of Marco Pagliaro ¶ 50.

[93]   Second Witness Statement of Marco Pagliaro ¶ 50.

[94]   Statement of Counterclaim ¶¶ 31-34.

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM

NYSCEF DOC. NO. 7

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

SLCG

ICDR/AAA Case No. 01-18-0002-9174 – Statement of Defense to Claim and Reply on Counterclaims

Page 25

Nigerian Department of Petroleum Resources.[95] This was the first time that the GEOG Entities received such letter, which is addressed to Greenville. The letter identifies GEOG as the EPC contractor, but such misdescription can only have resulted from misinformation received from Greenville and/or IEC. Nothing in the Contracts or GEOG's conduct remotely suggests that it is an EPC, and indeed GEOG has made clear since the beginning of the project that it "*is an equipment provider and not an EPC*".[96]

91. This contractual structure separates the types of loss suffered by IEC and Greenville. Any loss incurred by IEC has arisen in payments for capital equipment and sunk expenses and may simply be characterized by a delay in repaying the capital invested in Greenville.[97]

92. IEC commenced this arbitration jointly with Greenville, a Nigerian company that is indirectly owned by IEC. The Respondents have objected to Greenville's standing in this arbitration on the basis that Greenville is not a signatory to either of the Contracts, nor to any arbitration agreement with the GEOG Entities.[98] In an attempt to legitimize Greenville's status, IEC submits that Greenville is entitled to bring claims against the GEOG Entities as a third-party beneficiary to the Contracts.[99]

93. The Respondents submit that as a matter of New York law applied to the undisputed facts, Greenville is not an intended third-party beneficiary of the Contracts and therefore is not entitled to assert claims in this arbitration. IEC has failed to present even a plausible factual or legal basis for its assertion.

94. Rather, IEC's entire case is characterized by an attempt to distort the relationship between the Parties in order to assert claims on behalf of an entity that is not an intended third-party beneficiary of the Contracts and to inflate the amount in controversy.[100] The Respondents are

---

[95] Directive of the Nigerian Department of Petroleum Resources dated July 26, 2019 (**Exhibit R-175**), IEC Letter dated August 2, 2019 (**Exhibit R-176**), GEOG Letter dated August 5, 2019 (**Exhibit R-177**).

[96] Exhibit R-19, Minutes of Meeting of September 22-23, 2014, p. 18; Witness Statement of Alessandro Bresciani ¶¶ 17-19.

[97] Linnell Report §§ 2.57, 2.65.

[98] Statement of Counterclaim ¶ 23.

[99] Statement of Claim ¶¶ 14-15, 309.

[100] Any doubt that IEC's entire case is characterized by an attempt to blur the distinction between IEC and Greenville in order to inflate the amount in controversy was resolved by the email of July 5, 2019 from IEC's counsel opposing the Respondents' request for leave to file an interim application, which stated: "*And damages felt by Greenville are also incurred by IEC, which among other things owns 100% of Greenville's equity.*" IEC's July 5, 2019 Response to the Respondents' Application and Counter-Application for Interim Relief.

therefore placed in an unfair position where they must expend substantial time and money to address and defend a claim in excess of $591 million brought against them by a phantom party with whom they have no contractual relationship and no arbitration agreement. Further, the Respondents find themselves defending a claim that, under the contractual matrix, Greenville should have asserted against IEC regarding the delivery of the plant (to Greenville).

95. Therefore, one of the first issues that the Arbitral Tribunal must determine is whether Greenville, a subsidiary of IEC and non-party to the Contracts, is entitled to claim damages from the GEOG Entities in this arbitration as a third-party beneficiary under the Contracts.

96. The answer is **no**. Greenville not only failed to provide any evidence in support of its case; it actually provided, under Exhibits C-322, C-323 and C-324, evidence to disprove that it may be considered a third-party beneficiary to the Contracts.

97. Specifically, in support of its claim that Greenville is a third-party beneficiary to the Contracts, IEC refers to: (i) discussions between the Parties that purportedly demonstrate the Respondents' awareness of Greenville's role as the operator of the Rumuji Plant and (ii) an indemnification provision in the Equipment Contract that makes a passing reference to unnamed third parties.

98. For the reasons discussed below, IEC fails to demonstrate, under the specific New York rules governing construction contracts, that Greenville is entitled to assert claims as an intended third-party beneficiary of any contract between IEC and the Respondents. IEC further fails to provide any alternative factual or legal ground to support Greenville's claims against the Respondents.

99. By attempting to rewrite the Contracts to include Greenville as a party, IEC effectively seeks to recover consequential damages, as those damages, even if they did exist, would fall outside the contractual relationship between IEC and the Respondents. Also, by casting its $591 million claim as the direct damages of a party to the Contracts, IEC seeks to avoid the clear contractual limitation of liability that was negotiated at arm's length between the actual Parties, and to avoid the heightened burden of proving gross negligence and/or willful misconduct required under New York law to render such a waiver of consequential damages unenforceable. Further, by including Greenville, to whom the GEOG Entities never had any contractual obligations, IEC seeks to substitute GEOG in the role of EPC, which must be reserved for IEC itself.

A.     THE CORPORATE AND CONTRACTUAL RELATIONSHIP BETWEEN IEC AND GREENVILLE

100. According to Erik Helsen's witness statement, the company structure of the Claimants is the following:[101]



101. It is incorrect to say, as alleged by the Claimants' counsels, that IEC "*owns 100% of Greenville's equity*"[102] - in between IEC and Greenville there is another Belgian company, West Africa Electric NV, which was – who knows why - not included as a claimant in this arbitration. Neither were Société Patrimonial Financièr or the family owners included in this arbitration.[103]

102. IEC's disclosures in these proceedings reveal that IEC entered into three contracts with Greenville in connection with the Rumuji Plant project. The Respondents were not made aware of these contracts prior to disclosure in these proceedings. The three agreements between IEC and Greenville, all of which were effective September 1, 2014, are:

---

[101] Helsen Witness Statement ¶ 9.

[102] IEC's July 5, 2019 Response to the Respondents' Application and Counter-Application for Interim Relief.

[103] Even if the financial damages include losses suffered by the "shareholders", see Helsen Witness Statement ¶ 67.

i.   A Services Agreement, under which IEC agreed to provide project management, budgeting, accounting, legal, engineering, and third-party project financing services to Greenville;[104]

ii.  A Credit Agreement in which IEC provided a loan facility for up to $480 million to Greenville for the financing of the Rumuji Plant project;[105] and

iii. A Procurement Agreement under which IEC agreed to sell and transfer to Greenville equipment for the project, including "*LNG trains, power and loading stations, storage, filling stations and equipment for [Greenville's] customers, which [Greenville] may instruct [IEC] to purchase, in [IEC's] own name and for its own account, from such suppliers and under such terms and conditions as [Greenville] in its sole discretion may determine from time to time*".[106]

103. The contracts between IEC and the GEOG Entities, and the contracts between IEC and Greenville, all of which are in the record before the Arbitral Tribunal, clearly establish that the GEOG Entities have *no* contractual obligations to Greenville for which Greenville could assert claims in this arbitration, and that the Parties did not intend to confer any third-party rights on Greenville when the Parties negotiated their contractual relationship.

104. The respective roles of the parties cannot be disputed: the GEOG Entities are suppliers of equipment and services to IEC and IEC is the engineering company responsible for delivering the plant to Greenville.

105. The Equipment, Services, and Guarantee contracts between IEC and the GEOG Entities provide that GEOG and GE Nigeria would provide equipment for two small-scale LNG plants and plant installation and related services to IEC, respectively, in connection with the Rumuji Plant project. The GEOG Entities' limited role as equipment and services provider was clearly understood by the Parties. Because IEC divided the construction of the Rumuji Plant into numerous work packages, the GEOG Entities were among several sub-contractors hired by IEC. Notably, construction of the civil works and foundations, the power supply, the electrical works, the transportation and installation of the Trains, and all other balance of plant activities remained with IEC.

---

[104] Exhibit C-324 at ¶ 3.1.

[105] Exhibit C-322.

[106] Exhibit C-323 at ¶ 3.5.

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM
NYSCEF DOC. NO. 7
INDEX NO. 650627/2021
RECEIVED NYSCEF: 01/27/2021
ICDR/AAA CASE No. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 29
SLCG

106. Under the Contracts, the GEOG Entities had no obligations, nor oversight, with respect to any of the other packages procured and managed by IEC, and IEC understood that it was responsible for coordinating and integrating the interfaces between the equipment and/or work supplied or to be carried out under discrete packages so procured, including the safe operation of each of the packages comprising the Rumuji Plant.

107. The Procurement Agreement between IEC and Greenville, to which the GEOG Entities had no knowledge prior to its submission into evidence in these proceedings, provide that IEC would deliver "*LNG trains, power and loading stations, storage, filling stations and equipment for [Greenville's] customers.*" Therefore, the equipment for the Trains to be supplied to IEC by GEOG constituted only a part of the scope of engineering work that IEC contracted to deliver to Greenville. In addition, the Credit and Services Agreements between IEC and Greenville, of which the GEOG Entities also had no knowledge prior to disclosure in these proceedings, state that IEC agreed to provide Greenville with a loan facility, as well as project management, budgeting, accounting, legal, engineering, and third-party project financing services for the Rumuji Plant.

108. Plainly, the obligations stated in the Contracts between IEC and the GEOG Entities and the contracts between IEC and Greenville indicate that the GEOG Entities were responsible for supplying equipment and installation-related services to IEC, and IEC would undertake the role of engineering contractor responsible for delivering the Rumuji Plant and all of its necessary components to Greenville.

109. This clear contractual relationship and negotiated division of responsibilities contemplates no relationship between the GEOG Entities and Greenville that could give rise to the claims asserted in this arbitration.

110. The GEOG Entities never agreed to be responsible for the damages of a third-party. To allow Greenville to be a party to this arbitration would "*contravene sound public policy governing the orbit of duty owed to non-contracting parties*" under New York law.[107]

---

[107] *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., Inc.*, 485 N.E.2d 208, 211 (N.Y. 1985) (**Exhibit RL-1**): "*Dismissal of the third-party beneficiary claim was also proper. The third-party beneficiary concept arises from the notion that 'it is just and practical to permit the person for whose benefit the contract is made to enforce it against one whose duty it is to pay' or perform.*" (internal quotation marks and citation omitted).

B.    **Greenville Is Neither a Party Nor an Intended Third-Party Beneficiary to Any of the Contracts Between IEC and the GEOG Entities**

111.   The Contracts exclude from the outset that any third party – including Greenville – may assert claims against any of the signature parties.

112.   Under New York law, it is a well-settled principle of contract interpretation that "*the specific should control over the general*".[108]   Clause 30.1 of the Equipment Contract unambiguously provides that "*the provisions of this Agreement are for the benefit of the Parties hereto and not for any other third party.*"  This provision was negotiated by the Parties as part of a sophisticated business transaction and reflects a clear intent to decline third-party rights to unnamed beneficiaries such as Greenville.[109]

113.   IEC seeks to circumvent the unambiguous language of Clause 30.1 through a bootstrapping argument that focuses on passing references to "third parties" in the "Indemnity and Limitation of Liability" provisions in Clause 19.[110]  Specifically, IEC contends that because "*GE bargained for an indemnification right from IEC in cases where 'Buyer is furnishing Seller's Plants or Parts to a third party by contract or using Plants or Parts at a facility owned by a third party… GE anticipated that such a third party would have rights against GE under the Contract*".[111]

114.   Clause 19 of the Equipment Contract makes a single passing references to unspecified third parties.  In particular, Clause 19.4 provides:[112]

> *If Buyer is furnishing Seller's Plants or Parts to a third party by contract or using Seller's Plants or Parts at a facility owned by a third party, Buyer shall obtain from such third party a provision affording Seller the protection of this Clause and shall, in any event, indemnify and hold Seller harmless for and against any liability arising out of claims made by the third party in excess of the limitations and exclusions provided in this Agreement.*

---

[108]  *E-Z Eating 41 Corp. v. H.E. Newport L.L.C.*, 84 A.D.3d 401, 408 (N.Y. App. Div. 2011) (**Exhibit RL-2**).

[109]  See *Nepco Forged Products v. Consolidated Edison Co. of NY*, 99 A.D.2d 508, 508 (N.Y. App. Div. 1984) (**Exhibit RL-3**): "*Where a provision exists in an agreement expressly negating an intent to permit enforcement by third parties . . . that provision is decisive.*"

[110]  Statement of Claim ¶312.

[111]  *Id.*

[112]  Equipment Contract, Clause 19.4. Furthermore, Clause 19.4 only appears in the Equipment Contract; therefore, even if IEC could prove that Clause 19.4 of the Equipment Contract conferred third-party rights on Greenville to bring claims against GEOG, which it cannot, IEC fails to show that Clause 19.4 can serve as a basis for Greenville to claim damages from GE Nigeria under the Services Contract.

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM
NYSCEF DOC. NO. 7
INDEX NO. 650627/2021
RECEIVED NYSCEF: 01/27/2021

SLCG

ICDR/AAA CASE No. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 31

115. IEC's attempt to read into Clause 19 third-party rights that were not contemplated by the Parties must be rejected. Under New York law, "*[i]ndemnity contracts are to be **strictly construed** to avoid reading into them duties which the parties did not intend to be assumed*".[113] A plain reading of the indemnification provision in Clause 19 indicates that the Parties intended to protect against unforeseeable liability, *e.g.*, unforeseeable tort actions by unnamed third parties.

116. Significantly, Greenville is not actually asserting claims for a violation of Clause 19.4, but rather merely asserts that Clause 19.4 signifies an intent of the Parties to confer third-party beneficiary rights on Greenville. Such a tortuous construction cannot stand. Had the Parties intended for Greenville to have broad third-party rights, they would have explicitly set forth those rights in the Contracts. IEC provides no support for the novel proposition that a narrow indemnification provision alone is sufficient to override an unambiguous "no third-party beneficiary" clause and convey third-party rights to an unnamed beneficiary.

117. Tellingly, IEC also ignores an entire line of case law setting forth the specific rules governing third-party beneficiary claims relating to construction contracts. In *Port Chester Elec. Const. Co. v. Atlas*, the Court of Appeals stated that "*[g]enerally it has been held that the ordinary construction contract - i.e., one which does not expressly state that the intention of the contracting parties is to benefit a third party - does not give third parties who contract with the promisee the right to enforce the latter's contract with another.*"[114] The court explained that this stricter rule in the construction context requiring "***express contractual language stating that the contracting parties intended to benefit a third party...*** *reflects the particular nature of construction contracts and the fact that… there are often several contracts between various entities, with performance ultimately benefitting all of the entities involved.*"[115]

118. It follows that, because the Contracts contain no express provision indicating that the Parties intended specifically to benefit Greenville as a third-party, and IEC offers no other grounds for Greenville to assert rights under the Contracts, IEC's claim that Greenville is entitled to recover

---

[113] *Matter of White Plains Plaza Realty, LLC v. Cappelli Enterprises, Inc.*, 108 A.D.3d 634, 637 (N.Y. App. Div. 2013) (citations omitted) (emphasis added) (**Exhibit RL-4**).

[114] *Port Chester Elec. Const. Co. v. Atlas* 357 N.E.2d 983, 986 (N.Y. 1976) (**Exhibit RL-5**).

[115] *Dormitory Authority v. Samson Construction Co.*, 94 N.E.3d 456, 459-60 (N.Y. 2018) (emphasis added) (**Exhibit RL-6**); see also *Lake Placid Club Attached Lodges v. Elizabethtown Builders, Inc.*, 131 A.D.2d 159, 162 (N.Y. App. Div. 1987) (**Exhibit RL-7**): "*[O]rdinarily, construction contracts are not construed as conferring third-party beneficiary enforcement rights.*"

damages must fail.  In support of Greenville's alleged third-party beneficiary status, IEC points to:

    i.    discussions between the Parties that purportedly indicate the Respondents' knowledge of Greenville's role as the operator of the Rumuji Plant;[116] and

    ii.    the indemnification provision in the Equipment Contract, Clause 19.4, discussed above, which provides that IEC will indemnify GEOG for and against any liability arising out of claims made by unnamed third parties.[117]

Neither of IEC's arguments passes muster under the strict standard set forth in *Port Chester* for two reasons.

119.    **First**, even if "*GE understood Greenville's role in the project*" to be the operating entity of the Rumuji Plant, that knowledge alone has no bearing on the legal determination of Greenville's third-party beneficiary status, as the Court of Appeals has made clear.  In *Dormitory Authority v. Samson Construction Co.,* the Dormitory Authority of the State of New York ("**DASNY**") entered into a contract with the City of New York, which provided that DASNY would finance and manage the design and construction of a laboratory to be used by the City of New York's Office of the Chief Medical Examiner ("**OCME**").[118]  DASNY then entered into a separate contract with Perkins, an architectural company, for design, architectural, and engineering services relating to the construction of the laboratory.  In a suit brought by DASNY against Perkins, the Court of Appeals held that although all of the parties, including Perkins, "*were aware that the laboratory was being built for OCME's use,*" the City of New York (on behalf of OCME) was not a third-party beneficiary.[119]   Citing a fact pattern illustrative of an incidental third-party beneficiary relationship in the comments to the Restatement (Second) of Contracts that is strikingly similar to the one at issue, the court "*recogniz[ed] the fact that, **although the performance of a construction-related contract may benefit a third-party end-user, that does not in itself establish enforcement rights in that third party***".[120]  Accordingly, IEC's assertion that GE was

---

[116] Statement of Claim ¶311.

[117] Statement of Claim ¶312.

[118] *Samson Construction*, 94 N.E.3d at 458.

[119] *Id.* at 459-60.

[120] *Id.* (emphasis added).

aware of Greenville's role as the operating entity fails to support a finding of third-party beneficiary status.

120. **Second**, despite acknowledging that "*the Sales Agreement did not name Greenville specifically,*" IEC nevertheless asserts that the Equipment Contract "*anticipated in several places that a subsidiary such as Greenville would ultimately run the plant and receive the benefit of the contract.*"[121] Samson Construction is again dispositive on this issue. As discussed above, in Samson Construction, DASNY entered into a contract with Perkins for design, architectural, and engineering services relating to the construction of a laboratory for OCME. At the same time, DASNY also entered into a separate contract with Samson Construction to provide excavation and foundation work for the laboratory project. The Court of Appeals, in rejecting the City of New York's third-party beneficiary claims, distinguished between the DASNY/Samson contract, which explicitly "*provides that the client - i.e., the City [of New York] – 'is an intended third party beneficiary of the Contract for the purposes of recovering any damages caused by [Samson]'*" and the DASNY/Perkins contract, which contained only "***passing references** to the client... [and] no analogous language providing that the City is an intended third-party beneficiary.*"[122] Notably, unlike the DASNY/Samson contract, which "*expressly reserves third-party enforcement rights,*" IEC fails to demonstrate an unequivocal expression of rights to Greenville. Instead, IEC's citations to provisions in the Contracts referencing "third parties" are precisely in the nature of the "passing references to the client" that the Court of Appeals has rejected as grounds for finding third-party beneficiary status.[123]

C.  <u>GREENVILLE PROVIDES NO OTHER BASIS ON WHICH TO ASSERT CLAIMS AGAINST THE GEOG ENTITIES IN THIS ARBITRATION</u>

121. The import of the Court of Appeals' decision in *Samson Construction* is that a party asserting third-party beneficiary rights under a construction contract must show a clear intent to confer such third-party rights *on the face of the contract*. Indeed, New York courts applying *Samson Construction* have interpreted the Court of Appeals' decision to provide that "*courts should no*

---

[121] Statement of Claim ¶312.

[122] *Samson Construction*, 94 N.E.3d at 458.

[123] Compare *Sutton Apartments Corp. v. Bradhurst 100 Development LLC*, 36 Misc.3d 1205(A) (N.Y. Sup. Ct. N.Y. Cty. 2012) (**Exhibit RL-8**) (finding that absent "*any reference to eventual purchasers as beneficiaries of the agreements... the unit owners lack standing to assert claims against the contractors*"), with *Board of Managers of the Alfred Condominium v. Carol Management*, 214 A.D.2d 380, 382 (N.Y. App. Div. 1995) (**Exhibit RL-9**) (finding that individual condominium unit owners had standing to sue the building's contractors as third-party beneficiaries of the contract between the contractors and the sponsor where a contract rider "*explicitly refers to the unit owners as beneficiary parties to that agreement*").

*longer consider the surrounding circumstances in determining who qualifies as an intended third-party beneficiary of a contract.*"[124] As discussed above, IEC cannot show that the plain language of the Equipment Contract, Services Contract, or Guarantee - agreements between IEC and the GEOG Entities that make no reference to Greenville - grant any enforceable rights to Greenville.

122. However, even if the Arbitral Tribunal were to examine the surrounding circumstances, which New York law provides is irrelevant to the determination of this issue, neither the agreements between IEC and Greenville nor the conduct of the Parties can establish any rights in Greenville to assert claims against the GEOG Entities.

123. **First**, the Credit, Procurement, and Services Agreements between IEC and Greenville, to which the GEOG Entities were not a party, and of which the GEOG Entities had no knowledge, fail to confer any third-party beneficiary rights on Greenville. Plainly, there is no privity of contract between Greenville and the GEOG Entities, and none of the dealings between IEC and Greenville can create obligations to the GEOG Entities.

124. Nothing in IEC's only witness statement discussing IEC's relationship with Greenville supports a finding of third-party beneficiary rights. According to IEC's witness, Erik Helsen, as of December 31, 2018, Greenville's liability towards IEC under the Credit Agreement was $430,241,667.79, consisting of OPEX and CAPEX expenditures, accumulated interest on money transferred, and commitment fees.[125] In addition, as of December 31, 2018, Greenville purportedly invoiced IEC a total of $5,930,800.65 for work under the Services Agreement, including payments to engineers and other technical personnel for work related to the Rumuji Plant project. The payments related to these agreements between Greenville and IEC cannot create any contractual rights between Greenville and the GEOG Entities under New York law.

125. **Second**, any attempt by IEC to transfer or assign rights under the Contracts to Greenville through the purported transfer of title to the Trains from IEC to Greenville must be rejected. Even if the Trains supplied by GEOG were transferred from IEC to Greenville[126], IEC did not, and could not without GEOG's consent, assign any rights or obligations under the Equipment Contract to Greenville. Clause 4 of the Equipment Contract provides, in relevant part, that:

---

[124] *Town of Huntington v. Long Is. Power Auth.*, 60 Misc. 3d 1222(A), 2018 WL 3940358, at *13-14 (N.Y. Sup. Ct. Aug. 16, 2018) (**Exhibit RL-10**).

[125] Helsen Witness Statement ¶ 14.

[126] Helsen Witness Statement ¶ 18.

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM INDEX NO. 650627/2021

NYSCEF DOC. NO. 7

ICDR/AAA Case No. 01-18-0002-9174 – Statement of Defense to Claim and Reply on Counterclaims
Page 35

RECEIVED NYSCEF: 01/27/2021

SLCG

> [IEC] shall not assign the [Equipment Contract] or any part thereof or any benefit, obligation or interest therein or thereunder, to any third party, without the prior written consent of [GEOG]. Notwithstanding the foregoing, [IEC] shall be entitled, without [GEOG's] consent:(i) to assign the [Equipment Contract] or any part thereof or any benefit, obligation or interest therein or thereunder, to any Affiliate but provided (a) such Affiliate has been approved by [GEOG] as having the financial capability to perform the [Equipment Contract] obligations, or (b) [IEC] shall remain liable for all [IEC's] obligations under this [Equipment Contract] that are assigned to such [IEC's] Affiliate...

126. Under New York law, "*[n]on-assignability clauses have been held to negate third-party beneficiary status, even where assignment was permitted with prior written approval.*"[127]  For example, one court specifically rejected an attempt to confer third-party rights by assignment, denying a third-party beneficiary claim where the court found no express intent to benefit the plaintiff in the terms of the contract, and the court held that the existence of a clause prohibiting assignment "*without the prior written consent of the other parties*" barred any third-party beneficiary claims.[128]

127. Accordingly, none of the evidence in the single witness statement IEC cites in its Statement of Claim in support of its argument that Greenville is a third-party beneficiary to the Contracts is relevant to the Arbitral Tribunal's determination of this preliminary issue under New York law. Moreover, there is no additional evidence that could be proffered that would bear on the Arbitral Tribunal's determination.  For these reasons, the Arbitral Tribunal lacks jurisdiction to rule on any claims raised by Greenville.

## V.    LACK OF JURISDICTION ON THE BHGE ENTITIES

128. The BHGE Entities have nothing to do with this arbitration.

129. In the Statement of Claim, there are few paragraphs devoted to this issue, randomly allocated. ¶ 21 reads as follows:

> Currently, the arbitrability issue is sub judice before the U.S. District Court for the Southern District of New York.  Claimants' submissions to that Court establish that BHGE and BHGE LLC (i) have taken over the performance of the Contracts at issue in this arbitration, (ii) are the alter egos and successors of GEOG and (iii) are equitably estopped from denying their obligations under the contracts at issue here, including to arbitrate this dispute.

130. In ¶ 306, the Claimants maintain that the BHGE Entities "*are successors of GEOG and GE Nigeria and thus have successor liability for the contractual breaches*".  The Claimants go on to argue that

---

[127] *United Intern. Holdings, Inc. v. Wharf (Holdings) Ltd.*, 988 F. Supp. 367, 373 (S.D.N.Y. 1997) (**Exhibit RL-11**).

[128] *Sazerac Co., Inc. v. Falk*, 861 F. Supp. 253, 258 (S.D.N.Y. 1994) (**Exhibit RL-12**) (collecting cases in which "*[s]imilar language has been held to bar third party beneficiary claims in similar circumstances*").

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM
INDEX NO. 650627/2021

NYSCEF DOC. NO. 7
ICDR/AAA CASE No. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
RECEIVED NYSCEF: 01/27/2021
Page 36

SLCG

because of the merger, the BHGE Entities "*have stepped in and taken over performance of the Contracts*", given that "*BHGE LLC is carrying on the identical oil and gas business previously performed by, among others, General Electric Company subsidiaries GEOG and GE Nigeria, with continuity of employees, supervisors, and senior management; continuity of business locations; and continued performance of the Contracts by BHGE*".  In addition, the Claimants claim that GEOG and the BHGE Entities "*'share' a website*" and that "*GEOG no longer has separate, independent financial reports, and its federal tax returns are consolidated with and reported by BHGE LLC*" and demand that "*any effort to shield BHGE LLC and BHGE from liability for the contractual breaches cannot stand*".[129]

131.  The arguments raised by the Claimants before the New York District Court are "*incorporated by reference*"[130] in the Statement of Claim, with no additional details (legal arguments or supporting documentation).  And there is more - Claimants also reserve the right to (emphasis added) "*further develop these issues in this arbitration as appropriate **following** a ruling from the New York court*".[131]

132.  The reason the Claimants elected to involve U.S. Courts in this matter is unclear: the Arbitral Tribunal's jurisdiction to determine preliminary issues ought not to be in dispute, in light of AAA Rule 7 and the doctrine of competence-competence.[132]  Moreover, the issue of arbitrability on the BHGE Entities has already been submitted to the Arbitral Tribunal in this case.[133]

133.  As expected, the New York District Court dismissed the Claimants' petition with its order of August 13, 2019, finding that "*because IEC 'agreed to be bound by provisions that clearly and*

---

[129] Statement of Claim ¶¶ 306(a) and (b).

[130] Statement of Claim ¶¶ 21 and 307.

[131] Statement of Claim ¶¶ 21 and 307. The BHGE Entities expressly reserve the right to further argue on the arbitrability issue, in the event the Claimants provide further arguments in their Rejoinder.

[132] According to New York law, determinations of jurisdiction or arbitrability may be delegated to an arbitrator, "*if there is clear and unmistakable evidence from the arbitration agreement… that the parties intended that the question of arbitrability shall be decided by the arbitrator.*" *Shaw Grp. Inc. v. Triplefine Intern. Corp.*, 322 F.3d 115, 121 (2d Cir. 2003) (**Exhibit RL-13**).  The Second Circuit has held that, "*when . . . the parties explicitly incorporate [into the arbitration agreement] rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as 'clear and unmistakable evidence' of the parties' intent to delegate such issues to an arbitrator.*" *Contec Corp. v. Remote Solution Co., Ltd.*, 398 F.3d 205, 209 (2d Circ. 2005) (**Exhibit RL-14**). The arbitration agreement at issue provided that the arbitration would be held in accordance with the AAA. Those rules - specifically Rule 7(a) - provide that "*[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.*" *Id.* at 208 (quoting AAA Rule R–7(a)).

[133] The Respondents' Answering Statement ¶ 2 and Statement of Counterclaim ¶¶ 23-26; see also the letter from ICDR, dated August 20, 2018 at 2 (noting that the non- signatory issue "*must be determined by the Tribunal once appointed*").

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM INDEX NO. 650627/2021

NYSCEF DOC. NO. 7    ICDR/AAA Case No. 01-18-0002-9174 – Statement of Defense to Claim and Reply on Counterclaims    RECEIVED NYSCEF: 01/27/2021

SLCG

Page 37

*unmistakably allow the arbitrator to determine her own jurisdiction over an agreement to arbitrate whose continued existence and validity is being questioned, it is the province of the arbitrator to decide whether a valid arbitration agreement exists'".*[134]   The court agreed that it is for the Arbitral Tribunal, **not** for the New York Court, to determine its jurisdiction over the BHGE Entities.

134. In short, the Claimants' allegations are simply wrong, as they are all based on a misinterpretation of the scope, intent and effects of the merger between Baker Hughes and General Electric Company ("**GE**").  There is **no** reason whatsoever that can justify, under any legal theory, the direct involvement of a parent company as a party in arbitration proceedings related to contracts entered into by its subsidiaries.

135. Just as for the issue of Greenville's standing, the exclusion of the BHGE Entities from this arbitration is such an obvious conclusion that it is difficult to understand why the Claimants insist in trying to unduly complicate it.  For the sake of completeness, we will shortly deal with the arguments raised by the Claimants in the Statement of Claim on this point.

### A.   BHGE LLC Is The Parent – Not The Successor In Interest – To GEOG

136. In the GE-Baker Hughes Transaction in July 2017, GEOG's ultimate parent company, GE, and Baker Hughes contributed their respective oil and gas businesses to the newly formed BHGE LLC, so as to create the world's first fullstream oilfield technology provider.[135]

137. In connection with the GE-Baker Hughes Transaction, GE Oil & Gas, Inc. became GE Oil & Gas, LLC, and BHGE LLC became the parent company of GEOG.[136]  GEOG - one of the many legal entities which operated under the umbrella of the "GE Oil & Gas" group of families and was contributed by GE to the BHGE conglomerate - continues to exist and to do business.[137]

138. BHGE is a holding company and has no material assets other than its ownership in BHGE LLC and certain intercompany and tax-related balances.[138]  GEOG continues to be an active legal entity with its own distinct corporate identity.  As before the GE-Baker Hughes Transaction, GEOG has its own employees, totaling over 2,000.  Further, GEOG maintains its own books and

---

[134]  Order of the United States District Court Southern District of New York (**Exhibit R-178**), citing *Contec*.

[135]  Press Release, BHGE, Baker Hughes and GE Oil & Gas Complete Combination, (**Exhibit R-179**).

[136]  Certificate of Conversion to Limited Liability Company for GEOG (**Exhibit R-180**).

[137]  Exhibit R-9, Form 10K at 3.

[138]  *Id.*

records, and maintains its own financial records.[139]  GEOG and BHGE LLC also maintain
separate bank accounts.  Further, the GE-Baker Hughes Transaction did not result in the
transferring of all assets out of GEOG.  GEOG is an operating legal entity with assets sufficient
to satisfy any judgment against it in this arbitration.

139. GEOG informed IEC by a letter from Juan Cuesta, in which it explained that upon the GE-Baker
Hughes Transaction, GEOG would continue to operate as a separate legal entity.[140]  The letter
assured IEC that "*except for the change in the entity name, [GEOG's] Bank Account details remain the
same,*" and the updated banking details merely updated the name on the account from GE Oil
& Gas, Inc. to GE Oil & Gas, LLC (to note the conversion of the legal entity to an LLC).  The
letter added that IEC "*will be making payments to GE Oil & Gas for those goods or services,*" rendered
under the Contracts.  GEOG further assured IEC that they would "*continue to receive goods or
services from [GEOG]*" and would "*be making payments to [GEOG] for those goods or services.*"  The
letter further concludes that GEOG "*want[s] to reassure you that the relationship between you and
[GEOG] has not changed, and all payments should continue to be made to [GEOG].*"

140. Following that communication, GEOG sent another correspondence to IEC on June 13, 2018,
again reassuring IEC that GEOG remained an active, viable company after the GE-Baker
Hughes Transaction.[141]. In that letter, GEOG reiterated that "*the conversion of GE Oil & Gas, Inc.
to GE Oil & Gas, LLC has no tangible impact on the Project or IEC or whether GEOG can continue to
perform under the Sales Agreement.*"  The letter emphasized that GEOG was "*not abandoning any
obligations under the Agreements, and [has] shown every intention and ability to perform any remaining
obligations.*"

141. It is a well-established principle of New York law that parent corporations and/or holding
companies will not be liable for the alleged acts of their subsidiaries.  This default rule is the
reason that so many conglomerates are structured as a hierarchy of parent and subsidiary
corporations: "*It is a general principle of corporate law deeply ingrained in our economic and legal
systems that a parent corporation (so-called because of control through ownership of another corporation's
stock) is not liable for the acts of its subsidiaries*".[142]

---

[139] Written Consent of Sole Member in Lieu of Annual Meeting for GEOG (**Exhibit R-181**).

[140] Letter from Juan Cuesta, General Manager of GEOG Turbomachinery Process Solutions North America
(**Exhibit R-182**).

[141] Exhibit R-10, Letter from Marco Pagliaro dated June 13, 2018.

[142] See *U.S. v. Bestfoods*, 524 U.S. 51, 61 (1998) (**Exhibit RL-15**) (quoting Douglas & Shanks, Insulation from
Liability Through Subsidiary Corps., 39 Yale L.J. 193 (1929)); see also *Taylor Devices, Inc. v. Walbridge*

142. The legal principle that a parent company is not the successor-in-interest to its subsidiary was specifically discussed by the New York District Court in *Gary Friedrich Enterprises, LLC v. Marvel Enterprises, Inc*.[143] There, the plaintiffs filed a patent infringement lawsuit against multiple defendants, including Marvel Entertainment, LLC as the successor to Marvel Entertainment, Inc. Plaintiffs then moved to add the Walt Disney Company ("**Disney**") as a defendant, arguing, in part, that Disney was the successor in interest to Marvel Entertainment, Inc. The court denied that claim, noting that Disney acquired Marvel Entertainment, Inc. by creating Marvel Entertainment, LLC. Therefore, while Marvel Entertainment, LLC was the successor to Marvel Entertainment, Inc., Disney was the parent company. Accordingly, the court noted that "*Disney is not liable for the claims against Marvel Entertainment, Inc. simply because it is now the parent company.*"

143. The same rationale as in *Gary Friedrich* applies in the instant matter. In *Gary Friedrich*, Marvel Entertainment, Inc. was converted to Marvel Entertainment, LLC and Disney became the parent to the newly formed limited liability company. Here, GE Oil & Gas, Inc. was converted to GE Oil & Gas, LLC, with BHGE LLC becoming the parent company of GEOG. Just as in *Gary Friedrich*, BHGE LLC's status as the parent company does not make BHGE LLC the successor to GEOG. The Claimants' attempt to enforce arbitration against nonsignatories BHGE and BHGE LLC under a successor in interest theory is, therefore, without merit.

## B. THE BHGE ENTITIES ARE NOT THE ALTER EGOS OF GEOG

144. For the same reasons described above, the BHGE Entities are not alter egos of GEOG.

145. In the context of a non-signatory to an arbitration agreement, "*[a] non-signatory may be bound to arbitrate where it exercised complete control over a signatory and employed that domination to injure another signatory to the agreement*".[144] The conduct at issue must reveal a "*virtual abandonment of separateness*".[145]

---

*Aldinger Co.*, 538 F. Supp. 2d 560, 577 (W.D.N.Y. 2008) (**Exhibit RL-16**) (finding holding company was not the alter ego of subsidiary).

[143] *Gary Friedrich Enterprises, LLC v. Marvel Enterprises, Inc.*, No. 08 CIV. 1533 BSJJDF, 2011 WL 1142916 (S.D.N.Y. Mar. 22, 2011) (**Exhibit RL-17**).

[144] *McKenna Long & Aldridge LLP v. Ironshore Specialty Ins. Co.*, No. 14-CV-6633 KBF, 2015 WL 144190, at *8 (S.D.N.Y. Jan. 12, 2015) (**Exhibit RL-18**) (quoting *Masefield AG v. Colonial Oil Indus., Inc.*, No. 05 CIV. 2231 (PKL), 2005 WL 911770, at *6 (S.D.N.Y. Apr. 18, 2005) (internal quotations omitted)); see also *Thomson–CSF S.A. v. American Arbitration Ass'n*, 64 F.3d at 777–78 (**Exhibit RL-19**).

[145] *Thomson–CSF*, 64 F.3d at 777–78 (noting that courts will pierce the corporate veil "*where a parent dominates and controls a subsidiary*") (internal quotation marks and citations omitted). Determining that veil-piercing is appropriate is a "*fact specific*" inquiry, and courts consider many factors, including: (1) disregard of

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM
NYSCEF DOC. NO. 7
INDEX NO. 650627/2021
RECEIVED NYSCEF: 01/27/2021

ICDR/AAA Case No. 01-18-0002-9174 – Statement of Defense to Claim and Reply on Counterclaims
Page 40

SLCG

146. With respect to parent-subsidiary relationships (such as between BHGE LLC and GEOG), the parent "*must exercise complete domination 'in respect to the transaction attacked' so that the subsidiary had 'at the time' no separate will of its own, and such domination must have been used to 'commit fraud or wrong' against plaintiff, which proximately caused plaintiff's injury*".[146] Therefore, the party seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice such that a court will intervene.

147. Here, no evidence exists that BHGE LLC has used GEOG to commit fraud on or otherwise injure the Claimants. Rather, the evidence affirmatively demonstrates that GEOG has not been stripped of its assets, but, instead, as noted above, GEOG has sufficient assets to pay any final judgment in this arbitration. There is also no evidence that BHGE LLC, as the parent company, exercised "*complete domination*" over GEOG with a "*virtual abandonment of separateness*" between the two legal entities. GEOG is an active limited liability company; it maintains its own books and records; has its own employees; has its own bank accounts; and continues to conduct its own business (including, but not limited to, operating under its contractual rights and obligations under the underlying contracts).

148. Any reliance by the Claimants on changes to the GEOG website, as well as other press releases and marketing materials, to support their alter ego argument is also unsupported. Before the GE-Baker Hughes Transaction, GE's oil and gas businesses (including, but not limited to, GE Oil & Gas, LLC, Nuovo Pignone International, S.r.l. and others) operated under the umbrella of the "GE Oil & Gas" moniker or trade name. Following the GE-Baker Hughes Transaction, for branding purposes, the "GE Oil & Gas" moniker / trade name was dropped, and variations of

---

corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arm's length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities. *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997) (**Exhibit RL-20**).

[146] *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988) (**Exhibit RL-21**). A court may pierce the corporate veil only upon a showing that "(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury. See *Morris v. N.Y. State Dep't of Taxation and Fin.*, 623 N.E.2d 1157 (N.Y. 1993) (**Exhibit RL-22**) (citations omitted). While "*complete domination of the corporation is the key . . . such domination, standing alone, is not enough; some showing of wrongful or unjust act toward plaintiff is required.*" *Id.* at 141-142. See also *Freeman*, 119 F.3d at 1053: "[A]bsent findings of fraud or bad faith, a corporation . . . is entitled to a presumption of separateness from a sister corporation . . . even if both are owned and controlled by the same individuals.*" *Am. Renaissance Lines, Inc. v. Saxis S. S. Co.*, 502 F.2d 674, 677 (2d Cir. 1974) (citations omitted) (**Exhibit RL-23**).

the "Baker Hughes" or "BHGE" name were used to denote that the entities were now within the BHGE conglomerate. The use of logos and/or the language in promotional and marketing materials is irrelevant in determining the true relationship between the parent and subsidiary company.[147] Thus, the business and marketing decisions to use the Baker Hughes trade name and logo when interacting with the public, including within the GEOG employee emails, are irrelevant.

## C.   ON THE THEORY OF ESTOPPEL

149. Under the estoppel theory, a party is estopped from avoiding arbitration when it has received a direct benefit from an agreement containing an arbitration clause. But the benefits must be direct, meaning they must flow directly from the agreement. In turn, a benefit is indirect *"where the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself"*.[148]

150. Again, the Claimants' reliance on the estoppel theory to compel arbitration can only be based upon the incorrect (and unsupported) assumptions that (1) GEOG no longer maintains independent finances; (2) GEOG has ceased operations; and (3) BHGE LLC has taken over performance of the underlying contracts. As detailed above, the factual bases of the Claimants' arguments are false. GEOG maintains its own financial records; maintains its own bank accounts; has not ceased operations and continues to operate under the underlying contracts. Therefore, the BHGE Entities have received no direct benefit from the underlying contracts.

---

[147] *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1460 (2d Cir. 1995) (**Exhibit RL-24**) (rejecting alter ego argument that was based, in part, on shared logo and promotial literative between parent and subsidiary); *Japan Petroleum Co. (Nigeria) v. Ashland Oil Inc.*, 456 F. Supp. 831, 846 (D. Del. 1978) (**Exhibit RL-25**) (noting that representations made by parent in its annual reports that subsidiary serves as an agent *"may result from public relations motives or an attempt at simplification"*); *Am. Trading & Prod. Corp. v. Fischback & Moore, Inc.*, 311 F. Supp. 412, 416 (N.D. Ill. 1970) (**Exhibit RL-26**) (*"boastful"* advertising and consideration of subsidiaries as *"family"* do not prove that corporate identities were ignored.).

[148] See *Boroditskiy v. European Specialties LLC*, 314 F. Supp. 3d 487, 495 (S.D.N.Y. June 4, 2018) (**Exhibit RL-27**). Additionally, *"nonsignatories cannot be compelled to arbitrate under the direct-benefit estoppel theory solely due to their affiliation with a signatory." Id.; see also MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 62 (2d Cir. 2001) (**Exhibit RL-28**) (*"[A] signatory may not estop a nonsignatory from avoiding arbitration regardless of how closely affiliated that nonsignatory is with another signing party."*); *Oppenheimer & Co. Inc. v. Deutsche Bank AG*, No. 09 CIV. 8154 (LAP), 2010 WL 743915 at *2 (S.D.N.Y. Mar. 2, 2010) (**Exhibit RL-29**) (*"The mere fact of a nonsignatory's affiliation with a signatory will not suffice to estop the nonsignatory from avoiding arbitration, no matter how close the affiliation is."*). As the Second Circuit has specifically noted, the purpose of these limitations is to protect parent companies, stating that *"[a]nything short of requiring a full showing of some accepted theory under agency or contract law imperils a vast number of parent corporations." Thomson-CSF, S.A.*, 64 F.3d at 780.

151. Before the U.S. District Court, Claimants also made the erroneous argument that BHGE and/or BHGE LLC should be compelled to arbitrate under the theory of estoppel because BHGE LLC has sought recovery on claims under the Contracts. However, in this arbitration, the BHGE Entities made clear from the very beginning that they were objecting to the arbitrability of the Claimants' requests for relief against them and raised no claims against any of the Respondents.[149]

152. For all of the reasons above, the Arbitral Tribunal lacks jurisdiction over the BHGE Entities, and the BHGE Entities should be removed as parties to this arbitration.

**VI.     RESPONSE TO THE CLAIMS**

153. Almost 100 pages of the Statement of Claim are devoted to the description of the alleged breaches of the Contracts by the GEOG Entities. Yet it is clear from the narrative of the Statement of Claim itself that most of those "breaches" have been cured by the GEOG Entities under the Contracts, at no cost for the Claimants.

154. The list of breaches can be summarized in six categories:[150]

    i.    Late delivery of the Trains;

    ii.    Failure to provide fully-modularized Trains;

    iii.    Incapability of the Trains to produce 0.25 MTPA of LNG;

    iv.    Delivery of defective Trains;

    v.    Delivery of non-tropicalized Trains, and

    vi.    On the Services Contract, failure to provide "*meaningful installation of the Trains*".

To remove any doubt: the Claimants' allegations are all disputed. The expert reports attached to this Statement of Defense address in detail the "*litany of defects*"[151] claimed by the Claimants

---

[149] The Respondents' Answering Statement ¶ 2 and Statement of Counterclaim ¶¶ 23-26; see also the letter from ICDR, dated August 20, 2018 at 2 (noting that the non- signatory issue "*must be determined by the Tribunal once appointed*").

[150] Statement of Claim ¶¶ 304-305.

[151] Statement of Claim ¶¶ 157 and thereafter. See also Second Witness Statement of Marco Pagliaro ¶ 52: "*most of the issues listed in the 'litany of defects' on the Statement of Claim were in fact closed at GEOG costs as they occurred*".

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM

NYSCEF DOC. NO. 7

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

SLCG

ICDR/AAA CASE NO. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 43

(the HKA Expert Report of Gareth Smith (**Exhibit RER-10**), the HKA Expert Report of Alan Borrowman (**Exhibit RER-11**), the HKA Expert Report of John Middleton (**Exhibit RER-12**) and the HKA Expert Report of Stephen Linwood (**Exhibit RER-13**)), along with the delay and quantum claims presented by the Claimants (the Expert's Report on Time Related Issues of Jeffrey Alan Blinkhorn (the "**Blinkhorn Report**") (**Exhibit RER-14**), the Report of Kay Linnell (the "**Linnell Report**") (**Exhibit RER-15**) and the Second Expert Report on Project Execution and Quantum Matters of Ing. Christopher Hillier (the "**Second Hillier Report**") (**Exhibit RER-16**)) and the safety issues on site (Briefing Notes of Alan Borrowman dated January 16, 2019 (**Exhibit RER-8**) and the HKA Expert Report of Alan Borrowman dated June 3, 2019 (**Exhibit RER-9**)).

155. Here, however, we wish to focus on the legal framework under which the dispute must be resolved. The Contracts provide for a very specific – and quite standard – regulation of the remedies that can be applied to cure any potential breach of the Contracts by the GEOG Entities.

156. In their request for relief, the Claimants ignore the contractual discipline and request the payment of damages quantified at $591 million, as *"articulated in the Lapuerta Expert Report and the Witness Statement of Erik Helsen"*.[152] Neither the expert nor the witness for the Claimants refer to any article of the Contracts. We find it odd - to say at least - that the Statement of Claim follows the opinions of the expert and the witness, paying no attention to the contractual remedies.

157. The opinions of Mr. Lapuerta and Mr. Helsen are thoroughly analyzed in the Linnell Report, which finds that the losses calculated are *"unrealistic"*.[153] From a legal standpoint, it is difficult to comment on the Claimants' case. After reading the Statement of Claim, we feel the need to put some order to the discussion. We will start from the Contracts.

## A. THE CONTRACTUAL REMEDIES

158. The only reference in the Statement of Claim to the provisions of the Equipment Contract are three paragraphs at the end requesting $4.25 million in liquidated damages.[154]

159. In case of late delivery of the Trains, Clause 6.5 of the Equipment Contract sets the weekly amount (0.5% of the Contract Price for each Train) and the cap (the total amount *"shall not exceed*

---

[152] Statement of Claim ¶ 514(f).

[153] Linnell Report § 4.1.

[154] Statement of Claim ¶¶ 414-416.

*5% of the Contract Price*") of the liquidated damages for late delivery of the Trains.  Clause 6.5 also provides that GEOG shall have a four-week grace period from the delivery date, without any application of liquidated damages or other remedies.  Clause 9.1 of the Equipment Contract further specifies that GEOG *"shall deliver the Plants and the Parts FCA Port of Export (Incoterms 2010)… [GEOG] shall not be liable in any claim asserted by [IEC] with respect to delivery beyond that point"*.

160. The Claimants argue that the final modules for Train 1 were delivered in February 2016 and the final modules for Train 2 were delivered in March 2016.[155]  Because the later deliveries included only the ICP provided pursuant to a subsequent change order[156] and minor items, Mr. Hillier and Mr. Blinkhorn disagree with the Claimants and consider the reasonable last shipment delivery date to be October 28, 2015 for Train 1 and February 8, 2016 for Train 2.[157]

161. Mr. Blinkhorn also finds that (i) GEOG is entitled to an extension of the delivery dates to March 28, 2016 for both of the Trains and (ii) the BOG compressor and the Cold Box were both impacted during the design and procurement phase, causing delay in the delivery.[158]

162. For these reasons, GEOG is not liable for any delay under the Equipment Contract.  However, should the Arbitral Tribunal determine that GEOG is liable for any delay, IEC cannot be compensated more than the maximum liquidated damages under the Equipment Contract of $4.25 million – which, we note is much higher than IEC's actual loss of $677,000.[159]

163. But there are many other contractual provisions to consider.  The Contracts are very clear in terms of remedies available to the Parties in case of breach and leave no room for interpretation. The application of the contractual remedies is straightforward, once facts are established.

164. In the event the Trains do not reach the Guaranteed Performances, Clause 25.3 sets the criteria to determine the liquidated damages due to IEC for *"every kilowatt of power consumption per LNG gallon produced in excess"*, *"each ton per day of liquified natural gas less"* and *"if the LNG to tank inlet*

---

[155]  Statement of Claim ¶¶ 314-315.

[156]  Statement of Counterclaim ¶¶ 171-173.

[157]  Second Hillier Report § 7.3.4; Blinkhorn Report § 4.1.10.

[158]  Blinkhorn Report §§ 4.3.31 and 4.3.34-4.3.40; Second Witness Statement of Marco Pagliaro ¶¶ 33-35; Statement of Counterclaim ¶¶ 75-86.  Indeed, GEOG requested an extension of time with Change Order COR-030 dated December 8, 2015 (**Exhibit R-183**) and again with its change order request of June 28, 2018 (Exhibit R-4), yet further change order requests that were ignored by IEC.

[159]  Linnell Report § 4.4.

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM
INDEX NO. 650627/2021

NYSCEF DOC. NO. 7
RECEIVED NYSCEF: 01/27/2021

SLCG

ICDR/AAA CASE No. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 45

*fails to achieve the LNG Specifications*". Similarly to the liquidated damages for late delivery, the "*Liquidated Damage per Plant for failure to achieve the Guaranteed Performances shall not exceed five percent (5%) of the Contract Price for each plant*" (Clause 25.4).

165. Under Clause 17.3, in case of defect, "*Seller, at its expense shall correct*" it. If GEOG "*fails or is unable to remedy a Defect within a reasonable time*", "*Buyer has the right to recover against Seller for Buyer's **direct** damages…incurred as a result of Seller's failure of inability to remedy the Defect*" (Clause 17.4, emphasis added).

166. The total aggregate liability of GEOG "*for all claims of any kind, whether in contract, warranty, indemnity, tort/extra contractual liability (including negligence), strict liability, or otherwise, arising out of or relating to the performance or breach of the Agreement…shall not exceed the total Contract Price of the Plant giving raise to the claim*" (Clause 19.2).[160] Accordingly, IEC's total damages cannot exceed the contract price of $95 million.

167. Finally, under Clause 19.3, IEC is barred from recovering consequential damages under the Contracts: "*without prejudice to the guaranteed performance expressly provided in the agreement, and except in a case of wilful misconduct, in no event, whether as a result of breach of contract, warranty, indemnity, tort/extra contractual liability (including negligence), strict liability, or otherwise, shall either party or its subcontractors or suppliers be liable for loss of profit or revenues, loss of use of the plant, parts or any associated equipment, downtime costs, claims of a party's customers for such damages, or for any special, consequential, incidental, indirect or exemplary damages*.[161]

168. Yet the Statement of Claim ignores the liquidated damages for performance, the remedial actions under the warranty clause and the limitation of liabilities. The Claimants are not seeking

---

[160] The indemnification provision in Clause 19.1 also limits GEOG' liability as follows: "*For purposes of Seller's indemnity responsibility under this Clause 19.1, no portion of Buyer's equipment, facility or the Site is considered third party property; provided that Seller shall indemnify Buyer for physical damage:*

(a)   *to the Plant up to twenty five million dollars ($25,000,000.00 USD); and,*

(b)   *to Buyer's equipment, facility or the Site up to ten million dollars ($10,000,000.00 USD);*

*each only to the extent resulting directly from the negligence of Seller or its officers, servants, agents, employees, Sub-contractors and/or assigns while engaged in activities under or in furtherance of this Agreement, above such amounts Buyer shall release, indemnify and hold Seller harmless from and against all claims and damages REGARDLESS OF WHETHER SELLER'S NEGLIGENCE IN ANY FORM CAUSES DAMAGES IN EXCESS OF SAID AMOUNTS.*"

[161] The Services Contract contains exactly the same language, both in terms of limitations and exclusions of liability.

**FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM** INDEX NO. 650627/2021

NYSCEF DOC. NO. 7 ICDR/AXA Case No. 01-18-0002-9174 – Statement of Defense to Claim and Reply on Counterclaims RECEIVED NYSCEF: 01/27/2021

SLCG

Page 46

the application of any of those remedies: none of them are referenced or claimed in any of the Claimants' requests for relief.

169. In other words, the contractual remedies for lack of performance or supply of defective equipment are not included in the *petita* of the Claimants. Consequently, the GEOG Entities' reliance on the Contracts must be taken only as a defense against the Claimants' claims. To be clear - because the Claimants did not raise any claim based on the Contracts, should the Arbitral Tribunal believe that the GEOG Entities breached any of their obligations and that the contractual remedies should apply, such conclusion can only lead to the dismissal of the Claimants' requests for relief in this arbitration.

170. Indeed, the Claimants maintain that the GEOG Entities are liable for post-contract fraudulent misrepresentation and willful misconduct/gross negligence and/or for pre-contract fraudulent inducement. None of these allegations are supported by facts.

B.    THE CLAIMANTS' POST-CONTRACT FRAUDULENT MISREPRESENTATION CLAIM FAILS AS A MATTER OF LAW

171. IEC cannot satisfy the elements of fraud with respect to its post-contract fraudulent misrepresentation claims. First, without citing a single specific, actionable misstatement, IEC asserts that "*Claimants can meet each of the[se] elements*" of fraud.[162] IEC's conclusory allegations that "*GE fraudulently represented its capacity and plans throughout performance, causing Claimants to continue their relationship with GE instead of 'cutting their losses' and moving to a competent contractor*" cannot pass muster under the heightened fraud pleading standard under New York law.[163] On the contrary, the evidence shows that the GEOG Entities consistently flagged issues that arose during the performance of the Contracts, including submitting numerous change order requests for changes to the Trains and the provision of additional equipment outside of the GEOG Entities' Scope of Supply requested by IEC, all but one of which IEC ignored.

172. In each of the three authorities IEC cites in support of its claim, courts sustained fraud claims where there was evidence that "*defendant repeatedly misrepresented or concealed existing facts*".[164]

---

[162] Statement of Claim ¶ 369.

[163] Statement of Claim ¶ 374.

[164] *Eagle Comtronics, Inc. v. Pico Products, Inc.*, 256 A.D.2d 1202, 1202 (N.Y. App. Div. 1998) (**Exhibit RL-30**); see also *Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 236 (S.D.N.Y. 2006) (**Exhibit RL-31**) (allowed recovery of out-of-pocket expenses where plaintiffs relied on statements that failure to pay was due to a "*temporary payment problem*"); *Kajima Intern., Inc. v. Formosa Plastics Corp., USA*, 15 S.W.3d 289, 291 (Tex. 2000) (**Exhibit RL-32**) (applying Texas law and allowing post-contract fraud claim where defendants allegedly engaged in a "'*string along' fraud scheme in which [defendant] made repeated false*

**FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM**
INDEX NO. 650627/2021
NYSCEF DOC. NO. 7
RECEIVED NYSCEF: 01/27/2021
**SLCG**

ICDR/AAA Case No. 01-18-0002-9174 – Statement of Defense to Claim and Reply on Counterclaims
Page 47

Not only does IEC fail to provide any evidence of false post-contract promises, it was in fact IEC that made promises of a "*commercial discussion*" to induce GE to undertake additional work outside the scope of the Contracts.

173. Second, IEC's post-contract fraud claim must be rejected as duplicative of its breach of contract claims. Notably, IEC's own authority undermines its post-contract fraud claim. In *Soroof Trading*, the court dismissed the plaintiff's fraudulent misrepresentation claim on the grounds that the "*theory of liability that Defendants continued in their misrepresentations during the course of the Distributor Agreement is '**not sufficiently distinct** from the breach of contract cause of action to constitute a separate cause of action . . . and **the alleged misrepresentations did not result in any loss independent of the damages allegedly incurred for breach of contract**'*".[165] IEC's basis for claiming damages based on post-contract fraud, that "*Claimants have incurred significant damages because of GE's almost four-year delay*"[166], is identical to its basis for its breach of contracts claim, and therefore cannot sustain an independent fraud claim as a matter of law.

C. THE GEOG ENTITIES DID NOT ENGAGE IN WILLFUL MISCONDUCT OR GROSS NEGLIGENCE

174. Under established New York law, exculpatory clauses, "*especially when entered into at arm's length by sophisticated contracting parties… are enforceable.*"[167] In exceptional circumstances, courts have declined to enforce exculpatory clauses on public policy grounds. In setting a high bar for this public policy exception, the Court of Appeals stated that "*an exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity **smacks of intentional wrongdoing***".[168] Indeed, the Court of Appeals has held that willful acts "*subsume[s] conduct which is **tortious in nature**, i.e., wrongful conduct in which defendant willfully intends to inflict harm on plaintiff at least in part through the means of breaching the contract between the parties.*"[169]

---

promises to compensate [plaintiff] for delays, disruptions, bid omissions, and additional costs in order to keep [plaintiff] working").

[165] *Soroof Trading Development Co. Ltd. v. GE Microgen Inc.*, No. 10 Civ. 01391(LGS) (S.D.N.Y. Oct. 30, 2013) 2013 WL 5827698, at *9 (quoting *Church of S. India Malayalam Congregation of Greater N.Y. v. Bryant Installations, Inc.*, 85 A.D.3d 706, 707 (N.Y. App. Div. 2011) (Exhibit CL-40) (emphasis added).

[166] Statement of Claim ¶ 380.

[167] *Kalisch-Jarcho, Inc. v. City of New York*, 448 N.E.2d 413, 416 (N.Y. 1983) (**Exhibit RL-33**).

[168] *Id.* at 416-17 (emphasis added).

[169] *Metropolitan Life Ins. Co. v. Noble Lowndes Intern., Inc.*, 643 N.E.2d 504, 508 (N.Y. 1994) (**Exhibit RL-34**) (emphasis added).

175. Notably, courts have broadly held that conduct undertaken to advance a "*legitimate economic self-interest,*" even if amounting to an intentional breach of contract, is not enough to avoid a limited liability provision. Rather, the "*type of intentional wrongdoing that could render a limitation in [a contract] unenforceable is that which is 'unrelated to any legitimate economic self-interest'*".[170] In enforcing contractual limitations on liability despite the presence of acts undertaken in furtherance of legitimate economic interests—even acts that may harm another party to the contract—courts have explained that "*[t]he option to breach a contract and pay damages is always available, even where the breaching party had no intention of performing its obligations when it entered into the agreement*".[171]

176. The authority IEC cites in support of its assertion that the public policy exception to Kalisch applies is inapposite. IEC first relies on *Apache Bohai Corp., LDC v. Texaco China B.V.*[172], in which a federal court in Texas, interpreting New York law, held that a finding of "*reckless indifference*", in the absence of bad faith or malice, was sufficient to trigger the public policy exception of Kalisch. The court further held that a finding of reckless indifference was "*well-supported*" by "*1) Apache's abrupt withdrawal within a few weeks of an exploration phase deadline; 2) Apache's immediate disassembly of its team; 3) Apache's complete abdication of its performance responsibilities; and 4) Apache's total disregard for the difficult position in which it left Texaco*".[173]

177. Far from supporting a finding of reckless indifference, the record in fact reflects a sustained effort by the GEOG Entities to save a project that IEC severely mismanaged. The GEOG Entities provided a punch list of items in both their and IEC's scope, kept its technicians on the project site to assist with a variety of issues caused by IEC that were out of the GEOG Entities' scope, and mobilized additional personnel with continuous on-site presence to get the Rumuji Plant up and running. Indeed, the GEOG Entities provided all of this additional assistance without payment and "*without worrying whether it was [GE's] scope or IEC['s] scope*"[174], relying only on IEC's promise that the economic implications would be resolved later. On this evidence, IEC cannot prove that the GEOG Entities showed a reckless indifference to IEC's interest.

[170] *Electron Trading, LLC v. Morgan Stanley & Co. LLC*, 157 A.D.3d 579, 581 (N.Y. App. Div. 2018) (**Exhibit RL-35**) (emphasis added) (citation omitted).

[171] *Banc of America Securities LLC v. Solow Bldg. Co. II, L.L.C.*, 47 A.D.3d 239, 248 (N.Y. App. Div. 2007) (**Exhibit RL-36**) (citations omitted).

[172] *Apache Bohai Corp., LDC v. Texaco China B.V.*, Civil No. H-01-2019, 2005 WL 6112664, at *20 (S.D. Tex. Feb. 28, 2005), *aff'd*, 480 F.3d 397 (5th Cir. 2007) (Exhibit CL-39).

[173] *Id*. at *20 & n. 36.

[174] Witness Statement of Marco Pagliaro ¶ 21.

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM
NYSCEF DOC. NO. 7

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

SLCG

ICDR/AAA CASE NO. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 49

178. IEC's reliance on *Soroof Trading Development Co. v. GE Fuel Cell Systems, LLC*[175] is similarly misplaced.  In *Soroof*, the court held that allegations that:

i.    the defendant knew for four years "*that it could not build a product that would meet the contractual specifications*"; and

ii.    affirmatively deceived the plaintiff by repeatedly representing that "*a contractually adequate product would soon be ready for distribution,*"

were sufficient to support a challenge to an exculpatory provision on a motion to dismiss.[176] Contrary to IEC's assertions, GEOG in fact fulfilled its obligations under the Equipment Contract when it delivered the various parts comprising the modules as set forth in the Scope of Supply in October 2015 and February 2016, respectively.

179. The approximately four-month delay in the delivery of each of the Trains was due to IEC's repeated requests for additional work and equipment that resulted in 17 change order requests (16 of which were rejected by IEC), as well as IEC's continued failure to timely respond to RFIs and TQRs.[177]  During this time, GEOG did not "*conceal information*" from IEC, as IEC asserts, but continuously put IEC on notice of IEC's numerous delays and the constantly shifting scope resulting from IEC's many requests for additional work and equipment.

180. Moreover, not only did GEOG fulfill its obligations under the Equipment Contract, it even undertook significant additional work following the delivery of the Trains that was not within the scope of the contract in order to help complete the project that IEC had mishandled by, *inter alia*, failing to hire a competent EPC contractor to oversee the project.  Even now, Mr. Pagliaro notes that "*[n]otwithstanding the Arbitration, and the continuous frustration of every attempt to move forward, I've always invited the team to cooperate and leave the commercial discussions aside inviting them to promptly resolve any issues*".[178]

---

[175] 842 F. Supp. 2d 502 (S.D.N.Y. 2012) (Exhibit CL-15).

[176] *Id.* at 516.

[177] Blinkhorn Report §§ 4.3.34-4.3.40; Second Witness Statement of Marco Pagliaro ¶¶ 33-35; Statement of Counterclaim ¶¶ 75-86.

[178] Witness Statement of Marco Pagliaro ¶ 51.

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM

NYSCEF DOC. NO. 7

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

SLCG

ICDR/AAA CASE NO. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 50

181. As it was in fact IEC that made false promises of a "*commercial discussion*" regarding the pricing implications of the GEOG Entities' out-of-scope work at the end of the project, *Soroof* is clearly distinguishable.

D.     THE CLAIMANTS FAIL TO DEMONSTRATE THAT GEOG FRAUDULENTLY INDUCED IEC TO ENTER INTO THE CONTRACTS

182. IEC fails to satisfy the elements of fraudulent inducement in this case.  Under New York law, to prove fraudulent inducement, a party must establish "*(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff*".[179]   In addition, under New York law, fraud carries a higher burden of proof, as "*[t]he evidence of fraud must be clear and convincing and any inference of fraud must be unequivocal*"[180], which – based on IEC's submissions and evidence to date – arguably is far from being met.

   i.   **First**, IEC fails to prove that the GEOG Entities knowingly made any misrepresentation or material omission with respect to its technical capabilities or intention of satisfying its obligations under the Contracts.

   ii.  **Second**, even if IEC could prove that there was an actionable misrepresentation, IEC cannot demonstrate "*justifiable reliance*" on the GEOG Entities' representations where IEC, a sophisticated business, extensively negotiated an arm's length transaction with the GEOG Entities during which the GEOG Entities disclosed all material information regarding their technical capabilities and IEC personally inspected Train 3.

   iii. **Third**, IEC's fraudulent inducement claim must be dismissed as duplicative of its contract claims because the damages sought under IEC's fraudulent inducement claim are identical to the damages sought under its contract claims.

   i.   *The GEOG Entities Did Not Misrepresent Their Ability or Intention to Deliver on the Contracts*

183. Contrary to IEC's claims, the GEOG Entities did not misrepresent their ability to satisfy their obligations under the Contracts.  Instead, the evidence clearly shows that but for delays caused by IEC, GEOG was on track to deliver according to the initially agreed-upon schedule.  To satisfy the first element of its fraudulent inducement claim, IEC must show that the GEOG

---

[179] *Crigger v. Fahnestock and Co., Inc.*, 443 F.3d 230, 234 (2d Cir. 2006) (citation omitted) (**Exhibit RL-37**).

[180] *Miller v. Grigoli*, 712 F. Supp. 1087, 1095 (S.D.N.Y. 1989) (emphasis added) (internal quotation marks and citations omitted) (**Exhibit RL-38**).

Entities made "*not merely an insincere promise of future performance… [but] instead, a misrepresentation of then present facts that was collateral to the contract*".[181]

184. IEC asserts that GEOG knowingly misrepresented its ability to construct two small scale LNG plants based on the Salof Plant (also referred to as Train 3) in 9 and 12 months in order to fraudulently induce IEC into contracting with GEOG instead of its Chinese competitors.[182] IEC's assertion that GEOG never had the technical capability to construct the Trains is undercut by IEC's own admission that Train 3, which IEC eventually purchased from Shell, was installed successfully at the Rumuji Plant. Prior to Shell's suspension of the CGC project in Northern Canada, GEOG had completed construction of Train 3 for the CGC project. IEC nevertheless maintains, without support, that "*[a]s of September 2014, neither GE nor Salof had yet completed a plant like [Train 3]*".[183] However, IEC concedes that when it ultimately purchased from Shell Train 3, **which GEOG constructed**, the train "*was fully modularized and was assembled by Mr. Srinivasan of Greenville and eight workers in under four months.*"[184]

185. Ironically, IEC accuses GEOG of being disingenuous by representing that it could construct the Trains in 9 and 12 months when in fact it was IEC that insisted on de-scoping certain components from Train 3 in order to reduce costs, only to insist on substantial scope changes requiring amendments to the Contracts and to the project timeline soon after the project began. In fact, within the first six months following execution of the Contracts, IEC requested changes to the Trains and the provision of additional equipment that resulted in 17 change order requests from GE.[185]

186. Moreover, in focusing almost entirely on the statements made by GEOG's marketing team, IEC's characterization of the facts thoroughly distorts the arm's length relationship between the two sophisticated contracting parties. In fact, following initial discussions involving GEOG's marketing team, the parties engaged in lengthy negotiations that included extensive discussions during which IEC scrutinized the technical, commercial, and legal details of the project.[186] Without citing to any specific statements or omissions that were made in the course of the

---

[181] *GoSmile, Inc. v. Levine*, 81 A.D.3d 77, 81 (N.Y. App. Div. 2010) (emphasis added) (**Exhibit RL-39**).

[182] Statement of Claim ¶¶ 344-345.

[183] Statement of Claim ¶ 352.

[184] Statement of Claim ¶ 322.

[185] Blinkhorn Report §§ 4.3.34-4.3.40; Second Witness Statement of Marco Pagliaro ¶¶ 33-35; Statement of Counterclaim ¶¶ 75-86.

[186] Witness Statement of Alessandro Bresciani ¶ 15.

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM    INDEX NO. 650627/2021

NYSCEF DOC. NO. 7    ICDR/AXA CASE NO. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS    RECEIVED NYSCEF: 01/27/2021

SLCG

Page 52

negotiations, and focusing instead on vague and conclusory allegations regarding GEOG's apparent *"lack of expertise in and lack of success with building LNG plants"*, IEC claims that *"GE withheld material information concerning its present capabilities during contract negotiations."*[187]

187. Such general allegations of fraud must be dismissed.[188] *Soroof Trading*, on which IEC relies heavily, is plainly distinguishable because there, plaintiffs submitted evidence that defendants withheld material information from plaintiffs during contract negotiations, such as the fuel cell's failure to meet technical milestones and the results of independent testing.[189]  In contrast, IEC fails to show that any material information was withheld from the detailed, negotiated technical proposal summarizing the technical specifications for the Trains.

188. Furthermore, although *"a promise… made with a preconceived and undisclosed intention of not performing it, … constitutes a misrepresentation"*[190],  the evidence here demonstrates not only the GEOG Entities' continuing efforts to keep the project on track despite IEC's delays, but also the GEOG Entities' efforts to fix issues for which IEC was responsible after delivery by supplying additional personnel.  On this evidence, it cannot be said that the GEOG Entities had a *"preconceived and undisclosed intention"* of not performing the Contracts.  Whereas in *Soroof Trading*, the court found *"evidence that [defendant] shifted its efforts from developing the Product to developing other products"* to be probative of defendant's scienter[191], the GEOG Entities' provision of equipment and services that were indisputably outside the scope of the Contracts, relying only on promises of a future *"commercial discussion,"* indicates that the GEOG Entities had every intention of satisfying their obligations under the Contracts.

189. Having failed to establish that GEOG's statements regarding its technical capabilities were false or misleading, the remaining statements on which IEC relies are insufficient to sustain a fraudulent misrepresentation claim as a matter of law.  While acknowledging that a fraudulent inducement claim *"cannot be rooted in a statement of future intent"*[192], IEC nevertheless bases its

---

[187] Statement of Claim ¶¶ 361, 364.

[188] See *Beta Holdings, Inc. v. Goldsmith*, 120 A.D.3d 1022, 1022-23 (**Exhibit RL-40**) (dismissing "*promises . . . of a general nature . . . [as] insufficiently specific to establish fraudulent inducement*"); see also *Couri v. Westchester Country Club, Inc.*, 186 A.D.2d 712, 714 (N.Y. App. Div. 1992) (**Exhibit RL-41**) ("*[V]ague and conclusory allegations of misrepresentation and reliance . . . are insufficient to satisfy CPLR 3016(b), which requires, in an action sounding in fraud, that 'the circumstances constituting the wrong shall be stated in detail'*").

[189] *Soroof Trading*, 2013 WL 5827698, at *7 (Exhibit CL-40).

[190] *Sabo v. Delman*, 143 N.E.2d 906, 908 (N.Y. 1957) (**Exhibit RL-42**).

[191] *Soroof Trading*, 2013 WL 5827698, at *5 (Exhibit CL-40).

[192] Statement of Claim ¶ 347.

claim on the GEOG Entities' marketing team's promise that the Trains could be delivered in 9 and 12 months. Absent any proof that the GEOG Entities made misstatements regarding their present intent during contract negotiations, as discussed above, this hallmark example of a promise of future performance by the GEOG Entities' marketing team cannot alone serve as a basis for a fraudulent inducement claim under New York law.[193]

ii.    *IEC Fails to Demonstrate Justifiable Reliance Where the GEOG Entities Provided Full Transparency with Respect to their Technical Capabilities*

190. Next, even if IEC could prove an actionable misstatement, which it cannot, IEC's failure to conduct adequate due diligence precludes it from satisfying the reasonable reliance element. New York courts are generally skeptical of claims of reliance asserted by "*sophisticated businessmen engaged in major transactions [who] enjoy access to critical information but fail to take advantage of that access*".[194] Specifically, "*[r]easonable reliance entails a duty to investigate the legitimacy of an investment opportunity where 'plaintiff was placed on guard or practically faced with the facts'*".[195] Only under the limited circumstances in which "*matters are held to be peculiarly within defendant's knowledge*"[196], may a party rely on its counterparty's representations without further investigation. Indeed, if a party "*has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations*".[197]

191. "*In assessing the reasonableness of a plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them.*"[198] As discussed above, the GEOG Entities were fully transparent in disclosing their technical capabilities and prior experience throughout the negotiations. During the parties' discussions, IEC reviewed and scrutinized all details of the Contracts: technical, commercial and legal, and was represented by both an internal lawyer and

---

[193] *Couri*, 186 A.D.2d 712 at 714 ("[A]bsent a present intention to deceive, a statement of future intentions, promises, or expectations does not give rise to a cause of action sounding in fraud.").

[194] *Merrill Lynch & Co. Inc v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007) (**Exhibit RL-43**) (citing *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir. 1984) (**Exhibit RL-44**)).

[195] *Crigger*, 443 F.3d 230 at 234.

[196] *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir. 1980) (**Exhibit RL-45**), abrogated in part on other grounds by *Peltz v. SHB Commodities*, 115 F.3d 1082, 1090 (2d Cir. 1997) (**Exhibit RL-46**).

[197] *Keywell Corp. v. Weinstein*, 33 F.3d 159, 164 (2d Cir. 1994) (**Exhibit RL-47**).

[198] *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 195 (2d Cir. 2003) (citation omitted) (**Exhibit RL-48**).

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM

NYSCEF DOC. NO. 7

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

**SLCG**

ICDR/AXA Case No. 01-18-0002-9174 – Statement of Defense to Claim and Reply on Counterclaims
Page 54

external counsel.[199]  In addition, IEC inspected first-hand, on a site visit to Texas, Train 3 on which the design of the Trains was eventually based.  On this evidence, IEC's assertion that "*GE never divulged its lack of expertise in and lack of success with building LNG plants*" must be rejected, as IEC was given every opportunity throughout extensive negotiations, while represented by counsel, to review GE's track record.[200]

192. For the same reasons, IEC cannot rely on the "*peculiar knowledge*" exception to argue that the GEOG Entities were in sole possession of the relevant information.  Not only did IEC have an opportunity to visit and inspect Train 3 in Texas, but the GEOG Entities were also fully transparent with respect to their technical and design specifications during negotiations.[201]  Though IEC now characterizes the GEOG Entities' alleged lack of prior experience in constructing small scale LNG plants as new information that the GEOG Entities previously withheld, the GEOG Entities' track record was either fully known, or sufficiently knowable, to IEC had it undertaken reasonable due diligence.  Significantly, as the buyer of the equipment, IEC had the power to request whatever information it deemed necessary as a precondition to bidding for the Contracts.

193. IEC's justifiable reliance argument is further undercut by its status as a sophisticated party with a long business track record.  Despite IEC's attempts to cast itself as an unsophisticated party, noting that "*Claimants disclosed to GE that they were new to the LNG industry*"[202], the evidence shows that during negotiations regarding the scope and price of the GEOG Entities' work, IEC was an active participant in discussions regarding the technical modifications to the Trains, including, e.g., suggesting that some of the parts that were included in Train 3 be de-scoped, as IEC believed it would be able to procure those parts from another supplier at a lower cost.[203]

---

[199] Statement of Counterclaim ¶ 44.

[200] See *Northern Group Inc. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 135 A.D.3d 414, 422 (N.Y. App. Div. 2016) (**Exhibit RL-49**) (rejecting fraudulent inducement claim where "*sophisticated plaintiffs*" in an "*arm's-length transaction*" failed to read public disclosures "*from which plaintiffs could have ascertained the specific risks that they claim were not disclosed to them*").

[201] *MBIA Ins. Corp. v. Merrill Lynch*, 81 A.D.3d 419, 419 (N.Y. App. Div. 2011) (**Exhibit RL-50**) ("*Given their level of sophistication and the undisputed fact that the information was not exclusively in defendants' possession, plaintiffs' contention that it would have been impractical to conduct the investigation necessary to discern the truth of defendants' allegedly fraudulent representations does not satisfy the requirements of the peculiar knowledge exception.*").

[202] Statement of Claim ¶ 362.

[203] Witness Statement of Alessandro Bresciani ¶¶ 11-12

**FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM**
NYSCEF DOC. NO. 7

ICDR/AAA CASE NO. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 55

INDEX NO. 650627/2021
RECEIVED NYSCEF: 01/27/2021

**SLCG**

iii.    *IEC's Fraudulent Inducement is Duplicative of its Breach of Contract Claim*

194. In addition, IEC's fraudulent inducement claim must be dismissed because the damages sought under IEC's fraud claim are identical to the damages sought under its contract claims.[204] Under New York law, "*[w]here all of the damages are remedied through the contract claim, the fraud claim is duplicative and must be dismissed*".[205] IEC makes no attempt to disguise its fraudulent inducement claim as anything other than a restatement of its breach of contract claim, noting that "*[a]warding Claimants the full value of the direct and consequential damages is the only way to make them whole.*"[206]

E.    THE CLAIMANTS CANNOT CLAIM DAMAGES FOR LOST PROFITS THAT ARE MERELY SPECULATIVE

195. As discussed above in Chapter IV, Greenville has no standing and should be removed as a party in this arbitration. It is now clear why Greenville has been included as a claimant in this arbitration – none of the alleged $591 million in lost profits can be claimed by IEC. Indeed, any loss incurred by IEC relates to a lack of return on its capital invested in Greenville.[207] Ms. Linnell has calculated this loss to be no greater than $677,000, and possibly as low as $443,500.[208]

196. Yet even if Greenville were included as a party to this arbitration, its claim for damages must be rejected.

197. Under New York law, lost profits damages "*may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes*".[209] In particular, where a **new business** such as IEC is seeking lost profits, "*a*

---

[204] Statement of Claim ¶ 367 (referring to separate section describing damages for breach of contract).

[205] *MBIA Insurance Corp. v. Credit Suisse Securities (USA) LLC*, 165 A.D.3d 108, 114 (N.Y. App. Div. 2018) (**Exhibit RL-51**) (citing *Triad Int'l Corp. v. Cameron Indus., Inc.*, 122 A.D.3d 531, 531-32 (N.Y. App. Div. 2014 (**Exhibit RL-52**)) (affirming dismissal of fraud claim where the damages sought on the fraud claim were duplicative, explaining that "*plaintiff seeks the same compensatory damages for both claims. . . . Its purported fraud damages are actually contract damages*"); *Mosaic Caribe, Ltd. v. AllSettled Group, Inc.*, 117 A.D.3d 421, 422-23 (N.Y. App. Div. 2014) (**Exhibit RL-53**) (fraud claim duplicative of a breach of contract claim where the fraud claim sought the same damages, namely return of the deposit paid by the plaintiff under the contract).

[206] Statement of Claim ¶ 413; see also Exhibit RL-40, *Beta Holding* at 1022-23 (rejecting the same theory of fraudulent inducement—"*essentially that [defendants] did not intend to honor the terms of the [contracts] at the time they executed them*"—as being "duplicative of the breach of contract []claims").

[207] Linnell Report §§ 3.23, 4.3.

[208] Linnell Report § 4.4.

[209] *Kenford Co., Inc. v. Erie County*, 493 N.E.2d 234, 235 (N.Y. 1986) (**Exhibit RL-55**).

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM

NYSCEF DOC. NO. 7

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

SLCG

ICDR/AXA CASE NO. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 56

***stricter standard is imposed*** *for the obvious reason that there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty*".[210]

198. IEC contends that its lost profits calculations are not speculative for two reasons. **First**, IEC asserts that its marketing efforts have resulted in letters of intent with more than 160 industrial customers.[211] **Second**, IEC argues that its claim is supported by a model created by its damages expert, Carlos Lapuerta, which purportedly shows that IEC sustained $591 million in lost profits damages.[212]

199. IEC further states that Mr. Lapuerta's calculations were based on a model that "*ha[s] been the foundation for IEC's investment of more than US$500 million in capital since 2014*", and which is "*consistent with the cash flow models Claimants have been using to support their investments since before they contracted with GE.*"[213]

200. Ms. Linnell finds that Mr. Lapuerta's calculations are unrealistic for several reasons, and in particular because Mr. Lapuerta:[214]

i. overstated the demand for LNG as a long term product;

ii. misunderstood the contract between IEC and GEOG, which is a supply contract only;

iii. based his calculations on the production of five trains, when the Equipment Contract with GEOG provides for only two;

iv. does not account for a necessary post-delivery period before production could commence;

v. does not attribute any of the delay to Greenville, IEC or their other subcontractors;

vi. has no evidence that IEC had any customers signed up to purchase LNG and incorrectly assumes that all LNG would be sold immediately;

---

[210] *Id.* (emphasis added).

[211] Statement of Claim ¶ 394.

[212] Statement of Claim ¶ 395.

[213] Statement of Claim ¶ 395.

[214] Linnell Report §§ 2.10, 2.12, 2.13, 2.17, 2.18, 2.27-2.28, 2.37, 2.54 – 2.57.

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM

NYSCEF DOC. NO. 7

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

SLCG

ICDR/AAA CASE NO. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 57

vii.    applies European diesel prices to fix Nigerian LNG prices, rather than traded Nigerian natural gas prices which is a much more appropriate benchmark; and

viii.    does not consider all applicable risks and discount factors.

201.    Furthermore, because any profits that may have been lost as a result of IEC's failed project are merely speculative, particularly in light of the heightened standard for new businesses, IEC's lost profits damages claim must be rejected.

202.    **First**, the Court of Appeals has established a high standard for proving lost profits where the damages claim relies heavily, as IEC does here, on statistical projections.  In fact, in *Kenford Co.*, the court held that even though the plaintiff's lost profits analysis for a failed stadium facility "*employed historical data, obtained from the operation of other domed stadiums and related facilities throughout the country, which was then applied to the results of a comprehensive study of the marketing prospects for the proposed facility in the Buffalo area,*" and "*represent[ed] business and industry's most advanced and sophisticated method for predicting the probable results of contemplated projects*", the plaintiff nevertheless failed to meet its burden of proving loss profits with reasonable certainty.[215]  In denying the plaintiff's claim for lost profits damages, the court held that "*despite the massive quantity of expert proof submitted by [the plaintiff], the ultimate conclusions are still projections . . . [and] the multitude of assumptions required to establish projections of profitability over the life of this contract require speculation and conjecture, making it beyond the capability of even the most sophisticated procedures to satisfy the legal requirements of proof with reasonable certainty*".[216]  Indeed, IEC's lost profits calculations, no matter how sophisticated the analysis, are still merely projections that are based on countless assumptions regarding customer demand, pricing inputs, and other market factors, and cannot be proven with reasonable certainty.

203.    IEC's lost profits damages projections are further undercut by the company's lack of any track record in the market.  While it is undisputed that IEC is new to the LNG business, IEC points to the strength of its marketing efforts and letters of intent with prospective customers.  Courts, however, have been particularly reluctant to award lost profits damages to new businesses with no track record upon which to meaningfully base lost profit calculations.  In *Kidder, Peabody & Co., Inc. v. IAG Intern. Acceptance Group N.V.*, the court noted that "*IAG's expert calculations are premised upon a variety of assumptions about hypothetical deals continuing successively (and successfully) for several years by an entity that had no historical experience in the particular business for*

---

[215] *Kenford Co.*, 493 N.E.2d at 235-36.

[216] *Id.* at 236.

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM

NYSCEF DOC. NO. 7

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

SLCG

ICDR/AXA Case No. 01-18-0002-9174 – Statement of Defense to Claim and Reply on Counterclaims
Page 58

*which it seeks lost profits*".[217]   Indeed, IEC cites no authority to support the proposition that letters of intent provide adequate support for a claim for lost profits.  Rather, IEC is merely a "*fledgling, unproved business [that] cannot prove damages with reasonable certainty in the face of such extensive assumptions*" regarding its ability to run a profitable LNG business despite having no experience in the industry.[218]   Specifically, among the assumptions that the court considered were too speculative included "*the ability to sell the securities into the market at particular prices*".[219]

204.  Moreover, the court in *Kidder* specifically distinguished three cases[220] cited by the plaintiff in which internal profit projections made by one of the parties to a transaction were held to support an award of lost profits, stating that the cases were misapplied, as "**factors other than the projections**, *such as the parties' established course of business or the fact that the projections were borne out by actual performance, helped make the damages provable with reasonable certainty*".[221]

205.  Simply stated, IEC's claim for $591 million in lost profits damages is based on speculative assumptions and cannot be proven with reasonable certainty, particularly in light of the heightened standard imposed on new businesses.

F.    The Claimants Have Not Proven Any Direct Damages

206.  The Claimants' alternative claim for allegedly incurred direct damages to "*exceed US$ 200 million*" suffered due to delay as set forth by Mr. Helsen[222], must also be rejected.  Such claim is

---

[217] *Kidder, Peabody & Co., Inc. v. IAG Intern. Acceptance Group N.V.*, 28 F. Supp. 2d 126, 135 (S.D.N.Y. 1998) (**Exhibit RL-56**).

[218] *Id.* at 134-35; see also *RMLS Metals, Inc. v. Int'l Business Machines Corp.*, 874 F. Supp. 74, 76 (S.D.N.Y. 1005) (**Exhibit RL-57**) (rejecting lost profits damages claim where "*venture was in essence a new business for plaintiff, who converted a plant to be used for this contract*").

[219] *Kidder*, 28 F. Supp. 2d at 134.

[220] *Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992) (**Exhibit RL-58**) (documents given to plaintiff by defendant describing projected average financial performances of defendant's franchises during negotiations regarding plaintiff's purchase of a franchise could have provided the jury with a reasonable basis for calculating lost profits because the figures had been presented by defendant as an indication of what plaintiff could earn, and because the projections were actually reached by franchises in at least one region); *S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 852 (2d Cir. 1987) (**Exhibit RL-59**) (a full year of actual profits prior to the alleged breach of a contract making plaintiff the defendant's exclusive sales representative to the military, together with a pre-breach sales projection made by plaintiff's former sales manager and the fact that plaintiff typically had longstanding relations with its clients, were sufficient to support an award of lost profits damages); *Care Travel Company, Ltd. v. Pan American World Airways, Inc.*, 944 F.2d 983 (2d Cir. 1991) (**Exhibit RL-60**) (travel agency's lost profits proof, which relied in part on defendant-airline's reports of actual sales made by plaintiff and its competitor, as well as a report by defendant estimating the percentage of sales that would have been attributable to the two routes for which plaintiff claimed it had exclusivity, was sufficient to support the jury award).

[221] *Id.* at 135 (emphasis added).

[222] Statement of Claim ¶ 397.

based on Clause 6.6 of the Equipment Contract, which provides that, if the maximum liquidated
damages under the contract are reached, IEC may, *inter alia*, "*recover from [GEOG] any direct
damage [IEC] suffers in accordance with the Agreement subsequent to the Delay Limit Date*".

207. First, the alleged losses were incurred not by IEC, but by Greenville[223], which, as discussed
above in Chapter IV, should not be a party to this arbitration. Second, as explained above in
subchapter (A), GEOG is not liable for liquidated damages for late delivery, so Clause 6.6 does
not apply. Third, the Claimants do not prove a clear causal link between GEOG and the alleged
damages.[224] As just one example, the Claimants claim $19,811,753 for the provision of the
HHR[225], a piece of equipment for which GEOG has no responsibility.[226]

208. After GEOG's delivery of its equipment (which was GEOG's only contractually agreed delivery
date), IEC was responsible for several further delays that caused "*at a minimum concurrent delay*"
to the completion of the Rumuji Plant.[227] As such, Mr. Blinkhorn opines that IEC is not entitled
to claim any damages for the late completion of the Trains.[228] Mr. Hillier and Ms. Linnell further
address the flaws with Mr. Helsen's calculations in their expert reports.[229]

209. Frankly put, the Claimants have not proven that they suffered any direct damages. As noted
above in subchapter (E), Ms. Linnell opines that IEC's only losses are those related to a lack of
return on its capital invested in Greenville, which is no greater than $677,000, and possibly as
low as $443,500.[230]

## VII.    THE COUNTERCLAIMS

210. The Claimants argue that the counterclaims are nothing more than "*a futile, last minute attempt
to create a negotiating position and to distract this Tribunal from GE's own failings*".[231] On the

---

[223] Linnell Report § 2.73.

[224] Second Hillier Report § 4.3.12.

[225] Statement of Claim ¶ 398.

[226] Statement of Counterclaim ¶¶ 141-147.

[227] Blinkhorn Report § 2.3.12.

[228] Blinkhorn Report § 2.3.12.

[229] Linnell Report §§ 2.67-2.74; Second Hillier Report § 4.

[230] Linnell Report §§ 3.23, 4.3, 4.4.

[231] Statement of Claim ¶ 419.

**FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM**
INDEX NO. 650627/2021
NYSCEF DOC. NO. 7
RECEIVED NYSCEF: 01/27/2021
SLCG

ICDR/AAA CASE NO. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 60

contrary, the evidence shows quite the opposite, but it should be self-evident from the procedural history and positioning of the counterclaims before the claims.

211. Instead of responding to the GEOG Entities' requests for change orders in June 2018[232] that set out what would become a substantial portion of the counterclaim, IEC initiated this arbitration on July 31, 2018 to avoid its payment obligations.

212. The minimalist, bare-bones Demand for Arbitration is merely a list of various contracts and legal entities with a single-paragraph description of the claims (no contractual references), and damages stated as being in excess of $75 million. This rush to file, instead of simply responding to the GEOG Entities' change order request, caused the ICDR to introduce weeks of delay as the institution sought to untangle the last-minute jumble the Claimants had submitted.

213. After two weeks, the ICDR had still not sorted out the defects in the Demand for Arbitration. As a result, on August 14, 2018, the GEOG Entities filed their own Demand for Arbitration. This was ultimately consolidated into the present, single proceeding in which the counterclaims have been submitted well in advance of the claims. This is due to the Claimants' efforts to identify any possible basis for a claim or offset of their financial obligations.

214. Not only has IEC refused to pay approximately $21 million remaining due under the Contracts, it has refused to pay the GEOG Entities for all additional work they have performed in the amount of approximately $20 million. The GEOG Entities are entitled to these amounts pursuant to any of the following: (i) the terms of the Contracts, (ii) New York law, and/or (iii) as damages resulting from IEC's breach of Clause 1.7 of the Contracts.[233]

215. The GEOG Entities' counterclaims are explained in detail in Chapter VII of the Statement of Counterclaim, and the Second Hillier Report has slightly modified the total amount owed to the GEOG Entities. As a result, the GEOG Entities' total claims in this arbitration are set forth in the table below and total **$42,279,104**, plus around $9.8 million in accrued interest.

---

[232] Exhibits R-3 and R-4, the GEOG Entities' letters dated June 29, 2018 related to the Equipment Contract and the Services Contract.

[233] Clause 1.7 of the Equipment Contract provides: "*Where reference is made in the Agreement to a Party's decision, approval, refusal, consent, agreement, act, etc., such shall not be taken, given or withheld unreasonably or unfairly, unless otherwise expressly stated*". Clause 1.7 of the Services Contract is substantially similar.

| CLAIM | AMOUNT |
|---|---|
| Payments Due under the Contracts | $21,362,378 |
| Claims under the Equipment Contract | $7,981,202 |
| Claims under the Services Contract | $12,835,326 |
| Costs Incurred in the New York Action | $100,198 |
| **Total Claims** | **$42,279,104** |

A. PAYMENTS DUE UNDER THE CONTRACTS

216. In addition to the sum of $4,750,000 claimed for Mechanical Completion of Train 1 in the Statement of Counterclaim, the GEOG Entities now revise their claim for all amounts due and outstanding under the Contracts, for a total of $21,362,378.

i. *Mechanical Completion of the Trains*

217. GEOG first declared Mechanical Completion of Train 1 and issued an invoice for payment on September 23, 2016.[234] Around the same time, GEOG also issued an invoice related to change order COR-27[235] signed by IEC ($1 million) and the Train 2 Ready to Ship milestone ($950,000).[236]

218. IEC refused to acknowledge (i) that Mechanical Completion for Train 1 or Ready to Ship for Train 2 was achieved and (ii) that Mechanical Completion should be considered achieved five months after delivery date pursuant to the Equipment Contract.[237] Due to the impossibility of collecting such amounts, and to comply with requirements under the Sarbanes-Oxley Act[238], GEOG withdrew the invoices and issued credit invoices on November 30, 2016.[239]

219. Although GEOG maintains that Mechanical Completion was already achieved in September 2016, there can be no doubt that IEC approved the Mechanical Completion of Train 1 on May 19, 2018, when the last of the 18 sub-systems included in GEOG's Scope of Supply was certified

---

[234] Invoice dated September 23, 2016 (**Exhibit R-184**).

[235] Exhibit R-43, Change Order/Scope Change Resolution Contract for the supply of LNG plant 1 and 2, COR-27.

[236] Invoice dated September 16, 2016 (**Exhibit R-185**).

[237] Email from Nicholas Simpson (IEC) to Michael Cohen dated October 18, 2016 (**Exhibit R-186**); Second Witness Statement of Marco Pagliaro ¶ 18.

[238] Second Hillier Report §§ 7.4.5.

[239] Credit invoice n. 610007798 dated November 30, 2016 for Mechanical Completion of Train 1 (**Exhibit R-187**) and Credit invoice n. 610007797 dated November 30, 2016 for Train 2 Ready to Ship and COR-27 (**Exhibit R-188**); Second Witness Statement of Marco Pagliaro ¶ 19.

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM
INDEX NO. 650627/2021
NYSCEF DOC. NO. 7
RECEIVED NYSCEF: 01/27/2021
SLCG
ICDR/AXA Case No. 01-18-0002-9174 – Statement of Defense to Claim and Reply on Counterclaims
Page 62

as completed by IEC.[240]  Accordingly, GEOG submitted a new invoice for this milestone payment on June 13, 2018.[241]

220. Further or in the alternative, insofar as IEC is correct in asserting that GEOG did not achieve Mechanical Completion in September 2016 or in May 2018 in accordance with the Equipment Contract (which is denied), GEOG was prevented from achieving Mechanical Completion for reasons beyond its control.  In particular, and without limitation, IEC prevented GEOG from achieving Mechanical Completion by:[242]

i.   altering and removing parts and systems that had been certified as complete by IEC for use on IEC's Train 3, thereby destroying the traceability of materials and workmanship and undermining GEOG's ability to achieve a Mechanical Completion certificate;

ii.  failing to preserve materials following delivery to site, including but not limited to a failure to properly store, install and maintain the Trains;

iii. refusing to acknowledge that the provision of MRC cables and VFD is not within GEOG's scope of supply under the Equipment Contract;

iv.  preventing GEOG from completing any make good activity needed to rectify warranty defects associated with the piping supports;

v.   refusing to provide the needed inputs associated with the BOPs out of GEOG scope of supply to complete the flare network design review; and

vi.  denying GEOG to perform a 3D laser scanning of the plant at GEOG costs without any meaningful reason.

221. Similarly, the achievement of Train 2 Mechanical Completion is demonstrated by the 17 certificates signed for the completion of the relevant subsystems.[243]  GEOG would have reached the mechanical completion of the last outstanding certificate had IEC not interfered "*and*

---

[240] Statement of Counterclaim ¶ 170.

[241] Exhibit R-81, GEOG letter dated June 13, 2018 containing all relevant sub-system certificates.

[242] Second Witness Statement of Marco Pagliaro ¶ 23.

[243] Sub-system certificates List (**Exhibit R-189**).

*significantly aggravated GEOG Scope of Work by removing equipment and invalidating those system mechanical completion certificates*".[244]

222. In light of the above, GEOG refers to and relies on Clause 1 of the Equipment Contract, which provides in the contractual definition of Mechanical Completion that: "*…In the event [GEOG] is prevented from Mechanical Completion due to reasons beyond its control, Mechanical Completion shall mean five (5) months after the Delivery Date*."

223. As a result, Mechanical Completion was achieved for Train 1 on July 24, 2016 and for Train 2 on August 28, 2016[245], and the amount of $9,500,000 is due and payable under Clause 7.1 of the Equipment Contract. On March 29, 2019, GEOG informed IEC that payment for Mechanical Completion for both Trains was due, along with the milestone payment for Train 2 Ready to Ship, and sent the relevant invoices.[246]

224. Further or in the alternative, IEC's refusal to acknowledge and compensate GEOG for Mechanical Completion of Train 1 and 2[247] is a breach of IEC's obligation under Clause 1.7 of the Equipment Contract to act reasonably and fairly, in circumstances where:

    i.    IEC has certified completion of all 18 sub-systems of Train 1;

    ii.    since certifying the sub-systems, IEC has (without notice to and permission from GEOG) removed and altered certain parts of Train 1 and Train 2; and

    iii.    the contractual definition of Mechanical Completion, as set forth in clause 1 of the Equipment Contract, does not require the submission of specific documentation (particularly where such documentation would not prevent the safe operation of the Trains).

---

[244] GEOG Letter dated March 29, 2019 related to Mechanical Completion (**Exhibit R-190**); Second Witness Statement of Marco Pagliaro ¶ 21.

[245] Blinkhorn Report § 4.4.32.

[246] Exhibit R-190, GEOG Letter dated March 29, 2019 related to Mechanical Completion; Invoices 610011332 for Train 1 Mechanical Completion ($4,750,000) (**Exhibit R-192**), 610011323 for Train 2 Ready to Ship ($950,000) (**Exhibit R-193**) and 610011322 for Train 2 Mechanical Completion ($4,750,000) (**Exhibit R-194**), all dated March 30, 2019.

[247] IEC Letter dated April 9, 2019 related to Mechanical Completion of Train 1 and Train 2 (**Exhibit R-195**).

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM

NYSCEF DOC. NO. 7

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

SLCG

ICDR/AXA CASE No. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 64

### ii. Taking Over of the Trains

225. The final milestone payment under the Equipment Contract is 10% upon Taking Over.[248]  The contractual definition of Taking Over is similar to that of Mechanical Completion in that it provides that: "*…In the event [GEOG] is prevented from meeting the conditions set out in Clause 26.1 due to reasons beyond [GEOG]'s control, Taking Over shall mean eight (8) months after the Delivery Date.*"

226. For the same reasons detailed above in subsection (i), Taking Over has thus also been completed and the amount of $9,500,000 is due and payable under Clause 7.1 of the Equipment Contract.

### iii. Spare Parts under the Equipment Contract

227. GEOG is also due payment for spare parts purchased by IEC.  IEC issued two separate purchase orders for operating two year spares and commissioning/startup spares in December 2016, for the amount of $3,500,000.[249]

228. The amount of $412,378 remains outstanding under such purchase orders.  GEOG submitted an invoice for these spare parts issued on March 6, 2019 (as amended with the credit invoice issued the day after).[250]

### iv. Payment for the Services Contract

229. Although GE Nigeria exhausted the hours provided for in the lump sum payment under the Services Contract in April 2017, IEC refused payment and even denies that the Services Contract has ever been activated.[251]  To date, GE Nigeria has never issued an invoice under the Services Contract due to IEC's refusal to recognize the services performed.[252]

230. Clause 7.1 of the Services Contract provides that GE Nigeria may invoice for the hours performed before the following key events: (i) Mechanical Completion of the Trains, (ii) conclusion of Commissioning, (iii) conclusion of Acceptance Tests, (iv) at Taking Over and (v)

---

[248] Equipment Contract, Clause 7.1.

[249] Purchase Order No. IEC 16/122-25585 dated December 28, 2016 for $2,800,000 (**Exhibit R-196**), Purchase Order No. IEC 16/119-25582 dated December 28, 2016 for $270,000 (**Exhibit R-197**) and Change Order VOR-46 dated March 31, 2017 for $430,000 (**Exhibit R-198**). Second Witness Statement of Marco Pagliaro ¶ 28.

[250] Invoice n. 610011109 dated March 6, 2019 for the 2 years spare parts (**Exhibit R-199**) and Credit Invoice n. 610011117 dated March 7, 2019 for the 2 years spare parts (**Exhibit R-200**).

[251] Statement of Counterclaim ¶¶ 62, 197.

[252] Second Witness Statement of Marco Pagliaro ¶ 29.

sixty days after Taking Over.  The contractual definition of Taking Over is similar to that of the Equipment Contract in that it provides that: "*…In the event [GE Nigeria] is prevented from meeting the conditions set out in Clause 15.1 due to reasons beyond [GE Nigeria]'s control, Taking Over shall mean six (6) months after the Commencement Date.*"

231.  As the Taking Over Milestone of the Equipment Contract has been achieved, the entire lump sum amount of $1,000,000 is due under the Services Contract.[253]

232.  IEC has not made the payments for any of these milestones, in breach of Clause 7.1, as well as IEC's obligation to act reasonably and fairly under Clause 1.7 of the Contracts.  Once payment became due and payable, IEC must make payment within 30 days of receipt of the invoice and all relevant documentation.[254]  Interest has thus accrued in the amount of $6.6 million on IEC's contractual payment obligations alone.[255]

233.  Accordingly, GEOG claims the amount of (i) $9,500,000 for Mechanical Completion of the Trains, (ii) $950,000 for the Ready to Ship milestone payment due for Train 2, (iii) $9,500,000 for Taking Over of the Trains, (iv) $412,378 for payments due for spare parts and (v) $1,000,000 for the lump sum payment due under the Services Contract, for a total of $21,362,378, plus interest.

## B.  ADDITIONAL WORK UNDER THE CONTRACTS

234.  For the reasons set out in the Statement of Counterclaim and elaborated further in this Statement of Defense, the GEOG Entities are entitled to payment for additional works performed beyond the scope of:

    i.    the Equipment Contract in the sum of $7,981,202.22;[256] and

    ii.    the Services Contract in the sum of $12,835,326.28.[257]

235.  These amounts are slightly revised in the Second Hillier Report in light of items raised by Mr. Wills in his Expert Reply Report on Quantum (CER-5).[258]  It is notable that, although Mr. Wills criticizes Mr. Hillier's opinion, he offers no alternative quantum view.  It is also notable that

---

[253]  Second Witness Statement of Marco Pagliaro ¶ 30.

[254]  Equipment Contract, Clause 7.1.

[255]  Second Hillier Report §§ 7.5.1.

[256]  Second Hillier Report §§ 5.21.1.

[257]  Second Hillier Report §§ 6.13.1.

[258]  Second Hillier Report §§ 2.7.3 – 2.7.4.

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM

NYSCEF DOC. NO. 7

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

SLCG

ICDR/AXA CASE NO. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 66

Erik Helsen, who presents the Claimants' alternate claim in direct damages, also fails to meet the standards expected by Mr. Wills.[259]

236. IEC argues that GEOG did not meet the contractual requirements for change orders for the additional work performed under the Equipment Contract and "*deny that this work was for anything other than fulfilling GE's existing obligations under the Contracts*".[260] IEC similarly denies that it ever requested additional support from GE Nigeria under the Services Contract[261], despite the clear language of the minutes of meetings of 9 November 2016 and 28 January 2017 and discussed in contemporary correspondence for a subsequent commercial discussion for compensation for the GEOG Entities' mobilization of additional resources and works performed outside of its scope.[262]

237. It is simply unconscionable for IEC, having necessitated and/or directed the GEOG Entities to undertake this work, and having taken full and knowing advantage of the benefit of those additional works, to now deny compensation in purported reliance on terms of the Contracts that IEC itself did not observe.

238. The GEOG Entities have clearly separated the extra work that was carried out related to their scopes of work and the additional work they performed.[263] Furthermore, GEOG was unable to fully comply with the change order provision of Clause 24 because IEC directed GEOG to perform certain work, but then rejected the change order when submitted by GEOG, thereby breaching the obligation to act reasonably and fairly under Clause 1.7, and Clause 24.2 to use reasonable efforts to agree upon the change order as soon as possible.[264]

239. In other situations, IEC directed the GEOG Entities to perform work based on the representation that IEC will fairly compensate them for additional work, and the GEOG Entities relied on that

---

[259] Second Hillier Report § 2.3.3.

[260] Statement of Claim ¶ 426.

[261] Statement of Claim ¶ 471.

[262] Statement of Counterclaim ¶¶ 112-115.

[263] Statement of Counterclaim ¶ 198.

[264] The GEOG Entities have issued a total of 31 change orders to date. In addition to those already referenced as Exhibits R-3, 4, 24, 26-43, 62, 128, 183 and 198 the GEOG Entities also issued Change Order COR-028 dated August 13, 2015 (**Exhibit R-201**), Change Order COR-029 (rev 8) dated May 16, 2017 (**Exhibit R-202**), Change Order COR-031 dated April 14, 2016 (**Exhibit R-203**), Change Order COR-034 dated October 26, 2016 (**Exhibit R-204**) and Change Order VOR-047 dated December 19, 2017 (**Exhibit R-205**) under the Equipment Contract and Change Order COR-2 dated August 3, 2016 (**Exhibit R-206**) under the Services Contract.

representation and, as a result, incurred loss and damage.  As explained below, IEC has thus waived its right to rely on the change procedure and/or is estopped from denying the GEOG Entities fair compensation.  Alternatively, IEC was unjustly enriched at GEOG's expense, and based on the equities, the GEOG Entities are entitled to restitution for the costs incurred for this additional work.

i.   *Compliance with Clause 24 is not a condition precedent*

240.  The GEOG Entities' non-compliance with the change provisions of the Contracts does not *ipso facto* bar the GEOG Entities from now claiming and recovering under those provisions of the Contract.

241.  The change provisions of the Contracts do indeed prescribe and foresee a procedure for the Parties to follow with respect to any changes they wish to make to the Contracts.  However, neither the Equipment Contract nor the Services Contract contain sufficiently clear and unambiguous language that would prevent or preclude the GEOG Entities from later claiming a change order where it is just and reasonable to do so.

242.  Under New York law, conditions precedent "*must be literally performed; substantial performance will not suffice.*"[265]  However, a condition precedent capable of waiving a party's rights will only be construed as such where that condition and its consequences are clearly established and prescribed.[266]  Where contractual language is less exacting, as is the case here, courts are prone to giving parties greater latitude in enforcing contractual rights and considering surrounding circumstances.[267]

243.  Clause 24 of the Equipment Contract sets out a procedure, the intention of which is to restrict GEOG from making unilateral changes to the Equipment Contract that are not approved or directed by IEC.  What it does not do, however, is contain sufficiently clear and unequivocal language that clarifies the Parties' alleged intention that GEOG's failure to submit a Proposal

---

[265] *MHR Capital Partners v. Presstek*, 912 N.E.2d 43, 47 (2009) (**Exhibit RL-61**).

[266] *Kingsley Arms v. Sano Rubin Const. Co.*, 791 N.Y.S.2d 196, 197 (3d Dept. 2005) (**Exhibit RL-62**).

[267] *Matter of Niagara Frontier Transp. Auth. (Computer Sciences Corp.)*, 619 N.Y.S.2d 449, 450 (4th Dept. 1994) (**Exhibit RL-63**) (holding that "*contract does not mandate strict compliance with its [notice] procedures*" and finding that "*the record supports the conclusions that the [owner] had actual knowledge of the contractor's extra work and delay damages claims and that, by reason of the correspondence, discussions, negotiations and parties' course of conduct, the [owner] waived strict compliance with the contractual notice requirements*"). a Proposal

**FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM**
INDEX NO. 650627/2021

NYSCEF DOC. NO. 7
RECEIVED NYSCEF: 01/27/2021

ICDR/AAA CASE NO. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 68

SLCG

for change order would prevent it from later submitting a claim, or from recovering just and equitable compensation.[268]

244. Plainly, the change provisions of the Contracts are "liberal" rather than "strict" notice provisions. Indeed, Clause 24 of the Equipment Contract bears none of the requisite clarity of a condition precedent. There is no clear temporal requirement for the submission of a notice or change order proposal, instead, GEOG may remit a change order proposal "*within a reasonable time*".[269] Moreover, courts have held that liberal notice provisions that fail to state the consequences of a failure to comply with their terms, which Clause 24 fails to do, also do not establish conditions precedent.[270]

245. Further, Clause 24 of the Equipment Contract itself presents two exclusions to what IEC portrays as a steadfast condition precedent. First, Clause 24.3 envisages that at least with respect to more minor changes, GEOG may proceed with the additional work in the hope that the Parties will agree on an equitable adjustment within 30 days, after which time GEOG is "*permitted*" (but not mandated) to stop working on the change. Second, Clause 24.4 provides that any changes in applicable laws, rules and regulations that affect Contract Price or the Delivery Date "*shall be treated as a Change*", without the need for IEC to first issue a change order. Therefore, Clause 24 does, in certain circumstances, allow GEOG to perform a change and only subsequently proceed to agree an equitable adjustment with IEC.

246. Clause 25 of the Services Contract is even less prescriptive. Again, this provision indicates that either Party is entitled to request alterations to the Services, and notes that GE Nigeria "*is not obligated*" to proceed with a change to the Services without an agreement as to its consequences. It does not, however, contain any clear or unequivocal words that would indicate that not submitting any prior notice or change request (indeed, it refers to neither such concepts) would

---

[268] *Ginett v. Computer Task Group, Inc.*, 962 F.2d 1085, 1100-01 (2d Cir. 1992) (**Exhibit RL-64**) ("*Conditions [precedent] are not favored under New York law, and in the absence of unambiguous *1100 language, a condition will not be read into the agreement.*")

[269] *Neverfail Lighter Co. v. Blum*, 194 N.Y.S. 24, 26 (1st Dept. 1922) (**Exhibit RL-65**) (holding that where a contract fails to fix the time for performance, notice requiring performance in a reasonable time is not a condition precedent to an action for breach of the contract); *see also Rockland County v. Primiano Const. Co., Inc.*, 409 N.E.2d 951, 956 (N.Y. 1980) (**Exhibit RL-66**) (provision requiring that demand for arbitration be made "'*within a reasonable time after the claim has arisen*' . . . is not a condition precedent to arbitration*").

[270] *Peter Scalamandre & Sons, Inc. v. FC 80 Dekalb Associates, LLC*, 12 N.Y.S.3d 133, 137-38 (2d Dep't 2015) (**Exhibit RL-67**) (where notice provision was "*not a condition-precedent type notice provision setting forth the consequences of a failure to strictly comply . . . substantial compliance with the notice provision will suffice*").

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM

NYSCEF DOC. NO. 7

ICDR/AAA Case No. 01-18-0002-9174 – Statement of Defense to Claim and Reply on Counterclaims
Page 69

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

SLCG

preclude GE Nigeria from later claiming and being compensated for those additional Services where it is just and equitable to do so.

247. Accordingly, in the absence of clear and unequivocal language to the contrary, the GEOG Entities are not barred or otherwise precluded from claiming and recovering equitable adjustments to the Contracts.

248. Further, the authorities on which IEC vaguely cites (by way of footnote reference) in support of the proposition that "*New York courts strictly enforce change-order requirements in construction contracts*"[271] in fact do the opposite: they establish that in certain circumstances the courts will grant relief to claimants who have fallen short of compliance with certain notice or claim provisions.

249. While it is true that under New York law, "*failure to comply with provisions requiring written documentation of 'extra work' can preclude a contractor from recovering for such work,*"[272] the court in *Industrial Window* nevertheless held that the plaintiff's evidence that the defendants had waived the contractual requirement to submit records by "*approv[ing] and pa[ying] for other, unrelated change orders for extra work notwithstanding [plaintiff's] failure to submit contemporaneous records of that work*" was sufficient to survive summary judgment.

250. Similarly, IEC's repeated requests for additional work and representations that the parties would engage in "commercial discussions" regarding the impacts of GEOG's additional work constitute a waiver of the requirements under Clause 24. *F. Garofalo Elec. Co. v. New York University* is likewise distinguishable because there was no extra-contractual statement by defendant that waived the plaintiff's obligation to provide documentation of extra work.[273]

251. Moreover, to the extent IEC relies on *De Foe Corp.* to prove that GEOG waived its right to seek compensation for its additional work, the evidence shows that GEOG maintained weekly timesheets allocating which hours were part of the Services Contract and which hours were additional work requiring separate compensation.[274] Unlike the party that was precluded from recovering in *De Foe Corp.* because it did not have sufficient records to "*verify not only the cost of*

---

[271] Statement of Claim ¶ 424.

[272] *Industrial Window Corp. v. Federal Ins. Co.*, 609 F. Supp. 329, 343 (S.D.N.Y. 2009) (Exhibit CL-47).

[273] *F. Garofalo Elec. Co. v. New York Univ.*, 754 N.Y.S.2d 227, 231 (N.Y. App. Div. 2002) (Exhibit CL-48).

[274] Witness Statement of Ali Kassem ¶ 21.

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM
NYSCEF DOC. NO. 7

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

SLCG

ICDR/AAA CASE NO. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 70

*the work but also what work was actually performed*"[275], GEOG has produced detailed evidence of the additional work that it has performed, and the basis on which that work has been claimed.

252. Accordingly New York law indicates that it is relevant to look at all of the circumstances. In this case, the circumstances are startlingly in favor of granting relief to the GEOG Entities.

253. Each of the claims under the Equipment Contract and the Services Contract must be considered and assessed on their own merits. However, all claims for additional works under the Contracts must be judged in the following context.

   i. First and foremost, all of the additional work under the Contracts was either directed or instructed by IEC, and/or was necessary due to IEC's own failures or shortcomings. For example:

      a. IEC directed and/or instructed the GEOG entities to perform much of the additional work, including the provision of ICP, the request to replace standard black bolts with galvanized bolts, the change to the gas composition, the change to the load out philosophy, requests for alternative designs, and the other additional services, including a continuous project manager, on site;[276]

      b. much of the additional work was necessary due to IEC's own incompetence and failures to comply with its own obligations under the Contracts, such as the failure to specify the interface between the Trains and the power generation package, the change in the design of the flare system, the requirement for the BOG Compressor Inlet, the failure to buy strategic spare parts, failure to provide suitable health, safety and welfare services on site, the engagement of subcontractors to assist with IEC's scope, failure to apply proper care and custody of the material on site, defective material management procedures, failure to provide suitable accommodations on site, and lack of a coordinated project schedule;[277] and

---

[275] *De Foe Corp. v. City of New York*, 95 A.D.2d 793, 794 (N.Y. App. Div. 1983) (Exhibit CL-49).

[276] Statement of Counterclaim ¶¶ 173, 175, 178, 180, 186, 198-199; Witness Statement of Marco Pagliaro ¶ 26.

[277] Statement of Counterclaim ¶¶ 182, 188, 190, 192, 203, 205, 207, 209, 211, 213 and 215.

       c.    some of the additional work was necessary due to IEC's deliberate actions which, whilst not being a direct breach of the Equipment Contract, prevented GEOG from properly completing its obligations under the Equipment Contract.[278]

   ii.    The GEOG Entities repeatedly and consistently put IEC on notice that, despite performing additional work for the benefit of IEC and the Rumuji Plant, the GEOG Entities considered the additional work requested by IEC to be beyond the scope of the Contracts and for which work it expects to be compensated.[279]

   iii.    Despite being on clear notice that the GEOG Entities considered the additional work to be beyond the scope of the Contracts, IEC maintained its instructions and requests for the GEOG Entities to perform that additional work.

   iv.    IEC represented to the GEOG Entities that IEC would enter into *bona fide* commercial discussions with respect to the additional work performed by the GEOG Entities under the Contract, thereby implying (or inducing GEOG to believe) that IEC will fairly assess and compensate the GEOG Entitles for work beyond the scope of the Contracts.[280] In particular, at the November 9, 2016 meeting in Florence, IEC agreed that it would partake in discussions to jointly assess whether the additional works were beyond the scope of the Contracts, and as such, whether equitable adjustments were due to the GEOG Entities.[281]

   v.    In reliance on IEC's conduct and representations as set out above, the GEOG Entities performed the additional work with the reasonable expectation that IEC would fairly assess the commercial consequences of that additional work.[282]

   vi.    IEC was at all times aware that the GEOG Entities were performing the additional work, and accepted and retained the benefits of that additional work.

254. When considering the circumstances summarized above, it is unjust for IEC to now, after years of not respecting the change procedures under the Contracts, turn around and reject the GEOG Entities' claims for the consequences of the work performed at IEC's request on the basis of

---

[278] Witness Statement of Marco Pagliaro ¶¶ 62-64.

[279] Statement of Counterclaim ¶ 112; Witness Statement of Marco Pagliaro ¶ 16.

[280] Statement of Counterclaim ¶¶ 112-115.

[281] Exhibit R-69, Email from Nicholas Simpson dated November 18, 2016.

[282] Witness Statement of Marco Pagliaro ¶ 21.

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM

NYSCEF DOC. NO. 7

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

SLCG

ICDR/AAA CASE No. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 72

purported non-compliance with Clause 24 and 25 of the Equipment and Services Contracts respectively.

ii.   *Waiver / Estoppel*

255. Further and in the alternative to GEOG and GE Nigeria's entitlements under Clause 24 of the Equipment Contract and Clause 25 of the Services Contract, the GEOG Entities are entitled to compensation under waiver/estoppel.

256. By instructing GEOG to perform additional work without a change order and representing that it would fairly compensate GEOG for any additional work, IEC waived its right to rely on the change procedure and/or is estopped from denying GEOG's claims based on a mutual departure from the contractual regime.

257. Under New York law, a party must show the following for a waiver/estoppel claim: (i) a promise that is sufficiently clear and unambiguous, (ii) reasonable reliance on the promise by the other party and (iii) injury or loss caused by the reliance.[283]

258. The GEOG Entities have shown that they relied in good faith on IEC's promises during the meetings of 9 November 2016 and 28 January 2017 and discussed in contemporary correspondence for a subsequent commercial discussion for compensation for the GEOG Entities' mobilization of additional resources and works performed outside of its scope.[284]

259. Although the minutes of meeting sent by IEC refer specifically to additional support and services under the Services Contract, and not the Equipment Contract[285], given IEC's representations regarding additional work under the Services Contract, as well as its prior conduct where it agreed a commercial resolution to 17 disputed change orders by way of the COR-27 agreement[286], it was reasonable for GEOG to proceed on the assumption that IEC would enter into commercial discussions for extra works performed under the Equipment Contract and compensate GEOG at a later time, outside the mechanics of the contractual change provision.

---

[283] *Matlin Patterson ATA Holdings LLC v. Federal Express Corp.*, 87 A.D.3d 836, 841-42 (N.Y. App. Div. 2011) (**Exhibit RL-68**).

[284] Statement of Counterclaim ¶¶ 112-115.

[285] Exhibits R-69, R-72 and R-73.

[286] Statement of Counterclaim ¶¶ 77-80; Exhibit R-43, Change Order/Scope Change Resolution Contract for the supply of LNG plant 1 and 2, COR-27.

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM
NYSCEF DOC. NO. 7

INDEX NO. 650627/2021
RECEIVED NYSCEF: 01/27/2021

SLCG

ICDR/AAA CASE No. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 73

### iii.    Unjust Enrichment / Quasi Contract

260. Finally, GEOG should be compensated for its losses because IEC was unjustly enriched at GEOG's expense because of the out-of-scope work that GEOG was asked and/or induced by IEC to undertake.

261. Under New York law, unjust enrichment is found when (i) a party was enriched, (ii) the enrichment was at the other party's expense and (iii) the circumstances are such that in equity and good conscience the first party should return the money or property to the second party.[287] New York courts have noted that the "*essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered.*"[288]

262. It would be unequitable for IEC to retain the benefit of GEOG's additional work and services in circumstances where that work was required as a result of IEC's ineptitude and where IEC was fully aware of the enrichment it was receiving from GEOG on the understanding that GEOG was expecting payment for the same.

263. Although in general, "*[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract [i.e., unjust enrichment] for events arising out of the same subject matter,*"[289] courts have allowed unjust enrichment claims where "*the contract does not cover the dispute in issue.*"[290] Specifically, courts have allowed recovery in quantum meruit for additional work that "*was never the subject of the parties' oral agreement.*"[291] Here, the additional work the GEOG Entities provided under the Contracts was so far beyond the contractual scope (i.e., and of a different character than merely supplying two modularized Trains and related services) that it is not covered by the Contracts' change provisions.

264. Fairness dictates that the GEOG Entities be permitted to seek restitution from IEC for the additional services that unjustly benefited IEC, particularly given that the GEOG Entities were

[287] *Golden Pac. Bankcorp v. F.D.I.C.*, 273 F.3d 509, 519 (2d Cir. 2001) (**Exhibit RL-69**).

[288] *Paramount Film Distrib. Corp. v. State of New York*, 285 N.E.2d 695, 698 (N.Y. 1972) (**Exhibit RL-70**).

[289] *McDraw, Inc. v. The CIT Grp. Equip. Fin., Inc.*, 157 F.3d 956, 964 (2d Cir. 1998) (alteration in original) (**Exhibit RL-71**).

[290] *Mid-Hudson Catskill Migrant Ministry, Inc. v. Fine Hosp. Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (**Exhibit RL-72**).

[291] *Leroy Callender, P.C. v. Fieldman*, 252 A.D.2d 468, 469 (N.Y. App. Div. 1998) (**Exhibit RL-73**).

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM
INDEX NO. 650627/2021
NYSCEF DOC. NO. 7
RECEIVED NYSCEF: 01/27/2021
SLCG
ICDR/AAA Case No. 01-18-0002-9174 – Statement of Defense to Claim and Reply on Counterclaims
Page 74

simply trying to save a project that IEC had derailed and IEC was fully aware that the GEOG Entities were providing the additional services (at times, at IEC's direction).

iv.    *Alternative Damages Resulting from IEC'S Breach of the Contracts*

265. To the extent that the GEOG Entities have no entitlement to claim for the costs of additional work under the change provisions of the Contracts (which is denied), the GEOG Entities claim those sums as damages for IEC's breach of the Clause 1.7 of both the Equipment Contract and the Services Contract.

266. IEC required the GEOG Entities to perform additional work, which additional work was in large part due to IEC's own ineptitude and failures under the Contracts. IEC maintained its directions to perform the additional work in circumstances where IEC had represented to the GEOG Entities that it would fairly assess and compensate claims for work performed beyond the scope of the Contracts, and maintained its directions to the GEOG Entities to perform that additional work with the knowledge that the GEOG Entities considered it to be beyond the scope of the Contracts and would be seeking compensation.

267. As noted in the Statement of Counterclaim, IEC breached Clause 1.7 of the Equipment Contract with the following actions:

i.    failure to respond to GEOG's RFIs and TQRs within a reasonable time, thereby preventing GEOG from progressing its design and requiring additional man-hours to perform substantial re-work;[292]

ii.    failure to reasonably/fairly issue Mechanical Completion for Train 1 in circumstances where GEOG has been certified with all 18 system certificates, and IEC cannot point to a contractual basis for withholding the Mechanical Completion;[293]

iii.    failure to reasonably and fairly issue a change order to compensate GEOG for additional worked performed at IEC's direction;[294]

---

[292] Statement of Counterclaim ¶ 86.

[293] Witness Statement of Marco Pagliaro ¶ 56.

[294] Statement of Counterclaim ¶ 197.

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM

NYSCEF DOC. NO. 7

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

SLCG

ICDR/AAA CASE NO. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 75

 iv. failure to reasonably and fairly issue a change order to compensate GEOG for additional work required to ensure the safety of personnel and equipment, in light of IEC's failures to ensure such safety;[295] and

 v. failure to reasonably and fairly issue a change order to compensate GEOG for additional work required due to IEC's failure to provide certain BOP work.[296]

268. IEC also breached its obligation under Clause 1.7 of the Services Contract, including but not limited to rejecting GE Nigeria's claims for additional services that IEC requested and/or were necessary only due to IEC's failure to properly perform its own obligations under the Services Contract.

269. Additionally, as highlighted in subsection (i) above and the witness statement of Marco Pagliaro, one of the reasons that GEOG performed additional work under the Contracts was due to safety reasons – both to ensure the safety of its own equipment and personnel, as well as the overall safety of the Rumuji Plant. These claims for additional work arise as a result of IEC's own failures, and should be compensated as damages for IEC's breaches of the Services Contract, and in particular:

 i. obligations to provide safety information, training and equipment etc. under Clause 10.5 of the Services Contract;

 ii.  obligations to take all necessary precautions for GE Nigeria's security under Clause 22.8 of the Services Contract;

 iii. obligations to provide hygienic and safe housing and facilities under Clause 22.10 of the Services Contract; and

 iv. breach of Clause 11.5 of the Equipment Contract, which provides that IEC "*shall have in place safety policies and security on Site*".

 *v.* *GEOG's Warranty Limitations*

270. Finally, we note that certain of GEOG's claims are for costs that arise from having to remedy problems due to IEC (or its subcontractors') failure to properly store, preserve, maintain, install

---

[295] Statement of Counterclaim ¶ 137.

[296] Witness Statement of Marco Pagliaro ¶ 21.

and operate the Trains after they arrived at site.  IEC argues that such work falls within GEOG's warranty obligations.[297]

271. To this end, we note that Clause 17.5 provides that GEOG does not warrant its Plant or Parts against normal wear and tear including due to unique environmental conditions or operation at peak capacity. Further, GEOG's warranties are expressly conditioned on (i) the proper storage, installation, operation, and maintenance of the Plant and Parts, and conformance with GEOG's instruction manuals and (ii) IEC's repair or modification of the Plant which is not in accordance with GEOG's instructions or approval.

272. All additional work carried out by the GEOG Entities that arose as a result of IEC's failures to properly store and install the Trains at the Rumuji Plant, and the costs arising from IEC's "cannibalization" of Trains 1 and 2 are therefore not covered by the warranty provisions, and GEOG is entitled to recover costs it incurred.

### C.    Costs Incurred in New York Action to Compel Arbitration

273. The Respondents have requested compensation for the legal costs incurred in the unnecessary and futile proceedings brought by IEC in the New York courts.[298]  As noted above in Chapter V, such action was dismissed by the court based on the determination that, as argued by the BHGE Entities, the issue of arbitrability is to be decided by the arbitrators themselves.

274. The Respondents incurred a total amount of $100,198.12 in such action, as set forth in the table below, all of which should be compensated by IEC.

| Cost Incurred in NY Action | Amount |
|---|---|
| Daigle Fisse & Kessenich, PLC | $74,233.12 |
| Allegaert Berger & Vogel LLP | $9,965.00 |
| BHGE Internal Legal Counsel – Teresa Garcia-Reyes | $16,000.00 |
| **Total** | **$100,198.12** |

275. All compensation requested – both internal and external - relates exclusively to support in the New York litigation.  It does not include support for this arbitration, internal reporting or discussions about the case with management.

---

[297] Statement of Counterclaim ¶ 426.

[298] Statement of Counterclaim ¶ 221.

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM
INDEX NO. 650627/2021
NYSCEF DOC. NO. 7
RECEIVED NYSCEF: 01/27/2021
SLCG
ICDR/AAA CASE NO. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 77

276. The costs of the two external counsel engaged by the Respondents are supported by letters from those firms, confirming their fees in connection with the case.[299] Further supporting documentation, such as invoices, timesheets, agreed hourly rates and fee arrangements and expense receipts can be provided in redacted forms in the event the reasonableness of such costs is challenged.

277. With respect to in-house time, the Respondents do not request compensation for all internal legal counsel who provided legal support in the New York proceedings. Instead, the Respondents request compensation only for Teresa Garcia-Reyes, and only for 40 hours of the time she spent drafting or revising submissions and other legal preparation for the New York proceedings.[300]

278. Ms. Garcia-Reyes' fees are quantified at the hourly rate of $400, which reflects market rates of professionals with similar qualifications and seniority as quoted by BHGE's panel of law firms, costs the Respondents would incur to purchase such services externally.

## VIII.    THE RESPONDENTS' REQUEST FOR RELIEF

279. The Respondents request that the Arbitral Tribunal:

(a) Declare the Arbitral Tribunal's lack of jurisdiction to rule on (i) any claims raised by Greenville Oil & Gas Co. Ltd against the Respondents and/or (ii) any claims raised by the Claimants against Baker Hughes, a GE Company, LLC and Baker Hughes, a GE Company;

(b) Reject all claims advanced by the Claimants;

(c) Order IEC to pay the amount of $21,362,377.60 for payments due under the Contracts, plus accrued interest;

(d) Order IEC to pay the amount of $7,981,202.22 to GEOG for additional compensation due under the Equipment Contract, plus accrued interest;

---

[299] Letter from Allegaert Berger & Vogel LLP dated August 28, 2019 (**Exhibit R-207A**) and Letter from Daigle Fisse & Kessenich, PLC dated August 29, 2019 (**Exhibit R-207B**).

[300] Specifically, Ms. Garcia-Reyes carried out the following tasks: (i) reviewing pleadings and strategizing as to the response (3 hours); (ii) drafting the motion to dismiss, and commenting on any revised drafts of the motion to dismiss as well as drafts of the reply in support thereof (12 hours); (iii) reviewing, revising, and commenting on drafts of the response to IEC's motion to compel arbitration (15 hours); (iv) gathering evidence to support the response to IEC's motion to compel arbitration (8 hours); and (v) generally supervising outside counsel (2 hours).

(e) Order IEC to pay the amount of $12,835,326.28 to GE Nigeria for additional compensation due under the Services Contract, plus accrued interest;

(f) Order IEC to pay the amount of $100,198.12 to the Respondents for its costs incurred in the proceedings in the Southern District of New York;

(g) Order IEC to (i) cease and desist from disclosure to unauthorized third parties of GEOG Confidential Information, (ii) return to GEOG all original copies of the documents shared with Softec and any other unauthorized third party, and (iii) destroy all copies of such documents in its possession;

(h) Order the Claimants to reimburse the Respondents for all costs and expenses incurred in arguing their claims in this arbitration, including the fees and/or expenses of the Arbitral Tribunal, the ICDR/AAA administrative costs, legal counsel (including internal counsel), experts, consultants, and the costs of any witnesses or employees engaged in the preparation or presentation of the Respondents' defense and counterclaim; and

(i) Grant all further or other relief that the Arbitral Tribunal deems appropriate.


September 2, 2019

                                    Respectfully submitted on behalf of the Respondents
                                    GE Oil & Gas, LLC
                                    Pressure Control Systems Nigeria Limited
                                    Baker Hughes, a GE Company
                                    Baker Hughes, a GE Company, LLC


                                    By: _____
                                            Roberto Calabresi

**FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM** INDEX NO. 650627/2021

NYSCEF DOC. NO. 7 ICDR/AAA CASE NO. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS RECEIVED NYSCEF: 01/27/2021

Page 79

**SLCG**

## LIST OF ACRONYMS AND ABBREVIATIONS

**Additional Employees**: means the additional employees that could be provided upon IEC's request as per Services Contract, Clause 5.2.

**Baker Hughes**: Baker Hughes, Inc.

**Base Employees**: means one process specialist, one electrical specialist and one mechanical specialist to be provided by GE Nigeria as per Services Contract, Clause 5.2.

**BHGE**: the Respondent Baker Hughes, a GE Company.

**BHGE LLC.**: the Respondent Baker Hughes, a GE Company LLC.

**BHGE Entities**: BHGE LLC and BHGE.

**BOG**: Boil Off Gas.

**BOP**: balance of plant, means IEC's scope of supply.

**CGC**: Canadian Green Corridor project in Northern Canada, a Shell project.

**CGC Contract**: contract between Shell and GEOG for the CGC project.

**Cold Box**: LNG equipment that liquefies and purifies the natural gas from non-condensable items

**Contracts**: collectively the Equipment Contract and the Services Contract.

**EPC Contractor**: Engineering, Procurement and Construction Contractor.

**Equipment Contract**: Contract for the Sale of Two Small Scale (SCMR) LNG Plants, dated September 13, 2014.

**Eres Group**: Eres N.V.- Asca Group.

**GE**: General Electric Company

**GE-Baker Hughes Transaction**: Transaction Agreement and Plan of Merger between GEOG's ultimate parent company, GE and Baker Hughes Inc.

**GEOG**: the Respondent GE Oil & Gas, LLC.

**GEOG Entities**: collectively GEOG and GE Nigeria.

**GE Nigeria**: the Respondent GE International Operations (Nigeria) Ltd.

**Greenville**: the Claimant Greenville Oil & Gas Co. Ltd.

**Guarantee**: Guarantee Agreement dated September 13, 2014 entered into between GEOG as guarantor of GE Nigeria's contractual performances and IEC as buyer.

**HHR**: means heavy hydrocarbon removal.

**HSE**: Health, Safety & Environment

**ICP**: means interconnecting pipes.

**IEC**: International Engineering & Construction S.A.

**LNG**: Liquefied Natural Gas.

**MR Compressor**: means mixed refrigerant compressor.

**Parties**: collectively GEOG, GG Nigeria and IEC.

**PCSNL**: the Respondent Pressure Control System Nigeria Limited, a successor to GE Nigeria International Operations (Nigeria) Ltd.

**P&IDs**: means preliminary data sheets and piping and instrumentation diagrams.

FILED: NEW YORK COUNTY CLERK 01/27/2021 05:45 PM
INDEX NO. 650627/2021
NYSCEF DOC. NO. 7
RECEIVED NYSCEF: 01/27/2021
SLCG
ICDR/AAA CASE NO. 01-18-0002-9174 – STATEMENT OF DEFENSE TO CLAIM AND REPLY ON COUNTERCLAIMS
Page 80

**RFI**: Request for Information.

**Rumuji Plant**: the entirety of the plant, including GEOG's Scope of Supply, IEC's scope of supply and all site preparatory works, equipment and work packages to be managed by IEC.

**Scope of Supply**: means the scope of supply as per Appendix A attached to the Equipment Contract.

**Services**: means the services to be performed by GE Nigeria under the Services Contract.

**Services Contract**: Services Agreement entered into between GE Nigeria and IEC on September 13, 2014.

**Technip**: TechnipFMC plc.

**TQR**: Technical Query Requests.

**Train 1**: first modularized small-scale LNG production train.

**Train 2**: second modularized small-scale LNG production train.

**Trains**: collectively Train 1 and Train 2, means GEOG's Scope of Supply.

**VFD**: Variable Frequency Drive.

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

# Exhibit 7

1       INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

2          AMERICAN ARBITRATION ASSOCIATION

3          COMMERCIAL ARBITRATION TRIBUNAL

4     --------------------------------X

      INTERNATIONAL ENGINEERING &        :

5     CONSTRUCTION S.A., GREENVILLE OIL :

      & GAS CO. LTD.,                  :

6                            :

              Claimants,      :

7     v.                       : ICDR Case

                            : Number

8     GE OIL & GAS, LLC (F/K/A GE OIL & : 01-18-0002-9174

      GAS, INC.), BAKER HUGHES, A GE   :

9     COMPANY, LLC [AS SUCCESSORS TO GE :

      OIL & GAS, LLC (F/K/A GE OIL &   : Pages 1 - 262

10    GAS, INC.], GE INTERNATIONAL    :

      OPERATIONS (NIGERIA) LTD.,      :

11    PRESSURE CONTROL SYSTEMS NIGERIA  :

      LIMITED (AS SUCCESSOR TO GE     :

12    INTERNATIONAL OPERATIONS       :

      (NIGERIA) LTD.),               :

13                            :

             Respondents.    :

14    --------------------------------X

15

16

17                     Hearing

18                   Milan, Italy

19            Tuesday, January 21, 2020

20

21

22

      Reported by:   Yvonne Vanvi

23               EIRL Yvonne Vanvi

                 7 rue Georges Baudin

24             92500 Rueil-Malmaison, France

                 Tel: (33)(0)147082929 / (0)613437372

25             email: Yhvanvi@aol.com

```
 1     APPEARANCES:
       The Arbitral Tribunal:
 2     -    Mr. David Arias (Presiding Arbitrator)
            email: David.Arias@hsf.com
 3
       -    Mr. Paul Saba (Arbitrator)
 4          email: pfsaba1@gmail.com

 5     -    Mr. Stefano Azzali (Arbitrator)
            email: stefano.azzali@mi.camcom.it
 6
       For the Claimants:
 7     -    Mr. Peter Judge Gutowski
       -    Ms. Gina Venezia
 8          FREEHILL HOGAN & MAHAR, LLP
            email: gutowski@freehill.com
 9               venezia@freehil.com

10     -    Mr. Jay L. Alexander
       -    Mr. Andrew Behrman
11     -    Ms. Lindsay Cutié
            BAKER BOTTS, LLP
12          email: jay.alexander@bakerbotts.com
                 andrew.behrman@bakerbotts.com
13               lindsay.cutie@bakerbotts.com

14     For the Respondents:
       -    Mr. Michael McIlwrath (Global Litigation
15          Counsel)
            BAKER HUGHES, a GE Company
16          email: michael.mcilwrath@bakerhughes.com
       -    Ms. Georgia Magna (General counsel)
17          email: georgia.magno@bhge.com

18     -    Mr. Roberto Calabresi
       -    Ms. Kathryn S. Siebke
19     -    Ms. Caterina Aliberti
            SLCG - STUDIO LEGALE ASSOCIATO (Florence,
20          Italy)
            email: rcalabresi@slcg.it
21               ksiebke@slcg.it
                 caliberti@slcg.it
22
       ALSO PRESENT:
23     For the Claimants:
       -    Mr. Eddy van den Broeke (party representative)
24     -    Mr. Werner Pirjins (party representative)

25
```

Jan 21, 2020                                            3

1    Secretary to the Tribunal:
     -    Mr. Luis Capiel
2         email:  Luis.Capiel@hsf.com

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
             Hearing held at the Milan Chamber of
24   Commerce, Industry & Agriculture, Via Meravigli 7,
     20123 Milan, Italy, on the 21st day of January
25   2020, at 9:00 a.m.

Jan 21, 2020                                          4

1
                              INDEX
2
                                                    Page
3
   Procedural discussion                    5 -  15
4
   Submission by counsel for Claimants    16 - 107
5
   Submission by counsel for Respondents  108 - 218
6
   Rebuttal by counsel for Claimants      218 - 244
7
   Rebuttal by counsel for Respondents    245 - 253
8
   Procedural discussion                  253 - 261
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jan 21, 2020                                        5

```
 1              P R O C E E D I N G S
 2              THE PRESIDING ARBITRATOR:  Good morning,
 3   everybody.  Welcome to the beautiful city of Milan.
 4   As we know each other and we have a list of
 5   attendants, I don't think it is necessary to        09:00
 6   introduce ourselves.  On behalf of the Arbitral
 7   Tribunal, I just wanted to welcome Ms. Yvonne Vanvi
 8   who is going to help us with the transcript.
 9              And so let's start according to
10   Procedural Order No. 7.  Each party will have one    09:01
11   hour and 45 minutes to their closing arguments,
12   during which you must address the list of questions
13   that we sent in advance in the manner that you deem
14   appropriate, and after the closing arguments of one
15   hour and 45 minutes, each party will be given an     09:01
16   additional 45 minutes for rebuttal.
17              Before giving the floor to Claimant, is
18   there any preliminary issues that the parties may
19   wish to address?  Claimant.
20              MR. ALEXANDER:  Only one.  As I mentioned  09:01
21   to Mr. Calabresi before the start, we received
22   yesterday evening -- and I haven't actually even
23   seen it yet -- invoices from Total for the
24   take-or-pay obligations in the neighborhood of
25   $50 million.  And so that will be part of what we    09:02
```

Jan 21, 2020                                    6

1    discussed today, I am afraid, and we will ask the

2    Tribunal's permission to submit those as additional

3    exhibits in the course of these proceedings.

4            THE PRESIDING ARBITRATOR:  Okay.  So some

5    invoices have arrived yesterday?                09:02

6            MR. ALEXANDER:  Yes.

7            THE PRESIDING ARBITRATOR:  And those

8    invoices will be part of the amount claimed in this

9    arbitration?

10           MR. ALEXANDER:  Correct.                09:02

11           THE PRESIDING ARBITRATOR:  So you want to

12   introduce them into the file.  But do you want to

13   discuss them today, or just you announced that you

14   would submit them?

15           MR. ALEXANDER:  I want to announce that    09:02

16   we will submit them, and it will become relevant at

17   various points to say that this concern, which was

18   before last evening not yet ripe, is ripening.

19           THE PRESIDING ARBITRATOR:  Okay.

20   Mr. McIlwrath.                                  09:03

21           MR. McILWRATH:  I think this is

22   consistent with an issue that we wished to raise

23   about some of the questions that may introduce new

24   facts, new claims and new quantum after that there

25   has been a hearing, and whether it is really      09:03

Jan 21, 2020                                          7

1    appropriate for us to have this.  I mean, we can

2    certainly wait and raise our objections until after

3    the Claimants have provided their closing

4    discussion here today.  But we wonder whether the

5    Tribunal really wants to get into or admit these        09:03

6    issues into the hearing transcript, when that may

7    both call into question the safety of the award or

8    perhaps just as troublesome will be the question of

9    whether or not that we get into the issues of

10   reopening the hearing that has already been closed.      09:04

11          I can give you some examples of where the

12   questions I think delve into issues of new fact, of

13   new claims and new quantum, but we note there has

14   been no request by the Claimants to amend their

15   pleadings, and the procedural order was quite clear      09:04

16   in terms of being able to set out in front of the

17   Tribunal exactly, you know, in a separate section

18   what their claims are and the quantum on which they

19   are based.  So we, I think, raise a very rigorous

20   objection to the introduction of new quantum after      09:04

21   the hearing.

22          Also, I think this relates to some of the

23   concerns we have about the questions that have been

24   posed and the record that may be generated in the

25   parties' discussion of them post-hearing.               09:04

Jan 21, 2020                                                8

1                THE PRESIDING ARBITRATOR:  So do you have

2    any -- I understand that you have concerns of

3    having some of the questions we made.

4                MR. McILWRATH:  Yes.

5                THE PRESIDING ARBITRATOR:  But you didn't      09:05

6    raise those objections in advance.  Those questions

7    were sent on the 6th of January.

8                MR. McILWRATH:  We are raising them now.

9    I mean, this was the 6th of January.  We've also

10   looked at the potential -- so there are questions     09:05

11   of new fact.  We've gone back, we've looked also at

12   the Statement of Claim, we've looked at the Reply.

13               THE PRESIDING ARBITRATOR:  Okay.

14               MR. McILWRATH:  I think we are prepared

15   today to address that these were not raised.          09:05

16               So our objection is that these are

17   introducing new arguments post-hearing, and so we

18   are raising them now before they are being

19   introduced.

20               THE PRESIDING ARBITRATOR:  Are those        09:05

21   questions identified, the specific questions of the

22   list?

23               MR. McILWRATH:  Sure, yeah.

24               THE PRESIDING ARBITRATOR:  Can you name

25   them, please?                                          09:05

Jan 21, 2020                                    9

1        MR. McILWRATH:  Sure.  If you want to go

2   to questions of fact, I think 16 and 17 both ask

3   for issues or for factual answers that were outside

4   of either the pleadings or the discussion at the

5   hearing.                                            09:06

6        17, I think, is one that we would say is

7   very clearly asking for the identification of

8   information that was not raised previously,

9   potentially, potentially.  We don't know, we don't

10  know what -- besides, we don't know what their      09:06

11  answers are going to be to some of these questions.

12  We identified these before they provided them.

13        And why is that relevant?  Well, that's

14  relevant is that they now identified certain

15  invoices that they said were falsified.  Well, we   09:06

16  have no opportunity to respond to that because the

17  hearing is over.  We would of course be able to

18  provide or call witnesses in that instance to

19  potentially defend these accusations.

20        THE PRESIDING ARBITRATOR:  Let me just        09:06

21  list the questions to which you object.  16, 17...

22        MR. McILWRATH:  So 16, 17, if we go

23  through, I think, all of the preliminary issues.

24  1, 2, 3, potentially?  Except for 3.  I don't think

25  the 3 is of matter.  So 1 and 2 raised potentially  09:07

Jan 21, 2020                                            10

1    -- give them an opportunity to, I think, assert new

2    claims, if they are asserting them.  We don't know

3    if they are going to assert new claims.  We don't

4    know the answers.

5              THE PRESIDING ARBITRATOR:  Follow in          09:07

6    order, please.  1, 2, 16, 17.

7              MR. McILWRATH:  So 1, 2, 5, depending on

8    what their answers are going to be.

9              And then the entire section of liability.

10             THE PRESIDING ARBITRATOR:  Questions          09:07

11   number?

12             MR. McILWRATH:  Well, particularly

13   questions -- Question 21 and 22, which would give

14   the Claimants an opportunity potentially -- I don't

15   know if they will do this, but gives them a          09:07

16   potential opportunity to re-plead or to re-quantify

17   the characterization of their losses post-hearing.

18             THE PRESIDING ARBITRATOR:  Noted.  Any

19   other questions?

20             MR. McILWRATH:  I think those are the          09:08

21   principal ones of which we have concerns.  Again,

22   we don't know what their answers are going to be,

23   so we are raising these concerns before the

24   arguments are presented.

25             THE PRESIDING ARBITRATOR:  So it's 1, 2,          09:08

Jan 21, 2020                                              11

 1    5, 16, 17, 21 and 22.

 2            MR. McILWRATH:  Yeah.

 3            THE PRESIDING ARBITRATOR:  Okay.

 4            MR. McILWRATH:  We had this on our

 5    presentation.  We thought it'd be better to raise      09:08

 6    it before.  21, that's right.

 7            THE PRESIDING ARBITRATOR:  Okay.

 8    Regarding Claimants' announcement about the

 9    invoices received yesterday, any comments?

10            MR. McILWRATH:  Same objection, that           09:08

11    these are new facts, this is new quantum submitted

12    after the hearing.  We of course -- you know,

13    particularly when you have Mr. Helsen, in his

14    second witness statement, who provided affirmations

15    regarding the negotiations with Total.  They did       09:09

16    address this at paragraphs 82 and 83 of

17    Mr. Helsen's second witness statement, where he

18    says -- I'll quote -- "We have continued to have

19    discussions with Total regarding a waiver of our

20    take-or-pay obligations under the gas supply           09:09

21    agreement we entered into."

22            He says:  "We are close to agreeing a

23    waiver of any payment for 2018 and 2019."  He says:

24    "Which would otherwise amount to 33.2 million each

25    year."                                                 09:09

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                                    12

1              They then say that Total are close to

2     agreeing to impose a gradual startup under which

3     the obligation would be limited to -- they give the

4     quantification here.  We hope that -- 84 says:  "We

5     hope to have that agreement signed shortly.  We          09:09

6     will be able to avoid any payments to Total."

7              There was no quantification of this and

8     there are representations that there were

9     negotiations that were underway to avoid this

10    issue.  So it was not an issue that was ripe or          09:10

11    quantified at the time of the hearing.

12             There are other issues that we will see.

13    Again, this goes to the question I think raised by

14    21, when you have an allegation of costs to

15    complete.  Right?  That was something that they          09:10

16    left open on their request for damages.  It was

17    TBD:  To be determined.  If it's not determined at

18    the time of the hearing, to us, it's not

19    determined.  That's just the end of the story.

20             THE PRESIDING ARBITRATOR:  Thank you.           09:10

21             Mr. Alexander, any comments?

22             MR. ALEXANDER:  Sure.  I think, one, the

23    objection is premature because we haven't heard the

24    arguments, but far more importantly --

25             THE PRESIDING ARBITRATOR:  He announced         09:11

INDEX NO. 650627/2021
RECEIVED NYSCEF: 01/27/2021

Jan 21, 2020                                            13

1    it.

2              MR. ALEXANDER:  Absolutely.  Far more

3    importantly, the record is not closed in this

4    proceeding.  You are entitled to take any

5    additional information that you desire.  There is        09:11

6    no issue about the integrity of this award; and,

7    third, our Request for Relief made very clear that

8    there were various elements that were ongoing, and

9    what he read from Mr. Helsen's testimony says

10   exactly that, and yesterday it became crystallized.      09:11

11   It still hasn't been paid, but it's now

12   crystallized.  And we thought it's important to

13   bring it to the Tribunal's attention.  And if we do

14   have to pay it next week or in two weeks, then we

15   do believe those are damages that you do have            09:11

16   jurisdiction to award.

17             THE PRESIDING ARBITRATOR:  Thank you.

18             MR. ALEXANDER:  And then I guess the

19   final point I would make is, you know, application

20   of the law to the facts, the facts -- we are not        09:11

21   having a bunch of new facts we didn't have before

22   today or yesterday.  We are applying, and we will

23   apply it through the course of this morning, the

24   law that you have asked questions about to the

25   facts as they have been presented, as they have had     09:12

Jan 21, 2020                                          14

1     a full opportunity to address.  They chose,

2     throughout their submissions and throughout the

3     hearing, to address very few of the facts that were

4     presented and very few of the documents that were

5     presented.  That was their choice.                     09:12

6              THE PRESIDING ARBITRATOR:  Thank you.

7     Any further comments?  Okay, let's make a break and

8     the Arbitral Tribunal will deliberate on the

9     matter.

10             (Recess taken - 9:12 a.m.)                     09:12

11             (Proceedings resumed - 9:26 a.m.)

12             THE PRESIDING ARBITRATOR:  Well, after

13    deliberation, the Arbitral Tribunal has decided as

14    follows:  Regarding the invoices, Claimant is

15    invited to file them after the hearing, next week,     09:27

16    in writing, and Respondent will be given a

17    reasonable deadline to oppose or to make any

18    allegation on them.  But we would like that the

19    specific invoices and the amount of the invoices

20    and anything related to these new invoices are         09:28

21    discussed today, because we don't have them in

22    front of us and it will be a nuisance.  So you can

23    file them next week, and then you will be given an

24    opportunity to --

25             ARBITRATOR AZZALI:  Will not be discussed      09:28

Jan 21, 2020                                    15

1    today.

2              THE PRESIDING ARBITRATOR:  Will not be

3    discussed.  Okay.  So no reference to these new

4    invoices today.

5              Regarding the objected Questions 1, 2, 5,    09:28

6    16, 17, 21 and 22, we have taken note that these

7    objections may arise.  In case these objections

8    finally arise, we will take note of it and you will

9    be allowed to develop your objections in the

10   post-hearing briefs.  But we won't exclude any       09:28

11   comments on those questions today, even if they are

12   in the record.

13             We, the Arbitral Tribunal, made those

14   questions sufficiently in advance, and we believe

15   they are part of the powers of the Arbitral          09:29

16   Tribunal to conduct the hearings and to ask any

17   relevant questions that the Arbitral Tribunal

18   wishes to make.

19             So we take note, and there will be plenty

20   of opportunity to develop your objection in writing  09:29

21   and to oppose to those objections, as the case may

22   be, and we will decide afterwards.

23             Any further points?  Claimant?

24             MR. ALEXANDER:  No, sir.

25             THE PRESIDING ARBITRATOR:  Thank you.       09:29

Jan 21, 2020                                                    16

1    Respondent?

2              MR. CALABRESI:  No.

3              THE PRESIDING ARBITRATOR:  So,

4    Mr. Alexander, the floor is yours.  You have one

5    hour and 45 minutes for your closing notes.              09:29

6              MR. ALEXANDER:  Thank you and good

7    morning.  We do appreciate the questions that you

8    submitted because our objective is always to give

9    you the information that you need to issue as fair

10   and complete a decision as possible.                     09:29

11             Today, just as the beginning of my

12   opening argument, I took you to the documents and

13   the facts.  Today I am going to take you to the

14   law.  You have asked about the law, and I am going

15   to take you to the law.                                  09:30

16             Your questions have frankly in places

17   perked interest in further investigations and

18   research, and so there are some additional cases we

19   will take you to as well beyond those that are in

20   the actual written submissions, and those will be       09:30

21   referenced in the closing -- post-hearing briefs.

22             I am going to go through the questions as

23   you have asked them for the most part because I

24   think that is probably the easiest way for you.  So

25   Question 1, the answer is absolutely.  Claimants        09:30

Jan 21, 2020                                                17

1    are deserving a special consideration.  Why?

2    Because GE had a duty to disclose.  In the *Brass*

3    case, which is the Second Circuit decision, which

4    is the highest Federal Appellate Court that governs

5    New York Law, the Court explained: "New York        09:30

6    recognizes a duty by a party to a business

7    transaction to speak in three situations.  First,

8    where the party has made a partial or ambiguous

9    statement on a theory that once a party has

10   undertaken to mention a relevant fact to the other  09:31

11   party, it cannot give only half of the truth."

12          The second is not particularly relevant

13   here.

14          Third:  "Where one party possesses

15   superior knowledge not readily available to the     09:31

16   other and knows that the other is acting on a basis

17   of mistaken knowledge."

18          ARBITRATOR SABA:  May I ask that you give

19   us the citation --

20          MR. ALEXANDER:  Yes.                          09:31

21          ARBITRATOR SABA: -- or the clear

22   reference to the case so that we record it

23   properly.

24          MR. ALEXANDER:  Yes.  It's CL-28, which

25   is *Brass v. American Film Technologies*.  This duty  09:31

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                      18

1    arises both before the transaction is signed and

2    during the course of performance of the

3    transaction.

4          That same Court went on to explain:   A

5    tendency in New York to apply the rule of superior      09:32

6    knowledge in an array of context in which silence

7    would at one time have escaped criticism is no

8    longer acceptable.  "It is no longer acceptable if

9    it ever was to conclude in knowing silence a

10   transaction damaging to a party who is mistaken        09:32

11   about its basic factual assumptions when it would

12   reasonably expect a disclosure."

13         How would that apply here?  Let's take

14   some examples.

15         GE had a legal obligation to tell us it          09:32

16   couldn't manufacture these trains in nine and

17   12 months.  It had never completed a similar train

18   in that amount of time or even close.  The Shell

19   trains were on three years in counting.  Not only

20   were they far behind schedule, but GE was having       09:32

21   massive quality assurance problems with those

22   trains.  That's all in the testimony you've heard

23   and read.

24         We had no basis to have access to that

25   information.  We do not have that information.  It     09:33

Jan 21, 2020                                        19

1   was exclusively in their knowledge, exclusively

2   within their possession.  They had an obligation, a

3   duty to tell us.

4           In addition, insofar as you accept their

5   testimony that the change from C6 plus to C6 had          09:33

6   some substantiative significance to them at the

7   time, and we don't believe it did, they had an

8   affirmative duty to tell us the significance of

9   that change, because they are the ones that had the

10  technological know-how, not us.  And everybody            09:33

11  agrees, we made that very clear from the outset.

12          What else?  That they couldn't achieve

13  the guarantee specifications, that they changed the

14  Cold Box on September 18th from minus 6 to minus 70

15  degrees in a way that precluded that Cold Box from         09:33

16  conceivably ever operating the way they were

17  promising.  Equally, that at minus 6 it wouldn't

18  work either.  And we heard lots and lots of

19  testimony about that during the hearing.

20          They had a duty, an obligation to tell us          09:34

21  those things, because they had superior knowledge,

22  they indeed were the experts.  We came to them

23  because of their expertise.  We stayed with them

24  rather than going to China because of their claimed

25  expertise.                                                 09:34

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                                    20

1          Equally, the lack of ability, the lack of

2    electrical engineering know-how to convert from

3    60 Hertz to 50 Hertz.  You heard Mr. Mastronardi

4    testify that he went to a meeting in December 2015

5    before he was involved with Greenville, where he        09:34

6    was told we need help because we don't know how to

7    deal with the electrical codes that were being

8    required to deal with on an international project.

9    This was the only international project.  They had

10   a duty to tell us they didn't have the engineering      09:34

11   capacity, capability to do what they promised to

12   do.

13         Now, GE not only had a duty under the

14   common law, it also had this duty under the

15   contract itself.  Under the Equipment Contract in       09:35

16   Clause 6.2 obligated them to tell us when they were

17   falling behind schedule, how they were going to

18   make it up, why they are falling behind schedule.

19   They didn't do that.

20         Under Clause 24.2, they had an obligation          09:35

21   whenever they were to make any change, they wanted

22   to make any change, like change in the Cold Box

23   from minus 6 to minus 70, they had an obligation to

24   tell us and obtain a change order.  They had an

25   obligation to tell us the consequences of the           09:35

Jan 21, 2020                                                  21

1    changes they wanted to make.

2           And if you look at the definition of

3    "Change" which is a defined term in the Equipment

4    Contract, it captures any change in the

5    deliverable.                                            09:35

6           Why is this so important apart from the

7    fact that they violated this duty?  It's really

8    important because of the case that we cite at

9    CL-15, *Soroof Trading v. GE Fuel Cell.*  This is a

10   case against a GE entity.                               09:36

11          And what happened in that case?  The GE

12   entity tried to rely on a limitation of liability

13   clause like they are trying to do now, but the

14   claim -- one of the claims in that case was that

15   you didn't tell us about things you knew, the fact      09:36

16   that this fuel cell that we were going to be the

17   distributor for, that you in fact were unable to

18   develop, that although we were to be the

19   distributor upon development, you had promised you

20   were going to develop it within X days, it wasn't       09:36

21   developed, you kept telling us it was going to be

22   developed and it was never developed.  You had a

23   duty to tell.

24          What the Court said in *Soroof Trading* is

25   that that obligation was sufficient to establish        09:36

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                           22

1    gross negligence to trump the limitation of

2    liability clause, the exculpatory clauses.

3           Now, *Soroof* arises in the context of a

4    motion to dismiss.  GE said:  You need to dismiss

5    those claims out of hand because we had a                09:37

6    limitation of liability clause.  The Court there

7    said:  No, the allegations are sufficient.

8           If these allegations are proven that GE

9    made these representations to you and a jury were

10   to find -- here you sit as the jury -- that that         09:37

11   was a misrepresentation, they violated their duty

12   to disclose, that is sufficient to override the

13   exculpatory clause.

14          We're going to talk a lot more about the

15   exculpatory clause in connection with Question 18,       09:37

16   but this is -- in Question 1, this is the question

17   that clearly comes up and is clearly relevant.

18          Question 2:  Is there a duty of good

19   faith during contract performance?  The answer is

20   yes.                                                     09:37

21          In the decision -- and this is a decision

22   that is not yet part of the record.  Again, this is

23   from the Court of Appeals of New York, the highest

24   court in the state of New York.  So remember, when

25   I talk about the Court of Appeals of New York, that      09:38

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                        23

1    is the highest court in New York.

2              In *511 W. 232nd Owners*, the Court

3    explains:  In New York, all contracts imply

4    covenant of good faith and fair dealing in the

5    course of performance, all contracts.              09:38

6              Now, it goes on to say, and this is

7    important:  "The duties of good faith and fair

8    dealing do not imply obligations inconsistent with

9    other terms of the contractual relationship."

10             So where there is a clause that gives     09:38

11   certain rights or obligations, the duty of good

12   faith can't tear those obligations up, or those

13   rights.  But where the contract is silent or where

14   there is an overriding obligation, the duty of good

15   faith in fact does arise and exist.                 09:38

16             Question 3:  What relevance, if any, does

17   abandonment have?  It has a lot of relevance.  In

18   connection with Question 18 we will talk about in a

19   little while, it has relevance because abandonment

20   or constructive abandonment is a basis to override  09:39

21   exculpatory clauses like those that you find in

22   this contract.

23             But that's not all.  The pretextual

24   assertion of health safety and environmental

25   concerns establishes something far more insidious   09:39

Jan 21, 2020                                          24

1    on the record you have before you.  Mr. Dunagan

2    offered compelling testimony that he has worked

3    with GE in the past, he has never seen them walk

4    off a site for something like this, he has never

5    seen anybody walk off a site in a condition that          09:39

6    this site is in.  In his view, this is plainly

7    pretextual.

8            Pretext is dishonesty.  Pretext is

9    willful misconduct.  And this is not the only

10   instance of the GE project team's dishonesty, and         09:40

11   we will talk about that in connection with one of

12   the later questions as well.

13           Abandonment is not only a basis to

14   override the exclusions, it's also a breach of the

15   contract.  Clause 6.2 and Clause 5 of the Equipment       09:40

16   Contract, as well as Appendix A, part 3, page 4 in

17   Change Order 27 all obligate GE to complete this

18   project in nine and 12 months.  They are not

19   entitled to simply abandon and walk off site.  It's

20   a breach of contract.  It's also a breach of              09:40

21   Clause 6.2 of the Services Agreement which imposes

22   similar obligations.

23           It's also -- finally, it's circumstantial

24   evidence that GE never had the ability to perform

25   this contract, that they have thrown up their hands       09:40

Jan 21, 2020                                         25

1       and walked away because they have never been able

2       to do it.  And they knew that back in August,

3       September 2014.  And how do we know they knew that?

4       This is also a related question.  We know they knew

5       that because of the experience they had with Shell.    09:41

6       What they did -- what they experienced with us is

7       exactly the experience they had with Shell.  It's

8       just that Shell recognized that experience and

9       experienced that experience in the Schertz

10      facility.  We dealt with it on the ground in           09:41

11      Rumuji.

12              But if you read Mr. Griffin's testimony

13      and his witness statement, the experience of Shell

14      is exactly our experience.  And the fact that they

15      are walking off is simply proof that they are          09:41

16      throwing up their hands because they can't finish

17      the job.

18              Question 4:  What is meant by the

19      guarantee?  The guarantee, it's Exhibit C-3, I

20      believe, and it's a document by which GE Oil & Gas      09:41

21      guarantee the obligations of GE Nigeria.  And so

22      any obligations that GE Nigeria had in GE Oil & Gas

23      guarantee, and that guarantee does not -- so it's

24      basically a financial guarantee.

25              Question 5 --                                   09:42

Jan 21, 2020                                          26

1          ARBITRATOR SABA:  I am sorry.  Is it a

2     financial guarantee or a performance guarantee?

3          MR. ALEXANDER:  We will check.  We will

4     get back to you.  I think it may be both, but we

5     will check.                                       09:42

6          While we are checking, Question 5, yes.

7     The answer is yes, it is understood that the

8     liquidated damages is part of what we seek.  It's

9     quite clear, when you read the Request for Relief

10    in the context of the entire Statement of Claim,  09:42

11    paragraphs 414 to 416, they specifically say we are

12    entitled to the liquidated damages.

13         GE addressed the claim for liquidated

14    damages in their responsive papers.  There is no

15    issue of due process, and in their Request for     09:43

16    Relief at the end, although we didn't make a

17    specific reference to liquidated damages, in the

18    prayer for relief at the end, specifically there is

19    a final clause that does specifically say:  All

20    further relief that this Tribunal thinks is        09:43

21    appropriate and just.  And given the fact that this

22    was requested specifically in the context of the

23    Statement of Claim, it is captured with it.

24         Question 6 -- in response to Question 5,

25    the guarantee is both performance and financial.   09:43

Jan 21, 2020                                                           27

1      It is both.  Yes, sorry.  Question 4.

2                Question 6 is going to be answered by

3      Mr. Gutowski when I finish going through the rest

4      of the questions.

5                Question 7, Seller, that is GE Oil & Gas,        09:43

6      had the exclusive obligation -- the exclusive

7      obligation to cure its breaches of the Equipment

8      Contract.  So the Services Agreement is not

9      imposing on GE Nigeria an obligation to cure the

10     defects or deficiencies, or failure to complete         09:44

11     construction and fabrication of the trains.  That's

12     an obligation of GE Oil & Gas under the Equipment

13     Contract.

14               Now, the one place where it could be

15     relevant is insofar as you find that the Claimants      09:44

16     bear any responsibility for not having done

17     something properly once the trains arrived in

18     Rumuji, GE Nigeria, under the Services Agreement,

19     had an obligation to supervise, to instruct, to

20     make sure that we didn't make any mistakes.  And so     09:45

21     if there was any mistake made, that obligation

22     ultimately falls on GE Nigeria, because it's

23     ultimately their responsibility to make sure it

24     didn't happen.

25               Question 8:  Which contractual                 09:45

Jan 21, 2020                                                      28

1    obligations have been breached by GE Nigeria?

2    There is a series of clauses.  They had an

3    obligation under Section 5.2 of the Services

4    Agreement to provide specialists.  That they did

5    not do, and the evidence is pretty clear that          09:45

6    people they put on the ground were not specialists.

7           Section 11.3, they had an obligation to

8    provide a comprehensive and adequate training

9    program.  That has not been done.  In connection

10   with the declarations we seek from you, we would       09:45

11   want a declaration that they still have the

12   obligation to provide us with training so we can

13   run these trains if we can get them started.

14          Clause 12.1:  An obligation to provide

15   on-site supervision and guidance and instruction.      09:46

16   That's the obligation I was talking about a minute

17   ago.  Insofar as you find that we did not do

18   something the way it should have been done, that is

19   a breach by them of that obligation under 12.1.

20          And 17.1, that they give a warranty to         09:46

21   perform their duties in a competent and diligent

22   manner.  That simply is an overlay of the prior

23   obligations.

24          Question 9:  What was each party's

25   responsibility and role in the design of the           09:46

Jan 21, 2020                                    29

1    trains?  GE bore sole and exclusive responsibility

2    for design of the trains.  They have the obligation

3    to design the trains in accordance with our

4    requirements as provided in the RFP documents so

5    that those trains perform in accordance with the        09:47

6    contractual requirements.

7           And you find that obligation in many

8    clauses of the Equipment Contract.  You find it in

9    Clause 10.2, which says that Seller, that is GE,

10   shall be deemed to have scrutinized, prior to the       09:47

11   effective date, Buyer's requirements, including the

12   design criteria and calculations, if any, and all

13   other data and information provided by Buyer, in

14   particular as regards the accuracy of these

15   requirements and the consistency of the                 09:47

16   requirements and sets of information or data

17   mentioned.

18          Appendix A, Section 1.1:  The basis of

19   design for the plants which is developed by Seller

20   from the request for proposal documents provided by     09:47

21   Buyer.

22          We told them what we wanted.  All the

23   design obligations are on their side.

24          Appendix A, Section 3:  Seller's scope of

25   supply for the plants includes process design,          09:48

Jan 21, 2020                                              30

1    engineering design, procurement and module

2    fabrication.

3          Appendix A, page 12 of 31, that

4    obligation includes the obligation to engineer the

5    MR compressor motor startup system, that ultimately        09:48

6    we learn the VFD is required for.  All of these

7    obligations are theirs.  There is no obligation

8    anywhere in the Equipment Contract imposing any

9    design obligation, any responsibility to assist

10   with design on the Claimants.  In fact, even where         09:48

11   the Claimants proposed changes, the contract

12   provides the obligation remains exclusively on GE.

13         So if you look at Section 2, Section 2 of

14   the Equipment Contract says:  "Any request from

15   Buyer shall not relieve Seller from its                    09:49

16   responsibility for delivering the plant in

17   accordance with the agreement."

18         It's the final clause in Section 2 of the

19   Equipment Contract.

20         And then if you look at Section 10.1:                09:49

21   "Seller acknowledges that it must rely entirely on

22   its own skill and judgment in the performance of

23   its duties and obligations under this agreement.

24   Accordingly, the duties, obligations and

25   liabilities of Seller shall not be released,               09:49

Jan 21, 2020                                           31

1    diminished or in any other way affected by any

2    comment or approval made or given by or on behalf

3    of Buyer."

4            The obligations were entirely and

5    exclusively on GE.  Why?  Because GE represented        09:49

6    that it was the expert.  We were not.  Everybody

7    agrees we were not.  We were not taken on any

8    design responsibility.  We had no expertise to take

9    on design responsibility.  That was GE's.  And in

10   the contract, we made it very clear, and they made     09:50

11   it very clear that they owned it.  That is theirs,

12   entirely theirs.

13           Question 10:  Did the Equipment Contract

14   require the Seller to guaranteed performances other

15   than the three:  LNG throughout, LNG quality and       09:50

16   power?  Absolutely.  The Equipment Contract is a

17   contract.  Every provision in there is an

18   obligation, is a guarantee.  They need to perform

19   and comply with every single obligation in that

20   contract.                                              09:50

21           The HMB at Appendix A, Annex B, is an

22   integral part of the contract.  If you look at

23   Appendix A, page 2 of 31, it says:  "This

24   Appendix A has the following annexes each of which

25   shall be an integral part of this Appendix A."  And    09:51

Jan 21, 2020                                        32

 1    then it includes Annex B.

 2            So Annex B, that HMB with all the details

 3    including feed gas volume, including waste

 4    condensate production, that's all part of the

 5    contract, that's all what they were supposed to          09:51

 6    deliver to us, what they promised to deliver us.

 7            What is the significance of those three

 8    performance guarantees?  They are markers for the

 9    performance tests, that's all they are.  So when

10    you -- when the plant is up and running and we run       09:51

11    the performance test, we are going to test at least

12    three points, but it doesn't mean that you can

13    throw out the rest of the contract and if we hit

14    these three points, everything is fine.  Because if

15    that were the case, frankly, they could have loaded      09:52

16    up some trucks of LNG and brought them to us and

17    said:  Here you go, here is the guarantee quantity

18    of LNG.

19            It's not the way it works.  You have to

20    perform under the contract.  You have to perform --      09:52

21    run these trains as the contract requires the

22    trains to be run.  And that includes the feed gas,

23    that includes the -- what comes out, the LNG, the

24    waste condensate.  That includes everything.

25            So it's not possible to take just those          09:52

Jan 21, 2020                                         33

1    performance guarantees in isolation.  That's not

2    what's promised.  They are promising us -- we have

3    fulfilled the contract, we have delivered to you

4    what you have ordered.  And here, we are going to

5    test it based on all these three things.              09:52

6          But if something else doesn't work, let's

7    suppose they hit those three markers, but the VFD

8    doesn't work and we have to use our own VFD to

9    start up the train, that's still a breach.  They

10   haven't fulfilled their obligations, and that's why  09:53

11   everything is an obligation under this contract.

12         The other point I would make about this

13   is it's not possible anyway, and you will recall

14   during the hearing, Mr. Gutowski used the example

15   of Whac-a-mole, where if you hit one thing,          09:53

16   something else pops out of whack.  That's the case

17   here.

18         The evidence, I believe, shows that if,

19   for example, you put in extra feed gas, that

20   increases the power usage.  So that goes out of      09:53

21   whack, even if by throwing in a lot more feed gas,

22   you can get to the proper quantity of LNG.  But of

23   course you also end up with this massive amount of

24   waste condensate, which is a breach of the

25   contract.                                            09:54

Jan 21, 2020                                             34

1           If we turn to Question 11, you ask:

2    Which contractual provisions relate to the time of

3    delivery as compared to the final gas composition

4    and type of storage?  The answer is there are none,

5    and there are none because the contract specifies a      09:54

6    delivery date without any qualification.  It has to

7    be provided in nine and 12 months on the basis of

8    the basis of design.  The basis of design provided

9    the final gas composition and it provided the

10   storage conditions.                                      09:54

11          Three clauses of the contract are

12   absolutely consistent on establishing this.

13   Section 2:  "Buyer may issue to Seller requests

14   which Buyer may consider necessary or helpful in

15   the performance of Seller's obligations; if any          09:54

16   request impacts contract price or delivery date, it

17   constitutes a change and Clause 24 shall apply."

18          So what does that mean?  If we saw a

19   different feed gas composition or a different

20   storage capacity, then they needed to tell us if         09:55

21   this was a Change, capital C under the contract,

22   that necessitates a change order defined under

23   Clause 24 that would have an impact on delivery

24   date or price.  They never did that.

25          And so even if -- and we will get to the          09:55

Jan 21, 2020                                        35

1    questions where you asked about this -- even if

2    they had made some change because of the change of

3    feed gas composition or a change of storage, absent

4    them telling us -- that request you've just made to

5    us to change something has an impact on delivery        09:55

6    date, or on price, or on performance.  If they

7    don't tell us that, then it doesn't affect the

8    delivery date, it doesn't affect the performance,

9    it doesn't affect the price.

10            If they do tell us that under Clause 24,        09:56

11    we have a right to say, well, in that case, we

12    don't want it, because we don't want those changes

13    in delivery date or price, or performance.  But

14    because they are the expert, they have an

15    obligation to tell us if something we request that      09:56

16    would be a change from the contractual parameters

17    would have an impact for which they seek some form

18    of relief, either in performance, delivery date or

19    money.  And they didn't.

20            Clause 24.2, that's the clause I have           09:56

21    just been talking about that imposes on them this

22    obligation.

23            And then Appendix A, Clause 4.1.  After

24    the three performance guarantees that are listed

25    there, it specifically explains that if we change,     09:56

Jan 21, 2020                                                    36

1    if we change within the BOD, for example, gas

2    composition or storage pressure, then it's their

3    obligation to come to us, ask -- to tell us, here

4    is the impact that what you are asking will have on

5    the HMB, that graphic, and do you accept this?  You        09:57

6    need to accept it in writing.  It's what 4.1 says

7    expressly, and it's absolutely consistent with

8    24.2, the change order clause.

9            We need to tell you how your change to

10   the BOD is going to impact what you are buying, and        09:57

11   you have to accept that in writing because we don't

12   want any confusion about this, because it's really

13   important.

14           And so as to the specific answer to

15   Question 11, there is no qualification, nine and           09:57

16   12 months based on the feed gas and the pressure

17   that's in the BOD, if they want to change that,

18   they need to ask us for a change and we need to

19   agree.  And if we don't agree, then they continue

20   designing according to the feed gas composition and        09:58

21   the pressure that's in the basis of design.  That's

22   the way this contract works, and it works so that

23   we are not surprised at the end, as we have been.

24           Question 12:  When was the Cold Box

25   modified to accommodate our request for atmospheric        09:58

ICDR Case N° 01-18-0002-9174

1    storage?  It was never modified to accommodate our

2    request for atmospheric storage.  So the answer is

3    never.  The Cold Box was changed no later than

4    18 September 2014, and it never changed again.

5         If you compare Exhibit R-267 with C-837,      09:58

6    and you can also look at C-1064, and if you review

7    the testimony of Mr. Lumley and the

8    cross-examinations of Mr. Schleicher, Mr. Amidei

9    and Mr. Smith, it never changed.  It never changed

10   after September 18, the design of the Cold Box.    09:59

11        And the change that they made between

12   September -- the signing of the contract on

13   September 14, when it was exchanged, and

14   September 18 was not because of anything to do with

15   atmospheric pressure.  That was being done by      09:59

16   Mr. Shukui and Chart, because they were trying to

17   make the Cold Box work.  Because the Cold Box

18   wasn't going to work for them as it was configured

19   in the contract.

20        We know that's the case because on            09:59

21   October 2nd, there's an email -- an internal GE

22   email from Mr. Weir.  It's Exhibit C-889.  And in

23   it he asks -- he reports on a conversation he had

24   with Chart, where he asked Chart:  Will this Cold

25   Box at minus 70 work with atmospheric storage?     10:00

Jan 21, 2020                                              38

1           And Chart said:  No, this isn't designed

2    for atmospheric storage.

3           And he explains in that email -- it's

4    about five paragraphs long -- what Chart told him

5    about why this is not designed for atmospheric          10:00

6    storage.  Among other things that Chart says, you

7    need 20 percent more duty.  So it means you need a

8    much bigger box.

9           Now, we did tell GE that we wanted to use

10   both pressurized and atmospheric storage on              10:00

11   October 1st.  That is after the Cold Box had

12   already been changed to minus 70.  GE takes the

13   position in the hearing:  Actually, you told us

14   during the kick-off meeting on September 22nd and

15   23rd.  That's also after September 18.                   10:01

16          So even if that were true -- and the

17   minutes of that meeting do not reflect that's true.

18   Even if it's true, it wouldn't matter.  So the

19   answer to the question is the Cold Box was changed

20   before the request for atmospheric pressure came         10:01

21   from us.

22          And moreover, when we made that request,

23   really importantly, GE didn't say:  Hold on,

24   pursuant to Clause 24.2 of the contract and

25   Section 4.1 of Appendix A, we need to tell you that      10:01

Jan 21, 2020                                              39

1      there are consequences to this, that there is going

2      to be a different production profile of the plant

3      now.

4              They didn't say anything like that, and

5      they had an obligation to do that.                    10:01

6              Instead, what did they do?  They sent us

7      a revised basis of design on October 6 that

8      included atmospheric storage, and then they sent us

9      the HMB, Annex B of Exhibit A, which were in the

10     Transmittal 10.  That was exactly the same HMB that   10:02

11     was attached to the contract.  So what they were

12     telling us is:  We hear your request, no impact.

13     No impact.

14             And then as I explained during the

15     opening, Mr. Cohen several months later issued an     10:02

16     unsigned Change Order Request which he recalled

17     nine minutes later.  Never pursued, never followed

18     up.  There was never a request for any change about

19     this.  And at that point it was, frankly, too late

20     anyway, everything had been -- they had already       10:02

21     long changed the design.  They changed that in

22     September.

23             ARBITRATOR SABA:  Very quickly.  No

24     change after September 18?

25             MR. ALEXANDER:  Yes, sir.                      10:03

Jan 21, 2020                                        40

```
 1              ARBITRATOR SABA:  So should the Tribunal
 2    understand that the Cold Box as delivered, designed
 3    and delivered, when delivered, reflected the
 4    temperatures and everything else that is in the
 5    documentation as of September 18?                    10:03
 6              MR. ALEXANDER:  Yes.  Absolutely.
 7    Mr. Lumley explains that.  It's clear from the
 8    record -- the references I gave you before, if you
 9    compare that September 18 or 19, I think it may
10    have been, HMB, Mr. Shukui and the Chart data        10:03
11    sheet, with the October 1st Chart data sheet which
12    they have represented as the final data sheet, they
13    are the same within .1 degree centigrade.  And so
14    yes, it is the same design.
15              ARBITRATOR SABA:  Okay.                     10:03
16              MR. ALEXANDER:  What they may tell you,
17    they said in the hearing was, well, the actual
18    order chart was issued on October 13.
19              Sure, but the design was done way back in
20    September.                                           10:04
21              ARBITRATOR SABA:  And the delivery of the
22    Cold Box was in?
23              MR. ALEXANDER:  15 October 2015.
24              ARBITRATOR SABA:  15 October 2015.  And
25    that Cold Box as delivered reflects that design.     10:04
```

Jan 21, 2020                                          41

1              MR. ALEXANDER:  That's what they have

2     represented to us.  We haven't opened the Cold Box.

3     They have represented to us that that is correct.

4              ARBITRATOR SABA:  They have represented

5     that to you.  How so?  Where?                        10:04

6              MR. ALEXANDER:  In the disclosure

7     process, we requested the final as-built Chart data

8     sheet.  They sent it to us -- they resisted

9     providing it to us for a long time, and you recall

10    that.  They said they didn't have it themselves,    10:04

11    but then either they got it from Chart or they

12    found it.  I don't know.  But in a letter, and I

13    believe that's Exhibit C-837 --

14             ARBITRATOR SABA:  837.

15             MR. ALEXANDER:  I believe it's C-837.       10:04

16    They sent it to us with a cover letter that said:

17    We don't think you need this because we have given

18    you the GE final data sheet, but here is the Chart

19    final data sheet as well.  And when you compare the

20    Cold Box exit temperatures of the Chart final data   10:05

21    sheet with the GE final data sheet, they are, in

22    fact, the same.

23             ARBITRATOR SABA:  All right.  Thank you.

24             MR. ALEXANDER:  So the question to

25    Answer 13, you preempted me:  15 October 2015.       10:05

Jan 21, 2020                                              42

1    Mr. Lancaster gives you that date in CER-7, at

2    page 47, I believe.

3              Question 14:  Was the Cold Box able to

4    meet the contractually guaranteed performances

5    without the inclusion of the HHR system?  No, it        10:05

6    was not.  As-built, there is no dispute it will

7    freeze at minus 70 degrees Centigrade.  Mr. Amidei

8    says that at Day 5, page 113.  Mr. Lumley says at

9    Day 6, page 119.

10             As modified with the bypassing -- so what     10:06

11   you can do is you can add a bypass of warm gas to

12   heat it up when it comes out at minus 70, to warm

13   it to minus 45 or minus 50.  At that, it still

14   requires an HHR.  Dr. Smith, in this presentation

15   at Day 6, page 215:  "The final as-built Cold Box       10:06

16   design would give more condensate and less LNG

17   without mitigation, i.e., the HHR system."  That's

18   a quote from him, "i.e." included.

19             Mr. Lumley explains in his report, CER-6,

20   Section 10.2, 11 percent decrease in LNG,               10:06

21   820 percent increase in waste condensate, based on

22   the Cold Box as delivered.

23             So the only way to manage that is with a

24   HHR system.

25             ARBITRATOR SABA:  Did I hear you a moment      10:06

Jan 21, 2020                                                    43

1    or so ago say that the Cold Box hasn't been opened,

2    you haven't tested it yet?  Is that right?

3                MR. ALEXANDER:  Correct.  Right, we have

4    not tested it.

5                ARBITRATOR SABA:  It's on-site, it's          10:07

6    there?

7                MR. ALEXANDER:  Yeah, we haven't been

8    able to turn on Trains 1 or 2.

9                ARBITRATOR SABA:  Okay.  Thank you.

10                MR. ALEXANDER:  But we know from the          10:07

11   HYSYS and Thermofast stimulations that these are

12   the consequences that you will get, based on the

13   final data sheet that they have provided.

14                Question 15:  Was a change order altering

15   the feed gas composition ever agreed?  No, nor was        10:07

16   one ever issued for agreement.  There is no change

17   order changing the feed gas composition.

18                Question 16:  Did Turner or GE ever

19   institute arbitration or legal proceedings?  We

20   believe there was a dispute, we heard there was a         10:07

21   dispute.  It's up to GE to tell us.  They've

22   represented there was no dispute.

23                But I will ask where is the Turner

24   contract?  They were required to turn over the

25   Turner contract and they didn't.  And I think we          10:08

Jan 21, 2020                                          44

1    may now have figured out why they didn't.

2           We understand that the pipe racks -- and

3    this is in evidence in the record -- that the pipe

4    racks, Turner was requested to start constructing

5    those in late 2014, and they weren't requested to      10:08

6    start construction or fabrication of the modules

7    until spring of 2015.  And if that's right -- and

8    the contract would tell us if that's right, and

9    they haven't turned it over -- but if that's right,

10   then that itself is reckless indifference, because     10:08

11   by June 2015, they were required to have delivered

12   Train 1.

13          And if they didn't even contract with

14   Turner to build the modules until the spring of

15   2015, that is gross negligence, that's complete        10:08

16   reckless indifference to our rights and our ability

17   to get these trains.

18          And so those contracts are very material.

19   I guess we would urge the Tribunal again -- because

20   they must have the contracts -- to require them to     10:09

21   turn them over, so that we can see the dates that

22   in fact GE was directed.

23          Question 17.  This is the specific -- the

24   various certificates from Turner.  The answer is

25   the certificates are false in their entirety          10:09

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                        45

1    because they make representations that all of the

2    above were done, and we know all of the above was

3    not done.  So I don't want to use a lot of time

4    here, but I will go through just quickly and give

5    you an example of what we are talking about.          10:09

6              On C-1175, which is the instrument

7    installation certification, or verification, they

8    represent, for example, that flow element direction

9    and markings were checked.  Well, some of the

10   valves were missing.  So if they are missing, how     10:10

11   could they have checked that the flow direction was

12   correct?

13             On control valves, they say flow

14   direction correct.  Well, six globe valves, which

15   are control valves, were missing.  So how did they    10:10

16   check that they were correct?  Two ball valves were

17   backwards.  How did they check that they were

18   correct?

19             ARBITRATOR SABA:  How do we know that?

20   Is there record evidence --                            10:10

21             MR. ALEXANDER:  Yes.

22             ARBITRATOR SABA:  -- that they were

23   missing, that they were backwards, so we have -- if

24   you could point that -- if you could direct the

25   Tribunal to that evidence it is there.                 10:10

Jan 21, 2020                                          46

1            MR. ALEXANDER:  It is.  It's in the punch

2       list which is in a exhibit.  The punch list that GE

3       created when the trains arrived on-site, and they

4       were creating the punch list over the course of

5       2016 and 2017.  You find that all these things are      10:10

6       missing, and it's GE's responsibility to replace

7       them.

8            ARBITRATOR SABA:  I see.

9            MR. ALEXANDER:  Similarly, with respect

10      to devices, current location per drawings.  Well,      10:11

11      11 instruments are missing according to the

12      construction P&IDs.  So if you look at that punch

13      list, there are 11 instruments missing.  If you

14      then look at the construction P&ID, what they were

15      using to construct the train, the module,             10:11

16      Module 401b, you find those instruments on that

17      P&ID.

18           So nobody checked.  Or if they checked,

19      they just lied, because it was clear from the

20      documentation that Turner had and that GE had,        10:11

21      because they created the P&ID, that those documents

22      are missing.  And you have in the record both the

23      P&IDs and the punch list, so you can see that.

24      Instruments, sorry.  They created P&ID and the

25      instruments that are missing.                         10:12

Jan 21, 2020                                    47

1            The electrical termination is correct and

2      tight, but according to the punch list, they

3      weren't all wired to the instrument panel.  So how

4      could they have checked that they were correct and

5      tight?  It provides that conduit fittings and          10:12

6      glands were installed correctly.  You'll recall

7      recall glands were a huge issue in this case

8      because they either didn't provide glands or they

9      provided glands that were oversized.  And so how

10     did they check these things?  So this certification    10:12

11     was false.

12           The other certifications, the release for

13     packing where they certified the module is

14     complete:  A similar issue.  Have all ship-loose

15     items been identified and removed?  There are no       10:12

16     ship-loose items identified with the shipment.

17           Is all the paint and installation

18     complete?  None of the nuts and bolts were painted,

19     none of the connecters were painted.  Under the

20     painting specs, they were required to be painted,      10:13

21     including those that were -- you know, when they

22     were installed.

23           Have the punch list items been identified

24     for correction in the field?  There was no punch

25     list.  Yet for Module 401b, this is an excerpt from    10:13

Jan 21, 2020                                                    48

1    Exhibit C-101, there were 27 missing items:

2    Valves, strainers, instruments and more.

3          ARBITRATOR AZZALI:  Sorry, can I ask you

4    something?

5          MR. ALEXANDER:  Yes.                          10:13

6          ARBITRATOR AZZALI:  And that has been

7    checked up on delivery, upon delivery of the box,

8    because I remember that in New York, there was some

9    discussion about how long the boxes were sitting on

10   the site.                                           10:13

11         MR. ALEXANDER:  Correct.  So the boxes

12   were sealed when they arrived, because GE told us

13   not to open them until they were to be placed on

14   the foundations.  They were then -- the crates were

15   opened or the boxes were opened, they were placed   10:14

16   on the foundations, they were still in their

17   plastic shrink wrap.  You'll recall Mr. Srinivasan

18   explained that.

19         And then when the shrink wrap was taken

20   off, that's when you could first see.  And          10:14

21   Mr. Srinivasan testified when he took it off, he

22   could visually see gaps where things were missing.

23   And then over the course of 2016, the punch list --

24   GE was reviewing and identifying missing items; and

25   then in February 2017, after the meetings in        10:14

Jan 21, 2020                                              49

1    Florence, they came back and they found more

2    missing items.

3           ARBITRATOR AZZALI:  So it was not upon

4    delivery, it was after delivery.

5           MR. ALEXANDER:  Well, there was -- if you     10:14

6    are using --

7           ARBITRATOR AZZALI:  Because you said upon

8    delivery, but I wanted just to be sure I did

9    understand correct.  It was not upon delivery of

10   the box, it was after when you -- I mean, when IEC   10:14

11   opened the boxes.  It was after delivery.

12          MR. ALEXANDER:  It was identified when

13   the boxes were opened.

14          ARBITRATOR AZZALI:  Okay.  That was not

15   done upon delivery.                                  10:15

16          MR. ALEXANDER:  And delivery, we'll use

17   little d, not capital D, because there was no

18   actual delivery.  It was a contractual matter.

19          ARBITRATOR AZZALI:  Okay.  No, No, no.

20   Material.                                            10:15

21          MR. ALEXANDER:  Correct.  When the boxes

22   arrived in the Houston port, we did not open them,

23   on instructions from GE.

24          ARBITRATOR AZZALI:  Okay.

25          MR. ALEXANDER:  When the boxes arrived        10:15

1    on-site, we did not open them on instruction from

2    GE.  We opened them...

3             ARBITRATOR AZZALI:  Then that's correct.

4    Okay.  Thank you.

5             MR. ALEXANDER:  And the reason we know        10:15

6    these certificates have to be false is, you'll

7    recall this demonstrative I showed you during the

8    opening.  If the modules were fact fully fabricated

9    on-site in the United States and delivered --

10   Delivered, capital D -- in Houston, you will not      10:15

11   see GE's punch list obligations in the 5,000 range.

12   They would have -- they might have some.  Nobody is

13   saying they would be zero.  But it would be very,

14   very little, because the work that was supposed to

15   be done on-site was actually installation, which      10:16

16   was our responsibility, and that's the green punch

17   list.

18             But the fact that GE's punch list has

19   multiples more defects, more problems, more

20   deficiencies, tells you that GE didn't do the job     10:16

21   that they certified was completed when they shipped

22   the modules.

23             THE PRESIDING ARBITRATOR:  Do you

24   remember the exhibit number of that demonstrative

25   exhibit?                                              10:16

Jan 21, 2020                                    51

1              MR. ALEXANDER:  I don't.  But we will get

2       it for you.

3              Okay.  So evidence of falsity.  We have

4       talked about the punch list.  We have talked about

5       Mr. Srinivasan's testimony.  We haven't talked          10:17

6       about Mr. Pirjins' testimony and his witness

7       statement.  Again, he also talks a lot about the

8       missing and the incomplete delivery.

9              Mr. Lancaster's expert report; he shows

10      the massive amounts of equipment coming in, because     10:17

11      the true fabrication of these trains largely

12      happened on-site in Rumuji.  They didn't happen in

13      the Turner fabrication yard.  And that violates the

14      contract.  It was C-D10.

15             Now, you asked about other falsified            10:17

16      documents, and you referred to two in particular,

17      C-102, which is this manufacturer certificate.

18      It's hard to give you a clear answer on this,

19      frankly, because we don't know exactly what

20      compressor accessories were associated with this       10:17

21      Manufacturer Certificate.

22             But it does represent best quantity and

23      brand new materials, and we do know that the

24      quality of the materials we got was not the best

25      quality in some cases.  And so we have not said         10:18

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                         52

1    this is a false certificate.  You know, it may be

2    that it is, but we are not in this hearing arguing

3    to you this is false.  I don't have the record, the

4    evidence, to tell you that this certificate is

5    false.                                          10:18

6           You asked about Transmittal 86, C-754.

7    This is a promise of what GE was supposed to do in

8    terms of inspection and testing before delivering

9    to Houston.  At the time they wrote this, did they

10   think it was false?  I don't know.  Did it turn out   10:18

11   to be false?  Yes.  There are many things they

12   represented they are going to do in here that we

13   know they didn't do.

14          I actually took you to an earlier version

15   of this in the opening presentation and went        10:19

16   through some of the items that they have not done.

17          So there is responsibility vis-à-vis

18   control valves and manual valves, and safety

19   valves.  We know they didn't do those things

20   because they are missing.  As to piping, piping was   10:19

21   all supposed to be hydrostatic or pneumatic

22   pressure testing.  We know, because they told us,

23   that none of the ICPs were pressure tested.  So

24   they didn't do that.

25          Instrumentation electrical was all           10:19

Jan 21, 2020                                                        53

1    supposed to be checked.  We know it couldn't have

2    been because there were lots of instrumentation

3    missing that they were shipping back for years.

4              ARBITRATOR SABA:  And the evidence that

5    those items were missing is to be found on the          10:19

6    record?

7              MR. ALEXANDER:  Yes.  It's all in the

8    punch list.  It's the same evidence I was referring

9    to you before with respect to those inspection and

10   test certificates.  The punch list and               10:20

11   Mr. Srinivasan's testimony, Mr. Werner's testimony,

12   and Mr. Lancaster's report.  Because in

13   Mr. Lancaster's report, he itemizes, I think, the

14   document item by item, everything that was

15   delivered late, by date, by bill of lading number.    10:20

16             ARBITRATOR SABA:  Thank you.

17             MR. ALEXANDER:  Other false documents.

18   The time sheets -- well, let's do them in order.

19             Transmittal 10, the HMB that they sent to

20   us on October 9, 2015, representing that the Cold     10:20

21   Box, among other things, was the Cold Box that was

22   provided for in the contract.  That's false.  By

23   this time, they had changed the Cold Box to minus

24   70 degrees first outlet temperature, and they

25   deliberately didn't tell us.  That's in               10:21

Jan 21, 2020                                            54

1    Mr. Shuikui's memo or email internally within GE.

2    He actually recommends that they tell us, but then

3    they never tell us.

4           The mechanical completion certificate in

5    a letter that they sent to us in May of 2018, where    10:21

6    they represent to us that Train 1 is structurally

7    in accordance with the technical documentation,

8    excluding minor items which do not materially

9    affect the operation or safety of the plants.  They

10   knew this wasn't true.  How do we know?  I showed      10:21

11   you this document in Mr. Linwood's

12   cross-examination.  It's C-948.

13          In January 2018, several months before

14   they issued this mechanical completion certificate,

15   they had identified a very serious deficiency in       10:22

16   the suction line to the amine pumps.  The problem:

17   High sustain stress of 86 percent.  If you look at

18   their description of the problem on the next page,

19   you see the magnitude.  The allowable stress is

20   800.  The actual stresses are over 5,000.  A           10:22

21   massive problem.  And Dr. Smith testified that the

22   amine pump, which carries the amine system, is a

23   very toxic chemical.

24          Dr. Caligiuri testified that when he

25   visited the plant in 2019, this still had not been     10:23

Jan 21, 2020                                              55

1    corrected, which means when GE claimed mechanical

2    completion, they had a very serious stress

3    deficiency that they knew about.  They say all the

4    stress deficiencies that had been found now, we

5    didn't realize it's all the result of a lesson          10:23

6    learned.  That's not true, and the evidence shows

7    it's not true.  But even if it were true, this they

8    knew about, and this is a very serious stress

9    defect.

10            GE's May 8th letter declaring they were          10:23

11   abandoning the site because of HSE concerns, that

12   was pretextual.  The May 8th letter says, we are

13   abandoning because of HSE, and that's the only

14   reason they give.

15            But we know that this is not right.             10:24

16   Mr. Dunagan's testimony makes it clear this site is

17   a safe site.  This is a pretextual abandonment;

18   it's a false letter.

19            And, finally, in this arbitration, Mr.

20   Hillier -- Mr. Hillier and his independence.  Mr.        10:24

21   Hillier passes himself off as an independent expert

22   engaged to provide expert reports in November

23   of 2019.  He never tells you in his reports that he

24   was -- 2018, sorry.  He never tells you in his

25   reports that he was in fact engaged in               10:24

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                      56

1    February 2018 to assist GE with preparing their

2    counterclaim.

3              And so Exhibit C-1037, here is an email

4    from Mr. Pagliaro to Mr. Hillier -- I am sorry --

5    internally within GE, copying Mr. Hillier, asking      10:25

6    for change orders agreed and proposed submitted to

7    IEC, to be sent to Chris.  And then above, the GE

8    person to whom he sent that email says that she

9    will issue it at a later time.  She doesn't yet

10   have it, but once she gets them, she'll send them      10:25

11   to Chris.

12             And when confronted at the end of his

13   cross-examination, Mr. Hillier said, oh yes, yeah,

14   that's true, I was, but I was just giving them some

15   advice; I wasn't really preparing that Change Order    10:25

16   Request.

17             Not particularly credible, particularly

18   when you read the Change Order Request and how it's

19   formulated.  Because he says:  It was actually done

20   by a trainee at GE, and I was just helping him to      10:25

21   do it.

22             Really?  A trainee prepared that, that

23   full document with all the Xs and Ys and all the

24   detail and the formatting, but you had nothing to

25   do with it.                                            10:26

Jan 21, 2020                                                    57

1          But he says he did advise.  So he was

2    clearly involved.  In his first expert report, he

3    does say "prior engagements with GE" and he lists

4    one in 2016, he lists one in 2014, I think.  He

5    doesn't list the 2018, when he was engaged to help        10:26

6    prepare the change order.

7          But what does he do in his expert report?

8    Remarkably, he analyzes as an independent expert

9    what he had helped prepare in June, and says:

10   Actually, I look at this particular number and I         10:26

11   think that it's overstated by 10 percent, so I am

12   going to cut it by $200.

13         How disingenuous is that?  What is he

14   doing?  He is actually covering up the fact that he

15   was involved initially in preparing this thing.          10:26

16         And then the time sheets.  You heard

17   testimony from Mr. Kassem, and then ultimately from

18   Mr. Hillier, that these time sheets that Mr.

19   Hillier is passing off in his expert report as the

20   time sheets for the project were doctored, were          10:27

21   changed, in order to give him allocations and

22   details of descriptions of work that was done in

23   order to justify those allocations.

24         Nowhere in Mr. Hillier's report does he

25   explain that these are documents that were created       10:27

Jan 21, 2020                                    58

1    after the fact.  And Mr. Kassem's testimony is

2    quite vague on the point.  He says that he

3    allocated percentages.  He doesn't say anything

4    about changing the descriptions.  And he just

5    didn't change the descriptions on existing change      10:27

6    order -- on existing time sheets, rather.  They

7    actually re-create the time sheets, retype them,

8    change dates on them, add dates to them.

9          These are completely different documents

10   that have been submitted as the "counterclaim       10:27

11   evidence" than the actual change orders during the

12   project.  These are false documents submitted

13   during the arbitration to mislead you.

14         Blaming us, blaming us in the Statement

15   of Defense for having changed the -- for having      10:28

16   required -- requested the atmospheric pressure

17   order change to the Cold Box, now explaining why

18   the Cold Box changed, that's just not true.  It's

19   just -- it's literally a lie, because the Cold Box

20   changed on the 18th, before the atmospheric      10:28

21   pressure was even an issue.

22         As I've already talked about, the Cold

23   Box was never designed for atmospheric pressure.

24   That's what Mr. Weir's email -- I think it's

25   C-882 I told you -- says.  It's just a flat-out      10:28

1    false representation to you.

2            And then the disclosure process and the

3    disclosure responses.  Mr. Pagliaro testified that

4    he left Schertz in October 2018, and that's when

5    they started shutting it down and eliminating the        10:29

6    documents and equipment, and everything.

7            October 2018, think about that date.  GE

8    sent in their June 2018 letter, June 2018 letter

9    with essentially their counterclaim, their request

10   for all this stuff, in June of 2018.  We filed          10:29

11   arbitration at the end of July 2018.  So this

12   dispute was in place.  They filed their arbitration

13   request in August 2018, and then in October 2018,

14   they suddenly shut down the facility and destroyed

15   the documents, or sent them off-site somewhere          10:29

16   where they can't find them anymore.  And therefore,

17   that's their excuse for not disclosing documents to

18   us.  That's outrageous.

19           The ITO, the ITO is electronic.  Come on,

20   GE, a technology company, their ITO documentation       10:29

21   is in a hard file and it's not electronic

22   somewhere?  It's ridiculous.  And Mr. Mastronardi,

23   I believe, testified that in fact it is electronic.

24           The project schedule.  Mr. Lancaster

25   testified that Primavera does translate from            10:30

Jan 21, 2020                                        60

1    version to version.  So when Mr. Pagliaro testified

2    that, oh, well, it didn't work anymore because

3    Schertz had an old version of Primavera, and

4    therefore we couldn't translate it to Florence.

5           Mr. Lancaster testified that's              10:30

6    ridiculous.  This happens all the time on projects.

7    Primavera, the versions are updated, and it is

8    transferred.  It is designed to be transferable.

9           Financial documents, where are they?

10   Bente -- I can never pronounce her last name --     10:30

11   testified there are lots of financial documents

12   that are missing.  Really?  They have destroyed

13   their financial documents?  How can that be?  How

14   can that possibly be?

15          And finally, the Equipment Contract, the     10:31

16   promise of nine and 12 months.  The statement in

17   the recital that it has already been designed,

18   those are false statements.

19          Okay.  Now let's turn to the damages

20   section, 18 and on.                                 10:31

21          Okay.  I think I have used -- how much

22   time?

23          THE PRESIDING ARBITRATOR:  One hour.  If

24   you want a coffee break.

25          MR. ALEXANDER:  Sure.                         10:31

Jan 21, 2020                                                           61

1                 THE PRESIDING ARBITRATOR:  Let's make a

2       5-to-10 minute break.

3                 (Recess taken - 10:31 a.m.)

4                 (Proceedings resumed - 10:45 a.m.)

5                 MR. ALEXANDER:  One quick correction on          10:45

6       the record.  I mentioned C-837 was the letter from

7       Respondents with the as-built Chart Cold Box.  It's

8       actually C-959.

9                 Okay, Questions 18 to the end on damages.

10      First, sort of a step back, the delay here has had        10:45

11      horrific effects on this business.  Mr. Sahajwalla

12      testified about LNG is essentially like mobile

13      phones.  I mean, if we had the LNG, the demand for

14      it is unbelievable.

15                Mr. Lapuerta talked about having met with        10:45

16      the customers, having analyzed the pricing model.

17      GE itself recognized -- and I showed you this

18      document during the hearing.  GE itself recognized

19      that for two trains, from 2016 to 2018, the cash

20      flow expected would be $248 million.  This is            10:46

21      Exhibit C-1143.

22                So everybody recognized that this is a

23      cash cow.  The damages from the delayed cash flow

24      -- from delaying the cash flow from when it should

25      have been delivered to the end of 2019 alone -- and       10:46

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                              62

1    we are now in 2020 -- is already $700 million for

2    five trains and $300 million for two trains.  That

3    is in Mr. Lapuerta's testimony.

4           So now let's talk about the contractual

5    limitations of liability in damages.  Exculpatory        10:46

6    clauses are enforceable in New York Law.  However,

7    they are highly disfavored.  And *Gross v. Sweet*,

8    the New York Court of Appeals in 1979 made that

9    point clear.  They are enforceable, but they are

10   disfavored in the law.  And that disfavoring in the      10:47

11   law is very important when we look at when they are

12   and are not actually enforced or enforceable as a

13   matter of law.

14          The burden of proof is not a high burden

15   of proof.  It is preponderance on the evidence.  It      10:47

16   is a standard civil law -- not civil law, common

17   law, as opposed to criminal -- burden of proof

18   under New York Law.  Preponderance of the evidence,

19   which means more likely than not, when you weigh in

20   the balance, 50.000001 percent more likely than         10:47

21   not.  That's the standard of proof.

22          Okay.  There are at least four

23   circumstances.  Your Question 18 asked about

24   willful misconduct and gross negligence.  That's

25   one of them.  There are in fact four under New York      10:47

Jan 21, 2020                                                63

1    law that apply.  And the New York Court of Appeals,

2    in the *Corinno Civetta* case, identified those four.

3    It explained that the rule regarding exculpatory

4    clauses is not without its exceptions.  And even

5    exculpatory language which purports to preclude          10:48

6    damages for all delays resulting from any cause

7    whatsoever are not read literally.  Generally, even

8    with such a clause -- even with such a clause,

9    damages may be recovered for:  Delays caused by bad

10   faith or gross negligent conduct, uncontemplated         10:48

11   delays, delays so unreasonable they constitute an

12   intentional abandonment, and delays resulting from

13   contractee's breach of fundamental obligations.

14             Four circumstances.

15             ARBITRATOR SABA:  Citation, please.  Just       10:48

16   the exhibit.

17             MR. ALEXANDER:  It's not yet marked as an

18   exhibit.

19             ARBITRATOR SABA:  I see.  This is a new

20   case?                                                     10:48

21             MR. ALEXANDER:  It's referencing some of

22   the cases that are cited.  It's 67 New York 2nd

23   297, *Corinno versus Civetta* [sic].

24             So what does gross negligence willful

25   misconduct mean?  In the *Kalisch-Jarcho* case, which     10:49

Jan 21, 2020                                                    64

1    is CL-7, it explains that reckless indifference is

2    enough.  And in that case, reckless indifference

3    arose where there was a delay of 33 -- where the

4    performance went from 33 months to 61 months.

5            The Court held that that level of delay,        10:49

6    together with continual revision of drawings, was

7    sufficient to establish reckless indifference.  And

8    so that's one example.

9            Another example is where you have

10   repetitive negligence.  And the case of *O'Malley v.*    10:49

11   *Jegabbi* gives a good explanation of what that means

12   and why it makes logical sense.

13           The fact that there was evidence of his

14   negligence in these three aspects tended to

15   indicate that such negligent acts were not all due       10:50

16   merely to an error in judgment, momentary

17   inattention or loss of presence of mind.  And

18   that's the point, negligence is where you're a

19   little bit careless, you make a mistake.  When you

20   have repetitive negligence, when it keeps               10:50

21   happening, it's no longer just negligence.  It is

22   reckless indifference.  It is gross negligence.

23           And there are a number of cases, and I

24   will cite you to them, that hold this.

25           Reckless -- measuring whether lack of            10:50

Jan 21, 2020                                              65

1    care rises to the level of recklessness also

2    depends on the seriousness of the potential harm,

3    and there is law on this as well.

4           For example, if you have a very serious

5    situation, you are dealing with a highly flammable          10:51

6    substance, your level of care must be higher than

7    if you are dealing with chewing gum.  And so your

8    reckless indifference, the standard, you know, the

9    behavior, reckless indifference reaches much sooner

10   with the more dangerous or more significance the            10:51

11   consequence of your lack of care is.

12          And so here, the complete misconduct with

13   regard to stress calculations.  And Mr. Caligiuri

14   testified, and in his report he explains, far below

15   the level of care one would expect.  That's                 10:51

16   reckless indifference, because the consequences,

17   the consequences of getting that wrong are so

18   important.

19          Undersized cables, the same thing.  The

20   consequences of getting that wrong are really               10:51

21   important.  It's not that it's hard to do, but the

22   consequences of getting it wrong are really

23   serious.

24          Installing valves and bellows backwards.

25   Again, really serious consequences if it's not             10:52

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                        66

1    caught.

2            Changing the process from minus 6 to

3    minus 70 and generating all of this additional

4    waste condensate.  That has a complete fundamental

5    alteration in the entire business model.              10:52

6            We now need a second business model for

7    LPG.  That has serious consequences.  They are not

8    safety consequences, but they are commercial

9    consequences that are very significant.  And

10   therefore, the duty of care, the point of which      10:52

11   your neglect becomes reckless indifference, it has

12   to take that into account.

13           Quality control breakdowns on a gas

14   processing plant are highly serious.  Reckless

15   indifference.  The level of quality control          10:52

16   breakdowns here based on that punch list, the

17   amount of defects, the amount of deficiencies.

18   That's reckless indifference.  How do you get that

19   other than through reckless indifference?

20           The *Apache Bohai* case talks about          10:53

21   abandoning at the last minute, leaving somebody in

22   the lurch is reckless indifference, which is

23   obviously true.

24           Willfulness misconduct.  Recall the

25   *Soroof Trading* case that I talked about at the very  10:53

Jan 21, 2020                                          67

1      beginning of this hearing, that was the case where

2      filing the duty to disclose is willful misconduct.

3      It's not even reckless indifference.  That's

4      willful misconduct, and that's what the Court in

5      *Soroof v. GE* says.  That would be sufficient to       10:53

6      wipe out the limitations of the liability in a

7      contract.

8              So the fact that they didn't disclose all

9      the changes they were making, they didn't disclose

10     that the delay was going to be very long, and that      10:53

11     failure to disclose had a lot of significance

12     because they kept telling us:  It's coming, it's

13     coming, it's coming.  So we kept telling our

14     customers:  It's coming, it's coming, it's coming.

15             And that had massive repercussions for          10:54

16     us.  It gas damaged our credibility in the market.

17     So that's gross negligence or willful misconduct.

18             The extent of delay beyond the parties'

19     contemplation at the time of contracting.  *Corinno*

20     says this is not the ground:  Uncontemplated            10:54

21     delays.

22             The potential for delay here was

23     contemplated.  There is a clause for liquidated

24     damages and damages beyond liquidated damages.

25             But the delay that has happened here is         10:54

Jan 21, 2020                                              68

1    far beyond any potential contemplation.

2            And if you look at the cases that are in

3    the record, they talk about three days being

4    delayed to six weeks, or nine months delayed to two

5    and a half years, or a 600-day delay, or a          10:54

6    two-and-a-half-year delay.  We are now running on

7    -- we are on year four.  The level of delay is

8    uncontemplated, it is inconceivable, and that

9    itself is a ground to override the limitations on

10   liability clauses.                                  10:54

11           Abandonment.  Delays so unreasonable as

12   to constitute abandonment.  Here we have actual

13   abandonment.  They have gone, they have left.  They

14   took their equipment, and they admit they took

15   their equipment and left.  At the meeting, the      10:55

16   February 2019 meeting before abandonment, they said

17   they were going to order the cables for us.  They

18   said they were going to deal with the VFD problem,

19   and then they stopped.  They stopped working.  They

20   have abandoned the site, they have abandoned the    10:55

21   project, and we are left literally now on our own.

22           And that's why I said before, we haven't

23   even yet been trained.

24           Delays and breaches of fundamental

25   obligations.  Nine and 12 months was fundamental to 10:55

Jan 21, 2020                                    69

1     this contract, that's why we didn't go and buy the

2     trains from China for half the price.  There was a

3     fundamental aspect.  The other fundamental part of

4     this contract was that we would get operable LNG

5     trains.                                              10:56

6          Again, we didn't go to China because what

7     GE sold us was nine and 12 months and high quality.

8     Those were fundamental to this deal, and those are

9     the two things that we have not gotten.  And

10    therefore, again, and under the law that's cited in  10:56

11    our briefs, and we will give it to you again, the

12    *Corinno* case, the *Forward* case, the *Abax* case, the

13    *Bovis* case, all provide this is a basis to override

14    limitations of liability.

15         So now you ask, well, isn't there any           10:56

16    inconsistency between the gross negligence or these

17    exceptions and the entitlement to breach a contract

18    in good faith?  You know, that's really like a

19    first year law school exam question.  And the

20    reason I say that is you're taking -- and I          10:56

21    appreciate it, I appreciate it -- but it is for two

22    reasons.

23         The first reason is you are asking us to

24    reconcile two well established principles, and it's

25    very easy to do, and I will in a moment.  The        10:57

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                          70

1    second reason is because like a law school exam,

2    it's academic.  They don't claim -- GE never claims

3    that they made an intentional efficient breach of

4    the contract.  Their behavior was not deliberate

5    because it was in their economic self-interest,        10:57

6    legitimate economic self-interest to do it.

7          Their behavior was because they screwed

8    up.  They engaged in gross negligence and willful

9    misconduct.  They made mistakes; they did bad

10   things.  That's not a legitimate decision to breach    10:57

11   a contract.  That's we were unable to perform, we

12   were doing a really bad job performing.

13         So New York Law, the *MetLife* case, which

14   is another Court of Appeals decision, explains that

15   where you have -- you may have an efficient breach,     10:57

16   and let's call it an efficient breach, because it

17   may be that it is commercially reasonable in lieu

18   of performing to breach the contract to pay

19   damages.

20         So, for example, if I agree to sell you          10:58

21   my car for $20,000, and then Mr. McIlwrath comes

22   along and says, I'll give you $30,000, I am

23   entitled to breach my contract with you, pay you

24   the $20,000 in damages that you've now suffered and

25   take the 30,000 from Mr. McIlwrath, because it's        10:58

Jan 21, 2020                                      71

1    economically efficient to do so.

2           That makes sense.  I'm making an extra 10

3    grand, you're not out anything because you are

4    getting the $20,000 to go buy the car from someone

5    else.  Mr. McIlwrath is out the extra $10,000          10:58

6    because he misvalued the price of the car.

7           That's an efficient breach.  That's what

8    New York Law permits, and that's what *MetLife* says.

9           MR. McILWRATH:  McIlwrath.

10          MR. ALEXANDER:  Mr. McIlwrath.               10:58

11          MR. McILWRATH:  We're in Italy.  So it's

12   commonly mispronounced.

13          MR. ALEXANDER:  It comes out the same on

14   the transcript.

15          And what *Metropolitan Life* says is if       10:58

16   it's motivated exclusively by its own economic

17   self-interest -- motivated exclusively by its own

18   economic self-interest --

19          THE PRESIDING ARBITRATOR:  Being an

20   academic, I have a question now.  What I am going     10:59

21   to make -- but in the example of the car, I would

22   not be entitled to seek a specific performance from

23   you.  If you would give me my car, I will be

24   entitled to --

25          MR. ALEXANDER:  Unless it were an antique      10:59

Jan 21, 2020                                        72

1    vehicle that had some special value.

2              THE PRESIDING ARBITRATOR:  It's a Toyota.

3              MR. ALEXANDER:  You would not be entitled

4    to seek performance, correct.

5              THE PRESIDING ARBITRATOR:  I would not be    10:59

6    entitled?

7              MR. ALEXANDER:  Correct.  That's the

8    point of efficient breach.

9              This case is not an efficient breach

10   because the breaches were not done, because it was    10:59

11   economically sensible to do them.  It's not

12   economically sensible to delay beyond nine and

13   12 months.  It's not economically sensible to do

14   really, really bad engineering.

15             That's not a conscious decision that it    10:59

16   is economically more efficient for us to do it this

17   way.  No.  It's because it's gross negligence.  And

18   if you engage in gross negligence or negligence,

19   even negligence, that's not an efficient breach.

20   That's just a breach.                                 11:00

21             And how do we also know it's not an

22   efficient breach?  If it were an efficient breach,

23   they would have said:  Yes, we breached the

24   contract and we owe you damages for the breach.

25             You've never heard them say:  We breached   11:00

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                          73

1    the contract.  So how can it be an efficient

2    breach?

3            I mean, look at the action process,

4    changing it within days, concealing -- concealing

5    the fact that they changed it, how is that an                11:00

6    efficient breach?  Not doing stress engineering,

7    how is that an efficient breach?  Not doing proper

8    electrical engineering, how is that an efficient

9    breach?  It makes no sense.  These are not

10   efficient breaches.                                           11:01

11           And the two cases they cite, *Electron*

12   *Trading* and *Banc of America v. Solow*, make this

13   point, and we can explain that in the briefs.  But

14   they established exactly this.

15           *Electron Trading* says this is an                    11:01

16   efficient breach because you have omitted to do

17   this under the contract and it was in your economic

18   self-interest to do so.

19           *Banc of America v. Solow* says you are not

20   allowed to do this in the contract, and you are               11:01

21   basically engaging in negligent or willful

22   misbehavior.  That's the difference.

23           20 and 21, I am going to take together

24   because they really make sense to work together,

25   and there are several guiding principles that I              11:01

Jan 21, 2020                                        74

1   want to sort of talk to you as we go through these.

2           Direct damages are the natural and

3   probable consequence of the breach.  In other

4   words, in the ordinary course of human experience,

5   these are the damages that can be expected to          11:01

6   result.  And therefore, you don't need to prove

7   that they were foreseeable because they are

8   inherently foreseeable.  They are the natural

9   consequence.

10          That differs from consequential damages,       11:02

11  where it is not the inherent consequence, but,

12  rather it requires there to be some foreseeability,

13  which is why to prove consequential damages, you

14  have to prove not only the breach, but also that

15  that breach was reasonably foreseeable to the          11:02

16  parties.  That is the core distinction between

17  these two concepts.

18          And applying that distinction in the

19  context of any given case is a fact-specific

20  question.  So lost profits is not always              11:02

21  consequential or always direct, or any other

22  category you might choose.  And, for example, in

23  the *Biotronik* case, lost profit was a direct

24  damage.  In other cases, it will be a consequential

25  damage.                                                11:03

Jan 21, 2020                                                     75

1        And so you have to actually look at the

2   case and whether or not the injury that is being

3   alleged is in the ordinary course of human

4   experience, in your experience, is this something

5   that you would automatically expect to follow.          11:03

6        And now, if we go to the contract,

7   because I think it's now important to do this in

8   the context of the contract to talk about direct

9   damages.  If we go to Clause 6.6, 6.6(ii) entitles

10  us to recover from Seller any direct damages, any    11:03

11  direct damages we suffer.  And that's important.

12       Now, what is the natural and probable

13  consequence of delay?  Because this is for delay.

14  The natural and probable consequence of delay is to

15  shift to delay the flow of cash from when it should    11:03

16  have happened to when it does happen.  And this is

17  exactly what Mr. Lapuerta explains he is doing.

18  And this -- in his presentation at the hearing, and

19  it's also in his report, he shows you this graphic,

20  or he shows what he is doing.  It's the but-for       11:04

21  case is when the cash flow should have been

22  happening.  The actual case is when the cash flow

23  is actually happening.  It shifts.  It's not that

24  the cash flow is lost.  It moves, and as a

25  consequence of that movement, the delay, which is a    11:04

Jan 21, 2020                                        76

1    natural and probable consequence of delaying

2    delivery, you suffer a loss of cash flow.  And for

3    five trains, when you take all the factors into

4    account that's in his model, it's $700 million,

5    this delay plus the other direct damages that        11:04

6    Mr. Helsen talks about.

7              And he can pull all those out if we want.

8    If you're concerned that one or another of those

9    consequences are not direct but are indirect, his

10   model allows him to pull that out and calculate      11:05

11   what the number is.

12             For two trains, he explains in his

13   presentation, this damage, this direct damage is

14   $300 million.  And that's direct damage that we are

15   entitled to.  And with -- yeah, I won't talk         11:05

16   about -- New York Law confirms that this delay, in

17   the context of a project, is in fact direct

18   damages.

19             And so, for example, the *International*

20   *Fidelity* case talks about the traditional -- and    11:05

21   this goes back 150 years -- the traditional -- the

22   *International Fidelity* case doesn't, but this

23   principle goes back 150 years.  The Fiduciary [sic]

24   case.  But the principle goes back 150 years, that

25   the consequence of delay, the direct damage from     11:06

Jan 21, 2020                                      77

1    delay is a loss rent or economic value of what is

2    delayed.  And the lost rent here is that delay in

3    the cash flow.

4           Now, that number is more than the

5    $96 million value of the contract in Clause 19.2.        11:06

6    But that's okay, because what 6.6 says is we are

7    entitled to recover any direct damages.

8           19.2 contradicts or is in conflict with

9    6.6(ii), because 6.6(ii) says any direct damages,

10   full stop.  19.2 says something different,               11:06

11   admittedly.  And so there is a conflict there.

12   And, under New York Law, you need to resolve that

13   conflict because these exclusionary limitation

14   clauses are disfavored.  You also need to recognize

15   that 6.6 is the appropriate governing rule here,         11:07

16   because if you compare 6.6 to 17.4, 17.4, which is

17   the entitlement to direct damages for defects or

18   failures to perform of equipment; 17.4 entitles us

19   to not any direct damages, but direct damages in

20   accordance with the agreement.  So 17.4(i) is           11:07

21   capturing 19.2.  That's different than 6.6(ii),

22   which does not have, in accordance with the

23   agreement, and does have any --

24          THE PRESIDING ARBITRATOR:  So if I

25   understood you correctly, you are saying that even      11:08

Jan 21, 2020                                          78

1    if the Arbitral Tribunal finds that there is no

2    negligence, gross negligence or willful misconduct,

3    the provision under 6.6(ii) will apply, despite the

4    fact that there is a limitation of liability under

5    19.2.                                             11:08

6           MR. ALEXANDER:  That's correct.  As a

7    matter of contract interpretation, 6.6(ii) will

8    apply because 19.2 does not reach 6.6 -- the

9    6.6(ii) direct damages.

10           ARBITRATOR SABA:  So let me ask -- let's   11:08

11    go to 19.3.

12           MR. ALEXANDER:  Yes.

13           ARBITRATOR SABA:  And there, except in a

14    case of willful misconduct, loss of profit of

15    revenues is excluded as a damage claim.  The cash   11:09

16    flow:  Revenues, profit, what is it?

17           MR. ALEXANDER:  It is -- my position is,

18    again, you have to read this clause restrictively.

19    They did not choose in this clause to say "loss of

20    cash flow."  And if you look at the New York cases   11:09

21    on exclusion clauses, you will see they read these

22    clauses very strictly.

23           And so my position is it is not loss of

24    profit or loss of revenue.  But even if it were,

25    even if it were, Clause 6.6(ii) says it doesn't    11:09

Jan 21, 2020                                        79

1    matter because there would then be a conflict

2    between it and 19.3, and you would need to read

3    that conflict in a way that is consistent.  And

4    that would be to read 19.3 is not applying to

5    6.6(ii).                                       11:10

6            THE PRESIDING ARBITRATOR:  6.6(ii),

7    direct damages, as you have mentioned before, may

8    include loss of profits as direct damages.

9            MR. ALEXANDER:  That's correct.  They

10   could.  That's not what Mr. Lapuerta has         11:10

11   calculated.  That's not what Mr. Lapuerta has

12   calculated.  And there has been a lot of loose

13   language in the submissions, and for that I

14   apologize as much as anybody.  But in fact, what

15   he's calculating -- or we heard him testify he is  11:10

16   calculating is actually cash flow.

17           And the other thing, in response,

18   Mr. Saba, to your question, 19.3 only has a

19   carve-out for willful misconduct, but New York law

20   trumps that.  And so, in fact, even though it only  11:11

21   expressly carves out willful misconduct, that's

22   irrelevant.  All four of the *Corinno* factors apply.

23   And so whether there is gross negligence or

24   unexpected delay or fundamental, or abandonment.

25           ARBITRATOR SABA:  I understand that.  I   11:11

Jan 21, 2020                                            80

1    am getting at two things.  The second thing I will

2    ask you in a moment.  Under 6.6(ii), you are saying

3    that the delay in the receipt of cash flow is a

4    direct damage, that the cash flow unreceived as a

5    result of delay is a direct damage.                    11:11

6              MR. ALEXANDER:  Exactly correct.

7              ARBITRATOR SABA:  Okay.  That's the

8    argument you are making.

9              Mr. Lapuerta did not characterize cash

10   flow as loss of revenue or loss of profit.  It's      11:11

11   just cash flow, that's what he refers to.

12             MR. ALEXANDER:  Correct.

13             ARBITRATOR SABA:  Okay.  So I guess if --

14   we are invited as a tribunal to consider two

15   possibilities:  That cash flow is distinct, should    11:12

16   be considered, treated distinctly or differently

17   from a loss of revenue or a loss of -- loss of

18   profit, or that these two clauses, if they are --

19   if cash flow and revenue are profit, are one and

20   the same thing, or can be thought of as one and the   11:12

21   same thing, then these two clauses are somewhat

22   incompatible with one another, and we have to

23   decide which one prevails.

24             MR. ALEXANDER:  That's correct.

25             ARBITRATOR SABA:  Or, I am going to now     11:12

Jan 21, 2020                                                    81

1    offer a third possibility, that loss of cash flow,

2    which is effectively loss of revenue, can be

3    claimed as a damage if there is a showing of

4    willful misconduct or gross negligence or

5    fundamental breach of the contract, those four          11:13

6    examples you gave from the New York case law.

7            So we have a few choices here, it seems

8    to me, based on the arguments that you are making.

9    The first, that these are direct loss of cash flow,

10   but delayed cash flow is a direct damage.  And if       11:13

11   that's not so, are you arguing or am I arguing -- I

12   don't want to make the argument -- are you arguing

13   that the loss of cash flow is a consequential

14   damage that is excluded in the exculpatory clause,

15   but would be includable as a damage by the Tribunal     11:14

16   if the Tribunal found willful misconduct, gross

17   negligence, all these other items?

18           MR. ALEXANDER:  Yes.

19           ARBITRATOR SABA:  Are you arguing or am I

20   arguing?  I am asking the question.                     11:14

21           MR. ALEXANDER:  I'll reply that with a

22   caveat, actually, that this only applies to the

23   6.6(ii) damages.  For the 17.4 damages, I am not

24   arguing -- for the 17.4 damages, I am not arguing

25   that the language of the clause trumps 19.2 and         11:14

Jan 21, 2020                                    82

1    19.3.  For the 17.4 damages, I am still arguing

2    that even if you consider that to be loss of profit

3    or revenue, that the bars on this clause, because

4    of gross negligence, et cetera, would defeat it,

5    and therefore we would be entitled to those -- that     11:15

6    -- Lapuerta damages, let's call them, the delay in

7    cash flow.

8              And what is important about what

9    Mr. Lapuerta is saying is it's delaying the cash

10   flow.  It's the consequence that's delaying the         11:15

11   cash flow that is causing these consequences,

12   because when you look at the diagram, the curves

13   are roughly the same.  There are some differences,

14   and he explains it in his model, but it's really

15   just delaying it.  And that delay is causing a lot       11:15

16   of damage.  And that the difference between delay

17   and loss, I think, is important to comprehend as

18   well.

19             Yeah, and in fact, there is also a law

20   that we can cite to you, where a contract clause is      11:16

21   in conflict with the exculpatory clause, the

22   exculpatory clause must give way.

23             If we look at the Helsen damages -- and I

24   don't want to preempt if this is not yet clear, but

25   if we go to the Helsen damages, loss of useful life      11:16

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                          83

1    for the plants, the BOP, the logistical and the

2    customer equipment, that is all -- because of the

3    delay, all of this equipment is less valuable.  And

4    that is a direct consequence, it's something that

5    you would expect.  Indeed it's something that          11:16

6    Mr. Pagliaro concedes in his first witness

7    statement, at paragraph 70, where he says:  It sat

8    outside of the plant for months with the resulting

9    wear and tear damage.

10           This is something that you would             11:16

11   naturally and the consequence of delay in, actually

12   in capital D, Delivery, it means there is wear and

13   tear and loss of value.  So what we in fact acquire

14   when delivery actually happens, capital D Delivery,

15   is a less valuable piece of equipment.  And that is    11:17

16   what Mr. Helsen is calculating with loss of useful

17   life.

18           And that applies not only to the trains

19   themselves, but all the BOP and peripheral

20   equipment, because the trains themselves, everybody    11:17

21   has said from the beginning of this case, can't

22   operate in isolation.  They operate with the

23   balance of plan.  And therefore, it's all the

24   natural and probable consequence.

25           The OPEX incurred during delay.  The OPEX      11:17

Jan 21, 2020                                              84

1    incurred during delay, the same thing.  This is a

2    loss of something that we incurred, because they

3    didn't tell us:  Don't set your business in motion

4    yet, this is incumbent for five years.

5          It was dribbled out:  Delay, delay,          11:18

6    delay.  So we incurred OPEX.  That's loss, that's

7    the direct unexpected consequence.  And again,

8    there is case law that supports that.

9          The financial income, same thing, because

10   they didn't tell us it's five years out.  We        11:18

11   invested in short-term instruments.  It's the

12   obverse really as if we had a loan, if we had

13   borrowed money instead of investing with our own

14   money, and the delay caused us to have to pay that

15   loan over a longer period of time and have more     11:18

16   interest, that would be a direct damage and the law

17   recognizes that.  This is the same thing except

18   it's self-financed.  So it's paying ourselves for

19   the lost income from that uninvested money.

20         ARBITRATOR SABA:  I want to stay on this      11:18

21   point because I understood that -- many questions

22   were asked of Mr. Helsen regarding his itemization

23   of direct damages.  I did not understand him to be

24   saying at any time that the direct damages included

25   the lost cash flow or the delayed cash flow.        11:19

Jan 21, 2020                                          85

1              I think I am hearing for the first time

2     today that you are arguing that the hundreds of

3     millions of dollars of delayed or lost cash flow is

4     in fact a -- it's a direct damage, and you are

5     claiming for that direct damage.                    11:19

6              I didn't see -- I could be completely

7     wrong here, but I didn't see a claim for

8     consequential damages in your submissions.  There

9     is a great deal of argument, and you cited many

10    case laws -- many cases about overcoming an          11:20

11    exculpatory or limitation of the liability clause

12    by a showing of willful misconduct, gross

13    negligence, and the like.

14             And I wondered, as I read your

15    submissions, whether that argumentation was being    11:20

16    made in order to support a claim for, in effect,

17    lost revenues, which no one ever -- which is a

18    phrase not used by Mr. Lapuerta.  It's just cash

19    flow.

20             So I guess this was -- this was a point      11:21

21    of curiosity to me when I read the pleadings.  And

22    it remained the question open to me right until the

23    very end, until we finished up in New York, because

24    I was still probing Mr. Helsen and Ms. Linnell, and

25    Lapuerta even to some extent, on what it was you're   11:21

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                                  86

1    claiming by way of direct damage.

2           MR. ALEXANDER:  Yeah, so let me try to

3    answer and let me also make a clarification,

4    because I think I didn't make the point clearly

5    enough.  The direct damages, in our view, are the        11:21

6    delay in cash flow in the two trains, not the five

7    trains.  The remaining three trains are

8    consequential, in our view.

9           To answer your question, the Tribunal's

10   questions, I think, have for us -- allowed us to         11:22

11   clarify our thinking in light of the law.  And so

12   whereas I think we were not very clear in our

13   submissions as to what exactly was direct and what

14   was consequential, the Tribunal's questions has

15   allowed us to go back and look at the case law in        11:22

16   that context and give you the answers I am giving

17   you today.

18          THE PRESIDING ARBITRATOR:  So in the end,

19   the core issue is whether or not there's a

20   necessity of making any assessment on                    11:22

21   foreseeability.  If that's a direct damages, no,

22   there is no need to analyze whether it's

23   foreseeable or not; and if that analysis is needed

24   to be made, it would be consequential damages.

25          MR. ALEXANDER:  Precisely, which is why           11:22

Jan 21, 2020                                                 87

1    the New York cases, in a project context, explained

2    that if there is a delay -- the quintessential

3    delay damages is the delay in the cash flow or the

4    rents.

5           Mr. Helsen also talked about take or pay.    11:23

6    We don't need to talk further about that now.

7           Loss of warranty:  Similar concept.  Had

8    they told us at the time there was delay, we

9    wouldn't have necessarily bought everything at the

10   time.  We were trying to pace our project to match.  11:23

11   Interestingly, they complain that, you know,

12   everything wasn't done the end of 2015.  Well,

13   that's a consequence of our efforts to pace to keep

14   track of what -- to keep up with what they were

15   doing, and not have even more loss of warranty and  11:23

16   loss of value of the equipment because it was

17   sitting around unused.

18           So that then takes me to 17.4.  And the

19   direct damages under 17.4 are the HHR system, the

20   external engineering support, to do the engineering  11:24

21   that GE didn't do, the VFD and its installation,

22   the nitrogen and other auxiliary products where the

23   effort was made to dry out the trains -- Train 1,

24   in order to start commissioning.  That is now

25   wasted because of the defects.                       11:24

Jan 21, 2020                                                    88

1              Those are all the direct and natural

2     consequences of the defects in the trains.  And so

3     under 17.4, those are the remedies that we seek.

4     And those remedies in fact are consistent with

5     19.2 -- well, they may not be -- no -- I think          11:24

6     those likely are consistent, although there is also

7     a declaration that if we get Trains 1 and 2 started

8     up and we seek this, and there are additional

9     defects that manifest, that they will be

10    responsible to us for those defects as well.            11:25

11             ARBITRATOR SABA:  So the loss of the cash

12    flow, the delay and loss in cash flow is not

13    falling within 17.4, or is?

14             MR. ALEXANDER:  It is not.

15             ARBITRATOR SABA:  It is not.                    11:25

16             MR. ALEXANDER:  It is -- it falls

17    within -- let me make sure I'm clear about this.

18    Mr. Lapuerta's model captures these additional

19    costs as -- in the actual curve as additional

20    costs.  So these losses from -- damages losses are      11:25

21    captured in his model.

22             ARBITRATOR SABA:  The 17.4 losses are

23    captured in his model?

24             MR. ALEXANDER:  They are captured in his

25    model.  They are, they are absolutely captured in       11:26

Jan 21, 2020                                           89

1    his model.  And that's why he says, and Mr. Helsen

2    said.  If you give -- if you recognize the damages

3    as described by Mr. Lapuerta and the damages that I

4    am describing are redundant because they have been

5    captured -- the only one that has not been captured      11:26

6    are those that have not yet been incurred, like

7    take or pay, which has not yet been incurred;

8    additional problems, they have not yet been

9    incurred.

10          But otherwise, for example, the cost of           11:26

11   the VFD, the million plus, that is in the actual

12   scenario in his model, with the cost of the HHR

13   system.  That is incorporated, built into the

14   actual model of his scenario.

15          ARBITRATOR SABA:  I see.  I see.  I see.           11:26

16   All right.  Thank you.

17          Does that mean that if the loss of cash

18   flow is not falling under 17.4, in your

19   argumentation, it's falling under 6.6(ii)?

20          MR. ALEXANDER:  Yeah.  And I guess -- I            11:27

21   am thinking about it as you are speaking.  Let's

22   assume that they delivered the equipment in nine

23   and 12 months but it had all these defects, so

24   let's assume it was actually delivered, capital D,

25   in nine and 12 months, and then when we went to          11:27

Jan 21, 2020                                        90

1    commission it, there were massive defects, it

2    couldn't be started, it couldn't be operated and we

3    are still at today and it's still not running, we

4    would have the same -- the delay would be a

5    consequence of these defects.                         11:28

6           And frankly I haven't thought through,

7    but will before our rebuttal, whether or not that

8    would be a direct or a consequential damage of the

9    defect, as opposed to a -- it's clearly a direct

10   consequence of the delay because the natural and     11:28

11   probable consequence of a delay is delay.  Whether

12   it's a natural and probable consequence of the

13   defect, actually I need to think about that.

14          ARBITRATOR SABA:  I've thrown up my hands

15   at this moment, and that's fine.                      11:28

16          MR. ALEXANDER:  I think I just did too.

17          ARBITRATOR SABA:  You are entitled to

18   more time.

19          MR. ALEXANDER:  And then finally,

20   interest, we are entitled to interest on damages.     11:28

21   And in the Borrowman(?) model, that's incorporated

22   in his calculations.  If the Tribunal uses

23   another -- if you use Mr. Helsen's numbers, then it

24   would be, in our view, the contractual interest

25   rate of 12 percent.                                   11:29

Jan 21, 2020                                              91

1              So I think Question 22, I have answered

2        in the context of what we have talked about.  I can

3        run through it for you, if you want, item by item.

4        If you find there's willful misconduct, no limit.

5        If you find there's gross negligence, no limit.  If      11:29

6        you find there's --

7              THE PRESIDING ARBITRATOR:  My question

8        is:  Are willful misconduct and gross negligence

9        totally equivalent for the purposes of limitation

10       of absence of limitation of liability?                   11:29

11             MR. ALEXANDER:  Entirely the same.

12             THE PRESIDING ARBITRATOR:  Even if the

13       specific provision of the contract only refers to

14       willfulness conduct.

15             MR. ALEXANDER:  Absolutely.  A hundred            11:30

16       percent clear under New York Law.

17             ARBITRATOR SABA:  I have a related

18       question directly related to the Chairman's on

19       that --

20             THE PRESIDING ARBITRATOR:  And                    11:30

21       Consequential...

22             ARBITRATOR SABA:  And a consequential

23       question, perhaps.

24             Gross negligence is not mentioned in the

25       exculpatory clause.  Willful misconduct is defined,     11:30

Jan 21, 2020                                        92

1    and it refers to managerial or supervisory

2    personnel, conduct of managerial and supervisory

3    personnel.  Is that true, is that an element of

4    gross negligence as well?  Does gross negligence

5    involve conduct of managerial and supervisory          11:30

6    personnel?

7              MR. ALEXANDER:  It's not an element of

8    gross negligence, it's also not an element of

9    willful misconduct, because both of those are

10   established by New York public policy.  It's not a     11:30

11   matter of a contractual caveat under limitation of

12   liability.  What the contract says is irrelevant

13   about what is willful misconduct.

14             The exclusion -- the New York Law that

15   says an exclusionary clause is unenforceable in the    11:31

16   case of willful misconduct and gross negligence

17   stands alone and apart from the contract.  It is a

18   matter of New York public policy.  This is a

19   hundred percent clear.  The *Kalisch-Jarcho* case is

20   very clear, and a lot of other cases too.              11:31

21             And so if you define willful misconduct

22   as, you know, it has to be the CEO of the company,

23   it doesn't matter.  It's willful misconduct as

24   defined by New York Law, not by the contract.  It's

25   gross negligence as defined by New York Law, not by    11:31

Jan 21, 2020                                              93

1    the contract.

2            THE PRESIDING ARBITRATOR:  And you said

3    that this equivalence between willful misconduct

4    and gross negligence is also a matter of New York

5    public policy?                                      11:32

6            MR. ALEXANDER:  Correct.  Correct.

7            THE PRESIDING ARBITRATOR:  Thank you.

8            MR. ALEXANDER:  The evidence that GE is

9    not capable of delivering in nine and 12 months is

10   actually undisputed.  There is no dispute about    11:32

11   this.  Cody Lindsey's -- the two memos of Cody

12   Lindsey's confessions and the testimony of

13   Mr. Sahajwalla and Mr. van den Broeke:  Undisputed.

14   They didn't bring Mr. Lindsey to testify, they

15   didn't bring anybody to say that it wasn't true.   11:32

16   Undisputed that he confessed in 2018 that GE was

17   told, before signing this contract, that they could

18   not do it in nine and 12 months.

19           Mr. Griffin's testimony, in this

20   demonstrative exhibit that I showed you in the     11:32

21   opening, absolutely proves there's no way they

22   could have done it or believed they could have done

23   it.  They required nine months just to re-engineer

24   the CGC plant for Elba Island in Georgia.  And yet

25   they are going to deliver the entire plant to us in  11:33

Jan 21, 2020                                    94

1    nine months?  It's just absolutely inconceivable.

2         Mr. Mastronardi's testimony, that in

3    December 2015, they came to him because they still

4    couldn't figure out how to do the engineering, to

5    comply with the code for international electrical        11:33

6    issues because of the 50 hertz, 60 hertz

7    conversion.  The fact that GE in 2015 still hadn't

8    figured out how to do the electrical engineering

9    tells you they had no idea what they were doing,

10   they never did.                                          11:33

11        The missing ITO file.  You can draw an

12   adverse inference that that file would confirm that

13   they knew they couldn't do it in nine to 12 months.

14   The reality of what happened.  We are now on

15   Year 4, 5?  I have lost count.                           11:33

16        And there is no contrary evidence at all.

17   Why didn't we cross-examine Mr. Bresciani?  He

18   didn't, in his witness statement, say anything

19   about whether they could deliver in nine and

20   12 months.  He is silent on that subject.  And he        11:34

21   didn't submit a second witness statement after we

22   put in our Statement of Claim to dispute it, to

23   dispute what Mr. Lindsey said, to dispute what

24   Mr. Griffin said.  There is no testimony from any

25   GE witness that they believed, at the time they          11:34

Jan 21, 2020                                              95

1    signed this contract, they could do it in nine and

2    12 months.  None, zero.

3            And they had all the opportunity in the

4    world, because this is the heart, the heart and

5    essence of what we argued in the Statement of          11:34

6    Claim.  And they are silent.

7            Mr. Pagliaro's second witness statement

8    on this topic:  Silent.  Of course he wasn't there.

9    So he had not been able to testify anyway about it

10   or from personal knowledge.  But he's silent.         11:35

11           Mr. Lavander didn't put in a second

12   statement.

13           The only second witness statement, fact

14   statement, is from Mr. Amidei, who says he didn't

15   know anything about this project at all.              11:35

16           Question 24, I've just answered that.

17           Question 25:  Were the procedures

18   followed?  Yes, they were.  Is that 24?  Sorry.

19   Question 24:  Were the procedures followed?  Yes,

20   they were.                                            11:35

21           When the nine and 12 months came and

22   went, we sent a letter declaring liquidated

23   damages, and then there were a series of

24   conversations leading up to the Florence meeting in

25   November 2016, the Florence meeting in January 2017   11:35

Jan 21, 2020                                    96

1    where GE committed to have mechanical completion by

2    December 2016, and then July 2017 -- actually

3    running by July 2017.  And they didn't perform.  We

4    absolutely complied.

5            And then there is a subsequent letter        11:36

6    even in 2018.  We were again saying we demand the

7    stuff to work.

8            So absolutely we complied with 6.6, even

9    if we had to comply with the notice, because I

10   actually believe when you read 6.6, it gives four    11:36

11   alternative remedies.

12           6.6(i) says:  Give them a deadline, and

13   if they don't comply with that deadline, you then

14   have (ii), (iii) and (iv).  But it also entitles us

15   to go directly to (ii) (iii) and (iv) as remedies.   11:36

16   We didn't have to start with 6.6(i).  We did, but

17   we didn't have to.

18           17.4, yes, this entire case has shown a

19   history of our asking them to correct their

20   defects, their deficiencies, and they haven't.  So   11:36

21   there has been ages and ages.  And ultimately, when

22   they sent us that letter in June of 2018 seeking

23   $40 million, and saying, we don't owe you anything,

24   but you owe us $40 million, when GE says that, that

25   makes any further discussion absolutely futile,      11:37

Jan 21, 2020                                          97

1    absolutely futile.  And New York Law recognizes

2    that you don't have to exercise a futile(?)

3    procedure.

4              Concurrency.  In order for -- if there is

5    true concurrency and if there are two independent      11:37

6    causes of delay, one by each side, yes, that

7    offsets the delay for the period of the true

8    concurrency.  Here there is no true concurrency.

9    There is pacing going on.  We are engaged in

10   pacing.  For example, the gas, there is a big issue     11:37

11   about we didn't have the gas on-site until 2018.

12   Right, we didn't.  Because if we had committed to

13   that gas in 2015, we would have take-or-pay

14   invoices from 2015, '16, '17, '18, '19, and our

15   damage claim against GE for delay, direct damages,      11:38

16   would be much, much higher.

17             So we engaged in pacing activity to avoid

18   having -- we are ready.  They are still not ready.

19   We are ready.  In fact they know we are ready

20   because Train 3 is operating.  So all the plan is       11:38

21   ready, the gas is there.  We have paced.  They were

22   not able to deliver.  So there is no true

23   concurrency.

24             And finally, causation.  I think I have

25   talked a lot about how these things link up.  If        11:38

Jan 21, 2020                                       98

1    you have a particular questions, I will answer

2    them, but I don't want to totally deprive

3    Mr. Gutowski of any opportunity to speak.  But I

4    would be delighted to answer any questions.

5            THE PRESIDING ARBITRATOR:  (Off mic.)        11:38

6            Sorry, my apologies.  I was saying that

7    you are 10 minutes over schedule, but you are

8    allowed to use part of your rebuttal time for

9    finishing these arguments.

10           MR. ALEXANDER:  Okay.  I mean, still, I      11:39

11   think that the causation point, I think I have

12   probably pretty well answered in the course of the

13   other questions.  If the Tribunal has more

14   questions, I would be happy to answer them, but

15   otherwise...                                         11:39

16           THE PRESIDING ARBITRATOR:  So you are

17   addressing, Mr. Gutowski, Question No. 6.

18           MR. GUTOWSKI:  Correct.  So Question 6

19   focuses on the issue of whether an arbitration

20   clause can be extended to non-signatory parties,    11:39

21   and if so, how that's done.  That applies in two

22   contexts.  One, with respect to Greenville status

23   as a Claimant, and as the BHGE entities as

24   Respondents.

25           New York has a well developed body of law    11:40

Jan 21, 2020                                    99

1    which permits this, and it permits claims like this

2    to be enforced, like an entity like Greenville, who

3    is not a signatory, and the liability can be

4    extended to an entity like BHGE as the Respondent.

5           Let's look at Greenville's status first        11:40

6    real quickly.  There are two basic ways upon which

7    Greenville can support that it is a proper party to

8    the case:  The third-party beneficiary argument and

9    the intertwined claims argument.

10          These are covered in our submissions.  So      11:40

11   I will be brief because I think there you will find

12   an overlap of what I am going to tell you now, but

13   let me just tell you quickly what we said there and

14   why we think it's supportable.

15          On the third-party beneficiary argument,       11:40

16   there is no doubt that everyone to this contract

17   knew that we would have to operate in Nigeria under

18   a separate entity.  You simply cannot operate as a

19   foreign entity in Nigeria.  It's prohibited by

20   Nigerian Law, Section 54 of the Companies and        11:41

21   Allied Matters Act.

22          GE, having been in Nigeria for decades,

23   knew that.  So it's not that we had to tell them,

24   even though we did tell them.  They operate in

25   Nigeria through what we refer to as GE Nigeria.       11:41

Jan 21, 2020                                          100

 1    They appear in the Services Contract.  And in fact,

 2    it was GE that explained that was the reason why we

 3    had to have a separate Services Contract with their

 4    Nigerian affiliate.  But we confirmed that in the

 5    August discussions, in any event, when we were          11:41

 6    filling out the "know your customer" documentation,

 7    and the organogram that we provided, which

 8    illustrated that we would be functioning with a

 9    Nigerian subsidiary.

10          So under the law, where there are               11:41

11    circumstances surrounding the transaction and

12    contractual language which does not with certainty

13    forbid it, a party like Greenville can be a

14    claimant.  And that is what was intended, and

15    that's what is supported by the law and it's          11:42

16    supported by the sections to the contract.  In

17    fact, I think it was one of GE's witnesses -- I

18    will find it in a second.  Chika confirmed that is

19    the way you have to operate in Nigeria.

20          Now, under the law, provided, as I said,        11:42

21    that circumstances in a contract do not

22    unambiguously exclude that party's right to

23    participate; he can participate.  Here, there are

24    multiple clauses which suggest this was not a

25    situation of exclusive prohibition.                   11:42

Jan 21, 2020                                          101

1           In Clause 30.1, as is typical in many

2    third-party exclusionary clauses, it references the

3    fact that there would be no benefit to a third

4    party except as provided herein.

5           In 19.3, it refers to a situation where        11:43

6    through loss of use of the plant or customer claims

7    in a case of willful misconduct, GE would have the

8    right to bring a claim.  So it was clearly

9    contemplated that the plant could be utilized by

10   someone else or the customer claims could be         11:43

11   brought.

12          Similarly, in 19.4, there are four

13   references in there to third-party participation,

14   including indemnification claims made with respect

15   to a plant furnished for use by someone else.        11:43

16          So Greenville is not an excluded

17   third-party beneficiary.  It was contemplated that

18   they would be the operator of the plant in Nigeria.

19   There was an identification of a Nigerian

20   subsidiary in the original exchanges at the time we  11:44

21   entered into the contract, and the contract

22   language does not unambiguously exclude that right.

23          There is also the intertwined claim

24   estoppel basis, and this actually precludes GE and

25   BHGE from refusing to arbitrate against us.  It's a  11:44

1      separate doctrine.  It's not just the third-party

2      beneficiary.  It's a completely independent

3      equitable principle on which they were estopped

4      from basically rejecting Greenville's submission of

5      the claim.                                       11:44

6            The leading case on this is *Astra Oil*,

7      and it lays out the basis for when this applies.

8      And it applies in a situation where there is a

9      non-signatory petitioner, just like Greenville;

10     there is a signatory Respondent, just like BHGE;   11:44

11     and there is another signatory party with close

12     connections to the signatory.

13           The doctrine recognizes that o, certain

14     commercial circumstances, a signatory party may be

15     so aligned with another that their claims are      11:45

16     intertwined, and to the extent those claims are

17     intertwined with the contract against the

18     Respondent, the Respondent can't slice the baby, so

19     to speak.  You know, I don't want to hear from that

20     party.  And that's exactly what we have here.      11:45

21           There is a very close connection between

22     Greenville, the non-signatory, and IEC, the

23     signatory.  The first part of *Astra* is satisfied.

24           The claims flow from the agreement signed

25     with the other signatory, that's the Equipment     11:45

Jan 21, 2020                                        103

 1    Contract.  And the signatory treated the

 2    non-contractor as if it was a party.  GE dealt with

 3    Greenville day in and day out.  That's who they

 4    dealt with.  It's not a surprise claim by some

 5    unrelated, disinterested, unknown party.               11:45

 6    Greenville was there from literally outside of the

 7    contract, and that's who they dealt with.  So under

 8    the intertwined claim, the estoppel principle

 9    established New York Law, they are estoped from

10    rejecting Greenville's participation.                  11:46

11            Let's shift real quickly into the basis

12    for BHGE's participation as a Respondent Defendant.

13    There are three grounds:  Successor, the piercing

14    the corporate veil standards, and equitable

15    estoppel under the direct benefits principle.          11:46

16            Let's go quickly to successor.  Successor

17    liability really recognizes the reality of what

18    happens when one entity is transferred into

19    another, and it doesn't permit someone to evaporate

20    in the form in which they were when they entered       11:46

21    into the contract, transform themselves into

22    another form and then wash their hands of the

23    liability of the predecessor.

24            Here, BHGE is the continuation of GEOG.

25    That's how they advertise this reverse merger.         11:47

Jan 21, 2020                                    104

1    They took the whole and put it into Baker Hughes.

2            And so under the successor criteria, we

3    have the ability to pursue this successor because

4    they are in fact the company with whom we had our

5    contract.                                         11:47

6            Look at what still exists of GEOG.

7    Nothing.  There is no website.  We see no

8    employees.  No witnesses came to testify.  There is

9    no reflection of any ongoing business.  There is

10   not even a suggestion that GEOG is entering into    11:47

11   any contracts.

12           And while they may have left that entity

13   as a juridical entity, in fact they converted it

14   into an LLC so that whatever residual benefits come

15   through GEOG and what is in effect a runoff, they   11:47

16   go directly up to BHGE; they are a successor.

17           THE PRESIDING ARBITRATOR:  Sorry,

18   Mr. Gutowski.  Is it your submission that a change

19   in a shareholder of a company qualifies as a

20   successor criteria also?                            11:48

21           If the company remains the same under --

22   I don't know if this is the case specifically.  If

23   the company remains the same but the shareholder

24   changes, is it a case in which this successor

25   theory applies.                                     11:48

Jan 21, 2020                                          105

1          MR. GUTOWSKI:  Absolutely.  The veil

2     piercing standards are -- involve a basket of

3     issues that a Court will look at to determine

4     whether one entity is responsible for the liability

5     of another.                                    11:48

6          Those standards are well-known.  They

7     involve overlap of directors', officers' shared

8     space.  But ultimately, it is money and control

9     that drive the *alter ego* of valuation.  BHGE has

10    complete control of whatever is left of GEOG.  The    11:48

11    GEOG officers are gone, they have been replaced by

12    BHGE individuals, and there is no evidence of any

13    independent GEOG functionality at all.

14          As I said, as an LLC, whatever income

15    comes in goes up to BHGE.  There are no             11:49

16    identifiable employees.  All the employees that we

17    dealt with who were GEOG employees now appear as

18    BHGE employees.

19          The headquarters has either been assumed

20    by BHGE or it's gone.  Schertz is gone.  As I said,   11:49

21    their website is gone, there is absolutely no

22    advertising of GEOG doing any business.  And

23    importantly for this evaluation, we asked for the

24    documents that you typically ask for in a situation

25    where someone opposes this form of an application,    11:49

Jan 21, 2020                                                    106

1     and we were given virtually nothing by GEOG, or

2     BHGE, with respect to the corporate relationship,

3     where the money is.  Or even the filings are

4     normally generated or created by a company that has

5     independent existence.  They have no financial          11:50

6     documents of their own.

7          They have in effect become BHGE, and

8     there is no legal significance between the two, no

9     legal differentiation between the two.  Under

10    standard veil piercing standards, they should be        11:50

11    held accountable.

12         The final point is the direct benefits

13    estoppel argument.  The same background applies,

14    that GEOG has effectively ceased its business

15    operations, it does not operate as an independent       11:50

16    financial entity, as an LLC, everything goes up to

17    BHGE.  So whatever benefits remain of GEOG go

18    directly to BHGE, and therefore it's estopped from

19    generating artificial separateness for the purposes

20    of avoiding liability in this case.                     11:51

21         So under those three scenarios, we submit

22    that they are proper Defendant and Respondent, and

23    under the first two points I made, Greenville is an

24    appropriate Claimant, and the case should proceed

25    as it was originally styled, with Greenville and        11:51

Jan 21, 2020                                              107

1    IEC as Claimants and the full complement of the

2    Respondents as Defendants.

3            To the extent there has been any

4    corporate change in names, we would update that.

5    Greenville had a slight change in its name but --        11:51

6    and I am not sure whether BHGE has or not, but that

7    ministerial issue should be attended to as well.

8    Thanks.

9            THE PRESIDING ARBITRATOR:  So do we make

10   a break?  We will resume -- we can do -- we can         11:51

11   start at 12 -- from 12 to 12:45, and then the lunch

12   break, and continue afterwards?

13           MR. McILWRATH:  This doesn't need to be

14   on the record.

15           (Off-the-record discussion.)                    11:52

16           THE PRESIDING ARBITRATOR:  Let's make a

17   five minutes break.  We will resume at noon.

18           (Recess taken - 11:52 a.m.)

19           (Proceedings resumed - 12:05 p.m.)

20           THE PRESIDING ARBITRATOR:  The floor is         12:05

21   yours.  Who is going to do the --

22           MR. McILWRATH:  I will go first.

23           (Transcript logistics.)

24           (Short pause - 12:08 p.m.)

25           (Proceedings resumed - 12:11 p.m.)               12:11

Jan 21, 2020                                        108

```
 1              THE PRESIDING ARBITRATOR:  Go ahead,
 2       Mr. McIlwrath.
 3              MR. McILWRATH:  Thank you.  Just a
 4       quick -- words of preliminary -- words -- some
 5       preliminary words on how we are going to organize     12:11
 6       ourselves here, but we wanted to make very clear
 7       for the record that we are responding to the
 8       questions that have been raised, but we don't
 9       intend, obviously, to waive any objections that we
10       may have to any new evidence or claims or            12:12
11       revisitation or representation of quantum,
12       et cetera, but, in fact, we intend to preserve
13       those objections even though while we are
14       responding, our view is that -- it has been made
15       clear that if the claims were not -- must be         12:12
16       decided on how they are presented, otherwise they
17       should be rejected.  Decided on -- not decided
18       based on post-hearing re-presentations.
19              We have distributed some charts in hard
20       copy.  We've made some adjustments to them.  So it   12:12
21       will not follow the printed version completely.
22       There may be some changes.  We might not use some
23       of the charts because obviously many of these
24       things were responding to points that the Claimants
25       have made today.                                     12:12
```

Jan 21, 2020                                                      109

```
 1              And then, finally, just the order of what
 2      we -- how we will go.  Caterina will start.  We are
 3      not going to follow the order of the questions.  We
 4      are going to go in a way that we think makes sense
 5      from our point of view.  Then Roberto will address      12:13
 6      some of the more technical points, and I will
 7      conclude.  So we will start strong and just
 8      gradually decline.  That's the idea.
 9              MS. ALIBERTI:  Thank you.  Good morning.
10      Since today we didn't have any exhibit bundles to       12:13
11      distribute, let me speak first.
12              Now, as Mike said, I will deal with the
13      two questions, No. 7 and No. 8 related to the
14      breaches of the Services Contract.
15              So the first question, Question No. 7.           12:13
16      So actually here we are in agreement with the
17      Claimants, because Jay -- as Jay said before, GE
18      Nigeria has no obligation to rectify issues arising
19      from breaches under the Equipment Contract because
20      the Equipment Contract and Services Contract have        12:14
21      two different scopes of work between different
22      companies.
23              The problem here is actually another one,
24      maybe.  So from a standpoint, the Claimants said,
25      in email communications during the execution of the     12:14
```

Jan 21, 2020                                           110

1    project, that the Services Contract was never

2    activated.  One reference is to Exhibit R-83, which

3    is an email from Mr. Pirjins dated October 30,

4    2018, in response to an email from Mr. Pagliaro.

5           So from one side, they believe the            12:14

6    contract was never activated.  From the other side,

7    they are here now in this arbitration claiming that

8    GE Nigeria -- I assume GE Nigeria because that's an

9    assumption -- failed to perform its obligation to

10   instruct, supervise, and provide training under the   12:15

11   contract.

12          But here either it is one or the other.

13   Either the contract was never activated or there

14   have been breaches of the contract.  Maybe we can

15   deal later with -- I heard Jay saying that an          12:15

16   obligation under the Services Contract is to make

17   sure that IEC did not make any mistake.  I am not

18   sure the contract says that anywhere.  I don't

19   know.  That's something we can maybe look into in

20   the post-hearing briefs.                               12:15

21          As for the second question, Question

22   No. 8, which is still related to the Services

23   Contract, here I believe in the Statement of Claim,

24   we have a written summary of what the Claimants

25   believe was -- their damages were.  And it's -- the    12:16

Jan 21, 2020                                          111

1    quote is from paragraph 305 from the Statement of

2    Claim.

3          And Jay before quoted some provision of

4    the contract that they believe were -- there were

5    breaches of these provisions.  But here the problem    12:16

6    is that it is not clear from anywhere in the

7    submission what the damages actually are and

8    actually, not even who the Claimant believed should

9    be responsible to pay for them.

10         Because if we see in the Request for         12:16

11   Relief of both -- of all the submission of the

12   Claimants -- and here in the slides we have a quote

13   from the Statement of Reply, but we could actually

14   rely also to the Statement of Claim, because we

15   will see a bit later on with Mike that actually the    12:17

16   request of relief are pretty identical, apart from

17   the amount claimed which increases in the Statement

18   of Reply.

19         So here, the Claimants ask to award to

20   Claimants damages of no less than almost           12:17

21   700 million, but they don't say who should be

22   responsible for it.  Is it GE?  Is it GEOG?  GE

23   Nigeria, GEOG?  I am sorry.

24         So this is the problem that we face here.

25   And now I will hand the floor to my --             12:17

Jan 21, 2020                                                112

1          MR. McILWRATH:  To Roberto.

2          MR. CALABRESI:  Okay.  I am dealing with

3     the breach of the Equipment Contract first, so

4     questions from 9 to 15.  9 first.  And the question

5     is:  What was, under the Equipment Contract, each      12:17

6     party's responsibility and role in the design of

7     the trains?

8               And Mr. Alexander said this morning:  We,

9     meaning IEC, told them what we wanted.  All the

10    design obligations are on their side.  Which is        12:18

11    partially true.  Actually, we have an answer which

12    is a little bit more articulated, reading

13    Appendix 8 to the Equipment Contract.

14               Here we see that the basis of the design,

15    developed of course by the equipment manufacturer,     12:18

16    so GEOG, was developed by Seller from the request

17    for proposal documents provided by Buyer.  They are

18    attached by the way to the contract, so it's

19    Annex A.  And we have Annex B also, the HMB.

20               So if we look at the information provided    12:18

21    by the Buyer, so the parameters for the design of

22    the trains, we see some reliable -- let's say that

23    we have been discussing so far, such as the design

24    feed gas conditions, the pressurized or the

25    pressure at the storage of the train, and a lot of     12:19

Jan 21, 2020                                             113

1    other information that are relevant put on this

2    slide.

3           So without that kind of information,

4    without a specific indication from the buyer of

5    what they wanted in relation to those parameters,      12:19

6    there was no way for GE to develop any design.  So

7    the design was developed on certain assumptions.

8           One of them actually is the feed gas

9    composition.  It's the usual, again, discussion

10   that -- I mean, we have been having for more than      12:19

11   one year here.  And in Appendix A to the Equipment

12   Contract, page 23, we have this indication, this

13   sentence, "inlet gas analysis," and I am referring

14   to the last -- actually the last line:  "Major

15   variations in inlet gas content can have drastic       12:20

16   effects on overall plant capacity."

17          Now, the reason why I am mentioning this

18   point here in answering this question is because

19   when we hear the Claimants, you know, the way they

20   argue their claim, the way they quantify their         12:20

21   damages, they start from assumptions, and the

22   assumption is quite often:  Oh, let's assume that

23   GE had delivered on time the trains, let's assume

24   that the trains could actually meet the guaranteed

25   performances, and things like that.                    12:20

Jan 21, 2020                                        114

1          What we know for sure, without making any

2    assumption, is that the feed gas composition that

3    they have now available at the plant is completely

4    different from the one that was indicated into the

5    contract.                                    12:20

6          So whether or not the trains provided by

7    GE, whether or not the plant as built by IEC, can

8    actually meet those performances.  Well, that's a

9    big question mark.  We don't know.  We don't know

10   whether it is possible at all to reach any         12:21

11   performance.  Not only the ones in the contract,

12   but anything else, because we don't know, as of

13   now, what kind of gas they are using on the plant.

14         So this is the answer to the first

15   question.                                    12:21

16         Second question.  Yeah, which is No. 9,

17   the first question for me:  Question 9.

18         Question 10, so here we are talking about

19   guaranteed performances again.  The question is

20   whether there is something else than the three that  12:21

21   are clearly indicated in Section 4.1 of Appendix A

22   to the Equipment Contract.

23         Now, again, Mr. Alexander said

24   absolutely, I would have not -- absolutely not.

25   There is nothing else than this.  There is nothing  12:22

Jan 21, 2020                                          115

1    else than the clear language of the contract, which

2    is not only 4.1.  So 4.1 is the starting point.

3           So in 4.1, we have the definition of the

4    guaranteed performances and a clear indication in

5    numbers of what those performances are meant to be        12:22

6    by the parties and, you know, are indicated in the

7    contract.

8           But if you go on, again, using

9    Appendix A, we find the definition of performance

10   test, 4.1.3.  And the performance test is, again,         12:22

11   related to the LNG throughput capacity, LNG

12   quality, power consumption, nothing else than that.

13   They are not markers, as they were defined by

14   Mr. Alexander.  These are the performances that the

15   equipment need to meet in order to -- not to have,        12:23

16   you know, the consequences; they are contemplated

17   in the contract as well.

18           If we take the Equipment Contract then,

19   the definition of Guarantee Performance, nothing

20   clearer than that, I will say.  Guarantee                 12:23

21   Performance shall mean the values ascribed to LNG

22   throughput capacity, LNG quality, the power

23   consumption in Appendix A.  Nothing more and

24   nothing less.

25           Remedies, Section 25.3.  Liquidated               12:23

Jan 21, 2020                                              116

1    damages, in case of lack of performance or poor

2    performance of the equipment.  If the equipment is

3    not able to meet this kind of performances, GEOG is

4    liable and will pay for the amounts of liquidated

5    damages indicated in Section 25.3.  Nothing more        12:23

6    and nothing less again.

7              So here the answer is very simple.  I

8    would add that -- we have this discussion on the

9    significance of the HBM attached to the contract.

10   So whether or not that had any value to these three    12:24

11   guaranteed performances under the contract, that

12   was the sole -- it was a design case developed by

13   GE, or GEOG(?), of course, on the basis of the

14   available feed gas composition and the pressurized

15   storage.  It's the only document in which you can      12:24

16   see the first parts of the Cold Box at minus 6.

17             Now, it is not -- that HMB is not saying

18   that GEOG should or has an obligation to supply IEC

19   with a Cold Box with minus 6 first parts.  What it

20   is saying is that by using the train a certain way,    12:24

21   you can meet certain performances.  You can meet

22   the same performances using the train in another

23   way, but if you do it following the criteria

24   indicated in the HMB attached to the contract, you

25   will get that kind of outcome.  Nothing more and       12:25

Jan 21, 2020                                        117

1    nothing loss.

2             It is of course for the operator of the

3    plant to decide whether it is more important to

4    give priority to one or the other of the potential

5    criteria, and have more condensate, less                12:25

6    condensate, and it is for GE to meet the guaranteed

7    performances as a minimum.  That's it.  That's the

8    role of each of the parties in developing the

9    respective scope of work in this project.

10            I will go to Question 12.  On                   12:25

11   Question 11, I think we are on the same page with

12   the Claimants.  We have been unable to find any

13   specific contractual provision in relation to the

14   linking the time and the communication of the final

15   gas composition and the atmospheric storage.            12:26

16            Factually, of course we have a

17   reconstruction of the events which may give a

18   different story, but there is no contractual

19   provision that specifically addresses these points.

20            On Question 12, when was the Cold Box           12:26

21   modified?  It was modified for sure after the

22   issuance by GEOG of TM-0008, which is 5 October

23   2014, C-883.

24            Now, these TM-0008 still represents the

25   minus 6 first part, so not the minus 70.  And it        12:26

Jan 21, 2020                                          118

1    was further to after an exchange of emails with

2    IEC, in which IEC was communicating, let's say,

3    informing GE that a final decision on the

4    pressurized atmospheric storage had not been taken

5    yet.  So there was still an uncertainty on whether          12:27

6    or not to have a pressurized or an atmospheric

7    storage, and the design of the Cold Box was changed

8    in response to that kind of request that became an

9    official request later on.

10           Now, the Claimants says, actually that              12:27

11   change was implemented in mid-September,

12   18 September 2014.  We have documents showing that

13   actually the purchase order was placed to Chart on

14   13 October 2014, and the Cold Box was the critical

15   item, it was really the one that could have changed        12:27

16   the time of delivery of the equipment as such.  So

17   the capacity, the ability of GEOG to meet the

18   contractual delivery dates were largely dependent

19   on the time of delivery of the Cold Box.

20           So what the Claimants are saying is that           12:28

21   basically, GEOG waited for more than three weeks

22   before placing the order to Chart, even if they had

23   already taken a decision to change the design of

24   the Cold Box.  This is not the case.

25           And I want to add something on the Cold            12:28

Jan 21, 2020                                         119

1    Box.  Maybe on the next -- answering the next

2    question.  I will go on to Question 12, and here I

3    have these minutes of meeting of October 27, 28,

4    2014.  Here we have Section 7, IEC confirming the

5    design of the storage tanks and the number of          12:28

6    load-out stations, as communicated by email on

7    October 10, 2014, point 2.

8            And here we have the storage tanks and

9    here we see that there is both pressurized and

10   atmospheric storage.  Then point 2 is GE noted the     12:28

11   above IEC design is significantly different than

12   reference plant, and this will result in new design

13   for the boil off gas including different, larger

14   equipment.  As a result, GE noted that a change

15   order would be required.                                12:29

16           And then No. 3, IEC would like to have

17   flexibility to be able to use pressurized load-out

18   and not atmospheric load-out.  So what was formally

19   indicated at the beginning of October became an

20   official request at the end of October in the          12:29

21   course of a meeting.

22           Question 13, I understand here we have a

23   one-week difference in determining the time of the

24   delivery of the Cold Box.  It was 23 October 2015,

25   I think.  Mr. Alexander was saying 15 October.  So     12:29

Jan 21, 2020                                            120

1    one week before.  It is not a substantial

2    difference, I would say.

3              No. 14, this is a very interesting

4    question also from a technical standpoint.  So here

5    we have:  Based on the feed gas composition in the        12:30

6    basis of design, was the Cold Box as built and

7    delivered able to meet the contractually guaranteed

8    performances without the inclusion of an HHR

9    system?

10             Now, we decided to give different colors        12:30

11   to the different sections of this question, just to

12   be sure that we address each of the points.  It's

13   more for me to remember than for you, of course.

14             Now, the first point is:  Was the Cold

15   Box able to meet?  Here, I think we have a              12:30

16   potential misunderstanding, because we have been

17   discussing so much and so long about the Cold Box

18   that here we give the impression that what I see --

19   we may give the impression what I see was fine, it

20   was not a train, it was a Cold Box.  The Cold Box       12:30

21   was an important, a small portion of the train.

22             The value of the four Cold Boxes

23   installed at the Rumuji Plant is $6 million.  So it

24   is a relevant amount.  But out of the 96 of the

25   total price of the equipment, it gives you an           12:31

Jan 21, 2020                                          121

1    indication of how important it can be, the

2    selection of the Cold Box.

3            The Cold Box is always the same, the same

4    piece of steel or brazed aluminum, and it was the

5    same in September 2014, in October, in November.      12:31

6    It has always remained the same.  What it changed

7    at a certain point in time was the position of the

8    nozzle.

9            So inside the Cold Box, you have a point

10   in which the gas reaches the temperature of           12:31

11   minus 6, minus 70, minus 130, minus 150, and

12   whatever else, up to the point in which of course

13   you put the gas -- you have the gas liquefied and

14   you store the gas.  So it might be 150 for

15   pressurized storage or minus 160 for atmospheric      12:31

16   storage.

17           And the position of the nozzle is the key

18   in the point to determine whether you want to

19   operate the Cold Box at a certain temperature for

20   the first pass and so to separate the heavy from      12:32

21   the methane and the ethane, the one they use for

22   the LNG.  Nothing more and nothing less.

23           So it's the same piece, it's the same

24   equipment.  Only the position of the nozzle changes

25   from the first design to the second.                  12:32

Jan 21, 2020                                                        122

1              There is nothing like a contractually

2      guaranteed performance related to the Cold Box.  We

3      have a contractually guaranteed performance related

4      to the train.  The train is a much more complex

5      piece of equipment.                                    12:32

6              We don't have a Cold Box operating at

7      minus 70 or minus 6 degrees.  We have a Cold Box

8      that may operate at minus 6 and minus 70, or minus

9      any other potential kind of degree that you want to

10     reach in order to meet the contractually guaranteed   12:32

11     performances of the train or any other kind of

12     requirement that the Claimants may have.  It's

13     their discussion how to use the Cold Box.

14             We are obliged to provide the Cold Box

15     that can meet the contractually guaranteed            12:33

16     performances.  But it's not so rigid.  It's

17     flexible.  We can change the way the Cold Box can

18     operate, not only by changing mechanically the Cold

19     Box.  So different positions of the nozzle.  But

20     also changing the mixed refrigerant or the            12:33

21     temperature inside the Cold Box and have it working

22     in a different way.

23             It's not for GE to ask Chart to design a

24     Cold Box for atmospheric or pressurized storage.

25     GE was telling Chart to design a Cold Box using       12:33

Jan 21, 2020                                        123

1    certain parameters, and then it was for GE to

2    design a train to meet the contractual guaranteed

3    performances on the basis of different variables.

4    One of them was the Cold Box, but the compressor

5    has the same relevance, for example, of the Cold          12:34

6    Box, at least the same relevance of the Cold Box,

7    in terms of determining the performances of the

8    train.

9             And I am only quoting one of the piece of

10   equipment.                                                 12:34

11            So Cold Box, contractual guaranteed

12   performances.  Now we have a very interesting last

13   issue to be considered.  Here we say "without the

14   inclusion of an HHR system."  Now, the HHR system

15   has no impact whatsoever on the performances of the        12:34

16   equipment supplied by GE.  It may have an impact on

17   the performances of the plant as such, you know,

18   and that is really for the Claimants to decide how

19   to use the gas, depending of course on the kind of

20   gas that they have available.  But the HHR has             12:34

21   nothing to do with the performances of the trains

22   supplied by GE.

23            The trains supplied by GE can work with

24   or without the HHR, without any problem, and the

25   performances are exactly the same.                         12:35

Jan 21, 2020                                              124

1           What you can say, if you are the operator

2    of the plant, by using an HHR, is of course amount

3    of feed gas that you can inject into the trains,

4    because thanks to the HHR, you are recover part of

5    the methane and ethane that goes together with the      12:35

6    list, and more importantly, you can actually

7    produce LPG.  That's the reason why you buy the

8    HHR.  But you are not improving at all the

9    performance of the trains by buying the HHR.

10          ARBITRATOR SABA:  May I ask a question?          12:35

11   So here we are again.  I know that you made an

12   argument very much along these lines in New York.

13   I want to make sure that I understand what you are

14   saying.

15          Mr. Alexander said this morning that the         12:36

16   Cold Box, as designed as of September 18, was the

17   Cold Box as delivered in October 2015.

18          MR. CALABRESI:  Correct.

19          ARBITRATOR SABA:  Now, I understood

20   design to mean, for example, the temperatures, the      12:36

21   nozzle placement and the temperature, first at

22   pass A outlet, certain temperature.

23          Are you saying that that really doesn't

24   matter?  What matters is because the Cold Box is

25   workable at different temperatures, though it says      12:36

Jan 21, 2020                                                    125

1    minus 625 or minus 70, as of September 18, 2014,

2    that doesn't really matter.

3           What matters is what the

4    operator/owner/user of the Cold Box does with it,

5    how it operates it, in respect of the different        12:37

6    variables; not least, and most importantly, I would

7    say, the composition of the feed gas supply.

8           Are you effectively saying:  No, that

9    Cold Box was fine, it was -- there is no defective

10   design, it works -- it can work, though it said       12:37

11   minus 70 and here with the temperatures; it really

12   doesn't matter what those were, because it was

13   designed in such a way that the operator could use

14   it effectively with the result that would meet all

15   the guaranteed performances?                           12:38

16          The operator could use it with the result

17   that would meet the guaranteed performances by

18   adjusting the temperatures.  It's simply using the

19   Cold Box as designed.

20          Is that what you are saying?                     12:38

21          MR. CALABRESI:  Yeah.  The first point

22   from me would be what is the allegation of

23   defective design here, because -- is that the

24   original one of minus 6 or the actual one which is

25   minus 70?  That is one point.                           12:38

Jan 21, 2020                                          126

1            I understood at the beginning, reading

2      Mr. Lumley's expert report, that the allegation was

3      that the design developed by GE was defective

4      because there was no sufficient margin to avoid the

5      freezing of the heavies.  And that was in relation      12:38

6      to the minus 6 design.  And my response to that

7      would be, well, you know, if you want to have

8      10 degrees of margin, you can simply change the

9      temperature inside the Cold Box.  Yes, that would

10     be the answer to that need of having a higher          12:39

11     margin between the freezing point of the heavies

12     and the minus 6 which was originally designed by

13     GE.

14            Now, the next point is, yeah, but at a

15     certain point in time -- and I don't think it was       12:39

16     the 18th of September.  I think on the 18th of

17     September GE and Chart were still trying to

18     understand how to operate the Cold Box and the

19     train on the basis of potential changes after the

20     signature of the contract, because they were both       12:39

21     aware, Chart, GE and I would say also IEC, that

22     there were certain variables that could have

23     changed; in particular, gas composition and

24     pressurized or atmospheric storage.

25            They were still thinking how to               12:39

Jan 21, 2020                                         127

1      potentially adjust that minus 6 of the first pass,

2      which was still the original design, to something

3      that could have changed based on the needs or the

4      requirements of the Claimants, the buyer at that

5      point in time.                                  12:40

6            So we have something like 12 different

7      case scenarios developed by GE and Chart.  And the

8      truth is that the one of the 18th of September, the

9      one developed by Chart on the 18th of September, as

10     Mr. Alexander was saying in his closing statement,  12:40

11     theoretically cannot work.

12           What they are saying is that -- what

13     Chart was saying is you have everything going

14     liquid, including the heavies, so it cannot work.

15     But we know it will work.  They know better than    12:40

16     us.  They are operating Train 3 with exactly the

17     same temperature.  So it is working.

18           But the point is that in order for you,

19     as a designer of a train, to understand the

20     performances of the train, is not enough, and it's  12:41

21     not even strictly required to know what kind of

22     parameters the supplier of the Cold Box is using.

23     It is important to combine those parameters and

24     those results with the results of the train as a

25     whole.                                          12:41

Jan 21, 2020                                    128

1           So of course the final data sheet that GE

2      developed -- that's the reason why we were telling

3      IEC, you don't need the final data sheet from

4      Chart, because we, as the original equipment

5      manufacturer, developed the final data sheet of the      12:41

6      plant, including the Cold Box.

7           If you look at the final data sheet

8      developed by GE, the information related to the

9      Cold Box are the same information that you can find

10     on the 18th of September 2014 exchange of emails        12:41

11     between GE and Chart.  But the way GE is using the

12     Cold Box in order to meet the contractual guarantee

13     performance is completely different.

14          ARBITRATOR SABA:  All right.  So let me

15     stop you there for just a moment.  So the Cold Box       12:42

16     as delivered was at minus 70.  I am just talking

17     shorthand for a moment.

18          MR. CALABRESI:  Yes.

19          ARBITRATOR SABA:  Now, I believe

20     Mr. Lumley says as to that, the minus 70, that the       12:42

21     effect of operating the Cold Box, as designed that

22     way, was to increase hugely the condensate produced

23     in the process, the liquefaction process.

24          MR. CALABRESI:  Yes.

25          ARBITRATOR SABA:  The effect of heavily,          12:42

Jan 21, 2020                                          129

1    much greater production of condensate in that

2    process meant that there would be a reduction of

3    LNG, of the LNG output.  Am I wrong about that, or

4    am I misstating it?  Is the effect that you would

5    need more feed gas supply?  You would need more          12:43

6    feed gas supply?

7              MR. CALABRESI:  That's the point.

8              ARBITRATOR SABA:  That's what Lumley

9    said --

10             MR. CALABRESI:  Yes, yes.                       12:43

11             ARBITRATOR SABA:  -- you would need more

12   feed gas supply.

13             So my question is:  Using the Cold Box as

14   designed, as delivered, at minus 70, you would need

15   more feed gas supply; am I right?                         12:43

16             MR. CALABRESI:  For using the feed gas

17   composition, which one?  Because there is another

18   point.

19             ARBITRATOR SABA:  Using the feed gas

20   composition that was in the contract.                     12:43

21             MR. CALABRESI:  Yes, probably there will

22   be the need for more gas, but here the point is

23   what Lumley is considering is minus 70 as a fixed

24   number, or minus 6 as a fixed number.  He is saying

25   one is defective.  That was my understanding,             12:44

Jan 21, 2020                                    130

1    minus 6.  While minus 70 is not defective, but it

2    gives different results from the one that was

3    contractually included in the HMB.  That's my

4    understanding.  Okay.  But you are taking two

5    points:  Minus 6 and minus 70.                    12:44

6            This Cold Box, the one that was actually

7    delivered to IEC, can also work at minus 45, for

8    example, through the bypass, and there are other

9    ways to change the parameters.

10           ARBITRATOR SABA:  So this is what I am      12:44

11   getting at, so stay with me on the minus 70 for a

12   moment, and Lumley later concluding and opining

13   that this Cold Box, if operated that way, at that

14   temperature, would necessitate more -- a greater

15   supply of the feed gas, so based on the contractual  12:44

16   feed gas composition.  All right?

17           So my question is this:  Because I

18   understand Claimants to be saying additionally that

19   if you increase -- if you have to obtain a greater

20   supply of feed gas, there will be an extra claim on  12:45

21   power, on the needed power.  And one of GE's

22   performance guarantees is a certain -- I take it to

23   be a maximum amount of power that would have to be

24   consumed in order to operate the plant.

25           So this is why your argument that you are    12:45

Jan 21, 2020                                              131

1    repeating again today is meaningful, and I want to

2    understand it.  Because you are basically -- if you

3    are saying -- and I don't want to put words into

4    your mouth.  If you are saying the minus 70 doesn't

5    really matter because you can operate it at a              12:46

6    different temperature against the contractual --

7    you can operate it at a different temperature, and

8    really the question is:  Can you operate it at a

9    different temperature in all cases applied to the

10   gas -- the composition in the contract and get the         12:46

11   same result?  Can you move the temperature around

12   and achieve everything?

13          You don't have to increase the power that

14   you claim, that you need to operate it, and you can

15   get the same production of LNG?  It doesn't matter.        12:47

16   You are using that contractual gas, feed gas with

17   its composition, you can adjust the temperature and

18   it's okay, you will achieve those performances.

19          MR. CALABRESI:  Let's see whether we can

20   be on the same page on that.  If IEC confirms that         12:47

21   they only have pressurized storage as it is, that

22   is my understanding now, also with the testimony of

23   the witnesses and experts, I will say that the

24   answer to your question is, yes, the Cold Box can

25   work without any problem.  It could have worked at         12:47

Jan 21, 2020                                          132

1    minus 6.  That is our case.  It could have worked

2    at minus 10.  That was probably the case of what

3    Mr. Lumley was suggesting.

4           It is now working as a design case

5    scenario, let's say, at minus 70 only because we          12:47

6    had to decrease the temperature to accommodate the

7    atmospheric storage change.  That was the reason

8    why it went down to minus 70.  There was no reason

9    to go so down.  Also, if we take Mr. -- if we

10   accept -- without accepting that, but if you accept      12:48

11   theoretically Mr. Lumley's assertion that the

12   margin was too tight or was not enough -- actually,

13   that was his case, that it was not enough -- it

14   would have been good enough for us or for IEC to

15   decrease the temperature by 8 degrees, from 6 to         12:48

16   12.

17          Of course that assumes that you have a

18   pressurized storage.  If you have an atmospheric

19   storage, things change.  And because it's not for

20   us, as an equipment manufacturer, to decide whether      12:48

21   you, owner or operator of the plant, when I have an

22   atmospheric or a pressurized storage, we can only

23   try to design the equipment as flexible as possible

24   to meet your requirements, but nothing more than

25   that.                                                    12:49

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                    133

1              Then the daily decision on how to operate

2      the plant is completely up to you.  It can be minus

3      70.  And I'm not saying it's not our case that we

4      can go back from minus 70 to minus 6 without

5      changing the position of the nozzle.  What we know      12:49

6      for sure is that we can go down from minus 70 to

7      minus 45, because that was an HMB developed with

8      Chart -- between GE and Chart, and that was

9      feasible, that was possible.

10             We don't know the limits up and down           12:49

11     because we have never been requested to study that.

12     And here we go back to the point on whether the

13     feed gas composition is the one of the contract or

14     a new one, and all the discussion that we had also

15     at the hearing.  If you take TM-128, which is the      12:49

16     one with a new gas composition, one note on that,

17     also TM-128 says normally the same, and that's to

18     say no more complaint on the side of the Claimants.

19             And at that point in time, they should

20     have been aware the difference between a C6, C6        12:50

21     plus...  but if you take TM-128, we have minus 70,

22     minus 70 is the first pass of the Cold Box, a

23     lighter gas with respect to the one in the

24     contract.  And because it was lighter, you have a

25     power consumption which was higher than the one        12:50

Jan 21, 2020                                          134

1    provided in the contract.  Because there is this,

2    you know, quite strange correlation which is

3    inverse correlation between the weight of the gas

4    and the power assumption.

5           So the lighter the gas is, the more power      12:50

6    you consume in order to liquefy that.  But of

7    course it's better to have a lighter gas in terms

8    of production, in volumes.  But that is, again, a

9    decision, that must be taken from the owner, by the

10   owner or by the operator, and not by GE.  And if      12:50

11   you take that case, so it's no longer speculation,

12   you see that the impact of operating the Cold Box

13   at minus 70 is that, yes, you increase the volume

14   of gas that you need in order to make the

15   contractually guaranteed performances on one side,    12:51

16   which is not, by the way, the volume of the gas

17   that you are injecting into the chain -- a

18   contractually guaranteed performance.  And you have

19   a slight difference in terms of power consumption,

20   which is covered by the liquidated damages            12:51

21   provision of the contract.

22          That is because there was a change, and

23   the change was not the minus 70 versus the minus 6.

24   The change was the gas composition.  And the fact

25   that you are providing me, as an equipment            12:51

Jan 21, 2020                                                                 135

1     manufacturer, with a lighter gas composition is not

2     necessarily good for me.  It's only good for you as

3     owner and operator because you can get more LNG.

4               ARBITRATOR SABA:  So then I have -- now

5     you have to address a question.  It goes directly          12:52

6     to fact.  TM-128, is the minus 70 -- is the Cold

7     Box designed to deal with that gas composition?

8               MR. CALABRESI:  It's already minus 70,

9     TM-128.

10               ARBITRATOR SABA:  TM-128 is already --          12:52

11     but TM-128, that HMB has a -- it's a gas

12     composition that's different from the contractual

13     gas composition.

14               MR. CALABRESI:  Correct.  That's a

15     different composition.  We didn't run an analysis          12:52

16     on the gas composition and minus 70.  We run

17     analysis with the composition in minus 6, which was

18     the contractual design parameters.  We have that.

19     We don't have an analysis with a different gas

20     composition other than TM-128.                             12:53

21               ARBITRATOR SABA:  So did you just say

22     that if the Cold Box were -- the need for

23     additional feed gas supply comes about because the

24     feed gas is lighter than the contractual feed gas?

25               MR. CALABRESI:  No.  The power                   12:53

Jan 21, 2020                                        136

1     consumption is linked to the --

2              ARBITRATOR SABA:  I thought I heard you

3     say -- the power consumption, the power

4     consumption.  More power consumption if you are

5     using a lighter feed gas; is that right?          12:53

6              MR. CALABRESI:  Yes.

7              ARBITRATOR SABA:  So if you were using

8     the original feed gas, the contract feed gas, there

9     would be no extra power -- there would be no

10    greater power consumption?                        12:53

11             MR. CALABRESI:  There should be not.

12             ARBITRATOR SABA:  There should be not.

13             MR. CALABRESI:  Yes.

14             ARBITRATOR SABA:  At minus 70 or

15    anything --                                       12:53

16             MR. CALABRESI:  Maybe at minus 70 you may

17    have.  And of course you will have an impact in

18    terms of performances with respect to the minus 6

19    that were -- you know, the one or the HMB attached

20    to the contract.  That's for sure.                12:54

21             But minus 70 is only one case scenario,

22    and it's only one.  We could run the Cold Box at

23    minus 45, for example, and see what happens in

24    terms of condensate, in terms of production, in

25    terms of power consumption, the quality of the LNG.  12:54

Jan 21, 2020                                    137

1           The quality of the LNG is another

2    parameter that has never been discussed, but it's

3    important, again, for the design of the Cold Box

4    and the separation between the heavies and the

5    methane and ethane.                              12:54

6           And that changed from the beginning to

7    the end.  Not formally.  We know that.  But we have

8    seen the correspondence between the parties that

9    the methane number, which indicates the quality of

10   the LNG, changed.  And so there were discussions   12:54

11   between GE and IEC on how to meet the new

12   requirement of a methane number, so quality of LNG

13   which was slightly different, better than the one

14   provided in the contract.

15          But all these analyses should be -- had    12:55

16   required, actually, to see whether the performance

17   test can be carried out, because we don't even know

18   how a performance test can be carried out now,

19   because we don't know what kind of feed gas they

20   are using.  So it's particularly impossible to     12:55

21   carry out a performance test, and we don't know

22   what kind of outcome they want to get.

23          ARBITRATOR SABA:  Okay.  So just one last

24   time, this question, one last time.  Using only the

25   contractual feed gas supply, its composition, as   12:55

Jan 21, 2020                                              138

1    delivered the Cold Box, the train, would -- if

2    nothing else, all other things being equal, the

3    train was operated with that Cold Box as designed

4    at that temperature with that feed gas that's in

5    the contract.  Would there be a need for additional      12:56

6    gas supply, feed gas supply, to meet the

7    performance, the three performance guarantees that

8    you say are really the only ones guaranteed?  Would

9    the additional feed gas needed to meet those three

10   performance guarantees, including of course the          12:56

11   guarantee of maximum power usage, or would more

12   power usage be required in those circumstances?

13          MR. CALABRESI:  No, it's a kind of

14   speculation from my side.  So I am not sure that --

15          ARBITRATOR SABA:  I am sorry.  Maybe I'm          12:56

16   misstating the question or --

17          MR. CALABRESI:  No, no, no, no.  It's

18   just that -- no, no.

19          MR. McILWRATH:  Sorry.  It's a different

20   question.                                                 12:56

21          MR. CALABRESI:  No, no, no.  It's --

22          ARBITRATOR SABA:  It's just flowing

23   from -- is it okay or --

24          MR. CALABRESI:  No.  I'll give you my

25   feeling.  I wouldn't expect any impact on the power      12:57

Jan 21, 2020                                          139

1    consumption because we have the same weight of the

2    gas.  What I would expect is probably the need for

3    potentially more feed gas, potentially.  It depends

4    on, you know, again, if we operate that at minus 70

5    or minus 45, or another parameter which is unknown.    12:57

6          So I see it may tell us -- you know, my

7    priority is, in any event, to save us much methane

8    and ethane that we can, and if we have the

9    condensate as a waste.  So no LPG, we can throw it

10   away.  And that is a scenario that if the             12:57

11   pressurized storage is confirmed, it could allow us

12   to simply say, why don't we go back to original

13   design?  If minus 6 for you is not good enough,

14   let's go down to minus 10, minus 12.

15          But of course that excludes the               12:58

16   atmospheric storage.  And then we need to think on

17   how to adjust the Cold Box.  The change of position

18   of the nozzle, change the amount of mixed

19   refrigerant, have a bypass potentially.  Again, the

20   price of the Cold Box is 6 million.  So we are        12:58

21   talking about that.

22          And the impact of that equipment in the

23   performances of the equipment, of course it's

24   important.  It cannot be the one that it is -- it

25   has been presented to us, because it looks like       12:58

Jan 21, 2020                                                    140

1    they were buying a $6 million equipment.  Well,

2    they were buying at 95, a much more complex piece

3    of equipment.

4              And that 6 million plays a role, of

5    course.  No one disputes that.  We were able to          12:58

6    manage that.  And we believe they are as well.

7              ARBITRATOR SABA:  Okay.  And then the

8    extra supply of feed gas would not necessarily

9    involve an extra draw on power?  If you are

10   providing more feed gas --                               12:59

11             MR. CALABRESI:  No, no.  That's good.  It

12   depends on the --

13             ARBITRATOR SABA: -- you would need more

14   power to operate the plant.

15             MR. CALABRESI:  But the power, yes -- no,      12:59

16   that is true.  The point is that the power

17   consumption is actually linked to the power that

18   you need more than to drive the gas inside the Cold

19   Box.  It's the power you need to cool down the gas.

20   So that is the real parameter that can change the        12:59

21   power consumption.

22             ARBITRATOR SABA:  All right.  Okay.

23   Thank you.  Thank you.

24             THE PRESIDING ARBITRATOR:  Is this a good

25   moment for the lunch break or do you want --             12:59

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                    141

1            MR. CALABRESI:  Whatever you want.  I can
2       go ahead.  Whatever.
3            THE PRESIDING ARBITRATOR:  It's
4       1 o'clock.
5            MR. CALABRESI:  Okay.  Lunch.  Good.          12:59
6            THE PRESIDING ARBITRATOR:  We have the
7       time reports.
8            MR. CAPIEL:  It has been 48 minutes, out
9       of which 24 minutes were questions by Mr. Saba.  I
10      don't know what --                                 13:00
11           THE PRESIDING ARBITRATOR:  We will be
12      generous.  So let's resume at 2:15.
13           (Lunch break - 1:00 p.m.)
14           (Proceedings resumed - 2:13 p.m.)
15           THE PRESIDING ARBITRATOR:  Mr. Calabresi,    14:13
16      you may proceed.
17           MR. CALABRESI:  Question 15 was whether a
18      change order altering the basis of design feed gas
19      composition was ever agreed by the parties.  No,
20      the answer is no.  Actually, GEOG is not aware of    14:14
21      the actual current gas composition.  So that is one
22      of the issues of course in discussion in this
23      arbitration.
24           Then I am jumping to Question 24, that is
25      related to the procedures set forth in the           14:14

Jan 21, 2020                                    142

1    contract.  Here we are talking about delay and

2    warranty in particular.  And the answer again is

3    no, the procedures were not followed.

4            Actually, our allegation, and we made

5    that clear in our submission, is that contractual       14:15

6    remedies were not claimed by the Claimants, and

7    maybe this is an opportunity for us to better

8    clarify this point.

9            Liquidated damages first, I am talking

10   about contractual remedies in case of delay.  And      14:15

11   our position is that they have never been claimed

12   by the Claimants, they are not part of the Request

13   for Relief, they are not a point of discussion.  We

14   have never taken any position with respect to the

15   liquidated damages or their validity under New York    14:15

16   law, especially if we consider the liquidated

17   damages provision, which is Clause 6.5, together

18   with Clause 6.6, which is on other remedies,

19   so-called other remedies.

20           Now, here, this 6.6 sets forth a               14:15

21   procedure, and the procedure is the first

22   romanette, which is a notice to the Seller coming

23   from the buyer to require Seller to agree within

24   five working days of Buyer's demand to deliver the

25   plants, within the period of time identified by        14:16

Jan 21, 2020                                    143

1    Buyer at discretion.

2          It never happened.  There is nothing on

3    the record suggesting that this procedure was

4    followed.

5          The same, if we look at the guaranteed          14:16

6    performances, here we have again liquidated damages

7    and a procedure which is pretty much articulated.

8    I am looking at the Equipment Contract, Section

9    25.2, and here we have, under (ii), point (a), in

10   case the liquidated damages formula, here is a          14:16

11   value equal to or less than 5 percent, and point

12   (b) whether the value of the liquidated damages is

13   greater than 5 percent.

14         So the contract regulates both the

15   situations for the possible conditions, and we have     14:17

16   remedies with respect to the lack of performances

17   of the plant, and we know what kind of guaranteed

18   performances were provided by the contract.

19         So again, the last point on this, on

20   contractual procedures and remedies, here we are        14:17

21   talking about defects, the relevant clause is

22   warranty, and here again we have 17.4, which is the

23   procedure to be followed in case of Seller's

24   failure to remedy the defects.

25         And again, there is no clue, no evidence          14:17

Jan 21, 2020                                              144

1    on record that the procedure was followed.

2    Procedure meaning in this case a negotiation on a

3    potential equitable compensation for the Buyer in

4    case of an unremedied defect.

5          And then (ii):  "In the event that due to      14:18

6    Seller's failure or inability to remedy the Defect

7    Buyer is deprived of a substantial part of the

8    benefit of the Plant," potentially termination of

9    the contract.  Nothing like this is included in the

10   Claimants' Request for Relief of claims.            14:18

11         Question 25.  Here we are talking of

12   concurrent responsibility for delayed performance.

13         Now, I am not pretending to be an expert

14   on New York law, so I am just referring to the

15   first principle that we have here, and we also       14:18

16   included our reference to the relevant case law.

17   But the principle is pretty much standard, and it

18   says that in order to recover delayed damages,

19   Plaintiff -- the Claimant must demonstrate that the

20   Defendant is responsible for delay, that the         14:19

21   Defendant's delay caused a delay in the completion

22   of the project.

23         So the critical part, without -- this is

24   the one, the few words that we are underlining here

25   in bold -- "without any concurrent delays, and that  14:19

Jan 21, 2020                                        145

1    suffered rationally estimable damages as a result."

2             So the point for us is without any

3    concurrent delays.

4             Now, one example of concurrent delay that

5    we believe is probably -- is not the best, but it's      14:19

6    something that can give you a better picture of the

7    situation, which is the HHR.  I am going back to

8    the point on the HHR, so a timeline of what

9    happened in relation to the HHR.

10            We understand that the Claimants' case is        14:19

11   that without an HHR, the two trains delivered by GE

12   cannot operate, cannot work, cannot perform.

13            Okay, so the reason why the HHR was

14   required is again the Cold Box as designed and

15   delivered by GE to IEC.  And so the order to Chart       14:20

16   is October 2014.  And this is undisputed.

17            Now, the first time GEOG shared the

18   specification of the Cold Box with IEC is

19   March 2015.  At least on record we have that date.

20   We know that there were interactions in between          14:20

21   Technip on the side of IEC at the end of 2014, and

22   GEOG, but we have no record specifically related to

23   the design of the Cold Box.

24            The first document that we have on record

25   indicating the change, let's call it that way, of        14:20

Jan 21, 2020                                        146

1    the Cold Box, from minus 6 of the contract to minus

2    70, minus 45, which is the as-built Cold Box, is in

3    R-298, 299, which is when GEOG uploaded into the

4    IEC website the specification of the Cold Box.  But

5    that was a sort of unilateral communication.  So we      14:21

6    have an upload of documents into our website.

7            We know, by the way, for sure, that at

8    the latest, in September 2015, together with the

9    transmission of TM-128, it was very clear to

10   everybody that the Cold Box was operating at minus      14:21

11   70, no longer at minus 6.  And also Mr. Lumley said

12   in his testimony that TM-128 is not ambiguous on

13   that point.  It's very clear.  Ambiguous -- TM --

14   yes, it's very clear; the Cold Box was no longer

15   operated at minus 6.                                    14:21

16           So here we are in September 2015.  Now,

17   IEC buys the HHR in February 2017, which is, by the

18   way, almost one year after the acquisition of the

19   Train 3.  So we have September 2015, when we have a

20   document showing the change inside the Cold Box.        14:22

21   Those are the impacts of that change because we

22   have an increase of the condensate, we have an

23   increase of the power consumption which is due

24   for -- this is our position -- to the lighter case

25   which is included in this TM-128.                       14:22

Jan 21, 2020                                        147

1          But in any event, everything is very

2     clear in September 2015.  It's very clear also in

3     relation to the amount of condensate that was

4     changing with respect to the contractual one.  The

5     contract for the -- again, for the purchase of the      14:22

6     HHR is February 2017.

7          Then what do we have?  We have gas

8     available at the plant at the end of December 2018.

9     And then we have at the end of 2018, again, the

10    commissioning of the HHR.  We have the first claim      14:23

11    on the HHR together with the Statement of Claim

12    filed in this arbitration by the Claimants, which

13    is March 2019.  And then we have the startup of the

14    HHR, which is April 2019.

15         Now, our position is well, if the HHR was        14:23

16    really required for the plant to operate, what do

17    we have here, how much?  One year -- more than

18    18 months of delay in remedying the problem that

19    was allegedly caused by the change of the Cold Box,

20    from September 2015 up to April 2019.                  14:23

21         That was a remedial action, which is the

22    purchase of the HHR, that should have been taken

23    and could have been taken much faster, much earlier

24    in time and could have avoided a lot of damages,

25    alleged damages on the side of the Claimants.         14:24

Jan 21, 2020                                                      148

1           ARBITRATOR SABA:  So are you arguing

2    there that the Claimant is concurrently responsible

3    or solely responsible for the delay between

4    September 2015 and all the way out at least to

5    February 23rd, 2017?                                     14:24

6           MR. CALABRESI:  Solely responsible.  The

7    HHR has nothing to do with the equipment that GE

8    supplied.  We don't know -- that's the point.  If

9    they believe that the HHR was required for their

10   internal business, commercial decisions to have the    14:24

11   plants operating, they should have both the HHR at

12   the latest in 2015, after September 2015.

13           It took one year and a half, actually

14   more than that to them, two years and a half, to

15   have the HHR ready to operate.  We don't know          14:25

16   whether the HHR is actually needed.  Again, it's a

17   commercial decision.  But if it is, because

18   otherwise the operation of the plant is no longer

19   economically viable or profitable or whatever else,

20   well, they should have taken that step of buying       14:25

21   the HHR much earlier in time.

22           ARBITRATOR SABA:  One quick question,

23   going back to TM-128, Exhibit C-259, what again is

24   the significance -- I believe you said a few

25   minutes ago that with the transmission of TM-128,      14:26

Jan 21, 2020                                         149

1    Claimant should have recognized that there would be

2    an increase of condensate and an increase of power

3    consumption, an increase of condensate and an

4    increase of power consumption assuming the use of

5    the contract feed gas.                              14:26

6              MR. CALABRESI:  No.

7              ARBITRATOR SABA:  Then assuming what?

8              MR. CALABRESI:  The contract feed gas of

9    TM-128, which was the lighter gas composition.

10             ARBITRATOR SABA:  Right.  You say        14:26

11   contract feed gas.  How does that become the

12   contract feed gas?  You mean if that were used, if

13   that proved to be the supply, then that would be

14   the case?

15             MR. CALABRESI:  No.  What I am saying is  14:26

16   that for sure there was that change in the

17   operation of the Cold Box.  It was no longer --

18             ARBITRATOR SABA:  I see.

19             MR. CALABRESI:  That was the change with

20   respect to the contract in addition to the feed    14:27

21   gas.

22             ARBITRATOR SABA:  I see.

23             MR. CALABRESI:  So it was still

24   pressurized, it was a pressurized case and an

25   atmospheric case.  But even if we take the         14:27

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                                    150

1    pressurized storage case --

2              ARBITRATOR SABA:  Alone.  Alone.

3              MR. CALABRESI:  -- yes -- we have

4    different gas composition and for sure a different

5    degree of temperature of the first pass of the Cold        14:27

6    Box.  And it was clear from this point in time that

7    the Cold Box was not operating at minus 6 in the

8    first pass, but in that case, minus 70.  And the

9    effect of that was an increase of condensate.

10             ARBITRATOR SABA:  If you used the              14:27

11   contract feed gas or the March 15 feed gas which --

12             MR. CALABRESI:  The March 15 --

13             ARBITRATOR SABA:  The March 15 feed gas.

14             MR. CALABRESI:  The March 15 feed gas.

15             ARBITRATOR SABA:  That's OBELI [phonetic]      14:27

16   -- what is that?  How is that pronounced?  OBELI

17   [phonetic].  So TM-128 is based on -- what you said

18   is that there will be an increase of condensate and

19   there will be an increase of power consumption

20   using the feed box HMB reflected in TM-128 --            14:28

21             MR. CALABRESI:  Correct.

22             ARBITRATOR SABA:  -- if the OBELI

23   [phonetic] feed gas was used.

24             MR. CALABRESI:  That's correct.

25             ARBITRATOR SABA:  But not if the contract      14:28

Jan 21, 2020                                        151

1     feed gas was used, the original contract feed gas?

2              MR. CALABRESI:  Potentially, yes.

3              ARBITRATOR SABA:  Potentially, yes, okay.

4              MR. CALABRESI:  But that was the side

5     effect of that decrease of temperature of first        14:28

6     pass of the Cold Box.  That's my understanding of

7     what the Claimants' case is, it's not our case

8     actually.  Because we believe that that could have

9     been the effect of minus 70, but we could have

10    mitigated or reduced, or deleted that effect by        14:28

11    operating differently the Cold Box.

12             So I'm following their argument that

13    minus 70 *per se* brings to an increase of the

14    condensate.  If that's the case, then that's fine.

15    It was clear enough in September 2015, and you had     14:29

16    the HHR ready for operation only in April of 2019.

17    And that's the distance in time between the two

18    events.

19             ARBITRATOR SABA:  Okay.

20             MR. CALABRESI:  Moving on, I am going          14:29

21    back actually to Question 6.  This is, you know, on

22    the possibility to extend to a non-signatory party

23    under New York law, the binding effects of the

24    arbitration clause.  Now, we understand that there

25    are some prerequisites under New York law:             14:29

Jan 21, 2020                                                    152

1    Incorporation by reference, assumption, agency,

2    *alter ego*, they were not pleaded by the Claimants.

3           We have the third-party beneficiary and

4    the estoppel doctrine, which is, I understand, a

5    federal law doctrine, the intertwined estoppel that    14:30

6    Mr. Gutowski was mentioning before.

7           But here, you know, we can discuss a lot

8    about these principles of New York law, but here we

9    have something more and something, I would say,

10   clear.                                                 14:30

11          Now, Mr. Gutowski was referring to the

12   close connection which is required between the

13   companies or the parties in order to extend the

14   validity of an arbitration clause to a

15   non-signatory.                                         14:30

16          Well, here we have this situation, first

17   of all.  Now, we have an ownership structure that

18   is described in Mr. Helsen's witness statement, and

19   here we have this ownership structure starting from

20   family owners.  And then we have *société*             14:30

21   *patrimoniale*, and then we have IEC, and West

22   African Electric, then Greenville.  Nothing new, we

23   have already discussed all those points during the

24   hearing in New York.

25          So there is no direct link between IEC          14:31

Jan 21, 2020                                    153

1    and Greenville.  It is unclear what West African

2    Electric role is and what the role is not only in

3    terms of the business that they carry out, but also

4    in terms of corporate governance, the way the

5    relation between the companies actually works.        14:31

6            But what is clear is the kind of

7    contractual relationship that at least IEC and

8    Greenville have.  And again, it's Mr. Helsen's

9    witness statement, and we have a credit agreement,

10   a services agreement and a procurement agreement.    14:31

11   If we look at the contractual arrangement between

12   the two companies, and especially to some of the

13   sections of those contracts, here we have one

14   alternative.  Either we conclude that these

15   contracts are valid and effective between two         14:32

16   different entities, with two different boards of

17   directors and different interests, or we conclude

18   that these are basically false contracts, invalid

19   contracts, non-effective contracts that were only

20   drafted to be produced in case of an audit from the   14:32

21   Nigerian tax authorities, which is something that

22   was suggested at a certain point in time during the

23   testimony of the Claimants' witnesses.

24           But this is not pleaded.  This is not

25   their case.  They are not saying that those          14:32

Jan 21, 2020                                    154

1    contracts are not effective and not valid.  They

2    are saying those contracts are effective, were

3    effective, are valid, and that is the kind of

4    relationship between the two companies.

5            We have, on the one side, IEC, on the          14:32

6    other side, Greenville, providing services,

7    providing credit, providing materials, equipment,

8    and the relation between the two entities, and GE

9    is very clear.  And it is clear not only because

10   the contract is clear, but also in the               14:33

11   pre-contractual relationship between the parties in

12   the procedure that Mr. Gutowski was mentioning this

13   morning, the "know your customer" procedure of

14   General Electric, and it was made very clear from

15   Mr. Helsen to GE that the customer was IEC, not a     14:33

16   newly constituted Nigerian entity.  It was IEC.

17           So the relationship between IEC and the

18   Nigerian entity that was meant to operate the

19   plant, was something that was kept hidden to GE,

20   and we are not claiming anything because of that.     14:33

21   It was normal business, normal activity, and GE was

22   not even interested to have any knowledge about the

23   contractual relationship between IEC and

24   Greenville.

25           We discovered in this arbitration that        14:34

Jan 21, 2020                                          155

1    the contractual arrangement between the two

2    companies is the one that we have in front of us,

3    so very articulated, with clauses that made clear

4    that there is no joint venture, no partnership, no

5    association.  There is a possibility to assign the        14:34

6    contract.

7            It is a very articulated kind of

8    contractual arrangement which is -- again, that is

9    the case also of the Claimants, valid and effective

10   and excludes outright, with no doubt that there is        14:34

11   any chance for Greenville to be a Claimant in this

12   arbitration against GE.  And it's the end of my --

13   I leave it to my --

14           MR. McILWRATH:  I am going to do

15   something which is a little bit -- so this is             14:34

16   unconventional in a sense when we started the

17   hearing in New York, I think I quoted Collodi and

18   Pinocchio, which made it a little bit

19   unconventional.  Here is something which I think is

20   considered you don't do it in arbitration, which is      14:35

21   to quote yourself.  But I am going to quote myself

22   not for the purpose of representing that I am an

23   authority, that's not why I am putting this

24   forward, but to put this forward to say that I've

25   written about this concern that I have before            14:35

Jan 21, 2020                                         156

1   often, and why I think it's a potential risk in

2   arbitration, and the concern -- and this is in a

3   book that I did with John Savage.  It's the concern

4   where you have a defaulting party in an

5   arbitration, and you make the mistake of appointing      14:35

6   a very good Arbitral Tribunal, who then put

7   themselves in the role of having to vet the claims

8   in the evidence as if you had a party that was

9   present, and you actually wind up having it as your

10  adversary in a sense, a very qualified adversary        14:35

11  because it's the Tribunal that's putting the claims

12  to their basis.

13          I think when we were discussing some of

14  the questions and the concerns we raised, I think

15  we feel to an extent that that's a bit kind of         14:36

16  perhaps what the Tribunal is doing with these

17  questions which were directed really at the

18  Claimants' affirmative case for the most part, of

19  giving them an opportunity here to present perhaps

20  arguments that were not presented in the course of      14:36

21  the case.  It's a concern to us because obviously

22  the Claimants have not defaulted, we are the

23  Claimants, but really their strategy here has been

24  what we would call an all-or-nothing strategy.

25          It's actually something that one of my         14:36

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                        157

1    colleagues, and actually a mentor of mine,

2    Professor Ugo Draetta, former general counsel in

3    Europe of General Electric has written about in one

4    of his books, about when parties make the strategic

5    choice to put a Tribunal in the position of having        14:36

6    to decide an all-or-no situation without providing

7    alternatives on which to provide a potential

8    relief.

9            They say, well, we are asking for

10   700 million, why would we ask for liquidated             14:37

11   damages?  Those are less than $5 million.

12           So we don't want to give the Tribunal

13   that option.  We will give the Tribunal the option

14   only to rule on the principal claim that we put

15   forward.                                                  14:37

16           And I also -- I just lost the screen --

17   There we go.

18           The other aspect of the concern that we

19   have is -- I don't know if you've ever heard the

20   phrase -- Mr. Saba may have -- the Texas                  14:37

21   sharpshooter.  So Texas sharpshooter, it's actually

22   the sense of logical fallacy.  It's a term, but it

23   goes back to this Texas idea.  A guy takes a rifle

24   out to his barn and shoots at random at the barn,

25   right, and then after he shoots, he walks up and he       14:37

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                        158

1    draws circles around the holes.  He says, I made a

2    Bullseye in all these different places, this is

3    where I scored.

4              So I think we have an instance here of a

5    bit of Texas sharpshooting.  They should not be          14:37

6    allowed to do post-hearing.  They are stuck with

7    what they pled.  But they shouldn't also be given

8    extra bullets once they have done that.

9              So the need for arbitration in fact was,

10   you know, consistent, I think, with the strategy        14:38

11   they have adopted throughout.  On the 31st of July,

12   we had an arbitration that was initiated not under

13   two or three contracts, but under eight contracts

14   with different legal entities.  And there was all

15   single paragraph allegations across all eight of        14:38

16   these contracts.  There was not a single contract

17   clause that was mentioned in the demand for

18   arbitration.

19             During the proceedings, you know, the

20   Claimants added counsel as well.  They already had      14:38

21   experienced counsel, they had experienced counsel

22   that does international arbitration.  They brought

23   in an entire team, you know, a firm with a

24   department devoted to international arbitrations.

25   So certainly they would know how to plead their         14:38

Jan 21, 2020                                      159

1    claims.  We don't suggest anything to the contrary.

2            But none of the submissions break out

3    direct or consequential damages.  None of the

4    submissions break out which of the Respondents

5    should be held accountable for any particular        14:39

6    claims.  They provided no quantum expert on direct

7    damages.

8            We will get to this in a second, but

9    Mr. Lapuerta, when asked about this, actually said,

10   "I do not make the distinction between direct or     14:39

11   indirect."

12           So there is no expert here on their

13   alleged direct losses.  But yet they know about

14   that because they presented Mr. Wills, who was in

15   response to Mr. Hillier.  So they certainly know     14:39

16   how to retain a quantum expert who knows how to

17   look at their alleged direct losses.  They chose

18   not to do that.  This is their strategy.

19           So they founded the inducement claim.

20   Again, it really is -- at the end of the day, it's   14:39

21   their all-or-nothing case, and there are no

22   contractual remedies.  We will walk you through.

23   Caterina has touched on a few, but we think it's

24   really important for us to be measured against,

25   well, what do we look at?                            14:40

Jan 21, 2020                                              160

1           Well, we looked at certainly the rules

2     that were applicable here, but above all the rules,

3     the Tribunal's own procedural order, which to us

4     was very clear and I think it will be clear to

5     anybody who would look at this.  In fact, not once        14:40

6     but twice the Tribunal said each party shall

7     present its relief -- at paragraph 25:  Each party

8     shall present its relief sought to the Arbitral

9     Tribunal in a separate section at the end -- at the

10    end of its pleadings, and the Arbitral Tribunal          14:40

11    shall rule solely on the request identified in such

12    sections.

13          Maybe it's a typo, but probably because

14    it's an important point.  It also appears at

15    paragraph 43.  It's not word for word, but it's          14:40

16    almost the same thing.  It says:  The parties shall

17    present the relief they seek in a separate section

18    at the end of their respective submissions,

19    et cetera.

20          Yes, it is a separate sentence, though.            14:40

21    It says:  In the award, the Arbitral Tribunal shall

22    rule only on the claims identified in such

23    sections.

24          And the Tribunal also says in paragraph

25    38:  If you want to object to this, you should           14:41

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                    161

1    object, otherwise you waive your objection to

2    proceeding in this way.

3              So we certainly -- again, here I am

4    really thinking about the safety of an ultimate

5    award.  We comported ourselves, we acted in          14:41

6    compliance with which we think is a reasonable

7    interpretation of what the Tribunal put forward.

8    Roberto -- if we turn -- if we get the exhibits --I

9    have a demonstrative exhibit, that's actually a

10   copy of the next -- we have to go back to her job    14:41

11   of distributing things.  If we look at what -- what

12   we did is because the requests for relief in both

13   the Statement of Claim and the Reply are over

14   multiple pages, we thought it would be interesting

15   to just look at them together.  And what you see is  14:41

16   that they are -- for all practical purposes, they

17   are identical, the Request for Relief.

18             One thing that does change is in

19   Section F, where there is an adjustment to the

20   quantum, and a reference to also the second          14:42

21   statement of Erik Helsen, because he says in his

22   second witness he took into account some of the

23   criticisms that were made regarding his first

24   statement.

25             Those were the only changes in the         14:42

Jan 21, 2020                                            162

1    Request for Relief.  Why is this important?  Well,

2    it is important because between those two

3    documents, we specifically drew their attention.  I

4    mean, you can say they are already held to comply

5    with the Tribunal's procedural order, but we          14:42

6    specifically drew their attention to this in our

7    Statement of Reply, where we said, again, none of

8    those remedies are referenced or claimed in any of

9    the Claimants' Request for Relief.

10             Paragraph 169.  In other words, the          14:42

11   contractual remedies for a lack of performance or

12   supply of defective equipment are not included in

13   the *petita* of the Claimants.  And we go on to

14   explain this.

15             They made no adjustments in their Request    14:43

16   for Relief, even after -- they were clearly on

17   notice.  So again, we believe the result of that is

18   not that they have a chance to correct that now.

19   The result means that if they have not pled claims,

20   the Tribunal has no other choice but to deny them.     14:43

21             The Tribunal, if you go to Question 5,

22   for example, Roberto has already touched on this,

23   I'll just mention it for a different reason than

24   the one that Roberto did, which is with respect to

25   the liquidated damages on Question 5.                  14:43

Jan 21, 2020                                                    163

1          When we look at this the way the --

2     again, I appreciate how the Tribunal put these

3     questions together, and it was also done over the

4     holidays, so it was a bit of a challenge to do

5     this.  But when we look at the question on the          14:43

6     limitation of liability, it really shouldn't be in

7     the section on claims, on the liquidated damages,

8     Question 5 on the liquid damages.  It really ought

9     to appear in the section on 3, Liability and the

10    limitations of liability, because the liquidated      14:43

11    damages are a limitation of liability.  And that's

12    the only purpose for which we pled them.

13          That would be our one response, again,

14    there's no adding on there to Question 5.

15          If I go to Question 17, which is the             14:44

16    issue of the inspection certificates, now I won't

17    address all the points that Mr. Alexander has just

18    made, but I would just simply say that it's not

19    clear to us when they say -- I think we are less

20    clear today than we were before the hearing.  What    14:44

21    do the Claimants mean when they say the

22    certificates are falsified?  I mean, are they not

23    authentic?  Well, no, that doesn't seem to be what

24    they are saying.

25          They even referred to correspondence.           14:44

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                       164

1    They use the same term, "falsified."  It seems that

2    any document that they disagree with, they are now

3    using to be false -- they say the term "falsified."

4    Yeah, they refer to Mr. Hillier's time sheets.

5    They say those were falsified.                        14:45

6         Well, actually, no, if you look at our

7    pleadings, and even Mr. Hillier's statement, we are

8    very clear as to what was being done.  We didn't

9    hide the ball.  We said this is a reconstruction of

10   certain things.  So there was no attempt to hide      14:45

11   from the Tribunal what was taking place.

12        But the most important aspect of this, if

13   we look at the Question 17, and the context here as

14   to how it relates to the claims is there is no

15   allegation in the Statement of Claim or in the        14:45

16   Reply that the Claimants relied on these

17   certificates.  Certainly they couldn't rely on them

18   for their fraud in the inducement claim because

19   these were long after they'd entered into the

20   contract.  So it can't be relevant to their           14:45

21   substantive claim for liability.

22        They rely on them perhaps for other

23   purposes.  We have said, yes, but where is your

24   reliance on them?  The one area where you get a

25   hint of some allegation that they relied is where     14:46

Jan 21, 2020                                    165

1    they say that we provided those.  They don't say

2    they relied on them, but they say, we provided them

3    in order to convince them not to terminate the

4    contracts and to move the business to Chinese

5    companies.                                          14:46

6              How can that be reliance?  In fact, we

7    heard in the arbitration they haven't terminated

8    the contracts, notwithstanding all of the things

9    that had happened since then.  I don't think that

10   is a reasonable sense that they relied on those     14:46

11   certificates, but more importantly, you know -- and

12   we had a nice discussion at the hearing with Mr.

13   Saba on this point, and that was that these

14   certificates were not meant for them to be relied

15   on.  If you talk about the quality certificates --  14:46

16   Jay Alexander mentioned a number of different types

17   of documents, including correspondence from us

18   which he said was false, because he said we were

19   demobilizing from the site.  That's really a

20   pretext and that consecrates a false document.      14:46

21             I don't think that makes it a false

22   document.  I think it makes it a document that we

23   disagree about.

24             But if we go to the inspection

25   certificates in particular, those were inspection   14:47

Jan 21, 2020                                              166

1   certificates that we relied on and that we would be

2   damaged if there is anything that is found to be

3   inaccurate in them.  So, for example, if our

4   inspectors go to the Turner factory and find things

5   are out of order and they sign them off and they        14:47

6   get shipped to site, well, then of course once it

7   gets to the site, someone is going to have to fix

8   it.  That someone would be us, and it's going to be

9   more expensive for us.

10          So the party that would be damaged             14:47

11   from -- that relies on those inspection

12   certificates and would suffer damages is us.  And

13   what you are missing from the Claimants, when they

14   talk about falsified certificates, are those two

15   elements, legal elements:  causation, and what is     14:47

16   the damage from those.

17          We can drive very clearly; if there was

18   something that was inaccurate or falsified in

19   inspection certificates, we know exactly what the

20   causation and damages would be.  The causation        14:47

21   would be we'd have a defect discovered at site, a

22   higher cost of remedying it.  It's very clear.  You

23   will not find that anywhere in the Claimants'

24   pleadings.

25          Then Question 16, I --                          14:48

Jan 21, 2020                                                    167

1                ARBITRATOR SABA:  So fair enough, you

2       just said about your reliance and what would flow

3       from that, if in fact the certificates were

4       inaccurate.  Let's use the word "inaccurate."  And

5       causation, if in fact they were inaccurate, you had        14:48

6       to go back and remedy this, that, and the other

7       thing.

8                Does that go to the question of delay,

9       causation of delay in getting the plant up and

10      operating?                                                 14:48

11               MR. McILWRATH:  If you could point me to

12      a certificate that we relied on, right, and said

13      yes, we checked this off, it's okay to ship, and

14      that information is accurate, again, it's one thing

15      to say it's false; it could be another -- the             14:48

16      inspector just missed it, right?  Out of hundreds

17      of certificates, some might not have been perfectly

18      executed in terms of the inspection.

19               If we then discover -- we discover at

20      site that there is a problem, it could lead to             14:49

21      delay, which we would have LDs that we would be

22      exposed to, and it could lead to cost of

23      remediation, which of course would be on us.

24               Of course, that is the way the contract

25      works.                                                     14:49

Jan 21, 2020                                                168

1           ARBITRATOR SABA:  Okay, but delay is a

2    consequence to the counterparty, not -- if that's

3    not a consequence to you, that's a consequence to

4    the counterparty, isn't it?

5           MR. McILWRATH:  No.  It's a consequence        14:49

6    to us, because we face LDs under the contract.

7           ARBITRATOR SABA:  Sure, but to them too.

8    Don't they --

9           MR. McILWRATH:  To them as well, right.

10           ARBITRATOR SABA:  They suffer a delay.         14:49

11    That's a consequence that they are experiencing as

12    well, right?

13           MR. McILWRATH:  Exactly.  We'd say

14    there's a contractual remedy for that.  And our

15    job -- when we are performing a contract, our job      14:49

16    is -- what we are thinking -- and this is I think

17    true of any vendor of complex machinery.  What

18    you're thinking is I have exposure to liquidated

19    damages.  How can I manage this so that I don't

20    have delays?  Because I don't want to incur -- on a    14:49

21    $95 million contract, $5 million of LDs is quite

22    high.

23           THE PRESIDING ARBITRATOR:  Let us know

24    when we can make a very short break.

25           (Recess taken - 2:50 p.m.)                    14:50

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                                    169

1              (Proceedings resumed - 2:52 p.m.)

2              MR. McILWRATH:  Okay.  We get to instead

3       Question 16, and here I guess I have ambivalence

4       about how deeply we want to get into this.  The

5       question asked was not just litigation.  Again,      14:52

6       there was a request for production for litigation

7       with Turner, but also whether there are any

8       settlements with Turner over this contract.

9              We confirm there was no litigation.

10      We've gone back and we reconfirmed -- as I said at    14:53

11      the hearing, I think I would have known that at the

12      time, and I confirm there was no litigation.

13             Settlement agreements, that was not

14      requested by the Claimants.  Disputed issues with

15      Turner, they might arguably fall within some of       14:53

16      those requests, but you denied those requests.  So

17      we are getting into an area now post-hearing where

18      you are asking us to produce something that was not

19      requested or that you denied.  And I have two minds

20      over this because I think yes or no can be good or     14:53

21      can be bad, but without having the facts in front

22      of us, it is hard to develop this further.

23             I will give you an example.  We know that

24      Shell, for example, was very -- did a lot of

25      inspection.  They did a lot of inspection work of      14:53

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                        170

1      our equipment, because that's what you do.  We know

2      that we did that with Turner, because we have lots

3      of inspection certificates.  We know that IEC did

4      not do that with us, that they were absent in terms

5      of the inspection process.                          14:54

6            So for us to come forward with an

7      agreement that says, look, people were vetting the

8      contract, they were looking at it.  You have a

9      contract that's for between 35 and 40 million

10     dollars of construction work and time and           14:54

11     materials, are you going to have disputes?  Well,

12     of course you are going to have disagreements of

13     different things along the way.

14           And I said that at the hearing.  I didn't

15     know at the time, but I said it's kind of typical    14:54

16     of these contracts for there to be disputes, and

17     you get to the end of the contract and the supplier

18     says, you know, we are entitled to compensation as

19     to certain amounts.  And we say, well, that hourly

20     rate looks high to us.  So there are things like     14:54

21     that.

22           So there is a settlement of those sorts

23     of things as to what falls into the contract.

24     There are also settlements, what we would call

25     warranty claims.  Because you say, all right, there  14:54

ICDR Case N° 01-18-0002-9174

1    were defects, they were verified after you

2    delivered it, now we want you to pay for certain

3    defects.

4              So different types of settlements.

5              You know, I mean, how much do you really       14:54

6    want to know about this Turner relationship?  Do

7    you want to know that we had a dispute over whether

8    they could charge us for Porta Potties?  Porta

9    Potties are outside toilets.  You know, type of

10   materials, contract.  Or the use of golf carts,       14:55

11   because they felt that that made them more

12   efficient, you know, things like this.

13             I would say that if the Tribunal wants us

14   to produce that sort of thing, we are happy to

15   produce it, but we should have an opportunity then    14:55

16   to of course explain the situation.  I think at the

17   end of the day, we could explain it as most things,

18   you know, say this is the normal course, this is

19   what happens when these contracts get performed.

20             But I am reluctant to give an affirmative    14:55

21   answer either way here and to create a record

22   without kind of reopening the factual basis here

23   what this is getting into.

24             ARBITRATOR SABA:  Sorry.  Okay.  So now I

25   am going to ask another question that is in the       14:55

Jan 21, 2020                                        172

1     same vein, let's say, but it does not concern

2     Turner.

3              MR. McILWRATH:  Okay.

4              ARBITRATOR SABA:  All right.  And this

5     arises from the actual testimony by Mr. Hillier and     14:55

6     it concerns Chart and yourselves, and he says --

7     and this is on Day 9, page 98 of the transcript,

8     lines 4 to 6.

9              He refers to having seen a settlement,

10    quote/unquote, between yourselves and Chart.  Now,      14:56

11    here it is, he said it.  You were not asked about

12    it at the hearing, but there it is.  So is it

13    askable now, and how do you respond if it is asked?

14    I am not even asking it.  I'm asking if it's

15    askable and how --                                      14:56

16             MR. McILWRATH:  First of all, let me

17    answer the question with a premise, which is we as

18    -- we're Baker Hughes.  The company is Baker

19    Hughes, we are 36 or something percent owned by GE.

20    We have a very good relationship with Chart.  So        14:57

21    Chart continues to be a company with whom we do

22    work together in the LNG area.

23             Turner, we continue to do work with

24    Turner.  They are ongoing suppliers with us.  There

25    has been no interruption in the commercial              14:57

Jan 21, 2020                              173

1    relationship between the companies.

2             Given that there are no allegations

3    around these items, I mean, I can go back and I can

4    find out if we had a settlement.  I don't know if

5    Mr. Hillier is right or not, honestly.  I don't          14:57

6    know.  I don't know if you know either, if we had

7    any settlement with Chart.

8             But what I would say, though, Mr. Saba,

9    it's kind of when you have a lot of contracts and

10   you have -- and here is one of the problems with         14:57

11   these types of contracts where you have an ongoing

12   commercial relationship.  Typically what you'll

13   have is what's called some type of a frame

14   agreement or a master services agreement, and then

15   as things go on and claims get made, you kind of         14:58

16   adjust it as you go on and you continue with your

17   relationship.  It's just kind of garden variety

18   working together with your suppliers.

19            So I guess we are prepared to do it if

20   you want to do it, but I don't know how we do it         14:58

21   without opening up evidentiary issues, because we

22   would want an opportunity to be able to explain it

23   and provide evidence around it.

24            ARBITRATOR SABA:  Okay.

25            THE PRESIDING ARBITRATOR:  Fair enough.          14:58

Jan 21, 2020                                             174

1              MR. McILWRATH:  Okay.  But, you know, if

2     you -- I would say that if the Tribunal does want

3     to pursue this, I guess counsel was -- the

4     distinction between settlements over sort of the

5     garden variety closing out contract issues versus        14:58

6     settlements of defect claims, those are different

7     things.  I think you might be interested in one and

8     not the other if you decide to pursue that.

9              If we move on to Question No. 1 -- we

10    didn't say we were going to go sequentially here,         14:59

11    so -- Question 1, again, after hearing Jay's

12    discussion this morning, you know, I am not sure --

13    I don't think Jay really answered the question.

14    The question was whether or not they are -- the

15    Claimants are entitled to special treatment.  Let         14:59

16    me go back to the phrasing.  Special consideration.

17    All right.  That's what the question is answering.

18              The answer is no, that they are not

19    entitled to a special consideration.

20    Sophistication under New York law is relevant to          14:59

21    support a claim of fraud.  And that's how they pled

22    it.  They pled this with respect to their fraud

23    claim.

24              First, the one on the law, I will get to

25    that in a second, but they don't cite at any point        14:59

Jan 21, 2020                                    175

1     in any of their submissions any specific

2     misstatement of our expertise -- or our experience

3     and expertise.  They just made very general

4     statements.

5            And we will make a point, and they had an      15:00

6     opportunity to cross or rebut the person who

7     negotiated the contract, Mr. Bresciani.  So we

8     don't think that the fraud claim really is viable

9     anymore.  So sophistication for us is relevant to

10    fraud.  We don't think that they really seriously     15:00

11    pursued fraud at this point.

12           More importantly, though, talking about

13    the points, if you look at the case that Jay cited

14    this morning, which he said -- I think it was

15    CL-28.  I looked it up.  That is *Brass*.  It's a     15:00

16    case that says -- *Brass* v. American Film

17    Technologies.  It's not a case about sophisticated

18    parties or the protections they get.  It's a case

19    about, again, reliance and duties to disclose.

20    Right?  Duties to disclose is different from          15:00

21    whether you have -- an unsophisticated party is

22    entitled to particular protections.  The only

23    reference in that case to sophisticated parties --

24    and I pulled it out.  It's not in your deck here.

25    We just did this afterwards -- is this paragraph      15:01

Jan 21, 2020                                                    176

1    that says the Court says there is no such duty.

2    That's the only authority, the case.

3            Jay, you can look at it.

4            It says -- *Brass* says there is no --

5    "*Brass* does not point to and we are unable to find       15:01

6    any cases in New York or other jurisdictions that

7    have found an informal relationship of trust in a

8    situation like the one at hand, where a

9    sophisticated prospective investor attends a sales

10   meeting with a heretofore unknown corporate              15:01

11   officer.  There is no reason to expand the class of

12   informal fiduciary relationships to include these

13   parties participating in such an arms-length

14   transaction.  Hence, Jensen had no informal

15   fiduciary duty towards *Brass* that would have

16   required him to make full disclosure of the stock

17   restrictions."

18           That's the only discussion of

19   sophistication in that particular case.

20           I think even more important, though, is        15:02

21   what does the sophistication mean, and what does it

22   mean to the parties at hand?  Well, sophistication

23   under New York Law is not about whether or not you

24   yourself are sophisticated.  Otherwise, everybody

25   would be unsophisticated.  I work for an LNG           15:02

Jan 21, 2020                                            177

1    company, but I am certainly unsophisticated in

2    certain technical issues, almost all of the

3    technical issues, but I have access to people who

4    have the expertise and that's what New York law

5    says.                                          15:02

6            So New York law says -- and there is a

7    very good case on point to this, *Unique Goals v.*

8    *Finskiy*.  And the Court there it says -- you know,

9    again, this is a very similar case to the one at

10   hand, where you had a sophisticated international    15:02

11   investor who had expertise in one area and access

12   to resources who stepped into another industry and

13   relied on the expertise of the party in that new

14   venture, because they had the expertise there and

15   he didn't.  A very similar sort of situation to the  15:03

16   one that we are facing here.

17           And the Court there says while he may

18   have lacked expertise in the mining industry,

19   that's the new industry he's getting involved in,

20   he clearly had the resources necessary to obtain     15:03

21   expert advice or indeed do an investigation.

22           That's what New York law says when it

23   talks about sophistication, it's:  Do you have the

24   ability?  And clearly, IEC had such an ability

25   here.  We know from Mr. van den Broeke's testimony   15:03

Jan 21, 2020                                                178

1    but also from the substantial documentation on the

2    record that they are represented by both in-house

3    and outside counsel in this case.

4          We know that they vetted every technical,

5    commercial and legal detail when they were getting        15:03

6    involved into this contract.  We know that during

7    the performance of the contract, that they knew how

8    to hire an EPC, but for some reason they fired the

9    EPC.

10         They decided -- and I put a little screen           15:04

11   here -- the "Do It Yourself."  They decided to go

12   do it yourself, and they would do this themselves

13   without the benefit of having Technip or any other

14   experienced EPC to support them.  Well, that

15   doesn't make them unsophisticated.  That means they       15:04

16   made a decision to cut cost, and they have to live

17   with the consequences of that.

18         Question No. 2 is good faith.  Is there a

19   duty, you ask, about good faith/candor during

20   contract negotiations or performance under New York       15:04

21   law.

22         I think we're in agreement that there is

23   no such duty in contract negotiations.  Contract

24   negotiations, New York just has the same high

25   standards as fraud, or misrepresentation.  So             15:04

Jan 21, 2020                                    179

1    contract negotiations, no.

2             Performance, yes, there is.  In fact, I'd

3    say it's a very well-known claim under New York

4    law.  And I'll speak to Mr. Saba.  If you remember

5    *Wood v. Lucy, Lady Duff-Gordon*, which is -- it's a        15:04

6    wonderful case by Justice Cardozo about the implied

7    covenant of good faith and fair dealing.

8             And that's a covenant that's implied into

9    contracts, and it is available with respect to

10   performance.  And the idea is that you cannot            15:05

11   deprive the other party of the benefits of a

12   contract by interpreting a contract to the latter

13   in a way that may, you know, deprive them of the

14   fruits.

15            They didn't plead that.  There is               15:05

16   absolutely no reference in any of the Statement of

17   Claim or any of the authorities provided to the

18   New York implied covenant of good faith and fair

19   dealing.  And I don't believe that they have made

20   such an assertion today as well.                         15:05

21            If they come back in their post-hearing

22   submissions and say, well, you know, we kind of

23   pled the New York implied covenant of good faith

24   and fair dealing, it's embedded in our contract

25   claims, well, the one of two situations has taken        15:05

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                      180

1     place.

2                One is that they are impermissibly

3     pleading a new claim now, or the implied covenant

4     is the same as their contract claims.  And New York

5     Courts are very clear about this -- and we'll         15:06

6     address this in our post-hearing submissions --

7     it's that if you make a claim under the implied

8     covenant and it's the same as your breach of

9     contract claim, you don't get the implied covenant.

10    It has to be distinct.                                15:06

11               And our case is they have not made that

12    case.  And in fairness, really, it's a question of

13    due process.  Had they pled the implied covenant of

14    good faith, we would have defended accordingly, but

15    you have no discussion of the implied covenant in     15:06

16    our submissions because, again, it was not a claim

17    that was pled.

18               Question No. 3, abandonment.  You've

19    asked -- and again, I think we have different

20    interpretations of this question here -- what         15:06

21    relevance, if any, does the alleged abandonment of

22    the project by the Respondents have, other than the

23    Claimants' argument that it is used to vitiate the

24    exculpatory clause?

25               And our short answer to that is:  What     15:07

Jan 21, 2020                                        181

1    does it mean "other than"?  It goes to the

2    credibility really of their claims that they needed

3    us at site and the urgency that they had to

4    complete the plant [unclear].

5            First of all, one thing that is very         15:07

6    interesting about the way they have pled or they

7    have laid out their abandonment allegations in

8    their reply submission is they only focus on

9    questions of safety.  They say the plant [unclear]

10   is safe, and you'll be -- this is all pretextual,     15:07

11   really.

12           At no point do they say:  What do they

13   need us to actually do their on-site?  We cannot

14   complete these things without you.

15           There is no allegation of anything that       15:07

16   they needed us to do, and we tried to actually

17   elicit that at the hearing, and we really didn't

18   get any answers from them.  I think even the

19   Tribunal tried to elicit that from them.

20           So there is no clarity as to what it is        15:07

21   actually that they need to get these plants from us

22   to get these completed.  We have only four things

23   that are mentioned at various points that were

24   mentioned at testimony:  The VFD, cable issues,

25   supports for the piping and the Flare network          15:08

Jan 21, 2020                                           182

1    calculations.

2            None of those things require us to be at

3    site.  So even if your allegation would be amassed,

4    what do you need?  And Mr. van den Broeke

5    testified:  We are going to complete the plant, we        15:08

6    will be up and running, we'll have Plants 1 and 2

7    too.

8            He testified Trains 1 and 2 will be

9    running in March.  Okay, well, apparently they

10   didn't need us there.  They are going to do it on        15:08

11   their own.  So we think it's -- actually, it's an

12   interesting question when you kind of walk through

13   this aspect.

14           Of course on the facts, on the facts,

15   there is no abandonment.  That's their                   15:08

16   characterization of things.  All of our

17   correspondence talks about demobilization.  We've

18   never said we are abandoning you or we're

19   abandoning the site.  We only had one person

20   there -- this is in the correspondence.  It's all        15:09

21   documented.  We only had one person there.  We --

22   completely undercutting all of their cases that

23   they cite and any allegation of abandonment, the

24   fact that we offered to support them remotely, we

25   even asked that they release materials to us so          15:09

Jan 21, 2020                                      183

1      that we can support them, I think just it's in

2      stark contrast to any of the cases that they cite

3      with regard to situations of true abandonment,

4      where they said, we are never going to support you

5      or the *Soroof* case, which is actually a very good     15:09

6      case to read, the one that they cite.

7              It was a case about -- against a General

8      Electric company.  Again, we don't know what

9      actually happened because these were -- actually,

10     *Soroof* is two cases, and if you go and read this,      15:09

11     make sure you note this, because certain issues

12     were decided on a motion to dismiss.  The Court

13     granted some, rejected others, sent it back for

14     another decision, which they then ultimately

15     decided.                                                 15:09

16             So you actually have Claimants' CL-15 and

17     CL-40, two *Soroof* decisions worth reading.  But

18     *Soroof* was one where it was a case that GE at that

19     time, or one of its divisions, was promoting fuel

20     cells, a fuel cell technology, and they entered        15:10

21     into a joint venture with -- actually, a joint

22     venture with a company called Plug Power, which was

23     producing these fuel cells.  And these two

24     companies, GE and Plug Power, formed an entity to

25     market these globally, and entered into a contract      15:10

Jan 21, 2020                                    184

1    with a Saudi Arabian company to sell them in

2    Saudi Arabia.  That was *Soroof*.  And this was

3    around the year 2000.

4           Well, it turns out that shortly after

5    signing the contract, Plug Power stopped doing any      15:10

6    investment, starting working on other products.  So

7    they never developed the fuel cell.  GE stopped

8    investing in the -- this is the allegations --

9    stopped investing in the product.  And therefore,

10   the Court said that there is evidence here that        15:10

11   there was never any intention or sufficient

12   evidence to ever bring this product into

13   production, the product will never exist.

14          It's a very different situation where

15   you've got people who are actually trying to make a    15:11

16   delivery and to get things up on line and running.

17   And of course you have the fact that we offered to

18   return to site, have an open offer saying just

19   provide us with this documentation.  If they

20   provided us with the information about safety they     15:11

21   provided to you, we probably would have come back.

22   But for some reason they preferred to provide you,

23   the Arbitral Tribunal, with Mr. Dunagan's report

24   about the safeties at site, rather than just

25   telling us and say:  This is what we are doing.        15:11

Jan 21, 2020                                    185

1    Right?

2           If they have gone to these extremes, we

3    would have said -- they could have done much less

4    than that and just shown us the documents that we

5    asked to be seen.  We wanted to carry out one of        15:11

6    our own safety audits at our own costs.  Again, we

7    would have come back.  So there was never --

8    "abandonment" is a term that they used.

9    Demobilization because of safety concerns is what

10   we wrote to them about.                                 15:11

11          ARBITRATOR SABA:  I just want to go back

12   very quickly to -- let me see what we have here --

13   very quickly to page 33, your page 33, your

14   Question 3.  So you have a question in the middle

15   paragraph there right at the end:  "All in IEC's        15:12

16   capability.  Why not doing this in 2016 to 2018?"

17          MR. McILWRATH:  Yeah.

18          ARBITRATOR SABA:  Can you expand a little

19   bit on that question with respect to VFD, cables,

20   supports and Flare during that period of two years?     15:12

21          MR. McILWRATH:  Sure.

22          ARBITRATOR SABA:  Go ahead.  Go ahead.

23          MR. McILWRATH:  Again, if they are saying

24   that we abandoned -- in fact, all of these

25   issues -- start with the DFD.  Argument as to           15:12

Jan 21, 2020                                    186

1    whether or not this is even in our scope of supply,

2    right.  We think the startup could have worked.

3    They didn't want it.  They wanted to do the VFD.

4           We took this on as our cost so it's off

5    the table.  In terms for us, you know, we reduced      15:13

6    our counterclaim by that amount.  We'd say, okay,

7    if the VFD was an issue, why didn't you go ahead

8    and order this six months earlier, or a year

9    earlier?  Why were you waiting -- you know there is

10   also this notion of self-help.  Fix it yourself, go    15:13

11   back and do it, which eventually they did.

12          The question is instead of doing it now

13   at the end of 2019 -- so they did it now at the end

14   of 2019, order the VFD.  What is the reason they

15   couldn't have done that in 2016, 2017, 2018?           15:13

16          Cables.  Another point with cables, we

17   have testimony from the Claimants' expert.  He said

18   -- I think I was the one who asked him:  Do you

19   have any of your concerns if they operate the

20   trains at less than full load?                          15:13

21          He said:  No, there would be no problem

22   if you operate them at less than full load.

23          Okay, well then why don't you put this

24   into operation and then replace the cables --

25   because we know that it's going to take them time      15:14

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                        187

1    to get the full load anyway, and then replace those

2    cables at the time when that would be convenient to

3    do so.

4              The stress piping, well, we know we've

5    ordered additional stress supports -- piping              15:14

6    supports.  They have been sitting there since the

7    beginning of 2019.  We know that they did the

8    analysis with Softec in 2018, right?  We know that

9    because that's also stuff that they are making

10   claims over.                                              15:14

11             And we assume that they also made

12   adjustments to Train 3 with respect to the piping

13   supports, right?  Why didn't you fix it yourselves

14   at that time?

15             Following on all these different issues,        15:14

16   we could go, okay, you are the ones who are

17   developing and providing the plant.  We are

18   providing the trains.  But you are the ones who are

19   doing all the installation work at site.  If you

20   are doing these things now today without us, why         15:14

21   couldn't you have done it two years ago.

22             I think it was the scheduling expert --

23   I forget his name.  He was their scheduling expert.

24             ARBITRATOR SABA:  Lancaster.

25             MR. McILWRATH:  Lancaster.                      15:15

Jan 21, 2020                                    188

1              When I asked him, I said:  What about --

2      why wouldn't you do these things earlier?

3              He said:  Well, it's a question of

4      priorities and how quickly you want to get up to

5      production when you are the owner.                    15:15

6              I don't know if you remember that, that

7      interaction we had with him.

8              ARBITRATOR SABA:  So is your argument

9      that they were obliged to do that?

10             MR. McILWRATH:  If they were going to      15:15

11     mitigate their alleged losses, absolutely.

12             THE PRESIDING ARBITRATOR:  Did you raise

13     that mitigation argument in your pleadings?  I

14     don't remember.

15             MR. McILWRATH:  Mitigation, no, no.  A      15:15

16     fair point.

17             ARBITRATOR SABA:  Okay.

18             MR. McILWRATH:  Question 18.  Jay said

19     something which is -- and I am just wondering if

20     rather than getting into this here, leaving this    15:15

21     for our post-hearing submission.  Jay said

22     something which we just disagree with completely.

23     He says that exculpatory clauses are highly

24     disfavored under New York law.  Nothing can be

25     further than the truth, and we will provide lots of  15:16

Jan 21, 2020                                          189

1    cases that show you that New York is a very

2    pro-business jurisdiction, very pro-contracting,

3    and regularly enforces exculpatory clauses and

4    the -- in order to invalidate an exculpatory

5    clause, the bar is in fact very, very high.  I          15:16

6    think that's probably just something that's better

7    left for our post-hearing submissions and not use

8    the Tribunal's time here.

9            Let's skip to Question 19.  Yeah, I will

10   skip 19.  If we go to Question 20, Question 20, the     15:16

11   categorization of damages.  So we really see the

12   limitation of liability clause really breaking out

13   into three broad categories of losses:  You have

14   direct losses, direct damages, within the common

15   law we would typically call consequential or           15:17

16   indirect damages under which you have all these

17   other categories.  There's a level of -- this is

18   sort of the department of redundancy department in

19   terms of -- and the reason you do that when you are

20   doing these contracts is because these are very,       15:17

21   very important to the contracting parties.

22           So you want to make sure that okay, under

23   the definition of New York law, I am safe once I

24   have said that we are excluding any liability for

25   consequential losses.  That really ought to be         15:17

Jan 21, 2020                                    190

1    sufficient.  But contract lawyers, like my

2    colleague Georgia down here, you know, they want to

3    add the boots, the suspenders, and some buttons and

4    some hats, and all kinds of other apparel, just to

5    make sure that they are very well protected.  And        15:17

6    so I think you've got an excess of drafting just to

7    say, you know, we're really, really serious.  This

8    is all excluded under this contract.

9            And there is a third category which I

10   don't think it's worth talking about, because            15:17

11   they're not being requested, which are exemplary

12   damages or also called punitive damages.  I don't

13   think it's something we could spend time on.

14           Direct damages, again, I am now just

15   tempted to say, let's just leave this for the            15:18

16   post-hearing submissions, but I will say that Jay's

17   definition of direct damages might qualify him to

18   be a judge in Florence under the civil law, where

19   direct damages are basically anything flowing from

20   the breach.  But that's not New York law.  And we        15:18

21   will say that your attempt to take a civil law

22   interpretation and bring it into New York is

23   just -- you know, there are no cases in New York

24   that say that you can possibly do that.

25           Consequential damages are actually most          15:18

Jan 21, 2020                                           191

1    typically defined as those that include lost

2    profits, but, you know, they are -- anyway,

3    probably best left for post-hearing submission.

4    I'll get to Question 21 here, which is --

5             THE PRESIDING ARBITRATOR:  Sorry, sorry.    15:18

6    Before going to Question 21, do you agree with

7    Mr. Alexander's statement that a gross negligence

8    is equivalent to willful misconduct and that it is

9    a matter of New York public policy that in those

10   cases, clauses of limitation of liability don't     15:19

11   apply?

12            MR. McILWRATH:  There are two parts to

13   your question.  The first part, we would say that

14   the New York cases -- actually, maybe you guys

15   might agree -- they are not perfect, and I'm not     15:19

16   the only one that says[unclear] it's the same

17   standard, but when you read the cases, it looks

18   like it's pretty much the same.  At least in my

19   reading, it doesn't seem like there is any

20   substantial difference between willful misconduct    15:19

21   and gross negligence.

22            Now, whether or not you can use that to

23   vitiate I think also depends on a number of

24   circumstances which maybe better left for the -- in

25   addition to the causation elements which need to be  15:19

Jan 21, 2020                                          192

1    addressed as well.  I'd say we don't necessarily

2    agree on that, because there are a number of

3    qualifying factors where I think that you would

4    still apply those.  And that's a very fact-related

5    issue in any event.                                  15:20

6           THE PRESIDING ARBITRATOR:  I ask this

7    question to both parties because under Spanish law

8    and under German law, in some cases, both concepts

9    are not equivalent as far as limitation of

10   liability clauses.  So that's why I am interested   15:20

11   in New York law.

12          MR. ALEXANDER:  In our reply, I'll want

13   to make sure you understood my answer correctly.

14          MR. McILWRATH:  Question 21:  What

15   categories do these claims of damages fall?  Now     15:20

16   again, these are not damages that come from --

17   these are not damages from a quantum expert.  We do

18   not know -- we've had no independent verification

19   that the Claimants have incurred any of these

20   costs.  No one has looked at these.  They could      15:21

21   have had Mr. Wills come in and look at these and

22   look at whether or not these were reasonable,

23   whether they were real, they were reasonable,

24   whether they were caused by breaches of the

25   Respondent.  None of that was done.                  15:21

Jan 21, 2020                                              193

1              It has come from a witness who is

2    employed by the Claimants, and he says that they

3    are direct.  In our view, they are all

4    consequential losses because they are beyond our

5    scope of supply.  We could make arguable exceptions      15:21

6    for two areas:  One is the VFD for which we

7    accepted that cost anyway.

8              Again, it's arguable, but since we have

9    already accepted, I say, okay, well, the VFD might

10   fall within that, because if you were to determine      15:22

11   that that was within our scope of supply and that

12   we had to provide it, they said okay, whether you

13   had to remedy a defect in our supply, that was the

14   cost of remedying it.  That is a direct loss as

15   defined by New York law.                                 15:22

16             The only other item in this entire list

17   that Mr. Helsen has provided is what he calls the

18   additional investment in remediating the plants,

19   which he put as to be determined.  Again, this is

20   the question of -- it's not determined at the time      15:22

21   of the hearing.  Again, and we asked these

22   questions to the Claimants' witnesses and their

23   experts:  What does it need in your view?

24             The best answer we got were cables,

25   piping supports, and the VFD.  The only quantum we      15:22

1   have of those is what we have provided and what we

2   have accepted at this stage.

3           So first, these are all consequential

4   losses.  They are all excluded by the contract.

5           ARBITRATOR SABA:  Excuse me.  Did you say       15:23

6   that other than those two items, you view all these

7   other items if they are valid, whether or not they

8   are valid, as a claim for consequential damages?

9   As consequential damages.  If they are damages, if

10  they have been suffered, you view them as             15:23

11  consequential.

12          MR. McILWRATH:  I would say not only do I

13  view them, but New York law is quite clear on these

14  points.  These are all consequential losses.  I

15  mean, working back up, impact loss of warranty,       15:23

16  whatever that means, that's a consequential or

17  compensation for TLP(?), loss of financial income

18  during delay, OPEX incurred during delay.

19          Then we have the additional investments

20  in remediating plans.  Okay, I could see that being   15:24

21  a direct loss.  Right?  You are remediating

22  defects, you know.  But the others are not -- the

23  first item, equipment for removing unstabilized C3

24  plus, that would be the HHR, but that's a

25  consequential loss.  They bought that because they    15:24

Jan 21, 2020                                        195

1    wanted to operate in a certain way.  That's not

2    something that we would say is remediating

3    something that we provided.  What we provided can

4    work according to the contract.  They decided to

5    operate it differently.  They provided something          15:24

6    else.  It's consequential.  It's not a direct

7    damage within our scope of supply.  They're not

8    fixing something that we provided.

9         Anyway, just before these points on

10   question with respect to -- on Question 21, we have        15:25

11   these other problems, as we said before, on the

12   characterization of the direct damages.  Even if

13   you do accept the direct damages, I don't know how

14   you can issue an award, when they don't say if they

15   were incurred by Greenville or IEC.  There is no           15:25

16   effort by them to break them out.  We are certainly

17   not going to go to the task of breaking out and

18   making their claim for them.  That's not our job.

19        Without any other sort of validation or

20   causation -- also importantly, there was no effort         15:25

21   to categorize any of these as whether or not they

22   were delay related, because obviously if these

23   costs were incurred related to -- what I would call

24   the D word, which is Delay, well, then those were

25   things that would have been compensated under the          15:25

Jan 21, 2020                                          196

1    contract by the application of the liquidated

2    damages provision.

3         So if they were to have had an expert

4    that went through the many, many items of

5    compensation that Mr. Helsen attached to his        15:26

6    witness statement, I think an expert would have

7    said, well, I need to categorize certain of things

8    as relating to delay, because those are covered by

9    a particular contractual remedy.  So you can't

10   cover it, right?  That's not fixing something.      15:26

11        ARBITRATOR SABA:  So again, I am going

12   back to the question consequential versus direct.

13   Do we now understand or should we understand, from

14   what you just said, that if any of these items

15   could have been satisfactory evidence of proof or   15:26

16   authentication and testimony attributable to delay,

17   that was the responsibility of the Defendants, the

18   Respondents, then they would be -- they could

19   properly be considered direct damages?

20        MR. McILWRATH:  I think the question is         15:26

21   we don't know which of the costs that Mr. Helsen

22   put in could be considered.  There are lots of

23   invoices.  I invite you to take a spin through

24   them.  There are some in there, for example, the

25   purchase of nitrogen, if you go through these by     15:27

Jan 21, 2020                                        197

1    the invoices, or he puts in; he has invoices for

2    work on the foundations, right?  Is that even in

3    our scope?

4             If someone were to go through those and

5    say, well, wait a minute, how does this relate to          15:27

6    the contract itself to LNG trains or to remediate

7    the work?  Yeah, but they would have to do that.

8             ARBITRATOR SABA:  I understand that.  I

9    understand you are looking for proof or evidence of

10   that kind of claim and suggesting that there is            15:27

11   nothing on the record really to support that, but

12   he is saying here, for example:  OPEX incurred

13   during delay.  And I think you have said, no,

14   that's consequential.

15            If it's OPEX incurred by virtue of delay,         15:27

16   it is still consequential?  I am trying to figure

17   the D word, I am trying to understand the D word.

18            MR. McILWRATH:  Operating expenditures

19   are -- if it's just operations of the plant apart

20   from the other exclusions, right, you will be              15:28

21   excluded the damage claim.  But it's operating the

22   plant, they are not fixing anything that we have

23   provided, right?  I mean, direct losses are

24   fixing -- doing the repair work to put these things

25   into operation.                                            15:28

```
 1              It's not the lost profits or the other
 2      costs that they might be -- again, by the way,
 3      those are not LNG Trains 1 and 2 expenses.  Those
 4      are plant expenses.  We supplied trains -- the $95
 5      million into a $500 million plant.  So if they are      15:28
 6      incurring operating expenses on a $500 million
 7      plant, that's not a direct cost relating to our two
 8      trains.
 9              ARBITRATOR SABA:  That goes to -- I
10      appreciate that observation.  To me, that would go      15:29
11      to the evidentiary question.
12              Let me just -- let ask a question
13      harshly.  OPEX incurred during delay, you say it
14      applies to the entirety of the plan.  Let's suppose
15      there is evidence, no, actually this is what was        15:29
16      incurred with respect to 1 and 2, Trains 1 and 2.
17              Furthermore, we incurred these expenses,
18      says the Claimant, because the plants didn't start
19      up on time and the delay is entirely attributable
20      to misconduct, wrongful conduct, gross negligence,      15:29
21      whatever, by GE.  Just pause at that for a moment.
22      That's why I say it's harsh.  Pause at that.
23              Is that claim then for 75 million or
24      less, due to delay caused by GE's failure to
25      perform that contract, or to do so being grossly        15:30
```

Jan 21, 2020                                    199

1    negligent, is that a consequential or a direct

2    damage?

3          MR. McILWRATH:  So if I understand your

4    question right, your question is expenses from

5    operating while you are not operating, right,        15:30

6    because they are saying we are not operating

7    Trains 1 and 2, so we had operating expenses,

8    right?

9          ARBITRATOR SABA:  Yeah, I mean -- okay.

10   Let me just -- whatever we had to relay out,        15:30

11   whatever it costs us to maintain things, keep

12   things going, ready, what we had already done for

13   the day when finally these plants would come

14   on-line, whatever we were spending during that

15   time; because they had not come on-line when we     15:31

16   expected them to, this is the question, and that

17   difference in time, let's call it a delay, is

18   directly attributable to the Respondent.

19          Is what we incurred and expended during

20   that period attributable to a delay caused by the   15:31

21   Respondent, is that a direct -- I am just asking is

22   it a direct or a consequential damage, in your

23   view.

24          MR. McILWRATH:  In my view, it's -- no,

25   it's not.  It's not a loss.                          15:31

Jan 21, 2020                                        200

1              ARBITRATOR SABA:  It's not.

2              MR. McILWRATH:  Now we are getting into

3       another Cardozo decision, which would be the

4       famous -- the woman who is injured at the train

5       station.  I always remind these guys and I can't        15:31

6       remember the name.  Pasquale -- not Pasquale,

7       that's a bar in Florence.  The famous case of --

8       *Palsgraf*, thank you -- *Palsgraf*.

9              We are getting into, you know, how

10      foreseeable, how predictable than what's the           15:32

11      causation.  And I think there are levels there of

12      causation that we would need to take a look at.

13      The *Palsgraf* case is this case under New York law

14      -- it's is a terrible case.  There is this woman,

15      she is an immigrant, she is walking in the train        15:32

16      station, and there is a man carrying a bag of

17      fireworks with him, and one of the station

18      attendants pushes her -- the man, not her -- pushes

19      the man with the bag of fireworks.  He falls, the

20      fireworks go onto a train, they get lit up.  They      15:32

21      go across the train track, they hit the scale.  The

22      scale falls down, and it injures Mrs. Palsgraf.

23              And then the question really is where do

24      you draw the line.  And it's a big discussion as to

25      whether or not these are duties -- do the train        15:32

Jan 21, 2020                                                201

1    station owe Mrs. Palsgraf a duty of care or is

2    it actually -- at least in that case, the

3    dissenting opinion argues it's just a question of

4    where do you draw the line in terms of the linkage,

5    you know, how far down the line is it foreseeable        15:33

6    and what's the causation.

7            So I think really to answer your

8    questions, we'd want to look at the cases -- there

9    are probably analogous cases.  If there had been a

10   claim quantified in that respect, I think I would       15:33

11   have looked at to find, well, what do New York

12   cases say about whether or not this is

13   characterized properly as a direct or a

14   consequential loss.  Because there is a lot in New

15   York exactly on this sort of issue.                     15:33

16           ARBITRATOR SABA:  Okay.  All right.

17   Thank you.  Let me just turn quickly.  This may be

18   a pedantic lawyer's point.  I've been known to be

19   pedantic.  Let me just make sure -- here it is.

20   17.4 of the contract, Equipment Contract.  We are       15:33

21   in a clause in a contract that deals with damages

22   for delay, and everywhere in that clause the

23   reference is to direct damages.  Am I right, 17.4?

24           MR. McILWRATH:  No.  17.4 is about

25   defects.  We are in the warranty clause.                15:34

Jan 21, 2020                                                    202

1              ARBITRATOR SABA:  I see.  Just a second.

2    Yeah, okay, fine.  In 17.4, we are referring to

3    direct damages, are we not?  17.4(i).  So direct

4    damages.

5              MR. McILWRATH:  Yeah.                           15:34

6              ARBITRATOR SABA:  Now 17.4(ii).  There is

7    a phrase there that I found curious.  It says:

8    Loss of -- if Buyer is deprived of a substantial

9    part of the benefit of the plant, that appears to

10   be, at least as I read this casually, in 17.4(ii),   15:35

11   the loss of a substantial benefit of the plant, I

12   take to be, under this clause, a direct damage.  Am

13   I wrong?

14             MR. McILWRATH:  Repeat the question.  I

15   was looking for the language.                          15:35

16             ARBITRATOR SABA:  Is the loss of a

17   substantial benefit of the plant, substantial part

18   of the benefit of the plant referenced here in

19   17.4, would that be a direct damage?

20             MR. McILWRATH:  No.  This is -- Mr. Saba,   15:35

21   this is about termination.  I mean, this is about a

22   fundamental breach so you can terminate, and then I

23   think the damages would flow from that.  But this

24   is not -- I don't think it talks about damage.

25             ARBITRATOR SABA:  Well, (i) does.  (i)       15:35

Jan 21, 2020                                    203

1       talks about direct damages.

2               MR. McILWRATH:  Direct damages, right.

3               ARBITRATOR SABA:  That's all I am asking.

4       (i) says direct damages.  Does (ii) involve direct

5       damages?                                          15:36

6               MR. McILWRATH:  No.

7               ARBITRATOR SABA:  Thus loss of a

8       substantial part of the plant would not be direct

9       damages?

10              MR. McILWRATH:  Yeah, that's if -- it's    15:36

11      not remedied.  In other words, if we are unable to

12      provide that remedy, they can terminate.  We would

13      negotiate an equitable result, and if they are not

14      satisfied, they can terminate.  It's a remedy for

15      them.  To me, that's not a damages clause.         15:36

16              ARBITRATOR SABA:  Okay.

17              MR. McILWRATH:  Am I missing something?

18              ARBITRATOR SABA:  No.  That's a remedy.

19      That's a remedy.  But they would not be -- then if

20      they lost a substantial part of the benefit of the  15:36

21      plant, does this mean their exclusive remedy is

22      termination?  There is no claim for damages.  Is

23      that how you read that?

24              MR. McILWRATH:  No, I think you could

25      terminate and claim for damages, but that's a       15:37

Jan 21, 2020                                            204

1    different claim, yeah.

2            ARBITRATOR SABA:  You are terminating

3    claim for damages?

4            MR. McILWRATH:  Typically I think that's

5    what happens.  You terminate a contract and you        15:37

6    claim for damages.  I don't think that if you

7    terminate, you are left without remedies, you know.

8    But you have the remedies that are available to you

9    under the contract or at law.  Right?

10           ARBITRATOR SABA:  Would the claim for          15:37

11   damages in that case, where the contract was

12   terminated for loss of a substantial part of the

13   benefit of the plant, would that in those

14   circumstances, where you have terminated, be a

15   claim for direct damages?                              15:37

16           MR. McILWRATH:  I think -- no, I think

17   what we would do in a case -- again, we're walking

18   through a situation that is way beyond what has

19   been pled and argued by the parties.

20           ARBITRATOR SABA:  Understood.                  15:37

21           MR. McILWRATH:  Okay.  But I think if

22   they were to have terminated and sued us for

23   damages, right, we would have said, fine, but you

24   are still held to all of the other contract

25   provisions, including the limitations of liability    15:38

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                        205

1    which exclude all of those other -- which are very

2    specific as to the categories, which are excluded

3    in terms of calculating what would be a direct -- I

4    think at that point, we have to take a look at what

5    are the damages that they are claiming as a result        15:38

6    of termination.

7             ARBITRATOR SABA:  Okay.  That's why I

8    characterize it probably as a pedantic point, but I

9    was very curious because Mr. Helsen, of course, has

10   referred to loss of use of the plant.  It's one of        15:38

11   the items listed.  That's all.  I am just looking

12   at the contract language, and so on.

13            MR. McILWRATH:  But 28.2 also gives you

14   the other remedies for Seller's default.

15            ARBITRATOR SABA:  All right.  Okay.             15:39

16   Okay.

17            MR. McILWRATH:  I would say we are

18   getting -- this also highlights maybe one of the

19   dangers of us trying to discuss the hypothetical

20   case that has not been pled.                              15:39

21            ARBITRATOR SABA:  No, no, I understand.

22   I am just looking at contract language.  That's

23   all.

24            MR. McILWRATH:  By the way, we prepared

25   this slide, but I won't -- we forgot to put it in.        15:39

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                    206

1    We have it.  It's not in your deck here.  Just in

2    terms of trying to get clarity -- you don't have it

3    in your printed copy, but here's an excerpt of --

4    we raised this issue repeatedly.  We literally put

5    this question to Mr. Lapuerta, the Claimants'          15:39

6    quantum expert, as to -- he has a Harvard law

7    degree.  And we said:  So you would know the

8    difference between direct and indirect damages.

9           And he said:  Absolutely not.  I know

10   enough from Harvard Law School that this is            15:40

11   something that people can spend a lot of time

12   debating, and I don't know exactly where to draw

13   the line.

14          We asked him:  And you have not attempted

15   to draw that -- you've been asked to draw that         15:40

16   line, have you?

17          He said:  I have been asked to estimate

18   everything.  So it includes direct and indirect.

19          And so the useful way of proceeding is to

20   have some understanding of what the people believe     15:40

21   direct is, and I can tell you whether it's included

22   or it's not.  This was the discussion that we had

23   at the hearing.

24          Mr. Lapuerta, in terms of the losses,

25   just takes what he received literally verbatim from    15:40

Jan 21, 2020                                             207

1    Mr. Helsen and puts them into his model that he

2    uses, which is as good as what goes in.  It's the

3    garbage-in / garbage-out model.  If you put garbage

4    in, garbage is going to come out with no vetting of

5    it.  And he didn't purport to have vetted anything        15:41

6    that was in Mr. Helsen's deck of information,

7    right?  He said that.

8             And we gave him this opportunity then to

9    try to say, well, where is the direct damage?

10            He said:  I know enough not to make that          15:41

11   distinction.

12            Going on to Question 22, these are

13   different scenarios.  Again, I think we are better

14   off just leaving this for our post-hearing

15   submission for the most part.  But we would say          15:41

16   right now we're just going to highlight where we

17   think under any of the scenarios -- by the way, we

18   have difficulty in understanding what liability

19   would attach if there is no negligence.  That's one

20   that left us a little bit confused as to what does       15:41

21   that mean, what liability if no negligence.  If

22   there is no negligence, there is no breach, why

23   would there be liability.

24            But as to the other scenarios, we think

25   that they have a real problem in showing that they       15:41

Jan 21, 2020                                          208

1    have demonstrated losses of any type and any

2    causation between those losses, including the

3    different scenarios put forward and the damages

4    that they are claiming.  So...

5              THE PRESIDING ARBITRATOR:  You are            15:42

6    inviting me to ask academic questions.  There is a

7    breach of contract and you proved that a certain

8    clause had been breached.  You have to prove

9    negligence on top of that, or is it not necessary?

10             MR. McILWRATH:  I don't think so under        15:42

11   New York law.  I don't think the breach --

12             THE PRESIDING ARBITRATOR:  That probably

13   was the sense of the question.

14             MR. McILWRATH:  Yeah, okay.  Okay.

15             Question 23.  Evidence on the record to       15:42

16   deliver -- and this is one of these questions that

17   we feel is maybe -- we understand why you are doing

18   this; you are highlighting some of the issues with

19   the Claimants' affirmative case.  From our point of

20   view, that's what's being done here.                    15:42

21             We would point out a correction here,

22   that it's not nine and 12 months.  It's 10 and

23   13 months.  Because there is a four-week grace

24   period before liquidated damages are imposed.  So

25   that's the actual timing.                               15:43

Jan 21, 2020                                              209

 1              Again, it's in the liquidated damages

 2      clause.  It says specifically they should not be

 3      imposed before the end of the four-week grace

 4      period.

 5              But more than that, I think this is one          15:43

 6      of those questions that is -- it's kind of like

 7      asking someone to prove -- I mean, it's fair to ask

 8      them to prove that we couldn't, but it's a more

 9      difficult thing to prove that we could.  It's like

10      asking someone:  Well, prove that you are faithful     15:43

11      to your spouse.  Right?

12              Well, you know, to prove somebody is

13      unfaithful, you can think very clearly of what the

14      evidence would be of unfaithfulness, but to prove

15      that somebody is faithful, I don't know what to        15:43

16      say.  Well, you got married.  Well, but maybe you

17      didn't abide by that contract.  Okay, well, then

18      provide proof that you didn't.

19              So I think the question in terms of

20      putting forward a positive case that we intended to    15:44

21      is a bit unfair with respect to who has the burden

22      here of putting forward that we didn't.

23              We would say that though even adding the

24      ten or 13 months, we did lose a month of time just

25      in terms of where our heads were, because there was    15:44

Jan 21, 2020                                          210

1   this negotiation over going from pressurized to

2   atmospheric storage, and that did cause us to go

3   beyond I think what the business was thinking at

4   the time when they signed the contract.

5           I mean, you know, the main point is          15:44

6   it's -- I think is that it is we don't -- under

7   New York law -- although I think the evidence is

8   that we fully intended to comply with the contract.

9   That's not what New York law requires.  New York

10  law doesn't -- this is also the Claimants' cases.    15:44

11  New York law does not require you to be in a

12  position to actually perform the contract when you

13  sign it.  New York law -- and the courts are very

14  clear.  You just have to be able to make sure that

15  you made an attempt to perform the contract.         15:45

16          And there are cases that deal with this

17  where you have a clause similar to the one that we

18  have in this contract.  We have a clause here about

19  using commercially reasonable efforts to avoid

20  delays, and this is equipment contract, Article      15:45

21  6.2(v):  "Seller shall, in consultation with buyer,

22  use commercially reasonable efforts to minimize or

23  remove the actual or anticipated delay and

24  consequences thereof."

25          And there are other steps here that are       15:45

Jan 21, 2020                                211

1    obviously not followed.

2              ARBITRATOR SABA:  So a contract under

3    New York law is a contract to make reasonable

4    efforts to comply with the obligations.

5              MR. McILWRATH:  Yes.  To make an          15:45

6    attempt -- to make an attempt to comply.  For

7    example, you take the case that they give, one of

8    the cases is *Apache*.  Right?  *Apache* is this case

9    -- I forget, it was an oil and gas company.  It was

10   drilling in China.  *Apache* said:  We are not going  15:45

11   to drill any more wells.  It's an oil and gas.  No,

12   we want you to drill them.  They said:  No, we are

13   not going to.  They absolutely refused, right?

14             So that was a case where they did not

15   attempt to comply.  Right, that was so -- there      15:46

16   were no efforts at all in that case.

17             So if you actually look at *Soroof,* the

18   case that Jay mentioned this morning.  Again, I

19   invite you to read both cases.  It says:  "So long

20   as the GEFCS" -- this was this joint venture entity  15:46

21   -- "used reasonable efforts in its attempt to

22   manufacture the fuel cells, the best efforts

23   clause" -- this was best efforts -- "the best

24   efforts clause imposed no obligation to provide any

25   cells" -- that would be fuel cells -- "much less a   15:46

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                          212

1     quantity sufficient to distribute throughout Saudi

2     Arabia.  Put differently, reasonable efforts to

3     supply a product are not necessarily the same as

4     actual success in supplying a product."

5          Your point --                                  15:46

6          ARBITRATOR SABA:  No, my point is a

7     little bit different.  I have undertaken a -- I

8     signed a contract with you to deliver a

9     Stradivarius violin in three weeks' time.  The only

10    obligation I have under New York law is to really   15:47

11    make a reasonable effort to get that violin to you

12    in three weeks.  I don't have an obligation to

13    actually deliver it to you in three weeks.  It's

14    not a firm obligation.  There is a lot of

15    difference between reasonable effort, best effort,  15:47

16    and firm obligation.

17         MR. McILWRATH:  Different -- different --

18         ARBITRATOR SABA:  There is a deadline to

19    supply that contract -- (overspeaking)

20         MR. McILWRATH:  -- yes, you are correct.     15:47

21    But this is a great point.  You are correct:

22    Different claim, different remedy, right?

23         ARBITRATOR SABA:  I'm getting at the

24    obligation, the strength of the obligation.

25         MR. McILWRATH:  No, no, no.  Mr. Saba,       15:47

Jan 21, 2020                                    213

1    they are advancing these in respect of fraud,

2    right?  They say when you signed the contract, you

3    knew that you were not in a position to deliver

4    these things, right?

5           Now, if you don't -- we signed a              15:48

6    contract.  If we don't deliver, we are held to

7    contractual remedies.  They are saying:  We don't

8    want the contractual remedies.  We want to hold you

9    accountable for damages for fraud.  Right?  You

10   signed your contract with me for the violin, and     15:48

11   you have no intention and no access to

12   Stradivarius, and you've never been to Cremona and

13   don't even know they come from Cremona.  Right?

14   Cremona, right.

15           ARBITRATOR SABA:  Cremona.                    15:48

16           MR. McILWRATH:  Thank you.

17           Then, you know, that may be a fraud.  And

18   I am entitled to fraud damages.  But you signed a

19   contract.  Look, you want a music store, you got

20   some guitars, you got some ukuleles, you got some     15:48

21   mandolins, you might have a Stradivarius too.  I

22   don't know.  You say, I'll try to get a

23   Stradivarius.  You make reasonable efforts, you

24   don't get it.  I got to buy my Stradivarius from

25   Mr. Azzali instead.  So I get my contract damages,    15:48

Jan 21, 2020                                          214

1    which is the differences between what he agreed and

2    what I agreed with you.

3              ARBITRATOR SABA:  I understand that.  All

4    I was asking -- thank you for that response.  All I

5    was asking is in that very, very simplistic example      15:48

6    of a contract to deliver this thing by this date, I

7    am asking about the strength of the obligation you

8    have undertaken as the party who would deliver, not

9    what your damages are if you don't deliver.

10             What is the strength of your obligation?       15:49

11   Do you have a reasonable efforts obligation, do you

12   have a best efforts obligation, or do you have an

13   unqualifiedly firm obligation to deliver at that

14   time?

15             MR. McILWRATH:  With respect to DLA, we         15:49

16   had an obligation to use commercially reasonable

17   efforts, which is a phrase that is adequately

18   defined by New York law, to mean that we have to

19   try to meet the obligations that we have signed up

20   to.                                                       15:49

21             ARBITRATOR SABA:  Okay.  All right.

22   Thank you.  Thank you.

23             MR. McILWRATH:  And the evidence on the

24   record, what is the evidence?  You asked actually

25   what is the reference.  I just spoke about the            15:50

Jan 21, 2020                                    215

1     burden and what the law is.  But what is the

2     evidence on the record?  Well, the evidence on the

3     record is we signed the contract against -- like,

4     you are faithful to your spouse, you got married.

5             And Jay mentioned this morning the          15:50

6     reasons that they didn't call Alessandro Bresciani,

7     who is the vice president of our company who signed

8     the contract on our behalf.  Well, he didn't

9     actually say in his witness statement that the GEOG

10    was capable of delivering these in nine to          15:50

11    12 months.  Why would he say that in his witness

12    statement?  But what he does say in his witness

13    statement is that he negotiated the contract with

14    Mr. van den Broeke, that Mr. van den Broeke

15    expressed a lot of concerns about being able to     15:50

16    deliver.  He talks about why they went and they

17    outsourced certain components to Turner.  He talks

18    about breaking out the modularization.  And he

19    specifically says IEC was -- this is at

20    paragraph 15 -- was very active in subsequent       15:51

21    negotiations and there were several offers back and

22    forth.  IEC reviewed and scrutinized the contracts

23    in every detail, technical, commercial and legal.

24            He covers the contract negotiation.  He

25    is the guy who signed the contract.  So simply to   15:51

Jan 21, 2020                                          216

1    suggest, well, he didn't actually say words that we

2    wanted to contradict, I think that's a bit

3    disingenuous.

4            I think equally relevant are what does

5    that contract contain.  We've discussed this.  It        15:51

6    contains liquidated damages for delay.  So we

7    signed a contract, we are agreeing that we're going

8    to be punished if we don't make it on time.  We are

9    a commercial company, we are operating, we make

10   money, we don't sign contracts thinking that we are      15:51

11   going to not perform them and expose ourselves to

12   penalties, contract penalties.

13           The contract included bonus for early

14   delivery.  Why do we negotiate a bonus for early

15   delivery if the intention was not to --  again,          15:52

16   this is a highly negotiated contract.  Why would we

17   include them if we didn't want to meet those

18   deadlines?

19           We had milestone payments and delivery

20   dates that we signed.  We are going to make money        15:52

21   if we deliver.  Well, again, if we are not going to

22   deliver on those deadlines, why did we sign up to a

23   contract that is structured that way?

24           We have a contract with Chart for the

25   Cold Boxes which provides for the Cold Boxes to be       15:52

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                            217

1    delivered the 10th of June.  Again, the dates slip

2    a little bit when you have to add in the four weeks

3    for delay and some time that we lost because of

4    some changes to the storage.  But that shows that,

5    again, we were placing the contracts even as we go          15:52

6    along, the mind set was we are trying to meet these

7    delivery deadlines.

8             This is the Change Order Request 19,

9    March 31, 2015, even after we signed the contract.

10   So several months later, we agreed to revise the           15:52

11   contract with a new delivery date.  And what did we

12   change?  We changed one week.

13            So not only did we think at the time that

14   we were signing the contract in September of 2014,

15   but even as the time passed, we get to March, there        15:53

16   is still a sense that we can meet those delivery

17   deadlines or maybe fall within that short window.

18            To the extent that -- again, it's not our

19   burden and it's difficult to prove an obligation,

20   an intention of the sort.  I think there is               15:53

21   considerable evidence on the record to show that --

22   actually it's quite a bit to show that we had every

23   intention of fulfilling those obligations.

24            And finally, to wrap up a bit -- actually

25   a point to make sure that -- one thing:  We did not       15:53

Jan 21, 2020                                          218

1       think that Question 26 was for us to answer, and so

2       we have no comments on 26, and we didn't hear any

3       comments from the Claimants this morning on

4       Question 26.

5               THE PRESIDING ARBITRATOR:  Thank you very      15:54

6       much.  We will make a 10-minutes break before

7       rebuttal.

8               (Recess taken - 3:54 p.m.)

9               (Proceedings resumed - 4:04 p.m.)

10              THE PRESIDING ARBITRATOR:  Mr. Alexander.      16:04

11              MR. ALEXANDER:  Thank you.  First, as I

12      said, I want to make sure we're really clear on

13      this gross negligence, willful misconduct point.

14      New York law defines what gross negligence is and

15      it's basically reckless indifference, and I gave      16:04

16      you some examples of the kinds of things.  And

17      there's willful misconduct, which is basically bad

18      faith.

19              So they are two different things, but

20      they are both equally applicable and relevant to     16:04

21      overturn an exclusionary clause.  And both of them

22      need to be proved only by a preponderance of the

23      evidence.  And in neither case does the extra

24      [unclear] definition matter, because it's a

25      New York law definition that matters.                16:05

Jan 21, 2020                                              219

1           Okay.  I am going to just try to hit on

2    some high points.  I don't think that I'll have

3    time to try to touch everything.

4           Concurrent delay.  We heard that the HHR

5    system is a concurrent delay and it's our            16:05

6    responsibility.  Just two really quick answers on

7    that.  First, it's not on us.  The HHR system is

8    required because of a defect and deficiency in what

9    they delivered, and therefore, to the extent we

10   went out and purchased one in order to mitigate      16:05

11   their effect, that's not concurrent delay on our

12   part.  And second, Mr. Lancaster explained the HHR

13   is not actually on a critical path, and therefore,

14   it's not a delay that is relevant to the analysis

15   of delay.                                            16:06

16           Okay.  The inspection certificates, again

17   really quickly.  Our argument has not been that is

18   a basis for a claim fraud.  Our point is that these

19   false documents, these false representations

20   throughout the course of performance of this         16:06

21   contract are evidence of willful misconduct and

22   gross negligence.  The way they were able to throw

23   a lot of crap literally in boxes and ship it across

24   to Nigeria where they could actually be fabricated

25   is by literally fabricating or writing out false     16:06

INDEX NO. 650627/2021
RECEIVED NYSCEF: 01/27/2021

Jan 21, 2020                                      220

1     certifications about everything having been done.

2     It's part of the gross negligence case.  It's part

3     of the willful misconduct case.

4              Sophistication relevant to fraud.

5     Mr. McIlwrath -- first of all, the question -- the      16:06

6     question you asked is whether Claimants are

7     deserving of any special consideration of

8     protection for being less knowledgeable.  It wasn't

9     a question about sophistication as such.  And the

10    answer is under New York law, we were entitled to      16:07

11    special consideration because of our lack of

12    knowledge.

13             Second, when Mr. McIlwrath read to you

14    from the *Brass* case, he was reading to you from an

15    irrelevant excerpt from the *Brass* case.  Remember,     16:07

16    I told you at the beginning, there are three

17    reasons that *Brass* explains for why lack of

18    knowledge gives rise to this obligation.  And I

19    pointed you to the first one and the third one.  He

20    read to you about the second one.                       16:07

21             I am not arguing that we are entitled to

22    special consideration because there was a fiduciary

23    duty or anything like that, which was the second

24    criterion.  My point is because we are less -- not

25    sophistication -- less knowledge, and because there     16:08

Jan 21, 2020                                         221

1    was a partial and ambiguous statements and because

2    they possess a superior knowledge, we were entitled

3    to full disclosure and they had a duty to speak,

4    not because that they stood in a fiduciary or

5    confidential relationship.                          16:08

6          The language that he refers to is about

7    when there is a fiduciary confidential

8    relationship.  So the duty you asked about:  Do

9    they owe us candor and the duty to treat us with

10   special consideration of protection because we were   16:08

11   less knowledgeable?  Absolutely they did.  No

12   question about it.  And I urge you to read the

13   case.  We will explain it in our post-hearing

14   briefs.

15         Abandonment, just one observation.  I'd        16:08

16   like to say one observation.  He says, we would

17   probably come back if we had known in 2019 what we

18   learned in the hearing.  They haven't come back.

19         Independent expert on damages.  They say:

20   You don't have an independent expert on damages.     16:09

21   We don't need an independent expert on damages for

22   the direct damages.  Mr. Helsen is the owner of all

23   those accounting records, and he explained to you

24   what those accounting records meant, and he put in

25   as evidence all the underlying documentation.        16:09

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                    222

1          They are entitled to challenge him, to

2    cross-examine him, to have their own expert, you

3    know, express views about all that documentation.

4    They didn't.  His evidence -- they cross-examined

5    him, but his evidence is what his evidence is based    16:09

6    on his statement and the cross-examination.  We've

7    presented the evidence to prove that case.

8          Indeed, Mr. Hillier, in his expert

9    report, says Ms. Linnell will deal with those

10   issues.  Ms. Linnell, in her expert report, didn't    16:10

11   deal with those issues.  They had the opportunity,

12   and they didn't do it.

13         Direct damages, Mr. Saba's questions to

14   Mr. McIlwrath.  Based on what I understood

15   Mr. McIlwrath to be answering, if the Tribunal        16:10

16   agrees that the HHR is a remedy for a defective

17   process system, that would be in their view direct

18   damages.

19         With respect to Mr. -- because what he

20   said was --                                            16:10

21         THE PRESIDING ARBITRATOR:  I don't

22   follow.

23         MR. ALEXANDER:  Thank you.  Please ask me

24   questions if I am going too fast.

25         What Mr. McIlwrath said was the cost to          16:10

Jan 21, 2020                                        223

1      remediate defects is a direct damage.  And I think

2      if we look at the transcript, we will see that,

3      because he said the VFD would be a direct damage.

4              If the HHR is necessary to remediate the

5      process defect then it too is a direct damage on        16:11

6      GE's case.  And let me say Mr. McIlwrath's

7      definition of what are direct damages is --

8              THE PRESIDING ARBITRATOR:  You don't

9      agree with that, in your categorization of --

10             MR. ALEXANDER:  Absolutely.  He is way          16:11

11     too narrow.  He is way too narrow.

12             THE PRESIDING ARBITRATOR:  Well, go

13     ahead.

14             MR. ALEXANDER:  Please, ask me questions.

15             THE PRESIDING ARBITRATOR:  I think I            16:11

16     understood your categorization of direct damages as

17     damages inherent to the breach, as part of the

18     essence of the breach, as something which doesn't

19     need any sort of assessment on causation or

20     likelihood, because it's inherent to the breach.       16:11

21             MR. ALEXANDER:  Close.

22             THE PRESIDING ARBITRATOR:  You are going

23     to say I am wrong.  It's no problem with that.

24     That's no problem.

25             MR. ALEXANDER:  I'll never say you're           16:12

Jan 21, 2020                                        224

1    wrong.

2            THE PRESIDING ARBITRATOR:  No, no, you

3    can, you can.  It's New York law.  If it were to be

4    Spanish law, I might get upset; not with New York

5    law.  It's a foreseeability matter.  The                16:12

6    foreseeability is the word you used.

7            MR. ALEXANDER:  Correct.  And so what I

8    was saying is if the natural and probable

9    consequence of the breach or, in the ordinary

10   course of human experience, this is what you would     16:12

11   expect to happen, then that is a direct damage.

12           THE PRESIDING ARBITRATOR:  Okay.

13           MR. ALEXANDER:  Okay?  And so if they

14   deliver to you something that requires remediation,

15   in the ordinary course of human experience, you        16:12

16   would expect that that would meet -- the cost of

17   that remediation would have to happen, you would

18   need to remediate, just -- right?  And the cost of

19   that is therefore a direct damage.

20           So I agree that the cost to remediate is        16:13

21   a direct damage, but it's not the only direct

22   damage.  In the context of delay, for example, the

23   delay -- the cost of delay is the direct damage.

24   Does that help?

25           THE PRESIDING ARBITRATOR:  Yeah.                16:13

Jan 21, 2020                                             225

1              MR. ALEXANDER:  Okay.  Because, I mean, I

2      really want to make sure that I am able to convey

3      clearly.  It's my obligation, not yours.

4              They criticized Mr. Lapuerta for not

5      drawing a line between direct and indirect damages.      16:13

6      That's not for a damages expert to do, obviously.

7              What he did say, though, and it's

8      important, is if you draw the line and tell him

9      where the line is, he will easily take his model

10     and take out what you conclude shouldn't be there,       16:14

11     or insert what you conclude should be there.  So

12     it's all already in the model, it's all there.

13     It's just a matter of processing numbers.  That's

14     where the Tribunal's requirement is.

15              ARBITRATOR SABA:  Wait.                           16:14

16              THE PRESIDING ARBITRATOR:  They didn't

17     criticize him.  They just said that he didn't

18     reflect the --

19              ARBITRATOR SABA:  On this point, so this

20     is Question 21, page 41 of the Respondents'                16:14

21     presentation, where the direct damages claimed by

22     Mr. Helsen or listed by Mr. Helsen are there.

23              MR. ALEXANDER:  Yes.

24              ARBITRATOR SABA:  I have been proceeding

25     on the assumption that the Respondent is saying           16:14

Jan 21, 2020                                           226

1    that -- I want to check this document and this

2    citation, but that these are all direct damages as

3    listed by Mr. Helsen himself.  This is what he

4    claims as direct damages.

5           MR. McILWRATH:  Yes, that's his                16:15

6    characterization of his -- I mean, in his second

7    witness statement, that's what he says.

8           ARBITRATOR SABA:  Good.  You have that

9    citation.  Okay.  Good.

10          So let me now go to this point about           16:15

11   Mr. Lapuerta.  Suppose that the Tribunal found that

12   these were all direct damages.  It's 244 million,

13   245 million.  Now we have cash flow damages that

14   have been claimed.  It's about 300 million for the

15   first two trains.  Is it -- would we take them out   16:15

16   to 244?  Are the cash flow damages down to -- are

17   the cash flow damages down to 16 million?

18          I mean, they are 244.  They are

19   300 million less direct damages.  If the cash flow

20   damages are deemed to be consequential and not       16:16

21   direct, are they 16 million in this arithmetic?

22   Are they 16 million for the first two trains?

23   Because the first two -- the 300 million, his

24   calculation of cash flow damages includes direct

25   damages.                                             16:16

Jan 21, 2020                                           227

1           If we accept the 244 million are direct

2       damages, then of the first 300 million of cash flow

3       which include these, are we left with 16 million of

4       cash flow damages?

5               MR. ALEXANDER:  Plus --                         16:16

6               ARBITRATOR SABA:  As consequential, as

7       not direct damages.

8               MR. ALEXANDER:  I am just thinking -- I

9       am thinking this through because I thought about

10      this question from the other direction.  There is    16:16

11      also -- if you were to say these were all direct

12      and what Mr. Lapuerta did was indirect, then it

13      would be this plus interest, and then I believe you

14      would then subtract -- we would need to ask

15      Mr. Lapuerta to subtract these from his model,       16:17

16      because the model is very complex; and when we

17      asked him to subtract these from his model, I

18      suspect he would come up with a number which is

19      very, very low.

20              ARBITRATOR SABA:  Very, very low if these     16:17

21      direct damages were taken out of his model.

22              MR. ALEXANDER:  Yes.

23              ARBITRATOR SABA:  Okay.

24              MR. ALEXANDER:  On the two train model.

25              ARBITRATOR SABA:  On the two train model,     16:17

Jan 21, 2020                                      228

1    sure.

2              MR. ALEXANDER:  But if what you find is

3    that we are entitled to the consequential

4    damages -- you will find that -- it wouldn't

5    work -- so yes, on the two train model, the number      16:17

6    will be very, very low.

7              ARBITRATOR SABA:  I am just trying to

8    understand how the arithmetic would work.  Thank

9    you.

10             MR. ALEXANDER:  But as I say, he's made        16:18

11   the offer, and I think we would need to ask him to

12   run -- to pull all these numbers out of his model

13   and say:  In the two train model, what are you left

14   with?

15             ARBITRATOR SABA:  Okay.                        16:18

16             MR. ALEXANDER:  Okay.  Two last points

17   that I really want to cover.

18             First, we are in agreement with GE that

19   17.4 is designed to deal with consequential

20   damages.                                                 16:18

21             ARBITRATOR SABA:  17.4.

22             MR. ALEXANDER:  Is designed to deal with

23   consequential damages.  Sorry, 19.3.  Apologies.

24   The exclusion is intended to do with consequential

25   damages.  And that again takes me back to 6.6, and      16:18

Jan 21, 2020                                                    229

1    it's another way of reconciling any -- if there

2    were any inconsistency between the two.  Because

3    insofar as any lost profits or lost revenues under

4    New York law qualifies a direct damage in the

5    context of delay -- which it does, and I will          16:19

6    provide you the cases -- then 19.4, which is

7    dealing with excluding consequentials, is

8    irrelevant, even insofar as it's excluding as lost

9    profits and lost revenues when they are

10   consequential damages.  And that explains, again,     16:19

11   another way of looking at why it is that 6.6(ii) is

12   saying any direct damages are recoverable under

13   6.6(ii).

14         ARBITRATOR SABA:  If in these

15   circumstances the lost profits -- let's call them      16:19

16   profits, revenues, are direct damages, then 19.3,

17   excluding lost profits revenues, would not be

18   applicable?

19         MR. ALEXANDER:  It falls away.

20         ARBITRATOR SABA:  It's as simple as that.        16:20

21   And those direct damages of lost profits, lost

22   revenues are recoverable under 6.6.

23         MR. ALEXANDER:  Precisely.

24         ARBITRATOR SABA:  Okay.  Okay.  Because

25   they are direct damages.                               16:20

Jan 21, 2020                                    230

1           MR. ALEXANDER:  Because they are direct

2   damages.

3           ARBITRATOR SABA:  Okay.

4           MR. ALEXANDER:  Yeah.

5           ARBITRATOR SABA:  Okay.                  16:20

6           MR. ALEXANDER:  Otherwise, it's

7   essentially a meaningless clause, 6.6.

8           Okay, last issue.  Performance guarantees

9   and the Cold Box.  I am going to take the first

10  half of this, and my colleague is going to take the   16:20

11  second half.

12          And I am going -- just the first half,

13  because I am concerned that I wasn't sufficiently

14  clear this morning.  The question is asked:  Are

15  the three items in Section 4 of Appendix A the only   16:21

16  guaranteed performances?  I told you they are not,

17  and I stand by that, they are not.

18          What they are is they are the parameters

19  that during the performance tests you test for, but

20  to be clear, you test for it based on the overall    16:21

21  contractual obligation to deliver a plant.

22          And how do we know that?  We know that,

23  first, because Annex B, the HMB attached to the

24  contract in an integral part of the contract,

25  explains this is the performance guarantee case.     16:21

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                              231

1      In other words, you run the performance guarantee

2      test against this case.  This feed gas volume, this

3      power -- well, power in one of the outcomes --

4      these various compositions of the gas, these

5      outlets.                                              16:22

6              So you start with the inputs, you go to

7      the outlet, you run it through the system.  And

8      that's how you determine whether or not the

9      contract performance guarantees have been met.  You

10     are not free to substitute or vary all the          16:22

11     variables for what we bought, and say, well, we can

12     hit these three bogies, these three targets if we

13     change around all the other parameters of the

14     contract.

15             That's not how a performance guarantee       16:22

16     works in any contract.  And this annex specifically

17     proves it because it says this is the performance

18     guarantee case.

19             And then if you go back to Clause 4.1 in

20     Appendix A and you read what that actually says, it  16:23

21     says:  The guaranteed performance as per plan are

22     set out in Annex B -- that's what I just showed

23     you, the HMB -- in the table entitled Plant Summary

24     100 are as follows, and then it lists the three of

25     them.                                                16:23

Jan 21, 2020                                            232

1          And then it goes on to say:  "It is

2     understood and agreed that the above guaranteed

3     performances may vary in the event changes are

4     introduced to the basis of design."

5          In that case, they need to update this          16:23

6     document to change all of these details in order to

7     tell us what the new guaranteed performances will

8     be.  So it's not a matter of they just get to hit

9     three bullets -- using their example, you know,

10    shoot three bullets into the barn wall and then          16:24

11    monkey with all the parameters in order to draw the

12    target around those bullets.

13         ARBITRATOR AZZALI:  Sorry, can I ask you

14    something?  Because it does not make much sense

15    from a commercial perspective.  I mean, you have          16:24

16    the three parameters, okay?  Provided that the

17    three parameters are met, what is the point to if

18    from parameter A to B, you take a different route.

19    I am using a simple -- and then from B to C, a

20    different route, provided that the three parameters          16:24

21    are met, from the perspective of an unsophisticated

22    party or a buyer, what is the point?

23         I don't see the real interest in

24    questioning how to get to get from A to B, B to C,

25    provided that you get there.  Otherwise, I would,          16:25

Jan 21, 2020                                    233

1    you know --

2            MR. ALEXANDER:  It's a great question,

3    and hopefully I'll have a great answer.  It matters

4    a huge amount commercially, because what GE is

5    saying is, well, we'll just increase your cost of        16:25

6    feed gas because we'll just make you put in a bunch

7    more feed gas in order to get the plant to perform

8    as you want.  Commercially, it's very expensive for

9    us.

10           They are saying, well, not only are we          16:25

11   going to make you put in a bunch more feed gas, but

12   we are also going to make you to have to deal with

13   a whole other product, C3 plus, bubbling C3 plus,

14   unstabilized condensate.

15           That's a huge difficulty for us.  What do        16:26

16   we do?  Now we need a new business plan.  Now we

17   need to buy a new HHR system to deal with all this

18   unstabilized condensate.  We need to buy an LPG

19   load-out system, LPG tanks, LPG trucks.  We need a

20   new business model to deal with LPG.                    16:26

21           (Speaker speaking off mic.)

22           MR. ALEXANDER:  Maybe, but it wasn't a

23   business we were buying, it's not a business we

24   went into.  That's like saying, I hire you to build

25   me a machine to build shoes, and you build me one       16:26

Jan 21, 2020                                          234

1    that makes hats.  That is wonderful, but I am not a

2    hat salesman.

3           And so commercially, it makes a huge

4    difference that in order for them to hit the

5    parameters, they are not doing it in accordance        16:26

6    with the contractual conditions that they agreed

7    they would do under.  I hope that was clear, and I

8    am going to now leave off to Mr. Gutowski to

9    address.

10          MR. GUTOWSKI:  Let me just follow up on         16:27

11   your question.  All of the items that appear in

12   Schedule 100 on the HMB, with the exception of

13   volume of what comes in, are results.  They are not

14   processes.  They don't talk about how a particular

15   amine tower works or how a Cold Box works, or even     16:27

16   what temperature it's going to run at.

17          So I would agree with you that if the

18   experts, GE, designed this and they tweaked the

19   Cold Box for a couple of degrees, but the amount of

20   feed gas I put in is the same, the power that I use    16:27

21   is the same, and the amount of LNG I get and that

22   condensate level are the same, that's no problem.

23          But where, in order to achieve the result

24   they promised me, they now tell me I have to buy

25   more feed gas, the whole equation is off.  That's      16:28

Jan 21, 2020                                              235

1     not the way the contract is read.  Nobody would

2     read it that way.

3            So with that as background, let me cover

4     four points.

5            Let's go back to my favorite schedule,          16:28

6     which is the Cold Box, and with due respect to my

7     friend, I disagree with quite a bit of what he

8     said.

9            If you remember -- and I have a little

10    diagram, We'll call it D-33.  The original Cold Box     16:28

11    that was designed under the contract, let's call it

12    the minus 6 box.  So what that box was designed to

13    do was to take the ambient gas on the first pass A

14    and reduce it to a temperature of minus 6.  In the

15    grand scheme of things, a relatively modest change     16:28

16    of temperature of about 50 degrees.

17           So the amount of UA required in the A

18    pass will be relatively small in that specifically

19    designed box, because it's only achieving a

20    relatively small amount of reduction in                16:28

21    temperature.  So A goes in and goes out with a

22    small amount of UA.

23           Now, in the B and C pass, however, you

24    are going to make a radical drop of temperature on

25    the original design case, which, because you are       16:29

Jan 21, 2020                                                    236

1    only going to minus 6, has very little condensate

2    coming out, and then you are going to drop the

3    temperature from minus 6 all the way down to minus

4    50.  That is a lot of temperature drop, so you have

5    a much bigger duty.                                       16:29

6            The B pass was really big because it had

7    a little more volume when they split from B to C,

8    and the C was large too, but not quite as B.  But

9    in any event, very unique Cold Box, a little bit of

10   duty at the top, a lot of duty at the bottom.            16:29

11           Now, the Cold Box has three chambers.

12   It's not all one big box with gas moving through

13   it.  That wouldn't work.  There is an A chamber, a

14   B and a C.  That's obvious because it goes in under

15   pressure, has to come out under pressure.  That's        16:29

16   the way it works through the fans and gets cold.

17           So these individual chambers, you can't

18   just slide the nozzles up and down the side of the

19   Cold Box as was suggested.  You are sliding it into

20   an entirely different chamber.  You might be able        16:29

21   to slide in the design up and down a teeny bit

22   within the designed chamber, but you can't later on

23   stick a nozzle from the A chamber and the B chamber

24   and have it work.

25           Now, when they changed the Cold Box on 18        16:30

INDEX NO. 650627/2021
NYSCEF DOC. NO. 8                                        RECEIVED NYSCEF: 01/27/2021

Jan 21, 2020                                        237

1     September from the minus 6 to the minus 70, that

2     was a significant alteration from the original

3     design, because what they did was they increased

4     the UA on the A pass.  From that little relatively

5     small 45-degree ambient to minus 6, they increased        16:30

6     it from 45 to minus 70.  This is now the minus 70

7     box.  So the UA had to get much bigger, and the B

8     and the C, relatively speaking, got smaller,

9     because they were only required to cool from -- not

10    from minus 6 down to 150, but only from minus 70        16:30

11    down to 150.

12           That's the box they gave us.  That's the

13    box they didn't tell us about, and that's where the

14    trouble started.

15           Now, first they tell us that when they        16:30

16    gave us that HMB in September of 2015, we should

17    have picked all this up.  Well, to an extent we are

18    still struggling to try to figure out after all the

19    experts talked to us, the suggestion that IEC and

20    Greenville should have magically recognized all        16:31

21    this and sort of buying a heavy hydrocarbon removal

22    system in September is beyond the pale.

23           But what happened?  They delivered this

24    box to us and they remained quiet.  Mr. Shukui

25    said:  To see what kind of feed gas we would brand.        16:31

Jan 21, 2020                                        238

1          Now, the feed gas that's going into the

2    plant now is a little bit leaner than the contract

3    spec.  But what happens with the contract spec gas,

4    with the minus 70 box?  If you run it as it is

5    designed, ambient in, minus 70 out, and then you go          16:31

6    back in on the B and the C pass at minus 70 as it's

7    designed, it freezes, because there is no

8    separation of the heavy hydrocarbons.  That was the

9    whole point of our discussion back in December.

10          You need to make a separation after it          16:31

11    comes out from A, and if it's that cold, there is

12    no separation, it all goes back in its liquid and

13    it freezes.  And everything agreed:  Schleicher,

14    Amidei and Smith, and Lumley, they all agreed.

15          So what did GE do to fix on scene the          16:32

16    improperly designed box for our gas that they

17    delivered to us?  They say, we are going to stick

18    in the bypass.  And what the bypass is going to do

19    is it's going to warm up the gas as it comes out of

20    A a little bit.  So now we are going to get some          16:32

21    separation in that V400 separation vessel.

22          The problem is -- and this is the problem

23    -- when it comes out at minus 6 as we have in the

24    contract case, you get a small amount of

25    condensate, the 8 tons a day that appeared in the          16:32

Jan 21, 2020                                        239

1    promise that they gave us on the system they sold

2    us.

3          But the box they delivered, even with the

4    jury rig sticking some warm gas after A, you warm

5    it up to a maximum of minus 45 and you get 800        16:33

6    times the condensate, and an equivalent was LNG,

7    because at minus 45 you do get a separation much

8    more than you get at minus 6.  And minus 45 is the

9    warmest you can bring it up.

10         Contrary to what Roberto said, you can't        16:33

11   manipulate this box all the way back to minus 6,

12   because the B and the C pass are awaiting their

13   design, they are waiting for a temperature of about

14   minus 70.  And if you come back in at minus 6, it's

15   like what your mother told you not to do when you     16:33

16   stuck the frying pan right from the oven -- right

17   from the griddle into the sink; you are going to

18   wreck it because you are subjecting it to thermal

19   stress.

20         So what do you do?  You have to live with       16:33

21   -- the warmest you can warm it up is minus 45,

22   because coming out at 70, the box is expected to

23   come back in at 70, but it can tolerate about 20 or

24   25 degrees difference.  Schleicher said it, Amidei

25   confirmed it.                                         16:34

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                          240

1            So now what are we done with?  We find

2       out in November of 2016 that the box they gave us

3       can only function if we warm it to minus 45.

4       That's the best they can do.  And with that, we did

5       800 times to condensate, and because this gas now        16:34

6       being converted to a liquid, there's a whole lot of

7       condensate.  Guess what happens over at the LNG

8       tank?  But it's not there because it's coming out

9       as condensate.

10           The only thing we can do to mitigate the        16:34

11      improper box they gave us is to introduce the heavy

12      hydrocarbon removal system.  That takes the

13      condensate and it recaptures methane, ethane,

14      propane and butane.  It reduces the amount of

15      condensate and it is a mitigation for the        16:34

16      unilateral change in design they made over the box,

17      over the system, the process they sold us in the

18      contract.

19           They sold us a very efficient process.

20      They told us they were the stars of this process,        16:35

21      and we bought it.  They didn't deliver it, they

22      delivered us the minus 70 box, and they basically

23      said:  Now you have to make two new products.

24           That's what they did.  That was reckless,

25      reckless disregard for our financial position.        16:35

Jan 21, 2020                                    241

1    They forced us to engineer piping, storage, trucks

2    and load-out for two new, entirely new products

3    that were not in our business line at all, and they

4    stand here before you and tell you this fallacy

5    about being able to change the box, and like a           16:35

6    thermometer in your house, you can move it from

7    minus 6 to minus 70.

8            None of that is true.  These boxes are

9    specially designed, and the ones they delivered to

10   us were frozen as that design came to us and caused      16:36

11   -- and required that mitigation.  And that's what

12   we did.

13           THE PRESIDING ARBITRATOR:  You definitely

14   like the topic, that's clear.  And you are a very

15   sophisticated lawyer in the matter of LNG trains.        16:36

16           MR. GUTOWSKI:  Well, let's hope.  I have

17   good teachers.

18           ARBITRATOR SABA:  And the bypass is after

19   the fact of delivery, or the bypass at 45 is where,

20   where is that?                                           16:36

21           MR. GUTOWSKI:  So what happens is they

22   tie a line in from the raw feed gas which comes in

23   at 45.  And as the gas exits on the first pass A,

24   it's down to minus 70, it's all liquid.  There will

25   be no flashing or phasing in the V400.  So they          16:36

INDEX NO. 650627/2021
NYSCEF DOC. NO. 8                                          RECEIVED NYSCEF: 01/27/2021

Jan 21, 2020                                    242

1    inject warm gas into that minus 70, to warm it up

2    so that they will get some separation.

3              ARBITRATOR SABA:  They inject one gas at

4    minus 45.

5              MR. GUTOWSKI:  They inject -- no, they        16:37

6    inject at ambient, raw feed gas, not cooled, and

7    that raises the temperature from minus 70 up,

8    enough to make a separation, so that it will not

9    freeze on a second pass.

10             Otherwise, if you don't warm it up a          16:37

11   little bit -- and everybody agreed:  Schleicher,

12   Amidei and Smith.  If you leave it at the design

13   temperature of minus 70, it's all liquid, it goes

14   to V400 with difficulty because it's not designed

15   to handle all liquid.  But basically if you go back    16:37

16   through on a second pass and you go from minus 70

17   to minus 150, it will absolutely freeze, because

18   all the heavies are still in there, and those

19   heavies are freezing at much warmer temperatures

20   than minus 150.  You are right at the core.            16:37

21             ARBITRATOR SABA:  So the fix of injecting

22   the gas at ambient temperature came -- when was the

23   fix proposed?

24             MR. GUTOWSKI:  What happened was -- I

25   have to go back and look and see whether that pipe     16:38

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                        243

1    was there when they delivered it to us or whether

2    it was added.  But when they revealed to us the

3    actual box we had, when we understood, when they

4    finally in November -- and his name was

5    Ropaski [phonetic], finally said:  No, you can't go        16:38

6    back to minus 6, you have a box that's going to

7    come out at minus 70.  That's when they said:  You

8    warm the gas with the raw warm feed gas, that will

9    give you the separation, and then you can run it

10   back through without freezing.                             16:38

11         But that's when we said, how much are we

12   going to lose?  They said, you're going to lose 11,

13   12 or more percentage of your LNG and you are going

14   to have time to condensate.  We said, what are we

15   going to do with that?  And they said, we have to         16:38

16   introduce a heavy hydrocarbon separation system.

17         ARBITRATOR SABA:  And when Ropaski

18   [phonetic] said, was there equipment for

19   re-injecting at that point delivered with the Cold

20   Box, at any time was there -- when was that pipe,         16:39

21   that interconnecting pipe that would allow a

22   re-injection delivered?  When did you have it in

23   hand, if at all?  Do you have it in hand now?

24         MR. GUTOWSKI:  It's there now, yeah.

25   It's there because it has to be there, the warm          16:39

Jan 21, 2020                                    244

1    gas, because otherwise the Cold Box -- the Cold Box

2    as designed will not function with the feed gas, it

3    will only function with the very lean feed gas of

4    methane and ethane.  Taking it out at minus 70 and

5    going back at minus 70, it will freeze immediately.   16:39

6              So why did they do that?  I put the

7    bypass in, knowing they were going to have do that.

8    We can go back and look at the P&ID and see.  It

9    only became evident in November of 2016 when this

10   issue got up on the table finally.  And then we      16:39

11   looked back at T-128.

12             One of the reasons why we focused on

13   T-128 was by the time they released that HMB about

14   seven months after we gave them the feed gas, we

15   were looking at other feed gases.  It wasn't really  16:40

16   -- that feed gas was not the focus at the moment,

17   that may have been why we didn't focus on it.  We

18   just may not have understood it.  It's a

19   complicated process when you first are exposed to

20   it.  And they were the experts.                       16:40

21             In November of 2016, it got up on the

22   table, and then what was revealed, what was always

23   needed from the time that Cold Box was delivered.

24             ARBITRATOR SABA:  All right.  Okay, thank

25   you.                                                  16:40

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                        245

```
 1              THE PRESIDING ARBITRATOR:  Thank you.
 2    Have you finished?
 3              MR. GUTOWSKI:  Finished.
 4              THE PRESIDING ARBITRATOR:  Thank you,
 5    gentlemen.                                      16:40
 6              MR. GUTOWSKI:  Can I hand you D-33?
 7              THE PRESIDING ARBITRATOR:  Send it by
 8    email.
 9              Mr. McIlwrath.
10              MR. McILWRATH:  Just a few points from  16:40
11    us.  I think I want to think Pete Gutowski who,
12    I'll point out, is the counsel who negotiated --
13    one of the counsel negotiating the contract on
14    behalf of IEC.  If you couldn't find a more
15    sophisticated counsel in terms of negotiating this  16:40
16    type of contract, I will be very, very surprised.
17              This is relevant.  I am not making this
18    to be funny, because under New York law, access to
19    resources is the measurement, not whether the
20    client is sophisticated, whether they have access.  16:41
21    I think it shows quite well that IEC had the
22    highest level of sophistication available.  Just a
23    quick note of it in the Brass case.
24              I agree with Jay when he says that that's
25    part of the case that doesn't deal with the ones    16:41
```

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                              246

1    that he was citing too.  I just simply said the

2    only mention in the *Brass* case of issues of

3    sophistication, where the Court says that's not a

4    right that we see in New York law and we are not

5    going to create one here.                          16:41

6            Just a quick comment on the notion of

7    direct damages.  When we talk about direct damages,

8    we are not talking about them outside of the scope

9    of the contract.  The contract provides for

10   specific rights of remediation and the warranty    16:42

11   rights to go in and repair, and the phase, or the

12   secret period of replacement.  It's only when we

13   fail to do so, for example, that you would have a

14   replacement of something that we didn't supply.

15   That would then be a direct damage.  But it would   16:42

16   be a direct damage after having failed to avail

17   oneself of the rights of the contract.

18           A quick point about -- again I think this

19   is a -- we are getting into what we would call a

20   very new argument, a conflict of this tension       16:42

21   between Article 6 and Article 19 of the contract.

22           Leaving aside our point about introducing

23   new arguments at such a late stage -- and Jay did

24   say earlier this morning that they had been less

25   than clear about some of their statements.  We      16:42

Jan 21, 2020                                            247

1    certainly agree with that.

2         The first was 19.3 -- you didn't ask this

3    question in your questions, but I think you have to

4    read actually the paragraph as it is drafted.  It

5    says -- it excludes in no event whether as a result    16:43

6    of breach of contract, warranty, indemnity, tort,

7    extra-contractual liability including negligence,

8    strict liability otherwise, shall either party,

9    blah blah blah, be liable for loss of profit or

10   revenues, loss of use of the plant parts, or any       16:43

11   associated equipment, downtime costs, claims of a

12   party's customers to such damages.

13        Here's what is critical:  Or -- at that

14   point it says:  Or any special consequential,

15   incidental, indirect or exemplary damages.             16:43

16        So to the extent that you could

17   characterize loss of profits as direct, it says

18   those are excluded.  This is our point.  And then

19   it goes on to then say:  All of these types of

20   damages are excluded.  And then it says:  All          16:43

21   consequentials.

22        And then to the argument of a matter

23   being an inherent intention in their view between

24   Article 6 and Article 19, we would just simply draw

25   your attention to Article 19.8, which says:  The       16:44

Jan 21, 2020                                                      248

1    provision of this clause shall prevail over any

2    conflicting or inconsistent provisions contained in

3    any other documents comprised in this agreement.

4              So you don't need to reach into New York

5    law or the contracts to find out how to resolve          16:44

6    this.  The contract tells you if you think -- we

7    don't think there is any conflict, but if you were

8    to find that there was tension between these two

9    clauses, the contract has given you guidance as to

10   how to address them.                                      16:44

11             Very quickly on the argument that has

12   kind of emerged.  I think again this is the Texas

13   sharpshooter approach of -- now they are drawing

14   circles around certain bullet holes that they have

15   shot.  I think what we are hearing is a claim as it       16:44

16   if it were a breach of an implied covenant of good

17   faith and fair dealing.

18             What the Claimants are putting forward is

19   saying well, we've had to buy more feed gas.  We

20   have no representation in the contracts, no               16:45

21   obligation, with respect to the amount of feed gas

22   they have to buy.  That's their business.  But what

23   they are saying is, yeah, but you are depriving us

24   a certain value of the contract if you do that; if

25   you take this sort of literalist interpretation of        16:45

Jan 21, 2020                                           249

1    the contract, then we would somehow be deprived.

2           That at least to me again having trained

3    as a New York lawyer -- by the way, I trained with

4    Robert Summers at law school.  Summers and Hillman.

5    And Hillman was my contracts professor.  That now        16:45

6    seems to me to be within a range of a claim that

7    has not been pleaded.  You know, if they had

8    pleaded a breach of the implied covenant of good

9    faith and fair dealing, I think we would have had a

10   very different defense.  But they didn't, and so we       16:45

11   had a hearing that took place on a very different

12   basis, which is the basis that they put forward.

13          I am emphasizing this because I really

14   hope that this does not come back to us in

15   post-hearing submissions, where they say:  Ah, now        16:46

16   we see the way the facts have turned out, this

17   looks like to us like it might be a breach of the

18   implied covenant of good faith and fair dealing

19   under New York law -- which has not been pled.

20          Roberto, you want to give a couple of             16:46

21   quick points on -- or I can make it.

22          MR. CALABRESI:  I don't know.

23          MR. McILWRATH:  I'll make it.  With

24   respect to the feed gas, whether it was clean or

25   dirty, you know, we had -- you remember Jay             16:46

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                        250

1    Alexander's opening statement, he actually talked

2    about -- and I think, Mr. Saba, you asked him

3    questions about the feed gas that they were

4    purchasing.  Right?  Whether they were purchasing

5    heavy or light gas.  And what Jay said was:  And        16:46

6    there were -- there was one plant, I think it's in

7    the NG Delta.

8            This is by the way page 122 on the first

9    day of the hearing, it's at line 9.

10           "And there were -- there was one plant, I

11   think it's NG Delta.  That was actually a

12   processing plant that was going to actually be

13   taking all the heavies and just leaving the lights.

14   And so if we had bought from them, that would have

15   given us lights, we would have had no 46, C5, C6 at

16   all, heavy.  But we didn't know, and ultimately we

17   bought from Total."

18           So whether they were buying light or

19   heavy, that's their decision.

20           ARBITRATOR SABA:  So back to 19.3 for          16:47

21   just a moment in the contract.  Do I understand

22   what you just said as an interpretation of this

23   language in 19.3, that everything listed, all

24   damages listed until you get to the word "or" in

25   the second to last line are not consequential          16:48

Jan 21, 2020                                              251

1    damages?

2              MR. McILWRATH:  No, I am not saying that.

3              ARBITRATOR SABA:  Okay.

4              MR. McILWRATH:  What I'm saying is they

5    -- these are categories of potential damages.  I       16:48

6    think they are excluded regardless of whether they

7    fall under the heading of direct or consequential.

8    Right?  It doesn't matter if you characterize this

9    as a direct damage.  If it's lost profits, you

10   can't claim it under the contract.  Under no event    16:48

11   can you make these claims.

12             Then it goes on to say:  Or any special

13   consequential, incidental, blah blah blah.

14             ARBITRATOR SABA:  Okay.  I understand

15   that you are saying the clause excludes a claim for    16:48

16   lost profits and revenues, however you characterize

17   them.

18             MR. McILWRATH:  Yes.

19             ARBITRATOR SABA:  I just want your

20   understanding as to whether in this clause, lost       16:49

21   profits are properly characterized as not

22   consequential damages.  Is it fair to say that

23   reading this clause in that way, lost profits are

24   not -- lost profits or revenues are not

25   consequential damages?                                 16:49

Jan 21, 2020                                              252

1           I understand the point that they are

2   excluded by the clause.  I am just asking whether

3   you can read the clause to mean that lost profits

4   and revenues are not consequential, and therefore

5   they are direct damages, or they are certainly not     16:49

6   consequential damages, because consequential comes

7   up at the end.

8           MR. McILWRATH:  I would disagree with

9   your reading of that clause.

10          ARBITRATOR SABA:  It's all right.  Okay.        16:49

11          MR. McILWRATH:  And I think the reason

12  you have a clause -- this is not, I would say, a

13  clause that's unfamiliar to anybody who is engaged

14  in international contracting.  You often don't know

15  the laws that these contracts will be subjected to.     16:50

16  The definition, for example, of consequential loss

17  changes from country to country.

18          As I have said earlier, if you are here

19  in Italy, direct damages will include everything

20  potentially.  And so there tends to be -- again,        16:50

21  and you also don't know even if you have an

22  arbitration award, whether the award might be

23  executed.  There's a number of reasons why you may

24  have extra care in qualifying things that are

25  excluded.                                                16:50

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                              253

1            So I think the drafters here were very

2     careful to say:  I am not characterizing these

3     types of losses as any type of damage, direct or

4     consequential; I am just saying they are excluded.

5            ARBITRATOR SABA:  Okay.  Okay.              16:50

6            THE PRESIDING ARBITRATOR:  Well, I think

7     we are finished with your closing statements.  We

8     are really grateful to both parties.  It has been a

9     very interesting hearing and we have learned a lot.

10    We believe it has proven to be really helpful.      16:51

11           Now we have some housekeeping matters.

12    First, post-hearing briefs.  Did you confer about

13    how you would like to address this issue?  Any

14    particular preference by the parties; as far as

15    extension, whether they should or shouldn't be       16:51

16    limited; a deadline to file them?  Any other

17    questions?

18           MR. ALEXANDER:  Our preference is, one,

19    for it to be as speedy as possible.  Our client

20    really is struggling economically.  Two --          16:51

21           THE PRESIDING ARBITRATOR:  Meaning, which

22    deadline would you like to --

23           MR. ALEXANDER:  Assuming it is

24    simultaneous.

25           THE PRESIDING ARBITRATOR:  Yes.  Well --      16:52

Jan 21, 2020                                    254

1              MR. ALEXANDER:  I mean our preference

2     would be one round.  We don't see a need for two,

3     there has been plenty of opportunity.  And that at

4     the end, three weeks.

5              THE PRESIDING ARBITRATOR:  Okay.            16:52

6     Simultaneous.

7              MR. ALEXANDER:  Simultaneous.

8              THE PRESIDING ARBITRATOR:  Very good.

9              MR. ALEXANDER:  And that the Tribunal

10    give us direction as to what you are interested in,   16:52

11    beyond these questions, if any, and, frankly, give

12    us page limits.

13             THE PRESIDING ARBITRATOR:  Sorry?

14             MR. ALEXANDER:  And page limits.

15             THE PRESIDING ARBITRATOR:  Page limits.     16:52

16             MR. ALEXANDER:  Yes.  So that --

17             THE PRESIDING ARBITRATOR:  Which number

18    of pages would you like to -- do you have any

19    suggestions?  I mean, it is your wish list.

20             MR. ALEXANDER:  You know, I haven't         16:52

21    conferred on that, but it depends a little bit on

22    how broad your questions are.

23             THE PRESIDING ARBITRATOR:  Same format.

24    Times in Roman 12, not changing the --

25             MR. ALEXANDER:  I guess I would say under   16:53

ICDR Case N° 01-18-0002-9174

Jan 21, 2020                                        255

1     50.  And if the questions are not beyond what's

2     here, under 30.

3              THE PRESIDING ARBITRATOR:  Wow, three

4     weeks starting from the date in which the

5     transcript --                                      16:53

6              MR. ALEXANDER:  I've been vetoed.  Thirty

7     pages.

8              THE PRESIDING ARBITRATOR:  The deadline

9     is starting when the transcript is received and

10    submitted the consolidated versions of the         16:53

11    transcript, I assume.

12             MR. ALEXANDER:  I think -- do we need the

13    transcript?

14             THE PRESIDING ARBITRATOR:  We do need it.

15    Not for the post-hearing briefs, but --            16:53

16             ARBITRATOR SABA:  We'd like to see it.

17             THE PRESIDING ARBITRATOR:  So 50 pages,

18    one round, three weeks?

19             MR. ALEXANDER:  Yes, sir.

20             THE PRESIDING ARBITRATOR:  Okay.           16:53

21    Gentlemen?  Simultaneous?

22             MR. McILWRATH:  We have a strong

23    preference for two simultaneous exchanges.

24             THE PRESIDING ARBITRATOR:  Two exchanges.

25             MR. McILWRATH:  In terms of timing, we     16:53

Jan 21, 2020                                    256

1    are thinking -- there is a lot here, a lot of

2    facts.  We would say two months from when the

3    transcript is available for the main one, and then

4    one month for the remaining.

5            We have been brief in terms of our          16:54

6    submissions.  I don't think we have been excessive.

7    I do not think that it would help us to have

8    imposition of a page limit here.  And also the

9    problem with the page limit on the post-hearing

10   submission -- what are you going to do if we file    16:54

11   more pages.  I mean if we feel it necessary to go

12   beyond, it becomes at the end of the day more as an

13   aspirational goal than anything else.

14           THE PRESIDING ARBITRATOR:  Well, you

15   fulfil the Tribunal's desire.                        16:54

16           ARBITRATOR SABA:  That's an economic

17   breach...

18           THE PRESIDING ARBITRATOR:  Okay.  There

19   are basically two proposals.  Do you want us to

20   break for five minutes and decide, or do you want    16:55

21   to try to reach a compromise between both of you?

22   As you wish.  We can decide later on by means of a

23   procedural order.  We can do as you want.

24           MR. ALEXANDER:  My suggestion would be

25   perhaps if you want to deliberate and tell us your   16:55

Jan 21, 2020                                                    257

1     answer.  Let us see if we can work something out.

2     If we can, then you --

3             THE PRESIDING ARBITRATOR:  Fine, let's go

4     to our room.

5             (Recess taken - 4:55 p.m.)                    16:55

6             (Proceedings resumed - 5:03 p.m.)

7             THE PRESIDING ARBITRATOR:  There will be

8     two rounds of submissions.  The first round,

9     simultaneous, of course, the deadline will be

10    six weeks, and there will be a limitation of pages   17:03

11    to 75.

12            MR. McILWRATH:  May I ask that -- is that

13    because, we had the further -- so we have this

14    exchange of the Total invoices and the opportunity

15    to comment.  We are just wondering when is the       17:04

16    start time of the six weeks.  Is it from --

17            MR. ALEXANDER:  It should certainly be

18    from today.  We will get --

19            THE PRESIDING ARBITRATOR:  When are you

20    going to submit those invoices?                      17:04

21            MR. ALEXANDER:  We can get them in

22    tonight.

23            THE PRESIDING ARBITRATOR:  Tonight.  I

24    know there will be a sort of writing supporting

25    them.  Or just filing them and you will comment on   17:04

Jan 21, 2020                                                    258

1   post-hearing briefs?

2            MR. ALEXANDER:  Yes, literally just

3   submit them.

4            THE PRESIDING ARBITRATOR:  And you don't

5   need the transcript?                                  17:04

6            MR. ALEXANDER:  No.  We have the rough

7   transcript, we know what is said today.

8            THE PRESIDING ARBITRATOR:  So if they are

9   going to submit invoices, you can deal with them in

10  the post-hearing.                                     17:05

11           So six weeks starting as of today, we

12  will then specify this specific date, on which this

13  deadline elapses.  Simultaneous filing.  So you

14  don't have to copy yourself.  Once we receive the

15  submissions, we will cross-exchange them between      17:05

16  the parties.

17           So six weeks, 75 pages.  We will send an

18  email afterwards.

19           And then the second round will be limited

20  to comment on the counterparty's first submission.    17:05

21  Deadline, 3 weeks; and the limitation of pages, 40.

22           The Arbitral Tribunal is not going to

23  make further questions.  We have made all the ones

24  we consider necessary, and we don't have specific

25  instructions on how the post-hearing briefs should    17:05

Jan 21, 2020                                           259

1    be drafted.

2            My advice -- but that's -- what I always

3    advise to the parties is that it might be useful if

4    you put in our shoes what would be the award that,

5    according to the parties, specific reliefs, you          17:06

6    would like us to draft.  So go point by point, and

7    like in the children's cartoons, united dots -- I

8    don't know it in English -- take us by your hand

9    and lead us to the outcome that you believe should

10   be the outcome of the award.  Put it in our shoes.       17:06

11           There is no need to repeat arguments,

12   there's no need to make a further pleading, a full

13   pleading of everything.  We have extensively dealt

14   with all these matters.  So it's entirely up to you

15   on how you focus on your post-hearing briefs.  But       17:06

16   no further questions from our side.

17           Any questions regarding this?  Is it

18   clear?  We will send an email, a follow-up email.

19           And then we have the cost submissions.  I

20   suggest that they are submitted after the                17:07

21   post-hearing briefs, in case there are some further

22   points or some -- at the end of the proceedings.

23   We don't need to close this matter now.  We suggest

24   that you make a joint proposal, and if you don't

25   reach an agreement, we will decide.  One or two          17:07

Jan 21, 2020                                    260

1    rounds, and how would you like that the costs are

2    presented to the Tribunal.  Just a table from

3    counsel, or whether you need documents supporting

4    your expenses, that's for you to agree on that; and

5    if you don't reach an agreement, we will decide.        17:07

6    You can inform us in one or two weeks, whenever you

7    want, because there is time for that.

8              Any further points?

9              MR. GUTOWSKI:  Just one, Mike, this is my

10   first contract.                                         17:08

11             MR. McILWRATH:  I don't know.  I don't

12   know if the Tribunal wants to provide any guidance

13   to the parties in terms of the costs rule that it

14   would intend to apply.  One of the problems that

15   you have as a party often is not knowing really --     17:08

16   there is so much variation in terms of the rule of

17   costs following the event.  I think Colin Ong and

18   Mike O'Reilly -- there is only one book written on

19   costs in international arbitration; they talk about

20   modified costs following the event being one.  And     17:08

21   I am just wondering maybe -- we would appreciate

22   some guidance if the Tribunal has preferences or a

23   tendency towards a particular -- within its

24   discretion, as it has, under the AAA Rules, so that

25   when we provide our cost submissions, we know what     17:08

Jan 21, 2020                                    261

1    it is we are addressing.

2              THE PRESIDING ARBITRATOR:  Okay, we

3    haven't deliberated about that.  I have my personal

4    view, but I would like to discuss it with my fellow

5    co-arbitrators.  We will come back to you in due        17:09

6    course.

7              MR. McILWRATH:  Thank you.

8              MR. ALEXANDER:  Nothing else.  Thank you

9    very much.

10             THE PRESIDING ARBITRATOR:  Okay.  Thank       17:09

11   you.  Thank you very much to the court reporter,

12   thanks for your help.

13             Enjoy Milan, gentlemen.

14             (Whereupon, the hearing ended at

15   5:09 p.m.)

16

17

18

19

20

21

22

23

24

25

Jan 21, 2020                                          262

1                    CERTIFICATE OF REPORTER

2

3          I, YVONNE VANVI, the French registered

4    Court Reporter before whom the above hearing was

5    taken, do hereby certify that the said hearing was

6    taken by me to the best of my skill and ability and

7    thereafter reduced to typewriting under my

8    direction; that I am neither counsel for, related

9    to, nor employed by any of the parties to the

10   action in which this hearing was taken, and further

11   that I am not a relative or employee of any

12   attorney or counsel employed by the parties

13   thereto, nor financially or otherwise interested in

14   the outcome of the action.

15          Done and signed this 25th day of January

16   2020, in the city of Rueil-Malmaison, France.

17

18

19

20

21                    YVONNE VANVI

22

23

24

25

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

# Exhibit 8

**AMERICAN ARBITRATION ASSOCIATION**
**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**

**INTERNATIONAL ENGINEERING & CONSTRUCTION S.A. AND**
**GREENVILLE OIL & GAS CO. LTD.,**

<u>**Claimants**</u>

**- and -**

**GE OIL & GAS, LLC (F/K/A GE OIL & GAS, INC.),**
**PRESSURE CONTROL SYSTEMS NIGERIA LIMITED (AS**
**SUCCESSOR TO GE INTERNATIONAL OPERATIONS (NIGERIA) LTD.),**
**GE INTERNATIONAL OPERATIONS (NIGERIA) LTD.,**
**BAKER HUGHES, A GE COMPANY AND**
**BAKER HUGHES, A GE COMPANY, LLC (AS SUCCESSORS**
**TO GE OIL & GAS, LLC [F/K/A GE OIL & GAS, INC.]),**

<u>**Respondents**</u>

_____

**Claimants' Post-Hearing Submission**

**March 3, 2020**

_____

**Freehill Hogan & Mahar LLP**
**80 Pine Street, 25th Floor**
**New York, New York 10005-1759**

**Baker Botts L.L.P.**
**41 Lothbury**
**London EC2R 7HF**
**United Kingdom**

## TABLE OF CONTENTS

I.     INTRODUCTION AND FACTUAL OVERVIEW ........................................................1

II.    BHGE BREACHED THE EQUIPMENT CONTRACT AND THE SERVICES AGREEMENT .........................................................................................................8

    A.    Elements of Breach of Contract Under New York Law .................................8

    B.    BHGE Repeatedly Breached the Equipment Contract .............................9

        1.    BHGE's Failure to Deliver the Trains and Technical Documentation by Their Delivery Dates Violated Clauses 5 and 9.1 of the Contract ....................................................................... 9

        2.    BHGE's Failure to Deliver Fully-Modularized, Tropicalized and Operable Plants Breached Numerous Articles of the Contract ................ 12

        3.    BHGE Breached the Contract by Abandoning the Project ...................... 27

    C.    GEN Breached the Services Agreement ...................................................28

III.   BHGE IS LIABLE FOR THE OVER US$ 700 MILLION IN DAMAGES IT CAUSED CLAIMANTS ............................................................................................29

    A.    BHGE's Breaches Have Caused Claimants' Damages .........................29

        1.    Legal Standard for Causation and Quantum ............................................ 29

        2.    BHGE's Delay in Delivering the Trains Caused Damages ..................... 30

        3.    BHGE's Many Defects Caused Additional Damages ............................. 40

    B.    The Contract's Exculpatory Clauses and Limits of Liability are Unenforceable Or Do Not Apply .................................................................42

        1.    BHGE's Willful and Grossly Negligent Conduct Cannot Be Exculpated ................................................................................................. 43

        2.    A Four-Year Plus Delay in Delivery of the Trains Was Beyond the Contemplation of the Parties ................................................................... 56

        3.    BHGE Actually and Constructively Abandoned the Projects ................. 57

        4.    BHGE Breached its Fundamental Obligations Under the Equipment Contract ................................................................................ 57

    C.    Even If the Exculpatory Clauses Were Enforceable, Claimants Would Still Be Entitled to Direct Damages .......................................................58

IV.   BHGE IS LIABLE FOR FRAUD IN THE INDUCEMENT AND POST-CONTRACT FRAUD .............................................................................................62

    A.    Fraud in the Inducement .........................................................................62

    B.    Fraud During Performance ......................................................................63

V.      GREENVILLE IS A PROPER CLAIMANT TO THE ARBITRATION ........................64

VI.     THE BAKER HUGHES ENTITIES ARE PROPER RESPONDENTS ..........................64

VII.    BHGE AND GEN ARE NOT ENTITLED TO ANY OF THEIR
        COUNTERCLAIMS ........................................................................................................65

        A.      Respondents Failed to Meet the Requirements for the Milestone Payments .........65

        B.      Respondents Failed to Comply with the Contractual Provisions for Change
                Orders ....................................................................................................................66

        C.      Respondents Failed to Provide Documentary Support for their
                Counterclaims ........................................................................................................67

        D.      Respondents' "Independent" Quantum Expert Is Not Independent ....................68

        E.      The Testimony Presented at the Evidentiary Hearings Further Undermined
                Respondents' Change Order Counterclaims ........................................................69

VIII.   REQUEST FOR RELIEF ...............................................................................................74

## I.    INTRODUCTION AND FACTUAL OVERVIEW[1]

1.  Despite abundant energy resources, Nigeria lacks an effective distribution network, leaving local industries dependent on expensive, unreliable energy.[2]  Eddy Van den Broeke ("**Eddy**"), who has spent decades working in Nigeria, realized he could reliably deliver energy at a 40% discount compared to existing fuels, while still generating enormous economic returns, by buying cheap natural gas at a pipeline node, converting it to LNG, and trucking that LNG to customers throughout Nigeria and West Africa.[3]  Eddy was ideally suited to seize this opportunity, having dominated Nigeria's bitumen market for many years by building reliable plants and using temperature-controlled trucks.

2.  In 2014, Eddy's team had narrowed the search for small-scale LNG plants to China, the center of the small-scale LNG industry.  During the meeting with enCryo (one of the potential Chinese sellers), David Gordon, from BHGE, enticed Claimants away with a commitment of much faster delivery of higher American quality and superior know-how, and fully modularized trains that would allow Claimants to enter and dominate this high-margin business quickly.[4]  And so, entirely with his own equity, Eddy bought the Trains (and training) from BHGE and GEN at nearly twice the price of the Chinese competitors.

3.  The evidence leaves no room for doubt — and certainly proves by the mere preponderance of the evidence standard — that BHGE

   - lied to and deceived Claimants to obtain the Equipment Contract ("**Contract**"), then

   - concealed its inability to meet its contractual promises by performing the Contract dishonestly, dangerously and in bad faith, resulting in the shipment of incompletely

---

[1]    Claimants do not repeat the extensive and largely uncontested presentations in their Statement of Claim ("SoC") and Statement of Reply ("**SoR**"). This Post-Hearing Brief adopts the defined terms and acronyms from the SoC and SoR.  To ensure clarity, the GE counterparty to the Contract — including successors, etc. — is referred to as BHGE and the counterparty to the Services Agreement — including successors, etc. — is referred to as GEN.

[2]    CWS-1 (Van den Broeke), ¶¶ 2.6-2.10, 4.5; CWS-5 (Helsen), ¶¶ 24-26.

[3]    CWS-1 (Van den Broeke), ¶ 4.6; CWS-5 (Helsen), ¶¶ 24-26.

[4]    CWS-3 (Pirijns), ¶¶ 4.2-4.11; CWS-1 (Van den Broeke), ¶¶ 6.5-6.11.

1

engineered and fabricated modules that are inoperable and unsafe.

BHGE cannot — lawfully — be excused from the full consequences of its willful misconduct and reckless indifference (gross negligence) towards Claimants.[5]

4.   BHGE's deceit began from the start, when Mr. Gordon told Eddy that Shell <u>had mandated BHGE</u> to sell the <u>nearly complete</u> CGC Train.[6]  We now know both these representations were untrue.  <u>First</u>, according to Mr. Bresciani, Shell never discussed selling the train with BHGE until <u>after</u> Eddy expressed interest.[7]  <u>Second</u>, BHGE's own internal report and Ed Griffin's testimony reveal the CGC Train was still far from complete in August 2014.[8]

5.   Once Claimants were in Texas, BHGE completed this "bait and switch" by assuring Claimants that although the CGC Train was "no longer" for sale, BHGE could build new versions in 9 and 12 months that would be even better because they would be custom designed.[9]

6.   This promise aligned perfectly with what Eddy wanted.  But it was a lie.

7.   Cody Lindsey, a then and current BHGE employee, expressly admitted in 2018 that BHGE knew <u>when it signed the Contract</u> that it could not deliver a train in less than 18 months.[10]  BHGE has presented neither Mr. Lindsey nor <u>any</u> contrary evidence.[11]  BHGE also refused

---

[5]   *See Soroof Trading v. GE Microgen* ("***GE Microgen***"), 2013 WL 5827698, at *11-12 (S.D.N.Y. 2013) (CL-15) (finding that GE entity will have "*engaged in 'willful or grossly negligent acts'*" if it (i) knew its performance of its contractual obligation was "*not possible or at least unlikely*" prior to entering into the contract and accepting the fee, (ii) abandoned efforts to perform, (iii) withheld material information about the viability of its performance or (iv) affirmatively deceived plaintiff by promising performance by a date it knew to be untrue).  *See also* SoR, ¶¶ 393-407 (describing recent history of GE and BHGE dishonesty in their commercial dealings).

[6]   *See* SoC, ¶¶ 56-59; CWS-3 (Pirijns), ¶¶ 2.7-2.9; CWS-1 (Van den Broeke), ¶¶ 6.8-6.11.

[7]   RWS-1 (Bresciani), ¶¶ 8-9.

[8]   Ex. C-888 (CGC status as of August 18, 2014); CWS-6 (Griffin), ¶¶ 7.6-7.12.

[9]   *See* SoC, ¶¶ 61-62; Ex. C-1, Equipment Contract, Clauses 1, 13.2 & App A, p.26; CWS-3 (Pirijns), ¶ 4.6; CWS-1 (Van den Broeke), ¶ 7.18.

[10]  CWS-1 (Van den Broeke), ¶¶ 8.3- 8.10; CWS-4 (Sahajwalla), ¶¶ 27-30; Ex. C-13; Ex. C-14.

[11]  Mr. Bresciani, Mr. Lavander and Mr. Schleicher, all of whom were involved with this project in September 2014 and all of whom provided witness statements supporting BHGE's counterclaims, said <u>nothing</u> in those statements about BHGE's ability to achieve the promised delivery dates.  In response to the SoC — including a lengthy

to disclose the relevant documents. In response to this Tribunal's order to disclose the ITO file, BHGE instead invited the Tribunal to draw an adverse inference.[12] The Tribunal should do exactly that, and determine that the ITO file would support Claimants' contention that BHGE knew it would not deliver the trains in the time promised.[13]

8. Mr. Griffin confirms that as of August 2014, BHGE had <u>never</u> successfully built a similar train; was still struggling with massive engineering, fabrication and quality control problems on the CGC Train; was already years behind in its effort to replicate the CGC Train for Shell's similar Elba Island project; had included 9 months in the Elba Island contract solely for engineering differences with the CGC Train (differences that were nowhere near as stark as between the CGC Train and Claimants' Trains).[14] Annex A contains the demonstrative summarizing Mr. Griffin's testimony that proves BHGE knew it could not build the Trains in 9 and 12 months when it signed the Contract and took IEC's US$ 19 million down payment.[15]

9. BHGE's promise to customize the trains to meet Claimants' technical needs exacerbated the timing problem. BHGE was supposed to (i) re-engineer the liquefaction process to handle the much heavier Nigerian feed gas; (ii) design and procure different equipment to run on 50 Hz, which also meant re-engineering the physical layout of the modules and their electrical systems; and (iii) specify, design, and procure equipment capable of operating in "power island mode" and of resisting driving rains, beating sun and oppressive humidity. BHGE performed this necessary engineering recklessly, if at all.

---

discussion, with evidence, about BHGE's fraudulent promise of delivery in 9 and 12 months — each remained silent and did not provide a responsive witness statement at all.

[12] P.O. #4, Annex 1, p.19-20; Hr'g Tr. Vol. 2, pp.288:2-12, 291:3-21 (Mastronardi); Sept. 13, 2019 Ltr. From BHGE to the Tribunal (arguing that appropriate remedy is an adverse inference).

[13] *See* SoR, ¶¶ 405-411 (discussing propriety of adverse inference for this and numerous other failures of BHGE to disclose ordered documents). *Cf.* Ex. C-1, Equipment Contract, App A, p.24 (obligating BHGE to maintain and communicate project schedules).

[14] Demonstrative E. C-D03; CWS-6 (Griffin), *passim*; Ex. C-888 (CGC status as of August 18, 2014).

[15] *GE Microgen*, 2013 WL 5827698, at *11 (CL-15); Ex. C-1, Clause 7.1 (describing milestone payments).

10.   Further exacerbating the 9 and 12 month lie, BHGE out-sourced the fabrication to Turner, which, because Turner lacked the needed experience or facilities, violated BHGE's obligations under the Contract.  As Mr. Lindsey admitted in 2018, BHGE always knew "*it was a fantasy to go and fabricate the skids in premises outside the GE-Salof Schertz facility.*"[16]  Not only did BHGE choose a subcontractor that did not even have an indoor facility, it then sent the unqualified James Chestnut to supervise the work.[17]  A classic case of the blind leading the blind.

11.   Although BHGE assured Claimants before signing the Contract that "*we can do it all, process works, performance, etc.*,"[18] BHGE could not.  Rather than honestly confront and resolve its failures with Claimants, BHGE concealed them for as long as it could behind false statements, false certifications and false promises to remedy its failures.  BHGE:

- promised a liquefaction process that would produce 765 TPD of LNG and 8.5 TPD of waste condensate, included in the Contract a design that it belatedly conceded in late 2016 could never work, and, without telling Claimants, actually engineered something completely different, that also could not work without Claimants purchasing additional expensive equipment, and then falsely blamed Claimants for the change;[19]

- re-engineered the modules to fit the different-sized 50 Hz equipment with haphazard stress engineering of the re-configured piping, and then withheld the defective stress engineering reports when Claimants asked to inspect them;[20]

- mis-engineered the MRC motor starting system by adopting a starting device that is incapable of starting the motors, denied any problem for years and then, despite finally

---

[16]   Ex. C-13, 5th bullet; *see also* Ex. C-14, 2nd bullet.

[17]   CWS-2 (Srinivasan), ¶ 6.2 ("*Mr. Chestnut told me that his prior job had been as a radio operator in the U.S. military.  He had no prior experience with LNG and was unable to provide any guidance to us*").

[18]   Ex. C-1060.

[19]   *See* SoC, Part G.II.1; SoR, Part II.B.

[20]   *See* SoC, Part G.II.4; SoR, Part II.C.

agreeing to replace the system in 2019, backtracked and refused to do so;[21]

- engineered the flare network with reverse flows and other defects, but still denies that it is defective and unsafe;[22]

- waited until 2015 to contract with Turner to start fabricating the modules, but withheld the Turner contract despite an order from this Tribunal;[23]

- falsified the inspection and testing certificates before shipping incomplete modules from Turner with an instruction that the protective crates and shrink-wrapping be retained until they were installed on their foundations in Nigeria;[24]

- promised to complete the Trains quickly during the two Florence meeting so that they could begin producing LNG in 2017, but failed to deliver and then issued its counterclaim seeking $40 million for work required to complete its own performance.[25]

12.   Dr. Caligiuri and Dr. Wright explained the dangers of BHGE's work:[26]

- BHGE's defective flare system design creates "*significant life safety hazards*;"

- "*Missing or improperly-designed piping supports represents a significant safety hazard*;"

- Use of improper bolts, etc. "*can result in catastrophic loss of containment events*;"

---

[21]   *See* SoC, Part G.II.5; SoR, Part II.D.

[22]   *See* SoC, Part G.II.2; SoR, Part II.E.

[23]   *See* Ex. C-939 & C-941 (pro forma amended Turner Purchase Orders, showing original order date for modules was January 8, 2015); P.O. #4, Annex I, pp.44-45.

[24]   *See* SoC, ¶¶ 138-139; ¶¶ 261-266; Annex B.

[25]   Ex. R-69 (Minutes of November 2016 Florence meeting); Ex. R-72 (Draft minutes of January 2017 Florence meeting); CWS-3 (Pirijns), ¶¶ 13.34, 13.47.

[26]   CER-2 (Exponent), Parts 3.1, 3.2. *See Corwin v. NYC Bike Share, LLC*, 238 F. Supp. 3d 475, 514 (S.D.N.Y. 2017) (CL-218), *vacated in part on other grounds*, No. 14-CV-1285 (SN), 2017 WL 4075213 (S.D.N.Y. Mar. 13, 2017) (plaintiff's gross-negligence claim survived where there was a genuine fact issue as to whether defendant "*unjustifiably ignored sound engineering practices*").

- Undersized electrical cables could overheat, which "*can lead to fires and electrical faulting, both of which create significant health safety and functionality issues with the LNG trains*;"

- BHGE improperly installed numerous valves, which "*can cause significant life safety hazards and facility damage.*"

13. The result of BHGE's misconduct was inevitable: incomplete, dangerous, and inoperable Trains that — even today — are not finished or delivered.

14. Book-ending BHGE's dishonesty, it then relied upon the false pretext of HSE to abandon the project in May 2019.[27]  As Mr. Dunagan opined after a 7-day site inspection, HSE provides no genuine basis for departing the site.[28]  (*See also* ¶¶ 87-89, below.)

15. What was BHGE's motivation for proceeding with a contract it knew it could not fulfill? The Contract gave BHGE frontloaded milestone payments (pursuant to Clause 7.1 of the Contract, 60% of the contract price was payable before BHGE started fabricating the modules).  Mr. Pirijns was told that BHGE never expected Eddy's Nigerian companies to be able to follow through with their project.[29]  One internal BHGE document reveals BHGE was also counting on a decision by Claimants to change the contractual gas composition to provide contractual relief.[30]  But neither of those "get out of jail free" scenarios occurred.

16. The Trains are now nearly five years behind schedule, well beyond any contemplated delay.  Eddy, Mr. Lapuerta, Mr. Helsen, and Ms. Sahajwalla have provided detailed written and oral evidence about the business harm and resulting damages from this unconscionable

---

[27]  Ex. R-168 (May 8, 2019, official letter from BHGE asserting "*no option ... as a result of these HSE issues*").

[28]  Hr'g Tr. Vol. 7, p.65:3-14 (Dunagan) ("*my perception is that the stated rationale for departing the site was a pretext.*"); CER-11 (Dunagan), *passim* ("*I do not believe that there were any HSSE related conditions or risks to justify GE terminating their work and leaving the site*").  *See also* Hr'g Tr. Vol. 2, pp.252:6-253:4 (Griffin) (describing visit to Rumuji in December 2018: "*you could expect to see a plant like that in most any North American city ... I didn't see any [health/safety concerns]*").

[29]  CWS-12 (Pirijns), ¶¶ 13.2-13.4; SoR, ¶ 268.

[30]  Ex. R-234; SoR, ¶ 406.

delay. The amounts are large, but fully consistent with what both parties expected when this project began. BHGE and Claimants discussed Claimants' intent to have 4+ trains from the outset.[31] BHGE also understood Claimants' urgency, which is why it falsely promised delivery in 9 and 12 months.

17. The natural result of delayed delivery is delayed operation of the Trains. Under New York law, delay in cash flow is quintessential "direct" delay damage (*see* Part III.A.2.ii., below). Mr. Lapuerta calculated that BHGE caused $700 million of damages to Claimants (now more due to new take-or-pay costs).[32] BHGE shrugs this off, claiming that total damages are less than $120,000 — less than the *weekly* liquidated damages they agreed to pay. But in mid-2015 — before there was any adversity or litigation posturing — BHGE projected that IEC would earn free cash flow of US$ 248 million just between 2016 and 2018.[33]

18. BHGE has offered no basis to dispute the documented and detailed damages described by Mr. Lapuerta. BHGE's expert, Ms. Linnell only offered a random list of criticisms of Mr. Lapuerta's work that had no foundation. Her assertion, for example, that Nigerian roads are impassable for LNG trucks — even though Claimants had been delivering heavier bitumen over those same roads for many years and are now delivering LNG from Train 3 — was absurd and retracted at the hearing. Her assertion that LNG would soon be out-competed by a non-existent expansive gas pipeline network that would take uncountable years to build is fanciful.

19. BHGE also proffered virtually no evidence to support any factual defense. Its Statement of Defense ("**SoD**") rests on two fact witness statements from Mr. Pagliaro, who joined the project in 2017, and from Mr. Amidei, who was never involved. BHGE failed:

---

[31] Hr'g Tr. Vol. 10, p.155:10-20 (Lapuerta); Ex. C-1, Equipment Contract, Clause 32 ("*Seller further grants an option to Buyer to purchase up to two (2) additional 0.25 MTPA SCMR LNG plants ... from Seller*"); CER-5 (Helsen), ¶¶ 10, 27-30, 32 ("*I provided GE . . . with cash flow projections for the LNG business. . . . On August, 11, 2014 prior to the agreement with GEOG, we were looking at 4 plants of 750 MT/d each.*"); *see also, e.g.*, Hr'g Tr. Vol. 6, p.38:6-15 (Helsen) ("*the original idea in all this has been the idea to go for at least four plants*").

[32] CER-10 (Lapuerta), ¶ 106.

[33] Ex. C-1143, p.6 ("*IEC Cash ... Cash flow from LNG activity ('16 to '18) $248MM*").

7

(a) to produce many key witnesses, including Cody Lindsey (9 and 12 months), Sergio Bondi (engineering), Shukui Zhao (process engineering), Alan Dingeldein (electrical engineering), Javad Osmaian (stress engineering), James Chestnut (Turner, inspections and testing), or any witness to address the Shell project;

(b) to disclose or exhibit key documents that this Tribunal ruled are relevant, material and should be disclosed.[34] Claimants have explained the adverse inferences to be drawn from these failures at paragraph 411 of their SoR.

20. The law prohibits BHGE from seeking to minimize the losses caused by its misconduct by hiding behind generic limitation of liability provisions in the Contract. This Tribunal should hold BHGE fully accountable for the damages suffered by Claimants as a result of BHGE's deceit, bad faith, and reckless indifference.

## II.     BHGE BREACHED THE EQUIPMENT CONTRACT AND THE SERVICES AGREEMENT

### A.     Elements of Breach of Contract Under New York Law

21. Under New York law, a claim for breach of contract requires: (1) the existence of an agreement, (2) performance of the contract by the party asserting the breach, (3) breach of the agreement by the other party, and (4) damages caused by the breach.[35]

22. The only elements in dispute are whether BHGE and GEN breached their contractual obligations and what damages resulted (and are recoverable). This Part II addresses the breaches. Part III addresses damages and causation.

---

[34] The documents include: the ITO file; the Turner contract; communications between Chart and BHGE between September 3, 2014 and September 15, 2014; Shukui Zhao's work papers; GEOG's financial statements, ledger entries or bank statements showing transfers of the Claimants' payments by GEOG to the Baker Hughes entities; calculation files behind the stress analyses performed by BHGE since June 2018; and any internal GE/BHGE schedules or communications justifying (i) their November 2016 promises that mechanical completion would be achieved by December 2016 or (ii) their promises in January 2017 that mechanical completion would be achieved by April 2017. The Tribunal's rulings are at P.O. #4.

[35] *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996) (CL-1).

**B.      BHGE Repeatedly Breached the Equipment Contract**

    **1.      BHGE's Failure to Deliver the Trains and Technical Documentation by Their Delivery Dates Violated Clauses 5 and 9.1 of the Contract[36]**

        *i.      Delivery Includes the Plants <u>in their Entirety</u>, Including All Equipment, Components, Materials, Documentation, etc.*

23.    Clause 5 of the Contract required BHGE to "*sell and deliver the Plants (and Technical Documentation) to Buyer by their respective Delivery Dates*."[37]

24.    Clause 1 defines "*Delivery Dates*" as "*the date on which the Plants shall be delivered by Seller in accordance with this Agreement, which for (i) the first Plant shall be nine (9) Months; and (ii) the second Plant shall be twelve (12) Months, from the Effective Date*." These Delivery Dates — after adjustment for an agreed 11-day extension of time —were June 24, 2015, for Train 1 and September 24, 2015, for Train 2.

25.    By those dates, BHGE was required to sell and deliver "*the Plants*."  Clause 1 defines "*Plants*" as "*the fully-modular small scale LNG production plants . . . which shall include <u>all</u> equipment, components, materials, supplies, products, manuals and other goods to be supplied by Seller to Buyer, as more specifically described in Appendix A*."  (Emph. added.) Appendix A (p. 7 of 31) explains that "*[a]ll major equipment, piping, valves, electrical and instrument components shall be prefabricated and installed on skidded modules. These modules shall be insulated (where required by process and/or ambient conditions), painted and tested in the shop, to reduce the Site installation work, ensure quality, and shorten the project delivery cycle*."  (Emph. added).

26.    Clause 9.1 of the Equipment Contract permits partial shipments, but specifies that "*[t]he Delivery Date for each Plant is the date on which [each] Plant <u>in its entirety</u> is delivered in accordance with this Clause . . . . <u>For the avoidance of doubt, delivery of a Plant for purposes of the Delivery Date shall occur only when the Seller has complied with all of its</u>*

---

[36]    *See* SoC, Parts II.F.2, II.G.23, III.A.2; *see also* SoR, Part III.A.

[37]    Ex. C-1, Equipment Contract, Clause 5.

_delivery obligations for the Plant in its entirety_." (Emph. added.) Shipment of incomplete modules and withholding of documentation is not a delivery.

### ii. BHGE Has Not Yet Delivered the Trains

27. Dr. Lancaster explained in his reports and at the hearing that the Trains have never been delivered.[38]

28. Mr. Sakthi confirmed that the modules arrived shrink-wrapped in plywood crates and kept that way, at BHGE's instruction, until installed. When the shrink-wrap was removed, in the presence of BHGE's representatives, Claimants found (i) gaps in piping where valves and instruments belonged and (ii) wires dangling where instruments were needed.[39]

29. Dr. Lancaster has analyzed the missing components, and found that every module was shipped incomplete. Thousands of original parts trickled into Nigeria between 2016 and 2019.[40] Some original parts (_e.g._, MRC motor starting systems, pipe supports) are still missing.[41]

30. Dr. Lancaster's analysis is confirmed by Mr. Pirijns, who details the many delays plaguing this project. He explains that Technical Documentation, such as operating manuals for the Trains, remains missing.[42]

---

[38] CER-1 (Lancaster), _passim_; CER-7 (Lancaster), _passim_; _see, e.g._, Hr'g Tr. Vol. 8, pp.31:24-32:6 (Lancaster) (materials required to fully support piping are "_still a matter of outstanding supply_").

[39] CWS-2 (Srinivasan), ¶ 2.2; _See also_ CWS-3 (Pirijns), ¶¶ 12.10-12.12.

[40] Between November 2018 and February 2019, BHGE made 16 shipments, containing cable and cable accessories, electrical items, a generator, instruments and valves, pipe fittings, spares, and other items. CER-7 (Lancaster), ¶¶ 470-75. _See also_ CER-7 (Lancaster), App 7.

[41] At the February 2019 Rumuji meeting, BHGE promised to deliver a workable starting system, cables, pipe supports and more. In response to Claimants' repeated requests, BHGE dithered. Ultimately, in mid-2019, Claimants ordered these parts themselves and are now installing them. _See_ Ex. C-243; CWS-12 (Pirijns), ¶¶ 4.22, 4.34-4.35, 4.101.

[42] CWS-3 (Pirijns), ¶¶ 14.144-14.147 ("_we still do not have any manuals for the Trains. ... GE's admission last month that they are still changing it, makes it clear to me that these Trains remain a work in progress for GE. This, of course, runs totally contrary to what GE told us in 2014 – that the design was established and they could easily assemble two copies of the Reference Plant for us within the contractual timeframe for delivery._"); _see also_ CWS-8 (Mastronardi), ¶¶21-31; CWS-7 (Pirijns), ¶ 4.84.

31.     BHGE seeks to chip away at this extraordinary delay — now at 1,715 days for Train 1 and 1,623 days for Train 2[43] — arguing that (i) it is entitled to a four-week grace period under the Contract; and (ii) that Claimants caused "concurrent" delay.  Both arguments are wrong.

### iii.  BHGE is Not Entitled to a 4-Week Grace Period

32.     BHGE claimed entitlement at the closing hearing to a "grace period" of four weeks under Clause 6.5 of the Contract.[44]  But that grace period only applies if BHGE achieved delivery within it.  If not, liquidated and other damages are payable "*as from the first Day following the Delivery Date until the Day on which delivery of the Plant actually occurs*."[45]  The four week grace period has no effect here because BHGE's delay exceeds four weeks.

### iv.  There Is No "Concurrent Delay"

33.     BHGE argues that Claimants caused concurrent delays that excuse BHGE from liability for delay damages during the concurrent periods.  Claimants caused no concurrent delay.

34.     Dr. Lancaster explained that as BHGE fell behind, Claimants reasonably began pacing their work and using the float created by BHGE's delays to mitigate losses.[46]  For example, because feed gas contracts include onerous Take-or-Pay obligations, Claimants intentionally delayed committing to a feed gas contract until BHGE claimed to be ready for the Trains to receive gas.[47]  Recent events have proven the wisdom of that pacing.  The

---

[43]   *See* CER-7 (Lancaster), ¶ 552 (noting starting date of delay and that the delays are still on-going).

[44]   Closing Arguments Tr., p.208:21-25.

[45]   Ex. C-1, Equipment Contract, Clause 6.5, first para.

[46]   Hr'g Tr. Vol. 8, pp.91:21-94:4 (Lancaster) ("*So if, for example, you've constructed part of your plant, which I believe to be the case with the BOP in many instances, but you know that the rest of the plant is not ready, you've got the right, obviously, not to proceed at the pace you were intending originally . . . .  that pacing delay, as they are often called, is not independent of the first one [delay], they are one in the same delays, and therefore, that shouldn't be something that the Claimants would be considered to be blamed for.*"); Hr'g Tr. Vol. 8, pp.155:2-4 (Lancaster) ("*it's not critical delay, and it's not delay to the project.  It's just the use of float, basically, so it's just the erosion of available time.*")

[47]   *See, e.g.,* CWS-3 (Pirijns), ¶ 12.4 ("*Because GE had fallen months behind schedule, we were adjusting our own internal schedules for the BOP, delaying any take-or-pay commitment for feed gas and re-setting customer expectations.*"); Hr'g Tr. Vol. 8, pp.97:21-98:3 (Lancaster) ("*You assess on a progressive basis when you are building a plant of this nature, you can't just assume everything is going ok.  So you've got to evaluate your*

11

feed gas supplier has now charged Claimants US$ 58,642,586 in Take-or-Pay charges for gas that Claimants were unable to take in 2018 and 2019 because the Trains were not ready.

35. Dr. Lancaster's analysis, which is consistent with common sense, follows New York law, under which, only delay that is on a project's critical path can be concurrent.[48] BHGE must prove that the asserted concurrent delay affected the "*critical path*" — or "*affected not just an isolated part of a project, but its overall completion*."[49] Concurrent delay requires both that the two causes of delay "*occurred at the same time (partially or entirely)*," and that the two causes "*simultaneously affect[e]d the same work on the critical path*."[50]

36. Industry guidelines also consistent support Dr. Lancaster's approach.[51]

## 2. BHGE's Failure to Deliver Fully-Modularized, Tropicalized and Operable Plants Breached Numerous Articles of the Contract[52]

### i. BHGE's "Litany" of Problems Breached the Contract[53]

37. Claimants have described 23 types of serious (often dangerous) engineering, manufacturing and component problems — including innumerable missing parts, tens of thousands of parts requiring tropicalization, unfinished automation, and poorly (or non-)

---

progress as you are going through construction to see whether, are we going to be on time to take the gas when you're planning it. And you revise your position on what you are going to sign up and enter into as you go.")

[48] *See Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221, 1233 (10th Cir. 1999) (CL-197) ("*Courts often use [critical path methodology ("CPM")] to resolve disputes over excusable-delay claims. . . . a contractor must prove that a delay affected not just an isolated part of a project, but its overall completion*."); *see also Helena Assocs., LLC v. EFCO Corp.*, No. 06 CIV. 0861(PKL), 2008 WL 2117621, at *4 (S.D.N.Y. May 14, 2008) (CL-170) (applying New York law and citing *Morrison Knudsen Corp.* (CL-197)).

[49] *See Helena Assocs., LLC*, 2008 WL 2117621, at *4, 7 (CL-170) (concluding that there was sufficient evidence that "*[defendant] was on the critical path and was responsible for the delay*" and that there were no concurrent delays based on project manager's testimony that defendant was responsible for the delay); *see also R.W. Granger & Sons Inc. v. City Sch. Dist. of Albany*, 744 N.Y.S.2d 567, 568 (N.Y. App. Div. 2002) (CL-198), (affirming award of damages to plaintiff where plaintiff's expert testified that based upon a critical path analysis, the project was delayed for a total of 133 days, and that plaintiff's 15-day delay was "*neither substantial nor material to completion of the project*").

[50] Concurrent Delays, 1 Government Contract Changes § 15:10 (emph. added) (CL-232).

[51] Hr'g Tr. Vol. 8, p.91:12-94:4 (Lancaster) (referencing Ex. C-375 (AACEI standards)).

[52] *See* SoC, Parts, II.G.1-21, III.A.3-6; *see also* SoR, Parts II.A-F.

[53] *See* SoC, Parts, II.G.6-21, III.A.3, 5, 6; *see also* SoR, Parts II.A.

engineered and installed components — that began surfacing as the modules were unwrapped and have plagued the Trains ever since.[54]

38. BHGE's SoD disregarded most of this litany of design, fabrication and component problems. During the hearing, BHGE sought to dismiss them as irrelevant because they have allegedly been remedied.

39. Not all have been fixed. Spectacle blinds have not been tropicalized; instruments, electrical panels and cable boxes continue to suffer from lens bleaching and are missing glands, seals, and overhead protection; and the Trains' automation systems remain incomplete.

40. But more important, it took BHGE years to acknowledge and then finish the fabrication that was only started in the U.S. with Turner. For example, the delivery and installation of heat tracing was not completed until mid-2018. Heat tracing is essential to many of the modules and the Trains are inoperable without it.

41. In addition to delaying delivery in violation of Clauses 5 and 9.1 (addressed in Part II.B.1, above), these innumerable problems also breached (or arose from breaches of):

| Cl. 3: | "*Seller shall provide all necessary superintendence during the performance of its obligations under the Agreement.*" |
|---|---|
| Cl. 13.2: | "*The Plants shall be brand new and unused upon delivery .... The Plants shall be treated to resist deterioration due to the normal prevailing local conditions on Site ....*" |
| Cl. 14.3: | "*Seller shall comply with the Inspection Test Plan*" |
| Cl. 14.5: | "*As and when the Plants shall have passed the tests referred to in the Agreement during the manufacturing, Seller shall prepare the report with all required supporting data and shall deliver the same to Buyer, together with a test certificate.*" |

---

[54] *See* SoC, Part II.G; SoR, Part II; *see also,* CWS-3 (Pirijns), Part 14; CWS-12 (Pirijns), Part 4; CWS-2 (Srinivasan), ¶ 3-5; CER-1 (Lancaster) & CER-7 (Lancaster), *passim* (on defects and delay, confirming 4+ years of delay tied directly to these problems).

| Cl. 15.1: | "*Unless Buyer shall otherwise direct, <u>no Plant shall be delivered without having been tested</u> in accordance with the Inspection and Test Plans ....*" (Emph. added.) |
| Cl. 16.1: | "*The Contract price is based on Seller's design, manufacture, testing and delivery of the Plants pursuant to (i) its ... procedures and quality assurance program; (ii) ... industry specifications, codes and standards ... (iv) the mutually agreed upon specifications contained in Appendix A.*"[55] |
| Cl. 17.1: | "*Seller warrants that the Plants and/or Parts shall be free from Defects in material, workmanship ....*" |
| App. A, p.7: | "*All major equipment, piping, valves, electrical and instrument components shall be prefabricated and installed on skidded modules. These modules shall be insulated ... painted and tested in the shop ....*" |
| App. A, pp.15-17: | "*Seller's control system uses state-of-the-art control system hardware with the current Plant control software and data historian products .... State-of-the-art software running on high quality PCs ensures process control system availability*" |

42. Many of the breaches were exacerbated by BHGE's decision to use Turner. Turner had never before fabricated these modules nor did it have a purpose-built facility like Schertz in which to do so. The selection of Turner, therefore, further breached the Equipment Contract's restrictions on subcontracting and requirement for fabrication in a shop.[56]

43. Turner was not contracted to begin work on the modules (other than the pipe racks) until sometime in 2015.[57] By then, much of the 9 months had already lapsed. Because BHGE has refused to disclose the Turner contract in violation of P.O. #4, the Tribunal should draw an adverse inference that with reckless disregard for Claimants' interests, Turner was not contracted to do this work until 2015. Even at that late date, BHGE never provided Turner

[55] GE's painting specification required, *inter alia*, all nuts, bolts and tie downs to be painted. Ex. C-841, p.6.

[56] Ex. C-1, Equipment Contract, Clauses 4.2 & App A at p.7 (requiring (i) subcontractors to be "*fully experienced ... equipped, competent and qualified to perform all aspects of the subcontracted work*" and (ii) the Trains to be fabricated "*in the shop.*")

[57] *See* Ex. C-939 & C-941 (amended P.O.'s, showing original order date for modules was January 8, 2015).

14

with final engineering drawings, competent supervision, or honest inspection and testing (*see, e.g.*, ¶ 10, above).[58]

44. Under these circumstances, as BHGE had to know, it was impossible for Turner to fabricate the Trains by the required Delivery Dates and inevitable that Turner would ship partially completed modules that would require substantial fabrication and testing in Nigeria, where logistics were even more complicated.

## ii. BHGE's Process Engineering Breached the Contract[59]

45. The introductory paragraph of Appendix A of the Contract ("**App A**") states that each of its Annexes A, B and C "*shall be an integral part of this Appendix A.*" Clause 1.5 of the Contract states that App A is "*an integral part of the Agreement.*"

46. Clause 1.1 of App A states that the Trains "*are designed to each produce approximately 0.25 MTPA of LNG.*" In Clause 4.1, it provides "*Guaranteed Performances*" of 765.1 TPD (which exceeds 0.25 MTPA), using 13882 kW of power. The Guaranteed Performances set the marks that each Train must achieve to pass the performance tests in Clause 25.

47. Annex B of App A is titled "*Case-1: Performance Guarantee Case....(Rev-2).*" Annex B provides the performance test parameters under which the Performance Guarantees must be achieved. In other words, it is the contractual design for the Trains.

48. Clause 4.1 of App A further states that:

> the above Guaranteed Performances may vary in the event changes are introduced to the Basis of Design. In such case, Seller shall re-calculate the Guaranteed Performances and *propose an update of Annex (B). If Buyer confirms its agreement in writing* with these calculations and *with the proposed update of Annex (B)* provided by Seller, *such update shall replace Annex (B).* (Emph. added.)

---

[58] Cody Lindsey admitted that BHGE had no quality control program at the Turner facility. Ex. C-013.

[59] *See* SoC, Part II.G.1, III.A.4; *see also* SoR, Part II.B.

15

49.     In sum, Claimants purchased two Trains that must produce 765.1 TPD of LNG when operating as described in Annex B.  Annex B specifies not only the TPD of LNG, but also, *inter alia*, the amount of feed gas required to generate that LNG and the waste condensate that will be a byproduct.  (Annex B, in turn, is linked to the Basis of Design in Annex A.)

50.     Clause 24.2 of the Contract prohibits BHGE from making any "*Change*" without (i) issuing a change order request that describes any effect of the proposed change, including any impact on the Guaranteed Performances or App A; and (ii) obtaining a signed "*Change Order*" from Claimants.[60]

51.     BHGE willfully breached these requirements.  <u>First</u>, on September 18, 2014, just four days after signing the Contract, BHGE changed the process specified in Annex B by reducing the first pass outlet temperature from -6° C to -70° C <u>without</u> informing Claimants (or, obviously, obtaining a Change Order).[61]   This change without notification not only breached the Contract, but it also violated GE's corporate policy.[62]

52.     BHGE, however, was not merely silent.  It affirmatively concealed the change.  On October 9, 2014, BHGE issued TM-0010, showing that Annex B remained <u>unchanged</u>.[63]

53.     <u>Second</u>, as changed to -70° C, the Trains are incapable of producing 765.1 TPD of LNG under the Annex B conditions.  At -70° C, all of the feed gas exits the first pass as a liquid and freezes in the second and third passes when further chilled.[64]

---

[60]   Ex. C-1, Equipment Contract, Clause 24.2 ("...  *No change shall be made by Seller without a Change Order from Buyer, signed by representatives of each Party who have actual authority to legally bind ....*").

[61]   Hr'g Tr. Vol. 3, pp.113:16-115:18 (Schleicher); *see also* CWS-3 (Pirijns), ¶¶ 16.8-16.12; SoR, ¶¶ 58-67; Lumley Hearing Presentation, Slides 5-7 (and exhibits cited therein).

[62]   Hr'g Tr. Vol. 3, pp.58:17-59:3 (Schleicher).  If the Tribunal was observing Mr. Schleicher at that moment of his cross-examination, his facial expressions sank when he realized this change was not made <u>pre</u>-contract.

[63]   Ex. C-254.  BHGE never proposed an update of Annex B.  While BHGE issued various HMBs in response to Claimants' inquiries regarding possible feed gas composition changes, none was ever proposed to replace Annex B (much less accepted in writing by Claimants as a replacement).

[64]   Hr'g Tr. Vol. 6, pp.134:12-136:24 (Lumley), 234:3-16, 242:17-24, 263:21-275:22 (Smith); Hr'g Tr. Vol. 5, p.113:12-21 (Amidei); CER-6 (Lumley), ¶¶ 6.18, 10.4-10.8.

54.     To correct for this problem, BHGE used a bypass that warms the liquid exiting the first
pass from -70° C to -45° C, causing a "flash" that vaporizes most of the lighter
hydrocarbons (*e.g.*, methane and ethane), separating them from the liquid, which is diverted
away as waste condensate.[65]  But because the separation is not complete, large quantities
of the lighter hydrocarbons remain in the waste condensate.  As a result, the remaining
volumes of gas returning to the coldbox are only sufficient to produce 680.6 TPD of LNG,
an 11.1% reduction from the promised 765.1 TPD.[66]  The waste condensate, meanwhile,
increases to 85.3 TPD, which is a 896% increase over the amount specified in Annex B.[67]

55.     When Claimants discovered this in late 2016, BHGE "*stated that their policy is to allow
zero C5s and C6s to enter the cold box … [and that it] was not possible [to revert back to
the -6° C original design conditions] as the C5s and C6s need to be knocked out.*"[68]  BHGE
offered no remediation, but advised Claimants they would need to buy an HHR system.[69]

56.     Without an HHR system, the Trains would be unable to reach even 90% of the guaranteed
LNG volumes and Claimants would have no practical way to dispose of the waste
condensate.[70]  BHGE's change to the cold box breached Clause 4.1 of App A and 24.2 of
the Contract; its failure to remedy this fundamental process engineering defect, breached
Clauses 25.2(ii)(b) and 17 of the Contract.

57.     Finally, BHGE's assertion that it changed the first pass temperature from -6° C to -70° C
because Claimants changed the feed gas composition and/or demanded atmospheric

---

[65]     Hr'g Tr. Vol. 6, p.242:17-24 (Smith); CER-6 (Lumley), ¶ 10.9.

[66]     CER-3 (Lumley), ¶ 6.2.14; CER-6 (Lumley), ¶ 10.2.

[67]     CER-3 (Lumley), ¶ 6.2.13; CER-6 (Lumley), ¶ 10.3.

[68]     Ex. C-264 (Nov. 17, 2016 email from Mr. Wilson to Mr. Repasky, summarizing conversation the day before).
Ex. C-264 further states that on November 17, 2016, Mr. Repasky again spoke with Mr. Wilson to report that
GE's design team had confirmed "*zero tolerance on C5s.*"  Mr. Repasky's admission in November 2016 — before
any litigation began — confirms Mr. Lumley's testimony that BHGE's original design with a -6° C first pass
temperature was also defective and would cause the second/third passes of the cold box to freeze.  *See* Hr'g Tr.
Vol. 6, p.136:4-14 (Lumley); CER-3 (Lumley), Part 6.1; CER-6 (Lumley), Part 9; *see also* SoC, ¶ 172 and
evidence cited therein; SoR, ¶¶ 68-81 and evidence cited therein.

[69]     CWS-3 (Pirijns), ¶¶ 16.55-16.56.

[70]     *See* Ex. C-264 (describing options for disposing of waste condensate).

storage is false. There was no change in feed gas composition and the request for atmospheric storage came <u>after</u> BHGE had already changed the temperature.[71]

### iii. BHGE's Stress Engineering Breached the Contract[72]

58.  All experts agreed that stress engineering is not hard, but requires care and is design critical for the safety of a process plant.[73] BHGE knew its importance in 2014.[74] While Clause 16.1 of the Contract required BHGE to comply with all applicable industry standards, Clause 3.8 of App A specifically identified ASME B31.3 by name as a mandatory standard to be followed.

59.  ASME B31.3 "*sets forth engineering requirements deemed necessary for safe design and construction of piping installations.*"[75] It also makes it "*the designer's responsibility to assure the owner that they've done everything to be compliant with the code.*"[76]

60.  BHGE has breached — and continues to breach — this mandatory obligation. Prior to shipping the Trains, BHGE did virtually no stress analysis.[77] Even after shipment, but

---

[71] SoR, ¶¶ 58-67. *See also* Ex. C-889 (Oct. 2, 2014 internal BHGE email "*Per my discussion with Chris Bergman – Chart this morning, the current cold box design will only support pressurized LNG storage tanks.*"; this was after the current cold box design was finalized); Hr'g Tr. Vol. 6, pp.129:6-130:23, 132:25-139:5 (Lumley); Hr'g Tr. Vol. 3, pp.142:6-11, 143:2-9 (Schleicher).

[72] *See* SoC, Part II.G.4; *see also* SoR, Part II.C.

[73] Hr'g Tr. Vol. 7, p.231:6-11 (Caligiuri) ("*it's not rocket science [but] it's very, very important to ensure that a facility, particularly the process piping, which is the piping that carries potentially hazardous fluids around a facility is designed properly in conformance with the code....*") (emph. added); CER-8 (Exponent), ¶ 4.1.6 ("*Nonconformities to ASME B31.3 represent potential life safety hazards, prevention of which is, in part, the intended purpose of conformity to the Code.*"). Mr. Linwood agreed. Hr'g Tr. Vol. 7, p.184:6-14 (Linwood) (identification of stress deficiencies is "*a process that takes time[, b]ut provided you have the expertise to do it, it can be done, and it -- within the context of stress engineering, it's straightforward.*"); RER-13 (Linwood), ¶ 4.4.3.4. (explaining that stress deficiencies are "*design critical, requiring construction modifications to be completed prior to placing Train 1 into operation*") (emph. added).

[74] Ex. R-212, pp.19-24 (BHGE project spec. explaining pipe stress analysis is needed "*to prevent 1) Failure of piping components due to overstress 2) Leakage at joints 3) Excessive loads and moments on connected equipment ...*"); Ex. C-753 ("*Engineering In House Design[:] ... Pipe stress and structural analysis*").

[75] CER-8 (Exponent), ¶ 6.1.3.

[76] Hr'g Tr. Vol. 7, p.231:20-22 (Caligiuri); CER-8 (Exponent), ¶ 6.1.3 (quoting directly from ASME B31.3).

[77] Hr'g Tr. Vol. 7, pp.233:10-234:1 (Caligiuri); *see* Ex. C-947 (BHGE stress analyses performed prior to shipping).

before self-declaring mechanical completion in May 2018, BHGE's *stress engineering was entirely unacceptable*."[78]

61.     The difference between BHGE's stress analysis for Shell and the stress analysis that it performed for Claimants is shocking.[79]  It proves both (i) that BHGE knew how to do a proper ASME B31.3 analysis when its customer was Shell, but (ii) chose to ignore those requirements when working for Claimants.

62.     BHGE's "*post-mechanical completion analyses were equally lacking ... and far below what we would expect from a competent designer....*"[80]  As Exponent explained "*The issuance of no fewer than three, inconsistent reports regarding required design modifications ... after the point of mechanical completion raises significant concerns .... We would not expect any competent operator acting in accordance with industry practice to assume it safe to operate a plant with this chronology of identified deficiencies.*"[81]  Even worse, a small sampling of lines proves that even after three reports between December 2018 and August 2019, BHGE's stress analysis continues to be incomplete, missing unsafe, over-stressed lines.[82]

63.     Several of the over-stressed lines that BHGE missed in its original analysis carry highly toxic amine chemicals.[83]  BHGE discovered this problem in early 2018, issued an internal

---

[78]   CER-8 (Exponent), ¶¶ 4.1.6 & 6.1.19; *see also* Hr'g Tr. Vol. 7, pp.229:14-18, 234:5 (Caligiuri) ("*pre-mechanical completion here – stress analyses were entirely unacceptable, not consistent with the applicable code, and really inconsistent with what I would expect to see with the standard of care for projects like this. ... incomplete in my mind.*").

[79]   Hr'g Tr. Vol. 7, pp.233:10- 236:24 (Caligiuri).  In discovery, this Tribunal ordered BHGE to disclose its pre-mechanical completion stress analysis.  It disclosed both the stress work it did for Shell's train in 2012 and 2013, and the work it did on Claimants' trains.  There is no comparison.  *Compare* Ex. C-946 *with* Exs. C-947 & C-953; *see also* CER-8 (Exponent), ¶¶ 6.1.11-6.1.19.

[80]   CER-8 (Exponent), ¶ 6.1.38.

[81]   CER-8 (Exponent), ¶ 6.1.33 (emph. added).  *See generally* CER-8 (Exponent), ¶¶ 6.1.20 - 6.1.38; Hr'g Tr. Vol. 7, pp.239:2-240:25 (Caligiuri).

[82]   CER-8 (Exponent), ¶¶ 6.1.39-6.1.50.

[83]   Hr'g Tr. Vol. 6, p.243:4-6 (Smith).

report without disclosing it to Claimants until this arbitration, and have never fixed it.[84]  In that report, BHGE reported that three lines and nozzles suffer "*High Sustained stress of 86%*" and overload on three nozzles exceeding 700% of the allowable limits.[85]  The report further explains:

> *Cause:*
> 1. *The design of pumps/piping in IEC has been completely deviated from CGC.*
> 2. *"Probably" analysis never was performed on this system (could not find any analysis).*
> 3. *Pipe routing is not flexible enough.*
> 4. *Pipe supporting is not appropriate, wrong type and wrong location.*

64.   BHGE's treatment of the stress issue at the hearing exemplifies its bad faith disregard and minimization — throughout this project — of the problems they have created.   BHGE offered to pay US$ 100,000 for the cost of the steel for needed pipe supports.  But as Mr. Mastronardi explained, the impact of the stress defects goes far beyond the price of steel:

> *The value of your watch is not given by the weight of the steel it's made of. It's ... sophisticated engineering, and you cannot quantify the fact that these pieces of steel are missing with -- with an amount of money.... [H]ow much is the value of the steel in the foundation of a high rise building here in New York? It's negligible, but it's the value of the building. But you cannot say that, as you have not designed the foundation then I give you $10,000, and you live safe with that. There is no safe.*[86]

65.   The true cost of the missing stress engineering is all the time lost while BHGE concealed that its stress analyses were unfinished and inadequate, and the last two years during which BHGE bungled and then abandoned the analysis.  Making the situation even more willful and in bad faith, Mr. Linwood testified that although BHGE has now (purportedly) virtually completed this essential engineering, BHGE is withholding it from Claimants.[87]

---

[84]   Ex. C-948 (2017 Gap Pipe Stress Analysis); Hr'g Tr. Vol. 7, p.250:5-24 (Caligiuri).

[85]   Ex. C-948, pp.2-3 (2017 Gap Pipe Stress Analysis).

[86]   Hr'g Tr. Vol. 2, pp.271:16-272:3 (Mastronardi).

[87]   Hr'g Tr. Vol. 7, p.186:1-16 (Linwood) ("*Q. The work that you say has now been virtually completed has not been provided to IEC, has it? ... A.  It has not, yes.*").

66.     BHGE's actions are a continuing breach of Clause 16.1 of the Contract and Clause 3.8 of App A.  They also breach Clauses 5 and 9.1 of the Contract because delivery of the Trains cannot occur until the engineering is performed and the documentation that ASME B31.3 requires BHGE (as designer) to provide to Claimants has been supplied.

### *iv.  BHGE's Electrical Engineering of the MRC Motors Start-Up System Breached the Contract*[88]

67.     The mixed refrigerant compressors ("**MRC**") generate the coldness that allows the coldbox to liquefy feed gas.  They each require a motor (the "**MRC Motor**") to operate.  Under Clause 3.2.8 of App A, BHGE was required to supply the MRCs and the MRC Motors.

68.     Starting an MRC Motor requires additional equipment, a soft start system.  There are different soft start systems available — Autotransformers, Soft Starters and VFDs — at different price points.[89]   Clause 3.2.8 of App A required BHGE to engineer the methodology for starting the MRC Motors.[90]

69.     The parties initially disputed who was responsible for purchasing the soft start system.  That dispute was resolved in a July 2015 settlement, which became part of the Contract through Change Order 27.  BHGE agreed to "*absorb the cost of MR start-up system ("soft start")*" and guaranteed that the system would work if Claimants purchased BHGE's Jenbacher engines to generate the power that the start-up system would use to start the MRC Motors.[91]  Claimants purchased the Jenbacher engines.[92]

---

[88]   *See* SoC, Part II.G.5; *see also* SoR, Part II.D.

[89]   CER-8 (Exponent), ¶¶ 6.5.1-6.5.2.

[90]   Ex. C-1, Equipment Contract, App A, Clause 3.2.8 ("*The methodology of the startup system will be analyzed further.*").  *See also* Ex C-1146 (Sept. 18, 2014, internal BHGE Hand-Off Meeting Minutes) (identifying "*Electrical motor start*" as a "*technical and/or design risk*" for BHGE).

[91]   Ex. C-486.  *See* Ex. C-1, Equipment Contract, Clause 24.2 (providing that change order is "*an integral part of the Agreement.*").

[92]   To purchase the Jenbacher engines, Claimants had to cancel a contract to purchase the engines and a VFD start-up system from Wartsila, losing their US$ 150,000 deposit.  *See* SoC, ¶¶ 120 & n.7, 207; SoR, ¶¶ 139-140.

70. Even though Claimants believed a VFD was required,[93] BHGE chose a Soft Starter, which is substantially cheaper than a VFD. BHGE assured Claimants that *"The soft starter WILL work."*[94]

71. The soft starter does not work.[95]

72. During the February 2019 Rumuji meeting, BHGE agreed that its engineering of the start-up system had failed and agreed to remedy its failure by purchasing and installing the required VFDs.[96] But it never did so.[97]

73. BHGE is in continuing breach of its obligations under Clause 3.2.8 of App A to engineer the starting system and under Change Order 27 to provide one that works. It is also in breach of Clauses 5 and 9.1 because delivery of the Trains cannot occur before the engineering is completed and a start-up system is provided. Finally, BHGE has also willfully and in bad faith breached Clauses 17.1 and 17.4 by refusing to remedy these defects and instead abandoning the project.

---

[93] *See* SOR, ¶¶ 142, 145, 149; First Pirijns W.S., ¶ 15.21.

[94] Ex. C-248 (Email from Michael Cohen to Werner Pirijns et al., dated March 28, 2016).

[95] CER-8 (Exponent), Part 5.1.4. at pp.26-32.

[96] CWS-3 (Pirijns, ¶¶ 15.20-15.22 (*"At the February 2019 meeting, the GE electrical engineers finally conceded that despite trying for a year to manipulate the start-up, their system could not work, and they agreed that a VFD would be required."*); *see also* Ex. C-555, p.6 (*"GEOG asked IEC if they have any preferred/previously identified VFD solution…. GEOG to identify a viable long-term sustainable solution asap."*); *see also* Ex. C-186 (Letter from IEC to GE, dated February 28, 2019).

[97] In this arbitration, BHGE has tried to excuse its *volte-face* on purchasing the VFDs by arguing that Change Order 27 only required it to purchase a Soft Starter, and not any other type of sort start system, such as a VFD. That is wrong. Change Order 27 requires BHGE to provide an "*MR start up system ('soft start')*." Ex. C-486. Exponent's unchallenged opinion is that "*In common industry parlance, the reference to "MR start up system ('soft start')" would be understood to mean whatever starting system would be appropriate to start the MRC motors, whether that was an autotransformer, a soft starter, or a VFD, because all three provide a soft start to the motor.*" CER-8 (Exponent), ¶ 6.5.2. Dr. Wright explained the same point during his testimony, again without contradiction. Hr'g Tr. Vol. 4, p.106:11-18 (*"Now, there are several soft start solutions that are discussed: Auto transformers, soft starter, and VFDs. They can all provide soft start in order to reduce the electrical mechanical stress on the motors. And Trains 1 and 2 were designed specified as soft starters as opposed to VFDs by GE and installed as such originally."*). *See also* Ex. C-253 (December 2018 proposal from GE Power for a VFD called a "*Mixed Refrigerant Soft Starter Variable Speed Soft Starter System*."); Ex. C-253, p.37 (*"Two Soft Starter (Step down transformer, Variable Frequency Drive [VFD], …) are offered for #4 existing motors"*).

74. Claimants have been left to cure BHGE's breach, and are doing so by purchasing one VFD (for now), building a facility to house it and installing it.

### v. *BHGE's Electrical Engineering of Main Power Cables Breached the Contract*[98]

75. Similar to stress engineering, cable selection is an aspect of electrical engineering that is not very difficult, but very important to get right.[99] Use of undersized cables evinces reckless indifference to plant safety, and a fundamental lack of quality control.[100]

76. Clause 3 of App A obligates BHGE to provide the engineering design for the Trains.[101] BHGE performed this design work by, *inter alia*, creating electrical specifications and technical data sheets for the cables, cable trays and other electrical equipment.[102] Clause 3 of App A also obligates BHGE to procure this equipment for the Trains. Clause 3.8 of App A requires that "*all electrical equipment shall be in compliance with: NEMA, ANSI-IEEE, IEC codes.*" Finally, Clause 17.1 of the Equipment Contract warrants that the Trains "*shall be free from Defects ... and in accordance with [all] agreed specifications.*"

77. As described by Dr. Wright, BHGE undersized at least three sets of electrical cables in violation of the electrical codes.[103] First, the cables for the instrument air compressors; BHGE admitted this and replaced them.[104] Second, the cables from the transformers to the

---

98 *See* SoC, Part II.G.3; *see also* SoR, Part II.F.

99 Hr'g Tr. Vol. 4, p.146:5-8 (Middleton) ("Q *Would you agree with me that the selection of cables in a plant requires careful attention? A Yes. It's – but it's not a difficult thing.*").

100 Hr'g Tr. Vol. 4, pp.158:24-160:15, p.166:2-8 (Middleton) ("*Q And where [there] were mistakes are not caught, that it would be a reflection of an inferior quality system? A One would imagine so, yes.*").

101 Ex. C-1, Equipment Contract, App A, Clause 3 ("*Seller's Scope of Supply for the Plants includes ... engineering design ...*"). *See also* Ex. C-1, Equipment Contract, App A, Clause 3.6.11 (obligating BHGE to test all "*[a]ll interconnecting cabling*").

102 *See, e.g.*, C-966, GE-S14006-EROO-SCH CBL-REV07.pdf; C-967, MV Power Cables Technical Data Ed. 08/2017-11-06, MV Technical Data.pdf. *See generally* Ex. C-1, Equipment Contract, App A, Clause 3.7 (obligating BHGE to provide the Electrical One-Line Diagrams, which include cable lists).

103 Hr'g Tr. Vol. 4, pp.101:20-105:21 (Wright); CER-2 (Exponent), Parts 3.1.3 & 5.1.3; CER-8 (Exponent), ¶¶ 6.4.6-6.4.7, 6.4.17-6.4.20.

104 RER-12 (Middleton), ¶ 6.4.1.1 (cables "*too small for the rating of the short circuit protection in LVMCC-3*").

MCC room — the black cable shown during the hearing; BHGE admitted this, but has not replaced them.[105] <u>Third</u>, the cables for the MRC Motors — the red cable shown during the hearing; BHGE's electrical engineers admitted this during the February 2019 Rumuji meeting, but BHGE now denies it in the arbitration.[106]

78.     Despite BHGE's denial now, the cables for the MRC Motors are undersized. As Dr. Wright explained, these cables were undersized whether installed in air on cable trays or buried underground, although they are <u>less</u> undersized when buried. Specifically, Dr. Wright explained that when cables are unable to dissipate heat, their insulation break downs, eventually leading to arcing and possible fire. Because the cable trays designed by BHGE do not allow sufficient air flow around the cables to dissipate the heat (they are solid rather than perforated), he concluded that standard de-rating factors must be applied that render the cables undersized for the current they are required to carry.[107]

79.     In his testimony at the hearing, Mr. Middleton developed a new argument for why these MRC Motor cables are not undersized. He asserted that the cable trays were fine because the solid metal cable tray walls and lip, against which the cables must abut, do not necessitate any de-rating because they would not reflect heat back onto the cables.[108] This thesis, which is inconsistent with common sense, was also rejected by Dr. Wright, who explained (i) that abutting the cables up against the solid metal walls and lip of the cable tray necessitates a de-rating because they cannot be sufficiently cooled in that

---

[105]   Ex. C-555 ("*GEOG will replace cables on the secondary T-1 ... GEOG currently working in the final cable selection and procurement of the cables. ... Remedy actions will be at GEOG cost*"); Hr'g Tr. Vol. 4, p.131:5-20 (Middleton) ("*I agree with the Exponent Report, ... the design should have included more tray work*"). *See also* CWS-3 (Pirijns), ¶ 15.16; CWS-12 (Pirijns), ¶¶ 4.34-4.35 (despite its promises, BHGE has failed to replace cables).

[106]   *Compare* Ex. C-555, pp.3-4 ("*GEOG selected and supplied cables are not suitable to feed the MR Compressor Motor ... GEOG has to supply suitable cables — GEOG has identified 300 sqm cable size for the application, which IEC agrees. ... GEOG has started the procurement process ... Cable re-procurement shall be made at GEOG cost*") *with* Hr'g Tr. Vol. 4, p.136:5-9 (Middleton) ("*I believe that the 12-inch tray for those two very large red cables ... should be sufficient to provide the necessary spacing*").

[107]   CER-8 (Exponent), ¶¶ 6.4.6-6.4.16.

[108]   Hr'g Tr. Vol. 4, pp.180:16-187:23 (Middleton).

configuration[109] and (ii) in any event, once the cables reach the MCC room, it is impossible to give them even the single cable diameter spacing that Mr. Middleton said was the only requirement to avoid de-rating.[110]

80.     BHGE's under-sizing of three (or even two) sets of major cables violated the electrical codes, in breach of Clause 3.8 of App A.  In accord with Clauses 17.1 and 17.4 of the Contract, BHGE committed during the February 2019 Rumuji meeting to remedy those breaches by purchasing and installing the required cables.[111]  As with the VFD, BHGE reneged on that commitment and has instead abandoned the project in bad faith.

81.     As a result, BHGE is in continuing breach of its obligations under Clause 3.8 of App A to engineer the cables in accord with applicable electrical codes and in a safe manner.  BHGE has also willfully and in bad faith breached Clauses 17.1 and 17.4 of the Contract by refusing to remedy these defects, leaving Claimants to cure that breach.

### vi. BHGE's Engineering of the Flare System Breached the Contract[112]

82.     BHGE was responsible for designing the flare system and supplying its components. Under Clause 3.2.12 of App A, BHGE agreed "*the Plant pressure relieving system will be designed per API 520 'Sizing, Selection, and installation of Pressure-Relieving Devices in Refineries,' and API 521 'Guide for Pressure-Relieving and Depressurizing Systems*."

---

[109]  Hr'g Tr. Vol. 4, p.104:4-14 (Wright) ("*while the bottom of the cable tray is certainly allowed to have air flow through the cables [because it has a ladder-like bottom] as they are pushed up against the side [of the cable tray] some of the heat from the cable will be transferred into the wall of the cable tray as well as the lip on top of it. Heat from sun will be transferred to that side wall of the cable tray and then back to the cable ... indicating the cables can't be spaced with the necessary spacing for cooling*").

[110]  Hr'g Tr. Vol. 4, pp.104:23-105:8 (Wright) ("*The issue that I saw when visiting the plant ... is that in the entrance to the MCC room and the entrance designed by GE, there's not enough room to pull the cables apart there to have the one cable spacing.  Additionally, inside the room you can't have the spacing and you're limited by your most conservative metric ... and have to use the de-rating factor based on that.*").

[111]  *See* n.96, above. *See also* Ex. C-243 (Respondents' revisions to Claimants' draft Minutes of Meeting on February 12-13, 2019).

[112]  *See* SoC, Part II.G.2; *see also* SoR, Part II.E.

83.  The facts regarding BHGE's deficient flare system design are not disputed. Mr. Borrowman, BHGE's technical expert, conceded that BHGE's design (1) for the hot temperature vent header contains upward sloping sections,[113] contrary to the contractually mandated API standard; (2) for numerous other segments of that vent header have zero slope;[114] (3) for most of the discharge lines in that vent header have no slope (and that he had not calculated the volume of liquid that could build up in those lines, and that BHGE itself conceded that such a design was a mistake);[115] and (4) for the pressure relief valve of the Boil Off Gas skid was not what he would have expected or preferred.[116]

84.  Mr. Borrowman excused all of these defects, asserting that API 520 and 521 were only "*recommendations*," and that the defects (based on his inconsistent calculations) should not result in a critical accumulation of liquid in the flare pipes. The Contract disagrees; Clause 3.2.12 says the system "*will be designed*" in compliance with the API standards. And as Dr. Caligiuri explained, "*recommended practices are recommended that you do it. And/or if you're not going to do it, then you better be sure you are justifying why you are not doing it*."[117] Mr. Borrowman, who agreed with Dr. Caligiuri that any departures from API 520 and 521 must be justified,[118] does not state that BHGE has justified these violations of API 520 and 521. In fact, BHGE told him that they had not.[119] Mr. Borrowman's after-the-fact calculations to try to justify these violations, moreover, were wrong.[120]

85.  As a result, BHGE is in continuing breach of its obligations under Clause 3.2.12 of App A to engineer the Flare System in accordance with the API codes. It is also in breach of

---

[113]  Hr'g Tr. Vol. 7, p.209:5-9 (Borrowman).

[114]  Hr'g Tr. Vol. 7, p.210:13-16 (Borrowman).

[115]  Hr'g Tr. Vol. 7, pp.210:22-211:23 (Borrowman).

[116]  Hr'g Tr. Vol. 7, pp.216:22-217:17 (Borrowman).

[117]  Hr'g Tr. Vol. 7, pp.242:19-243:1 (Caligiuri).

[118]  RER-11 (Borrowman), ¶ 4.5.1.4.

[119]  *See* Ex. R-227 (admitting "*zero slope*" was "*a mistake*"; skid was inconsistent with "*GE's own design philosophies*").

[120]  *See* SoR, ¶ 167 (citing CER-8 (Exponent), Part 6.2).

Clauses 5 and 9.1 of the Contract because delivery cannot occur before the engineering is completed.  BHGE has also willfully and in bad faith breached Clauses 17.1 and 17.4 of the Contract by failing to remedy these defects.

### 3.    BHGE Breached the Contract by Abandoning the Project[121]

86.    BHGE's abandonment of the project in mid-2019 further breached its obligation to deliver fully modularized, operable and defect-free Trains.  Among other things, BHGE agreed in the February 2019 Rumuji meeting to resolve the stress defects, to provide a working MRC motor starting system, to provide and install replacement cables, and to correct design flaws allowing dissimilar metals to be in direct contact.[122]  Mr. Linwood testified that BHGE still needs to inspect the Trains on site in order to complete its stress analysis.[123]  Mr. Pirijns, Mr. Mastronardi and Mr. Van den Broeke testified that BHGE is still needed for, *inter alia*, the still incomplete automation system for Trains 1 and 2.[124]

87.    BHGE contends that Claimants refused to permit it to conduct an HSE audit of the Plant and failed to provide adequate information regarding two minor incidents in spring 2019.  Mr. Dunagan, who has worked with BHGE entities before, testified that BHGE's requests were inconsistent with industry practice and Claimants' responses were appropriate.  Mr. Dunagan, who performed a 7-day audit of the Rumuji facility, considered himself entirely safe and viewed the facility favorably as compared to what might be found in the U.S. or Europe.[125]  He concluded BHGE's HSE excuse was pretextual: "*my perception is that the stated rationale for departing the site was a pretext.  I can't, in my experience, recall a contractor departing a site under these circumstances for this type of safety situation*."[126]

---

[121]  *See* SoR, Part IV.

[122]  Ex. C-555 (Draft minutes of February 12-13, 2019 Rumuji meeting).

[123]  Hr'g Tr. Vol. 7, p.186:1-7 (Linwood).

[124]  Hr'g Tr. Vol. 2, pp.15:20-16:6, 107:9-14 (Van den Broeke); CWS-3 (Pirijns), ¶¶ 14.181-14.187.

[125]  Hr'g Tr. Vol. 7, p.60:2-12 (Dunagan).

[126]  Hr'g Tr. Vol. 7, p.65:3-7 (Dunagan).

88. Mr. Dunagan's evidence is uncontradicted. BHGE's HSE expert, Mr. Borrowman, issued two generic reports that express <u>no</u> opinion about the safety of the Rumuji site. Central to his first report is his opinion that the Nigerian Department of Petroleum Resources ("**DPR**") has a rigorous inspection process that BHGE should ensure is fulfilled before Train 3 is placed into operation. BHGE never told Mr. Borrowman that DPR conducted that detailed inspection before issuing its certificate authorizing the operation of Train 3.[127]

89. Mr. Dunagan's conclusion of pretext is also confirmed by BHGE's behavior since abandoning. At the closing argument, BHGE stated "*If they provided us with the information about safety they provided to you, we probably would have come back*."[128] Having received that information three months ago, BHGE has not "*come back*."

C. **GEN Breached the Services Agreement**[129]

90. GEN's breaches of the Services Agreement are discussed in the SoC and SoR.[130] The uncontradicted testimony is that GEN's personnel were not capable of doing the work.[131]

91. If the Tribunal finds Claimants' installation of the Trains caused any concurrent delay (a finding that would be inconsistent with the evidence) or contributed to any defect (a finding that would also lack any evidentiary support), those circumstances would necessarily arise from GEN's failure to provide the on-site supervision necessary "*to ensure that the Plants are properly installed and function to their designed and warranted capacities*."[132]

---

[127] Hr'g Tr. Vol. 7, pp.40:5-43:1 (Borrowman); Ex. C-1054 (referencing Pre-Start Up Safety Review (Ex. C-1112)); Ex. R-270; CWS-12 (Pirijns), ¶ 9.15.

[128] Closing Arguments Tr., p.184:19-21.

[129] *See* SoC, Parts II.G.22, III.A.7.

[130] SoC, ¶¶ 100-111, 292-296, 341-342; SoR, ¶¶ 45, 126.

[131] *See* CWS-3 (Pirijns), ¶¶ 14.178-14.180; CWS-2 (Srinivasan), ¶¶ 3.2-3.5, 6.1-6.3; CWS-12 (Pirijns), ¶¶ 8.1-8.10.

[132] Ex. C-2, Services Agreement, Recitals.

### III. BHGE IS LIABLE FOR THE OVER US$ 700 MILLION IN DAMAGES IT CAUSED CLAIMANTS

92. Part III.A summarizes the evidence establishing causation and damages. Part III.B. explains why the exculpatory clauses are unenforceable. Part III.C. describes the direct damages Claimants would be entitled to even if the exculpatory clauses were enforceable.

### A. BHGE's Breaches Have Caused Claimants' Damages[133]

#### 1. Legal Standard for Causation and Quantum

93. Under New York law, a party seeking damages for breach of contract must prove that the breach was a substantial factor in causing the injury.[134]

94. In delay cases, the plaintiff must demonstrate "*that defendant was responsible for the delay; that these delays caused delay in completion of the contract (eliminating overlapping or duplication of delays); that the plaintiff suffered damages as a result of these delays; and plaintiff must furnish some rational basis for the court to estimate those damages, although obviously a precise measure is neither possible nor required*."[135] The plaintiff "*may satisfy its burden by putting forth evidence and testimony which taken together*" proves "*that a delay affected not just an isolated part of a project, but its overall completion*."[136] Typically, this is done with a critical path analysis, like the one Dr. Lancaster performed.[137]

---

[133] *See generally* SoC, Part IV; SoR, Part XI.

[134] Joseph M. Perillo, Corbin on Contracts Damages §55.9 (Rev. Ed. 2005) (CL-233).

[135] *Manshul Constr. Corp. v. Dormitory Auth. Of New York*, 79 A.D.2d 383, 387 (N.Y. App. Div. 1981) (CL-199); *Najjar Indus., Inc. v. City of New York*, 451 N.Y.S.2d 410, 414-15 (N.Y. App. Div. 1982) (CL-244) ("*[W]hen it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach. A person violating his contract should not be permitted entirely to escape liability because the amount of the damages which he has caused is uncertain.*"), aff'd sub nom. *Najjar Indus., Inc. v. City of New York (Greenpoint Incinerator)*, 502 N.E.2d 997 (1986).

[136] *Helena Assocs, LLC*, 2008 WL 2117621, at *4 (CL-170) (holding that a formal critical path analysis is not required by New York law); *Morrison Knudsen Corp.*, 175 F.3d at 1233 (CL-197).

[137] *See Morrison Knudsen Corp.*, 175 F.3d at 1233 (CL-197) ("*Courts often use [critical path methodology ("CPM")] to resolve disputes over excusable-delay claims. . . . a contractor must prove that a delay affected not just an isolated part of a project, but its overall completion.*").

95.     The burden of proving the amount of damages is not a heavy one. "*Damages need not be proven with mathematical certainty, but there must be enough evidence . . . to make a reasonable estimate of damage*."[138] It is enough to reach "*rough estimates based on reasonable but imprecise credibility determinations*."[139]  New York courts have applied this rule in construction delay cases, recognizing that the plaintiff need only provide a rational basis for the fact-finder to make a determination of damages.[140]

## 2.     BHGE's Delay in Delivering the Trains Caused Damages

96.     Under Clause 6.5 of the Contract, "*[s]hould Seller's failure to deliver a Plant (or any portion thereof) continue beyond the Delay Limit Date, then Buyer shall have the right to pursue and exercise the rights and remedies in Clause 6.6*."  The Delay Limit Date (which is when the ten weeks of liquidated damages are exhausted) was reached on September 2, 2015 for Train 1 and on December 3, 2015 for Train 2.

97.     Clause 6.6 gives Claimants four independent rights, expressed as separate, "*and/or*" rights. The second of those rights entitles Buyer to "*recover from Seller any direct damages Buyer suffers in accordance with the Agreement subsequent to the Delay Limit Date*."[141]

---

[138]   *Liberty Media v. Vivendi Universal, S.A.*, 923 F. Supp. 2d 511, 531 (S.D.N.Y. 2013) (CL-200) (upholding jury verdict in breach of warranty case concluding that jury appropriately "*arriv[ed] at rough estimates based on reasonable but imprecise credibility determinations*.")

[139]   *Liberty Media*, 923 F. Supp. 2d at 531 (CL-200).

[140]   *S. Leo Harmonay, Inc. v. Binks Mfg. Co.*, 597 F. Supp. 1014, 1030 (1984)(CL-173) (quoting *Berley Indus., Inc. v. City of New York*, 45 N.Y.2d 683, 687 (N.Y. 1978) (CL-201) ("*[C]ourts have often recognized that the extent of harm suffered as a result of delay, such as the loss of efficiency claim in issue, may be difficult to prove. Thus, courts have recognized that a plaintiff may recover even where it is apparent that the quantum of damage is unavoidably uncertain, beset by complexity, or difficult to ascertain, if the damage is caused by the wrong. As the New York Court of Appeals commented: "The law is realistic enough to bend to necessity in such cases.*"))

[141]   Ex. C-1, Equipment Contract, Clause 6.6(ii).  BHGE has argued Claimants are not entitled to damages under Clause 6.6(ii) because they failed to give notice under Clause 6.6(i).  But Clause 6.6 expresses Buyer's "*rights*" as plural, separately, "*and/or*" rights, making clear that 6.6(i) and 6.6(ii) are separate rights. And the phrase "*and, at its entire discretion*" at the conclusion of Clause 6.6 would be meaningless if Claimants could not exercise their discretion to seek relief under subclauses (ii), (iii) and (iv) without also exercising clause (i). Regardless, the record is replete with Claimants' demands for delivery and BHGE's failures to meet them.  At both Florence meetings, BHGE itself offered specific dates that BHGE then failed to meet.

### i. *BHGE's Delays Caused Massive Delays in the Project*

98.   Consistent with general practice (*see* n.48), Dr. Lancaster did a detailed critical path analysis to calculate the duration of BHGE-caused delay.[142] Mr. Blinkhorn, BHGE's delay expert, did not perform a critical path analysis, but blindly adopted the assertions of BHGE's quantum expert, Mr. Hillier, who also did not do a critical path analysis.[143]

99.   Dr. Lancaster's analysis showed that BHGE's delayed the project by 54 months and 51 months, respectively, as of year-end 2019.  That delay is continuing, as items identified by Dr. Lancaster on the critical path (*e.g.*, stress issues, VFD) remain incomplete.  Dr. Lancaster considered the alleged concurrent delays in his Reply report and concluded that none caused any portion of the project delay.[144]

### ii. *Mr. Lapuerta's Calculation of Delay Damages*

100.   Mr. Lapuerta (Claimants' quantum expert) submitted a cash flow model that assesses the total damages from BHGE-caused delay at $700 million.[145]

101.   The model compares the cash flows that would have occurred absent BHGE's breaches to the actual cash flows experienced by Claimants to date and projected going forward.[146]  In other words, Mr. Lapuerta used a discounted cash flow ("**DCF**") analysis that examined the inflows and outflows of cash to the business in two scenarios, *i.e.*, the "but for" and "actual" scenario, with the difference between the two representing Claimants' damages.[147]

---

[142]   CER-1 (Lancaster), ¶¶ 150-151; CER-7 (Lancaster), ¶¶ 123-127; Hr'g Tr. Vol. 8, pp.6:25-158:16 (Lancaster).

[143]   Hr'g Tr. Vol. 8, pp.172:3-173:15 (Blinkhorn).

[144]   *See* CER-7 (Lancaster), *passim*.

[145]   CER-10 (Lapuerta), ¶ 106.

[146]   Hr'g Tr. Vol. 10, pp.152:19-154:16 (Lapuerta).

[147]   CER-4 (Lapuerta), ¶¶ 11-15.

102. U.S. courts recognize that DCF is "*the preeminent valuation methodology*" currently being used among experts for determining damages in the nature of lost enterprise value, which is essentially the situation here.[148]

103. To project cash flows, Mr. Lapuerta began with the models that Claimants used (and still use) to evaluate whether to make their $500 million investment. Mr. Lapuerta tested those models against demand, including by (i) examining the economic proposition for the product, which undercut the diesel market by 35%-40% and provided a reliable energy solution in a region that lacks reliable electricity or gas distribution networks; and (ii) testing the demand by reviewing letters of intent and contracts from customers and traveling to Nigeria to interview a sample. Mr. Lapuerta then discounted future cash flows to account for political risk and the time value of money (reducing damages by approximately 55%) and applied offsets to account for tax benefits and other gains.[149]

104. To the extent that BHGE challenge Mr. Lapuerta's reliance on projected sales, Ms. Sahajwalla testified at length about the productive sales effort going back to 2015. She and Mr. Van den Broeke have also provided extensive detail in their witness statements. Ms. Sahajwalla also confirmed that since the start-up of Train 3 in May 2019, Claimants have been steadily overcoming the doubts sown from years of delay.[150] Since operations began, the level of sales has steadily increased with daily sales reaching 140 TPD in November 2019, and 200 TPD by the time of the hearing in December 2019.[151]

[148] *Kipperman v. Onex Corp.*, 411 B.R. 805, 846 (N.D. Ga. 2009) (CL-234) (describing DCF as preeminent); *Charron v. Sallyport Global Holdings, Inc.*, No. 12-cv-6837, 2014 WL 7336463, at *10-12 (S.D.N.Y. 2014) (CL-235); *Neal v. Alabama By-Products Corp.*, Civ. A. 8282, 1990 Del. Ch. LEXIS 127, 1990 WL 109243, at *7 (Del. Ch. Aug. 1, 1990), *aff'd*, 588 A.2d 255 (Del.1991) (CL-236); *see also Matrix Group Ltd., Inc. v. Rawlings Sporting Goods Co.*, 477 F.3d 583, 594 (8th Cir. 2007) (CL-237) (referring to method as preeminent); *Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 362, 44 V.I. 419 (3d Cir. 2002) (CL-238); *In re Valley-Vulcan Mold Co.*, 5 Fed. App'x. 396, 2001 WL 224066, at *3 (6th Cir. 2001) (CL-239).

[149] CER-4 (Lapuerta), ¶¶ 20-34, 98-101 & Table 4; CER-10 (Lapuerta), ¶¶ 18, 25, 45-46, 87.

[150] CWS-9 (Sahajwalla), ¶¶ 4-10, 13.

[151] CWS-9 (Sahajwalla), ¶ 5; Hr'g Tr. Vol. 5, p.131:20-25 (Sahajwalla).

105.     The rate of increase reflects the demand for LNG in Nigeria.  Both Ms. Sahajwalla and Mr. Van den Broeke cautioned, however, that until they have a second operational train, they are being careful not to over-extend their sales efforts.[152]

106.     Evidence of the actual sales is plentiful.  Apart from Ms. Sahajwalla's testimony, the actual invoices are in the record,[153] as is testimony of other witnesses confirming LNG sales from Train 3.[154]  Further, Mr. Lapuerta traveled to Nigeria, interviewed customers, witnessed LNG deliveries, and confirmed LNG sales.[155]

107.     As a measure of the reasonable return on the completed Trains 1 and 2 during the period of delay, Mr. Lapuerta's analysis is conservative.  He testified at the hearing that his calculated damages are equivalent to an annual 13% return on investment, which is substantially lower than the project's projected IRR of 30%.[156]  The difference is largely due to Mr. Lapuerta's heavy discount of future cash flows for political risk.[157]

108.     Mr. Lapuerta's calculations are backed by the strong economics of the business.  Mr. Van den Broeke, Mr. Helsen and Mr. Lapuerta's testimony all confirm that the plant generates enough revenue to cover all operating expenses for three Trains as soon as the first Train reaches 500 TPD in production.[158]  As such, the revenue generated from any sales above 500 TPD are pure profit before considering interest, taxes and depreciation.

109.     As Mr. Lapuerta explained in his presentation at the hearing, using the average $419/metric ton price that has been achieved to date, together with the promised 750 MT production/day over 330 days of operation each year, results in three trains generating $199 million per

---

[152] Hr'g Tr. Vol. 5, p.134:7-135:23 (Sahajwalla); Hr'g Tr. Vol. 2, p.16:20-17:13 (Van den Broeke).

[153] *See, e.g.*, Ex. C-1003.

[154] *See, e.g.*, Hr'g Tr. Vol. 6, p.111-18-21 (Helsen).

[155] CER-10 (Lapuerta), ¶¶ 55-60, 71-81; Hr'g Tr. Vol. 10, pp.87:19-24, 164:13-25, 165:8-24 (Lapuerta).

[156] Hr'g Tr. Vol. 10, pp. 97:17-21 (Lapuerta).

[157] CER-10 (Lapuerta), ¶¶ 45-47.

[158] Hr'g Tr. Vol. 2, p.21:2-6 (Van den Broeke); Hr'g Tr. Vol. 6, pp.110:6-112:17 (Helsen); CER-10 (Lapuerta), ¶¶ 17-23.

33

year in free cash flow.[159]  Simply put, the business was expected to be (and will be) extremely profitable.

110.  Although loose language has been used throughout the written submissions, Mr. Lapuerta's analysis is not a lost profit analysis.  Rather, his analysis calculates the difference in the present value of cash flows that are delayed due to BHGE's breaches.

111.  Mr. Lapuerta's primary damages model assumes five trains, because Claimants intended to use the cash flows from Trains 1 and 2 to finance the purchase of at least three additional trains, and modeled their investment accordingly.  Mr. Lapuerta testified at the hearing that Claimants were, in fact, purchasing two additional, even larger trains, but that their acquisition was delayed because of the inoperability of Trains 1 and 2, causing a delay in the cash flows to support the acquisition.[160]  Mr. Helsen and Mr. Van den Broeke have testified that this was always the plan.[161]  Mr. Lapuerta confirmed that he has reviewed documents between BHGE and Claimants, dating back to the time that the Contract was signed "*for example, that referred to the possibility of four-plus trains*."[162]

112.  Under this model, Mr. Lapuerta calculates Claimants' damages at $700 million.  Under a two-train model, Mr. Lapuerta calculates damages of $304 million.[163]

113.  BHGE's expert provides no plausible alternative.  Ms. Linnell estimates maximum damages of $129,000, assuming BHGE is responsible for 100% of the delay.[164]  This is facially nonsensical, as BHGE agreed in the liquidated damages clause that a reasonable damages estimate for delay would be $212,000 *per train per week*.  She achieves this result

---

[159]  Lapuerta Hearing Presentation, Slide 4; Hr'g Tr. Vol. 10, pp.158-160 (Lapuerta).  Mr. Lapuerta's analysis is consistent with the testimony of Mr. Helsen.  Hr'g Tr. Vol. 6, pp.99:6-101:15 (Helsen) ("*we arrive at – for three plants, at approximately 196 million cash flow being generated*" per year).

[160]  Hr'g Tr. Vol. 10, pp.13:3-18:16 (LaPuerta); CWS-5 (Helsen), ¶¶ 36-44.

[161]  Hr'g Tr. Vol. 6, p.110:9-14 (Helsen); Hr'g Tr. Vol. 2, p.106:8-19 (Van den Broeke).

[162]  Hr'g Tr. Vol. 10, p.155:18-20 (Lapuerta).

[163]  CER-10 (Lapuerta), ¶ 100.

[164]  RER-15 (Linnell), ¶¶ 4.4-4.5.

through financial alchemy. Turning gold into lead, her formula takes the money paid to date for the Trains (not what was actually invested in the project), multiplies it by a return rate of 1.2% (a return an investor would demand for a bank certificate of deposit, not a Nigerian energy distribution project); multiplies that by a delay of 38.5 weeks (rather than 51-54 months); inexplicably discounts the entire number by 62%; and then applies a 50% discount for "risk" (despite having already assumed a 1.2% interest rate).[165]

114. Removing the discounts (which Ms. Linnell did not apply in her report, but only at the hearing), assuming the losses were on the full US$ 500 million investment over the full delay of 51-54 months, and applying the contractual interest rate of 12% proposed by Mr. Hillier, the damages would be at least US$ 255,000,000. (US$ 500mm x 12% x (51/12) = US$ 255,000,000). Ms. Linnell's own methodology (but not her unsupported inputs and calculations) confirms that BHGE has caused damages in the hundreds of millions.

### iii. Mr. Helsen's Alternative Calculation of Damages for Delay

115. Claimants also presented damages figures from Mr. Helsen, an accountant of 40 years' experience with direct knowledge of the accounting systems, personnel, business and accounts of the IEC group.

116. Mr. Helsen's calculations have a different objective than Mr. Lapuerta. They demonstrate just the costs and losses incurred through the expected date in 2020 for completing Trains 1 and 2,[166] without accounting for delay in "cash-in" from LNG sales.

117. BHGE has suggested that there is no support for Mr. Helsen's quantifications because they were not presented by an independent quantum expert. However, "*[t]here is no rule that damages can be proved only by documents, only by experts, or only by disinterested third parties.*"[167] Mr. Helsen is unquestionably qualified to do the work he has done. To the

---

[165]  RER-15 (Linnell), ¶¶ 2.64, 3.34; Hr'g Tr. Vol. 10 p.214:11-21 (Linnell).

[166]  Mr. Helsen assumed a start-up date of March 2020 for Trains 1 and 2. CWS-10 (Helsen), ¶ 58. The actual start-up of the Trains is likely to be later, which would of course make Mr. Helsen's calculations conservative.

[167]  *Micro Data Base Systems v. Dharma Systems, Inc.*, 148 F.3d 649, 657 (7th Cir. 1998) (CL-203) (evidence consisting entirely of testimony by lay witness and company president provided appropriate ground for damages

extent BHGE suggests he may be biased, the Tribunal will assess his credibility. We simply note the irony in BHGE's argument; their supposedly "independent" expert, Mr. Hillier, was secretly opining on the reasonableness of his own prior work. Mr. Hillier's (and BHGE's) failure to disclose that fact raises genuine credibility issues.

118.    Each category of Mr. Helsen's delay damages, considered below, was derived from Claimants' accounting records, which are independently audited by KPMG.[168]

119.    <u>Loss of Useful Life:</u> Relying on the promised delivery dates, Claimants bought equipment, such as delivery trucks, storage tanks, and regasification equipment. This equipment sat idle for years because of BHGE's delay. Similarly, the parts of the Trains that were shipped have sat idle for years in the harsh Nigerian climate. They are less valuable now than when new.[169] Claimants have lost roughly a fifth of the estimated useful life of the Trains, and a greater portion of the useful life of the semi-trailers (10-year depreciation), customer equipment (10-year depreciation); fueling stations (10 years), and trucks (3 years). Mr. Helsen calculates the loss of useful life of the plants and balance of plant at $68,729,792.78 and the loss of useful life of logistical and customer equipment at $19,074,435.52.[170]

120.    <u>Loss of Auxiliary Products and Containers in the Drying Process:</u> Claimants have wasted funds on nitrogen and chemical storage products during the long delay period. This cost is $1,084,953.74.[171]

---

award); *see also Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 265 (2d Cir. 1995) (CL-204) (applying New York law and holding that lay witness and company president "*certainly is capable of projecting lost profits*" and "*provided the jury with a reasonable basis upon which to calculate lost profit damages*" where evidence showed that specific customers had stopped dealing with the company); *Tempco Elec. Heater v. Temperature Engineering Co.*, No. 02 C 3572, 2004 WL 2931329, at *5 (N.D. Ill. Dec. 15, 2004) (CL-205) (adopting *Micro Data* and holding that damages could be calculated by Tempco's CFO, a former financial analyst and CPA).

[168]   CWS-10 (Helsen), ¶¶ 5, 70, 72, 95.

[169]   RWS-4 (Pagliaro), ¶ 70 (incorrectly assuming installation of the modules was delayed by Claimants, but stating in that context that "*the equipment sat outside at the plant for months, with the resulting wear and tear/damage*").

[170]   CWS-10 (Helsen), ¶¶ 52-60, 61-66.

[171]   CWS-10 (Helsen), ¶¶ 45-51.

121.   <u>Wasted Operational Expenses:</u>   Claimants have incurred years of wasted operational expenses. Had Claimants known that the Trains would be delayed through 2020, Claimants would not have incurred expenses going back to 2016. Such expenses include, for example, security to cover the facility, a commercial team, and repair and maintenance teams. The cost of this damage is $75,084,758.00.[172]

122.   <u>Loss of Financial Income During the Delay:</u>   Claimants had $500 million in funds intended for the Rumuji plant. Because BHGE did not tell Claimants that the Trains would be delayed for years, these funds had to be held at the ready to meet project costs. As a result, these funds were invested either in non-productive equipment (such as the Trains), or in cash. Had Claimants invested these funds even in safe liquid investments at LIBOR during the delay period, they would have earned a yield on their investment. The LIBOR figure used by Mr. Helsen is intentionally very conservative and should not be confused with the IEC group's expected rate of return on the Rumuji project (30%) or even with IEC's cost of capital.[173] Mr. Helsen's very conservative figure is $44,796,281.94.[174]

123.   <u>Take or Pay:</u>   *See* Part III.A.2.iv, below.

124.   <u>Loss of Warranty Value:</u>   Claimants have lost the value of warranties on equipment, including delivery trucks, generators, storage tanks and regasification equipment, fueling stations and truck stops. Had the Trains been delivered on time, this equipment would also have been put into operation when purchased, and ordinary repair and maintenance costs would have occurred during the warranty period. Because this equipment has only been put into operation in March 2019, the value of the warranties is largely lost. Mr. Helsen calculates this cost to be $17,639,247.26.[175]

---

[172]   CWS-10 (Helsen), ¶¶ 68-71.

[173]   CWS-5 (Helsen), ¶¶ 13-14; Ex. C-322; CER-10 (Lapuerta), ¶¶ 104 & n.133, 106.

[174]   CWS-10 (Helsen), ¶¶ 74-81.

[175]   CWS-10 (Helsen), ¶¶ 85-88.

### iv.  BHGE's Delays Caused Take or Pay Damages

125.  On September 2017, Greenville executed a Gas Sale and Aggregation Agreement ("GSAA") with the NNPC/TEPNG Joint Venture.[176]  In response to BHGE's request for feed gas to be available in early 2018, Claimants initiated supply obligations for that date, triggering the GSAA's take-or-pay obligations.[177]  Claimants had, until recently, avoided having to pay for gas volumes they could not take, but made clear that if "*Claimants have to pay for gas volumes that they are not able to use, or otherwise suffer loss relating to the GSAA due to GE's breaches and tortious acts, including legal expenses, such losses are recoverable as damage in this arbitration.*"[178]

126.  On January 13, 2020, NNPC/TEPNG issued invoices to Greenville for $17,218.399.26 for gas not taken in 2018 and $41,424,187.70 for gas not taken in 2019.[179]  Claimants anticipate additional take-or-pay costs for 2020 given ongoing delay in starting Trains 1 and 2.  Had BHGE lived up to its obligations, Claimants would not have to pay these sums for unused gas.  Given the date of the invoices, these amounts were not included in either Mr. Lapuerta's or Mr. Helsen's evidence, although both explained that the take-or-pay obligations existed and might result in additional damages.

127.  The Tribunal has ample authority to consider additional evidence that arises after the hearing and add it to the damages calculations.  The procedural order contemplated that the post-hearing briefs should not include additional evidence "*except with leave from, or at the request of, the Arbitral Tribunal.*"[180]  Tribunals have discretion to consider evidence after the hearing where new relevant events have occurred.[181]

---

[176]  Ex. C-312 (GSAA between NNPC and Greenville, dated September 11, 2017).

[177]  CWS-4 (Sahajwalla), ¶¶ 25-26; Exs. C-314, C-315, C-316.

[178]  SoC, ¶ 406.

[179]  Ex. C-1177 (2018 Total Take-or-Pay Invoice); Ex. C-1178 (2019 Total Take-or-Pay Invoice).

[180]  P.O. #1, ¶ 108.

[181]  "*The post-hearing briefs may not always be the end of the proceedings.  First, fresh evidence may come to light after the hearing, but before the arbitral tribunal has issued its award. . . . the arbitral tribunal has discretion to reopen the proceedings at the request of the party wishing to present the new evidence.*"  Redfern & Hunter on

128. Further, the Tribunal should issue the declaratory relief requested in the SoC, including that BHGE is liable for all additional and further losses that Claimants may incur as a result of breaches of the Equipment Contract and the Services Agreement.[182]

### *v. BHGE Is Liable for Liquidated Damages of $4.8 Million*[183]

129. In the Contract, the parties agreed to a liquidated damages clause that set a predetermined damages figure for delays up to the Delay Limit Date. Dr. Lancaster has explained in great detail that delivery has not yet occurred as a result of BHGE's failures.

130. Clause 6.5 of the Contract imposes liquidated damages of 0.5% of the Contract Price (*i.e.*, US$ 240,000 per Train) for each week of delay, up to 10 weeks (or 5% of the Contract Price, *i.e.*, US$ 2.4 million per Train). Trains 1 and 2 were due to be delivered on June 24, 2015 and September 24, 2015, respectively, but have yet to be delivered. As a result, Claimants are entitled to $4.8 million in liquidated damages.

131. BHGE asserted during closing arguments that liquidated damages "*have never been claimed by the Claimants, they are not part of the Request for relief, they are not a point of discussion. We have never taken any position with respect to the liquidated damages or their validity under New York law*."[184] That is untrue. Claimants made clear in the SoC that they are "*entitled to Liquidated Damages for Delay*."[185] BHGE addressed that claim in its SoD.[186]

---

Int'l Arb. (6th ed. 2015), p.412 ¶ 6.203 (CL-240). "*The arbitrator was free to determine the procedures by which the arbitration should proceed and whether new evidence should be considered.*" *Gen. Refractories Co. v. Aluminum, Brick & Glass Workers Int'l Union Affiliated, AFL-CIO, CLC*, No. 90-5588, 1991 WL 66050, at *2 (6th Cir. Apr. 29, 1991) (CL-208) (error to vacate awards where arbitrator considered new evidence).

182 SoC, ¶ 514(g)-(h).

183 *See generally* SoC, Part IV.E.

184 Closing Arguments Tr., p.142:11-16.

185 SoC, ¶ 416.

186 SoD, Part VIA. Regardless, the Tribunal has broad authority to determine, interpret, and enforce its own procedures to achieve a just result, and should use that authority to grant relief that is clearly merited, was explicitly requested, and to which BHGE responded at length on the merits.

### 3. BHGE's Many Defects Caused Additional Damages

132. Clause 17 of the Contract grants "*Buyer [ ] the right to recover against Seller for Buyer's direct damages in accordance with the Agreement incurred as a result of Seller's failure or inability to remedy the Defect.*"

133. Claimants' damages arising from the defects include the amounts spent to purchase and install the HHR system, external engineering support from Softec and the Lisbon Group, and the costs of the VFD and its installation, as well as additional costs that Claimants are still incurring to remedy BHGE's defective work.

134. In addition, if the Tribunal concludes that the Plants were at some point delivered (which they were not) and were subsequently delayed due to defects, damages from that portion of the delay would be recoverable under Clause 17 rather than under Clause 6.6.

135. BHGE's defense that Claimants did not comply with Clause 17.4 because they did not identify the defects or negotiate for compensation is wrong. Claimants incessantly complained about the defects, holding meetings (including the Florence meetings) and sending dozens of emails and letters regarding their existence and BHGE's failure to address them.[187] Securing compensation from BHGE has proven impossible as it denies responsibility and, instead, has made a counter-demand for US$ 40 million. In similar circumstances, courts have held that a party need not pursue negotiation further.[188]

136. BHGE's defects caused the following damages.[189] Each of the costs below is already included in Mr. Lapuerta's damages figures.

---

[187] *See, e.g.*, C-136, C-147, R-103; *see generally* CWS-3 (Pirijns), Part 14.

[188] *Allbrand Disc. Liquors, Inc. v. Times Square Stores Corp.*, 399 N.Y.S.2d 700, 701 (N.Y. App. Div. 1977) (CL-209) ("*Once it becomes clear that one party will not live up to the contract, the aggrieved party is relieved from the performance of futile acts*"); *Oak Bee Corp. v. N.E. Blankman & Co.*, 551 N.Y.S.2d 559, 562 (N.Y. App. Div. 1990) (CL-210) (same); *Anvil Holding Corp. v. Iron Acquisition Co.*, C.A. Nos. 7975-VCP, N12C-11-053-DFP, 2013 WL 2249655, at *12 (Del. Ch. Ct. May 17, 2013) (CL-211) (Buyer could succeed in showing that any negotiations would have been futile where Seller's response letter stated there was a "*complete lack of factual basis for the claims asserted*").

[189] *See Mead Corp. v. McNally-Pittsburg Mfg. Corp.*, 654 F.2d 1197, 1209 & n.17 (6th Cir. 1981) (CL-212) (direct damages included costs of additional labor and materials necessitated by defendant's delay in construction of coal

137.   <u>Procurement of HHR:</u>  The Trains are not capable of producing the contractually specified 765 TPD of LNG without substantially increasing the amount of feed gas and power required, and producing exorbitant amounts of waste condensate.  To manage this problem, Claimants had to purchase HHR systems.  Even attributing 1/3 of the cost of the HHR system to Train 3, the remaining cost of the equipment and its installation is $13,697,562.29.[190]

138.   <u>Consulting and Engineering Costs:</u> Claimants incurred significant engineering consulting costs to rectify BHGE's defective design and fabrication work on the Plants. For example, because BHGE failed to provide stress calculations when requested and subsequently proffered conclusory and inconsistent results, Claimants hired Softec to perform this task. Given the many defects in Trains 1 and 2 and BHGE's abandonment of the project, Claimants also retained the Lisbon Group to perform work on the Trains that BHGE failed to do.  The total cost of this work, so far, is $3,738,453.61.[191]

139.   <u>Investment in VFDs:</u>  BHGE designed and procured a start-up system that could not start the MRC motors as required.  Although having promised to supply the required VFDs in February 2019, BHGE then reneged, compelling Claimants to purchase and install a VFD at a cost of $1,025,130.89.[192]

---

washing plant because these costs were "*expenses incurred as a direct result of the failure to complete*" the plant); *Applied Data Processing, Inc. v. Burroughs Corp.*, 394 F. Supp. 504, 510 (D. Conn. 1975) (CL-213) (direct damages included costs incurred because (1) plaintiff had to remove defective equipment; (2) plaintiff had to pay its employees to rerun improperly processed reports; (3) plaintiff had to pay its employees who sat idle because the equipment was defective; and (4) plaintiff had to make additional purchases because defendant's equipment was unable to handle the plaintiff's obligations to its customers); *see also 21st Century Props. Co. v. Carpenter Insulation & Coatings Co.*, 694 F. Supp. 148, 152 n.4 (D. Md. 1988) (CL-214) ("*[T]he cost of replacing the allegedly defective roofs which plaintiffs seek to recover constitutes the direct damage, not incidental or consequential damages, caused by the wrongs alleged.*").

[190]   CWS-10 (Helsen), ¶ 32.

[191]   CWS-10 (Helsen), ¶¶ 33-36.

[192]   CWS-10 (Helsen), ¶¶ 37-44.

140. <u>Additional Investments Remediating Plants:</u> Claimants still face additional costs caused by the defects described during these proceedings. Claimants thus request a declaration that BHGE is liable for the cost of remediating all additional defects, subject to quantification.

**B. The Contract's Exculpatory Clauses and Limits of Liability are Unenforceable Or Do Not Apply[193]**

141. The clauses in the Equipment Contract purporting to limit BHGE's liability are not enforceable as a matter of New York law.

142. New York law is reluctant to enforce exculpatory clauses because of the moral hazard inherent in exculpating a party from liability for his own negligent behavior.[194] As New York's highest court explained, "*the law frowns upon contracts intended to exculpate a party from the consequences of his own negligence and though, with certain exceptions, they are enforceable, such agreements are subject to close judicial scrutiny .... the law's reluctance to enforce exculpatory provisions of this nature has resulted in the development of an exacting standard by which courts measure their validity.*"[195]

143. Because of the public policy concerns, parties are prohibited from contracting out of this restriction on exculpatory clauses. And even when a clause is not overridden by public policy (*e.g.,* in cases of mere negligence), New York courts reflect the law's reluctance by disregarding any exculpatory clause that bears the slightest ambiguity.[196]

---

[193] *See generally* SoC, Part. IV.A.

[194] *See, e.g.*, *Bd. of Educ. of Hudson City Sch. Dist. v. Sargent, Webster, Crenshaw & Folley*, 539 N.Y.S.2d 814, 818 (N.Y. App. Div. 1989) (CL-215) ("*[I]n general, exculpatory provisions are disfavored and are narrowly construed*[.]") (declining to apply an exculpatory clause).

[195] *Gross v. Sweet*, 400 N.E.2d 306, 308-309 (N.Y. 1979) (CL-37).

[196] *Gross*, 400 N.E.2d at 309 (CL-37) ("*As the cases make clear, the law's reluctance to enforce exculpatory provisions of this nature has resulted in the development of an exacting standard by which courts measure their validity. So, it has been repeatedly emphasized that unless the intention of the parties is expressed in unmistakable language, an exculpatory clause will not be deemed to insulate a party from liability for his own negligent acts . . . .*"); *Willard Van Dyke Prods., Inc. v. Eastman Kodak Co.*, 189 N.E.2d 693, 695 (N.Y. 1963) (CL-216) ("*[W]e have consistently decided that contracts will not be construed to absolve a party from, or indemnify him against, his own negligence, unless such intention is expressed in unequivocal terms.*"); *Ciofalo v. Vic Tanney Gyms, Inc.*, 177 N.E.2d 925, 926 (N.Y. 1961) (CL-217) ("*Of course, contracts may not be construed to exempt parties from the consequences of their own negligence in the absence of express language to that effect[.]*"); *Bd.*

42

144.    This rule applies to all types of limitations of liability, including liability caps and liability exclusions, such as Clauses 19.2 and 19.3, as well as any other provisions that purport to limit Claimants' damages to "direct" damages.[197]

145.    There are four reasons that these exculpatory provisions are inapplicable here.  First, BHGE may not exculpate itself from damages caused by its own willful misconduct or gross negligence.[198]  Second, BHGE may not exculpate itself from the delays in this case because they have been — and continue to be — beyond the parties' original contemplation.[199]  Third, BHGE may not exculpate itself because its delays and other behavior are tantamount to abandonment.[200]  Fourth, BHGE may not exculpate itself because its breaches impair the fundamental obligation of the Contract.[201]

146.    A finding that the exculpatory clauses are unenforceable for any one or more of these four reasons entitles Claimants to recover all their damages whether direct or consequential.

    1.    **BHGE's Willful and Grossly Negligent Conduct Cannot Be Exculpated**

147.    New York law absolutely prohibits a party from evading any liability arising from its grossly negligent or willful misconduct.[202]  "*An exculpatory agreement, no matter how flat and unqualified its terms, will not exonerate a party from liability under all circumstances. Under announced public policy, it will not apply to exemption of willful or grossly*

---

*of Educ. of Hudson City Sch. Dist.*, 539 N.Y.S.2d at 818, (CL-215) ("*[I]n general, exculpatory provisions are disfavored and are narrowly construed[.]*").

[197]    *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 554 (N.Y. 1992) (CL-36).

[198]    SoC, ¶¶ 385-390, 392; SoR, ¶¶ 412-424, 435.

[199]    SoR, ¶¶ 425-427.

[200]    SoR, ¶¶ 428-429.

[201]    SoR, ¶¶ 430-433.

[202]    *Sommer*, 79 N.Y.2d at 554 n.3 (CL-36).

*negligent acts*."[203]  In fact, "*[t]o the extent that agreements purport to grant exemption for liability for willful or grossly negligent acts they have been viewed as <u>wholly void</u>*."[204]

148.  A party may not evade this principle by defining gross negligence or willful misconduct more narrowly than New York law does.[205]  Moreover, while gross negligence and willful misconduct describe different behavior, proving either one has exactly the same effect: "*wholly void[ing]*" the exculpatory clause.[206]

149.  The burden of proof on the party seeking to prove gross negligence or willful misconduct is the basic burden applicable for virtually all civil disputes in New York:  a preponderance of the evidence; *i.e.*, more likely than not, or 50.000001%.[207]  In this case, BHGE's behavior is largely undisputed and, under New York law, is more likely than not grossly negligent and/or willful misconduct.

> **i.    *BHGE Committed Willful Misconduct Throughout the Project[208]***

150.  Willful misconduct is "*intentional wrongful conduct, done either with knowledge that serious injury probably will result or with a wanton and reckless disregard of the possible results*."[209]  It includes acts taken in bad faith.[210]  It also includes both (i) false statements made during the course of contracting and/or contractual performance and (ii) failing to disclose in the face of a duty to disclose.[211]

---

[203]  *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 384-85 (N.Y. 1983) (CL-7).

[204]  *Gross*, 400 N.E.2d at 308 (CL-37) (emph. added).

[205]  *See Sommer* 79 N.Y.2d at 554 n. 3 (CL-36).

[206]  *Gross,* 400 N.E.2d at 308 (CL-37).

[207]  *See Corwin*, 238 F. Supp. 3d at 514 (CL-218) ("*In order to establish a prima facie case in gross negligence, a plaintiff must prove by a fair preponderance of the credible evidence that the defendant not only acted carelessly in making a mistake, but that it was so extremely careless that it was equivalent to recklessness.*") (plaintiff's gross-negligence claim survived where there was a genuine fact issue as to whether defendant "*unjustifiably ignored sound engineering practices*").

[208]  *See generally* SoC, Part III; SoR, Part VII.

[209]  65 C.J.S. Negligence § 94 (CL-241).

[210]  *Kalisch–Jarcho*, 58 N.Y.2d at 385 (CL-7).

[211]  *See, e.g., GE Microgen*, 2013 WL 5827698, at *11-12 (Oct. 30, 2013) (CL-15) (discussed in n.5, above).  *See also, e.g., Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 603 N.Y.S.2d 526, 527-528 (1993) (CL-242) (finding

151. A duty to disclose arises when a contractual counterparty has superior knowledge that is not readily available to the other.[212]  For example, BHGE possessed superior knowledge regarding its (lack of) capacity to engineer, procure and fabricate the Trains in 9 and 12 months.  As BHGE knew, that knowledge was not "*readily available*" to Claimants.[213]

152. BHGE's willful misconduct spanned the entire period from contract negotiations through the present.

153. Dishonesty Regarding the Delivery Period:  From early August 2014, when David Gordon heard Mr. Van den Broeke's frustration with enCryo's inability to deliver trains in less than a year, through contract execution and throughout contract performance, BHGE has been dishonest about the timing needed to deliver operable trains.

- Mr. Gordon told Claimants that BHGE had a mandate from Shell to sell a virtually finished train that Shell no longer wanted;[214] Mr. Bresciani's witness statement denies BHGE ever had that mandate and Mr. Griffin explains that the Shell train was far from complete.[215]

---

exculpatory clause would be barred if "*prior to the award of the contract, the LIRR deliberately concealed its intention to issue, after work commenced, a substantial design change*").

[212] *See* SoC, ¶¶ 377-78; SoR, ¶¶ 515-17.  *See also Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 244 (S.D.N.Y. 2006) (CL-13) (New York law recognizes a duty do speak "*[w]here one party possesses superior knowledge not readily available to the other and knows that the other is acting on a basis of mistaken knowledge . . . It is no longer acceptable if it ever was to conclude in knowing silence a transaction damaging to a party who is mistaken about its basic factual assumptions when it would reasonably expect a disclosure*."); *see also Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 151 (2d Cir. 1993) (CL-28) ("*New York recognizes a duty by a party to a business transaction to speak in three situations: first, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth . . . third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge*," and noting that New York courts tend "*to apply the rule of 'superior knowledge' in an array of contexts in which silence would at one time have escaped criticism*."); *Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC*, 842 F. Supp. 2d 502, 516 (S.D.N.Y. 2012) (CL-40) (sufficient evidence that GE subsidiary acted with willful misconduct or gross negligence where GE subsidiary withheld from plaintiff information suggesting it could not build a product that would meet the contractual specifications).

[213] *See, e.g.*, Ex. C-1, Equipment Contract, Clauses 10.1 & 10.2.

[214] CWS-1 (Van den Broeke), ¶ 6.8.

[215] RWS-1 (Bresciani), ¶¶ 8-9; CWS-6 (Griffin), ¶¶ 7.6-7.12.

- Once BHGE had Claimants in Texas, they asserted the ability to engineer, procure and fabricate two new, fully-modularized and tropicalized trains in 9 and 12 months. That was also untrue. To make the lie seem true, however, BHGE took Claimants on a tour of the Schertz facility and falsely represented that the CGC train was essentially done and could be quickly replicated for Claimants.[216]

  In fact, after 36 months of trying, BHGE was still far from completing the CGC train.[217] Mr. Lindsey admitted in April 2018 that BHGE knew it required at least 18 months when it made the false promise to Claimants.[218] BHGE presented neither Mr. Lindsey (a current employee) to address the issue, nor any other witness (such as Mr. Bresciani or Mr. Lavander) to testify that BHGE believed it could build Claimants' trains in 9 and 12 months. No witness could truthfully give such testimony. In the summer of 2014 — after 15 months — BHGE was just 20% done trying to replicate the CGC Train for Shell's Elba Island project.[219] And Claimants' trains, unlike the Elba Island trains, had to be substantially redesigned for 50 Hz, a heavier feed gas than the CGC trains, and a tropical environment.[220]

- After the Contract was signed, BHGE continued to provide false projections. On October 15, 2014, BHGE issued a project schedule, representing that Trains 1 and 2 were on schedule to be shipped within the 4-week grace period of the contractual Delivery Dates. That was not true and, of course, did not happen.

  By the time of the November 9, 2016 meetings in Florence, the Trains were far behind schedule. BHGE nonetheless projected it could achieve mechanical completion by

---

[216]  Hr'g Tr. Vol. 2, pp.84:23-85:3 (Van den Broeke) ("*they told me they could fabricate Train 3 in nine months, I had no doubt when GE as a reputable company told me that. When I saw the fabrication places, I had no doubt.*")

[217]  CWS-6 (Griffin), ¶¶ 7.1-7.13; Ex. C-888.

[218]  CWS-1 (Van den Broeke), ¶¶ 8.9-8.10; CWS-4 (Sahajwalla) ¶¶ 27-30; Ex. C-13; Ex. C-14; SoC, ¶ 344.

[219]  CWS-6 (Griffin), ¶ 9.2; Ex. C-D03.

[220]  CWS-3 (Pirijns), ¶ 4.6.

December 31, 2016, and commissioning by March 2017.[221]  Then, at the January 28, 2017, Florence meeting, BHGE adjusted the mechanical completion date to late April 2017 and promised LNG production by July 2017.[222]  Claimants relied on those dates to try to manage their customers' expectations and, as each was missed, Claimants' customers lost faith in the project.[223]

This Tribunal ordered BHGE to disclose "*the internal GE schedules or communications that justified GE's promises to Claimants in November 2016 … and January 2017*."[224]  BHGE produced nothing responsive, and asserted more generally that its schedules no longer exist because the version of the Primavera software used could not be transferred when Schertz was shut down in October 2018.[225]  Not only is that assertion factually false,[226] it is legally irrelevant because (i) this arbitration was pending and BHGE had an obligation to preserve such obviously material documents and (ii) contractually, BHGE was already obligated to "*maintain[] and track[] project plans and schedules [and] update[] … project plans, schedules and deliverables.*"[227]  This Tribunal should draw the adverse inference that BHGE's promises at the Florence meetings were knowingly false.

---

[221] Ex. R-69 (Minutes of November 2016 Florence meeting); CWS-3 (Pirijns), ¶ 13.34.

[222] Ex. R-72 (Draft minutes of January 2017 Florence meeting); CWS-3 (Pirijns), ¶ 13.47.

[223] CWS-4 (Sahajwalla), ¶ 20 ("*excitement has been damaged by the cycle of missed deadlines for the production of LNG from the Greenville plant.  In line with the commitments made by GE, we initially advised customers that Greenville expected to be producing LNG by early 2016.  When that deadline slipped, we told customers that LNG should be flowing by the end of 2016.  After GE's president committed that we would have LNG by the second quarter of 2017, we passed that new deadline to customers and stressed that GE's president had committed to that time frame.  Again, it has passed unfulfilled.*").  Hr'g Tr. Vol. 5, p.134:7-16 (Sahajwalla) ("*our reputation of non-supplying of LNG was gone very, very bad.*").

[224] P.O. #4, Annex I, pp.27-28.

[225] Respondents' Comments on Claimants' Letter of September 18, 2019, ¶ 5 (Sept. 24, 2019).

[226] Hr'g Tr. Vol. 8, p.33:7-17 (Lancaster) ("*I've worked on many, many, many projects, many different installations, and I've yet to find one where the schedules couldn't be extracted ....*").

[227] Ex. C-1, Equipment Contract, App A, Clause 5.2.

154.  <u>Falsification of Documents</u>:  BHGE has falsified documents in order to facilitate the receipt of payments from Claimants, to try to avoid liquidated damages for late delivery, and to conceal its own failures.

155.  A prominent example is the falsified inspection and testing certificates, signed by BHGE, in order to ship the modules from Turner.  Pursuant to Clause 15.1 of the Equipment Contract, "*no Plant shall be delivered without having been tested in accordance with the Inspection and Test Plans*."[228]  Upon shipment, the inspection and testing certificates triggered milestone payments to BHGE.[229]

156.  BHGE provided Claimants with inspection and testing certificates confirming that inspections and tests had been completed at Turner.[230]  Those certificates were false.  For example, each "*Release for Packing*" form "*certifies that this module is complete to a level satisfactory for preparation for shipment.  All punch list items identified as field work has been annotated.*"[231]  No punch list item was ever identified,[232] but every single module was shipped with numerous missing parts and backwards installed parts.[233]  Annex B provides a detailed description of specific false entries in the various inspection and test reports.

157.  In addition to the testing and inspection reports, BHGE issued other false documents:

---

[228]  *See also* Ex. C-1, Equipment Contract, Clauses 14.3, 14.5 & 15.1, App A, Clause 4.1.1.

[229]  CWS-3 (Pirijns), ¶ 14.114 ("*GE ignored its inspection and testing obligations, and repeatedly signed off on Ready for Shipping certifications and thereby achieving payment milestones.*").

[230]  The inspection forms and certifications used by BHGE include the documents at Exhibits C-101, C-103, C-1174 and C-1175.  CWS-3 (Pirijns), ¶¶ 1.6-12.8 ("*Once ready for release, GE would issue a 'Release for Packing' form, executed by its Engineering representatives.  That Release for Packing document included a certification — and the form uses that word — that the module was complete and any punch list items to be addressed in the field had to have been identified. (Ex. C-101, set of all Release for Packing forms for Train 1 modules; see also Ex. C-103, set of all Inspection Matrix forms for Train 1 modules).  None of the Certifications issued for any of the modules contained a punch list, which would have alerted us to the significant numbers of components that were later found to be missing, incorrect, re-engineered or defective.*").

[231]  Ex. C-101 (Release for Packing forms for Train 1 modules).

[232]  CWS-3 (Pirijns), ¶ 12.8.

[233]  CER-7 (Lancaster), ¶ 182 & App 7 & 8; CWS-2 (Srinivasan), ¶¶ 2.1-2.12; Hr'g Tr. Vol. 4, pp.230:11-231:12 (Srinivasan); CWS-3 (Pirijns), ¶¶ 12.6-12.8, 14.4,14.18-14.24, 14.69, 14.81, 14.130-14.135, 14.155, 14.175; Hr'g Tr. Vol. 4, p.54:21-24 (Pirijns).

- BHGE's May 12, 2018 Notice of Mechanical Completion for Train 1 is false.[234]

    Although BHGE had obtained system certifications from Claimants for all sub-systems, BHGE knew, e.g., that Train 1 suffered from a serious unresolved stress defect (*see* ¶¶ 58-66, above) that barred mechanical completion and their 10% milestone payment.[235]  Disregarding that defect, BHGE's Notice declared that Train 1 "*has been mechanically, electrically, and structurally installed on site … but excluding … minor items which do not materially affect the operation or safety of the Plant.*"

- BHGE's May 8, 2019, letter giving notice of withdrawal from Rumuji "*as a result of HSE issues*" is false.[236]  As explained above, BHGE used HSE as a false pretext to abandon the project (*see* ¶¶ 87-89, above).

- In his January 18, 2019 expert report, Mr. Hillier falsely declared at paragraph 1.1.4 that "*I have no conflict of interest with either party.  I note that I have previously been instructed by GE various worldwide divisions to provide Independent Expert Report.*"  Mr. Hillier then lists a 2009 offshore engineering project, a 2013 equipment maintenance project and a 2016 renewable energy engineering project.  His report then expresses opinions on the reasonableness of BHGE's June 2018 change order request.

    Undisclosed by Mr. Hillier is that he was advising BHGE on preparing that June 2018 change order request since at least February 2018.[237]  Mr. Hillier's representation of independence is false, a fact that BHGE knew.

- To substantiate the part of his analysis purporting to allocate the time worked by BHGE personnel in Rumuji on tasks allegedly for Claimants' account, Mr. Hillier requested Mr. Kassem to create entirely new time sheets for the period from January 1, 2017 to

---

[234] Ex. C-16 (Notice of Mechanical Completion for Train 1, dated May 12, 2018).

[235] Ex. C-1, Equipment Contract, ¶ 1 (defining "*Mechanical Completion*" to be operable and safe); *see also* Hr'g Tr. Vol. 7, p.180:4-7 (Linwood) ("*Q … you would agree with me that it's not appropriate to declare mechanical completion if GE thought there were stress defects, correct?  A  That is correct.*").

[236] Ex. R-168 (May 8, 2019, official letter from BHGE asserting "*no option … as a result of these HSE issues*").

[237] Ex. C-1037 (GE internal email, dated February 20, 2018); Hr'g Tr. Vol. 9, pp.180:15-184:9 (Hillier).

November 30, 2018 that contain after-the-fact recreations of the tasks performed each day. Those "re-created" time sheets are exhibited by Mr. Hillier at his Annex CC, and give every appearance of being the time sheets maintained contemporaneously by BGHE in the ordinary course. Mr. Hillier does not disclose the reality, and Claimants only discovered it upon finding various anomalies and cross-examining Mr. Kassem and Mr. Hillier.

158.   <u>Dishonesty Regarding BHGE's Process Engineering:</u>[238]  BHGE deceived, concealed and misrepresented the facts regarding its process engineering before and after the Contract was signed. As a result, Claimants have been unable to operate the Trains as promised, had to incur the time and expense to purchase and install a costly HHR system and have had to complicate their business model in order to sell the resulting LPG and propane.

- Prior to executing the Contract, BHGE made a series of false representations to Claimants about BHGE's liquefaction process:

    o   BHGE told Claimants that their liquefaction process allowed BHGE to increase production levels by blowing the heavy hydrocarbons into the LNG to reduce the waste condensate.[239]  This is not true.[240]

    o   BHGE told Claimants its design could be used with atmospheric or pressurized storage with virtually identical production results, and provided Claimants with virtually identical Process Flow Diagrams to prove it.[241]  This is not true.[242]

---

[238]   SoR, ¶¶ 82-99.

[239]   CWS-3 (Pirijns), ¶ 16.22 ("*when they were first trying to convince us to shift away from the Chinese manufacturers and purchase Trains from them, they boasted about the sophistication of their design process that enabled them to maximize the LNG production by first extracting heavy hydrocarbons during the liquefaction process and then somehow 'blowing them back in' (GE's Eric Barton's exact words), ... reduc[ing] the actual amount of heavy hydrocarbon condensate (waste byproduct) and increased LNG production levels.*"); Hr'g Tr. Vol. 4, p.50:9-25 (Pirijns).

[240]   Ex. C-264 (Nov. 17, 2016 email from Mr. Wilson to Mr. Repasky).

[241]   Ex. C-43; Ex. C-44; *see* SoR, ¶ 58.

[242]   Hr'g Tr. Vol 5, pp.99:9-100:2, 103:10-13 (Amidei); Hr'g Tr. Vol. 6, p.134:4-19 (Lumley); Hr'g Tr. Vol. 6,

- BHGE contends in this arbitration that it substantively altered the description of Claimants' feed gas for purposes of the contractual Basis of Design from "*n-Hexane C6+*" to "*n-Hexane,*" and that this change has important consequences for the process design.[243] If, in fact, BHGE thought it was making an important substantive change, it had a duty to speak and its silence would qualify as willful misconduct.[244] That duty to speak arises not only from New York law, but also Clause 10.2 of the Equipment Contract, which obligated BHGE to scrutinize and confirm the accuracy of "*Buyer's requirements (including the design criteria …) and all other data and information provided by Buyer….*"

- During performance of the Contract, BHGE again acted deceptively with regard to the process engineering in order to prejudice Claimants:

  o On September 18, 2014, BHGE changed the process design from the -6° C first pass outlet temperature to -70° C. That change, as explained above (*see* ¶¶ 51-56, above), dramatically changed the performance of the Trains and compelled the use of an HHR system. Instead of disclosing this, BHGE issued TM-0010 on October 9, 2014, representing that nothing had changed, the first pass temperature was still -6° C, and performance remained exactly the same.

  o In this arbitration, BHGE has falsely argued, including in witness statements, that BHGE altered the coldbox design because of changes by Claimants to the feed gas composition and/or a request for atmospheric storage.[245] Not only did Claimants

---

pp.233:23-234:16 (Smith).

[243] *Compare* Ex. C-31 *with* Ex. C-1, Equipment Contract, App A, Annex A.

[244] *See* Ex. R-234 ("*This case is only for our internal use for equipment validation purpose. We will **not*** ["not" in bold, red font in original] *share this case with the client at this moment. We know their feed gas will potentially contain BTEX even though they have not realize [sic] it. We will have to make sure our plants are designed for the BTEX … This could be a little contract 'game' for our guarantee.*").

[245] SoD, ¶¶ 27-50; RWS-2 (Lavander), ¶¶ 32-35; RWS-6 (Schleicher), ¶¶ 12.6, 13.

never change the feed gas composition, but as explained above, those factual representations are disproven by the calendar (*see* ¶ 57 & n.71, above).[246]

### ii. BHGE Acted with Gross Negligence Throughout the Project[247]

159.   Gross negligence is conduct that shows a "*reckless indifference to the rights of others*" or "*smacks of intentional wrongdoing*."[248]   There is no requirement that the breaching party act with intent to harm.[249]   Nor is there any requirement of bad faith or malice.[250]

160.   Reckless indifference is determined in light of all the facts.[251]   Relevant factors include persistence in a course of ordinary negligent acts.[252]   The level of indifference required, moreover, varies by the potential severity of the harm.   Where the consequences are likely to be serious, the standard of care is heightened and what might otherwise be treated as ordinary negligence becomes gross negligence.[253]   In addition, when a party is alleged to

---

[246]   *See generally* SoR, ¶¶ 58-67; SoC, ¶¶ 445-448.

[247]   *See generally* SoC, Part III; SoR, Part VII.

[248]   *Deutsche Bank Nat'l Tr. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 289 F. Supp. 3d 484, 494, 500 (S.D.N.Y. 2018) (CL-38); *Kalisch–Jarcho*, 58 N.Y.2d at 385 (CL-7).

[249]   *Deutsche Bank*, 289 F. Supp. 3d at 500 (CL-38) (rejecting interpretation that would limit New York's public-policy exception to enforcing exculpatory clauses to cases "*where the breaching party acts primarily to hurt its counterpart*" because *"that is rarely how sophisticated parties conduct themselves"*).

[250]   *Apache Bohai Corp., LDC v. Texaco China B.V.*, No. H-01-2019, 2005 WL 6112664, at *20 (S.D. Tex. Feb. 28, 2005) (CL-39).   Respondents do not argue that they breached the contract in their own economic self-interest, so the notion of efficient breach does not come into play.

[251]   *Kalisch–Jarcho*, 58 N.Y.2d at 385 (CL-7).

[252]   *Williamson-Green v. Equip. 4 Rent, Inc.*, 46 N.E.3d 571, 575 (Mass. App. Ct. 2016) (CL-8) ("*[P]ersistence in a palpably negligent course of conduct over an appreciable period of time is one of the more common indicia of gross negligence.*").   *See also O'Malley v. Jegabbi*, 12 A.D.2d 389, 393 (NY App. 1961) (CL-225) ("*the fact that there was evidence of his negligence in these three respects tended to indicate that such negligent acts were not all due merely to an error in judgment, momentary inattention or loss of presence of mind*"); *Bayerische Landesbank v. Aladdin Cap. Mgmt.*, 692 F.3d 42, 65 (2d Cir. 2012) (CL-5) (while one failure may have been "*merely an oversight*," that failure supported an inference of gross negligence when "*aggregated with the other allegations*").   *See also* n.253.

[253]   *Internationale Nederlanden (U.S.) Capital Corp. v. Bankers Tr. Co.*, 689 N.Y.S.2d 455, 459 (N.Y. App. Div. 1999) (CL-219) (whether trust company had been grossly negligent in tabulating votes of noteholders was a jury issue because "*[f]ailure to keep accurate records has been considered evidence of gross negligence where the plaintiff relied on the defendant to protect its property interests and the defendant was aware that significant losses could result from inaccurate records . . . .*"). *See also New York State Workers' Comp. Bd. v. Program Risk Mgmt., Inc.*, No. 3203-13, 2015 WL 5774443, at *5 (N.Y. Sup. Ct. Sept. 21, 2015) (CL-220) (refusing to dismiss breach-of-contract claim based on exculpatory clause where complaint alleged persistent and fundamental acts of negligence on the part of trustees, leading to the trust's foreseeable insolvency because "*a repeated course of*

52

have "*entered into a contract . . . [and] intentionally disregarded a high likelihood that it would [breach], or that the required performance was impossible.... the breaching party's conduct certainly 'smacks of intentional wrongdoing' and/or evinces 'a reckless indifference to the rights of others,' which is all that is required for 'gross negligence' under New York law.*"[254]

161.    BHGE was, if not willful, grossly negligent in entering into a contract requiring delivery in 9 and 12 months.  As explained in the preceding paragraph, it is grossly negligent for a party to enter into a contract while disregarding a high likelihood that performance will be impossible.  That is particularly true here as BHGE knew delivery time was fundamental to Claimants' decision to contract with BHGE instead of far cheaper Chinese competitors.  Even if BHGE did not intentionally lie about its inability to meet the agreed delivery dates, it certainly disregarded a high likelihood that performance would be impossible, given the knowledge described by Mr. Lindsey and BHGE's experience with the Shell trains.

162.    BHGE was also grossly negligent in performing the Contract.  The breadth and repetitiveness of its carelessness — explained in Part II above — is astonishing, covering literally thousands of separate items over the entire course of the project.

163.    In virtually every respect, BHGE's engineering fell far below acceptable levels of competence, and the risks to life and property from those failures were huge.[255]

---

[ ] *ordinary negligence with a foreseeably severe cumulative effect may constitute gross negligence under some circumstances*"), *affirmed as modified*, 55 N.Y.S.3d 790 (N.Y. App. Div. 2017); *see Food Pageant, Inc. v. Consol. Edison Co.*, 54 N.Y.2d 167, 171-73 (N.Y. 1981) (CL-221) (several acts of negligence with foreseeably severe cumulative effect deemed gross negligence; court upheld general verdict awarding food-spoilage damages against utility upon proof of "*gross negligence*" which "*precipitated*" a major power outage and which "*could have contributed to the eventual blackout*"); *In re Allou Distributors, Inc.*, 395 B.R. 246, 260 (Bankr. E.D.N.Y. 2008) (CL-222) (allegations in trustee's complaint stated professional malpractice claim under New York law because "*[g]ross negligence has been found where there were several acts of negligence with foreseeably severe cumulative effect.*").

[254] *Deutsche Bank*, 289 F. Supp. 3d at 500 (CL-38) (quoting *Kalisch–Jarcho*, 58 N.Y.2d at 385 (CL-7)).

[255] *See Corwin*, 238 F. Supp. 3d at 514 (CL-218) (plaintiff's gross-negligence claim survived where there was a genuine fact issue as to whether defendant "*unjustifiably ignored sound engineering practices*"); *New York State Workers' Comp. Bd.*, 2015 WL 5774443, at *5 (CL-220) (holding that "*a repeated course of ordinary negligence with a foreseeably severe cumulative effect may constitute gross negligence*").

- Stress engineering: BHGE's original stress analyses between 2014 and 2018 were "*entirely unacceptable*." BHGE's stress analyses in late 2018 and 2019 were so "*far below what we would expect from a competent designer*" that Dr. Caligiuri opined that he could not "*understand how this happens*" and that he had "*never seen this before.*"[256]

- Process engineering: With regard to the contractual design (*i.e.*, -6° C from the first pass), Mr. Lumley opined that BHGE's carelessness with respect to the risk of heavy hydrocarbons freezing in the cold box fell "*far below acceptable engineering standards.*"[257] Dr. Smith, BHGE's expert, conceded "*an even chance that the design [would freeze] at 1 barg storage pressure.*"[258] It is undisputed that at the actual -70° C first pass temperature that Mr. Zhao and Chart agreed upon in September 2014, the coldbox would freeze unless a bypass was added to warm the cooled feed gas after the first pass, which generates excessive waste condensate.[259] (*See* ¶¶ 53-54, above.)

- Electrical engineering: Dr. Wright and Mr. Middleton agreed that cable sizing is not difficult, yet BHGE's electrical engineers got the sizing wrong on three major cable groups. BHGE's reckless indifference was highlighted by Mr. Mastronardi's testimony that BHGE approached him in late 2015 — after most of the incomplete modules had already been shipped — because it was having trouble understanding the electrical codes for 50 Hz (the current Claimants' Trains run on) and had an "*urgent need for engineering support.*"[260] (The current for the Shell trains was 60 Hz because they were destined for North America.)

---

[256] Hr'g Tr. Vol. 7, pp.239:23-240:6 (Caligiuri); CER-8 (Exponent), ¶ 4.1.6.

[257] CER-6 (Lumley), ¶ 2.5(ii).

[258] RER-10 (Smith), ¶ 5.2.2.8.

[259] Hr'g Tr. Vol. 6, pp.134:12-136:24 (Lumley), 234:3-16, 242:17-24, 263:21-275:22 (Smith); Hr'g Tr. Vol. 5, p.113:12-21 (Amidei); CER-6 (Lumley), ¶¶ 6.18, 10.4-10.8. However, Mr. Schleicher disagreed, testifying that the -70° C first pass temperature would not result in freezing under pressurized storage conditions. Hr'g Tr. Vol. 3, pp.119:6-120:17.

[260] Hr'g Tr. Vol. 2, pp.284:24-288:1 (Mastronardi).

- Electrical and mechanical design engineering:  BHGE issued 8 revisions of the electrical one-line diagrams and cable lists, with three revisions (2 substantial) after the modules were shipped.[261]  BHGE issued 12 revisions to the piping and instrumentation diagram, with 9 revisions after the modules were shipped.[262]  This, too, evidences a repetitive lack of engineering care.  As Mr. Middleton admitted, it is "*[p]robably not*" a common thing for revisions to be occurring years after the equipment ships.[263]  Dr. Lancaster described it as "*indicative of continually uncovering design issues.*"[264]

164.  Turner's fabrication (for which BGHE is responsible) was at least as bad.  The sheer volume of missing, backwards and untropicalized parts when the modules left Turner shows reckless disregard for the project.  As just one of hundreds of examples, failing to hydrotest the ICPs — after telling Claimants that they had been hydrotested — could have led to a catastrophic leak if Claimants had not discovered BHGE's failure, hydrotested the pipes themselves and discovered the defective piping.[265]  Sending Mr. Chestnut, a man with no relevant experience, to supervise Turner was even more reckless.

### iii.  BHGE's Actions in This Proceeding Confirm Their Willfulness and Recklessness[266]

165.  BHGE's efforts to withhold and conceal information in this arbitration are also evidence that its prior conduct was not garden-variety negligence, but willful misconduct and/or gross negligence.

(a)  BHGE allowed critical documents to be lost, destroyed or concealed, including the ITO, three months <u>after</u> the arbitration had begun.[267]

---

[261]  *See* CER-1 (Lancaster), ¶¶ 453, 467, 478 & n.95; Ex. C-374.

[262]  *See* CER-1 (Lancaster), ¶¶ 677-681.

[263]  Hr'g Tr. Vol. 4, p.148:2-6 (Middleton).

[264]  CER-1 (Lancaster), ¶ 432.

[265]  CWS-3 (Pirijns), ¶¶ 14.165-14.173.

[266]  *See generally* SoR, Part VI.

[267]  Hr'g Tr. Vol. 2, pp.144:7-146:2 (Pagliaro).

(b) BHGE failed to produce a host of documents it undoubtedly has or could readily obtain that this Tribunal deemed relevant and material. Included among the documents it secreted are the stress calculation files for the stress analyses that it performed in late 2018 and 2019, GEOG's audited and unaudited financials, the ITO file, and the Turner contract, which BHGE declined to produce even though Mr. Hillier testified he believed he had been able to review it.[268]

166.    BHGE's decision to withhold documents supports an adverse inference that those documents would have confirmed BHGE's willful and grossly negligent behavior.[269]

### 2.    A Four-Year Plus Delay in Delivery of the Trains Was Beyond the Contemplation of the Parties[270]

167.    Where delay is beyond any reasonable expectation of the parties, exculpatory clauses do not apply. As the New York Court of Appeals explained, "*The exception is based on the concept of mutual assent…. It can hardly be presumed … that the contractor bargained away his right to bring a claim for damages resulting from delays which the parties did not contemplate at the time.*"[271]

168.    Many New York cases confirm that delays far less egregious than the nearly five year delay here were beyond the parties' contemplation.[272] The most compelling evidence that these delays were beyond Claimants' contemplation is that Claimants paid nearly double the Chinese price because BHGE was promising delivery of the Trains in 9 and 12 months, with in-country installation of the modules in just three more, as compared to China's

---

[268]  Hr'g Tr. Vol. 9, p.74:14-20 (Hillier).

[269]  *See* SoR, ¶¶ 228-244, p.32.

[270]  *See generally* SoR, Part VII.B.

[271]  *Corinno Civetta Const. Corp. v. City of New York*, 493 N.E.2d 905, 910 (N.Y. 1986) (CL-224). *See also Bovis Lend Lease LMB Inc. v. GCT Venture, Inc.*, 775 N.Y.S.2d 259, 259-60 (N.Y. App. Div. 2004) (CL-125); *Clark-Fitzpatrick*, 603 N.Y.S.2d at 527-528 (CL-242).

[272]  *See Forward Indus. v. Rolm*, 506 N.Y.S.2d 453, 454 (CL-130) (3 days delayed to 6 weeks); *Spearin, Preston & Burrows, Inc. v. City of New York*, 553 N.Y.S.2d 372, 272-73 (N.Y. App. Div. 1990) (CL-126) (9 months delayed to 2.5 years); *Abax Inc. v. New York City Hous. Auth.*, 723 N.Y.S.2d 490, 492 (N.Y. App. Div. 2001) (CL-127) (600-day delay); *Bovis Lend Lease*, 775 N.Y.S.2d at 259-60 (CL-125) (2.5-year delay).

projected 18-month delivery time.[273]   Had delays of five years been contemplated, Claimants would never have paid such a huge premium for speed.

### 3.   BHGE Actually and Constructively Abandoned the Projects

169.   New York's highest court has further explained that "*delays so unreasonable that they constitute an intentional abandonment of the contract*" void an exculpatory clause.[274]

170.   In this case, BHGE has not only constructively abandoned, but has actually done so (*see* ¶¶ 86-89, above).

### 4.   BHGE Breached its Fundamental Obligations Under the Equipment Contract[275]

171.   The New York Court of Appeals has further held that while an exculpatory clause will apply to "*failure of performance in ordinary, garden variety ways,*" it will not preclude recovery "*for the breach of a fundamental, affirmative obligation the agreement expressly imposes on the contractee.*"[276]

172.   BHGE's fundamental obligation under the Contract was to provide operable LNG process plants in 9 and 12 months.  BHGE failed.  Claimants are not asserting that a delay of a few weeks, of the kind contemplated by the liquidated damages clause, would breach a fundamental obligation of this contract.  However, after nearly five years, with BHGE having abandoned the project after supplying a liquefaction process that has required Claimants to change their business model and sell new products, Claimants have been deprived of the essence of their bargain.  In these circumstances, BHGE cannot hide behind exculpatory clauses to escape full responsibility for its behavior.

---

[273]   CWS-1 (Van den Broeke), ¶¶ 7.1-7.11.

[274]   *Corinno*, 493 N.E.2d at 910 (CL-224); *Apache*, 2005 WL 6112664, at *20 (CL-39)

[275]   *See generally* SoR, Part VII.C.

[276]   *Corinno*, 493 N.E.2d at 912 (CL-224); *See Forward Indus.*, 506 N.Y.S.2d at 453–55 (CL-130) (defendant's five-week delay in installing operational telephone system was a breach of a fundamental contractual obligation precluding enforcement of no-damages-for-delay clause); *Abax*, 723 N.Y.S.2d at 492 (CL-127); *Bovis Lend Lease*, 775 N.Y.S.2d at 259–60 (CL-125).

**C.    Even If the Exculpatory Clauses Were Enforceable, Claimants Would Still Be Entitled to Direct Damages**[277]

173.    The Contract provides specific remedies for delay in delivery and for defects.  Clause 6.6(ii) entitles Claimants to "*any direct damages*" caused by delay in delivery.  Clause 17 also entitles Claimants are entitled to their "*direct damages*" caused by defects.

174.    Clause 19.3, meanwhile, provides that BHGE shall not "*be liable for loss of profit or revenues, loss of use of the plant, parts, or any associated equipment, downtime costs, claims of a party's customers for such damages, or for any special, consequential, incidental, indirect or exemplary damages.*"

175.    New York contract interpretation principles require both Clause 19.3 to be read narrowly (*see* ¶ 142, above) and Clause 6.6(ii) and Clause 19.3 to be read consistently with each other if at all possible.[278]

176.    Clause 19.3 is fully consistent with Clause 6.6(ii) and Clause 17 if read to exclude only indirect damages, such that BHGE is fully responsible for the direct damages it causes under Clauses 6.6(ii) and 17.4 (subject to the limitations discussed in Part III.B, above).

177.    Clause 19.3 becomes inconsistent with Clause 6.6(ii) if read to exculpate those *direct* damages that are *also* considered damages from lost profits or loss of use.  Under New York law, various categories of damages (such as lost profits) can be either direct or indirect, depending on the circumstances and the breach.[279]  The classic measure of <u>direct</u> damages for delay under New York law is the rental value of, or the reasonable return on, the completed structure for the delay period.  (*See* ¶ 182, below.)  If such damages were fell within Clause 19.3, even when they were *direct*, that would place Clause 19.3 in harsh

---

[277]  *See generally* SoC, Part IV.C; SoR, Part XI.C.

[278]  *See, e.g., Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 333 (S.D.N.Y. 2010) (CL-226) (caselaw requires rendering avoiding any contractual language redundant or surplusage); *LaSalle Bank Nt. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (CL-227) (New York law requires contracts to be construed to give full meaning and effect to all provisions, and interpretations that render provisions surplusage or meaningless are to be avoided "*if possible*").

[279]  *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 11 N.E.3d 676, 680 (N.Y. 2014) (CL-44).

conflict with Clause 6.6(ii)'s broad statement that Claimants may recover "*any direct damages*," rendering Clause 6.6(ii) effectively meaningless.

178. The better reading, then, is that Clause 19.3 only prohibits indirect damages, of which lost profits and loss of use may (or may not), depending on the particular dispute, be subtypes. That is how BHGE interpreted it at the closing hearing, arguing that Clause 19.3 exculpated it for what "*within the common law we would typically call consequential or indirect damages under which you have all of these categories.*" BHGE later reversed course, when it realized that this argument hurt its case. [280]

179. Reading Clause 19.3 to cover only indirect damages is also required under the well-recognized principle of *eiusdem generis*, which holds that the meaning of a word in a series of words "*is known by the company it keeps.*"[281] Here, "*loss of profits*" and "*loss of use*" must be read in conjunction with the phrase "*special, consequential, incidental [or] indirect*"—all synonyms for indirect damages. The repetition of these terms makes clear that the "*loss of profits*" and "*loss of use*" in Clause 19.3 refers only to damages that are indirect; not direct damages that are lost profits or lost use.

180. What are Claimants' direct, as opposed to consequential or indirect, damages?

181. Under New York law, direct damages are the "*natural and probable consequence of the breach.*"[282] Or, put another way, the losses that "*in the ordinary course of human experience*" can be expected to result from the breach.[283]

---

[280] Closing Arguments Tr., p.251:8-11 ("*It doesn't matter if you characterize this as a direct damage. If it's lost profits, you can't claim it under the contract. Under no event can you make these claims.*").

[281] *People v. Illardo*, 48 N.Y.2 408 (1979) (CL-228); *McKinney's Statutes*, § 239 (CL-243) ("*words employed in a statute are construed in connection with, and their meaning is ascertained by reference to the words and phrases with which they are associated.*"); *Miller Tabak & Co v. Senetek PLC*, 118 A.D.3d 520 (NY 1st Dept. 2014) (CL-229).

[282] *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York*, 886 N.E.2d 127, 130, 132 (N.Y. 2008) (CL-42).

[283] *R.K. Chevrolet, Inc. v. Hayden*, 480 S.E.2d 477, 481 (Va. 1997) (CL-245).

182. In the context of delay, New York law recognizes that the "*natural and probable*" result of late delivery is delay in the return, or "rents", associated with the object: "*the owner's <u>direct</u> damages, attributable to the delay, can be measured in one of two ways: 1. the rental value of the completed structure for the period of the delay; or 2. the reasonable return on the completed structure (treated as an investment) for the period of the delay.*"[284] In the "*ordinary course of human experience*," the inevitable result of BHGE's delayed delivery of the Trains is a delay in the cash flow that results from operating them. And that is precisely what Mr. Lapuerta's two-train model calculates.

183. If Mr. Lapuerta's calculation is rejected for any reason, Mr. Helsen has identified categories of delay damages that are direct:

- the loss of useful life — totaling US$87.7 million — is all direct damage because, as a direct result of the delay, the equipment is less valuable than when it was bought;[285]

- the operating expenses that were unnecessarily incurred during the delay — totaling US$ 75.1 million — are also direct damages because their wastage is the natural and probable result of the Trains not being delivered;[286]

[284] *Int'l Fid. Ins. Co. v. Cty. Of Rockland*, 98 F. Supp. 2d 400, 414-15 (S.D.N.Y. 2000) (CL-202) (emph. in original).

[285] *See* n.169 (describing Mr. Pagliaro's agreement on this point). The loss of useful life of all of the equipment, not just the Trains, is direct damages. *See Winforge, Inc. v. Coachmen Indus., Inc.*, No. 1:06-CV-619-SEB-JMS, 2008 WL 4098975, at *12 (S.D. Ind. Aug. 27, 2008) (CL-206) (holding that loss of plaintiff's initial investment in real estate, reasonable fees and expenses incurred by plaintiff during development, and increased interest costs due to an extended loan term during construction delays were all direct damages because "*the breach of an agreement to perform [the manufacture and completion of modular units] would foreseeably have the effect of irretrievably delaying the completion of the entire development project*").

[286] *See Lee Masonry, Inc. v. City of Franklin*, No. M200802844COAR3CV, 2010 WL 1713137, at *13 (Tenn. Ct. App. Apr. 28, 2010) (CL-207) (in the context of a construction project, substantial delay can cause contractor to "*suffer direct damages*" which can "*include increased payroll and labor costs, increased material costs, loss of efficiency of the use of equipment, extended bonding and insurance coverage, and overhead items.*").

- the loss of financial income — totaling US$ 44.8 million — is the time value of money and parallels the extra interest that would have had to be paid if the project had been debt financed instead of equity financed;[287] and

- finally, the loss of warranty — US$ 17.6 million — also flows naturally from the delay.

184. As for Mr. Helsen's calculations of damages under Clause 17.4 for BHGE's defects:

- The HHR system – with recoverable costs of $13,697,562.29 – was required as a direct result of BHGE's failure to provide Trains capable of meeting the contractually required specifications;

- The additional engineering costs –$3,738,453.61 – were incurred by Claimants as a direct result of BHGE's failure to provide defect-free, operable Trains;

- The costs incurred to purchase and install the VFD –$1,025,130.89 – were incurred as a direct result of BHGE's failure to provide a functional start-up system; and

- Finally, the costs that Claimants will incur to remedy the additional defects not specifically discussed above, are similarly a direct result of BHGE's failure to provide defect-free, operable Trains.

185. BHGE also relies on Clause 19.2, which purports to cap all aggregate damages at the contract price of US$ 96 million. Even if Clause 19.2 applied, it does not bar this Tribunal from awarding interest, costs, etc. in addition to damages. But more important, the limitation in Clause 19.2 establishes that the now nearly five-year delay in the delivery of the Trains was far beyond the contemplation of the parties and is, therefore, unenforceable. The $96 million cap is far below Claimants' hundreds of millions of dollars in actual damages for nearly five years of delay, an amount the parties could never have contemplated. As discussed in Part III.B.2, above, this voids the exculpatory provision: "*It can hardly be presumed … that [Claimants] bargained away [their] right to bring a claim for damages resulting from delays which the parties did not contemplate at the time.*"[288]

---

[287] Extra interest paid during the course of delay is direct damage. *See, e.g.*, *Winforge*, 2008 WL 4098975, at *12 (CL-206) (increased interest costs due to an extended loan term during construction delays constituted direct damages).

[288] *Corinno*, 493 N.E.2d at 910 (CL-224).

### IV.  BHGE IS LIABLE FOR FRAUD IN THE INDUCEMENT AND POST-CONTRACT FRAUD

#### A.  Fraud in the Inducement[289]

186.  Fraudulent inducement occurs where there is (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff.[290]

187.  In *GE Microgen*, the plaintiff presented evidence that the defendant, a GE subsidiary, withheld material information about a fuel cell's readiness for production, failure to meet technical milestones, and the results of independent testing.[291]  The court denied summary judgment, finding that the plaintiff had raised issues of material fact sufficient to sustain the elements of fraud, including regarding what GE Microgen knew about the fuel cell's development and viability during contract negotiations, and what it told the plaintiff.[292]

188.  BHGE made knowing misrepresentations and omissions to induce Claimants to sign the Contract.  (*See* Part III.A, above.)  The other elements are also met.

189.  Intent to induce reliance: BHGE contests falsity, but does not deny that it induced Claimants to purchase BHGE trains by claiming the Trains would be delivered in 9 and 12 months, and would be fully modular and easy to install and commission.

190.  Reasonable reliance: Claimants reasonably relied on these representations. BHGE's capacity to build the Trains in time, and its prior failures with the Shell plant, were exclusively within BHGE's knowledge.  Particularly in light of its lack of sophistication in

---

[289]  *See generally* SoC, Part III.B; SoR, Part X.B.

[290]  *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) (CL-9).

[291]  *GE Microgen*, 2013 WL 5827698, at *7 (CL-15).

[292]  *GE Microgen*, 2013 WL 5827698, at *8, 13 (CL-15).

this area,[293] Claimants had no reason to suspect that GEOG would mislead them regarding its ability to meet its contractual obligations.

191. <u>Causing Injury to Claimant:</u> BHGE's fraud caused Claimants to purchase a plant with negative value, or at least far less than the $70 million paid to date given the extraordinary delay and defects.[294] In addition, Claimants have incurred additional actual pecuniary losses[295] as a result of BHGE's fraud, including loss of auxiliary products and containers ($1,084,953.74), wasted OPEX ($75,084,758); take or pay ($64,320,907.96); loss of warranty value ($17,639,247.26), procurement of HHR ($13,697,562.29), consulting and engineering costs ($3,738,453.61), and investment in VFDs ($1,025,130.89).

## B. Fraud During Performance[296]

192. BHGE also committed fraud during the course of the Contract, causing Claimants to continue their relationship with BHGE instead of switching to an alternative contractor.

193. Under New York law, a claim for fraudulent misrepresentation requires (1) a material false representation; (2) intent to defraud the plaintiff; (3) reasonable reliance on the representation; and (4) damages as a result of such reliance.[297]

---

[293] *See* SoC, ¶ 360. "*New York authority follows a two-tier standard in assessing the duty of the party claiming fraud, according to whether the misrepresentations relate to matters peculiarly within the other party's knowledge. If so, the wronged party may rely on them without further investigation.*" *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007) (CL-10). "*[T]he general rule [is] that, in assessing the reasonableness of plaintiff's alleged reliance, the Court considers the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them.*" *Universe Antiques, Inc. v. Vareika*, 826 F. Supp. 2d 595, 609 (S.D.N.Y. 2011) (CL-14) (party's reliance on representation was reasonable "*in light of the entire circumstances*"), *aff'd*, 510 F. App'x 74 (2d Cir. 2013).

[294] Courts recognize the proximate cause standard applies in fraud cases and that causation can be shown when the defendant "*misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss.*" *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (CL-230).

[295] *Mills Studio, Inc. v. Chenango Val. Realty Corp.*, 221 N.Y.S.2d 684, 688 (N.Y. App. Div. 1961) (CL-223) (awarding damages for operational losses caused by fraud, such as cost of goods purchased, rent, and insurance); *Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (N.Y. 1986) (CL-20).

[296] *See generally* SoC, Part III.C; SoR, Part D.

[297] *Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 520 (S.D.N.Y. 2016) (CL-21) (post-contract misrepresentations were collateral to the contract where the contract required defendants to send plaintiff factory invoices and

194.    BHGE made numerous material false representations during the course of performance, with intent to defraud Claimants.  A "*strong inference of fraudulent intent*" arises where the facts show "*motive and opportunity to commit the alleged fraud*" or "*strong circumstantial evidence of conscious misbehavior or recklessness.*"[298]  BHGE had motive to string Claimants along to obtain its payments and hope change orders would "bail it out" of its failures.  There is also strong circumstantial evidence of conscious misbehavior and recklessness.[299]

## V.    GREENVILLE IS A PROPER CLAIMANT TO THE ARBITRATION[300]

195.    Claimants have extensively briefed the issue of Greenville's right to recover in this arbitration.[301]  Testimony at the hearing confirmed that IEC and Greenville operate as a single business and that BHGE was aware that IEC intended to own and operate the Trains through a Nigerian wholly-owned subsidiary.[302]

## VI.    THE BAKER HUGHES ENTITIES ARE PROPER RESPONDENTS[303]

196.    Claimants refer the Tribunal to the SoC and SoR for a thorough discussion of these issues.  In sum, upon the merger, the Baker Hughes entities stepped into the shoes and replaced GEOG in all material ways.  They controlled GEOG's finances; they took over and ran this project; they even invoice Claimants on Baker Hughes letterhead.[304]  Ms. Villadsen

---

defendants concealed the actual costs and sent plaintiff inflated invoices).

[298]    *Minnie Rose*, 169 F. Supp. 3d at 511-12 (CL-21) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006) (CL-231)).

[299]    *See generally* SoC, ¶¶ 313-335; SoR, ¶¶ 19, 25-46, 68-75, 112-137, 159-165, 169-193, 194-214, 245-285.

[300]    *See* SoC, ¶¶ 309-312; SoR, Part VIII.

[301]    SoC, ¶¶ 309-312; SoR, ¶¶ 436-463.

[302]    Hr'g Tr. Vol. 6, pp.11:3-19:20, 47:13-53:6 (Helsen). Mr. Van den Broeke also testified that IEC and Greenville are "*all integrated*" and that "*[f]or me they are the same companies . . . . The reason why Greenville is there is that IEC as a foreign company cannot operate in Nigeria. And that's the only reason.  It's the only reason.*"  Hr'g Tr. Vol. 2, pp.62:14-21, 75:10-76:9 (Van den Broeke).

[303]    *See* SoR, Part. IX.

[304]    Ex. R-181 (Written Consent of Sole Member in Lieu of Annual Meeting, dated March 21, 2018) (authorizing BHGE LLC's treasurer to withdraw GEOG funds in GEOG's name and execute agreements including account sweep agreements); Ex. R-81 (June 2018 Mechanical Completion Invoice on BHGE letterhead); CWS-3 (Pirijns), ¶ 1.13.

confirmed that BHGE had withheld information sufficient to evaluate GEOG as a going concern, and that the information it did provide showed it to be illiquid and insolvent.

197.  In September 2019, GE sold 132.25 million shares of Baker Hughes, a GE Company, and relinquished its position as controlling shareholder of BHGE.[305]  Baker Hughes, a GE Company, has since changed its name[306] to simply Baker Hughes Company.[307]  The award here should include reference to and be enforceable against Baker Hughes Company. Based on information currently available, Respondent Baker Hughes, a GE Company LLC, remains a subsidiary of the entity now named Baker Hughes Company.[308]

### VII.  BHGE AND GEN ARE NOT ENTITLED TO ANY OF THEIR COUNTERCLAIMS[309]

198.  Respondents' counterclaims seek tens of millions of dollars for (1) alleged unpaid milestone payments under the Equipment Contract and Services Agreement and (2) numerous change orders for additional work allegedly done during the project.

#### A.  Respondents Failed to Meet the Requirements for the Milestone Payments

199.  Respondents presented no evidence at the hearing to support their claims for outstanding contractual milestone payments and failed to respond to the myriad defects that are still preventing Trains 1 and 2 from operating.[310]  Instead, Respondents seemed to argue that the Equipment Contract permitted Respondents to declare Mechanical Completion and

---

[305]  Baker Hughes Company, *2019 Annual Report* (Feb. 13, 2020), available at https://www.bakerhughes.com/sites/bakerhughes/files/2020-02/Baker%20Hughes%202019%20Annual%20Report.PDF.

[306]  We invite Respondents to clarify their current legal names given GE's decision to sell its shares of BHGE and relinquished its position as controlling shareholder of BHGE.

[307]  Baker Hughes Company, *2019 Annual Report* (Feb. 13, 2020) (*see* hyperlink at n.305).

[308]  Baker Hughes Company, *2019 Annual Report* (Feb. 13, 2020) (*see* hyperlink at n.305).

[309]  *See* SoC, Part. V; SoR, Part XII.

[310]  *See* SoR, ¶¶ 552-564.

Taking Over even in the face of such defects—suggesting that there "*could still be punch list items outstanding after taking over has occurred.*"[311]

200.     Dr. Lancaster explained that while minor issues such as "*painting handrails*" would not prevent Mechanical Completion and Taking Over,[312] all "*safety critical and process critical items*" must be remedied prior to those milestones.[313]     These include Respondents' "*deficient stress analysis*," which was a "*safety critical issue*" as well as adequate cables. It also includes the VFD and similar process-critical items.

### B.     Respondents Failed to Comply with the Contractual Provisions for Change Orders

201.     The Contracts contain express provisions governing change order requests.[314]     As Mr. Hillier acknowledged, change order provisions permit the buyer to decide whether to proceed with a change after receiving the seller's proposal of additional time and/or cost.[315]

202.     Respondents do not dispute that they failed to comply with the contractual requirements for change orders.     In fact, Respondents operated in exactly the opposite manner.     For example, in November 2016, BHGE agreed that it would replace the rusted bolts (Counterclaim X2) at its own expense.[316]     And yet in June 2018, Respondents, without prior notice, demanded over $600,000 for that work.

203.     Respondents acted similarly in connection with their counterclaim X3 relating to alleged gas composition changes.     Respondents agreed at the beginning of the project that

---

[311]   Hr'g Tr. Vol 8, p.83:13-15 (Lancaster).

[312]   That is what the Equipment Contract states, as well, in the definition of "Mechanical Completion."

[313]   Hr'g Tr. Vol. 8, p.83:16;19 (Lancaster).

[314]   SoC, ¶ 421 *et seq*.; SoR, ¶¶ 567-580.

[315]   Hr'g Tr. Vol. 9, pp.65:10-66:4 (Hillier).   Mr. Hillier then attempted (as he did with regard to several other issues during his testimony) to explain why the contract is irrelevant and that what is important is how the parties actually operated.   Mr. Hillier has no expertise in that legal issue.

[316]   Ex. R-69; SoR, ¶¶ 590-91 (referencing Ex. C-133 and Ex. C-134).

Respondents would carry out preliminary analyses on gas compositions without charge, and that Claimants would only pay for further "in-depth" analyses if they so requested.

204. Respondents cannot charge Claimants for change orders that were never agreed and in many cases never even proposed.

### C. Respondents Failed to Provide Documentary Support for their Counterclaims

205. Respondents' counterclaims are based on unsupported allegations of additional work and estimates of costs incurred, with almost no supporting documentation.[317] And as Claimants learned at the hearing, much of the documentation BHGE did provide was created after this dispute arose.[318]

206. Respondents attempted to justify that lack of evidence with two arguments. First, they claim the employees at the Schertz facility did not maintain timesheets that attributed work to particular projects. Second, that other supporting documents were not available because of the shutdown of that facility. Neither argument is valid.

207. Mr. Wills explained that if it is necessary to estimate time spent due to the absence of timesheets, "*it must be fact-based estimating using actual supporting information from the project to explain what was changed*," such as "*how many isometric drawings were revised, how many simulations were run, how many POs were raised, how many NGOs were created and how many items were purchased*."[319]

---

[317] Hr'g Tr. Vol. 9, p.194:13-22 (Mr. Wills testifying that "*Mr. Hillier's evaluations are mostly without attaching any markup drawings, invoices, delivery orders or payment records for the verification of the quantities, all the amount that he has assessed as being reasonable. In addition, it appears entirely arbitrary as to how Mr. Hillier increases or decreases GE's claimed man-hours under the different heads of claim. For this, Mr. Hillier provides no analysis or explanation.*"

[318] Hr'g Tr. Vol. 5, pp.35:21-41:7 (Kassem) ("*Q. All right. And again, that information, both the description and the allocation, was not provided to IEC in the ordinary course, correct? At the time – A. No. No, it was not. . . . Q. The excerpts of the timesheets in Annex CC, they are altered from how the timesheets originally looked? For the ones that had no description, correct? A. Yes. . . . Q. All right. So you worked with Mr. Hillier to prepare this exhibit, Annex CC, correct? A. Yes.*").

[319] Hr'g Tr. Vol. 9, p.195:14-21 (Wills).

208.  As Mr. Wills testified, "*it should be incumbent on any fabricator or contractor to maintain and keep its records to demonstrate how and why additional work is a change and how much that change will cost. If the fabricator or contractor does not keep such records … a client cannot be expected to pay for this additional work without the actual evidence of the actual cost incurred*."[320]

209.  As for the Schertz shut-down, the counterclaims "*were first raised by GE before the closure of the Schertz facility*."[321] Mr. Pagliaro testified that the Schertz shut-down commenced in October 2018,[322] about four months <u>after</u> Respondents submitted their claims to Claimants, and even after Claimants commenced this arbitration. Respondents have no excuse for allowing evidence to support their counterclaims to be destroyed or lost. To allow Respondents' counterclaims in the absence of any supporting evidence "*would essentially be rewarding [Respondents] for poor commercial management practice*."[323]

### D.    Respondents' "Independent" Quantum Expert Is Not Independent

210.  The final flaw with Respondents' counterclaims is that their damages are supported only by the opinion of an expert who concealed that he was not independent.

211.  Respondents first submitted their change order claims to Claimants in June 2018. For each counterclaim, Respondents estimated (without any supporting documentation) the additional number of hours allegedly spent.

212.  In January 2019, Mr. Hillier submitted his first expert report. Because, as he explained, there were no supporting timesheets or other documents, he simply assessed whether Respondents' estimates in the June 2018 claims were reasonable.

213.  Mr. Hillier was careful in his report and testimony to state that he was first instructed to provide <u>his expert report</u> in December 2018. But what he concealed from the Tribunal is

---

[320]  Hr'g Tr. Vol. 9, p.195:1-11 (Wills).

[321]  Hr'g Tr. Vol. 9, pp.194:23-195:1 (Wills). Mr. Wills made that comment in connection with Respondents' X-counterclaims, but the same is true of their Y-counterclaims.

[322]  Hr'g Tr. Vol. 2, pp.144:7-146:2 (Pagliaro).

[323]  Hr'g Tr. Vol. 9, p.195:11-13 (Wills).

that he had actually been retained a year earlier to help Respondents put together the very claims that he then purported to independently analyze in his expert reports.

214. Mr. Hillier's belated explanation that he was just an occasional resource for Respondents is not credible. He testified that the individual at BHGE who was putting the claims together did not have experience in this area and was "*basically getting trained to do this type of work*."[324] And multiple communications between Mr. Hillier and Respondents prior to June 2018 contradict his statement that he was not intricately involved.[325]

215. In light of Mr. Hillier's involvement in compiling the counterclaims and his subsequent concealment of that fact, this Tribunal should reject his quantum opinions in their entirety.

### E. The Testimony Presented at the Evidentiary Hearings Further Undermined Respondents' Change Order Counterclaims

216. Even if the Tribunal sets aside these overarching deficiencies, each of Respondents' individual change order counterclaims fails. Respondents cannot demonstrate that they carried out additional work at Claimants' request. Nor have Respondents provided sufficient proof as to the quantum of each counterclaim.[326]

ICPs (Counterclaim X1)

217. Mr. Hillier's testimony established the ICPs were always included in BHGE's original Scope of Work. He confirmed that at the September 2014 Kick-Off meeting, "*[s]omeone who was at that meeting [from Respondents] confirmed*" that the internal ICPs were within their scope.[327] He also acknowledged that at the beginning of the project, Respondents

---

[324] Hr'g Tr. Vol. 9, pp.181:21-182:1 (Hillier).

[325] Ex. C-1037 (GE internal email, dated February 20, 2018); Ex. R-111 (GE internal email, dated March 15, 2018).

[326] Claimants addressed each of Respondents' change order counterclaims in the SoC and SoR. *See* SoC, ¶¶ 432-499; SoR, ¶¶ 586-690. Claimants will not repeat those arguments here, instead limiting these arguments to any pertinent information that was presented during the hearing.

[327] Hr'g Tr. Vol. 9, p.71:10-15 (Hillier).

placed a lump-sum order with Turner for both the "*provision of the modules and the pipework-related ICP*"[328] further showing BHGE understood the ICPs to be in their scope.

Bolts (Counterclaim X2):

218. Respondents provided no evidence at the hearing to explain how this counterclaim could survive in light of BHGE's agreement, during the project, that it would replace the rusted bolts at its own cost.[329] Dr. Caligiuri explained in detail why BHGE's choice of unpainted black bolts were "*never acceptable in this particular application*."[330]

219. BHGE's claimed damages is similarly unsupported. Half of its claim comprised alleged costs for third-party services, but the only support for those damages was Mr. Hillier's statement that he had seen purchase orders from a company called Geoplex. Mr. Hillier conceded, however, that he "*can't say whether Geoplex showed up.*"[331] This concession is just another example of the lack of evidentiary support for Respondents' counterclaims.

Gas Composition Changes (Counterclaim X3):

220. BHGE's counterclaim is based on Mr. Lavender's assertions in his witness statement that BHGE did additional work in response to Claimants' alleged requests to change the gas composition. At the hearing, Mr. Lavander conceded that many of the documents that he presented in his witness statement as proof of Claimants' alleged requests were nothing of the sort.[332] Many of the documents were internal BHGE documents discussing various issues regarding gas composition, but not referencing Claimants at all.[333]

---

[328] Mr. Hillier testified that he saw the contract with Turner, and yet despite this Tribunal's Procedural Order No. 4, Respondents never produced that document to Claimants.

[329] *See* SoC, ¶¶ 439-441; SoR, ¶¶ 590-91.

[330] Hr'g Tr. Vol 7, p.253:9-12 (Caligiuri).

[331] Hr'g Tr. Vol. 9, p.88:17-24 (Hillier).

[332] Hr'g Tr. Vol. 5, p.217 *et seq.* (Lavander).

[333] *See, e.g.*, Hr'g Tr. Vol. 5, pp.227:10-228:12 (Lavander) (citing R-121).

221.   Mr. Lavander also testified that near the beginning of the project, BHGE agreed to run quick simulations for Claimants on various gas compositions because it refused to provide Claimants the files so that they could run them themselves.[334]  He acknowledged that the parties agreed that Claimants would only pay for additional simulations and analyses if Claimants specifically asked BHGE to conduct further "in-depth" analyses.[335]  And he conceded that none of the documents he provided to the Tribunal contained any request from Claimants for such further analyses.[336]

222.   Mr. Hillier's quantum opinion suffers from the same flaws as all the other counterclaims with regard to the alleged additional management time.  He also conceded he had no evidence BHGE ever made payments supporting his alleged third-party costs.[337]

Alleged Technical Information Delay (Counterclaim X6):

223.   BHGE's counterclaim X6 is based on Mr. Slater's opinion that Claimants failed to respond to requests during the project within a required 10-day "fast track" time limit.

224.   That opinion was based on the assertion that the parties agreed, during the Kick-Off meeting to override the Contract's 15-day time limit.  Mr. Slater relied upon Exhibit R-19, which he contended was the agreed upon meeting minutes.[338]  But the minutes he presented to the Tribunal were unsigned, draft minutes.[339]  The signed, final minutes did not include the language Mr. Slater relied upon.[340]

---

[334]   Hr'g Tr. Vol. 5, pp.214:23-216:16 (Lavander).

[335]   Hr'g Tr. Vol. 5, p.234:1-17. (Lavander).

[336]   Hr'g Tr. Vol. 5, p.217 *et seq.* (Lavander).

[337]   Hr'g Tr. Vol. 9, pp.96:17-99:25 (Hillier) ("*Q Right. Again, I'm asking as you sit here to the Tribunal, you are asking Claimants to pay for 119 hours of Chart time, but there is zero evidence that Chart ever asked to be paid for that, correct?  That's before the Tribunal? A That's before the Tribunal, yes.*").

[338]   Slater Hearing Presentation, Slide 6.

[339]   Hr'g Tr. Vol. 7, p.106:11-21 (Slater).

[340]   Hr'g Tr. Vol. 7, pp.106:22-109:11 (Slater) (citing Ex. C-46).

Vent/Flare (Counterclaim X8):

225.    BHGE's Counterclaim X8 is based on the allegation that Claimants requested that BHGE redesign the flare system to include additional loads from the BOP.  But Mr. Borrowman admitted that he had not seen any proof of such a request and it may not have been made. Mr. Hillier therefore agreed that Counterclaim X8 would "*need to be put to one side*."[341]

Prolongation (Counterclaim X12):

226.    As Mr. Hillier conceded at the hearing, this claim "*goes away if GE is responsible for the delay*" in the project.[342]  As explained above, BHGE is responsible for the delay.

227.    Mr. Hillier's testimony also exposed the arbitrariness of his opinion.  He acknowledged that in his first report he used a figure of $10,000 per month for BHGE's costs attributable to the Rumuji project (despite BHGE telling him it was $25,000). He then conceded that in his second report, he used the $25,000 per month figure (presumably because it gave a larger quantum amount), but that he could not "*for the life of me remember why I did the 10,000 first and then the 25.*"[343]

Additional Support Services at Site (Counterclaim Y1):

228.    GEN's largest counterclaim under the Services Agreement is for $9.4 million for additional work allegedly done at the Rumuji site. But most of this work was done to complete fabrication of the Trains and to rectify BHGE's defects, not under the Services Agreement.

229.    This counterclaim is also not supported by reliable evidence.  Mr. Kassem testified he added the supporting entries in the time sheets years after the work was allegedly done. The recreations that Mr. Kassem made were "*not submitted at all to [Claimants]*" and were

---

[341]  Hr'g Tr. Vol. 9, pp.126:11-132:18 (Hillier).

[342]  Hr'g Tr. Vol. 9, p.140:20-22 (Hillier).

[343]  Hr'g Tr. Vol. 9, p.142:7-19 (Hillier).

not indicated on the timesheets so that a reader could understand that the information was added solely for purposes of this arbitration.[344]

230. As Mr. Wills testified at the hearing, "*normally you would have great reservation accepting timesheets that are not signed.*"[345] And the testimony Mr. Wills heard from Mr. Kassem about the adjustments he made to the timesheets "*two years, three years after the event*" together with "*discrepancies with them and changes*" exacerbated his concerns.[346]

Additional 3rd Party Support at Site (Counterclaim Y2)

231. The majority of this counterclaim is for third-party health and safety services allegedly provided to, and paid for by, GEN. But as exposed at the hearing, GEN's assertions that these costs were required or even incurred, have no basis.

232. Mr. Hillier's "opinion" that GEN incurred approximately $117,000 in costs for services provided by Lonadek must be rejected based on his admission that he has no evidence that Lonadek ever provided the services, or that GEN paid for them.[347] And GEN cannot explain why Claimants should reimburse them for the costs of an ambulance ($265,190) when it is undisputed that Claimants had an ambulance on site prior to GEN arriving.[348]

3rd Party Vendors (Counterclaim Y4):

233. Mr. Hillier's evolving opinion on this counterclaim demonstrates the arbitrariness and lack of rigor that permeate his reports. In his first report, Mr. Hillier opined that GEN was entitled to nearly $1.3 million for this counterclaim, the vast majority of which was for additional equipment as to which he conceded "*GEOG have been unable to provide actual costs incurred.*" Mr. Hillier assured the Tribunal that he would "*update this with actual*

---

[344] Hr'g Tr. Vol. 5, pp.37:21-38:17 (Kassem).

[345] Hr'g Tr. Vol. 9, p.231:9-10 (Wills).

[346] Hr'g Tr. Vol. 9, pp.231:9-232:6 (Wills).

[347] Hr'g Tr. Vol. 9, p.171:7-17 (Hillier).

[348] Hr'g Tr. Vol. 9, pp.171:8-175:2 (Hillier).

*data in my next report*."[349]  Unfortunately, when he submitted his second report, he provided no additional information, failed to acknowledge his previous promise to the Tribunal, and simply reiterated his "*satisfaction*" with the $1.3 million figure.

234.  In the hearing, Mr. Hillier again acknowledged that "*GEOG has been unable to provide the supporting data.*"[350]  But contrary to his reports, Mr. Hillier now valued this counterclaim at zero.  While Claimants agree with Mr. Hillier's belated admission that GEN failed to prove their damages, it is unclear why Mr. Hillier has not applied the same analysis to other counterclaims as to which he acknowledges that GEN failed to provide supporting information.[351]

### VIII.   REQUEST FOR RELIEF

235.  Claimants respectfully request that the Tribunal issue its final award:

(a)  declaring that Greenville is a third-party beneficiary of the Contract and the Services Agreement or is otherwise entitled to recover its damages under those Contracts, and that the Tribunal has jurisdiction over its claims;

(b)  declaring that BHGE and BHGE LLC are responsible, along with GEOG, for performance of the obligations under the Contract and the Guarantee;

(c)  declaring that GEOG, BHGE and BHGE LLC have breached the Contract;

(d)  declaring that GE Nigeria has breached the Services Agreement;

(e)  declaring that GEOG, BHGE and BHGE LLC have breached the Guarantee

---

[349]  RER-7 (Hillier), ¶¶ 6.7.9.7, 6.7.9.8.

[350]  Hillier Hearing Presentation, Slide 38 (Counterclaim Y4 – "*GEOG has been unable to provide the detailed supporting data and hence I too have valued this at zero*.")

[351]  *See, e.g.,* Hillier Hearing Presentation, Slide 41 (Counterclaim Y7 – "*GEOG has been unable to provide the supporting data Mr. Wills requires*"); Slide 42 (Counterclaim Y8 – "*GEOG has been unable to provide the timesheet supporting data Mr. Wills requires ...*").

(f)     awarding Claimants damages of no less than US$ 700 million as articulated in the Updated Workpapers in the Lapuerta Reply Report, plus interest;

(g)     alternatively, awarding Claimants no less than US$ 244.9 million as articulated in the Second Witness Statement of Erik Helsen, plus interest;

(h)     awarding liquidated damages in the amount of $4.8 million, plus interest;

(i)     awarding Claimants additional damages of US$ 58,642,586.96 for take-or-pay costs to date;

(j)     declaring that GEOG, BHGE and BHGE LLC are each liable, jointly and severally, to Claimants for all additional damages and further losses that Claimants may incur as a result of their breaches of the Equipment Contract, including take-or-pay costs, costs of remedying latent and patent defects and lost profits arising from the continuing unavailability of the project;

(k)     declaring that GE Nigeria and GEOG are liable to Claimants for all additional damages and further losses that Claimants may incur as a result of GE Nigeria's breaches of the Services Agreement;

(l)     declaring that GEOG, BHGE and BHGE LLC are jointly and severally liable for fraudulently inducing Claimants to enter into the Equipment Contract;

(m)     declaring that GEOG, BHGE and BHGE LLC are jointly and severally liable for defrauding Claimants during the performance of the Equipment Contract;

(n)     ordering Respondents, jointly and severally, to compensate Claimants for all fees and expenses incurred in connection with this arbitration, including legal fees and expenses, expert fees and expenses, and all other expenses including the fees of the Arbitral Tribunal and the administrative fees and costs of the AAA/ICDR; and

(o)     granting such other and further relief as the Arbitral Tribunal deems just and appropriate.

Respectfully submitted,

**Freehill Hogan & Mahar LLP**
80 Pine Street, 25th Floor
New York, New York 10005-1759

**Baker Botts L.L.P.**
41 Lothbury
London EC2R 7HF
United Kingdom

**Annex A—Demonstrative Exhibit C-D03**



i

## Annex B—Examples of False Certifications

| Certifications | Proof of Falsity | Resulting Injury |
|---|---|---|
| Static mixer on module 502 tested and inspected. [352] | Static mixer on module 502 installed backwards; testing would have caused the static mixer internals to dislodge.[353] | Static mixer on module 502 shattered during testing and was not replaced until August 2018.[354] |
| All modules certified as tested and inspected with all punch list items addressed or identified for rectification in the field.[355] | More than 4,000 punch list items identified for GEOG that would have been evident upon inspection.[356] For example, there were 18 and 28 items missing from Train 1 Modules 501 and 401B, respectively, including valves, instruments, and strainers.[357] | Claimants' unknowingly paid for and accepted shipment of incomplete modules in reliance on the false certifications. Delay while GEOG admitted responsibility and worked through the punch list.[358] |
| Control valve certified as having correct flow direction[359] | For example, six globe valves were missing, and two ball valves were backwards on Train 1 Module 401B, and 2 control valves were not | Claimants' unknowingly paid for and accepted shipment of incomplete modules in reliance on the false certifications. |

---

[352] CWS-3 (Pirijns), ¶ 14.98; Ex. C-198.

[353] Ex. C-201; Ex. C-203 at 3.

[354] CWS-12 (Pirijns), p.5; Ex. C-199.

[355] Ex. C-101 ("*Have punch list items been identified for correction in the field?*" and "*This certifies that this module is complete to a level satisfactory for preparation for shipment. All punch list items identified as field work has been annotated.*"); Ex. C-103 ("*All Punch List items addressed.*").

[356] Ex. C-19; Ex. C-20; Ex. C-D10.

[357] Ex. C-19.

[358] *See* CER-7 (Lancaster), Part 5.4.1.2.4 & App 9.

[359] *See, e.*g., Ex. C-1175.

| Certifications | Proof of Falsity | Resulting Injury |
|---|---|---|
| | installed on Train 1 Module 501.[360] | Delay; valves continued to be shipped into 2019.[361] |
| Valves certified as inspected to verify installation and alignment.[362] | Nearly 200 valves were not installed on Train 1 alone and 17 valves on Train 1 were installed backwards.[363] Several examples are listed below. | Claimants' unknowingly paid for and accepted shipment of incomplete modules in reliance on the false certifications.<br><br>Delay while valve direction was verified and missing valves were shipped; valves continued to be shipped into 2019.[364] |
| | VBL-3513 was not installed on Train 1 Module 300 and prevented mechanical completion. [365] | Delay; VBL-3513 was not delivered until May 17, 2017.[366] |
| | VGL-3806 was not installed on Train 1 Module 401B and prevented mechanical completion. [367] | Delay; VGL-3806 was not delivered until February 2, 2017.[368] |

---

[360] *See* Ex. C-19.

[361] CER-7 (Lancaster), App 6-8.

[362] Ex. C-103.

[363] Ex. C-141.

[364] CWS-3 (Pirijns), ¶¶ 14.111-14.113; CER-7 (Lancaster), App 6-8.

[365] Ex. C-19.

[366] CER-7 (Lancaster), App 8 at p.4.

[367] Ex. C-19.

[368] CER-7 (Lancaster), App 8 at p.6.

| Certifications | Proof of Falsity | Resulting Injury |
|---|---|---|
| | VCK-8800 and VBL-8803 were not installed on Train 1 Module 1000 and prevented mechanical completion. [369] | Delay; VCK-8800 was not delivered until April 7, 2017 and February 16, 2017, respectively.[370] |
| All instruments certified as installed per GE's directions[371] | Over 200 instruments were missing from Train 1.[372] Several examples are listed below. | Claimants' unknowingly paid for and accepted shipment of incomplete modules in reliance on the false certifications.<br><br>Delay; instruments for Train 1 continued to be shipped through 2018.[373] |
| | Flow element FE-4407 was not installed on Train 1 Module 502 and prevented mechanical completion.[374] | Delay; FE-4407 was not delivered until August 24, 2018.[375] |
| | Pressure gauges PG-2701, PG-2702, and PG-2703 were not installed on Train 1 Module 203 and prevented mechanical completion.[376] | Delay; PG-2701, PG-2702, and PG-2703 were not delivered until March 22, 2017.[377] |

---

[369]  Ex. C-19.

[370]  CER-7 (Lancaster), App 8 at p.10.

[371]  *See, e.g.*, Ex. C-1174; Ex. C-1175.

[372]  Ex. C-187.

[373]  *See, e.g.*, CER-7 (Lancaster), App 6 & 7.

[374]  Ex. C-19.

[375]  CER-7 (Lancaster), App 8 at p.7.

[376]  Ex. C-19.

[377]  CER-7 (Lancaster), App 8 at p.4.

| Certifications | Proof of Falsity | Resulting Injury |
|---|---|---|
| | Temperature gauge TG-4920 was not installed on Train 1 Module 503 and prevented mechanical completion.[378] | Delay; TG-4920 was not delivered until February 16, 2017.[379] |
| | Temperature gauges TG-5801 and TG-5901 were not installed on Train 1 Module 506 and prevented mechanical completion.[380] | Delay; TG-5801 and TG-5901 were not delivered until April 7, 2017.[381] |
| | Temperature element TE-8802 was not installed on Train 1 Module 1000 and prevented mechanical completion.[382] | Delay; TE-8802 was not delivered until March 22, 2017.[383] |
| Electrical Termination Certification: Connections were correct and tight.<br><br>Conduit fittings and glands were installed correctly.[384] | Not all connections were even wired to the instrument panel for over 40 instruments on Train 1.<br><br>Glands were missing and oversized.[385] | Claimants' unknowingly paid for and accepted shipment of incomplete modules in reliance on the false certifications.<br><br>Delays in completing electrical work (still not complete).[386] |

---

[378] Ex. C-19.

[379] CER-7 (Lancaster), App 8 at p.7.

[380] Ex. C-19.

[381] CER-7 (Lancaster), App 8 at p.8.

[382] Ex. C-19.

[383] CER-7 (Lancaster), App 8 at p.10.

[384] *See* Ex. C-1174; Ex. C-1175.

[385] Ex. C-187; CWS-3 (Pirijns), ¶¶ 14.148, 14.153-14.157.

[386] CWS-12 (Pirijns), p.5.

iv

| Certifications | Proof of Falsity | Resulting Injury |
|---|---|---|
| Release for packing certified modules were complete with no ship-loose items identified.[387] | Many parts to the modules were shipped loose and unidentified or were missing entirely.[388] | Claimants' unknowingly paid for and accepted shipment of incomplete modules in reliance on the false certifications.<br><br>Delays in construction; items continued to be shipped through 2019.[389] |

---

[387] Ex. C-101 ("*Have all ship loose items been identified and removed?*").

[388] CWS-2 (Srinivasan), Part 2; *See also* CER-1 (Lancaster), *passim*.

[389] CER-7 (Lancaster), App 6-8.

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

# Exhibit 9

**AMERICAN ARBITRATION ASSOCIATION**
**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**


**INTERNATIONAL ENGINEERING & CONSTRUCTION S.A. AND**
**GREENVILLE OIL & GAS CO. LTD.,**

<u>**Claimants**</u>

**- and -**

**GE OIL & GAS, LLC (F/K/A GE OIL & GAS, INC.),**
**PRESSURE CONTROL SYSTEMS NIGERIA LIMITED (AS**
**SUCCESSOR TO GE INTERNATIONAL OPERATIONS (NIGERIA) LTD.),**
**GE INTERNATIONAL OPERATIONS (NIGERIA) LTD.,**
**BAKER HUGHES, A GE COMPANY AND**
**BAKER HUGHES, A GE COMPANY, LLC (AS SUCCESSORS**
**TO GE OIL & GAS, LLC [F/K/A GE OIL & GAS, INC.]),**

<u>**Respondents**</u>

_____


**Claimants' Reply to Respondents' First Post-Hearing Brief**

**May 8, 2020**

_____



**Freehill Hogan & Mahar LLP**
**80 Pine Street, 25th Floor**
**New York, New York 10005-1759**

**Baker Botts L.L.P.**
**41 Lothbury**
**London EC2R 7HF**
**United Kingdom**

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................1

II.     THE TRAINS ARE STILL NOT DELIVERED, MUCH LESS DEFECT FREE ............8

        A.      Delivery Remains Incomplete.........................................................9

        B.      BHGE Continues Its "Game" of Trying to Shift Blame for the Defects ................9

        C.      BHGE "Theory" As to Why Claimants Did Not Want Trains 1 and 2
                Operational is Farcical ........................................................14

III.    BHGE'S ATTACKS ON CLAIMANTS' DAMAGES ARE GROUNDLESS ...............16

        A.      Mr. Lapuerta's Analysis Proves a Damages Claim of $700 Million ....................16

                1.      Mr. Lapuerta's Analysis Is Based on Reliable Financial
                        Information ..................................................... 18

                2.      Mr. Lapuerta Relies on Claimants' Financial Statements ........................ 19

                3.      Mr. Lapuerta Conducted Extensive Due Diligence .................................. 21

                4.      Mr. Lapuerta's Analysis Provides a 2-Train and 5-Train Model.............. 21

                5.      Mr. Lapuerta Reduces His Damages Analysis to Incorporate LPG
                        Sales ..................................................... 22

                6.      Mr. Lapuerta's and Mr. Helsen's Damages Calculations Are
                        Consistent........................................... 24

        B.      Mr. Helsen's Damages Calculations Are Substantiated and Explained ...............26

        C.      Contractual Remedies Sought ........................................................28

IV.     BHGE'S DUE PROCESS "CONCERNS" ARE GROUNDLESS .............................28

        A.      BHGE Waived Its "Tactical" Process Complaints. ...............................29

        B.      There Are No New Claims ......................................................30

        C.      Response to BHGE's Individual Due Process Arguments ...................................31

V.      GREENVILLE AND BAKER HUGHES ARE PROPER PARTIES ..............................33

VI.     CLAIMANTS HAVE NEVER ABANDONED THEIR FRAUD CLAIM ....................35

VII.    BHGE'S COUNTERCLAIMS ARE MERITLESS .........................................36

        A.      Claimants Exposed the Failure of BHGE's Counterclaims at the Hearing ..........36

        B.      BHGE Is Not Entitled to Its Contractual Payment Counterclaims ......................37

        C.      BHGE's Counterclaims' Quantum Has No Basis Due to Mr. Hillier's
                Lack of Independence and Unreliable Opinions...................................38

        D.      BHGE's Other Counterclaims Are Meritless ......................................39

i

## I.    INTRODUCTION

1.    BHGE promised Claimants a fully modularized, defect-free plant, that was built and tested with American quality, *i.e.*, superior engineering and construction. BHGE vaunted the small-scale fully modular LNG trains it was producing for Shell and guaranteed to produce similar trains customized for Claimants' performance requirements and country needs.[1] Critically, it made these assurances knowing Claimants' requirement for the Trains in 9 and 12 months – and knowing full well it could not and would not meet that deadline.[2]

2.    BHGE knowingly made these false promises to generate much-needed revenue, with total disregard for the devastating effects on Claimants.  BHGE's half-decade of delay has caused at least $700 million in damages. Eddy Van den Broeke, who had $500 million from the sale of the most successful bitumen business in West Africa, now teeters on the edge of insolvency. Without Train 3, BHGE would have already driven him there.  As he put it, "*[i]f Train 3 is down tomorrow and I cannot supply my customers, I am bankrupt*."[3] And that says nothing of the immeasurable harm caused to the local community and Nigerian populace as a whole.[4]

3.    Faced with this undeniable harm, BHGE has never truly sought to deny liability or disprove the overwhelming evidence of its dishonesty and reckless disregard,[5] but only to distract from them.  It declares "no harm, no foul" because it allegedly, eventually shipped everything that was missing.  Its position willfully ignores the <u>years</u> of delay caused by its

---

[1]    CWS-1 (Eddy), ¶ 6.15 (GE said it "*could fabricate two new trains, just like the Shell plant that we were looking at, and have them delivered to us within the time frame we were looking for*"), ¶ 7.18 ("*GE said that they would vary the reference plant's design to accommodate three fundamental differences between the Canadian and Nigerian location: (i) tropicalization …; (ii ) the ability to operate at 50 Hz, instead of 60 Hz, and (iii) a liquefaction process designed to operate on the heavy Nigerian gas composition we provided.*"); CWS-3 (Pirijns), ¶¶ 3.12, 4.5, 4.6.

[2]    CWS-1 (Eddy), ¶¶ 7.2-7.3; *see also* SoC, ¶¶ 56-68, 112-114; SoR, ¶¶ 507-514.

[3]    Hr'g Tr. Vol. 2, p.17:3-5 (Eddy).  In fact, even if the trains reach completion and Claimants are awarded damages tomorrow, Claimants can never be made truly whole.  Claimants have lost the opportunity for growth through the first mover's advantage due to BHGE's breaches.

[4]    *See, e.g.*, Hr'g Tr. Vol. 5, p.122:10-13 (Sahajwalla) (the purpose of the project was to "*bring[] gas to Nigeria where it is completely deprived of power*"); CWS-4 (Sahajwalla), ¶¶ 6-9; CWS-11 (Eddy), ¶¶ 4-7.

[5]    BHGE's SoD ignored virtually all of the delay and defects identified by Claimants, claiming that they were covered by its experts.  But for most of it, the experts were also silent.  *See* SoR, *passim*.

1

trickling deliveries of incomplete, untested, and defective equipment and engineering.[6]

4. BHGE's First Post-Hearing Brief ("**PHB**") now takes the same approach. It declares "*there is one factual circumstance that fundamentally impacts the Parties' claims and counterclaims: the Rumuji Plant is now close to completion*."[7] BHGE therefore claims that "*the majority of the evidence submitted in this arbitration by the Claimants [is] substantially useless.*"[8]

5. This statement is truly remarkable: all the immense delays, defects, and other issues in this arbitration are irrelevant because the plant is now close to completion (no thanks to BHGE). By starting Train 3, Claimants saved what could be saved, mitigating their damages to the extent possible. In the same spirit, Claimants engaged the engineers and bought the missing parts to try to complete Trains 1 and 2 with the hope — not certainty — they will work. But that hardly means Claimants have not suffered extremely large damages, including from years of delay. That BHGE would even say so defies belief.

6. And when BHGE says anything at all about delay, it contends <u>Claimants</u> are at fault for not seizing the reins from BHGE sooner.[9] In doing so, it wants you to forget BHGE's threat to cancel the warranties if Claimants installed a single support for an overstressed pipe in 2016.[10] Forget about its promise at the November 2016 Florence meeting that LNG would flow by March 2017.[11] Forget Mr. Simonelli's promise at the January 2017 Florence meeting that the Trains would produce LNG by late July or early August 2017.[12] Forget BHGE told Claimants it would purchase the VFD and cables in February 2019, a promise

---

[6] BHGE's (inadequate) offer to pay for the equipment required to fix these issues (*see* Ex. R-314) does not include the delay damage they had caused or even the labor required to rectify BHGE's failures.

[7] BHGE PHB, ¶ 2.

[8] BHGE PHB, ¶ 4.

[9] BHGE PHB, *passim*.

[10] Ex. C-182 (Email from Michael Cohen to Claimants, dated January 25, 2017) ("*There is no reason to add any supports for train 1&2. Modifying the GE structures and modules will void the warranty.*"); CWS-3 (Pirijns), ¶ 14.75.

[11] Ex. R-69 (Minutes of November 2016 Florence meeting); CWS-3 (Pirijns), ¶ 13.34.

[12] Ex. R-72 (Draft minutes of January 2017 Florence meeting); CWS-3 (Pirijns), ¶ 13.47.

it withdrew in June 2019.[13]  Forget BHGE insisted since December 2018 that Claimants trust BHGE's stress analysis and allow it to implement the remediation — until the December 2019 hearing, when Mr. Linwood admitted the analysis was still incomplete.[14]

7.  That BHGE even makes such an argument with a straight face — that despite the roughly US$ 70 million Claimants have already paid to BHGE, and all the promises BHGE made, Claimants should have stepped in and done BHGE's work for it — is astounding.[15]

8.  Having no excuse for the delay caused by its willful misconduct and gross negligence (shown by the inability to complete in 5+ years the trains that it promised in one), BHGE alleges absurd theories to try to shift responsibility to Claimants.  It claims Claimants never "*had any real interest in starting up the entire plant*" and producing LNG because there is no demand for their product.[16]  Nonsense.  Claimants invested over $500 million[17] to get the plant running and pay more each day to run it.  In mid-2017, because BHGE said it would be ready, Claimants committed to a take-or-pay gas contract to receive gas starting in 2018 (resulting in the recent invoices from Total for nearly $60 million).[18]  And they have been paying operating expenses for years.  There are no savings to Claimants from dragging their feet, only costs and massively lower cash flows.

---

[13]  CWS-3 (Pirijns), ¶¶ 15.20-15.22 ("*At the February 2019 meeting, the GE electrical engineers finally conceded that despite trying for a year to manipulate the start-up, their system could not work, and they agreed that a VFD would be required.*"); *see also* Ex. C-555 (Minutes of February 12-13, 2019 Rumuji Meeting), p.4 ("*GEOG has to supply suitable cables – GEOG has identified 300sqmm cable size for the application, which IEC agrees. ... GEOG has started the procurement process of the cables....*"); p.6 ("*GEOG asked IEC if they have any preferred/previously identified VFD solution.... GEOG to identify a viable long-term sustainable solution asap.*"); *see also* Ex. C-186 (Letter from IEC to GE, dated February 28, 2019); CWS-12 (Pirijns), ¶ 4.101 ("*But after GE/BHGE abandoned the Project, it also became clear that they were not going to supply the VFDs unless we agreed to pay for them.*").

[14]  *See, e.g.*, RWS-4 (Pagliaro), ¶ 59; RWS-7 (Pagliaro), ¶ 74; Hr'g Tr. Vol. 7, pp.185:25-186:16 (Linwood) ("*GE had stated that they wanted to carry out a further and final survey onsite of all of the stress....*").

[15]  Factual absurdity aside, BHGE fails to explain how — legally — Claimants' desire to maintain their warranties and avoid terminating BHGE's contracts gives BHGE any defense.  New York law permits — but does not require — a party to terminate upon its counterparty's willful breaches.

[16]  BHGE PHB, ¶ 8 (emphasis in original).

[17]  CWS-1 (Eddy), ¶ 1.3.

[18]  Ex. 312 (GSAA between NNPC and Greenville, dated September 11, 2017); Ex. C-1177 (2018 Total Take-or-Pay Invoice); Ex. C-1178 (2019 Total Take-or-Pay Invoice).

9.     BHGE also alleges Claimants relied entirely on demand from the Kaduna power plant.[19] As BHGE well knows, having itself wanted to partner with Claimants to replicate the project across West Africa,[20] that is false. The witnesses said the opposite, and produced letters of intent (beginning from 2015) from commercial customers for volumes much greater than the expected production capacity under the initial 2-train contract.[21] BHGE dishonestly says Claimants only have nine customer agreements.[22] The testimony and documents prove 25 signed customer agreements as of the December 2019 hearing, with 8 more in the final stages of negotiation and others progressing.[23]

10.    BHGE's PHB is filled with other distortions and outright misrepresentations, such as:

(i)     BHGE states "*[i]t is not known why the Claimants then waited until 2017 to begin meaningfully reaching out to other potential customers.*"[24] They did not. Long before 2017, Claimants had many LOIs[25] and "*had already started speaking to a lot of people about the gas.*"[26]

(ii)    BHGE misrepresents Mr. Lapuerta to have testified that "*the HHR is also a plant improvement,*"[27] but Mr. Lapuerta testified that the HHR system "*gives about a five percent return on the investment, which is lower than the return that a reasonable investor would demand for a facility like this.*"[28]

(iii)   BHGE asserts "*the soft-starter was added to GEOG's scope of work only with the*

_____

[19]   *See, e.g.*, BHGE PHB, ¶ 14.

[20]   CWS-4 (Sahajwalla), ¶ 22 (citing Ex. C-309).

[21]   CWS-4 (Sahajwalla), ¶ 15 & App. A; CWS-5 (Helsen), ¶¶ 33-34; CER-4 (Lapuerta), p.30 at Table 4. BHGE also ignores Claimants' prior successful trading in diesel, which it distributed all over Nigeria. CWS-1 (Eddy), ¶¶ 2.7, 2.9 (discussing Claimants' AGO (Automotive Gas Oil) business) that gave Claimants a ready base of potential customers for LNG sales).

[22]   BHGE PHB ¶ 11 & n.12 (emphasis added).

[23]   CWS-9 (Sahajwalla), ¶¶ 5-7 (citing several exhibits containing the agreements). BHGE did not ask Ms. Sahajwalla a single question about any of those customers or their contracts during the evidentiary hearing.

[24]   BHGE PHB ¶ 16 & n.19.

[25]   CWS-4 (Sahajwalla), ¶ 15 & App. A; CER-4 (Lapuerta), p.30 at Table 4

[26]   Hr'g Tr. Vol. 5, pp.130:21-131:10 (Sahajwalla). *See also* CWS-5 (Helsen), ¶¶ 33-34 (recounting a 2014 "*survey of 10 large cement companies*" and 2015/16 approaches to "*[i]mportant commercial customers – such as Coca-Cola, Olam (agricultural products) and the international brewers operating in Nigeria (Heineken, SAB Miller)*"); CER-4 (Lapuerta), p.30 at Table 4 (42 Letters of Intent signed in 2015/16).

[27]   BHGE PHB ¶ 101 & n.135 (emphasis in original).

[28]   Hr'g Tr. Vol. 10, p.97:13-16 (Lapuerta) (emphasis added).

4

Change Order/Scope Change Resolution in July 2015, <u>once IEC had already decided to opt for a soft-starter</u>, the cheapest solution out of the three proposed by GEOG."[29]  However, it was BHGE, not Claimants, that opted for a soft-starter; Claimants wanted a VFD.[30]

(iv)   BHGE states that "*[b]oth sides' experts do agree, however, that whatever issue may potentially have existed was fixed some time ago during the construction of the flare*."[31]  But Dr. Caligiuri's answer was clear: "*I don't think the issues in the vent lines have been -- have been addressed*;"[32] and

(v)   BHGE asserts that Claimants "*decided nonetheless not to disclose the outcome of that [Softec stress] analysis to [BHGE]*."[33]  Again, Mr. Mastronardi was clear: "*I deemed necessary to discuss with Marco Pagliaro the results of the ... stress analysis*;" "*I proposed that the two teams would stick together and align*."[34]

11.   So as disappointing as it is to write this, the Tribunal must check the evidence cited in the footnote to any statement in BHGE's PHB that it considers important.  That document is no more reliable than the inspection and testing reports signed at the Turner yard.

12.   As to damages, BHGE still offers no credible alternative to Mr. Lapuerta's analysis.  To arrive at his damages calculation of $700 million representing direct and consequential damages (or $304 million in the 2-train model representing solely direct damages),[35] Mr. Lapuerta used standard economic tools and inputs (*i.e.* Claimants' original cash flow models and certified financials) <u>that BHGE itself relied upon in mid-2015</u> when it projected that Claimants would earn free cash flow of $248 million between 2016 and 2018.[36]

---

[29]   BHGE PHB ¶ 116 & n.144  (emphasis added).

[30]   *See* Ex. C-476, C-479, C-483, C-484.  And BHGE is incorrect that the soft-starter was the cheapest option (*See* Ex. C-467).

[31]   BHGE PHB, ¶ 121 & n.149.

[32]   Hr'g Tr. Vol. 7, p.258:9-10 (Caligiuri).

[33]   BHGE PHB, ¶ 125 & n.153.

[34]   Hr'g Tr. Vol. 2, pp.269:17-270:23 (Mastronardi).

[35]   Greenville suffered this harm on a dollar-to-dollar basis with IEC. BHGE's attempt to deny the IEC/Greenville relationship to be one cash generating unit with each dollar gain/loss of Greenville equalling the same one dollar gain/loss of IEC is wrong. Greenville was incorporated to allow the Group to operate in Nigeria, it is 100% owned by IEC and all transactions between IEC and Greenville are without any profit allocation to IEC, the procurement/lending arm of the Group.

[36]   *See* CER-4 (Lapuerta), ¶ 85; Ex. C-1143 (BHGE's IEC/Greenville Proposal Overview, dated June 11-12, 2015), p.6 ("*IEC Cash ... Cash flow from LNG activity ('16 to '18) $248MM*").

5

INDEX NO. 650627/2021

RECEIVED NYSCEF: 01/27/2021

13. Claimants' damages – $700+ million – are the entirely predictable and proportionate result of 4+ years of delay and significant defects in a high value energy business.

14. To attack Mr. Lapuerta, BHGE claims Mr. Lapuerta made admissions he did not, such as the allegation that he never compared his projections to Claimants' consolidated financial statements.[37] Mr. Lapuerta testified his analysis used the figures from those KPMG-audited statements and that other amounts in those statements are consistent with the numbers he used from Mr. Helsen's calculations.[38]

15. BHGE also claims Mr. Lapuerta took information provided by Claimants at face value.[39] False again. In addition to relying on KPMG-audited financial statements, and cash flow models relied upon by BHGE (as well as a number of international financing organizations such as the World Bank's International Finance Corporation), Mr. Lapuerta and his team also independently assessed the demand for LNG and Claimants' costs, including by traveling to Nigeria to interview numerous prospective customers.[40]

16. BHGE's counterclaims are meritless, and serve only as another distraction from the extraordinary damages it has caused Claimants. It beggars belief that after all the damage BHGE has caused in the last 5+ years, it would be entitled to anything.

17. Disappointingly, having already disregarded many of the Tribunal's disclosure orders (*e.g.*, ITO file, Primavera scheduling files, GEOG financial statements), BHGE now spends one-fourth of its PHB threatening to challenge the Award if the Tribunal credits Claimants' "*new claims, new arguments, and new evidence.*"[41] If BHGE thought it were right on the facts or the law, it would be focusing on the merits of <u>this</u> dispute, not planning the next one. And if it really had any procedural concerns, it would have voiced them at the time of the supposed violations. There is, of course, no risk to the Award. The Tribunal gave

---

[37] BHGE PHB, ¶ 138.

[38] Hr'g Tr. Vol. 10, pp.53:20-22 (Lapuerta) ("*So I believe they are consistent with these numbers*"); 54:2-3 ("*Yes, I think these [financial statement numbers] are consistent with Mr. Helsen's statement.*"); 54:20 ("*These estimates are indeed consistent.*").

[39] BHGE PHB, ¶ 138.

[40] CER-10 (Lapuerta), ¶¶ 7-9; *see also* CER-10 (Lapuerta), Part IV ("Due Diligence").

[41] BHGE PHB, Part VI (pp.46-62).

BHGE extensive opportunities to defend itself — BHGE simply has no basis to do so.

18.     Instead, BHGE seeks to evade responsibility for the $700 million of damages that it caused Claimants by invoking the Contract's various limitations of liability.  But as Claimants have shown in their written submissions and as confirmed at the hearing, those provisions do not save BHGE, including because BHGE's conduct during negotiations and throughout the project constituted willful misconduct, or at the very least gross negligence.

19.     The record is clear.  BHGE's focus was to secure the deal at any cost — even by selling outright lies.  BHGE obtained this Contract by deliberately misrepresenting its capabilities, hiding the fact it could not deliver the Trains within years of the promised 9 and 12 months, despite knowing Claimants were paying nearly twice the Chinese competitors' prices for that speed and BHGE's alleged "American" quality.[42]

20.     Unsurprisingly, during the arbitration, BHGE failed to disclose the ITO file that would have confirmed BHGE never believed it could deliver on its promises to Claimants before entering into the Contract.[43]  Little wonder BHGE has never attempted to defend its pre-contractual representations to Claimants or disputed the evidence of their falsity.  Claimants' evidence on this issue — as on most others — is uncontested.

21.     BHGE's representation in the Contract that it had already "*developed and* [was] *producing fully-modular small scale LNG production plants*" like the ones Claimants were buying[44] was also false.  The only comparable trains, the Shell plants, which were being built at the Schertz facility, suffered significant delays and innumerable engineering, fabrication, and quality control problems that BHGE hid from Claimants.[45]  From its experience with the Shell plants, BHGE knew very well when it contracted with Claimants that it could never deliver the promised LNG trains in 9 and 12 months.

22.     The deceit continued after signing the Contracts.  Just days later, BHGE abandoned the

---

[42]    CWS-1 (Eddy), ¶¶ 7.2-7.5, 7.17; *see also* SoC, ¶¶ 56-68, 112-114; SoR, ¶¶ 507-514.

[43]    SoR, ¶¶ 226-227; PHS, ¶ 7.

[44]    Ex. C-1, Equipment Contract, Recitals.

[45]    *See* Ex. C-888 (CGC status as of August 18, 2014); CWS-6 (Griffin), *passim*.

non-viable process design it had sold that would "*blow[] [all the heavies] back in*,"[46] and secretly re-engineered that process to (i) make the Trains incapable of performing as promised and (ii) compel the addition of major new equipment that would profoundly change Claimants' business model. Rather than disclose it had sold a non-viable design and then re-engineered it to build something completely different, BHGE instead issued TM-0010 representing everything was on track as promised.[47]

23.  Then, without completing mechanical and electrical engineering, BHGE subcontracted fabrication to a contractor with no modular-LNG experience, and sent just one, incompetent supervisor to guide them.[48] The inevitable result of "the blind leading the blind" was that BHGE shipped incomplete modules, piecemeal, and in dangerous condition. It willfully covered up those problems with false inspection and testing certificates it needed to receive milestone payments.[49] As a result, the Trains are still being engineered and fabricated, but in Nigeria. And to compound BHGE's bad faith, its counterclaim seeks recovery for the work BHGE did in Nigeria to fix its own mess.

24.  Despite all of that, BHGE now blames Claimants for BHGE's own gross negligence and willful misconduct, accusing Claimants of dragging their feet on an investment that represents their entire business.

25.  BHGE should be profoundly ashamed. It clearly is not. The Tribunal cannot compel BHGE to decency. But it can compensate Claimants for their economic losses. Though they can never be made totally whole, Claimants should be awarded the full claimed amount of damages for BHGE's reckless and willful misconduct.

## II.   THE TRAINS ARE STILL NOT DELIVERED, MUCH LESS DEFECT FREE

26.  BHGE's obligations included delivering the Trains by the required Delivery Dates. Delivery is only complete when BHGE has delivered, in their entirety, "*the fully-modular*

---

[46] CWS-3 (Pirijns), ¶ 4.10.

[47] Ex. C-254 (TM-0010, dated October 9, 2014).

[48] *See* PHS, ¶¶ 10, 163-164.

[49] *See* PHS, ¶¶ 154-156.

8

> *small scale LNG plants ... which shall include <u>all</u> equipment, components, materials, supplies, products, manuals and other goods to be supplied by Seller to Buyer, as more specifically described in Appendix A.*"[50]  BHGE has still not met that obligation.

### A.     Delivery Remains Incomplete

27.   Dr. Lancaster explained how, even in December 2019, BHGE still had not provided key components of the Trains.  For example, (i) he (and BHGE's expert, Mr. Linwood) testified BHGE had not yet completed the stress engineering, (ii) he testified that BHGE never provided the VFD or the correct cables, (iii) Mr. Pirijns testified that BHGE has not provided the "*manuals*" required to operate the Trains.[51]  BHGE's delay is continuing.

28.   The same is true of the overlapping delay caused by the defects in what BHGE did ship, such as defective bellows (not replaced until 2018), missing heat tracing and untested ICPs.

29.   BHGE accuses Claimants of concurrent delay without any support.  BHGE's PHB contains a single paragraph asserting that "*Claimants have been responsible for concurrent delay in the completion of the Rumuji Plant from the beginning.*"[52]  Tellingly, that paragraph has no footnote or evidentiary support.  Dr. Lancaster testified the accusation is baseless.[53]

### B.     BHGE Continues Its "Game" of Trying to Shift Blame for the Defects

30.   BHGE attempts to divert attention from its breach of the delivery obligations by trying to blame Claimants for not remediating BHGE's defects sooner, but its argument is filled with misrepresentations.

31.   *Process Design:* BHGE argues that, with respect to the process design, it is unclear what

---

[50]  Ex. C-1, Equipment Contract, Clause 1 (definition of "Plant" and/or "Plants") (emphasis added).

[51]  Lancaster Hr'g Pres'n, Slides 32-33; Hr'g Tr. Vol. 8, pp.31:24-32:6 (Lancaster) (piping support is "*still a matter of outstanding supply*"); Hr'g Tr. Vol. 7, pp.185:25-186:16 (Linwood) ("*the work is done, with the exception that GE had stated that they wanted to carry out a further and final survey onsite of all of the stress*"); CWS-3 (Pirijns), ¶¶ 14.144-14.147 ("*[W]e still do not have any manuals for the Trains.*"); CWS-12 (Pirijns), ¶ 3.3.  *See also* CER-1 (Lancaster), *passim*; CER-7 (Lancaster), *passim*; CWS-8 (Mastronardi), ¶¶ 21-31.

[52]  BHGE PHB, ¶ 86.

[53]  Hr'g Tr. Vol. 8, p.143:3-15 (Lancaster) (all of the delays that BHGE argues Claimants were responsible for were "*all shorter delays, they are not the critical path.  That's what's important for determining the impact of the schedule.*"), 139:19-24 (Lancaster) ("Q … *In all the documentation that you've seen in your analysis, do you believe the critical path of the Rumuji project as a whole ever ran through the balance of plant?  A No, I don't think it did. And typically on an LNG liquefaction, the train is the critical part.*").

clauses BHGE violated, the remedy sought, or which design was defective.[54] BHGE violated Clauses 17.1 and 24.2 as well as Clauses 4.1 and 3.2.7 of App. A,[55] which required the Trains to produce 765.1 TPD using 13882 kW using the performance test parameters in Annex B of App. A and to remove heavy hydrocarbons including C5+ and aromatics, if any, after the first pass through the cold box, respectively. The original design and the as built design were both defective: the original would freeze; the as-built would freeze or, with use of the bypass, produce far too little LNG and far too much waste condensate.[56] So the HHR was necessary to remedy BHGE's defective design of the cold boxes as delivered.[57]

32.    BHGE argues the feed gas entering the plant is heavier than specified.[58] The argument is irrelevant and wrong. It is irrelevant for two reasons. First, BHGE admitted in late 2016 that all C5+ (*i.e.,* not even just C6+) must be removed, regardless of amount.[59] Second, once Claimants were compelled to purchase the HHR system, the limits on the gas composition changed and heavier gas would be useable. It is wrong because Claimants' feed gas is actually lighter than specified.[60] BHGE cites to testimony about the upper limits of the HHR system, not the feed gas actually purchased by Claimants.[61]    BHGE's

---

[54]   BHGE PHB, ¶¶ 93, 94.

[55]   Clause 1.5 makes App. A is "*an integral part of the Agreement*." Ex. C-1, Equipment Contract, Clause 1.5.

[56]   *See, e.g.,* PHS, ¶ 158; SoR, ¶¶ 68-81, 91.

[57]   *See* CER-6 (Lumley), ¶ 4.5 ("*the changes implemented by GE necessitated the introduction of a HHR system into the trains to avoid excessive LNG production loss and excessive condensate production resulting from the lower first pass temperature in the re-design, and the incorporation of the HHR components selected and installed to address these output deficiencies was appropriate.*").

[58]   BHGE PHB, ¶ 3 & nn.3-5.

[59]   Ex. C-264 (Email from David Wilson to John Repasky, dated November 17, 2016) ("*IEC suggested reverting back to the original design conditions but GE stated that this was not possible as the C5s and C6s need to be knocked out.*"); *see also* CER-3 (Lumley), ¶¶ 5.1.47-5.1.48, 6.1.17.

[60]   CWS-12 (Pirijns), ¶¶ 6.4-6.5 ("*[T]he feed gas we are currently taking … is consistent with the feed gas composition used in the Basis of Design with GE/BHGE. The average amount of C6+ (i.e., the heavy hydrocarbons) since we began taking the gas is 0.235, which is actually significantly below the contract specification of 0.3084.*").

[61]   Hr'g Tr. Vol. 3, p.275:12-22 (Pirijns) (with reference to Ex. C-275, "*Q…Is that the one that you are using? A It's not the gas that we are using. Q So the HHR was developed on the basis of a gas composition which is not the one that you are currently using? A As you can see, there is a light and heavy case. Q Yes. A And if you look at the gas composition that we have today, it's something in between. We want to set the boundaries.*"), p.276:13 (Pirijns) ("*they are the boundaries.*"), p.278:2-3 ("*The gas that we are using in Train 3 fits within those cases.*");

discussion about the range of gas that a particular piece of equipment can handle says nothing about the actual gas composition being used by Claimants.

33.  BHGE continues to argue that feed gas changes drove the process design. There were no such changes. Claimants first asked for a simulation of a potential alternative gas composition three months <u>after</u> the final cold box design was completed in September 2014.[62] And BHGE's own project manager wrote in an internal email that <u>no change</u> was ever made to the process design because of different feed gas simulations.[63]

34.  BHGE also continues to argue that Claimants' demand for atmospheric storage drove the process design change. Claimants' request, however, also came <u>after</u> the cold box was unilaterally redesigned by BHGE for the colder -70ºC first pass temperature.[64] And Chart told BHGE on October 1, 2014, that this redesigned cold box would "*only support pressurized LNG storage tanks*."[65]

35.  The fact that Train 3's cold boxes operate at "*approximately the same temperatures as Trains 1 and 2*"[66] is misleading and irrelevant. Misleading because Trains 1 and 2 only operated at the same temperature because of BHGE's concealed change to the process design. And irrelevant because Claimants paid less than US$ 16 million for Train 3, and it did not come with performance guarantees. Trains 1 and 2 did.

36.  **VFD:** BHGE admits the soft-start solution was in its scope of work as of July 2015, when the Parties settled various open issues and Claimants paid BHGE US$ 1 million under the

---

Hr'g Tr. Vol. 4, p.13:15-21 (Pirijns).

[62]  RWS-2 (Lavander), ¶ 29 (Lavander's identification of the first alternate feed gas simulation occurring on December 2, 2014); Hr'g Tr. Vol. 3, pp.114:18-121:17 (Schleicher) (confirming design change originated on September 18, 2014); Ex. C-1065 (Cold Box Purchase Order, dated October 13, 2014).

[63]  Ex. R-121 (internal BHGE email from Michael Cohen, dated December 12, 2016).

[64]  *See* PHS, ¶ 51 (citing Hr'g Tr. Vol. 3, pp.113:16-115:18 (Schleicher); CWS-3 (Pirijns), ¶¶ 16.8-16.12; SoR, ¶¶ 58-67; Lumley Hr'g Pres'n, Slides 5-7 (and exhibits cited therein)).

[65]  Ex. C-889 (internal BHGE email from William Weir to Michael Cohen, Oct. 02, 2014 confirming cold box is not designed for atmospheric storage). Further, the October 1, 2014 data sheets, based on pressurized storage and based on Shukui's design of September 18 (with exit temperatures of the B/C passes at -150ºC -- pressurized storage temperatures) confirm, from a technical perspective, that there was no change in design. *See* Ex. C-D26.

[66]  BHGE PHB, ¶ 96.

11

July 2015 agreement and Change Order 27. At that point, it indisputably was BHGE's obligation to both engineer and supply a system to start the MRC motors. It never did.

37. BHGE alleges that Claimants selected the soft-starter.[67] False. Claimants had chosen a VFD.[68] BHGE selected the soft-starter to comply with its obligations under Change Order 27; in response to Claimants' concerns about its viability, BHGE promised it would work.[69]

38. Further, BHGE blames Claimants for delay in acquiring the VFD, asking why Claimants only ordered the VFD in the summer of 2019. The answer is clear. It was BHGE's responsibility, and BHGE accepted this in February 2019, but then reneged in June 2019. (*See* n.10, above.) When it became clear that BHGE had abandoned this aspect of the project, too, Claimants did the required electrical engineering and then bought the VFD.[70]

39. *Flare:* BHGE claims Dr. Caligiuri agreed that the Parties have resolved all the flare issues. False. Dr. Caligiuri testified "*I don't think the issues in the vent lines ... have been addressed.*"[71]

40. Mr. Borrowman conceded numerous vent header discharge lines have zero slope, which he and BHGE never assessed for safety.[72] Dr. Caligiuri further explained that problems also remain with the position of pressure relief valves on the Boil Off Gas skid.[73]

41. *Stress:* BHGE does not seriously claim that it performed the necessary stress engineering before declaring Mechanical Completion in mid-2018. BHGE does not address Mr. Linwood's admission that the inconsistent stress analyses conducted since late 2018 remain

---

[67] BHGE PHB, ¶ 115 ("*There is no doubt that the decision to procure a soft-starter as a 'soft-start solution' ... was taken by IEC.*"), ¶ 116 ("*IEC had already decided to opt for a soft-starter*"), ¶ 117.

[68] CWS-3 (Pirijns), ¶ 15.21; CWS-1 (Eddy), ¶ 9.3 (Claimants chose and purchased VFD from Wartsila).

[69] Ex. C-488 (Email from Michael Cohen, stating "*The soft starter WILL work.*").

[70] CWS-10 (Helsen), App. R; Ex. C-1026 (Sales Confirmation (Proforma Invoice) for VFD, dated June 18, 2019).

[71] Hr'g Tr. Vol. 7, p.258:9-10 (Caligiuri).

[72] Hr'g Tr. Vol. 7, pp.210:17-211:23 ("*A That is correct, I have not calculated it, yeah. Q Okay. And are you aware that GE itself recognizes that that design was a mistake? A It was commented like that at a meeting, yes. Q At a meeting from GE on flare system where they recognize that the zero slope in the discharge pipes was a mistake, correct? A Yes.*"); *see also* RER-11 (Borrowman), ¶ 4.7.1.1; Ex. R-226 (Piping Slopes.xlsx).

[73] Hr'g Tr. Vol. 7, pp.245:22-246:23 (Caligiuri).

unfinished. Rather, BHGE blames Claimants for not seizing the reins from BHGE sooner, and identifying and correcting the stress issues itself.

42.    BHGE's sleight of hand seeks to distract from its own failures. BHGE had previously threatened to void the Trains' warranties if Claimants added pipe supports.[74] It also ignores Mr. Mastronardi's testimony that he was asking for collaboration on the stress engineering since summer 2018, but BHGE dragged its heels (because, we now know, they were hastily trying to do the stress engineering to avoid admitting it had not been done).[75]

43.    Nor does blaming Claimants explain why BHGE concealed major stress defects that it discovered in the amine lines in January 2018, and instead claimed Mechanical Completion in order to secure another major milestone payment.[76]

44.    BHGE blames Claimants for prohibiting it from changing the pipe supports in January 2019, but should be grateful that Claimants "*prevented [BHGE] from implementing any modifications to the pipes*" at that time.[77] Why? Because BHGE's revised reports in March 2019 and August 2019 contradicted the conclusions of its December 2018 report that it wanted to implement.[78] Claimants saved BHGE from exacerbating the problems.

45.    Most important, as with everything needed for fully functional Trains, it was BHGE's responsibility to design the Trains to handle the mechanical stresses and comply with ASME B31.3 and B31.5 as required under Annex A.[79]

---

[74]  Ex. C-182 (Email from Michael Cohen to Claimants, dated January 25, 2017) ("*There is no reason to add any supports for train 1&2. Modifying the GE structures and modules will void the warranty.*"); CWS-3 (Pirijns), ¶ 14.75.

[75]  Hr'g Tr. Vol. 2, pp.269:17-270:23 (Mastronardi).

[76]  PHS, ¶ 63 (citing Ex. C-948 (Gap Pipe Stress Analysis at P202.pptx); Hr'g Tr. Vol. 7, p.250:5-24 (Caligiuri)); Ex. C-16 (Notice of Mechanical Completion for Train 1, dated May 12, 2018).

[77]  BHGE PHB, ¶ 127.

[78]  CER-8 (Exponent), ¶¶ 6.1.27-6.1.29, 6.1.32 & Table 7; CWS-12 (Pirijns), ¶¶ 4.78-4.79; Ex. C-1122 (Softec Technical Note, dated April 12, 2019), p.5.

[79]  Ex. C-1, Equipment Contract, App. A., Clause 3.8.

**C.    BHGE "Theory" As to Why Claimants Did Not Want Trains 1 and 2 Operational is Farcical**

46.    Having debunked BHGE's explanations as to what went wrong with these 4 significant issues, let's now turn to BHGE's argument that any delay is Claimants' fault because they could have "*complet[ed] the Trains a long time ago*," but chose not to because they did not have a market for the LNG.[80]

47.    Like all BHGE's conspiracy theories, this one falls apart too. BHGE argues Claimants "*waited until 2017 to begin meaningfully reaching out to other potential customers*" and this "*clearly caused Claimants to 'slow roll' completion of the plant.*"[81]  But Claimants were securing customers since 2015.  Moreover, in September 2017, Claimants signed a contract with Total that would require them to pay for the full amount of gas for Trains 1 and 2 beginning in 2018, regardless of whether they used it.[82]

48.    BHGE cannot explain why Claimants would have signed such a contract if they were "*slow rolling*" completion.  Nor can BHGE explain why Claimants would voluntarily endure the financial and reputational costs of failing to get the Trains running for more than five years — difficulties in obtaining financing for expansion,[83] loss of customers,[84] and the risk of being unable to deliver any LNG during even routine maintenance on Train 3.[85]

49.    BHGE claims "*the main question is whether the start-up of the Trains in March 2020 can be considered late with respect to what was agreed by the Parties in the Contracts*" and there is "*no evidence on record that IEC was ready - or interested - to start-up the Trains*

---

[80]   BHGE PHB, ¶¶ 7-11.

[81]   BHGE PHB, ¶ 16.

[82]   Ex. C-312 (Gas Sale and Aggregation Agreement, dated September 11, 2017).  The "Take or Pay" clause is industry standard for Gas Supply Arrangements and was one of the reasons Claimants had postponed signing the Total contract in order to mitigate the risk of unnecessary additional costs in light of BHGE's continual delays.

[83]   Hr'g Tr. Vol. 10, pp.16:23-17:12, 162:22-163:13 (Lapuerta); Hr'g Tr. Vol 6, pp.93-97 (Helsen); CWS-11 (Eddy), ¶ 13.

[84]   Hr'g Tr. Vol. 5, pp.134:7-135:3 (Sahajwalla); CWS-4 (Sahajwalla), ¶ 20; CWS-9 (Sahajwalla), ¶ 13-14.

[85]   Hr'g Tr. Vol. 2, pp.16:20-17:13 (Eddy); Hr'g Tr. Vol. 5, p.135:4-25 (Sahajwalla).

*earlier than 2020 and no guidance at all is given by the Claimants' expert on delay."*[86]

50.   <u>First</u>, that is not the main question.  The legal question is whether BHGE breached its obligations to deliver the Trains, as contractually defined and specified.  It did breach.

51.   <u>Second</u>, saying "*no guidance at all is given by the Claimants' expert on delay*" does not make it so.  Dr. Lancaster's critical path analysis showed that none of Claimants' responsibilities delayed the project.[87]   BHGE's delay expert offered no critical path analysis (and thus provides no guidance on what delayed the project and what did not), but simply accepted without analysis the delivery dates asserted by Mr. Hillier.

52.   What did delay the project?  Missing engineering, components, and documentation for the Trains, all caused by BHGE's utter disregard for Claimants' interests and knowing inability to meet its own obligations at every step of the project.  In parallel, defective equipment. For example, BHGE did not complete the missing heat-tracing until mid-2018; did not provide a start-up system; has not completed the stress engineering; has still not provided documentation.  BHGE has no answer to any of this.

53.   <u>Third</u>, the record is groaning with evidence "*that IEC was ready - or interested - to start-up the Trains earlier than 2020*," including the testimony of witnesses the Tribunal met face-to-face.[88]  From the beginning, Claimants' financial projections were based on starting production in 2016, a fact BHGE <u>always</u> knew.[89]  Claimants paid twice as much for BHGE's trains in 2014 so they could be ready sooner than BHGE's competitors could

---

[86]   BHGE PHB, ¶ 78 (emphasis in original).

[87]   PHS, ¶ 99; *see, e.g.*, Hr'g Tr. Vol. 8, pp.76:4-25, 120:13-23, 134:14-21, 139:19-24 (Lancaster) ("*[D]o you believe the critical path of the Rumuji project as a whole ever ran through the balance of plant?  A No, I don't think it did.*"); CER-1 (Lancaster), ¶¶ 150-151; CER-7 (Lancaster), ¶¶ 123-127; Lancaster Hr'g Pres'n, Slides 32-33.

[88]   *See, e.g.*, Hr'g Tr. Vol. 2, p.18:13-16 (Eddy) ("*I didn't … spend hundred million dollars to use Train 1 and 2 as a backup, sir. They were the main trains. That's the main investment. I only took Train 3 as a rescue of Train 1 and 2.*"); Hr'g Tr. Vol. 5, pp.127:25-131:19 (Sahajwalla); CWS-4 (Sahajwalla), ¶¶ 14-16 & App. A (describing Claimants' marketing plan and efforts since 2015); Hr'g Tr. Vol. 6, p.36 *et seq.* (Helsen) (discussing Claimants' preparation of financial projections); Ex. C-683 (BR-24) (Claimants' financial projection showing projected proceeds from LNG sales starting in 2016).

[89]   CWS-5 (Helsen), ¶¶ 10, 30-35 (explaining financial projections prepared by Claimants and that Mr. Helsen "*provided GE … with cash flow projections for the LNG business*")); Ex. C-681 (BR-22); Ex. C-682 (BR-23), p.5; Ex. C-683 (BR-24) (Claimants' financial projection showing proceeds from LNG sales starting in 2016).

achieve.[90]  They staffed up with hundreds of employees, including sales teams, years before they turned out to be needed, paying over $75 million in OPEX starting in 2015.  None of these facts is consistent with an intent to delay or forego start-up.

54. BHGE's assertion that Claimants intended to rely exclusively on the Kaduna power plant is false.  Multiple witnesses testified otherwise.[91]  It is also irrelevant because, as Mr. Lapuerta has confirmed, Claimants had commercial customers waiting for LNG that exceeded Claimants' projected capacity under the original projected timeline.[92]  Mr. Lapuerta verified that demand through market studies and customer interviews in Nigeria.[93]  BHGE presented literally <u>no</u> contrary evidence.

55. BHGE's statement that Claimants "*reached agreements with only nine customers*" is also false.[94]  As of November 2019, Claimants had signed agreements with 25 customers and were within weeks of signing 8 further agreements.  Ms. Sahajwalla explained not all were taking LNG yet because some had not yet completed their customer-side civil works.[95]

56. As for BHGE's accusation that Claimants turned down their last-minute request for a site visit because they are trying to hide something,[96] the Tribunal will recall it was <u>Claimants</u> that invited the Tribunal and BHGE to visit the plant.  When the Tribunal agreed to the visit during the pre-scheduled hearing dates, <u>BHGE</u> immediately rejected the offer.

### III.   BHGE'S ATTACKS ON CLAIMANTS' DAMAGES ARE GROUNDLESS

### A.   Mr. Lapuerta's Analysis Proves a Damages Claim of $700 Million

57. Mr. Lapuerta relies on Claimants' contemporaneous financial analyses and substantiating

---

[90] CWS-1 (Eddy), ¶¶ 7.2-7.7.

[91] Hr'g Tr. Vol. 2, p.26:5-15 (Eddy) ("*But our main customers were and are going to be forever the private customers as the cement factories, as the tire factories, as the mines. This is our main basic customers.*"); Hr'g Tr. Vol. 5, pp.127:25-131:19 (Sahajwalla).

[92] CER-4 (Lapuerta), ¶¶ 98-99 & Table 4.

[93] CER-10 (Lapuerta), ¶¶ 7-9; *see also* CER-10 (Lapuerta), Part IV ("Due Diligence"); Hr'g Tr. Vol. 10, pp.164:13-25, 165:8-24 (Lapuerta).

[94] BHGE PHB, ¶ 11.

[95] CWS-9 (Sahajwalla), ¶¶ 5-8.

[96] BHGE PHB, ¶ 17; BHGE April 14, 2020 Comments, ¶ 24 n.8.

16

data to model their business under two scenarios.  The "But-for" scenario measures the value and cash-flow assuming BHGE's delays and defects never happened.  The "Actual" scenario measures Claimants' actual past performance, and the cash flow of the business going forward. Those calculations were based on an assumed start date (in the "Actual" scenario) for Trains 1 and 2 of March 1, 2020,[97] which, despite Claimants' efforts, has not proven possible.  Calculating the value of the difference in cash-flow (both inward and outward) over time gives Mr. Lapuerta his damages calculation of $700 million for the 5-train model and $304 million for the 2-train model, as of December 2019; virtually all of those losses occurred between 2016 and 2020, when the "Actual" scenario has no inward cash flow from Trains 1 and 2.[98]  As the delay in completing Trains 1 and 2 continues, Claimants' losses continues to grow, making the $700 million calculated by Mr. Lapuerta more conservative.  For example, delaying the projected start-up of Trains 1 and 2 by three more months (to June 2020) adds another approximately $80 million of losses.

58. In its April 24, 2020 submission on Claimants' Take-or-Pay claim, BHGE contends that Claimants' damages "*are entirely disproportionate to the Contracts in this dispute and disconnected with the reality of what [BHGE] agreed to deliver*."[99] That is wrong.  BHGE agreed to deliver 2 trains (in 9 and 12 months) that would be defect-free and produce a specified amount of LNG.  Claimants' $700+ million in losses from BHGE's massive delays and breaches were entirely predictable and, indeed, were predicted by BHGE.[100]

59. BHGE's attempt to play on the Tribunal's sympathy by calculating how many salaries is equivalent to the damages sought by Claimants is misguided.[101]  BHGE is liable for the damages it causes by its misconduct and breaches regardless of its financial situation.

60. BHGE's PHB continues to take random potshots at Mr. Lapuerta's damages analysis

---

[97]  CER-10 (Lapuerta), ¶ 101 & Table 4 at [4]; *see also* Ex. C-831 (BR-143U), Table A2.

[98]  CER-4 (Lapuerta), *passim*; CER-10 (Lapuerta), *passim*.

[99]  BHGE April 24, 2020 Reply, ¶ 36.

[100]  Ex. C-1143 (BHGE's IEC/Greenville Proposal Overview, dated June 11-12, 2015), p.6 (projecting free cash flow of $248 million between 2016 and 2018).

[101]  BHGE April 24, 2020 Reply, ¶ 31.

without making any attempt to undermine its theory and logic, and without finding any error in its data, formulae, or design. The random potshots are meritless.

### 1. Mr. Lapuerta's Analysis Is Based on Reliable Financial Information

61. Far from being "*wildly unrealistic*" and "*based on wishful expectations*,"[102] Mr. Lapuerta's model is underpinned by reliable facts. For example, he relied on "*credible financial projections in the ordinary course of business that are substantially similar to the ones that were produced well before the arbitration started*."[103]

62. Those analyses are the same ones that BHGE relied upon in mid-2015 (again, well before the arbitration started) to project that Claimants would earn free cash flow of $248 million from their trains between 2016 and 2018.[104] Those analyses were reliable enough for BHGE in 2015; they are equally reliable now.

63. Mr. Lapuerta also explained how Claimants were moving toward obtaining approximately $450 million in financing to cover both Phase 2 of the Rumuji Project (*i.e.*, Trains 4 and 5) as well as to allow Claimants to reduce their capital exposure on Trains 1, 2, and 3.[105] The World Bank's IFC, which is leading that financing,[106] would not do so based on "*wildly unrealistic*" projections or "*wishful expectations*."

64. The recent invoices sent to Claimants for their feed gas take-or-pay obligations show the cost for less than 2 years of feed gas for 2 trains is nearly $60 million.[107] Why is that relevant? When the feed stock to produce the LNG is tens of millions of dollars each year, it is no wonder that Mr. Lapuerta's analysis of more than four years of delay results in

---

[102] BHGE PHB, ¶¶ 137-38.

[103] Hr'g Tr. Vol. 10, pp.12:10-14 (Lapuerta).

[104] Ex. C-1143 (BHGE's IEC/Greenville Proposal Overview, dated June 11-12, 2015), p.6.

[105] Hr'g Tr. Vol. 10, pp.162:1-163:13 (Lapuerta).

[106] *See* CWS-5 (Helsen), ¶ 41(b); Hr'g Tr. Vol. 10, p.162:12-24 (Lapuerta). Although Claimants are confident that the financing lead by IFC will be finalized given IFC's interest and belief in the project (both from a financial perspective and for its positive impact on Nigeria and West Africa), Claimants' efforts to close the financing have been hindered by BHGE's delays and poor performance, which (as Mr. Lapuerta explains) have negatively impacted projected cash flow. *See also* Hr'g Tr. Vol 6, pp.93-97 (Helsen) (explaining that the delay in start-up, and the resultant delay in customer acquisition, has delayed the financing process).

[107] Ex. C-1177 (2018 Total Take-or-Pay Invoice); Ex. C-1178 (2019 Total Take-or-Pay Invoice).

damages to Claimants of $304 million for 2 trains. This business involves large amounts of money, as explained by Mr. Lapuerta who calculated an undiscounted value for the project of $5 billion (in the "but for" scenario) and $4.3 billion (in the "actual" scenario).[108]

**2.      Mr. Lapuerta Relies on Claimants' Financial Statements**

65.    BHGE alleges that Mr. Lapuerta "*admitted that no part of his quantum report assessed whether these projections were realistic when compared against the information provided by the Claimants' consolidated (and audited) financial statements.*"[109]  That is false.

66.    When asked about Claimants' financial statements, Mr. Lapuerta explained that the numbers contained in those statements were consistent with the numbers he used.[110]

67.    BHGE asserts that he "*adopted a blind eye to these financial statements when calculating the damages resulting from his cash flow model.*"[111]  That is false too.  Mr. Lapuerta explained his direct reliance on those statements to assess the <u>actual</u> historical performance of the project.  He testified that he "*used these [financial statement] numbers for the actual scenario based on the actual accounts*" whereas he used Mr. Helsen's "*evidence to say how the -- a but-for scenario in the absence of delays would have differed.*"[112]

68.    So despite BHGE's accusations, Mr. Lapuerta did rely on Claimants' financial statements, supplementing them with additional information where necessary.

69.    Finally, BHGE argues that Claimants' 2018 (not 2017, as BHGE mistakenly states) financial statements "*contained a very different damages assessment than Mr. Lapuerta*

[108]  Ex. C-831 (BR-143U: Brattle Workpaper A – DCF Model), Table A4.  Each train can also earn almost $200k profit per day ($263 x 750 MTs per day).  *See* Ex. C-831 (BR-143U), Table A56.

[109]  BHGE PHB, ¶ 138.

[110]  Hr'g Tr. Vol. 10, p.53:20-22 (Lapuerta) ("*So I believe they are consistent with these numbers*"), p.54:2-3 (Lapuerta) ("*Yes, I think these [financial statement numbers] are consistent with Mr. Helsen's statement.*"), p.54:20 (Lapuerta) ("*These estimates are indeed consistent.*").

[111]  BHGE PHB, ¶ 141.

[112]  Hr'g Tr. Vol. 10, p.55:4-8 (Lapuerta).  Mr. Lapuerta also expressly listed the Group Accounts for various years in the documents he relied on for his expert reports.  *See, e.g.,* CER-4 (Lapuerta), *passim* (citing BR-19 (Ex. C.-678), BR-20 (Ex. C.-679), BR-21 (Ex. C.-680) (Group financial statements for 2015, 2016, and 2017)).

*himself had previously provided to the Claimants*." [113]  False again.

70.     The $774 million that BHGE points to in Claimants' 2018 financial statements is the difference in the operating cash flow under the "but for" scenario with those under the "actual" scenario as calculated by Mr. Lapuerta ($759 million in past damages, and $15 million in future damages) before he discounted for liquidity and tax shield impact. [114]  In other words, far from being "*very different*," as BHGE would have this Tribunal believe, the financial statements and Mr. Lapuerta's damages calculations are <u>identical</u>.

71.     BHGE's refusal to acknowledge this identity is based on its counsel's "back of the envelope" calculation of damages at the hearing.  As garbled as his analysis was, it appears he assumed he could take the $774 million amount set forth in the financial statements and simply allocate it over 3 trains and 20 years (*i.e.*, 774 divided by 20 divided by 3). [115]  Although he never finished his calculation, this would result in $13 million per train per year, which for a 4+ year delay would result in over $100 million in damages for two trains.

72.     Although $100 million is a significant figure, it of course does not match the $304 million Mr. Lapuerta calculated for his 2-train model.  As Mr. Lapuerta explained "*the exercise that counsel just performed unfortunately does not bear any relation to economic reality*." [116]  Far from "*awkwardly attempt[ing] to explain*" [117] the alleged discrepancy, Mr. Lapuerta explained the fallacy in counsel's methodology, *i.e.*:

> *[I]t's failing to recognize that the delay has occurred in the past.  So there is no discounting for almost all of the delay has been in the past.  There should be no discounting to present value for that, and there is none in the model.* [118]

73.     In other words, the losses from the delayed cash flow were almost all suffered during the 4 years of delay as of the end of 2019.  BHGE's counsel's attempt to divide the damages

---

[113]   BHGE PHB, ¶ 139.

[114]   Lapuerta Hr'g Pres'n, Slide 6 (before discounting for illiquidity and tax shield impact).

[115]   Hr'g Tr. Vol. 10, pp.69:21-71:19 (BHGE's counsel).

[116]   Hr'g Vol. 10, p.72:5-7 (Lapuerta).

[117]   BHGE PHB, ¶ 139.

[118]   Hr'g Vol. 10, p.72:9-20 (Lapuerta).

equally over 20 years is, as Mr. Lapuerta made clear, nonsensical.

74. The fact that KPMG, Claimants' auditors, relied on Mr. Lapuerta's model and adopted its results in their financials to attract institutional loans further corroborates its reliability.[119]

### 3.   Mr. Lapuerta Conducted Extensive Due Diligence

75. BHGE alleges that Mr. Lapuerta took all the information provided to him by Claimants at face value. False. BHGE ignores the extensive due diligence by Mr. Lapuerta.

76. For example, as explained in his second report, Mr. Lapuerta:

> *travelled to Nigeria and performed a due diligence of Claimants' business. I have interviewed clients who had signed letters of intent and who have since signed contracts.... I visited a large brewery operated by AB InBev, which has already signed a contract with Greenville and is using LNG to generate electricity. Finally, I spoke with the managers at Greenville who are laying the groundwork for exports to other countries in western Africa.[120]*

77. In addition, BHGE cannot seriously criticize Mr. Lapuerta for relying on financial statements audited by KPMG and cash flow models that BHGE itself relied upon.[121]

### 4.   Mr. Lapuerta's Analysis Provides a 2-Train and 5-Train Model

78. BHGE criticizes Mr. Lapuerta's analysis because "*the entire claim of $700 million as outlined by the Lapuerta Reply Report ... is based on cash flow expectations of the Rumuji Plant as a whole (i.e., including works beyond the Respondents' scope of supply)*."[122]

79. It is unclear what BHGE is arguing. If it believes Mr. Lapuerta should only have calculated damages from Claimants' inability to operate Trains 1 and 2, it ignores the inevitable impact that delayed delivery of Trains 1 and 2 had on Claimants' known intent to use the

---

[119]  Hr'g Tr. Vol. 10, p.73 (Lapuerta) *("they are relying on my model for this")*.

[120]  CER-10 (Lapuerta), ¶ 7. *See also* CER-10 (Lapuerta), ¶¶ 5, 8-9 & Part IV ("Due Diligence"); CER-4 (Lapuerta), ¶ 14; Hr'g Tr. Vol. 10, pp.12:5-13:11 (Lapuerta).

[121]  BHGE's lack of belief in its own arguments is nowhere better seen than in the transparent statement "*[i]nstead of attempting to dismantle each of Mr. Lapuerta's unrealistic assumptions, or point out every time he places purposely naïve reliance on Mr. Helsen's witness statements, the Respondents believe it is more informative to refer the Tribunal to Mrs. Linnell's rebuttal in her expert report and testimony*." BHGE PHB, ¶ 143. Claimants whole-heartedly endorse BHGE's invitation to review Ms. Linnell's report and testimony – unfortunately for BHGE, the Tribunal will not find anything of substance there.

[122]  BHGE PHB, ¶ 81.i.

cash flow from those Trains to purchase trains 3-5. Claimants leased enough land at Rumuji to accommodate 7 trains.[123]

80. To the extent the Tribunal wants to know the impact of BHGE's breaches on just Trains 1 and 2, Mr. Lapuerta provided the Tribunal with a 2-train model, calculating the damages at $304 million. This however is only a fraction of the real damages, as explained above.

81. If BHGE is arguing that because its Contract only provided for the delivery of Trains 1 and 2, the $700 million damages calculation cannot be entirely "direct" damages, then Claimants agree. Claimants' Post-Hearing Submission ("**PHS**") explains that Mr. Lapuerta's 2-train model calculates direct damages, and the additional damages suffered under the 5-train model ($396 million) are consequential damages.[124]

### 5. Mr. Lapuerta Reduces His Damages Analysis to Incorporate LPG Sales

82. BHGE seems to assert that Claimants should be grateful that BHGE's breaches forced them to install an HHR system and sell LPG. It is a bizarre and arrogant argument that BHGE knows better than Claimants what Claimants' business should be.

83. BHGE refers to "*the evidence on the record about the immediate viability of LPG as a product for sale domestically, and the much higher price that customers are willing to pay for it.*"[125] BHGE cites to nothing. In fact, there is <u>no</u> such "*evidence.*"

84. What <u>is</u> in the record is that Mr. Lapuerta incorporated Claimants' ability to sell LPG into his analysis and thereby *reduced* the amount of damages BHGE is liable for.[126]

---

[123] CWS-5 (Helsen), ¶ 44 ("*Our financial calculus has always been to expand the Rumuji plant up to at least five trains to meet demand in the market. Indeed, the Rumuji plant was planned with enough space to accommodate this expansion and more.*"); Hr'g Tr. Vol. 10, p.145:23-25 (Lapuerta) ("*I would have had to check that there was sufficient demand for seven trains, and the indications are that there is*."), p.155:3-7 (Lapuerta) ("*[T]he [V]an den Broeke witness statement confirms that the current financing and plans are actually for what would be the equivalent of seven trains. That is 4 and 5 would be twice the size of initially contemplated....*"), p.155:14-20 (Lapuerta) ("*[T]he initial contract itself...was a sale for two trains with option for two more. And I've seen a document indicating that GE wanted to negotiate a discount for more trains. And there's an email I've seen, for example, that referred to the possibility of four-plus trains in the discussions with IEC.*").

[124] PHS, ¶¶ 111-112, 180-182.

[125] BHGE PHB, ¶ 102.

[126] CER-4 (Lapuerta), ¶116. *See* Brattle's working papers BR-143U (showing the sales amounts for LNG and LPG separately on Table A7 and the production schedule of LNG and LPG on Table 9).

85.    That is why BHGE's assertion that "*it is reasonable to infer that IEC (and Mr. Lapuerta) would have gladly shared the cost/benefit analysis if the HHR was a pure cost without any offsetting benefits*"[127] makes no sense.  Neither Claimants nor Mr. Lapuerta have ever argued the HHR system was a "*pure cost without any offsetting benefits*."  Instead, both the significant cost of the HHR system <u>and</u> the incremental higher price of LPG compared to LNG, were incorporated into Mr. Lapuerta's analysis and is visible in his model.

86.    As with much of the rest of BHGE's PHB, its arguments on the HHR system is replete with mischaracterizations and misrepresentations.  BHGE states that "*according to the testimony of Mr. Lapuerta, the HHR is also a **plant improvement**.*"[128]  False.  Mr. Lapuerta testified that the HHR system "*gives about a five percent return on the investment, which is lower than the return that a reasonable investor would demand for a facility like this.*"[129]

87.    BHGE feigns shock and horror: "*what is truly difficult to believe (and contrary to any reasonable current rate of interest on loans) is that Mr. Lapuerta considers a 5% return to be unsatisfactory for the Claimants – and, of course, without indicating what would be considered an acceptable return to justify the cost of the HHR.*"[130]

88.    But Mr. Lapuerta <u>did</u> say what "*would be considered an acceptable return to justify the cost.*"  Mr. Lapuerta's report explains the project's original projected internal rate of return was over 30%,[131] which is consistent with Mr. Helsen's testimony as to the rate of return previously earned by Mr. Van den Broeke in his bitumen business and appropriate for an investment in Nigeria.[132]

89.    By offering less than a reasonable return, the HHR system reduces the value of the Rumuji investment, making it hard to see how it could ever be described as an "*improvement.*"

---

[127]  BHGE PHB, ¶ 104.

[128]  BHGE PHB, ¶ 101 (emphasis in original).

[129]  Hr'g Tr. Vol. 10, p.97:11-16 (Lapuerta).

[130]  BHGE PHB, ¶ 103.

[131]  CER-10 (Lapuerta), Ex. C-831 (BR-143U), Table A5.

[132]  Hr'g Tr. Vol. 6, 80:10-14 (Helsen).

### 6.    Mr. Lapuerta's and Mr. Helsen's Damages Calculations Are Consistent

90.    BHGE next attacks the damages calculations of Mr. Lapuerta and Mr. Helsen as being inconsistent.  As explained below, BHGE is wrong again.

91.    BHGE incorrectly claims that there is a "*lack of any clarity on how the cash flow expectations calculated in Mr. Lapuerta's two expert reports subsume the 'direct damages' purportedly quantified by Claimants' factual witness Mr. Helsen.*"[133]

92.    Mr. Lapuerta explained that virtually all the elements in Mr. Helsen's witness statements were included in his own model.[134]   Mr. Helsen also confirmed that his damages calculations are not additive to Mr. Lapuerta's analysis.[135]

93.    Further, Mr. Helsen's and Mr. Lapuerta's analyses are based on the same cost inputs.  They both start with the OPEX and CAPEX incurred by Claimants, as set forth in the Group financial statements annually audited by KPMG.  For example, as Mr. Lapuerta explained: "*our actual scenario uses these numbers [from the 2017 audited Group accounts] for the Actual OPEX and CAPEX.*"[136]  And Mr. Helsen explained that his calculations are for the most part "*derived from our (audited) accounting records*."[137]

94.    So why do they arrive at different damage amounts?  Because Mr. Lapuerta and Mr. Helsen measured direct damages differently.   Mr. Helsen addressed the actual out-of-pocket expenditures incurred or lost due to BHGE's breaches, plus the loss of return on funds that had to be held ready due to BHGE's promises of imminent readiness.  Mr. Lapuerta took those same expenditures, but incorporated them into a complete cashflow model that values the timing of cash inflows and outflows and the reality of the cash position as compared to what the position should have been, to determine the full impact of BHGE's breaches.

95.    As detailed in Claimants' submissions, Mr. Lapuerta's analysis (and particularly the 5-train

---

[133]   BHGE PHB, ¶ 136.

[134]   *See, e.g.*, Hr'g Tr. Vol. 10, pp.32:16-33:10, pp.37 *et seq.* (Lapuerta).

[135]   Hr'g Tr. Vol. 6, pp.122:20-123:19 (Helsen).

[136]   Hr'g Tr. Vol 10, p.54:17-18 (Lapuerta).

[137]   CWS-10 (Helsen), ¶ 5.

model) is the correct way to measure Claimants' damages. If, however, the Tribunal were to decide (wrongly, under NY law) that Claimants' recoverable damages are limited to their direct out-of-pocket costs from the breaches, Mr. Helsen provides that calculation.

96.     BHGE also mischaracterizes Mr. Lapuerta's testimony about a $16.99 million amount in his analysis as being "*nothing close to the $176,140,824 estimated by Mr. Helsen for the same kind of damages.*"[138] Once again, BHGE is trying to convince the Tribunal that Mr. Lapuerta and Mr. Helsen's analyses are inconsistent. Once again, BHGE is wrong.

97.     The $176,140,824 that BHGE takes from Mr. Helsen[139] is *not* the "*same kind of damages*" (or an "apples-to-apples" comparison) as Mr. Lapuerta's $16,699,971. At the hearing, Mr. Lapuerta explained that the $16,699,971 consists of the costs incurred for the HHR system, the VFD, the external engineering and the wasted drying-out expenses.[140] These match Mr. Helsen's calculations for those categories of damages dollar for dollar.

98.     But then Mr. Lapuerta explained an additional large category of damages (the wasted OPEX) and where it can be found in his model:

> *And then there is one more category, which is one of the direct damages that Mr. Helsen is referring to… there have been a lot of operating costs at the site for many years. Okay? Now, that does show up in our model… this morning… You saw that the actual line for cash flows was negative for many years, and so that accumulates over time… as part of the damage calculation… [a]nd it's part of what makes the actual scenario less attractive financially than the but-for.*[141]

99.     Finally, BHGE overlooks that the remaining two categories of damages in Mr. Helsen's witness statement are also incorporated into Brattle's model. <u>First</u>, Mr. Helsen's loss of financial income is incorporated, albeit in a different fashion. Whereas Mr. Helsen's "but for" world assumes that the $500 million set aside by IEC for the Rumuji project could

---

[138]   BHGE PHB, ¶ 144.

[139]   BHGE calculates this $176,140,824 figure as being Mr. Helsen's total damages minus the loss of useful life. BHGE PHB ¶ 144 & n.177. But BHGE fails to deduct the $19,074,435.52 for loss of useful life of logistical and customer equipment (*see* CWS-10 (Helsen), ¶ 10). So in BHGE's comparison (which is incorrect regardless), it should start with $157,066,389 from Mr. Helsen's damages calculations and not $176,140,824.

[140]   Hr'g Tr. Vol. 10, pp.121-123 (Lapuerta).

[141]   Hr'g Tr. Vol. 10, pp.122:10-123:1 (Lapuerta).

instead have been earning interest (albeit at a very conservative rate),[142] Mr. Lapuerta's "but for" world assumes that money would have been spent and would have resulted in the generation of income from the sale of the LNG at the project's higher rate of return.[143] Second, Mr. Lapuerta's "but for" scenario incorporates certain warranty costs that would have been avoided, which compares to Mr. Helsen's loss of warranty claim.[144]

100.    When these heads of damages are correctly understood, far from being inconsistent as BHGE would have this Tribunal believe, Mr. Lapuerta's and Mr. Helsen's analyses are in step with each other.  That is entirely logical given that, as explained above, both witnesses started with exactly the same OPEX and CAPEX numbers.

### B.      Mr. Helsen's Damages Calculations Are Substantiated and Explained

101.    Before dealing with the specific heads of damages discussed in BHGE's PHB, Claimants must address BHGE's recent implication, that Mr. Helsen simply made up the damages claims.[145]  Mr. Helsen submitted two witness statements and testified under oath as to the extent of Claimants losses due to BHGE's breaches.  In doing so, he confirmed that while all the other damages had been incurred,[146] Claimants had not yet made any take-or-pay payment.[147]   The Tribunal will be able to make its own judgment as to Mr. Helsen's credibility, despite BHGE's insulting accusations.

102.    ***Wasted Opex***: BHGE argues that Mr. Helsen's "*OPEX incurred during delay*" category "*has little to do with 'hiring security staff for the Rumuji site repair and maintenance staff, medical staff, as well as accounting, HR and other back office staff*.'"[148]

103.    But Mr. Helsen never claimed that the wasted OPEX was incurred solely for those

---

[142]   CWS-5 (Helsen), ¶¶ 67-68; CWS-10 (Helsen), ¶¶ 74-81.

[143]   CWS-10 (Helsen), ¶¶ 74-81, 95.b.; Hr'g Tr. Vol. 6, 80:10-14 (Helsen); CER-4 (Lapuerta), ¶¶ 85-101; CER-10 (Lapuerta), ¶ 106

[144]   *See* BR-143U, working paper A16, line 57; CWS-10 (Helsen), ¶ 10.

[145]   BHGE April 14, 2020 Comments, ¶ 24 ("*one can now only hazard a guess as to whether any of the claim [in Mr. Helsen's witness statement] are merely hypothetical or reflect genuine damages*").

[146]   CWS-5 (Helsen), *passim*; CWS-10 (Helsen), *passim*.

[147]   Hr'g Tr. Vol. 6, pp.80:24-81:14 (Helsen).

[148]   BHGE PHB, ¶ 156 (citing CWS-10 (Helsen), ¶ 68).

purposes. Rather, he was providing examples to the Tribunal. In his first witness statement, Mr. Helsen explained that because Claimants' only activity was the LNG business, all the operational costs incurred by Claimants related to the LNG project.[149]

104. And because BHGE is years late in delivering Trains 1 and 2, all of those expenses incurred by Claimants have been unnecessary and wasted.[150] If BHGE had told Claimants that the Trains would not be ready for delivery until mid-2020, Claimants would have had no reason to incur any OPEX before late 2019.[151]

105. Finally, BHGE complains "*none of these costs are supported by any document: we have only the excel spreadsheet attached to the Second Witness Statement of Mr. Helsen.*"[152] But Mr. Helsen explained in his first witness statement how he calculated the wasted OPEX. BHGE then had the opportunity to seek documents during the document exchange phase but did not do so. BHGE cannot now complain about the result of that failure.

106. But even more, responding to BHGE's criticisms in its SoD, Mr. Helsen's second witness statement provides the support BHGE claims is missing. Mr. Helsen provided updated calculations, along with excerpts from the relevant pages of Claimants' Group Accounts and an itemized list of OPEX from 2019.[153] Mr. Helsen further explained that those Group Accounts and financial records were reviewed by KPMG and given clean audit opinions.[154]

107. *Loss of financial income during* **delay**: BHGE ignores its own expert's opinion that IEC suffered losses due to a "*lack of return on its capital invested in the Greenville Nigerian Project.*"[155] Thus, Ms. Linnell agrees in principle that Claimants should be compensated

---

[149] CWS-5 (Helsen), ¶ 64.

[150] CWS-10 (Helsen), ¶ 68 *et seq.*

[151] In its PHB (¶ 156), BHGE objects to approximately $8.5 million of the $75 million of "wasted OPEX" as not related to the costs incurred by having unnecessarily deployed infrastructure and personnel for the plants while they were not producing LNG during the delay period. These costs, however, include professional fees related to continuous contract renegotiation with suppliers and customers and travelling expenses from engineers to Nigeria for resolving "defect" issues, etc. and so are directly related to the issues under dispute (delay and defects).

[152] BHGE PHB, ¶ 157.

[153] CWS-10 (Helsen), ¶ 70 & Appendices BB, CC.

[154] CWS-10 (Helsen), ¶¶ 70, 72-73.

[155] RER-15 (Linnell), p.32, ¶ 4.3.

for their loss of financial income, a concession BHGE cannot escape. Ms. Linnell's calculations of that loss are, (unlike Mr. Helsen's) however, entirely misguided.[156]

108. **Impact of loss of warranty**: BHGE argues that Mr. Helsen's calculation of the impact of the loss of warranty is based on a "*randomly set*" 3% rate. Wrong again. Far from being random, Mr. Helsen gave detailed reasons for the 3% rate, based on a benchmarking analysis of warranty percentages in the annual accounts of various manufacturers. The 3% rate was commensurate.[157]

### C.     Contractual Remedies Sought

109. BHGE argues that Claimants are not "*pursu[ing] contractual remedies*" and that Claimants have not "*attempted to give any explanation as to why its claims may ignore the contractual remedies*."[158] BHGE's assertion is baffling because it is so obviously wrong.

110. Claimants are seeking Liquidated Damages under Clause 6.5. Given that BHGE's delay far exceeded the Contract's Delay Limit Date, they also seek additional damages under Clause 6.6(ii). And they also seek defect damages under Clause 17.[159]

111. Claimants further explained to the Tribunal why any contractual limitations on which BHGE might want to rely are unenforceable, permitting Claimants to recover the full extent of their damages (both direct and consequential).[160]

### IV.     BHGE'S DUE PROCESS "CONCERNS" ARE GROUNDLESS

112. BHGE spends one-fourth of its PHB threatening to challenge the Award if the Tribunal credits Claimants' "*new claims, new arguments and new evidence*."[161] BHGE would have focused on the merits if it believed it were right on the facts or the law; instead, it threatens that a ruling for Claimants will "*be at high risk of being set aside*" including, remarkably,

---

[156]   *See* PHS, ¶¶ 113-114.

[157]   Hr'g Tr. Vol. 6, pp.85:21-86:2 (Helsen).

[158]   BHGE PHB, ¶ 83.

[159]   *See, e.g.*, PHS, ¶¶ 96-128 (Clause 6.6(ii) damages), 129-131 (Liquidated Damages), 132-140 (defect damages).

[160]   *See* SoC, Part IV.A.-B.; SoR, Part VII; PHS, Part III.B.

[161]   BHGE PHB, Parts VI & VII.

for "*tribunal misconduct*."[162]  This effort to bully and coerce the Tribunal is unacceptable.

113.   BHGE's play on what the IBA has described as "*due process paranoia*" — the tendency of arbitrators to bend over backwards "*for fear of having their award set aside*" — is cynical.[163]   The IBA has described this over-deference to due process arguments as "*unnecessary*" and the risk of set aside for procedural issues as "*largely exaggerated*."[164]

114.   In this case, there is no risk.  The Tribunal has given BHGE extensive opportunities to defend itself, but BHGE has failed to take advantage of them and, indeed, affirmatively rejected the Tribunal's invitation to postpone the merits hearing in order to conduct a site visit.[165]  An award granting Claimants the relief they seek is justified and enforceable.  If BHGE challenges the award, Claimants will readily — and easily — defend it.

### A.   BHGE Waived Its "Tactical" Process Complaints.

115.   Under P.O.#1, "*[a]ny Party who proceeds with the arbitration after knowledge that any provision of or requirement of the applicable procedural rules or any direction given by the Arbitral Tribunal has not been complied with and who fails to state an objection in writing shall be deemed to have waived the right to object*."[166]  This rule prevents BHGE from doing exactly what it is doing here:  going through the hearing with no objection and then suddenly raising a host of procedural concerns after the fact when it realizes all is lost.

116.   Until the closing hearing, BHGE *never* complained that it did not have a fair opportunity to respond to any claim, argument, or evidence.  <u>BHGE</u> proposed the briefing schedule, which (unusually) gave it the first word, and set Claimants' reply date four weeks before the hearing.  It made no objection when Claimants filed their SoR (which BHGE now complains included new arguments and evidence).  It chose not to exercise its right to give notice within one week of the hearing that it would present new direct testimony from any

---

[162]   BHGE PHB, ¶¶ 173, 175.

[163]   *See Annulment of arbitral awards by state court: Review of national case law with respect to the conduct of the arbitral process*, Int'l Bar Ass'n, at 2 (Oct. 2018) (CL-249).

[164]   *See Annulment of arbitral awards by state court*, at 2 (CL-249).

[165]   *See* Email from Mr. McIlwrath to the Tribunal, dated November 14, 2019.

[166]   Amended P.O. #1, ¶ 38.

witness on anything in Claimants' SoR.[167]  And as the Tribunal observed at the closing, when BHGE complained for the first time about the Tribunal's questions: "*you didn't raise those objections in advance.  Those questions were sent on the 6th of January*."[168]

117.  BHGE's threats, like their counterclaims and their superficial engagement with the facts and the law, are tactical rather than genuine.  This Tribunal should reject those tactics. BHGE is not entitled to proceed with the hearing and then, only after things go poorly, raise the specter of due process.

### B.     There Are No New Claims

118.  To be clear, there are no new "claims."[169]  Claimants have always asserted the same claims, seeking delay and remediation damages for breach of contract and fraud.[170]  The theory behind these claims has remained constant too. The SoC explains BHGE defrauded Claimants into signing the contracts, and then breached those contracts by failing to deliver the Trains and services.  The SoC explains the contractual provisions that BHGE violated, including its obligations to provide, in 9 and 12 months, fully modularized, tested, defect-free, tropicalized trains capable of producing 0.25 MTPA of LNG.[171]  It also explains that BHGE is liable for all Claimants' damages, including damages available under Clauses 6.6 and 17.4, and liquidated damages under Clause 6.5.[172]

119.  What BHGE is really talking about are not claims, but arguments and evidence.  That is an important distinction that BHGE obscures.  The procedural order does not bar new legal arguments at any stage, let alone new counter-arguments.[173]  That makes sense.  Arguments develop over the course of an arbitration in response to the evidence, counter-arguments,

---

[167]  *See* Amended P.O.#1, ¶ 98(iii).

[168]  Closing Arguments Tr., p.8:5-7.

[169]  In light of Procedural Order No. 9, Respondents' objections to Claimants' take-or-pay claim are now moot.

[170]  SoC, Parts III & IV.

[171]  SoC, ¶¶ 75-99.

[172]  SoC, Part IV; *see also* SoC, ¶¶ 95, 396, 408-413, 414-416.

[173]  *See* P.O.#1, ¶ 40 (permitting new witness statements, expert reports, documents and evidence to respond to or rebut arguments raised in the other Party's submission, and making no attempt to limit new legal arguments).

and tribunal questions.[174]  Nor is there any possible prejudice here; the Tribunal provided questions in advance of oral closings and then <u>two</u> rounds of post-hearing briefs.

### C.    Response to BHGE's Individual Due Process Arguments

120.    <u>False Statements</u>:  BHGE includes a section entitled "*new evidence offered on alleged false certificates,*" but fails to identify any new evidence.[175]  It just complains that the Tribunal asked about false statements at the closing hearing.

121.    BHGE claims the allegations of false certifications in the SoC and hearing were "*generic*" and lacked "*any explanation or documentary evidence.*"[176]  But while the paragraphs cited by BHGE from the SoC don't contain specific discussion of BHGE's falsehood, other SoC paragraphs (which BHGE ignores) do.  For example, para. 276 of the SoC explains that BHGE certified every module as complete and ready for shipment in its Release for Packing Forms despite many mismatched, missing, and corroded nuts, bolts, and studs.

122.    Similar detailed discussion of BHGE's many false certifications appears at paras. 139, 145, 217-220, 233, 259, 266, and 276 of the SoC, and in the first Pirijns Witness Statement at paras. 12.5-12.8, 14.98, 14.99, 14.114.  As for BHGE's uncited assertion that Claimants "*reiterated the same generic allegations at the opening statement at the Hearing,*"[177] Claimants invite the Tribunal to read Day 1 of the Hearing Transcript at pages 54-63.

123.    <u>Good Faith and Fair Dealing.</u>  BHGE complains that Claimants have pleaded a "*possible new argument of implied covenant of good faith and fair dealing.*"[178]  But Claimants have not.  BHGE is complaining about a Tribunal question to which they did not timely object.[179]

---

[174]  Redfern & Hunter on International Arbitration (6th ed. 2015), p.412, ¶ 6.202 (CL-240) (post-hearing briefs are "*particularly useful where the arbitral tribunal has raised questions during the closing arguments and the parties' counsel wish to have time to undertake research before giving their answers*"); *see also* Gary B. Born, "Procedures in International Arbitration," in International Commercial Arbitration (2d ed. 2014), p. 2262 (CL-250) ("*Arbitral tribunals . . . often hold[] that flexibility and fairness require permitting parties to develop and refine their respective cases.*").

[175]  BHGE PHB, Part VII.D.

[176]  BHGE PHB, ¶ 199.

[177]  BHGE PHB, ¶ 199.

[178]  BHGE PHB, Part VII.C.

[179]  P.O. #7 Annex I, ¶ 2; Closing Arguments Tr., p.8:5-7 ("*THE PRESIDING ARBITRATOR: But you didn't raise*

124. <u>Uncontemplated Delay, Fundamental Breach, and Abandonment</u>: BHGE says these are new "claims," but they are not. They are counter-arguments to BHGE's position that the available damages are limited to direct damages and capped at the Contract Price. Nor are they rooted in new facts. The facts supporting BHGE's "uncontemplated delay" and "fundamental breach" are the bedrock facts of this case.[180] The notion that BHGE has been deprived of an opportunity to contest those facts or respond to legal authorities is absurd. As to abandonment, BHGE fully abandoned the project after the SoC had been filed.

125. BHGE also argues these principles of New York law only apply to contracts with specific clauses excluding all "damages for delay."[181] New York imposes no such limitation, and it would make no sense. If New York law refuses to enforce a specific decision of the Parties to bar all <u>damages for delay</u> in the face of uncontemplated delay, fundamental breach, or abandonment, it is inconceivable a general exculpation clause fares any better.[182]

126. <u>Liquidated Damages</u>: BHGE admits Claimants sought liquidated delay damages in the SoC.[183] Yet it argues it "*did not take a position on [liquidated damages], either from a legal (validity and effectiveness of the clause) or from a factual standpoint.*"[184] False. <u>Explicitly</u> in response to Claimants' request for such damages, BHGE argued it was entitled to a four-week grace period; the last shipment dates were October 28, 2015 and

---

those objections in advance. Those questions were sent on the 6th of January.").

[180] BHGE's attempt to impose a heightened burden on Claimants (*see* BHGE PHB, ¶ 191 & n.222) fails in light of the authority provided by Claimants that only requires proof by a preponderance of the evidence to support a showing of gross negligence or willful misconduct. *See* PHS, ¶ 149 & n.207.

[181] BHGE PHB, ¶ 187, *et seq.*

[182] The court in *Andron Construction Corp. v. Dormitory Authority of New York*, No. A114-13, 2016 WL 2338562 (Sup. Ct. Albany Cty. Apr. 22, 2016) (RL-108), did not hold that a "*three-month delay in turning over project site was not a fundamental breach*," as BHGE contends. *See* BHGE PHB, 192 n.224. Rather, the court found that the claim was waived by the signing of a "*no cost, no time*" change order. *Andron Constr. Corp.*, 2016 WL 2338562, at *6-7. Regardless, BHGE's 4+ year delay resulting from its failure to provide two fully-modularized, tropicalized, defect-free trains capable of producing 0.25 MTPA of LNG is hardly comparable to a three-month delay or the "*ordinary, garden variety*" delay in reviewing shop drawings that was at issue in *Harrison & Burrows Bridge Constructors, Inc. v. New York*, 42 A.D.3d 779, 782 (N.Y. App. Div. 2007) (RL-107).

[183] BHGE PHB, ¶ 215.

[184] BHGE PHB, ¶ 218.

February 8, 2016; and it was entitled to an extension of the delivery dates.[185]  BHGE chose not to make a legal challenge to the liquidated damages clause because there is none.

127.  With respect to BHGE's new argument that liquidated delay damages were left out of the Request for Relief, BHGE did not object in its SoD and certainly did not "*highlight[] this shortcoming in the Statement of Defense*."[186]  BHGE cites ¶¶ 168-169 of its SoD for this proposition.  But there, BHGE only argued that Claimants had not sought liquidated damages for <u>performance</u> (under Clause 25.4), not for <u>delay</u> (under Clause 6.5).[187]

128.  <u>Greenville as a Party</u>:  BHGE argued in its SoD that Greenville could not bring claims under the Contract.  Claimants responded to that argument.  BHGE has now had two hearings and two briefs to reply.  Finally, BHGE's argument that intertwined claims estoppel is the same analysis as the third party beneficiary analysis is incorrect.[188]

### V.  GREENVILLE AND BAKER HUGHES ARE PROPER PARTIES

129.  The SoR fully addresses Greenville's rights here.  Not only is it a third-party beneficiary of the Contracts, but BHGE is equitably estopped from objecting.[189]

130.  BHGE sought to challenge this at the hearing, but the testimony was consistent.  Mr. Van den Broeke testified "*IEC in Nigeria is Greenville*" because IEC "*cannot operate in Nigeria*."[190]  He further testified IEC and Greenville are "*all integrated*" and that "*they are the same companies ....  The reason why Greenville is there is that IEC as a foreign company cannot operate in Nigeria. And that's the only reason. It's the only reason*."[191]

---

[185]  SoD, ¶¶ 158-162.

[186]  BHGE PHB, ¶ 216.

[187]  *See* SoD, ¶ 164; *see also* PHS, ¶ 131 & n.185 (citing SoC, ¶ 416).

[188]  BHGE's cases, *Holzer v. Mondadori*, No. 12 Civ. 5234(NRB), 2013 WL 1104269 (S.D.N.Y. Mar. 14, 2013) (RL-101) and *JLM Industries, Inc. v. Stolt-Nielsen SA*, 387 F.3d 163 (2d Cir. 2004), do not discuss the third-party beneficiary doctrine or suggest the two inquiries are the same.  *Holzer* involved a situation where the signatory and non-signatory had no informal or formal relationship whatsoever. 2013 WL 1104269, at *14. *JLM Industries* made clear that the court "*had no occasion to specify the minimum quantum of 'intertwined-ness' required to support a finding of estoppel*" but had "*no difficulty concluding that it is present here*."  387 F.3d at 178.

[189]  SoR, Part VIII.

[190]  Hr'g Tr. Vol. 2, pp.55:22-56:2 (Eddy) (emphasis added).

[191]  Hr'g Tr. Vol. 2, pp.62:14-21, 75:10-76:9 (Eddy).

Mr. Helsen likewise confirmed IEC and Greenville are "*one unit*" and IEC was "*obliged to incorporate a company in Nigeria because that's simply Nigeria law*."[192]

131.   BHGE knew IEC would own and operate the Trains through a Nigerian wholly-owned subsidiary, as required by Nigerian law.[193]   BHGE does not dispute or deny this. BHGE also interacted with Greenville and IEC representatives for years without making any distinction.[194]   BHGE cannot now escape liability based on a counter-factual theory that IEC is an arms-length EPC for Greenville, to whom BHGE is a stranger.[195]

132.   Nor should BHGE's fiction even matter.  As Mr. Lapuerta explained: "*[i]f the delay in the project causes Greenville to lose $1, then its 100% shareholder IEC will lose $1*."[196]  This is neither "*legally meaningless*" nor "*difficult to follow*."[197]

133.   As Mr. Lapuerta further explained, IEC's investment in Greenville is not simply a cash loan, but an equity investment on which a return was expected.[198]   When adjusted for the fact that IEC holds 100% of Greenville's equity, the losses to IEC and Greenville are the same, as one would expect.[199]

134.   In its PHB, BHGE chose not to respond to Claimants' arguments as to why the Baker

---

[192]   Hr'g Tr. Vol. 6, pp.11:3-19:20 (Helsen).

[193]   CWS-5 (Helsen), ¶ 10 (citing Ex. C-318) ("*During [BHGE's Know Your Client] process, we explained [to BHGE] that the LNG business would be run the same as the bitumen business: there would be a financing & procurement center in Luxembourg-Belgium and an operating entity in Nigeria much like the Eres/ West African Trading (B/Lux) and the ASCA (Nigeria) constellation of our bitumen business*.").

[194]   SoR, ¶ 451 & n.579.

[195]   In fact, there is no clear delineation in the roles of IEC and Greenville that BHGE seeks to create.  *See* BHGE PHB, ¶ 65.  Mr. Van den Broeke testified that Greenville and IEC worked together such that "*some of the engineering and procurement was done by both companies ... by IEC and by Greenville*."  Hr'g Tr. Vol. 2, p.65:15-17 (Eddy).  And while title of ownership in the Trains transferred to Greenville at the end of 2018, CWS-5 (Helsen), ¶ 18, IEC remains the 100% owner of Greenville, which includes the Trains.

[196]   *See* CER-10 (Lapuerta), ¶ 15.  Mr. Lapuerta considered — and either ruled out or accounted for — any scenarios in which this might not be true.

[197]   *See* BHGE PHB, ¶ 67; *see also* SoR, Part XI.A.

[198]   CER-10 (Lapuerta), ¶¶ 102-109.

[199]   *See* Hr'g Tr. Vol. 10, pp.75:4-76:8 (Lapuerta); *see also* Hr'g Tr. Vol. 6, pp.13:22-16:6 (Helsen) (explaining the losses appear only once on the consolidated accounts).

Hughes entities are properly before this Tribunal.[200] Silence in the face of compelling evidence — turning GEOG into an insolvent shell; taking over GEOG's finances; operating and invoicing in BH's name; refusing to disclose financial information[201] — is telling.

## VI.     CLAIMANTS HAVE NEVER ABANDONED THEIR FRAUD CLAIM

135.   Rather than confront Claimants' fraud claim, BHGE asserts Claimants abandoned it.[202] False. The claim is addressed at length in the SoC, SoR, and PHS.[203] Claimants' witness statements and exhibits further prove BHGE's fraud, bad faith and willful misconduct.[204]

136.   For example: Mr. Van den Broeke identified misrepresentations by BHGE employees[205] and that Cody Lindsey, a then and current BHGE employee, told him that "*Mr. Salof and David [Gordon] . . . said before that those trains could never be done in nine months*" and that "*they discussed it with the management of GE.*"[206] Mr. Van den Broeke further testified that Mr. Lindsey repeated this to him at a later meeting.[207] It was documented and confirmed by Ms. Sahajwalla.[208]

137.   Mr. Griffin also described how deeply BHGE was struggling with engineering, fabrication, QA/QC and delays on the Shell trains in August 2014.[209] And then there were BHGE's false certifications,[210] and the process engineering documents BHGE was reluctant to disclose.[211] Claimants have met their burden of proof; BHGE has done nothing to rebut it.

---

[200] BHGE PHB, ¶ 55; Claimants' Statement of Reply, pp. 155-170.

[201] *See, e.g.*, PHS, ¶¶ 196-97; SoR, Part IX.

[202] *See* BHGE PHB, Part IV.

[203] SoC, Part III.B.-C.; SoR, Part X.B.-D..; PHS, Parts III.B.1.i. & Part IV.

[204] *See, e.g.*, SoC, Parts III.B.-C. & IV.A-B. (statements and exhibits cited there); SoR, Parts VII & X.B.-D. (statements and exhibits cited there); PHS, Parts III.B.1.i. & IV (statements and exhibits cited there).

[205] CWS-1 (Eddy), *passim*; *see also* CWS-4 (Sahajwalla), ¶¶ 27-30; Ex. C-13; Ex. C-14.

[206] Hr'g Tr. Vol. 2, pp.115:16-116:18 (Eddy).

[207] Hr'g Tr. Vol. 2, p.117:11-23 (Eddy).

[208] Ex. C-13, Ex. C-14.

[209] CWS-6 (Griffin), ¶¶ 7.6-7.12; *see also* Ex. C-888.

[210] Ex. C-101 (Release for Packing forms for Train 1 modules); Ex. C-103 (Inspection Matrix forms for Train 1 modules); *see also* PHS, Annex B.

[211] *See, e.g.*, Ex. R-234 (Email from Mr. Zhao to Mr. Schleicher et al., dated September 21, 2014 describing Mr.

138.     BHGE's much ado about Claimants not cross-examining Mr. Bresciani is misplaced.[212]
Mr. Bresciani was not offered by BHGE to "*rebut the fraud allegations*," as BHGE
purports.[213]  In fact, Mr. Bresciani gave no witness statement at all in response to the SoC
where Claimants made their fraud allegations.[214]  Claimants cannot be criticized for
preserving time and not crossing Mr. Bresciani on points for which he gave no statement.

139.     BHGE's reliance on *Browne v. Dunne*[215] is irrelevant.  It is an English procedural relic that
does not exist under New York law, the AAA Rules or this Tribunal's procedural orders.[216]
More important, Claimants do not say Mr. Bresciani's testimony is not to be believed; that
is for the Tribunal to decide.  Rather, Claimants argue his conscious decision not to address
the SoC's fraud allegations— and not to claim he ever believed the Trains could be
delivered in 9 and 12 months — is a powerful admission of the truth of those facts.[217]

### VII.    BHGE'S COUNTERCLAIMS ARE MERITLESS

### A.    Claimants Exposed the Failure of BHGE's Counterclaims at the Hearing

140.     BHGE attempts to solidify its tactical counterclaims by suggesting that Claimants have no
real defense against them and that Claimants therefore "*used only a small portion of their
time at the Hearing to address the Respondents' counterclaims*."[218]

141.     Claimants can only assume that BHGE was at a different hearing.  The Tribunal will recall
considerable time spent in cross-examining (and undermining) BHGE's witnesses:

   •     Lavander – gas composition changes (X3);

   •     Kassem – BHGE's manipulation of the time sheets (Y1);

---

Zhao's "*little contract 'game' for our guarantee.*"); Exhibit C-959 at p.4 (Respondents' Comments on Claimants'
Letter, dated September 24, 2019, including Chart data sheet dated October 1, 2014).

[212]  *See* BHGE PHB, ¶¶ 70-74.

[213]  BHGE PHB, ¶ 70.

[214]  *See* PHS, ¶¶ 7 n.11, 153.

[215]  *See* BHGE PHB, ¶¶ 73-74.

[216]  *See* P.O.#1, ¶72.

[217]  *See, e.g.*, 5A N.Y. Prac., Evidence in New York State and Federal Courts § 8:17 (Nov. 2019 update) (CL-251)
("*A party's silence in the face of an accusation, under circumstances that would prompt a reasonable person to
protest, is generally considered an admission.*").

[218]  BHGE PHB, ¶ 19.

- Borrowman – flare system (X8);
- Slater – alleged delay in responding to BHGE's requests for information (X6);
- Googan – contractual requirement for galvanized bolts (X2);
- Blinkhorn – delay allegedly caused by Claimants (X11 and X12);
- Linwood – equipment maintenance and inventory management (Y5 and Y6); and
- Smith – gas composition changes (Counterclaim X3).

142. And BHGE surely could not have forgotten the hours Claimants spent demonstrating the myriad flaws, inconsistencies, and lack of independence in Mr. Hillier's opinions, touching virtually every single one of BHGE's counterclaims.

143. In fact, it was <u>BHGE</u> that failed to examine <u>Claimants'</u> witnesses on their responses to BHGE's counterclaims. For example, in both of his witness statements, Mr. Pirijns addressed numerous of BHGE's counterclaims.[219] The Tribunal will search Mr. Pirijns' cross-examination in vain for any questions that BHGE's counsel asked him about his extensive statements about those counterclaims.[220] If BHGE believes the amount of time a party spends on a claim at the hearing is indicative of that party's belief in that claim, then it is BHGE that has no faith in its counterclaims.

## B. BHGE Is Not Entitled to Its Contractual Payment Counterclaims

144. BHGE takes the simplistic view that "*[a]s the Rumuji Plant is now completed, under Section 7.1 of the Equipment Contract, [BHGE] is entitled to the payment of all remaining amounts due of the Contract Price.*"[221]

145. Let's think about what BHGE is saying. BHGE spends a considerable amount of its PHB criticizing Claimants for not having fixed BHGE's multiple defects sooner.[222] As discussed above, that criticism is meritless. But regardless, BHGE concedes the only reason the

---

[219] CWS-3 (Pirijns), ¶ 11.21-11.22 (disputes relating to the BOG compressor, vent/flare system, and power generation were all resolved in the Parties' July 2015 agreement), Part 17 (Claimants' alleged requests for gas composition changes), Part 18 (ICPs); CWS-12 (Pirijns), Part 11 (addressing Counterclaims Y3-Y7).

[220] Although Mr. Pirijns was asked a number of questions about the gas composition at the Rumuji Plant, none of those questions focused on the alleged change requests set forth in Counterclaim Y3.

[221] BHGE PHB, ¶ 22 (emphasis added).

[222] While Claimants are certainly hoping that they will be able to start producing LNG from Trains 1 and 2 this year, given the extent of BHGE's failings and the unknown of what latent defects exist, that timeline is far from certain.

Trains are even close to working is because of the work <u>Claimants</u> are doing. How can BHGE claim millions of dollars in payment for milestones it concedes Claimants (as opposed to itself) are achieving.

146. As well as defying common sense, BHGE's argument is unsupported by the Contract. Clause 7.1 states that BHGE is only entitled to the Contract Price "*in consideration for the performance by [BHGE] of all its obligations under the Agreement*."[223]

147. That is consistent with black letter New York law, which requires a party alleging breach of contract to demonstrate it has performed its own obligations.[224] Given BHGE's numerous breaches of the Contract and its argument that Claimants are completing the work necessary for Mechanical Completion and Taking Over, BHGE has already been paid far more than the value of what it has provided. BHGE's counterclaims for contractual milestone payments must be rejected.

### C. BHGE's Counterclaims' Quantum Has No Basis Due to Mr. Hillier's Lack of Independence and Unreliable Opinions

148. BHGE's quantum claims for the additional work and services allegedly performed under the Contract and Services Agreement are based on Mr. Hillier's expert reports. Claimants highlighted Mr. Hillier's (concealed) lack of independence in their opening PHS.

149. Also telling is Mr. Hillier's consistent reductions in the amount he believed BHGE was entitled to.[225] Given that each time he presented the amounts to the Tribunal he gave his opinion that such amounts were "reasonable," the fact that he kept changing those amounts confirms the unreliability of his opinions.

150. In addition, although BHGE now claims that it has "*revised their final request for relief on their counterclaims to be in line with the assessment provided by Mr. Hillier at the Hearing*," BHGE has conveniently ignored a number of his concessions.[226]

---

[223] Ex. C-1, Equipment Contract, Clause 7.1.

[224] *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996) (CL-1).

[225] In fact, at one point, BHGE's counsel even joked that "*it almost looks like Mr. Hillier could be working for IEC*." Hr'g Tr. Vol. 9, p.230:18-19 (BHGE's counsel).

[226] Claimants do not concede BHGE is entitled to *any* payment for its Counterclaims, but are simply making the

151.    For example, BHGE claims $4,057,405.10 for the ICPs;[227] but Mr. Hillier reduced that amount to $3,883,000 in his opening presentation.[228] BHGE claims $884,100 for Counterclaim X3; but Mr. Hillier admitted on cross that this amount was in error and should be reduced further.[229] And BHGE insist on recovering $234,500 for Counterclaim X8; but Mr. Hillier conceded that counterclaim "*will need to be put to one side.*"[230]

### D.    BHGE's Other Counterclaims Are Meritless

152.    Claimants lack the pages to reprise all the flaws in BHGE's "Additional Work" counterclaims, but it is set out in detail in previous submissions. Rather, Claimants confine their response here to the few new arguments made in BHGE's PHB.

153.    BHGE contends that the Parties have "*been in dispute as to which Party is responsible for the ICP*" "*since the signing of the Equipment Contract*" in September 2014.[231] False. At the Kick-Off Meeting in September 2014, it was recorded that the ICPs were within BHGE's scope.[232] The first time BHGE ever argued the ICPs were not in its scope was in November 2015 (and then only to try and set-off Claimants' right to recover Delay LDs).

154.    BHGE also fails to address the myriad reasons provided by Claimants demonstrating the ICPs were within BHGE's scope, instead falsely asserting that the ICPs between the modules were descoped as part of the price reduction agreed to by the Parties.

155.    BHGE cites to Mr. Bresciani's witness statement and Mr. Hillier's testimony to support that assertion.[233] But those are also flawed cites. Mr. Bresciani stated that the Parties agreed the pipe racks would be sent as loose items to reduce the price, not that the ICPs

---

point that regardless of the merits of the Counterclaims, BHGE failed to provide any reliable support for the quantum.

[227] BHGE PHB, ¶ 30.
[228] Hillier Hr'g Pres'n, Slide 14.
[229] Hr'g Tr. Vol. 9, p.126:4-8 (Hillier).
[230] Hr'g Tr. Vol. 9, p.132:6-18 (Hillier).
[231] BHGE PHB, ¶ 32.
[232] Ex. C-46, p.12 (signed minutes from September 22-23, 2014 Kick-Off Meeting).
[233] BHGE PHB, ¶¶ 31-32 & nn.33-34.

were descoped.[234]  Mr. Hillier testified the ICPs were approximately 5% of the Contract Price which, if anything, implies that they were not descoped.[235]

156.  BHGE's counterclaim for additional work allegedly requested by Claimants borders on bad faith given that the work BHGE carried out in Nigeria was a direct result of its own continuing failure to complete the contractually required work prior to shipping the Trains and to remedy the myriad defects it caused in the first place.  Contrary to BHGE's assertion, Claimants deny that they "*required [BHGE] to carry out additional, unexpected work during the project.*"[236]  We find the same problem with BHGE's assertion that "*it is evident that this extra work was instructed by IEC.*"[237]  The only support BHGE provides is Mr. Hillier's testimony that "*work has been done.*"[238]  But Mr. Hillier was only discussing one single counterclaim and says nothing as to who instructed that work.

157.  The award of costs and fees incurred in the New York proceedings was within the authority of the New York court.  The court did not award BHGE its fees and this Tribunal has no basis to consider it.  Claimants deny that they have breached any confidentiality obligations, but in any case, BHGE concedes it would have no damages for it.

158.  Finally, as Mr. Wills explained, interest can be calculated after the Tribunal reaches its damages determination. But Claimants note BHGE's bad faith in seeking interest on Mechanical Completion payments from Nov. 1, 2016 and Jan. 1, 2017,[239] even though it does not contend Mechanical Completion was achieved on even Train 1 until years later.[240]

---

[234]  RWS-1 (Bresciani), ¶¶ 11-12.

[235]  Hr'g Tr. Vol. 9, p.71:17-18 (Hillier).

[236]  BHGE PHB, ¶ 39.  The only support in footnote 51 that BHGE provides for that contention is Mr. Pirijns' agreement that toward the end of 2014, Claimants requested that BHGE provide "*flexibility to use both pressurized and atmospheric storage.*"  But the request for flexibility in storage pressure does not form any part of any of BHGE's Counterclaims.  Nor did BHGE seek a change order for it.

[237]  BHGE PHB, ¶ 41.

[238]  Hr'g Tr. Vol. 9, p.24:16-24 (Hillier).  BHGE's other cite to page 81 of Mr. Hillier's testimony (BHGE PHB, n.59) must be in error because there is no testimony on that page to support its contention here.

[239]  BHGE PHB, ¶ 61.

[240]  BHGE PHB, ¶ 25.

Respectfully submitted,

**Freehill Hogan & Mahar LLP**
80 Pine Street, 25th Floor
New York, New York 10005-1759

**Baker Botts L.L.P.**
41 Lothbury
London EC2R 7HF
United Kingdom

# Exhibit 10

# General Arbitrator Oath Form

## American Arbitration Association

International Engineering & Construction S.A.
Greenville Oil & Gas Co. Ltd.
Vs.
GE Oil & Gas, LLC (f/k/a GE Oil & Gas, Inc.)
Baker Hughes, a GE Company
Baker Hughes, a GE Company, LLC (as successors
to GE Oil & Gas, LLC [f/k/a GE Oil & Gas, Inc.])
GE International Operations (Nigeria) Ltd.
Pressure Control Systems Nigeria Limited (as
successor to GE International
Operations (Nigeria) Ltd.)
Nuovo Pignone, S.p.A.

Case# 01-18-0002-9174

**Notice of Appointment for Stefano Azzali**

**Disclosure Obligations**

It is most important that the parties have complete confidence in the arbitrator's impartiality. Therefore, please disclose any past or present relationship with the parties, their counsel, or potential witnesses, direct or indirect, whether financial, professional, social or of any other kind. This is a continuing obligation throughout your service on the case and should any additional direct or indirect contact arise during the course of the arbitration or if there is any change at any time in the biographical information that you have provided, it must also be disclosed. Any doubts should be resolved in favor of disclosure. If you are aware of direct or indirect contact with such individuals, please describe it below. Failure to make timely disclosures may forfeit your ability to collect compensation. All disclosures will be brought to the attention of the parties.

**Instructions**

You will not be able to serve until this duly executed Notice of Appointment has been completed and submitted. Please review the *Disclosure Guidelines* found under the Neutrals eCenter "Resources" menu and, after conducting a conflicts check, answer the following questions and complete the remainder of this Notice of Appointment.

Should the answer to any of the following questions be "Yes", or if you are aware of any other information that may lead to a justifiable doubt as to your impartiality or independence or create an appearance of partiality, then describe the nature of the potential conflict(s) in the space provided.

1. Do you or your law firm presently represent any person in a proceeding involving any party to the arbitration?

Answer : NO

2. Have you represented any person against any party to the arbitration?

Answer : NO

3. Have you had any professional or social relationship with counsel for any party in this proceeding or the firms for which they work?

Answer : YES

# General Arbitrator Oath Form

Comments : See answer to question 9 below

4.  Have you had any professional or social relationship with any parties or witnesses identified to date in this proceeding or the entities for which they work?

Answer : YES

Comments : See answer to question 9 below

5.  Have you had any professional or social relationship of which you are aware with any relative of any of the parties to this proceeding, or any relative of counsel to this proceeding, or any of the witnesses identified to date in the proceeding?

Answer : NO

6.  Have you, any member of your family, or any close social or business associate ever served as a neutral in a proceeding in which any of the identified witnesses or named individual parties gave testimony?

Answer : NO

7.  Have you, any member of your family, or any close social or business associate been involved in the last five years in a dispute involving the subject matter contained in the case which you are assigned?

Answer : NO

8.  Have you ever served as an expert witness or consultant to any party, attorney, witness or other arbitrator identified in this case?

Answer : NO

9.  Have any of the party representatives, law firms or parties appeared before you in past arbitration cases?

Answer : YES

Comments : I have been appointed by GE, back in 2010-2011, as party appointed arbitrator in an ICDR case. The award has been rendered in 2011.
I am currently involved, as  party appointed arbitrator , in an arbitration case administered according to the AFSA Rules (Arbitration Foundation of Southern Africa) where the appointing party is represented by SLCG - Studio Legale Associato (Counsel for Respondent in the present ICDR casej. The case is pending (hearings are scheduled for February 2019).

10.  Are you a member of any organization that is not listed on your panel biography that may be relevant to this arbitration?

Answer : NO

11.  Have you ever sued or been sued by either party or its representative?

Answer : NO

12.  Do you or your spouse own stock in any of the companies involved in this arbitration?

Answer : NO

# General Arbitrator Oath Form

13.  If there is more than one arbitrator appointed to this case, have you had any professional or social relationships with any of the other arbitrators?

Answer : NO

14.  Are there any connections, direct or indirect, with any of the case participants that have not been covered by the above questions?

Answer : NO

15.  Are you aware of any other information that may lead to a justifiable doubt as to your impartiality or independence or create an appearance of partiality?

Answer : NO

**Arbitrator's Oath**

I attest that I have reviewed my biographical information provided to the parties on this case and confirm it is current, accurate and complete.

I attest that I have diligently conducted a conflicts check, including a thorough review of the information provided to me about this case to date, and that I have performed my obligations and duties to disclose in accordance with the Rules of the American Arbitration Association, Code of Ethics for Commercial Arbitrators and/or all applicable statutes pertaining to arbitrator disclosures.

**Terms of Compensation**

Before proceeding, please indicate that you have reviewed the Notice of Compensation Arrangements for this case.



Once completed, please indicate your acceptance of this appointment as arbitrator by entering your initials in the space provided.

(SA)

Stefano Azzali
23-Aug-18

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

— — — — — — — — — — — — — — — — — — — — — — — — X
In the Matter of the Application of      :
     :
INTERNATIONAL ENGINEERING &      :      Index No.
CONSTRUCTION S.A.,      :      RJI No.
     :      Date filed:
           Petitioner,      :
     :
For an Order under Article 75 of the Civil      :      **NOTICE OF VERIFIED**
Practice Law and Rules to vacate the Parties'      :      **PETITION**
arbitral award,      :
     :
           -against-      :
     :
GE OIL & GAS, LLC (f/k/a GE OIL & GAS,      :
INC.), GE INTERNATIONAL OPERATIONS :
(NIGERIA) LTD., BAKER HUGHES      :
ENERGY SERVICES LLC, PRESSURE      :
CONTROL SYSTEMS NIGERIA LTD.,      :
BAKER HUGHES CO., and BAKER HUGHES:
HOLDINGS LLC,      :
     :
           Respondents.      :
— — — — — — — — — — — — — — — — — — — — — — — — X

PLEASE TAKE NOTICE that upon the annexed verified petition of Petitioner International Engineering & Construction S.A., duly verified on January 27, 2021, and the exhibits annexed thereto, the accompanying Memorandum of Law, dated January 27, 2021, an application will be made to move this Court, at the Submission Part, Room 130, at the Courthouse, 60 Centre Street, New York, New York 10007 on the 9th day of March, 2021 at 9:30am, or on such other date and time as the Court may set, for an Order and Judgment vacating the arbitral award of October 30, 2020, in the International Centre for Dispute Resolution ("ICDR") / American Arbitration Association ("AAA") Case No. 01-18-0002-9174 ("Award"), under the Federal Arbitration Act, 9 U.S.C. § 10 ("FAA") and Article 75 of the New York Civil Practice Law and Rules ("CPLR").

PLEASE TAKE FURTHER NOTICE that, under CPLR 403(b), any answer and supporting affidavits shall be served on the undersigned attorneys for Petitioner no later than seven days before return date.

Date:  January 27, 2021
       New York, New York

Respectfully submitted,

White & Case LLP

By: */s/ David G. Hille*

David G. Hille
Elizabeth Oger-Gross
Joshua D. Weedman
1221 Avenue of the Americas
New York, New York 10020
(212) 819-8200
dhille@whitecase.com
elizabeth.oger-gross@whitecase.com
jweedman@whitecase.com

*Attorneys for Petitioner International
Engineering & Construction S.A.*

To:

Michael McIlwrath
Teresa Garcia-Reyes
Global Litigation Counsel
Baker Hughes, a GE Co.
Via F. Matteucci, 2
50127 Florence, Italy
+39 055 423 8445

*Attorneys for Respondents GE Oil & Gas,
LLC (f/k/a GE Oil & Gas, Inc.), GE
International Operations (Nigeria) Ltd.,
Baker Hughes Energy Services LLC, Pressure
Control Systems Nigeria Ltd., Baker Hughes
Co., and Baker Hughes Holdings LLC*

2

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

— — — — — — — — — — — — — — — — — — — — — — — — X
In the Matter of the Application of      :
     :
INTERNATIONAL ENGINEERING &      :     Index No.
CONSTRUCTION S.A.,      :     RJI No.
     :     Date filed:
             Petitioner,      :
     :
For an Order under Article 75 of the Civil      :
Practice Law and Rules to vacate the Parties'      :
arbitral award,      :
     :
             -against-      :
     :
GE OIL & GAS, LLC (f/k/a GE OIL & GAS,      :
INC.), GE INTERNATIONAL OPERATIONS      :
(NIGERIA) LTD., BAKER HUGHES      :
ENERGY SERVICES LLC, PRESSURE      :
CONTROL SYSTEMS NIGERIA LTD.,      :
BAKER HUGHES CO., and BAKER HUGHES :
HOLDINGS LLC,      :
     :
             Respondents.      :
— — — — — — — — — — — — — — — — — — — — — — — — X

## <u>MEMORANDUM OF LAW IN SUPPORT OF</u>
## <u>PETITION TO VACATE ARBITRAL AWARD</u>

**WHITE & CASE**
1221 Avenue of the Americas
New York, New York 10020

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................1

FACTUAL BACKGROUND ...................................................................3

    A.    The Parties and the Dispute ....................................................3

    B.    The Arbitration..........................................................................4

    C.    The Award ...................................................................................7

    D.    The Dissent .................................................................................9

ARGUMENT ............................................................................................10

I.    THE TRIBUNAL MANIFESTLY DISREGARDED THE LAW OF GROSS
    NEGLIGENCE AND WILLFUL MISCONDUCT BY REFUSING TO
    CONSIDER THE CUMULATIVE EFFECT OF GE'S CONDUCT....................11

    A.    The Law is Clear that Gross Negligence and Willful Misconduct can be
        Established Cumulatively .........................................................11

    B.    The Tribunal Misapplied the Law on Gross Negligence and Willful
        Misconduct by Refusing to Account for the Facts Cumulatively.............14

    C.    The Tribunal had Knowledge of the Law on the Cumulative Approach for
        Showing Gross Negligence and Willful Misconduct................................16

II.    THE TRIBUNAL MANIFESTLY DISREGARDED THE CONTRACT BY
    AWARDING GE THE MECHANICAL COMPLETION PAYMENT WHEN
    IEC MECHANICALLY COMPLETED THE PLANTS ......................................17

III.    THE TRIBUNAL'S DECISION TO AWARD GE THE MECHANICAL
    COMPLETION MILESTONE PAYMENT WAS COMPLETELY
    IRRATIONAL ......................................................................................19

CONCLUSION...........................................................................................21

## TABLE OF AUTHORITIES

**Cases**

*Apache Bohai Corp., LDC v. Texaco China B.V.*, No. H-01-2019, 2005 U.S. Dist. LEXIS 46363, 2005 WL 6112664 (S.D. Tex. Feb. 28, 2005)...........................................................6

*Bayerische Landesbank v. Aladdin Capital Management LLC*, 692 F.3d 42 (2d Cir. 2012)....5

*Citigroup Global Markets, Inc. v. Fiorilla*, 127 A.D.3d 491 (1st Dep't 2015) ......................11

*Crédit Agricole Corp. & Investment Bank v. Black Diamond Capital Management*, No. 18-CV-7620 (KNF), 2019 WL 1316012, 2019 U.S. Dist. LEXIS 48618 (S.D.N.Y. Mar. 22, 2019) ..............................................................................................................................................11

*Doe v. New York City Department of Social Services*, 649 F.2d 134 (2d Cir. 1981) ..............13

*Duferco International Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383 (2d Cir. 2003) ......................................................................................................................................11, 17

*Environmental Chemical Corp. v. Coastal Environmental Group, Inc.*, No. 18 Civ. 3082 (GHW) (GWG), 2018 WL 4378439, 2018 U.S. Dist. LEXIS 157246 (S.D.N.Y. Sept. 14, 2018)........................................................................................................................................10

*Food Pageant, Inc. v. Consolidation Edison Co.*, 54 N.Y.2d 167 (1981) .............................13

*Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir. 1996) ................................................................20

*International Brotherhood of Electrical Workers (IBEW), Local 97 v. Niagara Mohawk Power Corp.*, 143 F.3d 704 (2d Cir. 1998)......................................................................................10

*JDA Capital Partners LP v. BNP Paribas Prime Brokerage, Inc.*, No. 106158/09, 2009 N.Y. Misc. LEXIS 5514 (Sup. Ct., N.Y. Cty. Sept. 10, 2009) ......................................................12

*Kalisch-Jarcho, Inc. v. New York*, 58 N.Y.2d 377 (1983) ......................................................12

*Kudler v. Truffelman*, 93 A.D.3d 549 (1st Dep't 2012) ..........................................................19

*Lampidis v. Mills*, 305 A.D.2d 876 (3d Dep't 2003) ..............................................................12

*Langley v. Coughlin*, 715 F. Supp. 522 (S.D.N.Y. 1989) .......................................................13

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930 (2d Cir. 1986)............14

*Metrosvyaz Ltd. v. Whale Telecom Ltd.*, No. 600061/05, 2006 N.Y. Misc. LEXIS 298 (Sup. Ct., N.Y. Cty. Sept. 21, 2006) ..............................................................................................10

*Naidu v. Laird*, 539 A.2d 1064 (Del. 1988).............................................................................13

*National Cash Register Co. v. Wilson*, 8 N.Y.2d 377 (1960) .................................................11

*New York State Workers' Compensation Board v. Program Risk Management, Inc.*, No. 3203-13, 2015 N.Y. Misc. LEXIS 3568 (Sup. Ct., Albany Cty. Sept. 21, 2015) .........9, 12, 16, 17

*New York Telephone Co. v. Communications Workers Local 1100*, 256 F.3d 89 (2d Cir. 2001) ..........................................................................................................................11, 14, 16

*Niagara Mohawk Power Corp. v. Stone & Webster Engineering Corp.*, No. 88-CV-819, 1992 WL 121726, 1992 U.S. Dist. LEXIS 7721 (N.D.N.Y. May 23, 1992) .........................10, 13

*O'Malley v. Jegabbi*, 12 A.D.2d 389 (3d Dep't 1961) ............................................................13

*Pershing LLC v. Rochdale Securities, LLC*, No. 651604/2016, 2016 N.Y. Misc. LEXIS 3448 (Sup. Ct., N.Y. Cty. Sept. 23, 2016)........................................................................10

*Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, 559 U.S. 662 (2010) ......10, 11, 14, 16

*Sweeney v. Herman Management, Inc.*, 85 A.D.2d 34 (1st Dep't 1982)..........................19, 20

*Weiss v. Sallie Mae, Inc.*, 939 F.3d 105 (2d Cir. 2019) ........................................10, 17, 18, 19

*Weiss v. Sallie Mae, Inc.*, No. 13-CV-689, 2018 U.S. Dist. LEXIS 235834 (W.D.N.Y. July 12, 2018)....................................................................................................................17, 18

*Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200 (2d Cir. 2002)...........................11, 17

*Wien & Malkin LLP v. Helmsley-Spear, Inc.*, 6 N.Y.3d 471 (2006) ......................................10

*Williamson-Green v. Equipment 4 Rent, Inc.*, 46 N.E. 3d 571 (Mass. App. Ct. 2016) .............6

*Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15 (2d. Cir. 1997).......
.............................................................................................................................17, 19

**Statutes**

Federal Arbitration Act ..........................................................................................passim

**Rules**

New York Civil Practice Law and Rules ...................................................................passim

**Treatises**

57 AMERICAN JURISPRUDENCE (SECOND) ON NEGLIGENCE ..............................................13, 16

International Engineering & Construction S.A. ("IEC") respectfully submits this Memorandum of Law in Support of its Petition under New York Civil Practice Law and Rules ("CPLR") Article 75 to vacate an arbitral award rendered on October 30, 2020, in the International Centre for Dispute Resolution ("ICDR") / American Arbitration Association ("AAA") Case No. 01-18-0002-9174 ("Award").

## **PRELIMINARY STATEMENT**

IEC petitions this Court with full appreciation of the limited grounds for vacating awards under New York and federal law, and that it bears a significant burden to show entitlement to relief. Yet the law incorporates multiple grounds for vacatur, recognizing that, in appropriate circumstances, meaningful resort to the courts for redress is necessary. This application is one of those rare but legitimate situations.

In 2014, Respondent GE Oil & Gas, LLC ("GE") (called "GEOG" in the Award) agreed to deliver two liquefied natural gas ("LNG") plants for operation in Nigeria. GE boasted at the time that it was the world's premier engineer and fabricator of these custom and complex machines. GE promised to design, procure, construct, and deliver the two plants within 9 and 12 months, followed by supervision of installation and commissioning.

Unbeknownst to IEC, GE had never achieved such an aggressive delivery schedule. IEC later learned that GE's previous LNG projects took several years (not months) to complete. The project was plagued by serious engineering errors, which GE hid from IEC for years, followed by a cascading series of reckless deliveries of untested components—which, had they not been discovered by IEC, would likely have led to explosions during operation. As of 2020—5 years beyond the originally promised delivery dates—these two plants sat idle in the Nigerian delta, inoperable, un-commissioned, and incomplete. GE apparently was unconcerned for these potential consequences or the economic havoc that its conduct visited on IEC's operations in Africa.

1

In 2018, IEC initiated arbitration against GE to recover hundreds of millions in losses incurred and challenged GE's argument that it could hide behind the contractual provision purporting to cap and limit IEC's recovery to direct damages. Relying on the well-established New York law that such limitations are disregarded when performance rises to the level of gross negligence or willful misconduct, IEC proved a litany of defective and dangerous activities that underpinned IEC's position that the liability limitation provision was inapplicable.

Though the Tribunal agreed on practically all of the defects and delays, two of the three arbitrators declined to hold GE liable for the resulting harm by refusing to consider the *cumulative* effect of those failures for showing gross negligence or willful misconduct. The majority thus denied IEC compensation for *hundreds of millions* in harm arising from GE's breaches and instead compensated GE for work that the Tribunal agreed IEC performed. The dissent ("Dissent"), on the other hand, emphasized the mistakes of the majority and the fundamental injustice in the misapplication of the law.

Under the Federal Arbitration Act ("FAA") and the CPLR, vacatur is appropriate where a tribunal manifestly disregards the law or plain terms of the contract, or when the award is completely irrational. These grounds are satisfied here.

First, New York law is clear that gross negligence and willful misconduct are established not just through a single act, but also by the cumulative and aggregated effect of multiple acts of misconduct or negligence. The majority of the Tribunal manifestly disregarded this well-established law by requiring IEC to prove specific, isolated acts of gross negligence or willful misconduct and by refusing to look at the accumulation of GE's numerous breaches.

Second, the sales contract expressly conditioned GE's entitlement to the contract price on "the performance of Seller's obligations," and provided that the payments were "in consideration for the performance by Seller of all its obligations under the Agreement."

Mechanical completion was one such milestone and was never achieved by GE, the "Seller." Though the Tribunal found that it was IEC who procured the undelivered or mis-engineered components that GE refused to provide after abandoning the project, the Tribunal majority manifestly disregarded the express provisions of the contract by awarding GE payment for the mechanical completion milestone. The Tribunal's decision to pay GE for mechanical completion, which was actually accomplished by IEC, was also completely irrational.

All three arbitrators agreed that GE violated the contract multiple times in numerous ways, yet under the Award it is IEC that owes GE a net payment. This is not the Tribunal merely getting it wrong. The majority manifestly disregarded the law and rendered a decision that is completely irrational. In these extreme circumstances, and as set forth below, the high threshold for vacating awards under the FAA and CPLR is met.

## FACTUAL BACKGROUND

### A.  The Parties and the Dispute

Petitioner IEC is a Luxembourg corporation operating an LNG business in Nigeria through its subsidiary Greenville Oil & Gas Co. Ltd. (together, "Claimants"). Award ¶¶ 2, 286. Respondents GE, GE International Operations (Nigeria) Ltd. ("GE Nigeria"), and related entities are affiliates of General Electric Co. *Id.* ¶ 288.

On September 13, 2014, IEC and GE signed a contract for the sale of two LNG plants for Nigeria (also called "trains" in the Award) ("Equipment Contract"). Award ¶¶ 285, 294. IEC also signed a contract with GE Nigeria for proper installation, commissioning, and testing of the plants ("Services Agreement"). *Id.* ¶ 285. During negotiations, GE boasted about its design and ability to deliver more quickly than its competitors. Statement of Claim ¶¶ 61-63.

In the Equipment Contract, GE agreed to construct and deliver the plants in 9 and 12 months. Award ¶ 295. GE also warranted "that the Plants and/or Parts shall be free from Defects[.]" *Id.* cl. 17.1.

Under clause 7.1 of the Equipment Contract, IEC agreed to pay the Contract price of $95 million "in consideration for the performance by Seller of all its obligations under the Agreement[.]" IEC's payment obligation to GE arose after GE achieved specific milestones. Equipment Contract cl. 7.1; Award ¶ 895. GE was only entitled to the penultimate milestone payment if it achieved "Mechanical Completion," meaning each plant "has been mechanically, electrically and structurally installed on Site and connected, in accordance with the Technical Documentation, but excluding . . . (ii) any minor items which do not materially affect the operation or safety of the Plant[.]" Equipment Contract cl. 1. IEC was entitled to "withhold payment on an invoice or a portion thereof in the event of a failure of Seller to perform the Milestone related to the withheld payment[.]" *Id.* cl. 7.6.

Clause 19 of the Equipment Contract has provisions that cap GE's liability at the Contract price ($95 million) and limit IEC's recovery to direct damages. *Id.* cls. 19.2-3.

GE failed to deliver either plant by the Delivery Dates. Award ¶¶ 418, 436, 705-706. The portions of the plants that GE did deliver suffered from a multitude of serious defects, many of which materially affected the plants' operation and safety. *Id.* ¶¶ 633, 642, 669, 676, 678, 693, 696, 916, 923. GE failed to remedy these material defects. *Id.* ¶¶ 576, 579, 718. Instead, GE abandoned the site in May 2019, forcing IEC to remedy and mechanically complete the plants itself. *Id.* ¶¶ 691, 781.

## B. The Arbitration

On July 31, 2018, Claimants initiated arbitration against Respondents for grave and numerous breaches under the Equipment Contract. *Id.* ¶¶ 18. Incredibly, despite completely abandoning the site, Respondents counterclaimed for milestone payments. *Id.* ¶ 310.

The seat of arbitration was New York, and the applicable law was New York law. *Id.* ¶¶ 14, 16. Claimants nominated Mr. Paul F. Saba, a U.S.-qualified lawyer, as their party-appointed arbitrator. *Id.* ¶ 7. Respondents, represented by their legal team based in Italy,

nominated Mr. Stefano Azzali (*id.* ¶ 8), an Italian lawyer, teaching colleague of Respondents'

lead counsel (Mr. Michael McIlwrath) at Bocconi University in Milan,[1] and Secretary General

of the Milan Chamber of Arbitration. Arbitrator Azzali did not disclose his relationship with

Respondents' lead counsel in his disclosure statement. Stefano Azzali's Disclosure Statement

of Aug. 23, 2018. Mr. David Arias, a member of the Milan-based Club of Arbitrators,[2] was

chosen for tribunal chair. *Id.* ¶ 9. Arbitrators Arias and Azzali ultimately formed the majority

for the Award rendered in New York on October 30, 2020. Arbitrator Saba, the Tribunal's

only U.S. lawyer, issued a Dissent.

Claimants asserted that Respondents breached the Equipment Contract and sought

hundreds of millions in damages, including lost profits for losses suffered from the over four-

year delay in completing plants scheduled for delivery in 9 and 12 months. *Id.* ¶¶ 301-05, 843-

45. Claimants explained that the liability limitation provision was not applicable because,

under New York law, "limitations or caps on damages are not enforceable when the alleged

damages arise from the gross negligence or willful misconduct of the opposing party." *Id.* ¶

737. This point of law was not disputed between the parties. *Id.* ¶¶ 737, 744.

Claimants cited *Bayerische Landesbank v. Aladdin Capital Management LLC*, 692 F.3d

42 (2d Cir. 2012), for the principle that, while one contractual failure may amount to "merely

an oversight," it can show gross negligence when "aggregated with the other allegations."

Statement of Claim ¶ 335 n. 401. Claimants argued: "Even if [GE's] innumerable failures do

not evidence willfulness, they are surely the result of GE's gross negligence. Such conduct

'betokens a reckless indifference' to Claimants' contractual rights constituting 'an extreme

departure from the standards of ordinary care.'" *Id.*

---

[1] In addition, Arbitrator Azzali was interviewed at least twice by Mr. McIlwrath, in 2009 for his podcast and in 2014 for a law journal article.

[2] The world of international arbitration in Italy is a rather small, close-knit club. In this context, it is perhaps notable that Arbitrators Azzali and Arias spoke together during the hearing in a foreign language, excluding Arbitrator Saba. Furthermore, Arbitrators Azzali and Arias met at a meeting of the Milan Club of Arbitrators only two months before the hearing in this arbitration.

Claimants also cited *Apache Bohai Corp., LDC v. Texaco China B.V.*, 2005 WL 6112664 (S.D. Tex. Feb. 28, 2005), which found willful misconduct established based on reckless indifference by Apache's "(1) abrupt notice of its withdrawal (only weeks from a critical deadline); (2) immediate disassembly of its team; (3) complete abdication of its performance responsibilities; and (4) total disregard for the difficult position in which it left the other contracting party." *Id*. ¶ 387. Claimants further cited *Williamson-Green v. Equipment 4 Rent, Inc.*, 46 N.E. 3d 571 (Mass. App. Ct. 2016), for the proposition that "persistence in a palpably negligent course of conduct over an appreciable period of time is one of the more common *indicia* of gross negligence." *Id.* ¶ 335 n. 401; *see also* Closing Hr. Tr. at 64:9-65:3 (Jan. 21, 2020). In the post-hearing phase, Claimants reaffirmed that "[r]eckless indifference is determined in light of all the facts," which can be established by relevant factors, such as "persistence in a course of ordinary negligent acts." Post-Hearing Submission ¶ 160.

Claimants argued that GE's "willful misconduct spanned the entire period from contract negotiations through the present" and involved deceit about their abilities, falsification of documents, and dishonesty in process engineering. *Id.* ¶¶ 152-58. Claimants also argued:

> [GE] was, if not willful, grossly negligent in entering into a contract requiring delivery in 9 and 12 months . . . while disregarding a high likelihood that performance will be impossible. . . . [GE] was also grossly negligent in performing the Contract. The breadth and repetitiveness of its carelessness . . . is astonishing, covering literally thousands of separate items over the entire course of the project. In virtually every respect, [GE]'s engineering fell far below acceptable levels of competence, and the risks to life and property from those failures were huge.

*Id.* ¶¶ 161-63.

Respondents requested that the Tribunal reject IEC's claims, and asserted entitlement to milestone payments under the Equipment Contract and Services Agreement. Award ¶¶ 314-15. Respondents conceded that, under New York law, limited liability provisions have no force when there is misconduct that rises to willful misconduct or gross negligence. *Id.* ¶¶ 744, 753. Respondents also conceded that multiple factors can together show reckless indifference

(Statement of Defense ¶ 176), but argued that GE did not misrepresent or act dishonestly.

Award ¶¶ 746-48.

### C.    The Award

On October 30, 2020, the Tribunal issued the Award, declaring that GE breached the Equipment Contract by significantly delaying the delivery of the plants and refusing or failing to remedy defects, and ordered GE to pay IEC $7,210,084.63. Award at 230, §§ XB(1)-(3).

In particular, the Tribunal found:

- Starter: "GEOG was liable to rectify the issue of the ineffective soft-starter," and "IEC is entitled to recover from GEOG its direct damages resulting from GEOG's failure or inability to remedy the defect." *Id.* ¶¶ 568, 579; *see also id.* ¶¶ 583, 669.

- MRC motor cables: The MRC cables GE provided were not "adequately sized," and "GEOG did not design or supply any protection from heat exposure." *Id.* ¶ 683. "Despite GEOG's commitment . . . , GEOG did not deliver the replacement cables," and "IEC had purchased and installed the replacement cables itself." *Id.* ¶¶ 684-85.

- Incomplete/piecemeal module delivery: "[T]he delay in delivery of the modules and the subsequent protracted rectification of defects have slowed down IEC's installation, commissioning and start-up of the Trains and thus, it delayed the Trains' operation[.]" *Id.* ¶¶ 643, 668. GE knew of the defects that needed remediation, and, "by requiring almost three years to rectify this issue GEOG failed to remedy a Defect within a reasonable time." *Id.* ¶ 718(i).

- False inspection entries: The false entries in the various inspection and test reports "might indicate a deficient manufacturing and quality assurance / quality control by Turner [the subcontractor] and/or GEOG[.]" *Id.* ¶ 766.

- Pipe stress: GE was not transparent "as regards the stress tests it had or had not been performing and of the fact that it was only thanks to IEC's initiative . . . that the piping deficiencies were unearthed[.]" *Id.* ¶ 676. "[T]he pipe support defects are not minor items but they materially affected the operation and safety of the Trains." *Id.* ¶ 693 (emphasis in original). There were serious safety risks from the pipe defects. *Id.* ¶ 694. "IEC had remediated the piping stress defects itself." *Id.* ¶ 678.

- Insufficient slope/flare design: "[T]he insufficient slope was the result of a deficiency in GEOG's engineering, and that such defect materially affected the safe operation of the Trains, thus preventing Mechanical Completion." *Id.* ¶ 916. GE understood the risk from the flare design defect "can lead to a slug of liquid being sent to the flare while vapor is being released and can potentially cause 'burning run', excess back pressure, and possible large reaction forces in the header.'" *Id.* ¶ 909.

- Overall delay/No IEC concurrent delay: The causes of delayed operation of the plants were "(i) first, the delayed delivery of the modules on 28 March 2016; (ii) then, the protracted rectification of defects which slowed down IEC's installation,

7

commissioning and start-up of the Trains and thus, delayed the Trains' operation as long as the deliveries lasted, i.e. until February 2019; and (iii) then, the issues requiring replacement of the soft-starter with a VFD and remediation of the piping support issues, both of which prevented operation of Trains 1 and 2 until they were solved in early 2020." *Id.* ¶ 705.[3] "All these delay events are GEOG's responsibility and the Arbitral Tribunal has not made any findings of concurrent delays on IEC's part." *Id.* ¶ 706.

Notwithstanding, the majority found that "the limitation of liability provision in Clause 19.3 of the Equipment Contract remains applicable". Award ¶ 791. The majority found the fact that "many of the defects the Trains are riddled with 'are life-threatening and potentially plant destroying' is not sufficient for a finding of gross negligence." *Id.* ¶ 773. The majority concluded, without citing any legal authority, that, "[f]or a finding of gross negligence, the Arbitral Tribunal would need to be pointed at *specific instances* in which GEOG acted with reckless disregard of, or with a lack of substantial concern for, the rights of Claimants." *Id.* ¶ 774 (emphasis added). Thus, the majority did not consider GE's conduct in its totality to determine whether the liability limitation provision applied.

The Tribunal therefore awarded IEC only the direct damages from the delayed delivery of the modules, the remediation of defects, and delayed operation of the plants, and excluded IEC's consequential harm of hundreds of millions in lost profits from IEC's inability to produce and sell LNG because GE's plants are not operational. *Id.* at 230.

The Tribunal also ordered *IEC* to pay *GE* a milestone payment for Mechanical Completion of the plants, even though GE abandoned construction before completing the plants, leaving IEC to remediate and mechanically complete itself. *Id.* at 230-31. The Tribunal found outstanding defects in 2018 that "impede[] achievement of Mechanical Completion of the Trains, as none can be considered a minor item which does not materially affect the operation or safety of the Trains," and that GE was not "prevented from Mechanical

---

[3] At that time, the Plant was still not operational, however, and, indeed, is still not, as a result of the numerous serious issues that IEC is still handling as a result of GE's failures. There are daily discoveries of significant defects, with remediation works still ongoing. Commissioning of the trains has not yet started. While IEC has continued to make its best efforts, the inherent defects that are continually being discovered mean that the trains are still far from being fully operational, even now.

Completion due to reasons beyond its control." *Id.* ¶¶ 923, 925. The Tribunal concluded that IEC completed these issues *itself* by early 2020, and yet ordered IEC to pay GE $9.5 million for mechanically completing the plants. *Id.* ¶¶ 940, 943; *see also id.* ¶¶ 678, 685, 718, 939.

### D.    The Dissent

Arbitrator Saba dissented from the Tribunal's decision on gross negligence. Dissent ¶¶ 3-4, 21. Arbitrator Saba reiterated the Tribunal's express findings that GE repeatedly breached the Contract, and that these were not "ordinary, 'garden variety' performance failures." *Id.* ¶¶ 2, 5, 6, 14. Arbitrator Saba also found that "GE's failure to perform reliable stress tests as late as August 2019, with the severe safety risks that failure created, was grossly negligent." *Id.* ¶ 10. He also found that it was "'so extreme a departure from the standards of ordinary care' that 'the danger was either known to the defendant or so obvious that the defendant must have been aware of it'." *Id.* He also found that there had been an extreme departure from the standard of care, of which GE must have known "in view of the safety risks they also created," that was "difficult to characterize as mere negligence[.]" *Id.* ¶ 12. Arbitrator Saba concluded: "Singly or together these defective items prevented the Trains' start-up more than 5 years after execution of the Contract. In addition, they came after late delivery and atop a long list of other defects involving missing and major equipment items which themselves required years of protracted rectification." *Id.* ¶ 13. He emphasized, "these performance failures were too many, too serious, and too prolonged for GE to escape major liability." *Id.* ¶ 15. Arbitrator Saba quoted *New York State Workers' Compensation Board v. Program Risk Management, Inc.*, 2015 N.Y. Misc. LEXIS 3568 (Sup. Ct., Albany Cty. Sept. 21, 2015), for the proposition that "[a] repeated course of (even) ordinary negligence with a foreseeably severe cumulative effect may constitute gross negligence under some circumstances." *Id.*

Finally, Arbitrator Saba observed that the Tribunal had included an award for Mechanical Completion, even though "the Tribunal has expressly found that IEC alone, not

GE, has remedied the serious defects necessary to achieve mechanical completion." *Id.* ¶ 20 ("by awarding GE this $9.5 million and by simple arithmetic offset, the outcome of this case is an award which awards damages to GE and awards nothing to IEC").

## ARGUMENT

CPLR 75 actions to vacate arbitral awards involving transactions of interstate or foreign commerce are governed by the CPLR and the Federal Arbitration Act ("FAA"), 9 U.S.C § 1 *et seq*. *See Pershing LLC v. Rochdale Sec., LLC*, 2016 N.Y. Misc. LEXIS 3448, at *1 (Sup. Ct., N.Y. Cty. Sept. 23, 2016). The Award here involved the sale of LNG plants from the United States to Nigeria, and thus involved foreign commerce. *See* 9 U.S.C. § 1; *Metrosvyaz Ltd. v. Whale Telecom Ltd*., 2006 N.Y. Misc. LEXIS 298, at *5-6 (Sup. Ct., N.Y. Cty. Jan. 24, 2006).

Under the FAA, judicial review of awards is "narrowly limited," and arbitral decisions are given "great deference." *Envtl. Chem. Corp. v. Coastal Envtl. Grp., Inc.*, 2018 U.S. Dist. LEXIS 157246, at *14 (S.D.N.Y. Sept. 14, 2018). This means that courts may not "revisit or question the fact-finding or the reasoning which produced the award." *IBEW, Local 97 v. Niagara Mohawk Power Corp.*, 143 F.3d 704, 716 (2d Cir. 1998); *accord Wien & Malkin LLP v. Helmsley-Spear, Inc.*, 6 N.Y.3d 471, 479-80 (2006). Yet, "when an arbitrator strays from interpretation . . . and effectively dispenses his own brand of industrial justice [] his decision may be unenforceable." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010).

The FAA provides discrete statutory grounds for vacatur. 9 U.S.C. § 10. Courts will also vacate an award when it was rendered in manifest disregard of the law. *Weiss v. Sallie Mae, Inc.*, 939 F.3d 105, 108-09 (2d Cir. 2019). A manifest disregard challenge succeeds when the arbitrator's decision "strains credulity" or "does not rise to the standard of barely colorable," allowing the court to find the arbitrator "willfully flouted the governing law by

10

refusing to apply it." *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 217-18 (2d Cir. 2002).

The CPLR also provides statutory grounds for vacating awards, including when arbitrators "exceeded their powers." CPLR 7511(b)(iii). Applying this principle, New York courts will vacate an award when the arbitrators give "a completely irrational construction to the provisions in dispute and, in effect, made a new contract for the parties." *Nat'l Cash Register Co. v. Wilson*, 8 N.Y.2d 377, 383 (1960).

## I. THE TRIBUNAL MANIFESTLY DISREGARDED THE LAW OF GROSS NEGLIGENCE AND WILLFUL MISCONDUCT BY REFUSING TO CONSIDER THE CUMULATIVE EFFECT OF GE'S CONDUCT

An arbitral tribunal manifestly disregards the law when (i) a law was clearly applicable, (ii) the law was clearly misapplied, and (iii) the tribunal had knowledge of that law. *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389-90 (2d Cir. 2003); *see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 672 n. 3, 676-77 (2010) (vacating where tribunal imposed its own policy); *New York Tel. Co. v. Commc'ns Workers Local 1100*, 256 F.3d 89, 93 (2d Cir. 2001) (vacating where tribunal ignored controlling precedent); *Crédit Agricole Corp. & Inv. Bank v. Black Diamond Capital Mgmt.*, 2019 U.S. Dist. LEXIS 48618, at *29-30 (S.D.N.Y. Mar. 22, 2019) (vacating where tribunal ignored clearly applicable rule); *Citigroup Global Mkts., Inc. v. Fiorilla*, 127 A.D.3d 491, 492 (1st Dep't 2015) (vacating where the tribunal ignored the law). The three conditions are met here.

### A. The Law is Clear that Gross Negligence and Willful Misconduct can be Established Cumulatively

A party claiming manifest disregard must show that the law allegedly disregarded is "clear, and in fact explicitly applicable to the matter before the arbitrators." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 390 (2d Cir. 2003).

Here, IEC argued in the arbitration that the liability limitation provision did not apply because of GE's gross negligence and willful misconduct, based on multiple facts. *See*, *e.g.*,

11

Post-Hearing Submission ¶¶ 160-63. When deciding whether to avoid a liability limitation provision, the Second Circuit explained in *Bayerische* that, while an alleged wrongdoing "could have been merely an oversight that did not amount to gross negligence," the allegation "can be aggregated with the other allegations" in order to meet the standard. 692 F.3d 42, 65 (2d Cir. 2012) ("[t]aking the allegations as a whole," found that claimant made a sufficient showing of recklessness based on multiple facts).

In *Kalisch-Jarcho, Inc. v. New York*, the New York Court of Appeal noted that "the claim against the city centered on the extraordinarily long delay, the immense number of drawing revisions with which Kalisch was confronted and the failure to co-ordinate the contractors." 58 N.Y.2d 377, 385 (1983). The court then found, "[b]y attributing all of this to the misconduct of the city, even absent any evidence of malice, Kalisch's proof, if credited, would have to establish that the city's conduct amounted to gross negligence." *Id.*; *see also Internationale Nederlanden (U.S.) Capital Corp. v. Bankers Tr. Co.*, 261 A.D.2d 117, 122 (1st Dep't 1999) ("several acts of negligence with foreseeably severe cumulative effect deemed gross negligence"); *New York State Workers' Comp. Bd. v. Program Risk Mgmt., Inc.*, 2015 N.Y. Misc. LEXIS 3568, at *13 (Sup. Ct., Albany Cty. Sept. 21, 2015) ("a repeated course of ordinary negligence with a foreseeably severe cumulative effect may constitute gross negligence"); *JDA Capital Partners LP v. BNP Paribas Prime Brokerage, Inc.*, 2009 N.Y. Misc. LEXIS 5514, at *24-25 (Sup. Ct., N.Y. Cty. Sept. 10, 2009) ("plaintiff here states specific, cumulative facts, which, if deemed as true, are sufficient to support its gross negligence claim").

Gross negligence is also established with cumulative facts in cases not involving limited liability provisions. *See Lampidis v. Mills*, 305 A.D.2d 876, 876 (3d Dep't 2003) (finding gross negligence when "multiple acts of negligence cumulatively amount to egregious conduct"); *Doe v. New York City Dep't of Soc. Serv.*, 649 F.2d 134, 145-46 (2d Cir. 1981) ("deliberate

12

indifference" can be established by a "pattern of omissions"); *Langley v. Coughlin*, 715 F. Supp. 522, 560 (S.D.N.Y. 1989) ("extended pattern of such erroneous decisions" is "a means of showing that the alleged errors constituted not merely simple negligence but rather deliberate indifference").

This is consistent with the law throughout the United States, confirming that gross negligence can be established cumulatively:

> The existence of gross negligence need not rest upon a single act or omission, but may result from a combination of negligent acts or omissions, and many circumstances and elements may be considered in determining whether an act constitutes gross negligence. Hence, several connected or successive acts of simple negligence may support a finding of gross negligence, due to their compounding effect.

57 AMERICAN JURISPRUDENCE (SECOND) ON NEGLIGENCE § 229; *cf. Naidu v. Laird*, 539 A.2d 1064, 1075 n. 8 (Del. 1988) (jury instruction that "[a] combination of negligent acts by the same person may constitute gross negligence"); *O'Malley v. Jegabbi*, 12 A.D.2d 389, 394 (3d Dep't 1961) (under Vermont and Massachusetts law, "combining factors" can establish gross negligence).

Moreover, when a claimant argues cumulative facts, the trier of fact ***must*** consider whether gross negligence or willful misconduct is met cumulatively. In *Food Pageant, Inc. v. Consolidation Edison Co.*, for instance, the defendant objected to the guilty verdict because the alleged shortcomings were discrete theories of liability, which did not individually support gross negligence. 54 N.Y.2d 167, 174 (1981). But the New York Court of Appeal affirmed the jury instruction that the various allegations be treated not as separate theories but rather as evidentiary contentions "equivalent to a marshaling of the evidence" to decide whether there was gross negligence. *Id.* at 174-75. In *Niagara Mohawk Power Corp. v. Stone & Webster Engineering Corp.*, the defendant likewise sought to prevent the jury from deciding whether the allegations together amounted to gross negligence, but the court found it was proper for the

13

jury to decide whether the plaintiff established the aggregate theory of gross negligence.  1992 U.S. Dist. LEXIS 7721, at *51-52 (N.D.N.Y. May 23, 1992).

In sum, gross negligence and willful misconduct can be established by multiple, aggregated facts, and the trier of fact must consider a cumulative claim if pleaded.  This law was clearly applicable in the arbitration, as there was no dispute between the Parties that gross negligence or willful misconduct can be established cumulatively, without requiring specific facts that independently reach the standard.

### B.    The Tribunal Misapplied the Law on Gross Negligence and Willful Misconduct by Refusing to Account for the Facts Cumulatively

A party claiming manifest disregard must show "the law was in fact improperly applied, leading to an erroneous outcome."  *Duferco*, 333 F.3d 383, 390 (2d Cir. 2003).  "The error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir. 1986).

For instance, *New York Telephone* concerned a federal statute that makes payments to labor organizations illegal under certain circumstances.  256 F.3d 89, 91 (2d Cir. 2001).  After the telephone company stopped making payments to the union, arguing they were illegal under the statute, the payment dispute was submitted to arbitration.  *Id.*  The arbitrator found the payments were exempt and ordered the telephone company to resume the payments.  *Id.*  In doing so, the arbitrator refused to apply Second Circuit precedent that made the payments illegal.  *Id.*  The district court vacated the award, and the Second Circuit agreed because the tribunal's "opinions are not the law of this Circuit; it was therefore 'manifest disregard of the law' for the arbitrator to reject [Second Circuit precedent] and apply another rule."  *Id.* at 93.

Similarly, in *Stolt-Nielsen*, the issue of whether the arbitration clause permitted class arbitration was submitted to the tribunal.  559 U.S. 662, 668-69 (2010).  The FAA permits class arbitration only if there is specific intent for class arbitration.  *Id.* at 684.  Though the parties

recognized the arbitration clause was silent on class arbitration, the arbitral tribunal nevertheless found that class arbitration was permitted. *Id.* at 676. The Supreme Court disagreed, explaining that arbitrators are "not to make public policy[.]" *Id.* at 672. The Court found the tribunal did not inquire as to the applicable rule for deciding whether arbitration clauses allowed class arbitration, proceeding instead "as if it had the authority of a common-law court to develop what it viewed as the best rule to be applied in such a situation." *Id.* at 673-74. The Court consequently held that, by imposing its own version of the law, the Tribunal acted with manifest disregard of the law. *Id.* at 672 n. 3.

Here, the Tribunal manifestly disregarded gross negligence law by refusing to consider the cumulative impact of GE's misconduct and whether these facts ***in aggregate*** amounted to gross negligence or willful misconduct. In particular, while the Tribunal acknowledged the "sheer magnitude" of issues with GE's performance, the Tribunal ruled that it "would need to be pointed at ***specific instances*** in which GEOG acted with reckless disregard of, or with a lack of substantial concern for, the rights of Claimants." Award ¶ 774 (emphasis added).

At no point in the Award did the Tribunal examine ***cumulatively*** whether the course of GE's poor performance and later abandonment evidenced reckless indifference to IEC's rights. The Tribunal expressly found an array of misconduct by GE, including that GE was imprudent about meeting the delivery dates,[4] the plants were mechanically completed over four years after the Contract delivery dates,[5] there were a significant number of missing and defective items that GE had to remedy,[6] several defects that GE refused or failed to remedy within a reasonable time that materially compromised the operation and safety of the plants,[7] and GE put false entries in inspection and test reports and was not transparent about the stress tests performed

---

[4] Award ¶ 759.
[5] *Id.* ¶ 705; *see also id.* ¶¶ 699, 923.
[6] *Id.* ¶¶ 426-28.
[7] *Id.* ¶¶ 568, 684, 718, 916.

despite the safety risk of defective pipes in a gas plant.[8]  Yet at no point did the Tribunal examine whether this series of delay, material and dangerous defects, and abandonment were gross negligence.  Rather, the Tribunal majority incorrectly concluded that it needed "specific instances" of reckless disregard.  *Id.* ¶ 774

Like in *New York Telephone*—where the court vacated because the tribunal refused to apply controlling precedent—the Tribunal's opinion that gross negligence cannot be established cumulatively is not the law of New York or the United States.  *See* 256 F.3d 89, 93 (2d Cir. 2001); *New York State Workers*, 2015 N.Y. Misc. LEXIS 3568, at *13 (Sup. Ct., Albany Cty. Sept. 21, 2015); 57 AMERICAN JURISPRUDENCE (SECOND) ON NEGLIGENCE § 229. The Tribunal never questioned the cumulative approach and yet "proceeded as if it had the authority of a common-law court to develop what it viewed as the best rule to be applied in such a situation" (*Stolt-Nielsen*, 559 U.S. 662, 673-74 (2010)) in requiring individual acts in a course of conduct that rise to gross negligence.  Award ¶ 774.

In short, the Tribunal found a wide range of GE misdeeds, but these facts were not considered cumulatively by the Tribunal majority because of its improper application of the law, leading to an erroneous and unjust outcome.

C.    **The Tribunal had Knowledge of the Law on the Cumulative Approach for Showing Gross Negligence and Willful Misconduct**

To establish the tribunal's knowledge of the law for manifest disregard, courts "impute only knowledge of governing law identified by the parties to the arbitration."  *Duferco*, 333 F.3d 383, 390 (2d Cir. 2003).

Here, it is beyond dispute that the Tribunal was aware of the governing law.  Claimants emphasized the cumulative approach throughout the arbitration (*see*, *e.g.*, Post-Hearing Submission ¶¶ 160-63) and Respondents accepted it (*see* Statement of Defense ¶ 176).  The

---

[8] *Id.* ¶¶ 676, 766.

Tribunal thus had knowledge of New York law on how gross negligence and willful misconduct are demonstrated, and disregarded it anyway. *See Duferco*, 333 F.3d at 390. The Tribunal's knowledge of the applicable law is confirmed by the Dissent, which restated the law: "A repeated course of (even) ordinary negligence with a foreseeably severe cumulative effect may constitute gross negligence under some circumstances." Dissent ¶ 15 (quoting *New York State Workers*, 2015 N.Y. Misc. LEXIS 3568, at *13).

In short, the Tribunal's disregard of the law was manifest because the law was clearly brought to the arbitrators' attention during the arbitration, never questioned, and led to an erroneous and unjust outcome.

## II. THE TRIBUNAL MANIFESTLY DISREGARDED THE CONTRACT BY AWARDING GE THE MECHANICAL COMPLETION PAYMENT WHEN IEC MECHANICALLY COMPLETED THE PLANTS

A tribunal manifestly disregards the underlying contract when its decision "ignored and contradicted an unambiguous term of the agreement[.]" *Weiss v. Sallie Mae, Inc.*, 939 F.3d 105, 110 (2d Cir. 2019); *accord Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 222 (2d Cir. 2002); *see also Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 25 (2d. Cir. 1997) ("We will overturn an award where the arbitrator merely makes the right noises—noises of contract interpretation—while ignoring the clear meaning of contract terms.").

In *Weiss*, for example, the tribunal found the respondent liable for certain acts despite an earlier settlement agreement that released the respondent from liability. 2018 U.S. Dist. LEXIS 235834, at *5-7 (W.D.N.Y. July 12, 2018). The district court found "the arbitrator applied the settlement agreement to Weiss, but he ignored the release provision in the agreement." *Id.* at *12. The court noted that the respondent did "not take issue with the arbitrator's interpretation of any contract term" but rather "with the arbitrator's failure to apply—or even address—an explicit, unambiguous term of the settlement agreement." *Id.* at

*13. The court found the arbitrator "utterly failed even to consider the agreement's release provision" and vacated for manifest disregard. *Id.* at *13-14. The Second Circuit agreed the award could not stand because the decision could not be squared with the release provision. 939 F.3d 105, 110 (2d Cir. 2019).

Here, because IEC mechanically completed the plants by rectifying the undersized cables, soft starter, and defective pipes (which, according to the Tribunal, GE failed or refused to remedy, preventing Mechanical Completion), GE did not perform all of its obligations for Mechanical Completion. Award ¶¶ 705, 923, 925. The Tribunal's finding "that Mechanical Completion was indeed achieved" was based on the fact that IEC remediated the material defects and completed the mechanical aspects of the plant. Award ¶ 939.

To nonetheless award GE the Mechanical Completion payment, the Tribunal ignored the express wording of clause 7.1, that the Contract price is "for the performance of ***Seller's*** obligations"—i.e., GE—and that IEC "agreed to pay the Contract Price to Seller in accordance with the [Payment Schedule], ***in consideration for*** the performance by Seller of all its obligations under the Agreement[.]" Equipment Contract cl. 7.1 (emphasis added). In *Weiss*, the district court and the Second Circuit vacated because the tribunal's decision to find liability could not be squared with the release of liability in the settlement agreement. 2018 U.S. Dist. LEXIS 235834, at *12-14 (N.Y.W.D. July 12, 2018); 939 F.3d 105, 110 (2d Cir. 2019). Likewise, the Tribunal's decision to award GE the Mechanical Completion payment when GE failed to fulfill its obligations and abandoned the site cannot be squared with the plain language of clause 7.1 that payment is made for GE performing its obligations. *See id.*

The Tribunal acknowledged Claimants' argument that "Clause 7.1 states that [GE] is only entitled to the Contract Price 'in consideration for the performance by [GE] of all of its obligations under the Contract.'" Award ¶ 941. But the Tribunal plainly proceeded to ignore clause 7.1, and attempted to justify its decision to award GE the Mechanical Completion

payment by interpreting *other* provisions of the Equipment Contract. *Id.* The Tribunal cannot utterly ignore the provision that specifically governs GE's entitlement to payment to reach its desired outcome. And the Tribunal's attempt to rationalize its award of Mechanical Completion does not change the fact that it ignored the plain language of clause 7.1. *See Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 25 (2d. Cir. 1997) ("[w]e will overturn an award where the arbitrator merely makes the right noises—noises of contract interpretation").

Though the "interpretation of the contract terms is within the province of the arbitrator," *Weiss*, 939 F.3d 105, 110 (2d Cir. 2019), GE plainly had to mechanically complete the plants to be entitled to the Mechanical Completion payment. The Tribunal disregarded this plain language, and it was clear error given that the Tribunal found IEC mechanically completed the plants after GE failed or refused—and by then had abandoned the site. The Tribunal's decision to award Mechanical Completion is in manifest disregard of clause 7.1 and should be vacated.

### III. THE TRIBUNAL'S DECISION TO AWARD GE THE MECHANICAL COMPLETION MILESTONE PAYMENT WAS COMPLETELY IRRATIONAL

In New York, a tribunal's reading of a contract may be vacated when it is completely irrational, "thereby effectively rewriting it in a manner that was unjust and in violation of the spirit of the agreement." *Kudler v. Truffelman*, 93 A.D.3d 549, 550 (1st Dep't 2012) (vacating award for arbitrator's irrational construction of the agreement); *see also Sweeney v. Herman Mgmt., Inc.*, 85 A.D.2d 34, 39 (1st Dep't 1982).

In *Sweeney*, the respondent, Herman, signed a collective bargaining agreement as agent for the employer for premises he was managing. 85 A.D.2d at 34-35. The agreement stated that in case of sale, the transferee was required to adopt the collective bargaining agreement. *Id.* at 35. The premises were later sold. *Id.* The new owner fired the employees covered by the agreement, and an arbitration was commenced against Herman for breach. *Id.* The

arbitrator found Herman liable even though he had no role in the conveyances and could not bind the transferees. *Id.* at 36.

On review, the Appellate Division stated the long-standing rule that agents acting on behalf of disclosed principles are not personally liable without clear intent. *Id.* The court highlighted it was "the new owner of the premises, not respondent, which independently and summarily fired the employees in the face of its commitment to retain them. The court cannot close its eyes to an attempt to hold an agent, such as Herman, liable under these circumstances." *Id.* Further, the agreement "specifically placed the responsibility for guaranteeing continuity of the collective bargaining agreement on the transferor 'of the building,'" and "[c]learly, Herman could never have been considered" transferor under the circumstances. *Id.*

The court vacated the award as completely irrational because the contract clearly burdened the transferor, the award ignored that Herman did not have authority to transfer property or enforce the agreement or be personally liable for the principal (that is, ignored agency law), and the award gave no weight to the fact that the new owner was who breached by firing the employees. *Id.* at 38-39.

Like in *Sweeney*, the Tribunal here ignored the contract, the law, and the facts that the Tribunal itself found. The Tribunal ignored that the Equipment Contract makes the Contract price (milestone payments) ***conditional*** on GE performing its obligations. Equipment Contract cl. 7.1. The Tribunal further ignored the law that, to claim breach of contract, the aggrieved must show it has adequately performed its obligations. Claimants' Reply-Post-Hearing Submission ¶ 147 (citing *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)). GE did not adequately perform because it failed or refused to mechanically complete the plants, so it was not entitled to claim for IEC withholding payment. Award ¶¶ 568, 684, 718, 916. Finally, the Tribunal ignored the fact that GE abandoned the site in 2019, and therefore could not have

achieved mechanical completion in 2020.  The Tribunal's award of Mechanical Completion

payment to GE should thus be vacated.

## **CONCLUSION**

For the foregoing reasons, Petitioners respectfully request that the Court vacate the

Parties' Award under 9 U.S.C. § 10 and CPLR § 7511, direct a rehearing before a new panel,

and issue such further relief as is just and proper.

Date:    January 27, 2021
          New York, New York

                                 Respectfully submitted,

                                 White & Case LLP

                                 By: */s/ David G. Hille*

                                 David G. Hille
                                 Elizabeth Oger-Gross
                                 Joshua D. Weedman
                                 1221 Avenue of the Americas
                                 New York, New York 10020
                                 (212) 819-8200
                                 dhille@whitecase.com
                                 elizabeth.oger-gross@whitecase.com
                                 jweedman@whitecase.com

                                 *Attorneys for Petitioner International*
                                 *Engineering & Construction S.A.*

21

## CERTIFICATE OF WORD COUNT

As required by Rule 17, of the Rules of the Commercial Division of the Supreme Court,

I certify that the Petitioner IEC's Memorandum of Law in Support of its Motion to Vacate the

Award contains 6,985 words, exclusive of the caption, table of contents, table of authorities,

and signature block, and is therefore in compliance with the word count limit set forth therein.

Date:    January 27, 2021
         New York, New York

Respectfully submitted,

White & Case LLP

By: */s/ David G. Hille*

David G. Hille
Elizabeth Oger-Gross
Joshua D. Weedman
1221 Avenue of the Americas
New York, New York 10020
(212) 819-8200
dhille@whitecase.com
elizabeth.oger-gross@whitecase.com
jweedman@whitecase.com

*Attorneys for Petitioner International
Engineering & Construction S.A.*

22

# REQUEST FOR JUDICIAL INTERVENTION

UCS-840
(rev. 07/29/2019)

**SUPREME** _____ COURT, COUNTY OF **NEW YORK** _____

Index No: _____ Date Index Issued: _____

| | For Court Use Only: |
|---|---|
| | IAS Entry Date |
| | |
| | Judge Assigned |
| | |
| | RJI Filed Date |

**CAPTION**    Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet.

INTERNATIONAL ENGINEERING & CONSTRUCTION S.A.

Plaintiff(s)/Petitioner(s)

-against-

GE OIL & GAS, LLC (f/k/a GE OIL & GAS, INC.), GE INTERNATIONAL OPERATIONS (NIGERIA) LTD., BAKER HUGHES ENERGY SERVICES LLC, PRESSURE CONTROL SYSTEMS NIGERIA LTD., BAKER HUGHES CO., and BAKER HUGHES HOLDINGS LLC

Defendant(s)/Respondent(s)

**NATURE OF ACTION OR PROCEEDING**    Check only one box and specify where indicated.

**COMMERICIAL**
- O Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.)
- O Contract
- O Insurance (where insurance company is a party, except arbitration)
- O UCC (includes sales and negotiable instruments)
- O Other Commercial (specify): _____
- *NOTE: For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C).*

**REAL PROPERTY**    Specify how many properties the application includes: _____
- O Condemnation
- O Mortgage Foreclosure (specify):   O Residential   O Commercial
  - Property Address: _____
  - *NOTE: For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the FORECLOSURE RJI ADDENDUM (UCS-840F).*
- O Tax Certiorari
- O Tax Foreclosure
- O Other Real Property (specify): _____

**OTHER MATTERS**
- O Certificate of Incorporation/Dissolution   [see *NOTE* in **COMMERCIAL** section]
- O Emergency Medical Treatment
- O Habeas Corpus
- O Local Court Appeal
- O Mechanic's Lien
- O Name Change
- O Pistol Permit Revocation Hearing
- O Sale or Finance of Religious/Not-for-Profit Property
- O Other (specify): _____

**MATRIMONIAL**
- O Contested
  - *NOTE: If there are children under the age of 18, complete and attach the MATRIMONIAL RJI ADDENDUM (UCS-840M).*
  - *For Uncontested Matrimonial actions, use the Uncontested Divorce RJI (UD-13).*

**TORTS**
- O Asbestos
- O Child Victims Act
- O Environmental (specify): _____
- O Medical, Dental or Podiatric Malpractice
- O Motor Vehicle
- O Products Liability (specify): _____
- O Other Negligence (specify): _____
- O Other Professional Malpractice (specify): _____
- O Other Tort (specify): _____

**SPECIAL PROCEEDINGS**
- ◉ CPLR Article 75 (Arbitration) [see *NOTE* in **COMMERCIAL** section]
- O CPLR Article 78 (Body or Officer)
- O Election Law
- O Extreme Risk Protection Order
- O MHL Article 9.60 (Kendra's Law)
- O MHL Article 10 (Sex Offender Confinement-Initial)
- O MHL Article 10 (Sex Offender Confinement-Review)
- O MHL Article 81 (Guardianship)
- O Other Mental Hygiene (specify): _____
- O Other Special Proceeding (specify): _____

**STATUS OF ACTION OR PROCEEDING**    Answer YES or NO for every question and enter additional information where indicated.

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons with notice been filed? | O | O | If yes, date filed: _____ |
| Has a summons and complaint or summons with notice been served? | O | O | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | O | O | If yes, judgment date: _____ |

**NATURE OF JUDICIAL INTERVENTION**    Check one box only and enter additional information where indicated.

- O Infant's Compromise
- O Extreme Risk Protection Order Application
- O Note of Issue/Certificate of Readiness
- O Notice of Medical, Dental or Podiatric Malpractice   Date Issue Joined: _____
- O Notice of Motion   Relief Requested: _____   Return Date: _____
- ◉ Notice of Petition   Relief Requested: Vacate Arbitral Award   Return Date: March 9, 2021
- O Order to Show Cause   Relief Requested: _____   Return Date: _____
- O Other Ex Parte Application   Relief Requested: _____   Return Date: _____
- O Poor Person Application
- O Request for Preliminary Conference
- O Residential Mortgage Foreclosure Settlement Conference
- O Writ of Habeas Corpus
- O Other (specify): _____

**RELATED CASES** — List any related actions. For Matrimonial cases, list any related criminal or Family Court cases. If none, leave blank. If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A).**

| Case Title | Index/Case Number | Court | Judge (if assigned) | Relationship to instant case |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**PARTIES** — For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided. If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A).**

| Un-Rep | Parties (List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant, 3rd party plaintiff, etc.) | Attorneys and Unrepresented Litigants (For represented parties, provide attorney's name, firm name, address, phone and email. For unrepresented parties, provide party's address, phone and email.) | Issue Joined (For each defendant, indicate if issue has been joined.) | Insurance Carriers (For each defendant, indicate insurance carrier, if applicable.) |
|---|---|---|---|---|
| ☐ | Name: INTERNATIONAL ENGINEERING & CONSTRUCTION S.A. Role(s): Petitioner | David G. Hille, White & Case LLP, 1221 Avenue of the Americas New York, NY 10020 | ○ YES ◉ NO | |
| ☐ | Name: GE OIL & GAS, LLC (f/k/a GE OIL & GAS, INC.) Role(s): Respondent | | ○ YES ◉ NO | |
| ☐ | Name: GE INTERNATIONAL OPERATIONS (NIGERIA) LTD. Role(s): Respondent | | ○ YES ◉ NO | |
| ☐ | Name: BAKER HUGHES ENERGY SERVICES LLC Role(s): Respondent | | ○ YES ◉ NO | |
| ☐ | Name: PRESSURE CONTROL SYSTEMS NIGERIA LTD. Role(s): Respondent | | ○ YES ◉ NO | |
| ☐ | Name: BAKER HUGHES CO. Role(s): Respondent | | ○ YES ◉ NO | |
| ☐ | Name: BAKER HUGHES HOLDINGS LLC Role(s): Respondent | | ○ YES ◉ NO | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | |
| ☐ | Name: Role(s): | | ○ YES ○ NO | |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.**

Dated: 01/27/2021

_David G. Hille_
Signature

2834737
Attorney Registration Number

David G. Hille
Print Name

UCS-840C
3/2011

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF **New York** _____

_____x

INTERNATIONAL ENGINEERING & CONSTRUCTION S.A.

Index No. _____

RJI No. (if any) _____

Plaintiff(s)/Petitioner(s)

-against-

GE OIL & GAS, LLC (f/k/a GE OIL & GAS, INC.), GE INTERNATIONAL O

Defendant(s)/Respondent(s)

_____x

## COMMERCIAL DIVISION

**Request for Judicial Intervention Addendum**

**COMPLETE WHERE APPLICABLE** [add additional pages if needed]:

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

☐ Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g. unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g. sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)

☐ Transactions governed by the Uniform Commercial Code (exclusive of those concerning individual cooperative or condominium units)

☐ Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only

☐ Shareholder derivative actions — without consideration of the monetary threshold

☐ Commercial class actions — without consideration of the monetary threshold

☐ Business transactions involving or arising out of dealings with commercial banks and other financial institutions

☐ Internal affairs of business organizations

☐ Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters

☐ Environmental insurance coverage

☐ Commercial insurance coverage (e.g. directors and officers, errors and omissions, and business interruption coverage)

☐ Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures — without consideration of the monetary threshold

☒ Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues — without consideration of the monetary threshold

**Plaintiff/Petitioner's claim for compensatory damages** [exclusive of punitive damages, interest, costs and counsel fees claimed]:

$ _____

**Plaintiff/Petitioner's claim for equitable or declaratory relief** [brief description]:

Petitioner seeks this Court to (i) Vacate the arbitral award of October 30, 2020, in the International Centre for Dispute Resolution ("ICDR") / American Arbitration Association ("AAA") Case No. 01-18-0002-9174 ("Award"), under the Federal Arbitration Act, 9 U.S.C. § 10 ("FAA") and Article 75 of the CPLR and (ii) direct a rehearing before the ICDR/AAA, with a new arbitral tribunal on the Petitioner's claims lying in contract and tort.

**Defendant/Respondent's counterclaim(s)** [brief description, including claim for monetary relief]:

N/A

**I REQUEST THAT THIS CASE BE ASSIGNED TO THE COMMERCIAL DIVISION. I CERTIFY THAT THE CASE MEETS THE JURISDICTIONAL REQUIREMENTS OF THE COMMERCIAL DIVISION SET FORTH IN 22 NYCRR § 202.70(a), (b) AND (c).**

Dated: **01/27/2021**_____

_____
David Hille
**SIGNATURE**

**David Hille**_____
**PRINT OR TYPE NAME**